**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

D.N.N. and V.R.G.

*Petitioners-Plaintiffs*,

v.

NIKITA BAKER, et al.

*Respondents-Defendants*.

Case No. 1:25-cv-01613

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR**
**CLASS CERTIFICATION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS.................................................................................................. 2

   A.   ICE's Hold Room Policies........................................................................................ 2

   B.   Baltimore Field Office Detention Practices......................................................... 3

   C.   Representative Plaintiffs ........................................................................................ 7

      1.   Plaintiff Ms. N.N......................................................................................... 7

      2.   Plaintiff Ms. R.G......................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.   Rule 23(a) Requirements for Class Certification Have Been Satisfied................................ 10

   A.   The Proposed Class Is So Numerous That Joinder Is Impracticable ............................... 10

   B.   The Class Presents Common Questions of Law and Fact ................................................. 13

   C.   The Claims of the Named Plaintiffs are Typical of the Claims of the  Members of the Proposed Class ........................................................................................ 15

   D.   The Named Plaintiffs Will Adequately Protect the Interests of the Proposed Class and Their Counsel are Qualified to Litigate this Action.......................................................... 15

II.   The Rule 23(b) Requirements for Class Certification Have Been Satisfied .......................... 16

III.   Plaintiffs' Transfer from the Baltimore Hold Rooms is Irrelevant.................................. 17

CONCLUSION.................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Ashcroft,*
213 F.R.D. 390 (W.D. Wash. 2003) ...................................................................................11

*Bell v. Wolfish,*
441 U.S. 520 (1979).............................................................................................................1

*Berry v. Schulman,*
807 F.3d 600 (4th Cir. 2015) .............................................................................................17

*Brito v. Barr,*
395 F. Supp. 3d 135 (D. Mass. 2019) ................................................................................11

*Brown v. Nucor Corp.,*
785 F.3d 895 (4th Cir. 2015) .............................................................................................13

*Coreas v. Bounds,*
No. TDC-20-0780, TD-20-1304, 2020 WL 5593338 (D. Md. Sept. 18, 2020) .............. *passim*

*County of Riverside v. McLaughlin,*
500 U.S. 44 (1991).................................................................................................10, 17, 18

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,*
375 F.2d 648 (4th Cir. 1967) .............................................................................................10

*Damus v. Nielsen,*
313 F. Supp. 3d 317 (D.D.C. 2018) ...................................................................................14

*Deiter v. Microsoft Corp.,*
436 F.3d 461 (4th Cir. 2006) .............................................................................................15

*Doe v. Lally,*
467 F. Supp. 1339 (D. Md. 1979) ........................................................................................9

*Dubon Miranda v. Barr,*
463 F. Supp. 3d 632 (D. Md. 2020) ...................................................................................18

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) .............................................................................................14

*G.T. v. Bd. of Educ. of Cnty. of Kanawha,*
117 F.4th 193 (4th Cir. 2024) ...........................................................................................13

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)..........................................................................................16

*Hernandez v. Cnty. of Monterey*,
   No. 5:13-cv-2354-PSG, 2015 WL 399975 (N.D. Cal. Jan. 29, 2015)......................14

*Jonathan R. by Dixon v. Just.*,
   41 F.4th 316 (4th Cir. 2022) .......................................................................10, 18

*Jones v. Murphy*,
   256 F.R.D. 519 (D. Md. 2009)...........................................................................9

*Lacy v. Cook Cnty., Illinois*,
   897 F.3d 847 (7th Cir. 2018) .............................................................................9

*Lloyd v. Gen. Motors Corp.*,
   266 F.R.D. 98 (D. Md. 2010)............................................................................16

*Menocal v. GEO Grp., Inc.*,
   882 F.3d 905 (10th Cir. 2018) ...........................................................................9

*Mondragon v. Scott Farms, Inc.*,
   No. 5:17-cv-356-FL, 2019 WL 6125928 (E.D.N.C. Nov. 18, 2019) .....................12

*Owino v. CoreCivic, Inc.*,
   60 F.4th 437 (9th Cir. 2022) ..............................................................................9

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ..............................................................................9

*Pederson v. La. State Univ.*,
   213 F.3d 858 (5th Cir. 2000) ............................................................................11

*Reid v. Donelan*,
   297 F.R.D. 185 (D. Mass. 2014)........................................................................11

*Rodriguez Guerra v. Perry*,
   1:23-cv-1151, 2024 WL 3581226 (E.D. Va. Apr. 26, 2024)..................................11

*Savino v. Souza*,
   453 F. Supp. 3d 441 (D. Mass. 2020) ...........................................................14, 17

*Scott v. Clarke*,
   61 F. Supp. 3d 569 (W.D. Va. 2014) ..................................................................12

*Short v. Hartman*,
   87 F.4th 593 (4th Cir. 2023) ...............................................................................1

ii

*In re Titanium Dioxide Antitrust Litig.*,
    284 F.R.D. 328 (D. Md. 2012) ........................................................................................11

*In re Under Armour Sec. Litig.*,
    631 F. Supp. 3d 285 (D. Md. 2022) ...............................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) .............................................................................................13, 14

*Ward v. Dixie Nat. Life Ins. Co.*,
    595 F.3d 164 (4th Cir. 2010) .........................................................................................16

*Yates v. NewRez LLC*,
    686 F. Supp. 3d 397 (D. Md. 2023) ...............................................................................11

*Zepeda Rivas v. Jennings*,
    445 F. Supp. 3d 36 (N.D. Cal. 2020) .............................................................................14

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    7 F.4th 227 (4th Cir. 2021) ............................................................................................11

**Statutes and Other Authorities**

Fed. R. Civ. P. Rule 23 ...................................................................................... *passim*

*ICE Arrests in First 50 Days of Trump Administration,* DHS (Mar. 13, 2025) (ECF No. 1-3),
    available at https://www.dhs.gov/news/2025/03/13/ice-arrests-first-50-days-trump-
    administration .................................................................................................................12

"ICE reveals new details about viral video of Baltimore-area arrests that caught Trump's
    eye," The Baltimore Banner (May 29, 2025), available at
    https://www.thebaltimorebanner.com/politics-power/national-politics/viral-ice-arrest-
    video-baltimore-trump-BSP5DT4BMVCYTL4X7QLMDGBZRM/ ..............................12

Tanvi Misra, "Essentially Cages": ICE Is Using Courthouse Cells for Lengthy Detentions,
    The Nation (Mar. 17, 2025) available at https://www.thenation.com/article/society/ice-
    detention-courthouseholding-room/ ............................................................................3, 12

Van Hollen, Alsobrooks Press Trump Administration on Inhumane Conditions for
    Detainees at ICE's Baltimore Field Office (Apr. 10, 2025), available at
    https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-
    trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-
    office ..................................................................................................................................3

## INTRODUCTION

Petitioner-Plaintiffs ("Plaintiffs") bring this action to enjoin punitive and unconstitutional detention conditions in the "hold rooms" at the Immigration and Customs Enforcement ("ICE") Baltimore Field Office (the "Baltimore Hold Rooms"). The Baltimore Hold Rooms are authorized to detain individuals for up to 12 hours at a time. But Respondent-Defendants ("Defendants") have held Plaintiffs and hundreds of noncitizens in the Baltimore Hold Rooms for days at a time, packing them into overcrowded and filthy cells; depriving them of adequate sleep, food, water, and medical care; refusing to provide them with basic hygiene supplies; and arbitrarily cutting them off from communication with counsel.

As detailed in the First Amended Complaint ("FAC") (ECF No. 6) and supporting declarations,[1] these conditions violate both Defendants' own written detention policies as well as the Constitutional prohibition on subjecting civilly detained individuals to punitive detention conditions. *Bell v. Wolfish*, 441 U.S. 520, 536-39 (1979); *Short v. Hartman*, 87 F.4th 593, 606 (4th Cir. 2023). On behalf of themselves and members of the proposed class, Plaintiffs seek to enjoin Defendants from (i) violating their own detention policies; and (ii) detaining members of the proposed class under unconstitutional and punitive conditions.

Pursuant to Fed. R. Civ. P. Rule 23, Plaintiffs now respectfully move this Court to appoint Plaintiffs as class representatives, appoint Plaintiffs' counsel as class counsel, and certify the

---

[1] See the accompanying Declaration of Amelia Dagen, dated June 6, 2025, which attaches the Declarations of Salomon Manrique Parra, dated April 1, 2025 ("Parra Decl."); Mirsa Polanco Cruz, dated April 2, 2025 ("Cruz Decl."); Rachel Girod, dated March 27, 2025 ("Girod Decl."); B.R.R., dated May 29, 2025 ("B.R.R. Decl."); Randy Hiro Henna Vasquez, dated May 22, 2025 ("Vasquez Decl."); Yandel Falcon Nieves, dated March 20, 2025 ("Nieves Decl."); O.P.L., dated May 19, 2025 ("O.P.L. Decl."); Bradley Jenkins, dated May 15, 2025 ("Jenkins Decl."); Tess Davey, dated March 28, 2025 ("Davey Decl."); April Amaya-Luis, dated March 31, 2025 ("Amaya-Luis Decl."); Jose Munoz Anibal Ponce, dated March 27, 2025 ("Ponce Decl."); and Marisa Tillman, Esq., dated March 20, 2025 ("Tillman Decl.").

following class: All persons who are now or in the future will be detained at the Baltimore Hold Rooms (the "Class").

**STATEMENT OF FACTS**

**A.      ICE's Hold Room Policies**

The Department of Homeland Security ("DHS") and ICE have adopted written policies governing conditions at Enforcement and Removal ("ERO") holding facilities like the Baltimore Hold Rooms. On January 31, 2024, ICE issued Directive 11087.2, "Operations of ERO Holding Facilities" (the "Policy") (ECF No. 1-8). The "Purpose/Background" of the Policy is to provide ICE ERO officers "with policy and procedures for operating holding facilities located within their respective field offices." *Id*. § 1.1. The Policy defines a "holding facility" as "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, or other holding facility, or other agency." *Id*. § 3.2. It notes that "short-term is defined as a period ***not to exceed*** 12 hours, absent exceptional circumstances." *Id*., § 3.2 n.3 (emphasis added).

The Policy provides that "ERO Officers are responsible for," *inter alia*:

- "Ensuring that detainees are provided a meal at least every six hours" (*id.*, § 4.4.1.2);

- "Ensuring that hold rooms are safe, clean, equipped with restroom facilities, and clear of objects that could be used as weapons against ERO personnel, contractors, or detainees" (*id.*, § 4.4.1.3); and

- "Ensuring that detainees . . . who exhibit signs of acute mental health distress are referred to mental health professionals pursuant to the applicable detention standards and policy" (*id.*, § 4.3.1).

With respect to "Procedures and Requirements," the Policy provides the following "Procedures for ERO Officers":

- "Allow detainees to keep personal inhaled medication on their person and

2

have access to other prescribed medication as necessary" (*id.*, § 5.7.2);

- "[E]mpty holding facilities upon the conclusion of daily operations in those field office locations operating on a daily schedule . . . absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours" (*id.*, § 5.1.1); and

- "Provide detainees with access to drinking water in hold rooms at all times" (*id.*, § 5.2.2").

### B. Baltimore Field Office Detention Practices

In early 2025, Defendants announced that they were granting the Baltimore Hold Rooms a waiver from the Policy's 12-hour limitation.[2] Defendants began employing the Baltimore Hold Rooms as a residential detention facility, detaining putative Class members in the facility for multiple days at a time, with many individuals detained for as many as six or seven days in unhealthy, unsanitary, and punitive conditions. *See, e.g.*, Parra Decl. (Ex. 1)[3] ¶ 5 (6 days); Cruz Decl. (Ex. 2) ¶ 6 (5 days); Girod Decl. (Ex. 3) ¶ 10 (7 days); B.R.R. Decl. (Ex. 4) ¶ 5 (6 days); Vasquez Decl. ¶ 8 (Ex. 5) (6-7 days).

Defendants routinely pack as many as 20 or more detained noncitizens into rooms that are intended to hold only a handful of individuals at a time. *See, e.g.*, Nieves Decl. ¶ 7 (Ex. 6) ("I was held in a 12ft/12ft room with about twenty other men."); Parra Decl. ¶ 6 (Ex. 1) (held in "roughly 12 x 18 ft." room with "about 20 other men"); Girod Decl. (Ex. 3) ¶ 5 (held with "between fifteen and twenty-five people at any given time"); B.R.R. Decl. (Ex. 4) ¶ 6 ("held in a

---

[2] *See* Tanvi Misra, "Essentially Cages": ICE Is Using Courthouse Cells for Lengthy Detentions, The Nation (Mar. 17, 2025) available at https://www.thenation.com/article/society/ice-detention-courthouseholding-room/ (ECF No. 1-10); Van Hollen, Alsobrooks Press Trump Administration on Inhumane Conditions for Detainees at ICE's Baltimore Field Office (Apr. 10, 2025), available at https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office.

[3] Unless otherwise indicated, all cited exhibits reference the exhibits to the accompanying Declaration of Amelia Dagen, dated June 6, 2025.

room with about twenty other people"); O.P.L. Decl. (Ex. 7) ¶ 6 (held with "fourteen other people"); Jenkins Decl. ¶ 9 (Ex. 8) (held with 12 other men); Davey Decl. ¶ 17 (Ex. 9) (held with 12 men); Cruz Decl. ¶ 7 (Ex. 2) (held with 13 women).

These crowded rooms contain a single open toilet with no privacy, requiring detained individuals to expose themselves to one another repeatedly while using the bathroom. *See, e.g.* Jenkins Decl. (Ex. 8) ¶ 10 ("The restroom was inside the holding cell and was disgusting. There was no privacy."); Parra Decl. (Ex. 1) ¶ 6 ("If we had to use the bathroom, everyone was able to see."); Girod Decl. (Ex. 3) ¶ 7 ("Due to the crowding, there was no privacy when [he]needed to use the bathroom."); Hyde Decl. ¶ 7 (ECF No. 6-2) ("[I]t is impossible for Ms. R.G. or the other detained women to use the toilet with any privacy.").

While living in a cramped room with an open toilet, detained individuals are denied access to showers as well as basic hygiene items, including clean clothes, toothbrushes, and in some instances even soap. *See*, *e.g.* Cruz Decl. (Ex. 2) ¶ 9 ("We remained in the clothes we were wearing when detained for the next five days. There was no toothbrush, no deodorant, and no other hygiene products, except soap, which was useless without a shower"); O.P.L Decl. (Ex. 7) ¶ 7 ("We were not given anything to bathe, to shower, or to brush our teeth. We were not given a change of clothes."); Amaya-Luis Decl. (Ex. 10) ¶ 10 ("[F]or more than seven days . . . I was not able to change my clothes or have access to any clean clothing. There was no way to clean yourself, because there were no showers, washcloths, or towels."); Vasquez Decl. (Ex. 5) ¶ 8 ("There was no access to showers."); Girod Decl. (Ex. 3) ¶ 7 ("It was also very dirty, because there were no showers and no one was given a change of clothes. No one was given soap or access to toothbrushes/toothpaste."); Hyde Decl. (ECF No. 6-2) ¶ 8 ("Ms. R.G. has not been allowed to shower or change clothes. Sometimes ICE provides Ms. R.G. and the other detained

women a couple of baby wipes.").

Defendants have denied putative class members access to medical care as well as prescribed medications for serious medical conditions ranging from diabetes to HIV. Justiniano Decl. (ECF No 1-15) ¶¶ 3-5 (denied diabetes medication for days and told "they did not have the capacity to provide such medical care at this facility because it was meant to be temporary, and she would receive this care wherever she was transferred"); Jenkins Decl. ¶¶ 12-13 (Ex. 8) (denied HIV medication for several days and told there was "no nurse in the facility" to provide it); Hyde Decl. (ECF No. 6-2) ¶ 4 (denied thyroid medication and medical treatment for days); B.R.R. Decl. (Ex. 4) ¶ 6 ("For these three days, I asked to see a doctor, they said that there was no doctor, and they wouldn't be able to help me."); O.P.L. Decl. (Ex. 7) ¶ 9 ("I saw him ask for insulin and the officials did not give him any . . . he was on the floor and was having difficulty breathing . . . they had to take him to the hospital.").

Defendants are not providing individuals detained in the Baltimore Hold Rooms with consistent access to drinking water. Instead of regular access to drinking water mandated by their own policies, Defendants provide detained people with one to three small water bottles per day. Justiniano Decl. (ECF No 1-15) ¶ 3 (8 oz bottle of water provided with meals); Girod Decl. (Ex. 3) ¶ 8 ("Each person received one water bottle three times a day"); Ponce Decl. (Ex. 11) ¶ 7 (water provided at meal times); Vasquez Decl. (Ex. 5) ¶ 5 ("small water bottle" provided twice a day); Hyde Decl. (ECF No. 6-2) ¶ 6 ("Ms. R.G. is not being given water outside of a small bottle at mealtimes").

Defendants are not providing individuals detained in the Baltimore Hold Rooms with adequate meals as required under the Policy. Instead, Defendants provide irregular "meals" consisting of a piece of bread, a peanut butter and jelly sandwich, a pouch of beans, or a cup of

instant noodles. Nieves Decl. (Ex. 6) ¶ 8 (one small bowl of soup and one piece of bread in a 24 hour period); Justiniano Decl. (ECF No 1-15) ¶ 3 (one cup of noodle soup, one ham sandwich, and one portion chicken noodle soup in 24 hour period); Girod Decl. (Ex. 3) ¶ 8 ("Sometimes B.L.C. was given a cup of instant noodles, sometimes a protein bar, and sometimes bread or a cheese sandwich."); Davey Decl. (Ex. 9) ¶ 17 ("dinner was just a bag of pre-cooked beans"); Amaya-Luis Decl. (Ex. 10) ¶ 11 ("The ICE officers only gave me peanut butter and jelly sandwiches for the first two days . . . After that, for the next five days, they gave me much less food, sometimes no food at all."); B.R.R. Decl. (Ex. 4) ¶ 6 ("[T]he horrible food that they gave us put me in pain for three days."); Ponce Decl. (Ex. 11) ¶ 7 ("Three times a day, they gave us water, a small sandwich, and sometimes a bowl of beans. The food was so gross I could not eat it.").

Defendants are not providing individuals detained in the Baltimore Hold Rooms with adequate conditions for sleep. The lights remain on 24 hours a day and, because the Baltimore Hold Rooms are designed to hold only a few people for short periods of time, individuals are forced to sleep on the bare concrete floors or thin inflatable air mattresses without adequate blankets or any pillows. Jenkins Decl. (Ex. 8) ¶ 10 (describing 13 men "sleeping on the ground with no pillows or blankets"); Parra Decl. (Ex. 1) ¶ 6 ("I had no blanket and had to sleep on the floor."); Girod Decl. (Ex. 3) ¶ 5 ("[E]veryone had to sleep on the floor."); Amaya-Luis Decl. (Ex. 10) ¶ 9 ("Because everything was made of concrete though, it was impossible to be comfortable or to sleep well; the floors were also cold, and I was not given a blanket to help me stay warm."); Ponce Decl. (Ex. 11) ¶ 7 ("The lights were left on 24 hours a day"); Nieves Decl. ¶ 7 (Ex. 6) ("There was never a time that the lights were off."); Hyde Decl. (ECF No. 6-2) ¶ 9 ("ICE does not provide pillows or sheets, only aluminum blankets").

In some instances, crowding is so bad that detained individuals are forced to sleep sitting up or are unable to move in the cell. *See* Parra Decl. (Ex. 1) ¶ 6 (When sleeping, "I had to sit on the floor because there was no room to extend my body."); Girod Decl. (Ex. 3) ¶ 5 ("Sometimes, there wasn't enough room for everyone to even lay down on the floor, so people had to sleep sitting up."); O.P.L Decl. (Ex. 7) ¶ 6 ("When we had the mattresses on the floor . . . there was nowhere to move.").

Defendants regularly deny detained individuals in the Baltimore Hold Rooms the ability to call attorneys. Cruz Decl. (Ex. 2) ¶ 4 ("I was not allowed to make any other phone calls for the next five days. I could not contact an attorney."); Jenkins Decl. (Ex. 8) ¶ 11 ("While he was at the Baltimore Hold Room, he was not allowed to speak to an attorney, nor allowed to call his family."); Amaya-Luis Decl. ¶ 13 (Ex. 10) ("I asked the ICE officers to let me the phone to call my husband, an attorney, or even the Mexican consulate, but they did not let me use the phone to contact anyone."); Ponce Decl. (Ex. 11) ¶ 9 ("I was only allowed one phone call. After that one call, I had no access to a phone to contact an attorney or way to look for help with my case."); Cruz Decl. (Ex. 2) ¶ 11 ("We weren't allowed to make any phone calls, so I could not call a lawyer.").

### C. Representative Plaintiffs

#### 1. Plaintiff Ms. N.N.

Ms. N.N. was held in the Baltimore Hold Rooms for approximately 72 hours in a small cell where she was forced to sleep on an air mattress with up to seven other women. Justiniano Decl. (ECF No 1-15) ¶ 6; Declaration of N.N., dated June 6, 2025, ¶ 1.

Ms. N.N. has Type II diabetes, for which she takes Ozempic. Justiniano Decl. (ECF No 1-15) ¶ 4. After she was detained, on May 7, Ms. N.N.'s children brought her Ozempic to the Baltimore Hold Rooms, but ICE refused to give the medication to Ms. N.N. for at least 24 hours.

*Id*. ¶¶ 3-4. Only after persistent advocacy from her attorney (Ms. Justiniano) was Ms. N.N. given access to her diabetes medication. *Id*. ¶¶ 3-4. Defendants also did not allow or provide for Ms. N.N. to regularly check her blood sugar, which she usually does at least three times a day prior to eating a meal. *Id*. ¶¶ 5-6. On May 8, Ms. Justiniano requested a medical exam for Ms. N.N. "given the lack of monitoring of her blood sugar levels, missed dosage of diabetes medicine, and inadequate diet." *Id*. Officer Rickets, an ICE officer, informed her, however, that "they did not have the capacity to provide such medical care at this facility because it was meant to be temporary, and she would receive this care wherever she was transferred." *Id*. ¶ 5.

In one 24-hour period, Ms. N.N. received meals consisting of (i) a cup of noodle soup and an 8 oz. bottle of water; (ii) a ham and cheese sandwich with an 8 oz. bottle of water; and (iii) a portion of chicken noodle soup. *Id. ¶ 3*. Ms. N.N. was unable to even eat some of this food for fear that the high-carb meals would spike her blood sugar, which she was unable to test. *Id*.

### 2.     Plaintiff Ms. R.G.

Ms. R.G. was detained at the Baltimore Hold Rooms for approximately 48 hours. Declaration of V.R.G., dated June 6, 2025, ¶ 1. She has a thyroid condition that requires daily medication. Hyde Decl. (ECF No. 6-2) ¶ 4. While at the Baltimore Hold Rooms, she was denied access to her medication and was not permitted to see a medical professional. *Id*. Ms. R.G. was provided with minimal food, often consisting of small rations such as a cup of noodle soup or a military pouch of food. *Id*. ¶ 6. Ms. R.G. was not given water outside of a small bottle at mealtimes. *Id*.

When Ms. R.G. arrived at her holding cell, it was "dirty and full of old aluminum blankets and hair." *Id*. 7. "Because the sole toilet in the room had a small dividing wall and no curtain or door, it was impossible for Ms. R.G. or the other detained women to use the toilet with any

privacy." *Id*. Ms. R.G. noted that "[t]he toilet was not routinely restocked with toilet paper" and she was "not allowed to shower or change clothes." *Id*. Instead, "Sometimes ICE provide[d] Ms. R.G. and the other detained women a couple of baby wipes." *Id*. ¶ 8.

Ms. R.G.'s holding cell was very cold, and she only received a jacket after it was discarded by a departing detained noncitizen. *Id*. ¶ 9. Ms. R.G. had to sleep on an inflatable "mattress" that was approximately eight inches thick, without pillows or sheets, and with only an aluminum blanket. *Id*.

## ARGUMENT

This case is uniquely well-suited for class certification, as it challenges Defendants' policies and practices resulting in intolerable, unconstitutional, and punitive conditions of confinement for Plaintiffs and the proposed class. It further involves issues that would evade judicial review absent class certification. To obtain certification, a class must satisfy all four elements of Fed. R. Civ. P. Rule 23(a): numerosity, commonality, typicality, and adequacy. If the class satisfies each of these requirements, the Court must also find that the proposed class action fits into one of the categories of class action under Fed. R. Civ. P. 23(b).

Courts in this district and others routinely certify classes of detained and imprisoned individuals challenging conditions of confinement, including specifically in the context of civil immigration detention. *See, e.g.*, *Coreas v. Bounds*, No. TDC-20-0780, TD-20-1304, 2020 WL 5593338, at *7 (D. Md. Sept. 18, 2020); *Jones v. Murphy*, 256 F.R.D. 519, 522 (D. Md. 2009); *Doe v. Lally*, 467 F. Supp. 1339, 1344 (D. Md. 1979); *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 444 (9th Cir. 2022); *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 865 (7th Cir. 2018); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 925 (10th Cir. 2018); *Parsons v. Ryan*, 754 F.3d 657, 681-82 (9th Cir. 2014), *reh'g denied*, 784 F.3d 571 (9th Cir. 2015) (en banc).

As detailed below, Plaintiffs and the proposed Class unquestionably satisfy the requirements for class certification under Rule 23(a). Likewise, Plaintiffs' claims fall squarely in Rule 23(b)(2), as they seek to establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Finally, Defendants may argue that Plaintiffs cannot serve as class representatives because they have now been transferred out of the Baltimore Hold Rooms, thus mooting their claims. But where, as here, class actions challenge conditions of short-term confinement or other recurring injuries, individuals "can serve as class representatives for purposes of class certification even after their own claims have been rendered moot." *Coreas*, 2020 WL 5593338, at *9; *see also County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) (holding that where a claim is "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires," the mootness of a named plaintiff's claim before class certification does not moot the class action or prevent them from serving as a class representative) (citation omitted); *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 326 (4th Cir. 2022) (applying "inherently transitory exception").

## I.      Rule 23(a) Requirements for Class Certification Have Been Satisfied

### A.      The Proposed Class Is So Numerous That Joinder Is Impracticable

To satisfy the numerosity requirement, the proposed class must be sufficiently numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fourth Circuit has certified classes as small as 18 members, finding they meet the numerosity requirement. *See Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967); *see also Coreas*, 2020 WL 5593338, at *10 (certifying class consisting of 29 detained individuals). And when a proposed class has 40 or more members, courts presume that joinder

10

is impracticable. *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 337 (D. Md. 2012).

"[N]umbers alone are not controlling, and a district court should consider all the circumstances of the case when deciding if this requirement has been met." *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 404 (D. Md. 2023) (internal quotation and citation omitted). "Where general knowledge and common sense indicate the class is so large that joinder of all members is impracticable, the numerosity requirement is satisfied." *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 300 (D. Md. 2022) (internal quotation and citation omitted).

In particular, "the fact that the class includes unknown, unnamed future members . . . weighs in favor of certification." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000); *Reid v. Donelan*, 297 F.R.D. 185, 189 (D. Mass. 2014), *rev'd on other grounds*, 819 F.3d 486 (1st Cir. 2016) ("[W]hen a party seeks only declaratory or injunctive relief, . . . the inclusion of future members increases the impracticability of joinder"); *Ali v. Ashcroft*, 213 F.R.D. 390, 408-09 (W.D. Wash. 2003) ("[W]here the class includes unnamed, unknown future members, joinder of such unknown individuals is impracticable and the numerosity requirement is therefore met, regardless of class size.") (internal quotations and citation omitted).

This is especially the case where, as here, class members are present and future "immigration detainees" who "may lack legal status and could be removed from the United States at any time, [are] inherently 'transient,' lack sophistication, and do not always speak English well." *Coreas*, 2020 WL 5593338, at *11; *see also Rodriguez Guerra v. Perry*, 1:23-cv-1151, 2024 WL 3581226 at *1 (E.D. Va. Apr. 26, 2024) (finding individual noncitizen joinder impracticable because of "the inherently fluid nature of detention and litigation"); *Brito v. Barr,* 395 F. Supp. 3d 135, 144 n.3 (D. Mass. 2019) (finding joinder impracticable in part

because the class of detained noncitizens were "transient" and lacked English language skills and the ability to secure counsel); *Mondragon v. Scott Farms, Inc*., No. 5:17-cv-356-FL, 2019 WL 6125928, at *4 (E.D.N.C. Nov. 18, 2019) (finding joinder of migrant worker class members impracticable); *Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) (finding numerosity based in part on the class of prisoners' lack of access to counsel to pursue challenges to allegedly inadequate medical care).

Here, the proposed class contains thousands of present and future detained noncitizens such that joinder is clearly impracticable. According to publicly reported data, "ICE's Baltimore field office arrested 1,434 people last fiscal year ending in September 2024."[4] Since then, arrests and resulting detentions have increased on an unprecedented scale. In a March 4, 2025 interview, Matthew Elliston (the Baltimore Field Office Director at that time) explained that ICE's arrest numbers were "up about 600 percent" nationwide in the first few months of 2025.[5] Consistent with these radically higher arrest numbers, and as reflected in the FAC and supporting Declarations, there are dozens of detained individuals at the Baltimore Hold Rooms on any given day. According to public reporting, there may be as many as 50 individuals being held in the Baltimore Hold Rooms at a time.[6] Even assuming that only 100 detained individuals move through the Baltimore Hold Rooms each week (which is likely a significant undercount), the

---

[4] "ICE reveals new details about viral video of Baltimore-area arrests that caught Trump's eye," THE BALTIMORE BANNER (May 29, 2025), available at https://www.thebaltimorebanner.com/politics-power/national-politics/viral-ice-arrest-video-baltimore-trump-BSP5DT4BMVCYTL4X7QLMDGBZRM/.

[5] *ICE Arrests in First 50 Days of Trump Administration,* DHS (Mar. 13, 2025) (ECF No. 1-3), available at https://www.dhs.gov/news/2025/03/13/ice-arrests-first-50-days-trump-administration

[6] *See* Tanvi Misra, "Essentially Cages": ICE Is Using Courthouse Cells for Lengthy Detentions, The Nation (Mar. 17, 2025) available at https://www.thenation.com/article/society/ice-detention-courthouseholding-room/ (ECF No. 1-10).

number of present and future class members would be measured in the thousands. Moreover, joinder of these individuals is particularly impracticable given the transient nature of this population, their absence of financial resources, lack of counsel, lack of familiarity with the legal system, and limited English proficiency. *See Coreas*, 2020 WL 5593338, at *11.

## B.      The Class Presents Common Questions of Law and Fact

Rule 23(a)(2) requires questions of law or fact that are common to the class and that "class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted). To satisfy the commonality requirement, a "single common question will suffice" if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (internal quotation and citation omitted); *see also, e.g.*, *Brown v. Nucor Corp.*, 785 F.3d 895, 908-09 (4th Cir. 2015).

Here, the Class asserts a common core of material facts and challenges common policies and practices at the Baltimore Hold Rooms. At a minimum, the Class members share the following common questions of law:

- Whether Defendants' practices of failing to provide detained people with beds or adequate bedding; overcrowding holding cells; and illuminating the cells around the clock—which alone or in combination interfere with Plaintiffs' and putative Class members' ability to sleep—violate the Due Process Clause of the Fifth Amendment and/or the Administrative Procedures Act?

- Whether Defendants' practices of overcrowding the holding cells; and failing to provide detained people with toothbrushes or toothpaste, or with soap, showers, or with clean clothes or access to laundry—which alone or in combination deprive Plaintiffs and putative Class members of shelter that satisfies safety and sanitation standards—violate the Due Process Clause of the Fifth Amendment and/or the Administrative Procedure Act?

- Whether Defendants' practices of failing to provide for adequate medical care and consistent administration of prescription drugs to detained people deprive Plaintiffs and putative Class members of a safe and healthy environment in

violation of the Due Process Clause of the Fifth Amendment and/or the Administrative Procedure Act?

- Whether Defendants' practices of providing insufficient quantities of food and insufficient drinking water deprive Plaintiffs and putative Class members of adequate food and water in violation of the Due Process Clause of the Fifth Amendment and/or the Administrative Procedure Act?

- Whether Defendants' failure to enforce the ICE Hold Room Policy and their practice of consistently detaining Plaintiffs and putative Class members in the Baltimore Hold Rooms for periods exceeding 12 hours, as well as denying medical care, and adequate water and meals, violates Section 706 of the Administrative Procedure Act and/or the Due Process Clause of the Fifth Amendment?

Plaintiffs and putative members of the proposed Class are all subjected to ICE's systemic detention practices at the Baltimore Hold Rooms, such that resolving the legality of these practices will "drive the resolution of the litigation." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Dukes*, 131 S. Ct. at 2551). This action is directly in line with numerous decisions after *Dukes* that find commonality satisfied in civil rights cases alleging deficiencies in detention conditions. *See, e.g.*, *Coreas*, 2020 WL 5593338, at *13 (commonality satisfied where group of detained noncitizens brought "conditions-of-confinement constitutional claims"); *Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) ("[A] common question of law and fact in this case is whether the government must modify the conditions of confinement."); *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 38 (N.D. Cal. 2020) (commonality satisfied in detained noncitizen lawsuit over "conditions of confinement at the facilities"); *Hernandez v. Cnty. of Monterey*, No. 5:13-cv-2354-PSG, 2015 WL 399975, at *18 (N.D. Cal. Jan. 29, 2015) (without class actions challenging "systemic deficiencies in prison conditions," "it is unlikely that … prison conditions that violate the Eighth Amendment could ever be corrected by legal action" (citations omitted));*see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 333 (D.D.C. 2018) (commonality satisfied where plaintiffs alleged that defendants were

"systematically denying parole" in violation of their own policy).

### C. The Claims of the Named Plaintiffs are Typical of the Claims of the Members of the Proposed Class

Under Fed. R. Civ. P. 23(a)(3), the class representative's claim and defenses must also be "typical of the claims or defenses of the class" in that prosecution of the claim will "simultaneously tend to advance the interests of the absent class members." The named plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the plaintiff's own individual claim. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).

As the court in *Coreas* explained:

> In analyzing this question, a court compares the class representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and determines the extent to which those facts would also prove the claims of the absent class members . . . The claims do not have to be factually or legally identical, but the class claims should be fairly encompassed by those of the named plaintiffs.

2020 WL 5593338, at *13.

As described in the FAC and summarized above, the named Plaintiffs have been detained for longer than 12 hours at the Baltimore Holding Rooms and subjected to the punitive conditions challenged on behalf of the Class, including the unconstitutional deprivation of (i) sleep; (ii) hygienic and sanitary conditions; (iii) adequate medical care; (iv) adequate food and water; and (v) access to counsel. The named Plaintiffs and putative class members are united in their interest and injury, share a common core of salient facts, and raise common legal claims. Thus, the element of typicality is met.

### D. The Named Plaintiffs Will Adequately Protect the Interests of the Proposed Class and Their Counsel are Qualified to Litigate this Action

Finally, the named plaintiffs must "fairly and adequately protect the interests of the class"

without a conflict of interest with the absent class members. Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts examine whether a named plaintiff and their counsel have a "fundamental" conflict of interest. "A conflict is not fundamental when, as here, all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 431 (4th Cir. 2003)) (alteration in original).

The adequacy prerequisite also requires consideration of "the competency of class counsel." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). In this case, the proposed Class is represented by expert immigration and detention law counsel from esteemed public interest organizations Amica Center for Immigrant Rights and the National Immigration Project of the National Lawyers Guild. In addition, the proposed Class is represented by Crowell & Moring LLP, a highly sophisticated international law firm. "Class counsel are highly experienced and have the intellectual and financial resources necessary to prosecute a sophisticated class action." *Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98, 104 (D. Md. 2010).[7]

## II. The Rule 23(b) Requirements for Class Certification Have Been Satisfied

Plaintiffs also meet the requirements of Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds generally applicable to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Here, Defendants have created and applied policies and practices that affect all individuals who are brought to the Baltimore Hold Rooms. Plaintiffs challenge—and seek

---

[7] *See* Declaration of Daniel Melo, dated June 6, 2025; Declaration of Sirine Shebaya, dated June 6, 2025; Declaration of Jerome Murphy, dated June 6, 2025.

declaratory and injunctive relief from—systemic policies and practices that subject them and others similarly situated to punitive and unconstitutional conditions of confinement. *See, e.g.*, *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) ("[T]his is a paradigmatic Rule 23(b)(2) case: The meaningful, valuable injunctive relief . . . is indivisible, benefitting all [] members of the (b)(2) Class at once.") (internal quotation marks and citations omitted); *Coreas*, 2020 WL 5593338, at *15 ("Upon a finding that a class or subclass is subjected to unconstitutional policies or conditions of confinement, the Court could order certain global relief"); *Savino*, 453 F. Supp. 3d at 453 (Rule 23(b)(2) satisfied by request for "an injunction ordering the government to reduce crowding of Detainees").

## III.    Plaintiffs' Transfer from the Baltimore Hold Rooms is Irrelevant

Defendants may suggest that Plaintiffs cannot serve as class representatives because, although they were detained when the Complaint and FAC were first filed, they have now been transferred from the Baltimore Hold Rooms. The law, however, is to the contrary. In *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Supreme Court held that plaintiffs who had been arrested without warrants and claimed they were denied due process of law could serve as class representatives in a case seeking only forward-looking injunctive relief. The Court noted "[i]t is true, of course, that the claims of the named plaintiffs have since been rendered moot; eventually, they either received probable cause determinations or were released." *Id*. at 51. After noting that this mootness arose before the class was certified, the Court nonetheless recognized that where a claim is "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires . . . the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *Id.* at 51-52 (internal quotation and citation omitted).

Relying on *County of Riverside*, the Court in *Coreas* certified a class of detained noncitizens despite the release of certain named plaintiffs. As the court explained:

> Here, Petitioners' claims are inherently transitory because based on the nature of immigration proceedings, their detention can suddenly end before a court can rule on a class certification motion . . . For example, in *Nielsen v. Preap*, ⸺ U.S. ⸺ ⸺, 139 S. Ct. 954, 203 L.Ed.2d 333 (2019), a plurality of the Supreme Court applied this principle to a class of immigration detainees that had "claim[ed] that they would be harmed by detention without a hearing pending a decision on their removal" and concluded that "the fact that a class 'was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction' when, as in these cases, the harms alleged are transitory enough to elude review." *Id.* at 963 (quoting *Cty. of Riverside*, 500 U.S. at 52, 111 S.Ct. 1661) (plurality opinion). "Because this type of injury ends as soon as the decision on removal is made, it is transitory." *Id.* Similarly, the United States Court of Appeals for the District of Columbia Circuit applied this same exception to mootness in a class action brought by another group of immigration detainees, this time pregnant minors who entered the United States alone without lawful immigration status, because "[t]he claims at issue likely will, or at least might, end quickly," as there were several potential events that might result in the plaintiffs' release from custody. *J.D. v. Azar*, 925 F.3d 1291, 1299, 1311 (D.C. Cir. 2019) (per curiam).

*Coreas,* 2020 WL 5593338, at *9; see also *Dubon Miranda v. Barr*, 463 F. Supp. 3d 632, 641 (D. Md. 2020), *vacated and remanded on other grounds sub nom*, *Miranda v. Garland,* 34 F.4th 338 (4th Cir. 2022) (explaining that while release from detention might moot individual noncitizens claims, "the mootness of proposed class members' claims does not prevent courts from reaching the merits in a case involving 'inherently transitory claims' such as these."); *Jonathan R. by Dixon,* 41 F.4th at 326 (4th Cir. 2022) (applying "inherently transitory exception").

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court certify this case as a class action as proposed by Plaintiffs, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel.

18

Dated: June 6, 2025

Respectfully submitted,

*/s/ Jerome A. Murphy*
Jerome A. Murphy (D. Md. Bar No. 27678)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2895
JMurphy@crowell.com

Jared A. Levine (NY Bar No. 4897211)**
Daniella Schmidt (NY Bar No. 5186283)**
Luke Taeschler (NY Bar No. 5308325)**
Emily Werkmann (NY Bar No. 5750229)**
**CROWELL & MORING LLP**
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com
DSchmidt@crowell.com
LTaeschler@crowell.com
Ewerkmann@crowell.com

Ian Austin Rose (D. Md. Bar No. 22079)
Daniel Melo (N.C. Bar No. 48654)*
Amelia Dagen (D.C. Bar No. 90004838)
**AMICA CENTER FOR IMMIGRANT RIGHTS**
**NATIONAL IMMIGRATION PROJECT**
1025 Connecticut Ave. NW
Suite 701
Washington, DC 20036
(202) 788-2509
Austin.rose@amicacenter.org
Dan.melo@amicacenter.org
Amelia@amicacenter.org

Sirine Shebaya (D. Md. Bar No. 07191)
Matthew Vogel (LA Bar No. 35363)*
Yulie Landan (CA Bar No. 348958)*
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Rd. NW
Suite 175 #896645
Washington, DC 20009
(202) 656-4788
sirine@nipnlg.org
matt@nipnlg.org
yulie@nipnlg.org

*Pro bono counsel for Plaintiffs*

*Admitted pro hac vice
** Pro Hac Vice forthcoming