# Exhibit 9

# **DECLARATION OF TESS DAVEY**

I, Tess Davey, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a staff attorney at Amica Center for Immigrant Rights. I have represented detained clients in their removal proceedings for two years.
2. I am counsel for an individual who was held for more than twelve hours at the Baltimore Holding room. He currently wishes to remain unnamed due to fear of retaliation from the government.
3. I began representing said client on March 14, 2025 for an emergency motion to rescind in absentia and reopen his case. I was supposed to have a call with him at 9 am on Friday, March 21, 2025, but I was informed ICE had picked him up that morning. Given the urgency of his motion, I immediately went to find out where he was. Baltimore outreach office did not answer any calls nor could he be found in the ICE online detainee locator. A paralegal at Amica Center for Immigrant Rights was able to make contact with a Deportation Officer who informed us that the individual had not yet been put in the system and was in transport.
4. On Friday, March 21, 2025,, at 11:53 AM, an ICE official called me while I was in another call and I missed it. The number was marked as private. They left a voicemail saying I could speak with my client. However, they did not provide a number and their number was private. They said to call their main line, which was not mentioned; however, circumstances suggest they are referring to the Baltimore ERO Field Office number which is 443-560-0640. They did not say where he was being detained.
5. On Friday, March 21, 2025, at 12:09 PM, the client's wife added me to a call where she had my client on the other line. My client did not know where he was. All he knew was he was in Baltimore. He told me that he was not allowed to talk for long. The background of the call was very noisy. I asked if he could identify anything saying where he was and he said that some uniform said something with "S" on the end of it. I told him I needed a call with him to discuss the submission of his emergency motion to rescind his *in absentia* removal order and reopen his case. He said he did not know where he was going and could not talk to me for long.
6. I asked my client if he could ask an officer where he was or where he was going. He handed the phone to an ICE officer who must have been right next to him. The officer told me that they were at the Baltimore ERO field office. He said that he would not usually let him speak to him since he had already let him speak to his wife. But he told me he had just taken my client's photos. He said that they did not know where to place him and they would have to find a detention center for him, but that was not this officer's job. I explained how I needed a legal call with my client. He told me that no one would be providing me with a phone call. He kindly returned the phone to my client who wrote down my phone number and promised to call me if he was able to. I asked my client to request that any officials permit me and some other attorneys who wanted to assist him to enter and see him that weekend. He agreed.

7. On the morning of Saturday, March 22, 2025, I went to ICE's Enforcement and Removal Operations Field Office located on the 6th Floor of the George H. Fallon Federal Building at 31 Hopkins Place, Baltimore, Maryland 21201 (the "Baltimore Field Office"). I was also joined by two colleagues providing pro bono services from a law firm, one of whom is fluent in Spanish.

8. I needed to meet with My client regarding an order that had been entered to deport him and to inquire of My client the circumstances, duration and conditions of his detention at the Baltimore Field Office as part of the pre-suit investigation of those matters.

9. When we arrived at the Federal Building, the doors were locked. At that point, I made repeated calls to the listed phone number of the Baltimore Field Office, *i.e*. -- (443) 560-0640. No one answered those calls. Additionally, none of the numbers for the deportation officers whose number are accessible answered any calls or voicemails.

10. As I was unable to reach the office by phone, I knocked on the door. A security guard on duty, came to the door to inquire why we were there. The officer politely explained that the doors were locked because the Building was closed on the weekends.

11. We informed the officer, whose security tag identified him as DHS staff, that we were lawyers seeking to meet with a person being held in ICE's Baltimore Field Office but could not reach them by phone. The DHS officer told us that he did not have a phone number to call the office from his front desk. Without an ability to call, he further explained that he attempted to take the elevator to ICE's office on the 6th floor, but his security pass did not permit him to access that floor. We then asked, and the officer kindly agreed to try to reach someone in that office to let them know that we were at the front door requesting entrance.

12. Toward that end, the officer went back into the building and returned several minutes later. The officer explained that he did not have a phone number to call the office from his front desk. Without an ability to call, he further explained that he attempted to take the elevator to ICE's office on the 6th floor, but his security pass did not permit him to access that floor.

13. At that point, the officer asked me for the number she had been using in an effort to reach ICE's Baltimore Field Officer. He then called that number and received no answer as well. He told us that the only known way to enter was if an ICE officer came down and brought people up themselves, which occurred from the garage entrance. The only times the DHS officer reported seeing the officers was when they were bringing people from the garage entrance to the 6th floor.

14. That same day, March 22, 2025, at 12:05 PM, I called My client's wife, Lisette. She had not heard from her husband since he briefly called her yesterday around noon to tell her that he was in ICE custody. The only number she has was the same Baltimore Outreach number: 443-560-0640. She has not been able to use it to reach anyone either. I gave her the message to inform my client if he calls her that he should inform the ICE officers that his attorneys would be visiting on Monday morning. He should tell them that they need to permit his attorneys to see him because he has an urgent matter to discuss with them. I also reminded her to please have him call me as well if he is allowed too. She understood the message and agreed to my request.

15. Later that day, my client's wife told me that he called her for a minute to inform her that he would be transported from the Baltimore holding office to a detention center on 5 am on Monday.

16. On Thursday, March 27, 2025, my client shared that, at this time, he did not feel safe helping with this lawsuit beyond permitting my submission of this letter. When I had asked him to participate, he also asked if the call was being recorded. Upon learning that it was a private and confidential legal call, he shared that he was scared about what the U.S. government would do to him if was involved. He did not trust the government anymore to treat him fairly and he was scared that he would be put in jail or kept in the detention center for longer if he openly told a court what happened to him.

17. My client was held in the Baltimore Holding room from Friday morning to Sunday morning. He was placed in a small room with a toilet. ICE kept twelve men in that room during my client's time there. They all shared the single toilet in the holding room. They would be given mattresses around 8:00 PM each night and then the mattresses would be taken away in the early morning. The small mattresses could barely fit in the room together. They were given water but not a lot of food each day. For example, one day they were given little food for breakfast, a small sandwich for lunch, and then dinner was just a bag of pre-cooked beans and a bottle of water to heat them up.

18. My client was at risk of deportation during this entire time and could not finalize his declaration for his automatic stay of removal on Friday as planned. The denial of access to his attorney nearly resulted in his deportation without an opportunity of being heard in court. He and his family, including his very pregnant wife and two young children, were placed in unnecessary emotional turmoil, increased stress, and fear of not being able to find him and having him deported so suddenly.

Executed this 28th day of March 2025, at Washington, D.C.

Tess Davey

Tess Davey
Amica Center for Immigrant Rights