## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| D.N.N. *and* V.R.G., *on behalf themselves and all others similarly situated*, | |
| | |
| *Petitioners-Plaintiffs*, | **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| | Civil Action No.: 1:25-cv-01613 |
| NIKITA BAKER, *in her official capacity as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations Baltimore Field Office,* et al., | |
| | |
| *Respondents-Defendants*. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

  A. ICE's Hold Room Policies ......................................................................... 2

  B. Defendants' Decision to Waive the Policy and Operate the Hold Rooms as a Residential Facility ..................................................................................................... 3

LEGAL STANDARD ......................................................................................... 9

ARGUMENT ....................................................................................................... 10

  I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................. 10

    A. Plaintiffs are Likely to Succeed on their Fifth Amendment Punitive Conditions Claims (Counts IV-V) .............................................................................................. 10

      1. Defendants Deprive Putative Class Members of Hygienic, Sanitary, and Safe Conditions in Violation of the Fifth Amendment (Count IV) ..................................... 11

      2. Defendants Deprive Putative Class Members of Adequate Medical Care in Violation of the Fifth Amendment (Count V) ............................................................... 16

    B. Plaintiffs Are Likely to Succeed on Their Claims that Defendants Violated the APA (Count I) ................................................................................................... 18

      1. Defendants Decision to Waive Application of the Policy to the Baltimore Hold Rooms Is a Final Agency Action ................................................................................ 19

      2. Defendants' Decision to Waive the Policy Violates the APA Because it is Contrary to the Constitution, Arbitrary and Capricious, and an Abuse of Discretion .................... 21

    C. Plaintiffs Are Likely to Succeed on Their Claims Under the *Accardi* Doctrine (Count II) ................................................................................................... 24

  II.  PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM TO THE PLAINTIFFS ............................................................. 27

  III.  BOTH THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING PRELIMINARY INJUNCTIVE RELIEF ............................. 27

  IV.  THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR REQUIRE PLAINTIFFS TO PROVIDE A NOMINAL SECURITY ................................................. 28

CONCLUSION ................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accardi v. Shaughnessy*,
347 U.S. 260 (1954)...............................................................................10, 24, 25, 27

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
No. 25-cv-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) ................................29

*Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.*,
No. 22-cv-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023)..............................15, 20

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) .......................................................................20

*Bell v. Wolfish*,
441 U.S. 520 (1979)..........................................................................................1, 13

*Bennett v. Spear*,
520 U.S. 154 (1997)......................................................................................19, 20

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) .......................................................................20

*Campbell v. Cauthron*,
623 F.2d 503 (8th Cir. 1980) .................................................................................12

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) .................................................................................28

*Clark v. Daddysman*,
No. 16-cv-0921, 2018 WL 1453333 (D. Md. Mar. 22, 2018) ................................14

*ClearOne Advantage, LLC v. Kersen*,
710 F. Supp. 3d 425 (D. Md. 2024).....................................................................9, 28

*Coreas v. Bounds*,
451 F. Supp. 3d 407 (D. Md. 2020) .......................................................................10

*Coreas v. Bounds*,
458 F.Supp.3d 352 (D. MD. 2020) .......................................................................29

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ...................................................................25, 27

*DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs*,
    489 U.S. 189,199-200 (1989) ............................................................11

*Doe v. Hampton*,
    566 F.2d 265 (D.C. Cir. 1977) ............................................................25

*Egebergh v. Nicholson*,
    272 F.3d 925 (7th Cir. 2001) .............................................................17

*Estelle v. Gamble*,
    429 U.S. 97 (1976)..................................................................16, 21

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)....................................................................22

*Ferguson v. Cape Girardeau Cnty.*,
    88 F.3d 647 (8th Cir. 1996) .............................................................13

*FTC v. Standard Oil Co.*,
    449 U.S. 232 (1980).....................................................................19

*G.G. ex rel. Grimm v. Gloucster Cnty. School Bd.*,
    822 F.3d 709 (4th Cir. 2016) ............................................................10

*Heyer v. United States Bureau of Prisons*,
    849 F.3d 202 (4th Cir. 2017) ............................................................11

*Hill v. Nicodemus*,
    979 F.2d 987 (4th Cir. 1992) ............................................................11

*Hubbard v. Taylor*,
    538 F.3d 229 (3d Cir. 2008)............................................................13

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) ............................................................15

*Judulang v. Holder*,
    565 U.S. 42 (2011)......................................................................21

*Karn v. PTS of Am., LLC*,
    590 F. Supp. 3d 780 (D. Md. 2022) ................................................12, 14

*Khalil v. Joyce*,
    1:25-cv-01935, ECF No. 48 (Mar. 14, 2025) ............................................26

*Lareau v. Manson*,
    651 F.2d 96 (2d Cir. 1981).............................................................12

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
    2 F.4th 330 (4th Cir. 2021) ......................................................................27, 28

*League of Women Voters of N. Carolina v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) ...........................................................................9

*Maryland v. United States Dep't of Agric.,*
    No. 25-cv-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) ...............................28

*Matherly v. Andrews,*
    859 F.3d 264 (4th Cir. 2017) .........................................................................15

*Moghaddam v. Pompeo,*
    424 F. Supp. 3d 104 (D.D.C. 2020) ................................................................26

*Morton v. Ruiz,*
    415 U.S. 199 (1974)..................................................................................24, 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).........................................................................................22

*Nat. Res. Def. Council v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020).........................................................................20

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    767 F. Supp. 3d 243 (D. Md. 2025).................................................................28

*Nin-Carrasquillo v. Montes Gonzalez,*
    No. 06-cv-1408, 2006 WL 8450973 (D.P.R. Dec. 20, 2006) .............................15

*Ohio v. Env't Prot. Agency,*
    603 U.S. 279 (2024)........................................................................................22

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013) .........................................................................28

*Reese v. Bounds,*
    No. 20-cv-3080, 2021 WL 849108 (D. Md. Mar. 5, 2021) ................................16

*S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.,*
    No. 18-cv-0760, 2023 WL 2564119 (D.D.C. Mar. 15, 2023) .............................20

*Sanchez v. McAleenan,*
    No. 19-cv-1728, 2024 WL 1256264 (D. Md. Mar. 25, 2024) .............................24

*Shakka v. Smith,*
    71 F.3d 162 (4th Cir. 1995*) .........................................................................17

*Short v. Hartman*,
   87 F.4th 593 (4th Cir. 2023) ................................................................1, 11, 16

*Sierra Club v. Dep't of the Interior*,
   899 F.3d 260 (4th Cir. 2018) ...........................................................................22

*Tendo v. United States*,
   No. 2:23-cv-438, 2024 WL 3650462 (D. Vt. Aug. 5, 2024) ...............................19

*Torres v. United States Dep't of Homeland Sec.*,
   411 F. Supp. 3d 1036 (C.D. Cal. 2019) .......................................................19, 20

*United States v. Heffner*,
   420 F.2d 809 (4th Cir. 1969) ...........................................................................25

*W. Virginia Coal Workers' Pneumoconiosis Fund v. Bell*,
   781 F. App'x 214 (4th Cir. 2019) .....................................................................23

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)........................................................................................19

*Williams v. Griffin*,
   952 F.2d 820 (4th Cir. 1991) ...........................................................................14

*Williamson v. Stirling*,
   912 F.3d 154 (4th Cir. 2018) ...........................................................................11

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)........................................................................................10

*Zolnowski v. Cnty. of Erie*,
   944 F. Supp. 1096 (W.D.N.Y. 1996) ...........................................................12, 13

## Statutes and Other Authorities

5 U.S.C. 706(2) ....................................................................................... *passim*

Benjamin Eisenberg & Victoria Thomas, Am. Diabetes Assoc., *Legal Rights of Prisoners and Detainees with Diabetes*,
   https://diabetes.org/sites/default/files/2023-10/legal-rights-of-prisoners-detainees-with-diabetes-intro-guide.pdf ...............................................................17

Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily*, Fox News (May 29, 2025),
   https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day ..................................................................................3

Department of Homeland Security, *ICE Arrests in First 50 Days of Trump Administration* (Mar. 13, 2025), https://www.dhs.gov/news/2025/03/13/ice-arrests-first-50-days-trump-administration ................................................................3

Department of Homeland Security, Office of Inspector General, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (January 29, 2019) ........................23

Directive 11087.2, "Operations of ERO Holding Facilities" ................................................ *passim*

"Fact Sheet: President Donald J. Trump Ensures the Enforcement of Federal Rule of Civil Procedure 65(c)," WHITEHOUSE.GOV (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/ ................................................29

Federal Rule of Civil Procedure 65 ................................................................9, 28, 29

Meg Anderson, *Private prisons and local jails are ramping up as ICE detention exceeds capacity*, Nat'l. Public Radio (June 4, 2025), https://www.npr.org/2025/06/04/nx-s1-5417980/private-prisons-and-local-jails-are-ramping-up-as-ice-detention-exceeds-capacity ................................................4

NBC Washington (March 12, 2025), https://www.nbcwashington.com/investigations/like-living-in-a-dark-room-inside-overcrowded-ice-detention-centers/3865502/ ................................................4

Tanvi Misra, "Essentially Cages": ICE Is Using Courthouse Cells for Lengthy Detentions, The Nation (Mar. 17, 2025), https://www.thenation.com/article/society/ice-detention-courthouse-holding-room ................................................22

Taylor Bennet, *Maryland's ICE director reflects on growing challenges with lack of support*, WBAL NewsRadio (March 4, 2025), https://www.wbal.com/marylands-ice-director-reflects-on-growing-challenges-with-lack-of-support ................................................3

Tracee Wilkins, et al., *'Like living in a dark room': Inside overcrowded ICE detention centers*, NBC Washington (March 12, 2025), https://www.nbcwashington.com/investigations/like-living-in-a-dark-room-inside-overcrowded-ice-detention-centers/3865502/ ................................................4

US Immigration and Customs Enforcement, *100 days of record-breaking immigration enforcement in the US interior* (Apr. 29, 2025), https://www.ice.gov/news/releases/100-days-record-breaking-immigration-enforcement-us-interior ................................................3

United States Department of Justice, *Federal Performance Based Detention Standards* (May 1, 2025), www.usmarshals.gov/sites/default/files/media/document/federal-performance-based-detention-standards-12.pdf ............................................................................15

Van Hollen, Alsobrooks Press Trump Administration on Inhumane Conditions for Detainees at ICE's Baltimore Field Office (Apr. 10, 2025), https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office ................................................................................ *passim*

## INTRODUCTION

Petitioner-Plaintiffs ("Plaintiffs") bring this action to enjoin punitive and unconstitutional detention conditions in the "hold rooms" at the Immigration and Customs Enforcement ("ICE") Baltimore Field Office (the "Baltimore Hold Rooms"). The Baltimore Hold Rooms are authorized to detain individuals for short term duration, ***not to exceed*** 12 hours. But Defendants have held Plaintiffs and hundreds of noncitizens in the Baltimore Hold Rooms for days at a time, packing them into overcrowded and filthy cells; depriving them of adequate sleep, food, water, and medical care; refusing to provide them with basic hygiene supplies; and arbitrarily cutting them off from communication with counsel. These degrading conditions pose an immediate risk of illness, trauma, and death requiring immediate court intervention.

As detailed in the First Amended Complaint ("FAC") (ECF No. 6) and supporting declarations, Defendants' decision to use the Baltimore Hold Rooms as a residential (*i.e.* overnight or multi-day) facility is arbitrary, capricious, and contrary to Plaintiffs' constitutional rights. The conditions at the facility violate Defendants' own written detention policies as well as the constitutional prohibition on subjecting civilly detained individuals to punitive conditions. *Bell v. Wolfish*, 441 U.S. 520, 536-39 (1979); *Short v. Hartman*, 87 F.4th 593, 606 (4th Cir. 2023).

Plaintiffs have brought this action on behalf of themselves and members of a proposed class consisting of all persons who are now or in the future will be detained at the Baltimore Hold Rooms (the "Class").[1] Plaintiffs are likely to succeed on the merits of their claims and have met all other requirements for a preliminary injunction. Accordingly, this Court should grant Plaintiffs' motion and issue an order enjoining Defendants and their agents and employees from: (i) operating the Baltimore Hold Rooms as a residential facility; and (ii) subjecting Plaintiffs and putative Class

---

[1] Plaintiffs filed their motion for class certification on June 6, 2025 (ECF No. 31).

Members to punitive and unconstitutional conditions of confinement in the Baltimore Hold Rooms.

## FACTUAL BACKGROUND

### A.    ICE's Hold Room Policies

The Department of Homeland Security ("DHS") and ICE have adopted written policies establishing mandatory procedures for Enforcement and Removal ("ERO") holding facilities like the Baltimore Hold Rooms. On January 31, 2024, ICE issued Directive 11087.2, "Operations of ERO Holding Facilities" (the "Policy") (ECF No. 1-8). The "Purpose/Background" of the Policy is to provide ICE ERO officers "with policy and procedures for operating holding facilities located within their respective field offices." *Id*. § 1.1. The Policy defines a "holding facility" as "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, or other holding facility, or other agency." *Id*. § 3.2. It notes that "short-term is defined as a period ***not to exceed*** 12 hours, absent exceptional circumstances." *Id*., § 3.2 n.3 (emphasis added).

The Policy provides that "ERO Officers are responsible for" enforcing mandatory procedures including, *inter alia*:

- "Ensuring that detainees are provided a meal at least every six hours" (*id.*, § 4.4.1.2); and

- "Ensuring that hold rooms are safe, clean, equipped with restroom facilities, and clear of objects that could be used as weapons against ERO personnel, contractors, or detainees" (*id.*, § 4.4.1.3).

With respect to "Procedures and Requirements," the Policy provides the following "Procedures for ERO Officers":

- "Allow detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary" (*id.*, § 5.7.2);

- "[E]mpty holding facilities upon the conclusion of daily operations in those field office locations operating on a daily schedule . . . absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours" (*id.*, § 5.1.1); and

- "Provide detainees with access to drinking water in hold rooms at all times" (*id.*, § 5.2.2").

### B.    Defendants' Decision to Waive the Policy and Operate the Hold Rooms as a Residential Facility

After taking office, the Trump administration immediately issued new quotas requiring ICE to make between 1,200 and 1,500 arrests per day.[2] According to Defendants' press releases, ICE made 32,809 "enforcement arrests" in the first 50 days of the Trump Administration (compared to 33,242 arrests in the entire fiscal year 2024), with that number rising to 66,463 arrests in the first 100 days.[3] In a March 4, 2025 interview, Matthew Elliston (the Baltimore Field Office Director at that time) explained that ICE's arrest numbers were "up about 600 percent" nationwide.[4] And on May 29, 2025, White House Deputy Chief of Staff Stephen Miller announced that Defendants are "looking to set a goal of a minimum of 3,000 arrests for ICE every day."[5]

---

[2] Danielle Wallace, *Trump officials give ICE goal of number of arrests per day: report,* Fox News (Jan. 27, 2025)*,* https://www.foxnews.com/politics/trump-officials-give-ice-goal-number-arrests-per-day-report.

[3] Dep't of Homeland Security, *ICE Arrests in First 50 Days*, (Mar. 13, 2025), https://www.dhs.gov/news/2025/03/13/ice-arrests-first-50-days-trump-administration (ECF No. 1-3); US Immigration and Customs Enforcement, *100 days of record-breaking immigration enforcement* (Apr. 29, 2025), https://www.ice.gov/news/releases/100-days-record-breaking-immigration-enforcement-us-interior.

[4] Taylor Bennet, *Maryland's ICE director reflects on growing challenges with lack of support*, WBAL NewsRadio (March 4, 2025), https://www.wbal.com/marylands-ice-director-reflects-on-growing-challenges-with-lack-of-support (ECF No. 1-5).

[5] Cameron Arcand, *Trump administration sets new goal of 3,000 illegal immigrant arrests daily*, Fox News (May 29, 2025), https://www.foxnews.com/politics/trump-administration-aims-3000-arrests-illegal-immigrants-each-day.

ICE's detention infrastructure was not designed to handle this sudden and extreme increase in the number of arrested individuals. As a result, it has been widely reported that ICE is already above its nationwide detention capacity.[6] In a publicly reported March 12, 2025 interview, Field Officer Elliston acknowledged that ICE "do[esn't] want anyone here more than 12 hours" (apparently in reference to the Baltimore Hold Rooms), but the number of newly detained people has required people "to be here for a couple of days" before they can be transferred elsewhere in the country.[7]

At the beginning of March 2025, Field Office Director Elliston discussed the Baltimore Hold Rooms with attorney Rachel Ullman, the Chair of the Baltimore ICE/ERO/OPLA liaison committee for the DC Chapter of the American Immigration Lawyers Association. In a March 7, 2025 email[8] to the AILA DC Chapter Listserv, Ms. Ullman reported:

> I have spoken with our Baltimore ICE ERO Field Office Director, Matthew Elliston, and he has confirmed the following information pertaining to the use of their Baltimore holding facility.
>
> When detention facilities in Pennsylvania and Virginia are full, BAL ICE has needed to hold some people for longer than 12 hours in order to find available bed space outside of Maryland.
>
> **BAL ICE has obtained a waiver of the 12 hour time limit for hold rooms.**
>
> Those who are in the BAL ICE holding facility are provided with blankets, food, and necessary medical care. FOD Elliston has ordered cots, but they have not yet arrived.

---

[6] *See, e.g.* Meg Anderson, *Private prisons and local jails are ramping up as ICE detention exceeds capacity*, Nat'l. Public Radio (June 4, 2025), https://www.npr.org/2025/06/04/nx-s1-5417980/private-prisons-and-local-jails-are-ramping-up-as-ice-detention-exceeds-capacity.

[7] *See* Tracee Wilkins, et al., *'Like living in a dark room': Inside overcrowded ICE detention centers* NBC Washington (March 12, 2025), https://www.nbcwashington.com/investigations/like-living-in-a-dark-room-inside-overcrowded-ice-detention-centers/3865502/ (ECF No. 1-11).

[8] See Email from Rachel Ullman to AILA DC Chapter Listserv (March 7, 2025, 4:41 PM), Exhibit 1 to the Declaration of Amelia Dagen dated June 12, 2025 ("Dagen Decl.") (emphasis added).

At that time, Defendants had already begun operating the Baltimore Hold Rooms as a residential facility despite the absence of basic resources necessary to care for individuals in their custody. In April 2025, U.S. Senators Chris Van Hollen and Angela Alsobrooks visited the facility and notified Defendants publicly of the "unacceptable harms inflicted on those being detained" in the Baltimore Hold Rooms. In contrast to Field Officer's Elliston representations about food, cots, and medical care, the Senators confirmed reports "that detainees have been held for durations longer than allowed by ICE standards in a facility that is unequipped to meet their basic needs, including reports of overcrowding in holding cells with no bed space, lack of adequate food service, and the absence of medical staff on-site."[9]

Since February 2025, Defendants have routinely detained putative Class Members in the facility for multiple days at a time, with many individuals detained for as many as six or seven days in unhealthy, unsanitary, and punitive conditions. *See, e.g.*, Parra Decl. ¶ 5 (6 days) (ECF No. 31-5); Cruz Decl. ¶ 6 (5 days) (ECF No. 31-6); Girod Decl. ¶ 10 (7 days) (ECF No. 31-7); B.R.R. Decl. ¶ 5 (6 days) (ECF No. 31-8); Vasquez Decl. ¶ 8 (6-7 days) (ECF No. 31-9).

Defendants routinely pack as many as 30 detained noncitizens into rooms that are intended to hold only a handful of individuals at a time. *See, e.g.*, Declaration of Katharine Gordon, dated June 12, 2025 ("Gordon Decl."), ¶ 14 (held in ""extremely crowded" room with "over 30 men"); Nieves Decl. ¶ 7 (ECF No. 31-10) ("I was held in a 12ft/12ft room with about twenty other men."); Parra Decl. ¶ 6 (ECF No. 31-5) (held in "roughly 12 x 18 ft." room with "about 20 other men"); Girod Decl. ¶ 5 (ECF No. 31-7) (held with "between fifteen and twenty-

---

[9] Van Hollen, Alsobrooks Press Trump Administration on Inhumane Conditions for Detainees at ICE's Baltimore Field Office (Apr. 10, 2025), https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office.

five people at any given time"); B.R.R. Decl. ¶ 6 (ECF No. 31-8) ("twenty other people"); O.P.L.

Decl. ¶ 6 (ECF No. 31-11) ("fourteen other people"); Jenkins Decl. ¶ 9 (ECF No. 31-12) (12

other men); Davey Decl. ¶ 17 (ECF No. 31-13) (12 men); Cruz Decl. ¶ 7 (ECF No. 31-6) (13

women).

These crowded rooms contain a single open toilet with no privacy, requiring detained

individuals to expose themselves to one another repeatedly while using the bathroom. *See, e.g.*,

Jenkins Decl. ¶ 10 (ECF No. 31-12) ("The restroom was inside the holding cell and was

disgusting. There was no privacy."); Parra Decl. ¶ 6 (ECF No. 31-5) ("If we had to use the

bathroom, everyone was able to see."); Girod Decl. ¶ 7 (ECF No. 31-7) ("Due to the crowding,

there was no privacy when [he]needed to use the bathroom."); Hyde Decl. ¶ 7 (ECF No. 6-2)

("[I]t is impossible for Ms. R.G. or the other detained women to use the toilet with any privacy.").

While living in a cramped room with an open toilet, detained individuals are denied access

to showers as well as basic hygiene items, including clean clothes, toothbrushes, and in some

instances even soap. *See*, *e.g.*, Cruz Decl. ¶ 9 (ECF No. 31-6) ("We remained in the clothes we

were wearing when detained for the next five days. There was no toothbrush, no deodorant, and

no other hygiene products, except soap, which was useless without a shower"); O.P.L Decl. ¶ 7

(ECF No. 31-11) ("We were not given anything to bathe, to shower, or to brush our teeth. We

were not given a change of clothes."); Amaya-Luis Decl. ¶ 10 (ECF No. 31-14) ("[F]or more

than seven days . . . I was not able to change my clothes or have access to any clean clothing.

There was no way to clean yourself, because there were no showers, washcloths, or towels.");

Vasquez Decl. ¶ 8 (ECF No. 31-9) ("There was no access to showers."); Girod Decl. ¶ 7 (ECF

No. 31-7) ("It was also very dirty, because there were no showers and no one was given a change

of clothes. No one was given soap or access to toothbrushes/toothpaste."); Hyde Decl. ¶ 8 (ECF

No. 6-2) ("Ms. R.G. has not been allowed to shower or change clothes. Sometimes ICE provides Ms. R.G. and the other detained women a couple of baby wipes.").

Defendants have denied putative Class Members access to medical care as well as prescribed medications for serious medical conditions ranging from diabetes to HIV. *See* Justiniano Decl. ¶¶ 3-5 (ECF No 1-15) (despite having family member bring diabetes medication to facility, Plaintiff was denied access to medication for over 24 hours and was advised that Defendants "did not have the capacity to [dispense medication] at this facility because it was meant to be temporary, and she would receive this care wherever she was transferred"); Jenkins Decl. ¶¶ 12-13 (ECF No. 31-12) (denied HIV medication for several days and told there was "no nurse in the facility" to provide it); Hyde Decl. ¶ 4 (ECF No. 6-2) (denied thyroid medication and medical treatment for days); B.R.R. Decl. ¶ 6 (ECF No. 31-8) ("For these three days, I asked to see a doctor, they said that there was no doctor, and they wouldn't be able to help me."); O.P.L. Decl. ¶ 9 (ECF No. 31-11) ("I saw him ask for insulin and the officials did not give him any . . . he was on the floor and was having difficulty breathing . . . they had to take him to the hospital.").

Defendants are not providing individuals detained in the Baltimore Hold Rooms with consistent access to drinking water. Instead of regular access to drinking water mandated by their own policies, Defendants provide detained people with one to three small water bottles per day. Justiniano Decl. ¶ 3 (ECF No 1-15) (8 oz bottle of water provided with meals); Girod Decl. ¶ 8 (ECF No. 31-7) ("Each person received one water bottle three times a day"); Ponce Decl. ¶ 7 (ECF No. 31-15) (water provided at meal times); Vasquez Decl. ¶ 5 (ECF No. 31-9) ("small water bottle" provided twice a day); Hyde Decl. ¶ 6 (ECF No. 6-2) ("Ms. R.G. is not being given water outside of a small bottle at mealtimes").

Defendants are not providing individuals detained in the Baltimore Hold Rooms with

adequate meals as required under the Policy. Instead, Defendants provide irregular "meals" consisting of a piece of bread, a peanut butter and jelly sandwich, a pouch of beans, or a cup of instant noodles. Nieves Decl. ¶ 8 (ECF No. 31-10) (one small bowl of soup and one piece of bread in a 24 hour period); Justiniano Decl. ¶ 3 (ECF No 1-15) (one cup of noodle soup, one ham sandwich, and one portion chicken noodle soup in 24 hour period); Girod Decl. ¶ 8 (ECF No. 31-7) ("Sometimes B.L.C. was given a cup of instant noodles, sometimes a protein bar, and sometimes bread or a cheese sandwich."); Davey Decl. ¶ 17 (ECF No. 31-13) ("dinner was just a bag of pre-cooked beans"); Amaya-Luis Decl. ¶ 11 (ECF No. 31-14) ("The ICE officers only gave me peanut butter and jelly sandwiches for the first two days . . . After that, for the next five days, they gave me much less food, sometimes no food at all."); B.R.R. Decl. ¶ 6 (ECF No. 31-8) ("[T]he horrible food that they gave us put me in pain for three days.").

Defendants are not providing individuals detained in the Baltimore Hold Rooms with adequate conditions for sleep. The lights remain on 24 hours a day and, because the Baltimore Hold Rooms are designed to hold only a few people for short periods of time, individuals are forced to sleep on the bare concrete floors or on thin inflatable air mattresses without adequate blankets or any pillows. Jenkins Decl. ¶ 10 (ECF No. 31-12) (describing 13 men "sleeping on the ground with no pillows or blankets"); Parra Decl. ¶ 6 (ECF No. 31-5) ("I had no blanket and had to sleep on the floor."); Girod Decl. ¶ 5 (ECF No. 31-7) ("[E]veryone had to sleep on the floor."); Amaya-Luis Decl. ¶ 9 (ECF No. 31-14) ("the floors were also cold, and I was not given a blanket to help me stay warm."); Ponce Decl. ¶ 7 (ECF No. 31-15) ("The lights were left on 24 hours a day"); Nieves Decl. ¶ 7 (ECF No. 31-10) ("There was never a time that the lights were off"); Hyde Decl. ¶ 9 (ECF No. 6-2) ("ICE does not provide pillows or sheets, only aluminum blankets").

In some instances, crowding is so bad that detained individuals are forced to sleep sitting up or are unable to move around in the cell. *See* Parra Decl. ¶ 6 (ECF No. 31-5) (when sleeping, "I had to sit on the floor because there was no room to extend my body."); Girod Decl. ¶ 5 (ECF No. 31-7) ("Sometimes, there wasn't enough room for everyone to even lay down on the floor, so people had to sleep sitting up."); O.P.L Decl. ¶ 6 (ECF No. 31-11) ("When we had the mattresses on the floor . . . there was nowhere to move.").

## **LEGAL STANDARD**

This Court has authority under Rule 65 of the Federal Rules of Civil Procedure to issue a preliminary injunction "to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but ... [s]uch an injunction restores, rather than disturbs, the status quo ante." *Id*. (*quoting Aggarao v. MOL Ship Mgmt. Co.,* 675 F.3d 355, 378 (4th Cir. 2012)).

A party seeking a preliminary injunction must establish four factors: "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When a government entity is a party to the case, the third and fourth factors merge." *PFLAG, Inc.*, No. 25-337, 2025 WL 510050, at *5 (D. Md. Feb. 14, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other

inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucster Cnty. School Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

While discovery has yet to begin, Plaintiffs have already marshalled sufficient evidence to establish a likelihood of success on numerous claims seeking to enjoin Defendants' unlawful practices in the Baltimore Hold Rooms. First, Plaintiffs have established that the punitive conditions of confinement in the Baltimore Hold Rooms violate their Fifth Amendment rights to hygienic and sanitary conditions (Count IV) and adequate medical care (Count V). Second, Plaintiffs have established that Defendants' decision to waive the Policy and operate the Baltimore Hold Rooms as a residential facility was contrary to the Constitution and arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. 5 U.S.C. § 706(2)(A) (the "APA") (Count I). Finally, Plaintiffs have established that Defendants' decision to suspend and deviate from their own written procedures violates the Due Process Clause and APA under the *Accardi* doctrine (Count II).

### A.    Plaintiffs are Likely to Succeed on their Fifth Amendment Punitive Conditions Claims (Counts IV-V).

Plaintiffs have established a likelihood of success on the merits for Counts IV and V, which assert that Defendants have violated the Due Process Clause of the Fifth Amendment[10] by

---

[10] Because immigration detention is civil in nature, challenges to conditions of confinement in immigration facilities arise under the Fifth Amendment and are subject to the same constitutional analysis as pre-trial detention. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also* C*oreas v. Bounds*, 451 F. Supp. 3d 407, 420 (D. Md. 2020).

subjecting civilly detained individuals to punitive conditions, including through the denial of (i) sanitary, hygienic, and safe conditions and (ii) medical care.

"Civil detainees 'are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017) (*quoting Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment, a [civil] detainee . . . may not be subjected to punishment of any description. *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992); *see also Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018) ("Put most simply, it is settled that [civil] detainees possess a constitutional right 'to be free from punishment.'") (*quoting Bell v. Wolfish*, 441 U.S. 520, 535) (1979).

When a civilly detained individual challenges conditions of confinement, "the controlling inquiry for such a claim is whether the conditions imposed . . . constitute punishment." *Williamson,* 912 F.3d at 174 (4th Cir. 2018) (quotation omitted). In the Fourth Circuit, there is no requirement of subjective intent; a civilly detained individual prevails "on the purely objective basis that the 'governmental action' they challenge is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024).

## 1.    Defendants Deprive Putative Class Members of Hygienic, Sanitary, and Safe Conditions in Violation of the Fifth Amendment (Count IV).

Defendants have violated their constitutional obligation to provide for Plaintiffs' and putative Class Members' health, safety, and well-being while in their custody in the Baltimore Hold Rooms. *See DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs*, 489 U.S. 189,199-200 (1989). "It is a 'settled rule that housing inmates in a grossly overcrowded and unsanitary facility

violates the inmates' rights to be free from cruel and unusual punishments.'" *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 812 (D. Md. 2022) (citation omitted).

Defendants disregard their constitutional obligation by overcrowding the Baltimore Hold Rooms. Defendants routinely pack as many as 30 or more detained noncitizens into rooms that are intended to hold only a handful of individuals at a time. *See, e.g.*, Nieves Decl. ¶ 7 (ECF No. 31-10) ("I was held in a 12ft/12ft room [144 square feet] with about twenty other men" [7.2 square feet per person]); Parra Decl. ¶ 6 (ECF No. 31-5) (held in "roughly 12 x 18 ft." [216 square feet] room with "about 20 other men" [10.8 square feet per person]); Girod Decl. ¶ 5 (ECF No. 31-7) (held with "between fifteen and twenty-five people at any given time"); Gordon Decl., ¶ 14 (held in ""extremely crowded" room with "over 30 men").[11]

Even in a criminal detention facility, where cells provide "inmates with as little as eighteen square feet of living space . . . We have no trouble concluding that such crowded conditions constitute cruel and unusual punishment for those convicted inmates who are kept in their cramped cells for all but a few hours each week." *Campbell v. Cauthron*, 623 F.2d 503, 506 (8th Cir. 1980). And, in the context of a pre-trial detention facility, detaining individuals in rooms providing less than 23 square feet per prisoner "do[es] not provide minimum decent housing under any circumstances for any period of time." *Lareau v. Manson*, 651 F.2d 96, 107-08 (2d Cir. 1981); *see also Zolnowski v. Cnty. of Erie*, 944 F. Supp. 1096, 1113 (W.D.N.Y. 1996) (holding pretrial detainees in spaces affording about 26 square feet per prisoner violates due process).

---

[11] *See also* B.R.R. Decl. ¶ 6 (ECF No. 31-8) ("held in a room with about twenty other people"); O.P.L. Decl. (ECF No. 31-11) ¶ 6 (held with "fourteen other people"); Jenkins Decl. ¶ 9 (ECF No. 31-12) (held with 12 other men); Davey Decl. ¶ 17 (ECF No. 31-13) (held with 12 men); Cruz Decl. ¶ 7 (ECF No. 31-6) (held with 13 women).

The square footage alone is not dispositive, and "the court must look to a number of factors, including the size of the detainee's living space, the length of the confinement, the amount of time spent in the confined area each day, and the opportunity for exercise." *Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650 (8th Cir. 1996); *Hubbard v. Taylor*, 538 F.3d 229, 233 (3d Cir. 2008) (same). For example, in *Bell*, the Supreme Court found that it was constitutionally permissible to hold two "pretrial detainees" in a seventy five square foot cell (37.5 square feet per person) because "[d]etainees are required to spend only seven or eight hours each day in their rooms, during most or all of which they presumably are sleeping . . . During the remainder of the time, the detainees are free to move between their rooms and the common area." *Bell*, 441 U.S. at 543.

Here, in contrast to *Bell*, individuals are kept in far more crowded quarters and remain locked in their cell for the entire duration of their stay without any opportunity for exercise or recreation. Girod Decl. ¶ 7 (ECF No. 31-7) (held for five days, during which time "[n]o one was allowed to go outside the room"); Amaya-Luis Decl. ¶ 7 (ECF No. 31-14) (held for seven days, during which "[t]he ICE officers never let me out of the rooms, I never saw daylight, and I did not taste any fresh air"); Ponce Decl. ¶ 7 (ECF No. 31-15) ( "I was not allowed to leave the cell during the entire [three days] I was there.").

Adding to these indignities, the Baltimore Hold Rooms contain only a single open toilet with no privacy, requiring up to 30 detained individuals to expose themselves to one another repeatedly while using the bathroom. *See, e.g.*, Jenkins Decl. ¶ 10 (ECF No. 31-12) ("The restroom was inside the holding cell and was disgusting. There was no privacy."); Parra Decl. ¶ 6 (ECF No. 31-5) ("If we had to use the bathroom, everyone was able to see."); Hyde Decl. ¶ 7 (ECF No. 6-2) ("[I]t is impossible for Ms. R.G. or the other detained women to use the toilet with any privacy."); Girod Decl. ¶ 7 (ECF No. 31-7) (describing bathroom as "very dirty"); *see also Zolnowski*, 944 F.

13

Supp. at 1113 (finding punitive conditions where Defendants "often house[] ten to twenty prisoners with only one toilet.")

Further compounding the overcrowding and dirty conditions, Defendants refuse to allow detained individuals to wash or clean themselves or to change clothing. *See, e.g.*, Cruz Decl. ¶ 9 (ECF No. 31-6) ("We remained in the clothes we were wearing when detained for the next five days. There was no toothbrush, no deodorant, and no other hygiene products, except soap, which was useless without a shower"); O.P.L Decl. ¶ 7 (ECF No. 31-11) ("We were not given anything to bathe, to shower, or to brush our teeth. We were not given a change of clothes."); Amaya-Luis Decl. ¶ 10 (ECF No. 31-14) ("[F]or more than seven days . . . I was not able to change my clothes or have access to any clean clothing. There was no way to clean yourself, because there were no showers, washcloths, or towels.").[12]

Courts in this Circuit have also found constitutional violations where, as here, defendants' conduct leads to overcrowding and unsanitary conditions. *See, e.g.*, *Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991) (allegations that, *inter alia*, plaintiff's cell toilet was shared by twelve inmates and constantly unclean deemed sufficient to sustain claim); *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 811 (D. Md. 2022) (granting summary judgment to plaintiff who was forced to ride in van that smelled of "defecation, urine, vomit, old food"); *see also Clark v. Daddysman*, No. 16-cv-0921, 2018 WL 1453333, at *10 (D. Md. Mar. 22, 2018) (confining individuals "in a cell containing human waste" is dangerous to the individual's health).

---

[12] Vasquez Decl. ¶ 8 (ECF No. 31-9) ("There was no access to showers."); Girod Decl. ¶ 7 (ECF No. 31-7) ("It was also very dirty, because there were no showers and no one was given a change of clothes. No one was given soap or access to toothbrushes/toothpaste."); Hyde Decl. ¶ 8 (ECF No. 6-2) ("Ms. R.G. has not been allowed to shower or change clothes. Sometimes ICE provides Ms. R.G. and the other detained women a couple of baby wipes.").

The conditions at the Baltimore Hold Rooms are radically below the minimum requirements for criminal detention facilities under the Federal Performance Based Detention Standards. These require that contracting facilities provide "a minimum of 35 square feet of space per detainee," "one [toilet] for every 12 detainees in male facilities and one for every eight detainees for female facilities," and "one shower for every 12 detainees."[13]

In the Ninth Circuit, "when a [civil] detainee is confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004); *see also Americans for Immigrant Just*, No. 22-cv-3118, 2023 WL 1438376, at *12 (Feb. 1, 2023) (recognizing presumption where "conditions of confinement applicable to civil . . . detainees are equal to or worse than conditions experienced by [criminal] inmates"); *Nin-Carrasquillo v. Montes Gonzalez*, No. 06-cv-1408, 2006 WL 8450973, at *7 (D.P.R. Dec. 20, 2006) (same).

While the Fourth Circuit has declined to apply this presumption (*see Matherly v. Andrews*, 859 F.3d 264, 275 (4th Cir. 2017)), the fact that these conditions are *radically* below the minimum standard required for convicted criminals in federal facilities strongly supports Plaintiffs' claim. Defendants can provide no legitimate nonpunitive objective that would justify inflicting the indignities of these conditions on civilly detained individuals at the Baltimore Hold Rooms. Moreover, any non-punitive purpose could be accomplished through alternative methods[14] consistent with the constitutional rights of Plaintiffs and putative Class Members.

---

[13] U.S. Dep't of Justice, *Federal Performance Based Detention Standards* (May 1, 2025), www.usmarshals.gov/sites/default/files/media/document/federal-performance-based-detention-standards-12.pdf, at 79, 94.

[14] *See, e.g.*, U.S. Immigration & Customs Enforcement, *Alternatives to Detention* (https://www.ice.gov/features/atd) (describing "ICE's Alternatives to Detention (ATD) program" which "enables aliens to remain in their communities — contributing to their families and

### 2. Defendants Deprive Putative Class Members of Adequate Medical Care in Violation of the Fifth Amendment (Count V).

Defendants have violated their constitutional obligation to provide medical care for Plaintiffs' and putative Class Members' while in their custody in the Baltimore Hold Rooms. The Supreme Court long ago recognized the "government's obligation to provide medical care" for detained individuals, noting that "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Accordingly, a civilly detained individual "'makes out a due process violation if he shows 'deliberate indifference to serious medical needs' . . . because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *Reese v. Bounds*, No. 20-cv-3080, 2021 WL 849108, at *7 (D. Md. Mar. 5, 2021) (quoting *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988)).

In *Short v. Hartman*, the Fourth Circuit adopted an "objective test" for claims by civilly detained individuals, dispensing with a prior requirement that a plaintiff establish a defendant's subjective knowledge of a serious risk of harm. 87 F.4th 593, 611 (4th Cir. 2023). As a result, a plaintiffs must show that:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id*.

There can be no serious dispute that Defendants have recklessly (and even knowingly) subjected putative Class Members to significant risk of harm by detaining them for days at a time

---

community organizations" and for which the daily cost is "less than $4.20 per day — a stark contrast from the cost of detention, which is around $152 per day.").

without even basic access to medical care. Following their inspection of the Baltimore Hold Rooms, Senators Van Hollen and Alsobrooks wrote to Defendants to express their shock that "[t]here is no infirmary or medical staff on-site, and even when a field medical coordinator is contacted, they are not able to speak to the detainees directly about their medical needs."[15]

Consistent with those findings, and despite receiving formal notice as part of the legislative oversight process, Defendants have denied putative Class Members access to medical care. One notable example of this is Defendants' failure to provide for the proper administration of prescription drugs, which are confiscated from detained individuals upon detention. Defendants' practice of withholding prescription medications alone creates an objectively "substantial risk of . . . serious harm" or even death. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995*)*.

For example, the American Diabetes Association notes that "[i]f a person who needs insulin is not able to take that medication for a period ranging from several hours to several days, he or she can experience diabetic ketoacidosis (DKA)," which, "if left untreated, will eventually result in death."[16] Indeed, even missing a single necessary dose of insulin can result in death. *See*, *e.g.*, *Egebergh v. Nicholson*, 272 F.3d 925 (7th Cir. 2001) (deliberate indifference by police officers for ignoring morning shot of inmate, leading to ketoacidosis and death).

Yet even when Defendants have been advised that detained individuals require insulin, they have refused to provide access. *See* O.P.L. Decl. ¶ 9 (ECF No. 31-11) ("I saw him ask for insulin and the officials did not give him any . . . he was on the floor and was having difficulty

---

[15] *See* Van Hollen Press release, https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office.

[16] Benjamin Eisenberg & Victoria Thomas, Am. Diabetes Assoc., *Legal Rights of Prisoners and Detainees with Diabetes*, https://diabetes.org/sites/default/files/2023-10/legal-rights-of-prisoners-detainees-with-diabetes-intro-guide.pdf.

breathing . . . they had to take him to the hospital."); Compl., Ex. 9 (ECF No. 1-10) (for two days detained individual "was not given his insulin or other medication" and, upon transfer from the Baltimore Hold Rooms had to be "placed under medical observation for 23 hours due to "uncontrolled diabetes"); *see also* Justiniano Decl. ¶¶ 3-5 (ECF No 1-15) (despite having family member bring diabetes medication to facility, Plaintiff was denied access to medication for over 24 hours because Defendants stated "they did not have the capacity to [dispense medication] at this facility"); Jenkins Decl. ¶¶ 12-13 (ECF No. 31-12) (individual experiencing shortness of breath requested HIV medication "multiple times" but was denied access for several days and told there was simply "no nurse in the facility" to provide medication). While there is no longer a subjective requirement for medical care claims, Defendants are subjectively aware of the serious dangers to putative Class Members caused by lack of access to medical care, and yet fail to take any action to prevent such dangers. Plaintiffs are thus likely to succeed on Count V of their Complaint.

### B. Plaintiffs Are Likely to Succeed on Their Claims that Defendants Violated the APA (Count I).

In March 2025, Defendants disclosed that they had made an affirmative decision to waive the Policy's 12-hour limitation and employ the Baltimore Hold Rooms as a residential facility. As noted by Senators Van Hollan and Alsobrooks, Defendants decided to detain hundreds of individuals "in a facility that is unequipped to meet their basic needs."[17] As detailed below, Plaintiffs are likely to succeed on their claim challenging this decision under the APA because it

---

[17] Van Hollen, Alsobrooks Press Release, https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office.

is "contrary to constitutional right" and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)-(B).

### 1. Defendants Decision to Waive Application of the Policy to the Baltimore Hold Rooms Is a Final Agency Action.

Defendants' decision to waive the Policy's 12-hour limitation and employ the Baltimore Hold Rooms as a residential facility is a "final agency action" under the APA. "[T]he word 'action[ ]' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *see also FTC v. Standard Oil Co.*, 449 U.S. 232, 238 n.7 (1980) ("According to the legislative history of the APA: The term agency action . . . assure[s] the complete coverage of every form of agency power, proceeding, action, or inaction.") (internal citation and quotation omitted). Action is "final" when it (i) "mark[s] the 'consummation' of the agency's decisionmaking process" and (ii) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).

In this case, Defendants made a discrete decision to waive the Policy's 12-hour limitation and employ the Baltimore Hold Rooms as a residential facility. At the beginning of March 2025, Field Office Director Elliston advised the Baltimore ICE/ERO/OPLA liaison committee for the DC Chapter of the American Immigration Lawyers Association that "BAL ICE has obtained a waiver of the 12 hour time limit for hold rooms."[18] In other cases involving these same Defendants, Courts have repeatedly found that a decision to suspend enforcement of an agency policy constitutes final agency action. *See, e.g.*, *Tendo v. United States*, No. 2:23-cv-438, 2024 WL 3650462, at *13 (D. Vt. Aug. 5, 2024) (finding final agency action where "ICE and DHS made a

---

[18] *See* Dagen Decl. Ex.1.

concerted decision not to adhere to its use-of-force guidelines"); *see also Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1069 (C.D. Cal. 2019) (finding final agency action where ICE made a "decision not to enforce " detention standards at specific facilities); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 120 (D.D.C. 2018) (final agency action where defendants chose not "to abide by a binding, official agency directive governing parole determinations"); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-cv-0760, 2023 WL 2564119, at *4 (D.D.C. Mar. 15, 2023) (final agency action can be established where "a plaintiff challenges one, overarching agency decision to no longer enforce or apply an agency policy"); *Americans for Immigrant Just.*, 2023 WL 1438376, at *18 (finding no final agency action because plaintiff *did not allege* that Defendants made a "final decision that any one Facility need not comply" with detention standards); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 225 (D.D.C. 2020) (no final agency action because "Plaintiffs do not identify any discrete final agency decision not to implement" COVID-related detention policies).

Defendants' decision to waive the durational limitations of the Policy reflects a "consummation" of their decision-making process, because it is "attributable to the agency itself and represents the culmination of [its] consideration of an issue." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting *Bennett*, 520 U.S. at 177-78). This decision directly determines "rights or obligations" (*Bennett*, 520 U.S. at 178 (citation omitted)), because it reduces durational obligations of the Baltimore Hold Rooms while immediately eliminating the rights of putative Class Members to, *inter alia*, be detained in a setting with Constitutionally mandated access to medical care. *See Torres*, 411 F. Supp. 3d at 1069 ("The Court assumes that the rights of detainees and obligations of detention contract facilities would flow from any agency action regarding detention standards compliance and enforcement.").

**2.    Defendants' Decision to Waive the Policy Violates the APA Because it is Contrary to the Constitution, Arbitrary and Capricious, and an Abuse of Discretion.**

Plaintiffs are likely to prevail on their APA claim in at least two respects. First, under the APA, this Court is compelled to "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(A)-(B). In this case, Defendants' decision to repurpose the Baltimore Hold Rooms as a residential detention facility is contrary to putative Class Members' constitutional rights because the facility is not equipped with basic resources necessary to ensure the minimal conditions required under the Constitution. As noted by Senators Van Hollen and Alsobrooks, "[t]here is no infirmary or medical staff on-site, and even when a field medical coordinator is contacted, they are not able to speak to the detainees directly about their medical needs."[19] Defendants' affirmative decision to detain individuals for days on end in such a facility is, at a minimum, a clear violation of Plaintiffs' and putative Class Members rights to receive medical care (see Section I.A.2, *supra*) while in detention. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

Even if it did not directly contravene putative Class Members' constitutional rights, Defendants' decision was unlawful because it was "arbitrary, capricious, [and] an abuse of discretion[.]" 5 U.S.C. 706(2)(A). In assessing agency action, the Court's underlying "task involves examining the reasons for [the] agency decision[]—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). An agency action is arbitrary and capricious when the agency departs from a prior policy without "articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice

---

[19] *See* Van Hollen Press Release, https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office.

made." *See Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (citation omitted). This includes a change in policy in which the agency "entirely failed to consider [] important aspect[s] of the problem" that it sought to address. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Ohio v. United States Env't Prot. Agency*, 603 U.S. 279, 293 (2024) ("[A]n agency cannot simply ignore an important aspect of the problem.") (internal citation and quotation omitted).

In this case, Defendants have not offered any justification or rationale for departing from their Policy limiting the duration of detention at the Baltimore Hold Rooms to a maximum of 12 hours and instead utilizing the Baltimore Hold Rooms as a residential facility. Indeed, Defendants did not even publicly acknowledge the existence of a waiver until being forced to do so following public advocacy by members of the legal community.[20] This is precisely the type of "depart[ure] from a prior policy sub silentio" that is prohibited under the APA. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The lack of reasoned decision-making underlying Defendants' waiver decisions is not new. On January 29, 2019, the DHS Office of the Inspector General issued a report raising serious concerns about the waiver process employed for privately contracted residential detention facilities. It found:

> ICE frequently issued waivers to facilities with deficient conditions, seeking to exempt them from having to comply with certain detention standards. However, we found that ICE has no formal policies and procedures to govern the waiver process and has allowed ERO officials without clear authority to grant waivers. We also

---

[20] *See* Tanvi Misra, "Essentially Cages": ICE Is Using Courthouse Cells for Lengthy Detentions, The Nation (Mar. 17, 2025), https://www.thenation.com/article/society/ice-detention-courthouse-holding-room (ECF No. 1-10).

determined that ICE does not ensure key stakeholders have access to approved waivers.[21]

Consistent with the noted absence of reasoned decision-making and failure to share waivers with key stakeholders, Defendants in this case have refused to provide any details about their waiver decision, leading Senators Van Hollen and Alsobrooks to serve a formal request that Defendants "produce the waiver" and answer the following questions: "When was the 12-hour holding rule waiver granted, under what authority was it granted, and what reasoning supports it being granted indefinitely?"[22] As of this filing, Defendants have not responded to the Senators' inquiries.

Even if reasoned decision-making could support a waiver of certain restrictions at certain facilities, Defendants' waiver in this case is clearly arbitrary and capricious because it "entirely failed to consider an important aspect of the problem." *W. Virginia Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 229 (4th Cir. 2019) (internal citation and quotation omitted). Defendants elected to begin employing the Baltimore Hold Rooms as a residential facility as early as February 2025 even though, as of April, it still had "no infirmary or medical staff on-site," "no food service contract" and "no bed space."[23] Defendants' abject failure to address the basic minimum conditions required for a residential facility has predictably led to gross constitutional violations. Plaintiffs are likely to prevail on Count I of their Complaint.

---

[21] See Department of Homeland Security, Office of Inspector General, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (January 29, 2019), Dagen Decl. Ex. 2.

[22] Van Hollen Press Release, https://www.vanhollen.senate.gov/news/press-releases/van-hollen-alsobrooks-press-trump-administration-on-inhumane-conditions-for-detainees-at-ices-baltimore-field-office.

[23] *Id*.

**C.      Plaintiffs Are Likely to Succeed on Their Claims Under the *Accardi* Doctrine (Count II).**

Independent of their APA challenge, Plaintiffs are also likely to prevail on their claim challenging Defendants' deviation from their own written procedures under the *Accardi* doctrine. Under the *Accardi* doctrine, agencies are bound to follow their own rules that affect the fundamental rights of individuals, including self-imposed policies and processes that limit otherwise discretionary decisions. *See Accardi v. Shaughnessy,* 347 U.S. 260, 267 (1954) (holding that BIA must follow its own regulations in its exercise of discretion and that an APA claim may be brought where an agency does "precisely what [its] regulations forbid [it] to do"); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required."); *Sanchez v. McAleenan,* No. 19-cv-1728, 2024 WL 1256264, at *7 (D. Md. Mar. 25, 2024) ("The *Accardi* doctrine provides that when an agency fails to follow its own procedures and regulations, that agency's actions are generally invalid.").

The *Accardi* doctrine arises from the principle "that any violation by an agency of its own regulations, at least one that results in prejudice to a particular individual, offends due process[.]" *Sanchez v. McAleenan*, No. 19-cv-1728, 2024 WL 1256264, at *7 (D. Md. Mar. 25, 2024) (*quoting* Thomas W. Merrill, The *Accardi* Principle, 74 GEO. WASH. L. REV. 569, 576 (2006)). While some courts have treated it primarily as a constitutional principle arising under the Due Process Clause (*see id.*), others have analyzed an *Accardi* claim as "a subset of claims for relief cognizable under the APA." *Americans for Immigrant Just.,* 2023 WL 1438376, at *17.

The *Accardi* doctrine applies to any binding agency guidance, even if is "not promulgated in something formally labeled a 'Regulation' or adopted with strict regard to the Administrative Procedure Act; the *Accardi* doctrine has a broader sweep." *United States v. Heffner*, 420 F.2d 809,

812 (4th Cir. 1969). Courts routinely apply the *Accardi* doctrine to agency guidance documents if they are "intended" by the agency to be binding and are "promulgated for the protection of individuals." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (citations omitted); *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."). Even an unpublished policy binds the agency if "an examination of the provision's language, its context, and any available extrinsic evidence" supports the conclusion that it is "mandatory rather than merely precatory." *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977).

Here, the Policy provides mandatory procedures for confinement of detained noncitizens and was thus "promulgated for the protection of individuals." *See Damus,* 313 F. Supp. at 336. Moreover, an examination of the Policy's language and context confirms that the Policy's procedures are mandatory and intended to be binding. On its face, the Policy is a "Directive" providing that "ERO Officers are responsible ***for ensuring*** that field office personnel follow the procedures in this ***Directive*** for operating holding facilities located within their respective field offices." ECF No. 1-8, § 4.3. (emphasis added). This same mandatory language appears throughout Section 4.4.1, establishing procedures under which "ERO Officers are responsible ***for ensuring***" that detainees in Baltimore Hold Room have "a meal at least every six hours" (*id*., § 4.4.1.2) (emphasis added), and that hold rooms are "safe, clean and equipped with restroom facilities." *Id*., § 4.4.1.3. Conspicuously absent from the responsibilities set forth in Section 4.4.1 is any permissive language such as "may," "within the ERO Officer's discretion" or "if practicable."

Similarly, Sections 5.1 sets forth certain "Supervision and Monitoring -- Procedures for ERO Officers" including, "empty[ing] holding facilities upon the conclusion of daily operations." *Id,* § 5.1.1. In prescribing this procedure, the Policy expressly states: "Absent exceptional

circumstances, no detainee should be housed in holding facility for longer than 12 hours" (*id.*) – a requirement that is reinforced in the definition of a "short-term" as "a period not to exceed 12 hours, absent extraordinary circumstances" (*id.,* §3.2, n. 3). In similarly mandatory fashion, the Policy established a procedure under which ERO officers must "provide detainees access to drinking water . . . at all times" (*id.*, § 5.2.2); and "allow detainees . . . to have access to . . . prescribed medication as necessary. *Id.*, § 5.7.2.

This mandatory nature of Defendants' written procedures finds further support from extrinsic evidence. On March 12, 2025, William Joyce, Field Officer of the ICE New York Field Office confirmed, in a Declaration filed in federal court that the Policy is still in effect and "***dictates*** that absent exceptional circumstances, no detainee should be housed in a Holding room facility for longer than 12 hours." *Khalil v. Joyce*, 1:25-cv-01935, ECF No. 48 at ¶ 13 (Mar. 14, 2025) (emphasis added). Mr. Joyce's Declaration under penalties of perjury leaves no doubt as to the field office's view regarding the mandatory nature of these procedures. *See Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 121 (D.D.C. 2020) (finding agency "intended to be bound by this guidance" based on public statements and court filings).

In this case, Defendants have violated and continue to violate their own procedures in multiple respects, including by:

- detaining putative Class Members in the Baltimore Hold Rooms for longer than 12 hours (ECF No. 1-8, § 5.1.1);

- failing to empty the Baltimore Hold Rooms upon the conclusion of daily operations (*id.*);

- denying putative Class Members access to necessary prescribed medications (*id*,. § 5.7.2);

- failing to provide putative Class Members with access to drinking water (*i.e.* sanitary water suitable for drinking) at all times (*id*,. § 5.2.2); and

- failing to provide putative Class Members with a meal at least every six hours (*id*,. § 4.4.1.2).

Defendants concerted decision to suspend and deviate from these written procedures infringes on Plaintiffs' Due Process rights under the *Accardi* Doctrine and violates the APA. Plaintiffs are thus likely to prevail on Count II of their Complaint.

## II.   PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM TO THE PLAINTIFFS

The putative Class Members will clearly continue to suffer irreparable harm in the absence of an injunction. With respect to their constitutional claims, "[i]t has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (internal citation and quotation omitted). With respect to their APA claims, "unlike economic harm, the harm from detention pursuant to an unlawful departure from agency procedure cannot be remediated after the fact." *Damus,* 313 F. Supp. 3d at 342. Absent an injunction, extended confinement in the overcrowded, unsanitary Baltimore Hold Rooms will continue to cause putative Class Members personal injury, mental anguish, emotional trauma, and potential death, for which monetary damages are inadequate.

## III.   BOTH THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING PRELIMINARY INJUNCTIVE RELIEF

Putative Class Members will continue to suffer significant irreparable harm to their life and liberty in the absence of the requested injunctive relief. In contrast, Defendants are "in no way harmed by the issuance of [an injunction] which prevents [them] from" engaging in practices "likely to be found unconstitutional." *Leaders of a Beautiful Struggle,* 2 F.4th at 346. The requested injunctive relief would merely enjoin Defendants from violating their own policies regarding the use of holding rooms for short term, temporary detention. *See, e.g.*, *ClearOne Adv., LLC v. Kersen*,

710 F. Supp. 3d 425, 437 (D. Md. 2024) (recognizing that a defendant "can suffer little cognizable hardship" from the enforcement of a contract—or, in this case, a policy—that the defendant created or agreed upon). It would not prevent Defendants from detaining non-citizens at more than 150 long-term ICE facilities across the country.

Finally, the public interest weighs heavily in Plaintiffs' favor because "it is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346; *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) ("[U]pholding constitutional rights surely serves the public interest.") (citation omitted).

## IV.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR REQUIRE PLAINTIFFS TO PROVIDE A NOMINAL SECURITY

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." Under Fourth Circuit law, "the district court retains the discretion to set the bond amount as it sees fit or [even] waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (*abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977, 981 (4th Cir. 2022)). Courts have "frequently waived the bond requirement in cases where a fundamental constitutional right is at stake." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (setting "a nominal bond of zero dollars"); *Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ( "District courts have discretion to set the required security at a nominal amount . . . and this approach has long been followed in public-interest litigation cases") (citation omitted); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 25-cv-00702, 2025 WL 833917, at *25 (D. Md. Mar. 17, 2025) (setting nominal bond of $100).

President Trump has instructed government attorneys to "curb[] activist judges" and "deter[] . . . litigation" by seeking excessive, punitive bonds in litigation like this class action.[24] But any request for bond that exceeds a nominal amount is an attempt to deter litigation, which is not tailored to this request for a preliminary injunction as required under FRCP 65(c).

A court in this district has previously waived the bond requirement in a case involving civilly detained noncitizens seeking preliminary injunctive relief related to unconstitutional conditions at Defendants' facilities. *Coreas v. Bounds*, 458 F.Supp.3d 352, 362 (D. Md. 2020). This Court should do the same here or, in the alternative, set a nominal bond of $1.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion and issue an order enjoining Defendants and their agents and employees from: (i) operating the Baltimore Hold Rooms as a residential facility and (ii) subjecting Plaintiffs and putative Class Members to punitive and unconstitutional conditions of confinement in the Baltimore Hold Rooms.

Dated: June 12, 2025                                 Respectfully submitted,

*/s/ Jerome A. Murphy*                             Ian Austin Rose (D. Md. Bar No. 22079)
Jerome A. Murphy (D. Md. Bar No. 27678)            Daniel Melo (N.C. Bar No. 48654)*
**CROWELL & MORING LLP**                           Amelia Dagen (D.C. Bar No. 90004838)
1001 Pennsylvania Avenue NW                        **AMICA CENTER FOR IMMIGRANT RIGHTS**
Washington, DC 20004                               **NATIONAL IMMIGRATION PROJECT**
(202) 624-2895                                     1025 Connecticut Ave. NW
JMurphy@crowell.com                                Suite 701
                                                   Washington, DC 20036
Jared A. Levine (NY Bar No. 4897211)**             (202) 788-2509
Daniella Schmidt (NY Bar No. 5186283)**            Austin.rose@amicacenter.org

---

[24] *See* "Fact Sheet: President Donald J. Trump Ensures the Enforcement of Federal Rule of Civil Procedure 65(c)," WHITEHOUSE.GOV (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/.

Luke Taeschler (NY Bar No. 5308325)**
Emily Werkmann (NY Bar No. 5750229)**
CROWELL & MORING LLP
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com
DSchmidt@crowell.com
LTaeschler@crowell.com
Ewerkmann@crowell.com

Dan.melo@amicacenter.org
Amelia@amicacenter.org

Sirine Shebaya (D. Md. Bar No. 07191)
Matthew Vogel (LA Bar No. 35363)*
Yulie Landan (CA Bar No. 348958)*
NATIONAL IMMIGRATION PROJECT
1763 Columbia Rd. NW
Suite 175 #896645
Washington, DC 20009
(202) 656-4788
sirine@nipnlg.org
matt@nipnlg.org
yulie@nipnlg.org

*Pro bono counsel for Plaintiffs*

* Admitted *Pro Hac Vice*
** *Pro Hac Vice Forthcoming*