OFFICE OF INSPECTOR GENERAL

# ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards

Homeland Security

January 29, 2019

OIG-19-18

# DHS OIG HIGHLIGHTS

## *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*

**January 29, 2019**

## Why We Did This Inspection

U.S. Immigration and Customs Enforcement (ICE) contracts with 106 detention facilities to detain removable aliens. In this review we sought to determine whether ICE contracting tools hold immigration detention facilities to applicable detention standards, and whether ICE imposes consequences when contracted immigration detention facilities do not maintain standards.

## What We Recommend

We made five recommendations to improve contract oversight and compliance of ICE detention facility contractors.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

Although ICE employs a multilayered system to manage and oversee detention contracts, ICE does not adequately hold detention facility contractors accountable for not meeting performance standards. ICE fails to consistently include its quality assurance surveillance plan (QASP) in facility contracts. The QASP provides tools for ensuring facilities meet performance standards. Only 28 out of 106 contracts we reviewed contained the QASP.

Because the QASP contains the only documented instructions for preparing a Contract Discrepancy Report and recommending financial penalties, there is confusion about whether ICE can issue Contract Discrepancy Reports and impose financial consequences absent a QASP. Between October 1, 2015, and June 30, 2018, ICE imposed financial penalties on only two occasions, despite documenting thousands of instances of the facilities' failures to comply with detention standards.

Instead of holding facilities accountable through financial penalties, ICE issued waivers to facilities with deficient conditions, seeking to exempt them from complying with certain standards. However, ICE has no formal policies and procedures to govern the waiver process, has allowed officials without clear authority to grant waivers, and does not ensure key stakeholders have access to approved waivers. Further, the organizational placement and overextension of contracting officer's representatives impede monitoring of facility contracts. Finally, ICE does not adequately share information about ICE detention contracts with key officials.

## ICE Response

ICE officials concurred with all five recommendations and proposed steps to update processes and guidance regarding contracting tools used to hold detention facility contractors accountable for failing to meet performance standards.

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

January 29, 2019

MEMORANDUM FOR: Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement

FROM: John V. Kelly
Senior Official Performing the Duties of the Inspector General

SUBJECT: *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*

Attached for your information is our final report, *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*. We incorporated the formal comments from the ICE Office of the Chief Financial Officer in the final report.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Jennifer Costello, Deputy Inspector General, or Tatyana Martell, Chief Inspector,
at (202) 981-6000.

Attachment

## Table of Contents

Background ........................................................................................ 3

Results of Inspection ........................................................................... 7

ICE Does Not Consistently Use Contract-Based Quality Assurance Tools and Impose Consequences for Contract Noncompliance ........................ 7

ICE's Waiver Process May Allow Contract Facilities to Circumvent Detention Standards and May Inhibit Proper Contract Oversight ........... 9

Organizational Placement and Overextension of CORs Impede Monitoring of Detention Facilities ................................................................... 12

Lack of Direct Access to Important Contract Files Hinders CORs' and DSMs' Ability to Monitor Detention Contracts .................................... 14

Conclusion .......................................................................................... 15
Recommendations................................................................................ 15

## Appendixes

Appendix A: Objective, Scope, and Methodology ................................. 21
Appendix B: Management Comments to the Draft Report..................... 22
Appendix C: Facility Listing and Quality Assurance Surveillance Plan Status....................... ................................................................. 27
Appendix D: Office of Inspections and Evaluations Major Contributors to This Report ............................................................. 31
Appendix E: Report Distribution ......................................................... 32

## Abbreviations

| | |
|---|---|
| ADP | average daily population |
| CDF | contract detention facility |
| CFR | Code of Federal Regulations |
| COR | contracting officer's representative |
| DIGSA | dedicated inter-governmental service agreement |
| DSM | Detention Service Manager |
| ERO | Enforcement and Removal Operations |
| FAR | Federal Acquisition Regulation |
| ICE | U.S. Immigration and Customs Enforcement |
| IGA | inter-governmental agreement |

| | |
|---|---|
| IGSA | inter-governmental service agreement |
| NDS | National Detention Standards |
| ODO | Office of Detention Oversight |
| OIG | Office of Inspector General |
| PBNDS | Performance-Based National Detention Standards |
| QASP | quality assurance surveillance plan |

## Background

U.S. Immigration and Customs Enforcement's (ICE) Office of Enforcement and Removal Operations (ERO) confines detainees in civil custody for the administrative purpose of holding, processing, and preparing them for removal from the United States. While ICE owns five detention facilities, it has executed contracts, inter-governmental service agreements (IGSA), or inter-governmental agreements (IGA) with another 206 facilities for the purpose of housing ICE detainees.[1] Table 1 lists the types and numbers of facilities ICE uses to hold detainees as well as the average daily population (ADP) at the end of fiscal year 2017.

**Table 1: Types of Facilities ICE Uses for Detention**

| Facility Type | Description | Number of Facilities | FY 17 End ADP |
|---|---|---|---|
| **Service Processing Center** | Facilities owned by ICE and generally operated by contract detention staff | **5** | **3,263** |
| **Contract Detention Facility (CDF)** | Facilities owned and operated by private companies and contracted directly by ICE | **8** | **6,818** |
| **Inter-governmental Service Agreement (IGSA)** | Facilities, such as local and county jails, housing ICE detainees (as well as other inmates) under an IGSA with ICE | **87** | **8,778** |
| **Dedicated Inter-governmental Service Agreement (DIGSA)** | Facilities dedicated to housing only ICE detainees under an IGSA with ICE | **11** | **9,820** |
| **U.S. Marshals Service Inter-governmental Agreement (IGA)** | Facilities contracted by U.S. Marshals Service that ICE also agrees to use as a contract rider | **100** | **6,756** |
| | **Total:** | **211** | **35,435** |

*Source:* ICE data

[1] Unless otherwise indicated, in this report we use the term "contract" in reference to the contract, IGSA, or IGA instrument used to establish a relationship between ICE and the detention facility and the term "contract facility" to describe any detention facility operated under a contract, IGSA, or IGA.

For this review, we focused on the 106 CDF, IGSA, and DIGSA facilities[2] for which ICE has primary contracting authority.[3] In FY 2017, these 106 facilities held an average daily population of more than 25,000 detainees. Since the beginning of FY 2016, ICE has paid more than $3 billion to the contractors operating these 106 facilities.

### Key ICE Offices Involved in Contract Management and Facility Oversight

ICE spreads duties for planning, awarding, and administering contracts for detention management and overseeing contract facilities between Management and Administration and ERO, resulting in a multilayered system. Figure 1 provides the organizational structure for the key offices involved in managing contracts and overseeing contract facilities.

**Figure 1: Offices Responsible for Contract Management and Oversight**




*Source:* Office of Inspector General (OIG) analysis of ICE data

[2] See Appendix C: Facility Listing and Quality Assurance Surveillance Plan Status for a listing of the 106 facilities reviewed.
[3] We did not review contracts from the 100 detention facilities for which the U.S. Marshals Service has primary contracting authority. ICE executed IGAs (contract riders) with the U.S. Marshals Service to house ICE detainees at these facilities.

Within ERO, the Custody Management Division (Custody Management) manages ICE detention operations and oversees the administrative detainees held in detention facilities. Custody Management has a Detention Standards Compliance Unit, which monitors oversight inspections to evaluate compliance with ICE's national detention standards. As part of ICE ERO's development of a Detention Monitoring Program in 2010, Custody Management assigned Detention Service Managers (DSM) to cover 54 contract facilities to monitor compliance with detention standards. Custody Management also analyzes operational bed space needs and initiates requests for additional contract facilities to the Office of Acquisitions Management (Acquisitions Management), within Management and Administration.

Acquisitions Management is responsible for preparing, executing, and maintaining the contracts for detention facilities and for processing any modifications to contracts. Acquisitions Management contracting officers have signature authority to execute and modify contracts for detention facilities. Contracting officers also appoint contracting officers' representatives (COR) to oversee the day-to-day management of each contract facility, but retain ultimate authority for enforcing the terms of the contract.

ICE has 26 principal COR positions physically located at the 24 ERO Field Offices to function as liaisons between field operations and contracting. CORs report to Field Office management and are responsible for ensuring the contractor complies with the terms of the contract. CORs generally conduct detention facility site visits and should have first-hand knowledge of detention facility operations in order to approve invoices for payment and to address instances of noncompliance, such as by pursuing contractual remedies. The Field Operations Division provides guidance to and coordination among the 24 national ERO Field Offices. The Field Office Directors are chiefly responsible for the detention facilities in their assigned geographic area.

**Detention Contracts and Standards Compliance**

Each detention facility with an ICE contract must comply with one of three sets of national detention standards: *National Detention Standards, 2008 Performance-Based National Detention Standards* (PBNDS), or 2011 PBNDS. These standards (1) describe a facility's immigration detention responsibilities, (2) explain what detainee services a facility must provide, and (3) identify what a facility must do to ensure a safe and secure detention environment for staff and detainees.

ICE monitors facility compliance with the applicable detention standards through triennial Office of Detention Oversight (ODO) inspections,[4] annual contractor-led compliance inspections by Nakamoto Group, Inc., and the assignment of Custody Management DSMs to cover 54 contract facilities. Inspectors and DSMs report deficiencies to the facility, the ERO Field Office responsible for the facility, and ICE headquarters. To correct these deficiencies, ICE's Detention Standards Compliance Unit, which works independent of the contract offices, prepares and sends uniform corrective action plans to the ERO Field Offices and works with them to ensure the deficiencies get resolved. As we previously reported, this process is not as effective as intended.[5]

Another path for correcting deficiencies is through the contracts. Though not required, detention contracts may include a quality assurance surveillance plan (QASP). The QASP is a standard template that outlines detailed requirements for complying with applicable performance standards, including detention standards, and potential actions ICE can take when a contractor fails to meet those standards. When facilities are found to be noncompliant, CORs may submit a Contract Discrepancy Report (Discrepancy Report), which documents the performance issue.

After CORs submit Discrepancy Reports, facilities are responsible for correcting deficiencies or at least preparing a corrective action plan by the identified due date. If the facility is not compliant, a Discrepancy Report may include a recommendation for financial penalties, such as a deduction in or withholding of ICE payment to the contractor.[6] For example, the QASP states that a deduction may be appropriate when an egregious event or deficiency occurs, such as when a particular deficiency is noted multiple times without correction or when the contractor failed to resolve a deficiency about which it was properly and timely notified. A withholding may be appropriate while the contractor corrects a deficiency. The contracting officer must approve any withholdings or deductions.

We initiated this review to determine whether ICE is effectively managing detention facility contracts for its 106 CDF, IGSA, and DIGSA facilities. This report addresses (1) ICE's failure to use quality assurance tools and impose consequences for contract noncompliance; (2) the use of waivers, which may circumvent detention standards specified in contracts; (3) how the CORs' organizational placement hinders their ability to monitor contracts; and

[4] ODO conducts compliance inspections at detention facilities housing detainees for greater than 72 hours with an average daily population greater than 10. ODO is under ICE's Office of Professional Responsibility.

[5] *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67, June 2018

[6] Detention facilities cannot recoup a deduction, but can recoup a withholding when they correct a deficiency.

(4) CORs' and DSMs' lack of direct access to important contract files.

## Results of Inspection

Although ICE employs a multilayered system to manage and oversee detention contracts, ICE does not adequately hold detention facility contractors accountable for not meeting performance standards. ICE fails to consistently use contract-based quality assurance tools, such as by omitting the QASP from facility contracts. In fact, only 28 out of 106 contracts we reviewed included the QASP. Because the QASP contains the only documented instructions for preparing a Discrepancy Report and recommending financial penalties, there is confusion about whether ICE can issue Discrepancy Reports and impose financial consequences absent a QASP. Between October 1, 2015, and June 30, 2018, ICE imposed financial penalties on only two occasions, despite documenting thousands of instances of the facilities' failures to comply with detention standards. Instead of holding facilities accountable through financial penalties, ICE issued waivers to facilities with deficient conditions, seeking to exempt them from having to comply with certain detention standards. However, ICE has no formal policies and procedures about the waiver process and has allowed officials without clear authority to grant waivers. ICE also does not ensure key stakeholders have access to approved waivers. Further, we determined that the organizational placement and overextension of CORs impede monitoring of facility contracts. Finally, ICE does not adequately share information about ICE detention contracts with key officials, such as CORs and DSMs, which limits their ability to access information necessary to perform core job functions.

### ICE Does Not Consistently Use Contract-Based Quality Assurance Tools and Impose Consequences for Contract Noncompliance

As noted, there are two paths for correcting deficiencies: the facilities inspection process and the quality assurance tools in the facilities contracts themselves. With respect to the inspection process, we previously reported that ICE does not adequately follow up on identified deficiencies or consistently hold facilities accountable for correcting them.[7] During our current work, we found similar problems with ICE's use of contract-based quality assurance tools. Specifically, ICE did not consistently include the QASP in the facility contracts we reviewed, which has led to confusion among CORs about how to issue Discrepancy Reports. These problems are compounded because ICE does not

[7] *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67, June 2018

track these reports and rarely imposes financial consequences, even when identified deficiencies present significant safety and health risks.

Out of 106 contracts we reviewed, only 28 contained the QASP.[8] The QASP is especially important because it contains the only documented instructions for preparing a Discrepancy Report and recommending financial penalties, when informal resolution is not practicable.[9] Consequently, when contracts do not contain the QASP, CORs and contracting officers are left confused as to what actions they can take when deficiencies are identified. For example, of the 11 CORs we interviewed, 5 told us they could issue a Discrepancy Report to a facility that did not have the QASP, while 2 said they could not. Two others said they could issue a Discrepancy Report without the QASP, but they could not seek financial penalties for noncompliance. The two remaining CORs told us they did not know whether they could issue a Discrepancy Report without a QASP.

Even where ICE does issue Discrepancy Reports, ICE does not track their use or effectiveness. No office within ICE could provide any data on how many Discrepancy Reports are issued to facilities and for what reasons. An ICE official from Acquisitions Management explained that his office would have to review the individual contract files to see whether Discrepancy Reports were issued and why. The Discrepancy Reports we reviewed involved serious deficiencies such as significant understaffing, failure to provide sufficient mental health observation, and inadequate monitoring of detainees with serious criminal histories. However, we have no way of verifying whether any of these deficiencies have been corrected.

Furthermore, ICE is not imposing financial penalties, even for serious deficiencies such as those we found in the Discrepancy Reports. In addition to the issues flagged by these Discrepancy Reports, from October 2015 to June 2018 various inspections and DSMs found 14,003 deficiencies at the 106 contract facilities we focused on for this review. These deficiencies include those that jeopardize the safety and rights of detainees, such as failing to notify ICE about sexual assaults and failing to forward allegations regarding misconduct of facility staff to ICE ERO. Despite these identified deficiencies, ICE only imposed financial penalties twice. ICE deducted funds from one facility as a result of a pattern of repeat deficiencies over a 3-year period, primarily related to health care and mental health standards. The other deduction was made due to a U.S. Department of Labor order against the

---

[8] Specifically, all 8 CDF and 10 of the 11 DIGSA facilities had a QASP in place, but only 10 of 87 non-dedicated IGSA facilities had a QASP.
[9] The QASP directs the COR to send a Discrepancy Report documenting the deficiencies to the facility. The facility is required to respond to the Discrepancy Report by a specified date, indicating that either the deficiencies have been corrected or a corrective action plan is in place.

contractor for underpayment of wages and was not related to any identified deficiency. Our review of the corresponding payment data identified about $3.9 million in deductions, representing only 0.13 percent of the more than $3 billion in total payments to contractors during the same timeframe. ICE did not impose any withholdings during this timeframe.

## ICE's Waiver Process May Allow Contract Facilities to Circumvent Detention Standards and May Inhibit Proper Contract Oversight

Instead of holding facilities accountable through financial penalties, ICE frequently issued waivers to facilities with deficient conditions, seeking to exempt them from having to comply with certain detention standards.[10] However, we found that ICE has no formal policies and procedures to govern the waiver process and has allowed ERO officials without clear authority to grant waivers. We also determined that ICE does not ensure key stakeholders have access to approved waivers. In some cases, officials may violate Federal Acquisition Regulation requirements because they seek to effectuate unauthorized changes to contract terms.

<u>Lack of Guidance on the Waiver Process Potentially Exempts Contract Facilities from Complying with Certain Detention Standards Indefinitely</u>

Generally, waiver requests result from ICE's inspections or DSMs' monitoring. After completing an inspection, inspectors brief the facility on the deficiencies they find and issue inspection reports. The Detention Standards Compliance Unit then issues uniform corrective action plans to the ERO Field Offices and DSMs. The Field Offices forward the uniform corrective action plans to the facilities, work with the facilities to correct the identified deficiencies, and report those corrective actions to the Detention Standards Compliance Unit. DSMs monitor compliance on a daily basis and report deficiencies to the facilities, to local ICE Field Offices, and through weekly reports to Custody Management.

As ICE ERO works with the contractor to resolve the deficiencies, a facility can assert that it could not remedy the deficiency because complying with the standard can create a hardship, because of a conflict with a state law or a local policy, a facility design limitation, or another reason. In these cases, the Field Office Director may submit a waiver request to Custody Management, which approves or denies the request. We analyzed the 68 waiver requests submitted

[10] *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67, June 2018

between September 2016 and July 2018. Custody Management approved 96 percent of these requests, including waivers of safety and security standards.[11]

Despite this high approval rate, ICE could not provide us with any guidance on the waiver process. Key officials admitted there are no policies, procedures, guidance documents, or instructions to explain how to review waiver requests. The only pertinent documents that ICE provided were examples of memoranda that Field Office Directors could use to request waivers of the detention standards' provisions on strip searches. However, the memoranda did not acknowledge the important constitutional and policy interests implicated by a facility's use of strip searches. ICE officials did not explain how Custody Management should handle such waiver requests when a contrary contractual provision requires compliance with a strip search standard.

Further, contract facilities may be exempt from compliance with otherwise applicable detention standards indefinitely, as waivers generally do not have an end date and Custody Management does not reassess or review waivers after it approves them. In our sample of 65 approved waiver requests, only three had identified expiration dates; the 62 others had no end date.

The Chief of the Detention Standards Compliance Unit within ICE ERO Custody Management has drafted written guidance on the waiver submission and approval process, but has not finalized that document. Without formal waiver guidance and review processes, ICE may be indefinitely allowing contract facilities to circumvent detention standards intended to assure the safety, security, and rights of detainees. A facility's indefinite exemption from certain detention standards raises risks to detainee health and safety that ICE could reduce by enforcing compliance with those standards. For example, Custody Management granted a waiver authorizing a facility (a CDF) to use 2-chlorobenzalmalononitrile (CS gas) instead of the OC (pepper) spray authorized by the detention standard. According to information contained in the waiver request, CS gas is 10 times more toxic than OC spray.[12] Another waiver allows a facility (a DIGSA) to commingle high-custody detainees, who have histories of serious criminal offenses, with low-custody detainees, who have minor, non-violent criminal histories or only immigration violations, which is a practice the standards prohibit in order to protect detainees who may be at risk of victimization or assault.[13]

---

[11] PBNDS 2008 and PBNDS 2011 organize standards by seven topics: safety, security, order, care, activities, justice, and administration and management. NDS 2000 organizes standards by three topics: detainee services, health services, and safety and control.
[12] ICE PBNDS 2011, Part 2 – Security, 2.15 Use of Force and Restraints Section (V)(G)(4) states, "The following devices are not authorized […] mace, CN, tear gas, or other chemical agents, except OC spray."
[13] ICE PBNDS 2011, Part 2 – Security, 2.2 Custody Classification System requires facilities to avoid commingling low-custody detainees, who have minor, non-violent criminal histories or

ERO Officials without Clear Authority Are Granting Waivers That May Undermine Contract Terms

ICE's practice for issuing waivers could violate the Federal Acquisition Regulation (FAR), which establishes policies and procedures that executive agencies, including DHS, must use for acquisitions, unless other legal authority removes an acquisition from the FAR's coverage. Under the FAR, "only contracting officers acting within the scope of their authority are empowered to execute contract modifications."[14] To prevent others from exercising authority expressly reserved for contracting officers, the FAR explains that other Federal personnel shall not "[a]ct in such a manner as to cause the contractor to believe that they have authority to bind the Government."[15] ICE asserts that only its CDFs, not its DIGSAs or IGSAs, are acquisitions governed by the FAR. However, Acquisitions Management procurement guidance stipulates that, in handling DIGSA and IGSA issues, contracting officers "should utilize applicable FAR principles and clauses that are in the Government's best interest to the maximum extent possible."[16]

Despite these FAR provisions and this guidance, a senior official told us that the Assistant Director for Custody Management has the authority to act on waiver requests. The Assistant Director has, in turn, orally delegated authority to decide waiver requests to the Deputy Assistant Director for Custody Management. However, Custody Management did not provide any documentation of this authority, delegated or otherwise, to grant waivers. According to the same official, the detention standards are ICE policies and the current waiver approval process is sufficient. This position does not acknowledge that ICE contractually requires facilities to comply with detention standards, and that only the contracting officer — not the Assistant Director or the Deputy Assistant Director — can modify those contract terms.

Through their approval of waivers, ERO officials without the authority to modify contracts have sought to remove certain detention standards from oversight, even though those standards are part of the contract for the detention facility. In reviewing waivers approved for CDFs, we found that ICE issued two waivers between October 2016 and July 2018 for aspects of ICE's 2011 PBNDS that are part of ICE's contracts for these facilities. Through these waivers, ICE allowed facilities to deviate from PBNDS 2011 requirements.

only immigration violations, with high-custody detainees, who have histories of serious criminal offenses.
[14] 48 Code of Federal Regulations (CFR) § 43.102(a)
[15] *Id.* § 43.102(a)(2)
[16] ICE Acquisitions Management, Procurement Guide 18-02, *Inter-governmental Service Agreements (IGSA)* (Apr. 20, 2018)

ICE Staff Responsible for Management and Oversight of Facility Contracts Do Not Receive Information on Approved Waivers

Custody Management does not share information on approved waivers with Acquisitions Management, which is responsible for administering detention contracts. Acquisitions Management contracting officers told us that most of them did not know that Custody Management had issued waivers after a facility entered into a detention contract with ICE. The Detention Standards Compliance Unit's draft guidance for the waiver process does not require Custody Management to share waiver requests or approvals with Acquisitions Management. Because Acquisitions Management does not receive information on approved waivers, it cannot determine whether the waiver contradicts contract terms or violates the FAR or other procurement requirements. Further, Acquisitions Management cannot ensure that contracting officers and CORs know about Custody Management's waiver decision, which undermines their ability to monitor their assigned contracts.

## Organizational Placement and Overextension of CORs Impede Monitoring of Detention Facilities

COR placement under the Field Office raises concerns about the CORs' ability to perform their primary functions of monitoring detention facilities and enforcing contract terms. They may not be able to fulfill these functions because the Field Office pressures them to do things outside of protocol and assigns them additional duties. In some cases, CORs have unachievable workloads that inhibit their ability to provide consistent and appropriate oversight. Overall, these issues may allow facility violations of contract terms and noncompliance with performance standards to go unaddressed and may lead to dangerous detention conditions.

Reporting to Field Offices May Compromise a COR's Independent Oversight Efforts

When the COR program was initially developed in 2009, CORs were located at Field Offices, but the COR Program Manager at headquarters served as their first-line supervisor. Field Office Directors provided input for CORs' performance work plans and ratings, but did not directly supervise them. This supervisory chain allowed the COR to remain independent from the Field Office and detention facility operations. However, after a year under this supervisory structure, the COR supervisory chain was changed by making the assigned Field Office responsible for COR supervision.

An email to Field Office Directors and Deputy Field Office Directors announcing the transition gave four reasons for the initial alignment of CORs reporting to

headquarters.[17] In contrast, the only justification ICE provided for the realignment was that the current organizational reporting relationship was "proving to be cumbersome and sub-optimal." During interviews, ICE officials could not provide any additional explanation for why ICE moved supervision of CORs from headquarters to the Field Offices. Most CORs we interviewed who held those positions during the transition explained that this organizational realignment was detrimental to their duties and independence. For example, two CORs said they were hesitant to identify instances of noncompliance or issue Discrepancy Reports on contracts they oversee because they feared retaliation from Field Office management.

The contracting officers we spoke with had similar concerns regarding the CORs' ability to do their jobs independently. Some contracting officers noted that CORs might be reluctant to disagree with their Field Office supervisors, who complete their performance appraisals. For example, one contracting officer identified a time when, at the request of the Field Office supervisor, a COR was authorizing payment for transport of ICE detainees on a contract that did not allow transportation. However, this COR lacked the authority to approve such contract additions because only the contracting officer can modify contracts.

The current COR position descriptions permit CORs to complete "other duties as assigned," which allows Field Offices to task CORs with duties outside of contracting oversight and management. During interviews with 11 CORs we heard that Field Office managers have tasked CORs with collateral duties to the detriment of their primary function. These tasks included supervising mission support personnel; acting as the interim DSM; processing background investigations for all employees; and developing requirements for contracts on projects unrelated to detention, like retirement planning and finding office space for employees.

Furthermore, inconsistent support from the Field Office can create an environment that impedes CORs' oversight of detention contracts. According to the *ERO Contracting Officer's Representative Supplement*, dated October 2015, the COR work plan template identifies site visits as a possible monitoring technique for contracts, but not all CORs are encouraged to conduct these visits. Three Field Offices restricted CORs from traveling to detention facilities, which impedes proper evaluation of facilities' compliance with contract terms.

---

[17] The May 26, 2010 email from ERO's Assistant Directors for Field Operations and Mission Support announcing the transition of CORs (formerly COTRs) from headquarters to Field Offices stated, "While the COTR positions were established in the field, they reported directly to Headquarters (HQ) primarily to (1) provide the COTR with the ability and autonomy to ensure that contracts are properly established and administered; (2) ensure that the COTR's primary duty is contract monitoring and administration; (3) establish and standardize best practices across the DRO enterprise; and (4) enhance dialogue with HQ regarding field office acquisition, contract administration, and facility project management issues."

According to a senior official, ICE is working with the Office of Personnel Management to adjust the current COR position descriptions; expected changes include removing the "other duties as assigned" language and providing clearer guidance on COR responsibilities.

Overextending CORs May Weaken Contract Oversight

Although some CORs are assigned additional work, others are overtasked with detention contracts. CORs tasked with overseeing many facility contracts and invoices, as well as non-detention contracts supporting the functions of a Field Office, told us they were overextended. For example, of the 11 CORs we interviewed:

- Four CORs oversee 10 or more facilities, with 2 overseeing 16 and 22 contracts, respectively, across multiple states.
- One COR has been assigned as the primary Project Manager for a new processing center that will be used by four Federal agencies, while also being a COR for three detention contracts.
- Five CORs also oversee large transportation contracts, which require CORs to spend substantial time reviewing and approving invoices.

In one Field Office covering multiple states, Field Office leadership allowed CORs to develop a network of assistants to aid oversight efforts. Other Field Offices use mission support personnel to support CORs with administrative tasks, such as reconciling invoices.

## Lack of Direct Access to Important Contract Files Hinders CORs' and DSMs' Ability to Monitor Detention Contracts

CORs are integral to ICE's efforts to monitor its detention contracts, a process in which DSMs are also heavily involved. However, CORs and DSMs lack consistent access to all pertinent contracts and modifications. Although DHS requires ICE to maintain an official file folder for each contract, which should contain the contract and all modifications to it, this system does little to ensure all key stakeholders have access to pertinent contract documents.

Acquisitions Management places contracts and modifications in an electronic database called PRISM, to which several members of Contract Management have access but neither CORs nor DSMs have access. Acquisitions Management also places contract documents, including modifications, on the "Q Drive," an electronic library that will eventually replace PRISM as the official repository for detention contracts. However, CORs and DSMs do not have

access to the Q Drive either. Acquisitions Management also has some historical paper-only files for active contracts initiated around 2005 or earlier, but does not give CORs automatic access to these documents.

CORs must maintain their own file, which is part of the official contract file, and which should include a copy of the contracts and modifications that CORs oversee. One interviewee noted that CORs should receive contracts and modifications from contracting officers or contract specialists, but this practice is not consistent. Absent access to contracts and modifications through Acquisitions Management, CORs in the field must obtain these documents on their own, which can be time consuming and inefficient. When one COR began her position, she had to create her own electronic drive of documents, where she maintains copies of all contracts and modifications.

## Conclusion

From October 2015 to June 2018, ICE paid contractors operating the 106 detention facilities subject to this review more than $3 billion. Despite documentation of thousands of deficiencies and instances of serious harm to detainees that occurred at these detention facilities, ICE rarely imposed financial penalties. ICE should ensure that detention contracts include terms that permit ICE to hold contractors to performance standards and impose penalties when those standards are not maintained. ICE needs to finalize policies and procedures for the waiver process to ensure that officials do not circumvent contract terms. ICE also needs to develop or enhance policies and procedures to ensure that those responsible for contract oversight have access to information necessary to do their jobs and receive adequate guidance about the actions available to them when contract performance standards are not met. Further, ICE should ensure CORs in the field are unencumbered in their ability to manage and oversee detention contracts. Finally, ICE should strengthen the ability of CORs and DSMs to access documents related to pertinent detention contracts.

## Recommendations

We recommend the Executive Associate Director for Management and Administration:

**Recommendation 1:** Develop a process to decide when to seek to include a QASP in existing contracts and IGSAs that are not subject to a QASP and all future detention contracts and IGSAs. For each contract and IGSA that remains without a QASP, document the reason(s) why a QASP could not be included and summarize the actions available to contracting officers and CORs when contractors fail to meet applicable detention standards.

**Recommendation 2:** Develop protocols to guide CORs and contracting officers in issuing Discrepancy Reports and imposing appropriate financial penalties against detention facility contractors in response to contract noncompliance. The protocols should include:

1. clear guidance for determining when to issue a Discrepancy Report;
2. instructions for issuing and approving a Discrepancy Report;
3. clear guidance for determining when to impose a financial penalty and what type of financial penalty to impose;
4. instructions for imposing a financial penalty; and
5. a process to track all Discrepancy Reports issued and financial penalties imposed by ICE, to include data regarding the final resolution of the issue that led to the Discrepancy Report or financial penalty.

We recommend the Executive Associate Director for Enforcement and Removal Operations:

**Recommendation 3:** Develop protocols to ensure that all existing and future waivers are:

1. approved by ICE officials with appropriate authority;
2. distributed to key stakeholders, such as contracting officers, CORs, and DSMs, who need the waivers to perform core job functions;
3. consistent with contract terms; and
4. compliant with FAR requirements, as applicable.

**Recommendation 4:** Develop a staffing plan for detention CORs, to permit adequate contract oversight and ensure an achievable workload. Evaluate the organizational placement of CORs. If CORs remain under Field Office supervision, develop safeguards to prevent Field Office supervisors from interfering with CORs' ability to fulfill their contract oversight duties.

We recommend the Executive Associate Director for Management and Administration:

**Recommendation 5:** Develop protocols to ensure that CORs and DSMs have full and expedient access to the contract documentation they need to perform core job functions.

## Management Comments and OIG Analysis

We have included a copy of ICE's Management Response in its entirety in appendix B. We also received technical comments from ICE and incorporated them in the report where appropriate. We consider all recommendations to be resolved and open. A summary of ICE's responses and our analysis follows.

ICE concurred with all five recommendations but disagreed with some of the report's conclusions. As a result, we will be closely monitoring all actions ICE takes in reponse to the reccomendatiosn to ensure compliance. Specifically, ICE purports that it "already has practices in place to maintain *and distribute* waivers to appropriate stakeholders" (emphasis added). However, ICE did not provide DHS OIG with documentation supporting its claim that it has practices in place to distribute waivers to appropriate stakeholders; rather, the evidence indicates only that ICE makes approved waivers accessible to stakeholders upon request. Providing access to waivers upon request is not the same as distributing approved waivers to appropriate stakeholders. Compounding the issue, we determined that ICE did not provide notification of approved waivers effectively. For instance, we determined that CORs and a DSM were not notified of approved waivers, and contracting officers confirmed that most of them did not know that Custody Management had issued waivers.

ICE also stated that the report does not discuss actions it took to resolve "non-compliance issues" at facilities, including removing detainees from a facility, scaling back its usage of a facility, and terminating agreements. However, ICE failed to provide specific examples of corrective action at particular facilities, thereby limiting DHS OIG's ability to evaluate whether the actions were effective means by which to hold contractors accountable. Moreover, the objectives of this review focused on whether ICE uses *contracting tools* to ensure facilities meet applicable detention standards. ICE's purported removal of detainees from a facility, or diminished use of a facility, are not relevant to review of its use of contracting tools to drive contractor accountability. ICE's assertion that it terminated facility agreements for unspecified "non-compliance issues" at other, unnamed facilities is also irrelevant to our review. Our review focused on ICE's efforts to use contracting tools to ensure compliance with applicable detention standards at 106 CDF, IGSA, and DIGSA facilities (see appendix C). Based on the information provided by ICE during the review, ICE's facility contracts for these facilities were not terminated because of a failure to meet applicable detention standards.

ICE also stated it uses a "layered approach to monitor detention conditions at facilities, with processes in place to implement corrective actions in instances where non-compliance with ICE detention standards is found." We determined that the processes in place do not ensure consistent compliance with detention standards. Not only does ICE not fully use contracting tools to hold detention facility contractors accountable for failing to meet performance standards, our previous work has determined that ICE's inspections and onsite monitoring do not ensure consistent compliance with detention standards or promote comprehensive deficiency corrections.[18] We identified serious incidents of

[18] *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67, June 2018

noncompliance during our own unannounced inspections of ICE detention facilities[19] and the more than 14,000 deficiencies identified by various inspections and DSMs from October 2015 to June 2018 suggest room for improvement in the current processes for addressing noncompliance with ICE detention standards.

**ICE Response to Recommendation 1:** ICE concurred with the recommendation. ICE will ensure that all CDF, service processing centers, and DIGSA facilities will have a QASP. ICE will develop a process to evaluate whether to include a QASP in the remaining contracts or IGSAs. For each contract and IGSA that remains without a QASP, ICE will document the reason why a QASP was not included. ICE will provide training and issue procurement guidance to summarize the actions available to contracting officers and CORs when contractors fail to meet applicable detention standards. ICE anticipates completing these actions by March 31, 2019.

**OIG Analysis:** We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive documentation showing that ICE has: (1) included a QASP for all CDFs, service processing centers, and DIGSA facilities; (2) implemented a process to evaluate whether to include a QASP in all remaining and future detention contracts or IGSAs; (3) documented the reason why a QASP was not included for each contract or IGSA that remains without a QASP; and (4) completed training and issued procurement guidance summarizing the actions available to contracting officers and CORs when contractors fail to meet applicable detention standards.

**ICE Response to Recommendation 2:** ICE concurred with the recommendation. ICE has already begun providing additional training to all ERO CORs responsible for detention contracts, consisting of six training sessions that cover various aspects of COR duties. The training includes sessions that cover various methods to ensure contract compliance, monitoring and inspections, and dealing with unsatisfactory contractor performance. ICE will also provide more specific training on monitoring and inspections and dealing with unsatisfactory performance to Acquisitions Management contracting officers responsible for detention contracts.

---

[19] *Management Alert – Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*, OIG-18-86, September 2018; *Concerns About ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32, December 2017; and *Management Alert on Issues Requiring Immediate Action at the Theo Lacy Facility in Orange, California*, OIG-17-43-MA, March 2017

ICE will also develop and issue procurement guidance that will provide protocols for Discrepancy Reports, which will address when to issue a Discrepancy Report, instructions for issuing and approving a report, when to impose a financial penalty, what type of financial penalty to impose, and instructions for imposing a financial penalty. The procurement guidance will also include a process to track all Discrepancy Reports issued and financial penalties imposed. ICE anticipates completing all actions responsive to this recommendation by March 31, 2019.

**OIG Analysis:** We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive documentation showing that: (1) all ERO CORs have completed the specified training covering methods to ensure contract compliance, monitoring and inspections, and dealing with unsatisfactory contractor performance; (2) all Acquisitions Management contracting officers have completed the specified training covering monitoring and inspections and dealing with unsatisfactory performance; and (3) ICE has developed and issued procurement guidance providing protocols for Discrepancy Reports, which addresses when to issue a Discrepancy Report, instructions for issuing and approving a report, when to impose a financial penalty, what type of financial penalty to impose, instructions for imposing a financial penalty, and a process to track all Discrepancy Reports issued and financial penalties imposed.

**ICE Response to Recommendation 3:** ICE concurred with the recommendation. ICE will document the waiver process in a policy or standard operating procedure (SOP) that is accessible to stakeholders, such as contracting officers, CORs, and on-site DSMs. The policy or SOP will clearly address when waivers need to be incorporated via contract modification. ICE will also review all current waivers to determine continuing applicability and, if appropriate, cancel any waivers that are no longer needed. ICE will also ensure that the annual or more frequent review of approved waivers by appropriate personnel is included in its documented waiver process. Finally, ICE will ensure stakeholders have access to approved waivers and expand waiver distribution to DSMs, contracting officers, CORs, and other staff who monitor detention conditions or contract performance, in addition to the ERO Field Office personnel and facility management staff who already receive the waivers. ICE anticipates completing these actions by April 30, 2019.

**OIG Analysis:** We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive the waiver policies or SOP addressing when waivers need to be incorporated via contract modification, requiring annual or more frequent review of approved waivers by appropriate personnel, and ensuring access to and distribution of waivers to stakeholders, along with documentation showing that current waivers were reviewed to evaluate whether they were approved by ICE officials with the authority to do so, are consistent with contract terms, comply with FAR requirements, and continue to be applicable.

**ICE Response to Recommendation 4:** ICE concurred with the recommendation. ICE will review the workload of its detention facility CORs, and determine an ideal staffing level to oversee its existing contracts. ICE will consider the operational placement of CORs under Field Office supervisors. If CORs remain under Field Office supervision, ERO leadership will ensure Field Office managers are fully aware of the importance of the CORs' responsibilities and allowing them sufficient time and resources to complete their contract oversight duties. ICE anticipates completing these actions by September 30, 2019.

**OIG Analysis:** We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive documentation showing ICE completed a review of the workload of detention facility CORs and determined an ideal staffing level to oversee its existing contracts, evaluated the operational placement of CORs, and, if CORs remain under Field Office supervision, ensured Field Office managers are made fully aware of the importance of the CORs' responsibilities and allowing them sufficient time and resources to complete their contract oversight duties.

**ICE Response to Recommendation 5:** ICE concurred with the recommendation. ICE now requires that every contract document be available electronically on a shared drive. ICE will give CORs and DSMs read-only access to this system to allow them efficient access to contract documentation. ICE anticipates completing this action by June 30, 2019.

**OIG Analysis:** We consider these actions responsive to the recommendation, which is resolved and open. We will close this recommendation when we receive adequate supporting documentation that CORs and DSMs have full and expedient access to the contract documentation they need to perform core job functions.

## Appendix A
## Objective, Scope, and Methodology

DHS OIG was established by the *Homeland Security Act of 2002* (Public Law 107−296) by amendment to the *Inspector General Act of 1978*. In this review, we sought to determine whether ICE contracting tools hold immigration detention facilities to applicable detention standards; and whether ICE imposes consequences when contracted immigration detention facilities do not maintain standards.

To answer the objective, we evaluated the policies and procedures governing ICE detention contract execution, amendment, and oversight and conducted a walkthrough of contract files with ICE Acquisitions Management to obtain an understanding of the detention contracting process. We reviewed a judgmental sample of current contracts, which included CDF, IGSA, and DIGSA facilities, and obtained and reviewed payment and penalty data for the 106 facilities within the scope of this review. We collected and analyzed data regarding detention facility inspections and calculated the number of deficiencies identified by ICE. We reviewed all of the proposed waivers submitted for detention facilities subject to this review and evaluated the waiver process and ICE's authority to issue waivers. We interviewed contracting officers, CORs, and DSMs, along with ICE representatives from several components, including Acquisitions Management, Office of Contract Management, ERO's Budget Office, Office of the Chief Financial Officer, Detention Management Division, Burlington Finance Center, and Office of Detention Policy and Planning. We also interviewed Field Office leadership from ICE's Baltimore Field Office.

We conducted this review between January and October 2018 pursuant to the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency. The evidence obtained provides a reasonable basis for our findings and conclusions based upon our objectives.

# Appendix B
# Management Comments to the Draft Report

*Office of the Chief Financial Officer*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

U.S. Immigration and Customs Enforcement

DEC 0 3 2018

MEMORANDUM FOR: John V. Kelly
Senior Official Performing the Duties of the Inspector General
Office of the Inspector General

FROM: Stephen A. Roncone
Chief Financial Officer and
Senior Component Accountable Official

SUBJECT: Management Response to OIG Draft Report: "ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards" (Project No. 17-090-ISP-ICE)

Thank you for the opportunity to review and comment on this draft report. U.S. Immigration and Customs Enforcement (ICE) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

ICE is pleased the OIG acknowledges ICE's compliance monitoring efforts, including actions taken to proactively address findings in this report. ICE is committed to protecting the safety, rights, and health of detainees in its care, and appreciates the OIG's recognition of ICE's processes to monitor facilities through inspections, report deficiencies, implement corrective action plans, and ensure resolution. The OIG also described ICE's existing process for issuing waivers, noting that ICE has drafted written guidance on its process. In addition, the draft report summarized steps ICE has already taken to refine the Contracting Officer's Representative (COR) position descriptions.

However, ICE disagrees with some of the OIG's conclusions and believes the report would benefit from additional context. For example, ICE already has practices in place to maintain and distribute waivers to appropriate stakeholders. In addition to the compliance tools mentioned in the draft report, ICE's Office of Acquisition Management and Enforcement and Removal Operations (ERO) took action where necessary to address non-compliance issues. For example, there are multiple facilities where ICE terminated the agreement, removed all detainees from the facility, or scaled back its usage of the facility based on non-compliance issues. This is an effective tool to hold a contractor accountable.

ICE is committed to continually enhancing civil detention operations to promote a safe and secure environment for both detainees and staff. ICE uses a layered approach to monitor

www.ice.gov

detention conditions at facilities, with processes in place to implement corrective actions in instances where non-compliance with ICE detention standards is found. ICE's detention operations are governed by national detention standards and are overseen by Field Office personnel, inspections by ICE's Office of Professional Responsibility, and other programmatic oversight and inspections by ERO.

The draft report contained five recommendations with which ICE concurs. Attached find our detailed response to each recommendation. Technical comments were previously provided under separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Attachment

**Attachment: Management Response to Recommendations Contained in 17-090-ISP-ICE**

OIG recommended the Executive Associate Director for Management and Administration:

**Recommendation 1:** Develop a process to decide when to seek to include a QASP [quality assurance surveillance plan] in existing contracts and IGSAs that are not subject to a QASP and all future detention contracts and IGSAs [inter-governmental service agreements]. For each contract and IGSA that remains without a QASP, document the reason(s) why a QASP could not be included and summarize the actions available to contracting officers and CORs when contractors fail to meet applicable detention standards.

**Response:** Concur. ICE acknowledges the usefulness of the QASP. All contract detention facilities, service processing centers, and dedicated inter-governmental service agreement facilities[1] either already have a QASP or will have a QASP added. The Office of Acquisition Management (OAQ) is working with Enforcement and Removal Operations (ERO) to develop a process for evaluating whether to include a QASP in the remaining contracts or IGSAs.[2]

Almost all the agreements referenced in the OIG report that do not already contain a QASP are agreements with state and local governments, a majority of which have average daily populations below 100. OAQ has had varied success including QASPs in smaller facility contracts. Historically, IGSAs and intergovernmental agreements have not had QASPs as part of the contract for a variety of reasons, the most important being the ease of terminating the agreement for any reason. If the provider is not performing or is performing below standards or expectations, ICE can terminate the agreement or reduce the population levels immediately. This is a very effective tool to ensure compliance and hold contractors accountable.

The Discrepancy Report process is an aligning tool as opposed to a sanctioning tool for penalizing our service providers, a majority of which are state and local governments. ICE's goal is to receive compliance and delivery of services, not to recoup money that we have agreed to pay by virtue of the contract with a state or local entity.

OAQ will document information on each facility contract, including whether it has a QASP included. If a QASP is not included, there will be a documented reason to support the decision. Actions available to Contracting Officers (COs) and CORs will be covered in training and procurement guidance, which are addressed in response to recommendation 2. Estimated Completion Date (ECD): March 31, 2019.

**Recommendation 2:** Develop protocols to guide CORs and contracting officers in issuing Discrepancy Reports and imposing appropriate financial penalties against detention facility contractors in response to contract noncompliance. The protocols should include:

1. clear guidance for determining when to issue a Discrepancy Report;

---

[1] Facilities dedicated to housing only ICE detainees.
[2] Facilities, such as local and county jails, housing ICE detainees and other inmates.

3

2. instructions for issuing and approving a Discrepancy Report;
3. clear guidance for determining when to impose a financial penalty and what type of financial penalty to impose;
4. instructions for imposing a financial penalty; and
5. a process to track all Discrepancy Reports issued and financial penalties imposed by ICE, to include data regarding the final resolution of the issue that led to the Discrepancy Report or financial penalty.

**Response:** Concur. ICE has been working to improve guidance for CORs and contracting officers through training and the issuance of official Procurement Guidance (PG).

More specifically, OAQ is providing additional training to all ERO CORs responsible for detention contracts. OAQ is conducting six training sessions that cover various aspects of the COR duties, from roles and responsibilities to invoice payments. OAQ completed initial training sessions prior to the end of October 2018, and copies of the training material have been provided to OIG under separate cover. The CORs are receiving training on the various methods to ensure contract compliance. This includes a session on monitoring and inspections and a session on dealing with unsatisfactory performance. These two trainings will also serve as a baseline for a more specific training to be given to OAQ COs responsible for detention contracts. These training sessions provide CORs and COs with the necessary background information and guidance to issue Discrepancy Reports and request a withholding or deduction of funds.

The OAQ Quality Assurance Division will develop and issue PG that will provide protocols for Discrepancy Reports. The PG will address when to issue a Discrepancy Report, instructions for issuing and approving a report, when to impose a financial penalty, what type of financial penalty to impose, and instructions for imposing a financial penalty. The PG will also include a process to track all Discrepancy Reports issued and financial penalties imposed. ECD: March 31, 2019.

OIG recommended the Executive Associate Director for Enforcement and Removal Operations:

**Recommendation 3:** Develop protocols to ensure that all existing and future waivers are:
1. approved by ICE officials with appropriate authority;
2. distributed to key stakeholders, such as contracting officers, CORs, and DSMs, who need the waivers to perform core job functions;
3. consistent with contract terms; and
4. compliant with FAR requirements, as applicable.

**Response:** Concur. ERO, in collaboration with OAQ, will document ICE's waiver process in a policy or standard operating procedure (SOP) that is accessible to stakeholders, such as COs, CORs, and on-site detention services managers (DSMs). The policy or SOP will clearly address when waivers need to be incorporated via contract modification. ICE agrees that documenting the process will provide stakeholders with a better understanding of how waivers are adjudicated and the criteria for approval.

ICE will also review all current waivers to determine continuing applicability and, if appropriate, cancel any waivers that are no longer needed. ICE will ensure the annual or more frequent review of approved waivers by appropriate personnel is included in its documented waiver process.

In addition, ICE will ensure stakeholders have access to approved waivers. Currently, ERO Field Office personnel and facility management staff receive copies of approved waivers. ICE will expand its waiver distribution to DSMs, COs, CORs, and other staff who monitor detention conditions or contract performance. ECD: April 30, 2019.

**Recommendation 4:** Develop a staffing level for detention CORs, to permit adequate contract oversight and ensure an achievable workload. Evaluate the organizational placement of CORs. If CORs remain under Field Office supervision, develop safeguards to prevent Field Office supervisors from interfering with CORs' ability to fulfill their contract oversight duties.

**Response:** Concur. ERO will review the workload of its detention facility CORs, and determine an ideal staffing level to oversee its existing contracts. ICE will consider the operational placement of CORs under Field Office supervisors. If CORs remain under Field Office supervision, ERO Leadership will ensure Field Office managers are fully aware of the importance of the CORs' responsibilities and allowing them sufficient time and resources to complete their contract oversight duties. ECD: September 30, 2019.

OIG recommended the Executive Associate Director for Management and Administration:

**Recommendation 5:** Develop protocols to ensure that CORs and DSMs have full and expedient access to the contract documentation they need to perform core job functions.

**Response:** Concur. Currently, OAQ copies the COR on every contract action, but there is not a central repository where CORs or DSMs can locate all pertinent contract information if they were not sent the information directly. OAQ has required that every contract document be available electronically on a shared drive. The system currently allows access to OAQ contracting personnel only. ICE will provide CORs and DSMs with read-only access to provide efficient access to contract documentation. ECD: June 30, 2019.

## Appendix C
## Facility Listing and Quality Assurance Surveillance Plan Status

| Detention Facility | Facility Type | QASP Included in Contract |
|---|---|---|
| BROWARD TRANSITIONAL CENTER | CDF | YES |
| DENVER CONTRACT DETENTION FACILITY | CDF | YES |
| ELIZABETH CONTRACT DETENTION FACILITY | CDF | YES |
| HOUSTON CONTRACT DETENTION FACILITY | CDF | YES |
| NORTHEAST OHIO CORRECTIONAL CENTER (YOUNGSTOWN CDF) | CDF | YES |
| NORTHWEST DETENTION CENTER | CDF | YES |
| OTAY MESA DETENTION CENTER (SAN DIEGO CDF) | CDF | YES |
| SOUTH TEXAS DETENTION COMPLEX | CDF | YES |
| ADELANTO ICE PROCESSING CENTER | DIGSA | YES |
| ELOY FEDERAL CONTRACT FACILITY | DIGSA | YES |
| FOLKSTON ICE PROCESSING CENTER (D. RAY JAMES) | DIGSA | YES |
| IMMIGRATION CENTERS OF AMERICA FARMVILLE | DIGSA | YES |
| IMPERIAL REGIONAL DETENTION FACILITY | DIGSA | YES |
| JENA/LASALLE DETENTION FACILITY | DIGSA | YES |
| MESA VERDE DETENTION FACILITY | DIGSA | YES |
| OTERO COUNTY PROCESSING CENTER | DIGSA | YES |
| PINE PRAIRIE CORRECTIONAL CENTER | DIGSA | NO |
| PRAIRIELAND DETENTION FACILITY | DIGSA | YES |
| STEWART DETENTION CENTER | DIGSA | YES |
| ALLEGANY COUNTY JAIL | IGSA | NO |
| ALLEN PARISH PUBLIC SAFETY COMPLEX | IGSA | NO |
| BAKER COUNTY SHERIFF'S OFFICE | IGSA | NO |
| BALDWIN COUNTY CORRECTIONAL CENTER | IGSA | NO |
| BEDFORD MUNICIPAL DETENTION CENTER | IGSA | NO |
| BRISTOL COUNTY DETENTION CENTER | IGSA | NO |
| BURNET COUNTY JAIL | IGSA | NO |
| BUTLER COUNTY JAIL | IGSA | NO |

| | | |
|---|---|---|
| CABARRUS COUNTY JAIL | IGSA | NO |
| CALDWELL COUNTY DETENTION CENTER | IGSA | NO |
| CALHOUN COUNTY CORRECTIONAL CENTER | IGSA | NO |
| CARVER COUNTY JAIL | IGSA | NO |
| CHASE COUNTY DETENTION FACILITY | IGSA | NO |
| CHAUTAUQUA COUNTY JAIL | IGSA | NO |
| CHIPPEWA COUNTY SSM | IGSA | NO |
| CHRISTIAN COUNTY JAIL | IGSA | NO |
| CIBOLA COUNTY CORRECTIONAL CENTER | IGSA | YES |
| COBB COUNTY JAIL | IGSA | NO |
| COLLIER COUNTY NAPLES JAIL CENTER | IGSA | NO |
| DALE G. HAILE DETENTION CENTER | IGSA | NO |
| DAVIDSON COUNTY SHERIFF | IGSA | NO |
| DEARBORN POLICE DEPARTMENT | IGSA | NO |
| DOUGLAS COUNTY DEPARTMENT OF CORRECTIONS | IGSA | NO |
| EL PASO COUNTY CRIMINAL JUSTICE CENTER | IGSA | NO |
| ELGIN POLICE DEPARTMENT | IGSA | NO |
| ESSEX COUNTY CORRECTIONAL FACILITY | IGSA | YES |
| EULESS CITY JAIL | IGSA | NO |
| FAIRFAX COUNTY ADULT DETENTION CENTER | IGSA | NO |
| FREDERICK COUNTY DETENTION CENTER | IGSA | NO |
| FREEBORN COUNTY ADULT DETENTION CENTER | IGSA | NO |
| GARVIN COUNTY DETENTION CENTER | IGSA | NO |
| GASTON COUNTY JAIL | IGSA | NO |
| GLADES COUNTY DETENTION CENTER | IGSA | NO |
| GLENDALE POLICE DEPARTMENT | IGSA | NO |
| GRAND FORKS COUNTY CORRECTIONAL FACILITY | IGSA | NO |
| HALL COUNTY DEPARTMENT OF CORRECTIONS | IGSA | NO |
| HARDIN COUNTY JAIL | IGSA | NO |
| HOWARD COUNTY DETENTION CENTER | IGSA | NO |
| HUDSON COUNTY CORRECTIONAL CENTER | IGSA | NO |
| JAMES A. MUSICK FACILITY | IGSA | YES |

| | | |
|---|---|---|
| JEFFERSON COUNTY JAIL | IGSA | NO |
| JOE CORLEY DETENTION FACILITY | IGSA | YES |
| JOHNSON COUNTY CORRECTIONS CENTER | IGSA | YES |
| KENT COUNTY JAIL | IGSA | YES |
| LINCOLN COUNTY DETENTION CENTER | IGSA | NO |
| LONOKE POLICE DEPARTMENT | IGSA | NO |
| MINICASSIA DETENTION CENTER | IGSA | NO |
| MOFFAT COUNTY JAIL | IGSA | NO |
| MONROE COUNTY DETENTION CENTER | IGSA | NO |
| MONROE COUNTY DETENTION-DORM | IGSA | NO |
| MONTGOMERY CITY JAIL | IGSA | NO |
| MONTGOMERY COUNTY JAIL | IGSA | NO |
| MORGAN COUNTY ADULT DETENTION CENTER | IGSA | NO |
| MORROW COUNTY CORRECTIONAL FACILITY | IGSA | NO |
| NAVAJO COUNTY SHERIFF | IGSA | NO |
| NEW HANOVER COUNTY JAIL | IGSA | NO |
| NOBLES COUNTY JAIL | IGSA | NO |
| NORTHERN OREGON CORRECTIONAL FACILITY | IGSA | NO |
| OLDHAM COUNTY JAIL | IGSA | NO |
| ORANGE COUNTY INTAKE RELEASE FACILITY | IGSA | YES |
| ORANGE COUNTY JAIL | IGSA | NO |
| PIKE COUNTY CORRECTIONAL FACILITY | IGSA | NO |
| PLATTE COUNTY DETENTION CENTER | IGSA | NO |
| PLYMOUTH COUNTY CORRECTIONAL FACILITY | IGSA | NO |
| POLK COUNTY ADULT DETENTION FACILITY | IGSA | NO |
| PULASKI COUNTY JAIL | IGSA | NO |
| RIO COSUMNES CORRECTIONAL CENTER | IGSA | NO |
| RIO GRANDE COUNTY JAIL | IGSA | YES |
| ROANOKE CITY JAIL | IGSA | NO |
| ROLLING PLAINS DETENTION CENTER | IGSA | NO |
| SAINT CLAIR COUNTY JAIL | IGSA | YES |
| SAINT TAMMANY PARISH JAIL | IGSA | NO |
| SENECA COUNTY JAIL | IGSA | NO |
| SHAWNEE COUNTY DEPARTMENT OF CORRECTIONS | IGSA | NO |
| STRAFFORD COUNTY CORRECTIONS | IGSA | NO |

| | | |
|---|---|---|
| SUFFOLK COUNTY HOUSE OF CORRECTIONS | IGSA | NO |
| TAYLOR COUNTY ADULT DETENTION FACILITY | IGSA | NO |
| TELLER COUNTY JAIL | IGSA | NO |
| THEO LACY FACILITY | IGSA | YES |
| TULSA COUNTY JAIL (DAVID L. MOSS JUSTICE CENTER) | IGSA | NO |
| WAKE COUNTY SHERIFF DEPARTMENT | IGSA | NO |
| WAKULLA COUNTY JAIL | IGSA | NO |
| WHITFIELD COUNTY JAIL | IGSA | NO |
| WORCESTER COUNTY JAIL | IGSA | NO |
| YAVAPAI COUNTY DETENTION CENTER | IGSA | NO |
| YORK COUNTY PRISON | IGSA | NO |
| YUBA COUNTY JAIL | IGSA | NO |

*Source:* ICE Data (as of June 7, 2018)

## Appendix D
## Office of Inspections and Evaluations Major Contributors to This Report

Tatyana Martell, Chief Inspector
Inez Jordan, Lead Inspector
Christopher Zubowicz, Assistant Counsel
Jason Wahl, Senior Inspector
Erika Algeo, Inspector
James Johnson, Inspector
Ryan Nelson, Independent Referencer

## Appendix E
## Report Distribution

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committee

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.

## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305