# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| *N.N.N. and V.R.G., on behalf themselves and all others similarly situated*, | * | |
| | * | |
| *Plaintiffs*, | | |
| | * | |
| v. | | |
| | * | Civil Action No. 1:25-cv-01613-JRR |
| *NIKITA BAKER, in her official capacity as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations Baltimore Field Office, et al.*, | * | |
| | * | |
| *Defendants*. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## BRIEF OF AMICUS CURIAE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General of Maryland

/s/ David A. Prater
DAVID PRATER
Federal Bar No. 30223
Tyler Cochran (CPF No. 2310170001)
Julianne Cozzetto (CPF No. 2501281007)
Jonathan Smith (CPF No. 9907260005)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jsmith@oag.state.md.us
(410) 576-7844

June 18, 2025

Attorneys for Amicus Curiae

**TABLE OF CONTENTS**

Page

STATEMENT OF INTEREST OF AMICUS CURIAE STATE OF MARYLAND .........................1

STATEMENT OF FACTS.............................................................................................................2

ARGUMENT .................................................................................................................................4

I.      CONDITIONS IN THE HOLD ROOMS VIOLATE THE CONSTITUTION..........................................5

II.     CONDITIONS IN THE HOLD ROOMS ARE AGAINST PUBLIC POLICY.......................................7

        A.      Conditions in the Hold Cells Would, in a State Facility, Violate Maryland's
                Adult Detention Center Standards. ...........................................................................7

                1.      Medical Care .................................................................................................8

                2.      Food ...............................................................................................................9

                3.      Bedding .........................................................................................................10

                4.      Access to Counsel ........................................................................................10

                5.      Access to Basic Hygiene...............................................................................11

        B.      Conditions in the Hold Rooms Create Severe Public Health Risks.......................12

        C.      Balancing the Equities, ICE's Public Policy Violations and Public Health
                Risks Warrant a Preliminary Injunction................................................................13

CONCLUSION............................................................................................................................14

**BRIEF OF AMICUS CURIAE STATE OF MARYLAND**

The plaintiffs seek a preliminary injunction to compel the defendants to cease their violations of the plaintiffs' constitutional and legal rights. The State of Maryland respectfully submits this brief *amicus curiae* in support of the plaintiffs.

All Marylanders, regardless of immigration status, are entitled to be treated with dignity and respect for their constitutional and statutory rights. The plaintiffs here allege with supporting declarations that persons arrested in Maryland by the United States for civil immigration violations are being deprived of necessary medical care, adequate nutrition and water, sanitation, sleeping facilities, and access to their lawyers, as they are held (sometimes for days at a time) in a temporary detention facility in Baltimore. These conditions are contrary to the public interest and the interests of the State of Maryland, and they are unacceptable in a society bound by the rule of law.

**STATEMENT OF INTEREST OF AMICUS CURIAE STATE OF MARYLAND**

More than a million immigrants currently reside in the Maryland—17% of the State's population.[1] Nearly half a million children who are United States citizens live in Maryland with one foreign born parent and 730,000 individuals (21% of Maryland's workforce) are immigrants who pay nearly $16 billion in taxes.[2] The harm to the immigrant community is a harm to the entire State.

The plaintiffs' complaint and motion for preliminary injunction attest to a systemic practice by Immigration & Custom Enforcement ("ICE") of detaining immigrants in "Hold Rooms" at the George H. Fallon Federal Building in Baltimore. Although Hold Rooms are short-term facilities

---

[1]    Am. Immigration Council, *Immigrants in Maryland*, https://map.americanimmigrationcouncil.org/locations/maryland/ (last visited June 9, 2025).

[2] *Id.*

designed to hold detainees only on the day of an immigration hearing until their case is called, ICE has been detaining immigrants in Hold Rooms for multiple days. The plaintiffs have produced evidence that those detained for long periods in the Hold Rooms experience conditions that violate constitutional and statutory mandates.

The conduct of the United States, as described in the plaintiffs' complaint and motion for a preliminary injunction, is contrary to the public interest and clear public policy of the State of Maryland. If occurring in a state correctional facility, the alleged conditions in the Hold Rooms would violate numerous Adult Detention Center Standards promulgated by the Maryland Commission on Safety Standards to ensure a minimum level of safety and dignity. *See* Dep't of Pub. Safety & Corr. Servs., Md. Comm'n on Corr. Standards, *Adult Detention Center Standards* 54 (2020), https://tinyurl.com/yv84ne6p. The importance of those standards to Maryland is shown by the General Assembly's recent creation of the Maryland Office of the Correctional Ombudsman, an independent state agency responsible for overseeing detention conditions in all state facilities, which may investigate complaints; conduct independent reviews of health care, mental health care and restrictive housing; inspect facilities; make criminal referrals; and compel agencies to respond to recommendations. Md. Code Ann. , State Gov't §§ 9-4004 – 9-4005 (LexisNexis 2021). These laws and standards demonstrate Maryland's public policy in favor of adequate detention conditions. Thus, the State has a strong interest in the plaintiffs' challenge to the abuses alleged.

## STATEMENT OF FACTS

The plaintiffs' complaint, motion for preliminary injunction, and declarations detail a systemic deprivation of basic human and constitutional rights of immigrants civilly detained by ICE in the Hold Rooms. In being denied health care, food, sleeping facilities, and hygiene,

2

detainees are being treated like "animals" rather than human beings.  Ponce Decl. ¶ 7 (ECF No. 31-15) ("I was treated like a little animal during the three days I was held at the Baltimore ICE office."); Nieves Decl. ¶ 13 (ECF No. 31-10) ("I was treated like a criminal and a dog by the ICE Officers.)

The Hold Rooms are intended only for short-term custody of up to 12 hours while the detainee awaits transfer to a different facility or release.[3]  Instead, the plaintiffs have been held for up to seven days while being subjected to "inhumane" and "punitive" conditions.  S*ee* Compl. 2; Amaya-Luis Decl. ¶ 5 (ECF No. 31-14) (held for seven days and seven nights in isolation).

The plaintiffs have been denied access to adequate food, water, and medical care, including prescribed medication for serious conditions including diabetes and HIV.  *See, e.g.*, Davey Decl. ¶ 17 (ECF No. 31-13) ("[D]inner was just a bag of pre-cooked beans."); Amaya-Luis Decl. ¶ 11 (describing how she was "sometimes [given] no food at all"); Hyde Decl. ¶ 6 (ECF No. 6-2) ("Ms. R.G. is not being given water outside of a small bottle at mealtimes."); Justiniano Decl. ¶¶ 3-5 (ECF No 1-15) (stating detainee was denied diabetes medication); Jenkins Decl. ¶¶ 12-13 (ECF No. 31-12) (stating detainee was denied HIV medication for several days).  The plaintiffs also have been denied access to beds and bedding, private bathroom facilities, and hygiene supplies, while being kept in overcrowded, excessively lit, and uncomfortably cold conditions.  *See, e.g.*, Nieves Decl. ¶ 7 (ECF No. 31-10) ("I was held in a 12ft/12ft room with about twenty other men."); Parra Decl. ¶ 6 (ECF No. 31-5) (stating that when sleeping, "I had to sit on the floor because there was no room to extend my body."); Jenkins Decl. ¶ 10 (ECF No. 31-12) (describing 13 men "sleeping on the ground with no pillows or blankets"); Ponce Decl. ¶ 7 (ECF No. 31-15) ("The lights were left on 24 hours a day."); Amaya-Luis Decl. ¶ 9 (ECF No. 31-14) ("[T]he floors were also cold,

---

[3] ICE, Off. of Enf't and Removal Operations, *Operations of ERO Holding Facilities* § 1.1 (2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf.

and I was not given a blanket to help me stay warm."); Cruz Decl. ¶ 9 (ECF No. 31-6) ("There

was no shower and no way for us to bathe or wash up.  We remained in the clothes we were

wearing when detained for the next five days.  There was no toothbrush, no deodorant, and no

other hygiene products, except soap, which was useless without a shower.").  These conditions

have taken a toll on the plaintiffs' mental health.  Amaya-Luis Decl. ¶ 15 (ECF No. 31-14) ("I

became so stressed that I began to pull my hair out.  I would bang my head on the concrete wall,

because I did not know what to do. . . . Things were so bad I wanted to die.").

Finally, ICE has denied people adequate opportunities to contact legal counsel.  The

plaintiffs have access to only one phone requiring the use of a credit card, which many detainees

lack.  *E.g.*, B.R.R. Decl. ¶ 6 (ECF No. 31-8) (stating "the official told me I had the right to make

a call, and only one call . . . you needed credit card information to call").  This telephone lacks any

privacy, so detainees are unable to have a private conversation with their attorney under the

protection of the attorney client privilege.  Gordon Decl. ¶ 14 ("[I]t was not a private and

confidential call because I could hear individuals in the background.  This limited the questions I

could ask.")

## ARGUMENT

The plaintiffs are entitled to a preliminary injunction because they have "demonstrate[d]

by a preponderance of the evidence . . . : (1) a likelihood of success on the merits; (2) a likelihood

of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities

tips in its favor; and (4) that issuing the injunction is in the public interest."  *See Winter v. Natural*

*Res. Def. Council*, 555 U.S. 7, 22 (2008).  The balance of equities and the public interest factors

"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because the plaintiffs have extensively briefed the first two elements—arguments that Maryland

4

adopts and incorporates—this brief will focus on the final factor of the public interest and balance of the equities, which strongly support a ruling in the plaintiffs' favor.

The conditions described in the plaintiffs' declarations fall far short of the minimal treatment acceptable under the United States Constitution as well as the standards that Maryland has established for its own detention facilities.

## I.    CONDITIONS IN THE HOLD ROOMS VIOLATE THE CONSTITUTION.

The conditions challenged in this case violate the Constitution as well as ICE's own standards for detention facilities.  All individuals in detention are guaranteed constitutional protection, including requirements that the government provide for their safety and well-being. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  When an individual is taken into the custody of the government, and held against their will, "the Constitution imposes upon [the government] a corresponding duty to assume some responsibility" for that individual's general well-being.  *Id*. at 200.

The duty to provide for an individual's well-being includes basic human necessities, such as edible food, potable drinking water, medical care, and conditions conducive to sleep.  *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) ("[T]he State concedes a duty to provide adequate food, shelter, clothing, and medical care."); *see also Doe 4 ex rel. Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F. 3d 327, 338–39 (4th Cir. 2021) (detained unaccompanied minors are constitutionally entitled to have basic human needs met, including "food, clothing, shelter, medical care, and reasonable safety") (quoting *DeShaney*, 489 U.S. at 199-200); *E.D. v. Sharkey*, 928 F 3d 299, 307 (3d Cir. 2019) (finding conditions of confinement of immigrant detainees that rise to the level of punishment to be unconstitutional). Despite these basic requirements, detainees at the Hold Rooms are suffering from a lack of basic human provisions while being indefinitely held in facilities designed for short-term detention on the day of an immigration hearing.

The Hold Rooms lack facilities to meet the most basic standards for safety and well-being because, under ICE's own rules, they are not meant to hold people for more than 12 hours.[4] Nevertheless, ICE has been holding individuals in the Hold Rooms for much longer—in some instances, as long as 168 hours (14 times the allowed timeframe). Amaya-Luis Decl. ¶ 5 (ECF No. 31-14) (held for seven days and seven nights in isolation).  The plaintiffs' declarations make clear that ICE is unable to detain people in Hold Rooms for that long consistent with minimal requirements for human dignity under the Constitution.[5]

Likewise, conditions in the Hold Rooms violate the Fifth Amendment guarantee of due process of law, which applies to civil detainees in deportation proceedings.  *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Doe v. Kelly*, 878 F. 3d 710 (9th Cir. 2017).  Because immigration detention is a civil detention, detainees cannot be subjected to "conditions of confinement substantially worse than they would face upon commitment."  *Unknown Parties v. Nielsen*, 611 F. Supp. 3d 786, 794 (D. Ariz. 2020) (citing *Lynch v. Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984)). Therefore, any "conditions of confinement that violate the Eighth Amendment will necessarily violate the Fifth Amendment." *Id.* at 794.  The court in *Nielson* found a Fifth Amendment violation for conditions very similar to those in the Hold Rooms, where "detainees [were] forced over a period of several nights (more than two nights) to sleep on mats on concrete floors or benches in

---

[4] *Operations of ERO Holding Facilities*, *supra*, § 3.2 n.3.

[5] The Department of Homeland Security's Inspector General repeatedly has reminded ICE that "[f]acilities and staff must comply with ICE detention standards to provide a clean and safe environment and protect the health, safety, and rights of detainees." *E.g.*, U.S. Dep't of Homeland Sec., Office of Inspector Gen., *Summary of Unannounced Inspections of ICE Facilities Conducted in Fiscal Years 2020–2023*, at 1 (Sept. 24, 2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-09/OIG-24-59-Sep24.pdf; *see also* U.S. Dep't of Homeland Sec., Office of Inspector Gen., *Concerns About ICE Detainee Treatment and Care at Detention Facilities* (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

fully lit holding cells" that were uncomfortably cold. *Id.* at 799-800; *see, e.g.*, Ponce Decl. ¶ 7 (ECF No. 31-15) ('The lights were left on 24 hours a day'); Parra Decl. ¶ 6 (ECF No. 31-5) (when sleeping, "I had to sit on the floor because there was no room to extend my body").

## II.    CONDITIONS IN THE HOLD ROOMS ARE AGAINST PUBLIC POLICY.

Defendants' conduct violates both the public interest and Maryland public policy. Although all correctional institutions, including Maryland's, face challenges in ensuring safe, decent, and humane conditions of confinement, Maryland law demonstrates a clear policy that detention conditions in the State must meet a minimal level of safety and decency. The conditions in the Hold Rooms violate these precepts and values.

### A.    Conditions in the Hold Cells Would, in a State Facility, Violate Maryland's Adult Detention Center Standards.

In addition to violating both the Constitution and ICE's own standards for detention facilities, the conditions challenged in this case would, in a state facility, violate Maryland's Adult Detention Center Standards. The defendants' conduct thus contravenes Maryland public policy as embodied by the Standards.

Promulgated by the Maryland Commission on Correctional Standards, Maryland's Adult Detention Center Standards apply to all state correctional facilities and constitute "minimum mandatory standards applicable to security and incarcerated individual control, incarcerated individual safety, incarcerated individual food services, incarcerated individual housing and sanitation, [and] incarcerated individual rights." Md. Code Ann., Corr. Servs. § 8-103(a)(1) & (b)(2)(i) (LexisNexis 2017 & Supp. 2024). Among other requirements, the Standards mandate that all incarcerated individuals in state facilities have, among other protections, appropriate access

to food, water, hygiene, medical care, and the right to access legal counsel.[6]  *See* Code of Md. Regs. ("COMAR") 12.14.03.02–12.14.03.08.  The Commission inspects all state correctional facilities to ensure compliance with the Standards, Corr. Servs. § 8-113, and may "order the immediate cessation of operation" when conditions threaten incarcerated persons' lives or health. *Id.* § 8-115(a).

In the following ways, the defendants have contravened Maryland public policy by treating detainees in a manner that, in a state facility, would violate the Adult Detention Center Standards.

### 1.  Medical Care

Maryland's Standards require that detainees have access to health care.  See COMAR 12.14.03.06B(2).  Compliance with the Standard requires access to prescribed medications, emergency care, medical screening, and sick calls. *Adult Detention Center Standards* 24-32.  ICE, however, ignored detainees' medical needs by denying access to prescription medication and refusing necessary medical care.  Multiple declarants describe ICE refusing to allow them prescription medication for life-threatening illnesses such as diabetes, HIV, and a thyroid condition, even though ICE had their medication, because no medical staff were available at the Hold Cells. *E.g.*, Justiniano Decl. ¶¶ 3–5 (ECF No 1-15) (despite having a family member bring diabetes medication to facility, the plaintiff was denied access to medication for more than 24

---

[6] These requirements are substantially similar to those promulgated by the United States Marshals Service, 12 *Federal Performance Based Detention Standards* (2025), https://www.usmarshals.gov/sites/default/files/media/document/federal-performance-based-detention-standards-12.pdf; the American Bar Association, *ABA Civil Immigration Detention Standards* (2012) https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/abaim mdetstds.pdf; and the National Commission on Correctional Health Care, *Standards for Health Services in Jails* (2018), https://mn.gov/doc/assets/NCCHC%20Standards%20for%20Health%20Services%20in%20Jails %202018_tcm1089-652655.pdf, as well as ICE's own standards that the plaintiffs allege Defendants are refusing to follow, *Operations of ERO Holding Facilities*, *supra*, § 1.1.

hours and was advised that the defendants "did not have the capacity to [dispense medication] at this facility because it was meant to be temporary, and she would receive this care wherever she was transferred"); Jenkins Decl. ¶¶ 12–13 (ECF No. 31-12) (denied HIV medication for several days and told there was "no nurse in the facility" to provide it). At least one person was transported to a hospital for emergency care after having been denied access to life-sustaining medication. O.P.L. Decl. ¶ 9 (ECF No. 31-11) (describing witnessing another person who was diabetic request his insulin dose and ICE refused, and the other man was seen "on the floor and was having difficulty breathing. That morning, they had to take him to the hospital.") In addition, ICE refused medical care when people asked for it. B.R.R. Decl. ¶ 6 (ECF No. 31-8) ("For these three days, I asked to see a doctor, they said that there was no doctor, and they wouldn't be able to help me.")

### 2. Food

Maryland's Standards require that the menu of food be approved by a registered dietitian, that three meals be served each day, that food service meet sanitation standards, and that special medical and religious diets be provided. *See* COMAR 12.14.03.04; *Adult Detention Center Standards* 36–41. By contrast, according to the plaintiffs, ICE failed to provide detainees with adequate food and water. ICE's "meals" consist of irregular offerings of a cup of instant noodles, a single pouch of beans, or a sandwich. Girod Decl. ¶ 8 (ECF No. 31-7) ("The food was also poor quality and inconsistent. Sometimes B.L.C. was given a cup of instant noodles, sometimes a protein bar, and sometimes bread or a cheese sandwich."); Davey Decl. ¶ 17 (ECF No. 31-13) ("[D]inner was just a bag of pre-cooked beans."). The only water offered to detainees was a small bottle provided with meals, which was inconsistently provided as infrequently as once or twice per day. *E.g.*, Justiniano Decl. ¶ 3 (ECF No 1-15) (8 oz bottle of water provided with meals); Vasquez Decl. ¶ 5 (ECF No. 31-9) ("small water bottle" provided twice a day).

Maryland's Standards also prohibit withholding food as punishment. *See* COMAR 12.14.03.04G. But the plaintiffs attest that if more or different food was requested, ICE sometimes failed to provide detainees with any food at all. Amaya-Luis Decl. ¶ 11 (ECF No. 31-14) ("I asked the ICE officers for different food . . . [a]fter that, for the next five days, they gave me much less food, sometimes no food at all. On multiple days they only gave me water, but no food. I lost about twenty pounds while I was in the Baltimore hold rooms.").

### 3. Bedding

Maryland's Standards require the provision of "mattresses, pillows, sheets, pillowcases, towels, wash cloths, and blankets." *See* COMAR 12.14.03.05A.(6); *Adult Detention Center Standards* 46. ICE, however, has failed to provide even the most basic sleeping arrangements. The plaintiffs are forced to sleep in crowded groups, on a concrete floor or thin air mattresses, without proper blankets, in cold rooms where lights are on at all hours. *E.g.*, Jenkins Decl. ¶ 10 (ECF No. 31-12) (describing 13 men "sleeping on the ground with no pillows or blankets"); Amaya-Luis Decl. ¶ 9 (ECF No. 31-14) ("[T]he floors were also cold, and I was not given a blanket to help me stay warm."); Hyde Decl. ¶ 9 (ECF No. 6-2) ("ICE does not provide pillows or sheets, only aluminum blankets"). These conditions make sleep all but impossible.

### 4. Access to Counsel

Maryland's Standards guarantee confidential legal visits, legal phone calls, and access to the courts. *See* COMAR 12.14.03.06C(1), (3), & (4); *Adult Detention Center Standards* 46. But the plaintiffs attest that ICE has denied them access to their lawyers. The Hold Rooms have only one phone, which requires inputting credit card details and is not located in a private area. *E.g.*, B.R.R. Decl. ¶ 6 (ECF No. 31-8). Some plaintiffs were not allowed to use the phone at all. Girod Decl. ¶ 10 (ECF No. 31-7) ("I was not allowed to speak with [my client] on the phone."). Even those who were permitted to use that phone were denied effective access to their attorneys because

the phone does not afford privacy, which prevents attorneys from gathering potentially privileged information needed to represent their clients.  Gordon Decl., ¶ 14.

### 5.  Access to Basic Hygiene

Maryland's Standards require that detainees receive basic sanitation supplies and access to facilities to meet their sanitation needs, including "sufficient toilet, shower, and bathing accommodations to maintain basic health and personal hygiene." *Adult Detention Center Standards* 44; *see also* COMAR 12.14.03.05A(4).  The defendants failed to meet those requirements.  They allowed detainees access to only a single toilet in the Hold Rooms, which was located in an open space for all detainees confined.  Jenkins Decl. ¶ 10 (ECF No. 31-12) ("The restroom was inside the holding cell and was disgusting.  There was no privacy.").  ICE refused people access to showers or opportunities to change into clean clothes.  Amaya-Luis Decl. ¶ 10 (ECF No. 31-14) ("There was no way to clean yourself, because there were no showers, washcloths, or towels. It was disgusting to be locked up without any way to stay clean or even change my clothes."); Ponce Decl. ¶ 8 (ECF No. 31-15) ("Conditions inside the cell were very bad. For three days, I had no shower and no change of clothes,"); Cruz Decl. ¶ 9 (ECF No. 31-6) ("There was no shower and no way for us to bathe or wash up. We remained in the clothes we were wearing when detained for the next five days."); Girod Decl. ¶ 7 (ECF No. 31-7) ("It was also very dirty, because there were no showers and no one was given a change of clothes.").  ICE also failed to provide detainees with toothbrushes, toothpaste, and in some cases, even soap. Cruz Decl. ¶ 9 (ECF No. 31-6) ("There was no toothbrush, no deodorant, and no other hygiene products, except soap, which was useless without a shower."); Girod Decl. ¶ 7 (ECF No. 31-7) ("No one was given soap or access to toothbrushes/toothpaste.").

11

**B.** **Conditions in the Hold Rooms Create Severe Public Health Risks.**

By indefinitely detaining immigrants in overcrowded, unsanitary conditions without reliable access to appropriate sanitation and bathing facilities, adequate food and water, or life-sustaining medications such as those used to treat diabetes and HIV, ICE also has created an unacceptable risk to Maryland's public health. *See* Compl. 2. Similar conditions have been enjoined by other courts. *Kelly*, 878 F 3d at 717–18.

The alleged conditions create a range of individual health and public health concerns. First, overcrowding and high rates of turnover in immigration detention facilities—exactly the conditions described in the Hold Room—have been associated with increased incidence of highly infectious diseases such as COVID-19. Gabrielle Beaudry et al., *Creating Supportive Conditions to Reduce Infectious Diseases in Prison Populations*, 5-11, BMJ Global Health (2020), https://gh.bmj.com/content/bmjgh/5/11/e003201.full.pdf. Courts have recognized that failure to take steps to protect detainees from infectious disease violates the constitution and can be enjoined. *See*, *e.g.*, *Banks v. Booth*, 459 F. Supp. 3d 143, 153-54 (D.D.C. 2020). As the Supreme Court has noted, detention officials must take reasonable measures to protect detainees from predictable harms "having stripped [detainees] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials [must] take reasonable measures to guarantee the[ir] safety." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1970); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (finding that deliberate indifference by prison officials to the risk of serious communicable diseases violates the constitution).

The plaintiffs have specifically detailed the overcrowded and unsanitary conditions in the Hold Rooms that threaten public health. Between 15 and 30 persons are detained in rooms of no more than 12 by 18 feet. *E.g.*, Parra Decl. ¶ 6 (ECF No. 31-5) (held in "roughly 12 x 18 ft." room with "about 20 other men"); Girod Decl. ¶ 5 (ECF No. 31-7) (held with "between fifteen and

12

twenty-five people at any given time"). By refusing to provide basic medical care, food, or hygiene while overcrowding people into small rooms, ICE has created an environment ripe for disease and infection to spread among detainees and, ultimately, to other Maryland residents. Facility and immigration court staff, detainees' family members, and attorneys are at risk of catching diseases due to the overcrowded and unsanitary conditions of confinement. *Cf.* Radha Sadacharan, MD, *The Intersection of Community Health & Carceral Health*, JAMA Network (June 3, 2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2834852#google_vignette.

Furthermore, many plaintiffs will be released from detention and returned to their communities and families in Maryland.[7] Maryland medical providers will need to address the new or worsened medical conditions those plaintiffs have developed because of their mistreatment, as well as any diseases that they spread to other persons. The unlawful, unsanitary, and inhumane conditions ICE has created thus will impose a burden on Maryland's healthcare system.

### C.    Balancing the Equities, ICE's Public Policy Violations and Public Health Risks Warrant a Preliminary Injunction.

Due to these public policy violations and public health risks, this Court should preliminarily enjoin ICE from keeping detainees in the Hold Rooms for more than 12 hours. Like any citizen, the State of Maryland has an interest in ensuring that the federal government complies with the law. *See Roe v. Department of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020). That interest is heightened where, as here, the challenged conduct violates Maryland public policy and creates unacceptable public health risks within the State.

Balancing the equities, the harm to the United States from an injunction is slight. Assuming that ICE is otherwise able to meet minimum constitutional standards for confinement in the Hold

---

[7]    TRAC Immigration, *Alternatives to Detention (ATD)*, https://tracreports.org/immigration/detentionstats/atd_pop_table.html (as of May 17, 2025, 3,810 people have been released under the Alternates to Detention Program in ICE's Baltimore area).

Rooms, it would be permitted to keep detainees there for up to 12 hours as its policies permit. If ICE cannot meet those standards, then it may use its existing Alternatives to Detention program, which "exists to ensure compliance with release conditions . . . for non-detained" persons while allowing them to "remain in their communities—contributing to their families and community organizations, and, as appropriate, concluding their affairs in the U.S."[8] While enrolled in the Alternatives to Detention Program, participants are subject to electronic monitoring and check-ins through the SmartLINK phone application or some other form of monitoring such as by ankle monitor. In Fiscal Year 2025, more than 180,000 immigrants were enrolled in the Alternatives to Detention program.[9] Participants in the program had a more than 98% attendance rate for all immigration hearings and an 87.9% attendance rate at final hearings.[10] By relying on the Alternatives to Detention Program, ICE may execute the administration's immigration enforcement priorities in a manner that guarantees the constitutional rights of immigrants and safeguards Maryland public policy and public health.

The plaintiffs have proved that the federal government is detaining immigrants at the Baltimore Federal Building in conditions that violate basic constitutional requirements and human dignity. These conditions contravene the public policy of Maryland and create unacceptable risks to public health in the State. The public interest and the balance of the equities therefore support an injunction.

## CONCLUSION

The motion for preliminary injunctive relief should be granted.

---

[8] ICE, *Alternatives to Detention* (Feb. 27, 2025), https://www.ice.gov/features/atd.

[9] ICE, *Detention Management*, https://www.ice.gov/detain/detention-management#stats.

[10] *Id.*

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ David A. Prater
DAVID PRATER
Federal Bar No. 30223
Tyler Cochran (CPF No. 2310170001)
Julianne Cozzetto (CPF No. 2501281007)
Jonathan Smith (CPF No. 9907260005)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jsmith@oag.state.md.us
(410) 576-7844

Attorneys for Amicus Curiae

## CERTIFICATE OF SERVICE

I certify that, on this 18th day of June, 2025 the foregoing Brief of Amicus Curiae State of

Maryland was served by CM/ECF counsel of record, who are registered CMF users.

/s/ David A. Prater
DAVID PRATER

15