**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

D.N.N. and V.R.G., *on behalf themselves and all others similarly situated,*

*Plaintiffs,*

v.

NIKITA BAKER, *in her official capacity as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations Baltimore Field Office,* et al.,

*Defendants.*

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Civil Action No.: 1:25-cv-01613

**<u>DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

Plaintiffs allege that the conditions of their confinement at the ICE Holding Facility in Baltimore, Maryland violate the Due Process Clause under the Fifth Amendment and the Administrative Procedures Act (APA) because they deprive putative plaintiffs of a safe and sanitary environment and adequate access to medical care. Plaintiffs cannot establish constitutional claims with a high probability of success on the merits. As described in detail below, their challenge to hypothetical future conditions of confinement are not cognizable in a habeas action. Plaintiffs fail to allege a plausible claim for relief under either the Fifth Amendment or the APA and their deliberate indifference claim fails because they cannot demonstrate irreparable harm. A preliminary injunction is also unwarranted here because the

balance of the equities and the public interest weigh in Defendants' favor. Plaintiffs' detention is related to a legitimate government interest because (as Congress authorized and as an immigration judge ("IJ") already determined) the public interest is served when the immigration laws are enforced. *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009). Therefore, the Court should deny Plaintiffs motion.

## FACTUAL BACKGROUND

Plaintiffs D.N.N. and V.R.G. are noncitizens who were previously detained at U.S. Immigration and Customs Enforcement ("ICE") Baltimore Field Office (the "Holding Facility"), but were transferred to permanent detention facilities in May 2025. *See* ECF No. 14 at p.1, n. 1; Exhibit 1, Declaration of Jose Guerrero ("Declaration"), ¶ 3. Putative Plaintiffs are all persons who are now or will be detained at the Baltimore Holding Facility. *See* Am. Compl. (ECF No. 6) at ¶ 60.

The purpose of the Holding Facility is to process aliens arrested pursuant to removal proceedings or while awaiting removal before being transported to an ICE detention facility. Guerrero Decl. at ¶ 6. These individuals are almost exclusively either in the process of being removed from the United States subject to final orders of removal or subject to mandatory detention under the Immigration and Nationality Act (INA) during their removal proceedings. *Id.* at ¶ 12. The Holding Facility plays a critical role in ensuring public safety during the removal process by filling a notable gap in federal detention capacity in the State of Maryland. *Id.* at ¶¶ 14, 19 Maryland prohibits detention facilities within the State from contracting with ICE to detain aliens in removal proceedings. *Id.* at ¶ 19. Consequently, Enforcement and Removal Operations (ERO) must locate facilities outside Maryland with available housing space to provide extended-term detention, which lengthen the post-arrest processing time. *Id.* ICE uses the Holding

Facility while processing aliens and locating facilities for their long-term detention. *Id.* at ¶ 12. The Holding Facility thus allows ICE to bridge the interim period between an alien's arrest and detention during or following removal proceedings. Absent the availability of the Holding Facility, ERO would likely be unable to process individuals for detention or effectuate any arrests as required pursuant to the INA. Guerrero Decl. at ¶¶ 14, 19. Due to increased operational demands, ICE-Baltimore received a waiver on February 5, 2025, authorizing it to hold individuals in the Holding Facility for sixty hours. On June 24, 2025, ICE issued a waiver nationwide granting all ICE holding facilities up to 72 hours to process individuals for transport to a long-term detention facility; still, ICE-Baltimore aims to hold individuals no longer than twelve hours in the Holding Facility while processing and locating facilities for their long-term detention. *Id.* at ¶¶ 16-18.

The Holding Facility consists of two large and two small cells—the large cells may hold up to 35 individuals, while the small cells may each hold up to 15 individuals. *Id.* at ¶ 7. The average population of the Holding Facility on any given day during the months of May and June this year has been approximately 60-65 individuals. *Id.* at ¶ 12. The individuals are segregated by sex and risk classification assessment. *Id.* at ¶ 10. Each cell contains a toilet and sink, separated from the open area by a mid-height privacy wall. *Id.* at ¶ 15.

ICE-Baltimore provides inflated mattresses and blankets for any individuals in the Holding Facility overnight. Guerrero Decl. at ¶ 21. Water is provided to any individual upon request and there is a sink in each cell. *Id.* at ¶ 24. ICE-Baltimore Officers provide three meals per day to individuals in the Holding Facility and has also purchased meals from local restaurants and snacks from local convenience stores. *Id.* at ¶ 26. ICE-Baltimore issues individuals a set of toiletries that include a toothbrush, toothpaste, and moist towelettes for use while in the Holding Facility.

*Id.* at ¶ 25. ICE-Baltimore currently utilizes a vendor that provides pre-made ready-to-eat meals for each individual. *Id.* at ¶ 27. The Officers take dietary limitations and requests into account in purchasing meals. *Id.* at ¶ 26. During an arrest, ERO Officers ask aliens if they have any medical conditions, require any ongoing medical treatment, or need to bring any medication with them. *Id.* at ¶ 28. ICE-Baltimore authorizes family members to bring medication to aliens who did not have it with them at the time of arrest and requests family members bring both necessary prescription and over the counter medication. *Id.* Medication is placed in an individual's property bag to be distributed as scheduled, and ICE-Baltimore maintains a log to ensure individuals receive medications as prescribed. *Id.* at ¶ 29. If aliens require medication during their time in the Holding Facility, they are taken to the University of Maryland Medical Center, approximately three blocks from the Holding Facility, or Johns Hopkins Hospital, approximately one mile from the facility. *Id.* at ¶ 30. ICE-Baltimore offers all aliens the opportunity to make a phone call upon arrival at the Holding Facility, and each cell has a phone for free public use by all individuals at any time. *Id.* at ¶ 32. Upon request, ERO Baltimore will allow individuals to use phones outside of the cells to address private issues. *Id.*

## ARGUMENT

### I. Plaintiffs' Claims are Not Justiciable

#### A. The Claims of Plaintiffs' D.N.N. and V.R.G. Are Moot

A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)). Where, as here, a detainee seeks injunctive relief from an allegedly unconstitutional prison condition, the detainee's subsequent transfer from the institution with the challenged condition renders the claim moot. *See*

*Magee v. Waters*, 810 F.2d 451 (4th Cir. 1987) (holding prisoner's request for injunctive relief on inadequacy of law library claim moot because of transfer of prisoner). Though, as Plaintiffs note, courts have allowed would-be class representative plaintiffs to remain as class representatives even when their individual claims have mooted, Mot. for Class Cert. (ECF No. 31) at 18, the instant motion presents a different question and Plaintiffs appear to concede as much, *see id.* at 7, citing *Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022), for the proposition that release from detention is a ground of mootness for individual claims. *See also Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991) (holding that transfer of prisoner mooted claims for injunctive and declaratory relief regarding allegedly unconstitutional prison conditions); *Murray v. Lappin*, No. CIV. A. 5:07CV6, 2008 WL 249167, at *3 (N.D. W. Va. Jan. 29, 2008) ("Because the plaintiff is no longer housed at Hazelton, he is no longer subject to the allegedly unconstitutional conditions about which he complains in his complaint. Therefore, he no longer has a legally cognizable interest in having such alleged conditions at Hazelton resolved."). Plaintiffs' claims are moot because they are no longer subject to the detention conditions they seek to challenge.

To the extent they seek to do so, Plaintiffs D.N.N. and V.R.G. cannot redress injuries of putative class members. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others"); *Hummer v. Dalton*, 657 F.2d 621, 625-626 (4th Cir. 1981) (stating that an inmate's suit was "confined to redress for violation of his own personal rights and not one by him as knight-errant for all prisoners"). Accordingly, Plaintiffs' motion for Preliminary Injunction should be denied.

**B. Plaintiffs Lack Article III Standing**

"Standing to sue is a doctrine rooted in the traditional understanding of a case or

controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must have suffered an "injury in fact." *Id.* Second, the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the Court." *Id.* Third, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision." *Id.* at 561. Plaintiffs do not raise a cognizable injury, and as such, they lack standing to present their claims.

i. Plaintiffs Fail to Demonstrate an Injury-in Fact Because the Alleged Harms are Speculative and Generalized

To establish injury in fact, a plaintiff must show that they suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Injury in fact is a "constitutional requirement" and is the "[f]irst and foremost" of standing's three elements. *Id.* at 1547-48 (quoting *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 103 (1998)). To be "particularized" the injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Spokeo, Inc*, 136 S. Ct. at 1548. A "concrete" injury must be "'*de facto*'; that is, it must actually exist[,]" that is, it must be "real," and not "abstract." *Id.*

When, as here, an alleged injury has not yet occurred, courts must determine whether it is imminent. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). An injury is imminent if the threatened injury is "certainly impending" or if there is substantial risk that the harm will

occur. *Id.* Plaintiffs bear the burden of pleading concrete facts showing that the defendant's actual action has caused the substantial risk of harm. *Id.* In the context of a putative class action, all named plaintiffs "must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

Plaintiffs fail to establish standing because the claimed risk of harm they face is premised on hypothetical future conditions that are necessarily speculative and highly variable. While Plaintiffs seek to advance their claims based on testimonial assertions of harms experienced by previous detainees (which as Defendants argue below do not establish per se constitutional violations), the likelihood that any putative plaintiff will encounter a similar adverse consequence remains entirely speculative and depends on the convergence of multiple independent variables along with the actions of immigration officers and facility operators. *See Clapper*, 133 S. Ct. at 1150. Plaintiffs have defined their putative class with maximum breadth, inclusive of every alien who enters the Holding Facility. They ask this Court to accord them standing irrespective of the duration of time a person will spend in the facility, whether he has an existing medical condition or concern, or the size of the fellow detainee population present at that time—either in the facility overall or in the particular cell to which a putative plaintiff has been assigned. With respect to duration of stay, for example, numerous detainees will spend only a single night in the facility while others may spend two or more. Guerrero Decl. at ¶¶ 16, 20. ICE-Baltimore aims to hold individuals no longer than twelve hours in the Holding Facility while processing and locating facilities for their long-term detention. *Id.* at ¶ 16. Each will have a different health portfolio. Certainly, each detainee does not face the same level of risk. Though some constellation of circumstances could converge to create a substantial risk of harm for some putative plaintiff, it

would not create the same risk for each detainee present time—much less every detainee present at any time. *See Lujan*, 504 U.S. at 560 n.1. (holding an injury cannot be "particularized" unless it "affect[s] the plaintiff in a personal and individual way"). *Clapper* has already instructed that a party cannot claim injury-in-fact based on hypothetical future harm that is not "certainly impending." *Welborn v. Internal Revenue Serv*., 218 F. Supp. 3d 64, 76 (D.D.C. 2016) (citing *Clapper*, 133 S. Ct. at 1143). For example, Plaintiffs claim that putative plaintiffs face a significant risk of having their serious medical needs denied in violation of their Due Process rights. Mot. at 16-17. But, given that, as defined, a putative plaintiff is any individual who will be detained at the Holding Facility, the alleged constitutional injury is necessarily too attenuated because Plaintiffs cannot show that a now-anonymous future detainee—no matter his age, health profile, or duration of confinement—is at substantial risk of a) experiencing a serious medical need; the b) risk of which will be known to, but disregarded by, facility personnel; that 3) will then result in harm to the individual. *See e.g.*, *Aslanturk v. Hott*, 459 F. Supp. 3d 681, 699 (E.D. Va. 2020) (distinguishing between a petitioner's recoverable claim where it was factually established that the injury "commenced when [the] individual was detained" and the instant petitioner's deliberate indifference claim based on feared exposure to COVID that was "speculative given that Petitioner will only be injured in the manner he raises should he be first exposed to the virus, then also contract the virus, and then also develop severe symptoms"). Indeed, even in instances where "prison officials [ ] actually knew of a substantial risk to inmate health or safety" and that particular harm ultimately occurs, the officials "may be found free from liability if they responded reasonably to the risk." *Aslanturk*, 459 F. Supp. 3d at 699. This subjective inquiry renders the feared possibility of harm even more attenuated, as a court obviously cannot predict how an ICE official will respond to a future risk at some indefinite point in the future. Put simply, Plaintiffs have not

alleged facts from which a plausible inference could be drawn that they personally face imminent harm that is "certainly impending." *Id.* Thus, Plaintiffs' allegations of speculative or possible future injury do not satisfy Article III.

**II. Plaintiffs Do Not Satisfy the Requirements for Preliminary Relief.**

Even if Plaintiffs could satisfy the threshold requirement of standing (and they cannot), Plaintiffs' motion for a preliminary injunction fails because they do not satisfy any of the four elements required to obtain the relief they seek. As this Court has explained:

> The standard for granting a preliminary injunction requires the moving party to show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. All four factors must be shown, and the movant bears the burden on each.

*Montgomery v. Housing Auth. of Baltimore City*, 731 F. Supp. 2d 439, 441-42 (D. Md. 2010) (internal citations omitted).

Generally, preliminary injunctions aim "to preserve the relative positions of the parties" and "protect the status quo." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). The Fourth Circuit has defined the "status quo" as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). Mandatory preliminary injunctions, such as the one Plaintiffs request here, "alter the status quo," and are therefore, "disfavored." *League of Women Voters of N. Carolina*, 769 F.3d 224, 235-36 (4th Cir. 2014). An injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). Because issuing a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a

certain way[,] '[t]he danger of a mistake' in this setting 'is substantial.'" *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)). The movant must show more than a "grave or serious question for litigation"; instead, he bears the "heavy burden" of making a "clear showing that [he] is likely to succeed at trial on the merits." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347, 351 (4th Cir. 2009).

Plaintiffs do not seek to merely maintain the status quo—the general purpose of a temporary restraining order or a preliminary injunction. *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). Instead, Plaintiffs seek the extraordinary relief of a "mandatory" injunction, requiring their immediate release. To obtain the extraordinary relief they seek, courts require "a heightened showing of the four factors." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 (10th Cir. 2009). Because Plaintiffs cannot meet the requirements of a regular showing of the four factors required for a preliminary injunction—let alone the heightened showing—this Court should deny their motion.

**A. Plaintiffs are Unlikely to Succeed on the Merits.**

1. <u>This Court Lacks Subject Matter Jurisdiction</u>.

Courts often deny preliminary injunction motions when subject matter jurisdiction over the underlying complaints is lacking. *See, e.g., Sanderlin v Hutchens, Senter & Britton, P.A.*, 783 F. Supp. 2d 798, 799 (W.D.N.C. 2011) ("Because this Court lacks subject-matter jurisdiction, the Court denies Plaintiff's Motion for TRO[.]"); *Wilson v. Suntrust Bank, Inc.*, No. 3:10-cv-00573, 2010 WL 4718612, at *1 (W.D.N.C. Nov. 15, 2010) (same). Here, the Court lacks subject matter jurisdiction over Plaintiffs' habeas claims and thus, they cannot show a likelihood of success on the merits under these claims.

To the extent Plaintiffs seek recovery via a writ of habeas corpus, the Court lacks jurisdiction to consider the claim. In their Amended Complaint, Plaintiffs allege violations of the APA (Count 1) and the Fifth Amendment's Due Process (Counts 2-7). However, the Amended Complaint does not contain a freestanding habeas corpus claim under 8 U.S.C § 2241. Notwithstanding this, Plaintiffs ask this Court to, "[i]ssue a writ of habeas corpus ordering Ms. N.N.'s and Ms. R.G.'s immediate release from ICE custody, placement in community-based alternatives to detention such as conditional release or, at minimum, transfer to an adequate detention facility." Am. Compl. at Prayer for Relief, ¶ h. And, Plaintiffs further assert, without support, that this Court has jurisdiction under 8 U.S.C. § 2241. *Id.* at ¶ 14. The Court lacks jurisdiction to hear any claim sounding in habeas because it is not the appropriate vehicle to challenge conditions of detention.[1]

A § 2241 habeas action is appropriate where the detainee challenges the fact or length of his confinement, but generally not the conditions of that confinement. *Manuel v. Stewart,* No. DKC-13-2043, 2014 WL 4094788, at n.2 (D. Md. Aug. 18, 2014) (citing *Preiser v. Rodriguez,* 411 U.S. 475, 498-99 (1973) and *Muhammad v. Close*, 540 U.S. 749, 750 (2004)); *see, e.g.*, *Crooker v. Stewart*, ELH-14-1972, 2015 WL 1210209, at * 3 (D. Md. Mar. 13, 2015) ("This court must follow the Supreme Court and Fourth Circuit authority, which holds that a prisoner may not challenge conditions of confinement under § 2241. Accordingly, the petition for writ of habeas is subject to dismissal to the extent that it is predicated on 28 U.S. C. § 2241."); *Braddy v. Wilson*,

[1] Courts have been unwilling to grant immediate release even when they do find a constitutional violation of a civil detainee's rights. *See e.g.*, *Jarpa v. Mumford*, 211 F. Supp. 3d 706 (D. Md. 2016); *Duncan v. Kavanagh*, Civ. No. CCB-19-1465, 2020 WL 619173, at * 2 (D. Md. Feb. 10, 2020); *Obando-Segura v. Whitaker*, No. CV GLR-17-3190, 2019 WL 423412, at * 5 (D. Md. Feb. 1, 2019); *Portillo v. Hott*, 322 F. Supp. 3d 698, 709-10 (E.D. Va. 2018); *Haughton v. Crawford*, 2016 WL 5899285, at * 10 (E.D. Va. 2016).

580 Fed. App'x 172, 173 (4th Cir. 2014) (affirming the district court's dismissal of petitioner's § 2241 with prejudice and stating "[b]ecause Braddy's petition alleged constitutional violations regarding only the conditions of his confinement and did not challenge the fact or duration of his sentence, his claims are more properly brought in an action pursuant to *Bivens*."); *Lee v. Winston*, 717 F.2d 888, 892 (4th Cir. 1983) (finding that habeas "is primarily a vehicle for attack by a confined person on the legality of his custody"); *Lane v. Trent*, 2013 WL 709052, at *1 (N.D. W. Va. Jan. 28, 2013) ("[A]lleging a violation of [detainee's] constitutional rights with respect to his medical treatment while in custody following his arrest, . . . is not the type of claim which can be brought in a habeas corpus petition."). Nor can Plaintiffs cure any purported habeas claim by contending that putative plaintiffs are challenging the constitutional sufficiency of their confinement. A challenge to the constitutional sufficiency of their confinement, even when paired with a request for immediate release, is still a challenge to the conditions of their confinement. *Toure v. Hott*, 458 F.Supp.3d 387, 399-400 (E.D. VA 2020). The "heart of habeas corpus" is a challenge involving both "the fact or duration of [ ] physical confinement itself, and . . . seeking immediate release or a speedier release." *Id.* at 400 (citing *Preiser*, 411 U.S. at 498 and referring to the two facets together as the "essence," "core," and "heart," of habeas corpus).

Thus, because the crux of Plaintiffs' allegations relate to a challenge to the conditions of confinement, they do not bring a challenge to the fact or duration of their confinement. Further, in *Wilborn v. Mansukhani*, 795 Fed. App'x. 157, 163 (4th Cir. 2019), the Fourth Circuit found that attacking the conditions of confinement go beyond the scope of habeas corpus and should be challenged as a civil rights action (noting that courts have generally held that a § 1983 suit or a Bivens action is the appropriate means of challenging conditions of confinement). But nor do

Plaintiffs bring a Section 1983 or *Bivens* claim. *See generally* ECF No. 1. As such, Plaintiffs have not asserted a cognizable habeas corpus claim and are unlikely to be successful on the merits.

2. Plaintiffs' Due Process Rights are not Being Violated.

a. Plaintiffs Fail to Allege a Fifth Amendment Violation.

Plaintiffs claim that, as civil detainees, their constitutional rights under the Fifth Amendment are likely to be violated because the alleged substandard sanitary conditions and overcrowding is tantamount to an impermissible punishment. *See* Pls.' Mot. (ECF No. 36-1) at 11-15. In attempting to show that the Plaintiffs are being punished, despite acknowledging no binding precedent in this Circuit, they go as far as to encourage the Court to follow the Ninth Circuit's expansive finding in *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004), and hold that, "civil detainees are entitled to conditions of confinement that are superior to those of criminal pretrial detainees." Pls.' Mot. at 15. However, Plaintiffs disregard decades of Supreme Court precedent finding that immigration detainees enjoy *fewer* constitutional protections than the civilly detained U.S. citizen in *Blanas*. *See, e.g.*, *Mathews v. Diaz,* 426 U.S. 67, 79-80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."); *Demore v. Kim*, 538 U.S. 510, 521-22 (2003); *Reno v. Flores*, 507 U.S. 292, 305-306 (1993); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990).

Plaintiffs are "entitled to the basic necessities of human life," including "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Andrews v. Cross*, No. 5:10CV113, 2012 WL 707478, at *2 (N.D. W. Va. Mar. 5, 2012), *aff'd*, 490 F. App'x 615 (4th Cir. 2012). Officers provide water to any individual upon request and three meals per day to the detainees. Guerrero Decl. at ¶¶ 24, 26. ERO Officers also take dietary limitations and requests

into account in purchasing meals. *Id*. Each cell contains a sink and toilet that, contrary to Plaintiffs' suggestions, is separated from the open area by a mid-height privacy wall. *Id*. at ¶ 15. ICE-Baltimore provides inflated mattresses and blankets for any individuals in the Holding Facility overnight, jumper suits (sweatsuit top and bottom), socks, and sneakers upon arrival, and jackets for individuals upon request. Guerrero Decl. at ¶¶ 21-23. ICE also issues individuals a set of toiletries that include a toothbrush, toothpaste, and moist towelettes for use while in the Holding Facility. *Id*. at ¶ 25. The temporary detainees at the Holding Facility are afforded humane conditions and provided basic necessities of life. While Plaintiffs allege a lack of privacy or inadequate sleeping conditions, these do not amount to constitutional violations. *See Andrews v. Cross*, Civ. A. No. 5:10CV113, 2012 WL 707478, at *2 (N.D. W. Va Mar. 5, 2012) (finding that "[p]rivacy in using the toilet, comfort, and a pleasant-smelling cell are not guaranteed to inmates by the constitution;" and "simply because the plaintiff's mattress was on the floor . . . does not amount to a deprivation of sanitary living conditions"). And, while the holding cells occasionally—but not routinely—need to accommodate ten or more people, Plaintiffs contention that this circumstance alone is tantamount to punishment and violative of Due Process is misplaced. Indeed, in *Bell v. Wolfish*, the Supreme Court noted that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time *might* raise serious questions under the Due Process Clause as to whether these conditions amounted to punishment." 441 U.S. 520, 535 (1979) (emphasis added). The Court noted in its conclusion that conditions were constitutional, which was "further buttressed by the detainees' length of stay" in which detainees were typically released within sixty days—a far more extensive duration of time than any detainee at the Holding Facility. *Id.* at 543 ("We simply do not believe that requiring a detainee to share toilet facilities

and this admittedly rather small sleeping place with another person for generally a maximum period of 60 days violates the Constitution."). The Baltimore Holding Facility is a transitional facility where detainees are stationed for a matter of hours or days before being transferred to extended-term detention centers. Guerrero Decl. at ¶¶ 6, 12. The Holding Facility "generally holds individuals no longer than twelve hours in the Holding Facility while processing and locating facilities for their long-term detention." *Id.* at ¶ 12. And, contrary to Plaintiffs' suggestion, even in circumstances where a particular detainee stays at the facility for three or more days, the number of detainees present in the cell is in flux rather than static. Guerrero Decl. at ¶¶ 10-12.

Punishment may be shown through express intent or a restriction or condition that is not "reasonably related to a legitimate governmental objective." *Wolfish*, 441 U.S. at 535; *see also Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018). Plaintiffs have not alleged that the conditions of their detention demonstrate an express intent to punish, so the success of their case turns on whether their detention is reasonably related to a legitimate governmental objective. And that inquiry sinks Plaintiffs' claims as well.

In *Wolfish*, the Supreme Court held that conditions imposed on detainees that are "reasonably related to a legitimate Governmental objective . . . , without more, [do not] amount to 'punishment.'" *Id.* at 539. Petitioners in that case were detainees held in a federal facility awaiting trial and argued that "they had been deprived of their statutory and constitutional rights because of overcrowded conditions, undue length of confinement, improper searches, inadequate recreational, educational, and employment opportunities, insufficient staff, and objectionable restrictions on the purchase and receipt of personal items and books." *Id.* at 527. As the Court explained, however, what mattered was not that certain conditions imposed by the detention facility were potentially objectionable; the dispositive question instead was "whether the disability

is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. So long as the conduct at issue served the latter purpose and was not excessive, it was not an impermissible "punishment." *Id.* at 538-39. Because the petitioners' confinement in *Wolfish* reasonably served a legitimate governmental interest, their claims failed. *Id.* at 560-62.

Similar to the petitioners in *Wolfish*, Plaintiffs' claims fail here because their detention serves the legitimate governmental interest of protecting the public and ensuring that the nation's immigration laws are properly enforced. The Supreme Court has consistently recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *Demore*, 538 U.S. at 520-522; *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). Nor is detention pending removal an "excessive" means of achieving those interests. For over a century, the Supreme Court has affirmed detention as a "constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523 (listing cases). Indeed, "deportation proceedings 'would be vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id.* at 523 (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Congress has vested discretion in ICE to determine whether continued custody of an individual detainee is necessary to further the government's objectives—discretion that ICE exercises through individualized assessments of flight risk, danger to the community, and other factors. *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 236.1(c)(8).

Here, the government's legitimate interest in detaining individuals is heightened by the fact that some putative plaintiffs committed serious crimes while being present unlawfully in the

United States, Guerrero Decl. ¶ 13, but all Plaintiffs were have found to be in violation of the immigration laws of the United States. Preventing Plaintiffs from absconding and protecting the public from risk of danger are legitimate government objectives and Plaintiffs' current confinement is not excessive in relation to that objective.

b. Plaintiffs Fail to Allege an Eighth Amendment Due Process Violation**.**

Plaintiffs argue that their continued detention also violates their due process rights under the Eighth Amendment by providing inadequate medical care. *See* Pls.' Mot. at 16-17. A plaintiff "makes out a due process violation if he shows deliberate indifference to serious medical needs . . . because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (internal quotations omitted). "The deliberate indifference standard is a two-pronged test: (1) the prisoner must be exposed to a substantial risk of serious harm, and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97-98 (4th Cir. 2017). In this case, the Plaintiffs cannot show either.

First, as discussed above, the Plaintiffs cannot show they are exposed to a substantial risk of serious harm. During an arrest, ICE Officers ask aliens if they have any medical conditions, require any ongoing medical treatment, or need to bring any medication with them. Guerrero Decl. at ¶ 28. ICE authorizes family members to bring medication to aliens who did not have it with them at the time of arrest. *Id.* If aliens require medication during their time in the Holding Facility, they are taken to the University of Maryland Medical Center, approximately three blocks away, or Johns Hopkins Hospital, approximately one mile from the Facility. Guerrero Decl. at ¶ 17. The support Plaintiffs offer to show that they are exposed to a substantial risk of serious harm

is speculative. *See* Pls.' Mot. at 17 (predicting that ICE will "subject[ ] putative Class Members to significant risk of harm by detaining them for days at a time without even basic access to medical care."). This is a baseless prediction and insufficient to establish Plaintiffs will be exposed to a substantial risk of serious harm. Indeed, if aliens require medication during their time in the Holding Facility, they are taken to the University of Maryland Medical Center or Johns Hopkins. Guerrero Decl. at ¶ 30; *see Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017) ("[W]e read *Clapper's* rejection of the Second Circuit's attempt to import an 'objectively reasonable likelihood' standard into Article III standing to express the common-sense notion that a threatened event can be 'reasonabl[y] likel[y]' to occur but still be insufficiently 'imminent' to constitute an injury-in-fact.")

Second, even if Plaintiffs could show that their continued detention exposes them to a substantial risk of serious harm, they certainly cannot show that the Government is acting with deliberate indifference to knowingly disregard that risk. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Farmer*, 511 U.S. at 839-40 (adopting "subjective recklessness as used in the criminal law . . . as the test for 'deliberate indifference' under the Eighth Amendment"). Deliberate indifference is "a very high standard" because, "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999); *see also Washington v. Stewart*, Civ. A. No. DKC-15-3181, 2017 WL 550032, *8 (D. Md. 2017). The Fourth Circuit has defined actions which constitute deliberate indifference as treatment "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (1990); *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

In the context of an Eighth Amendment violation based upon deliberate indifference to a serious medical condition, a plaintiff must show that the medical need to which the defendants allegedly did not attend was "sufficiently serious" to qualify as a deprivation of a basic human need, and secondly, that the defendants acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). In order for the medical need of an inmate to be "sufficiently serious" to rise to the level of an Eighth Amendment violation if not properly treated, it must be "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Andrews*, 2012 WL 707478, at *4. The notion that there is a substantial risk that putative plaintiffs—none of whose identities nor medical backgrounds are known or could be known to counsel—will routinely present with diagnosed medical conditions mandating treatment only to then receive grossly incompetent care, is speculative and unfounded. Plaintiffs present no evidence that any of the current detainees are present with diagnosed medical conditions mandating treatment such that it could support an inference that putative plaintiff population could even face the prospect of receiving incompetent care. Moreover, as illustrated by the protocols for access to medical care ICE has put in place, *see* Guerrero declaration, the Government is not acting with a deliberate indifference to the risk of harm, nor do putative plaintiffs face a moderate much less substantial risk that ICE will do so in the future.

**B. Plaintiffs Have Not Shown Irreparable Harm.**

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm. *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding irreparable harm not established by statements that "are conclusory and without sufficient support in facts").

As stated *supra Section II-A-ii*, Plaintiffs allege that only ordering ICE to cease its operations at the Baltimore Holding Facility will spare them the heightened risk of adverse consequences from the temporary stays there. This is not only speculative, but it is unlikely. Plaintiffs do not explain how the amorphous putative class—not limited to any sub-population or curtailed in any way—will suffer irreparable harm in the absence of an order shutting down the facility.

**C. The Balance of Interests and Public Interest Favor Respondents**

It is well-settled that the public interest in enforcement of United States immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the

streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law." (internal marks omitted)).

Concerns about access to adequate sanitary conditions and medical care is, of course, shared by all. However, given the vast expanse and indiscriminate nature of Plaintiffs' requested relief, the balance of interests clearly favors Defendants. The disruptive effect of such an order would likely serve to prevent the agency from arresting individuals subject to orders of removal, including some criminal aliens. Moreover, the public interest is best served by allowing the orderly medical processes and protocols implemented by government professionals. *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) (urging judicial deference and finding presumption of validity regarding decisions of medical professionals concerning conditions of confinement). This type of burden and attendant harm, and its potential impact on ICE operations nationwide, is too great to be permissible at this preliminary stage. Because Plaintiffs cannot show that the balance of hardships and public interest tips in their favor, the Court should deny Plaintiffs' request for preliminary relief.

## III. Plaintiffs' Claims Under the APA Fail for Lack of Jurisdiction and Because the Agency's Actions were Neither Unconstitutional Nor Arbitrary and Capricious

Plaintiffs fail to identify a final agency action to support their APA claims. The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Whether there is a final agency action is a jurisdictional question in the Fourth Circuit. *See, e.g., Jake's Fireworks Inc. v. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) ("[F]inality under the APA is a jurisdictional requirement."). As explained *infra*, the INA grants broad discretionary authority to the Executive Branch to administer the removal process and the decision to waive an internal policy is not a final agency action within the meaning of the APA. *See Perez Perez v. Wolf*, 943 F.3d 853, 860 (9th Cir. 2019) ("Review

under the APA is unavailable when statutes preclude judicial review and when the agency action is committed to agency discretion by law." (internal quotations omitted)).

Even if the court finds Plaintiffs have challenged a final agency action, which it should not, Plaintiffs fail to demonstrate that the agency's actions were an arbitrary and capricious abuse of discretion. *See* 5 U.S.C. § 706(2). The agency made a rational decision based on a statistical increase in individuals moving through the facility and the time it takes to place those individuals in a long term detention facility. Such action cannot be found to be an abuse of discretion. Finally, Plaintiffs *Accardi* claims fail because the doctrine considers procedures that must be in place when an agency adopts regulations. Here, the agency waived a policy and adopted a new policy. That internal policy decision is unrelated to the rulemaking process that *Accardi* considers and their claim is therefore misplaced.

### A. There is Not a Final Agency Action Under the APA.

Not all agency conduct is qualified as "final agency action" under the APA. The APA defines reviewable "agency action" to include, as relevant here, an "agency rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). As the Supreme Court has emphasized, the APA therefore does not permit "general judicial review of [an agency's] day-to-day operations." *Lujan*, 497 U.S. at 899. Nor does the APA authorize agencies to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Similarly, the APA does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Here, Plaintiffs challenge the agency's decision to waive an internal policy. That is not a discrete, identifiable, final "agency action" subject to challenge, but rather a challenge to the day-to-day operational decisions and conduct that the Supreme Court in *Lujan* advised do not fall

within the APA's ambit. *See Lujan*, 497 U.S. at 899. As the Fourth Circuit has recognized, courts "are woefully ill-suited . . . to adjudicate" "'attack [s]"' "asking [the judiciary] to improve an agency's performance or operations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). In that kind of case, "courts would be forced either to enter a disfavored 'obey the law' injunction or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." *Id.* (citation omitted); *see also Lujan*, 497 U.S. at 890-91 (holding that a plaintiff cannot challenge "the continuing (and thus constantly changing) operations" of the agency in carrying out a program, but must instead "direct its attack against some particular 'agency action' that causes it harm"). Plaintiffs' understanding of what qualifies as "agency action" would have sweeping and untenable consequences. A court could not review such decisions without bringing within the scope of the APA virtually aspect of ICE's continuing and constantly changing operations at its facility. Every time an agency wished to alter its own policy, the agency could have to seek a court's permission and convince the court, through detailed submissions, that the change was due to a sufficient need. The Court should not be involved in such internal decisions.

A principal feature of the removal system is the broad discretion exercised by immigration officials. *Arizona v. United States*, 567 U.S. 387, 396 (2012); *see id.* at 409 (holding that decisions "touch[ing] on foreign relations . . . must be made with one voice"); *Mathews*, 426 U.S. at 81 (removal decisions "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary"). Indeed, "any policy *toward aliens* is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (emphasis added). Here, a decision to waive an internal policy is

grounded in the Executive Branch's "broad power over the creation and administration of the immigration system," which necessarily includes discretion to determine where individuals will be detained to execute their removal orders. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment).

The Executive's discretionary authority to administer the removal process is further reinforced by the statute that governs judicial review of removal orders—8 U.S.C. § 1252. That statute is replete with provisions "aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the *theme* of the legislation." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999) (emphasis added) (citing, *e.g.*, 8 U.S.C. § 1252(a)(A); § 1252(a)(2)(B); § 1252(a)(2)(C), § 1252(b)(4)(D)). This concern with protecting the Executive's discretion appears as well in 8 U.S.C. § 1231(g), which gives the Attorney General broad latitude to "arrange for *appropriate* places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g) (emphasis added). In interpreting § 1231(g), courts throughout the country have recognized that determinations regarding the location of confinement for individuals subject to removal orders are within the discretion of the Executive Branch. *See, e.g.*, *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999); *Edison C. F. v. Decker*, No. 2-cv-15455-SRC, 2021 WL 1997386, at *6 (D. N.J. May 19, 2021) ("Congress has provided the Government with considerable discretion in determining where to detain aliens pending removal or the outcome of removal proceedings." (citing § 1231(g)(1))).

Even if the agency's decision to waive the policy qualifies as a challengeable "agency action," it is not "final" for the purposes of the APA. Agency actions are final if two independent conditions are met: (1) the action "mark[s] the consummation of the agency's decision-making process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which

rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (internal quotation marks omitted). Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). For example, "[i]nitiating an enforcement proceeding against a company . . . may have a devastating effect on the company's business, but that does not make the agency's action final." *Id.* What matters is that the alleged policy decisions here have no "direct and appreciable legal consequences" for plaintiffs and their pending immigration proceedings, which forecloses Plaintiffs' APA claim here.

### B. Waiver of the 12-hour Policy was not Arbitrary or Capricious Under the APA

Plaintiffs are also unlikely to succeed on the merits of their claims that the government acted arbitrarily or capriciously in waiving the 12-hour policy. With regard to review of agency policies, the Supreme Court has held that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Moreover, Congress has codified in the INA the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in or otherwise removable from the United States to effectuate their removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. Among other things—and in contexts

not necessarily involved here—the INA authorizes federal immigration officials to make civil immigration arrests with an administrative warrant, 8 U.S.C. § 1226(a), and without a warrant, 8 U.S.C. § 1357(a); and it explicitly recognizes that the federal government may undertake enforcement actions at courthouses. 8 U.S.C. § 1229(e). Consistent with that authority and the Executive Branch's "broad" and "undoubted power" over the enforcement of this Nation's immigration laws, *Arizona v. United States*, 567 U.S. 387, 394 (2012), ICE has long exercised its detention authority in executing removal operations, including the considerations that go into determining where an alien under a removal order is detained, transferred, or removed. Those decisions necessarily "implicate our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005) (internal quotation marks omitted). Accordingly, courts should decline to hear any challenge that suggest the agency's discretionary decisions about the location of individuals in detention are arbitrary and capricious. Such a ruling would interfere with the complex, delicate, and considered process by which removal decisions are made in light of the particularized facts within the agency's command. The use of a particular detention site is purely an operational choice made entirely in the agency's discretion and attendant to the determinative final removal order. *See* 8 U.S.C. § 1231(g).

In terms of policymaking, the decision by the agency to amend the 12-hour holding rule to 60-hours is reasoned and supported by evidence. The purpose of the Holding Facility is to process aliens arrested pursuant to removal proceedings before they are transported to an ICE detention facility. Guerrero Decl. at ¶ 6. Absent the availability of the Holding Facility, ERO would not be able to process individuals for detention and would be unable to effectuate any arrests as required under the INA. *Id.* at ¶ 10. While ERO Baltimore generally holds individuals no longer

than twelve hours in the Holding Facility, the agency is currently authorized to hold individuals for 60 hours due to the volume of individuals being processed. *Id.* at ¶ 12. When an individual is detained in the Holding Facility, ICE must locate facilities with available housing space for long term detention. *Id.* at ¶ 13. Locating available housing out of state extends the processing time for those in the Holding Facility. *Id.* The agency exercised its judgement in determining a necessary change to existing policy given the volume of individuals currently moving through the Holding Facility. The decision made by the agency to waive the 12-hour policy is exactly the type of discretionary authority considered by the INA. It was a rational outcome given the influx of individuals moving through the federal building and cannot be found to be sufficiently arbitrary and capricious so as to produce a claim under the APA.

### C. The *Accardi* Doctrine is Inapplicable to this Case

The *Accardi* doctrine arises from *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The Court held that when an agency adopts regulations pursuant to proper statutory delegation that specify the procedures that are to be followed in matters before the agency, the agency must follow its own procedures. *Id.* at 268. The *Accardi* doctrine is thus a procedural due process protection. *See C.G.B. v. Wolf*, No. 20-cv-1072 (CRC), 2020 U.S. Dist. LEXIS 96482, at *99 (D.D.C. June 2, 2020) ("agency regulations do not create substantive due process rights. *Accardi* is rooted instead in notions of procedural due process"); *Ashley v. Ridge*, No. 04-CV-1579 (JLL), 2005 U.S. Dist. LEXIS 45143, at *21 (D.N.J. May 11, 2005) (citing *Accardi* for its holding that "Petitioner has, however, alleged in Count Four sufficient facts to support a procedural due process violation, insofar as he claims that the Board was not impartial and was unduly influenced by the Attorney General to disregard regulations.").

The Court should reject Plaintiffs' attempt to unmoor *Accardi* from its analytical anchor:

procedural due process. In their *Accardi* claim, Plaintiffs make no contention that some "process" was due or denied them. Instead, they seek to convert a constitutional conditions of confinement claim into a negligence-type action, using operating policies for maintaining safe and healthy facilities as the standard of care. Plaintiffs have pointed the Court to no circuit court opinion holding that an executive branch agency's operational policy relating to conditions of confinement for its detainees is the type of regulation contemplated by *Accardi* to support a due process violation.

Unlike the formally promulgated and properly delegated regulation in *Accardi*, the waiver of the 12-hour policy was never promulgated as a regulation pursuant to the APA. It did not go through the rulemaking process or require public comment and notice, and was instead an informal, internal policy decision. Furthermore, Plaintiffs have not explained the source of statutory authority that would even permit such agency rule-making delegation under these circumstances. Even if an *Accardi*-type claim may theoretically exist absent a formally adopted regulation, the voluntary decision to follow nonbinding "guidance" from another agency of the Executive Branch certainly does not for *Accardi* purposes bind the agency that chooses to follow the guidance. Thus, even if Defendants have made the voluntary decision to extend the period of time an individual can be detained in the holding rooms, that does not subject Defendants to an *Accardi* conditions of confinement claim. As a result, Plaintiffs' APA claims fail both jurisdictionally, and on the merits.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

BRETT A. SCHUMATE
Assistant Attorney General

DEVIN BARRETT
Senior Litigation Counsel

MADELYN J. PHINNEY
Trial Attorney
United States Department of Justice, Civil Division
Office of Immigration Litigation

*/s/ Brendan T. Moore*
BRENDAN T. MOORE
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
202.880.0330

Attorneys for Defendants