# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

D.N.N. and V.R.G.

*Petitioners-Plaintiffs*,

v.

NIKITA BAKER, et al.

*Respondents-Defendants*.

Case No. 1:25-cv-1613

## PETITIONERS-PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR EXPEDITED BAIL HEARINGS

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. 2

TABLE OF AUTHORITIES........................................................................................... 3

INTRODUCTION AND FACTUAL BACKGROUND................................................. 1

FACTUAL BACKGROUND ......................................................................................... 2

ARGUMENT ................................................................................................................. 3

    I.    Petitioners D.N.N. and V.R.G. Merit Release from Detention on Bail Pending a Final Determination on Their Petition. ................................................................................ 3

       A.   Petitioners Have Raised Substantial Constitutional and Statutory Claims on Which They Have a High Probability of Success ......................................................... 5

          1.   Defendants Have No Authority to Detain Petitioners Beyond the 90-Day Removal Period, Which Elapsed Years Ago ...................................................................... 6

          2.   Defendants Violated Petitioners' Due Process Rights by Arbitrarily Revoking Their Release Without Any Notice or Explanation ................................................ 7

          3.   Petitioners' Removal is Not Reasonably Foreseeable and Their Ongoing Detention Does Not Serve the Goals of Civil Immigration Detention ................................ 9

          4.   Petitioners Were Detained and Remain Detained Because Defendants Implemented an Unlawful, Arbitrary and Capricious No-Release Policy Without Notice and Comment ……………………………………………………………………………10

       B.   Petitioners Have Established Extraordinary and Exceptional Circumstances Justifying Bail, Which is Necessary to Make the Habeas Remedy Effective ....................... 15

          1.   Petitioners are Not Receiving Adequate Medical Care for Their Chronic Medical Conditions and Have Developed New and Serious Medical Concerns in ICE Custody .. 16

          2.   Petitioners are the Primary Caretakers for Multiple LPR and U.S. Citizen Children and Family Members who Need Their Support .............................................. 18

CONCLUSION.............................................................................................................. 20

EXHIBIT LIST .............................................................................................................. 22

# TABLE OF AUTHORITIES

**Federal Cases**

*Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969) ............................................................... 4

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ................................................... 13

*Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) .............................. 14

*Ceesay v. Kurzdorfer*, No. 25-cv-267, 2025 WL 1284720 (W.D.N.Y. May 2, 2025).................... 8

*Cherek v. United States*, 767 F.2d 335 (7th Cir. 1985)......................................................... 4

*Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615 (4th Cir. 2018)................ 13

*Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112 (9th Cir. 2009) ................................. 13

*Cordon-Salguero v. Noem et al.*, No. 25-cv-1626 (D. Md. June 18, 2025) ................................. 7

*Coreas v. Bound,* 451 F.Supp.3d 407 (D. Md. 2020)........................................................ 3, 15, 20

*Demore v. Kim*, 538 U.S. 510 (2003)........................................................................... 9

*Deptula v. Lynch*, 1:15-cv-2228, 2016 WL 98152 (M.D. Pa. Jan. 8, 2016)................................. 4

*Dotson v. Clark*, 900 F.2d 77 (6th Cir. 1990)................................................................. 4

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011) .................... 13

*Elrod v. Burns*, 427 U.S. 347 (1976)........................................................................... 16

*F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003)..........................................11

*Forchion v. Intensive Supervised Parole,* 240 F. Supp. 2d 3020 (D.N.J 2003) .......................... 16

*Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018)............................................. 12

*Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022) ...................................................... 6

Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955)*........................................................... 4

*Landano v. Rafferty*, 970 F.2d 1230 (3d Cir. 1992) ...................................................... 4

*Leslie v. Holder*, 865 F. Supp. 2d 627 (M.D. Pa. 2012)................................................. 4, 16, 18

*Lucas v. Hadden,* 790 F.2d 365 (3d Cir. 1986) ............................................................... 4

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ............................................................... 4, 5

*Marcazak v. Greene*, 971 F.2d 510 (10th Cir. 1992) .................................................. 12

*Martin v. Solem*, 801 F.2d 324 (8th Cir. 1986) ........................................................... 4

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C.Cir.1988) ................... 13

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .............................................. 12, 13

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ..................................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) .................................. 11

*Munoz-Saucedo v. Pittman*, 25-cv-2258 (D.N.J. filed June 24, 2025) .................. 10, 20

*Ozturk v. Trump*, -- F. Supp.3d --, 2025 WL 1420540 (D. Vt. May 16, 2025) ......... 3, 18

*Parks v. United States*, 1:22-cv-03058, 2025 WL 128725 (D. Md. Apr. 3, 2025) .... 4, 15

*Pfaff v. Wells*, 648 F.2d 689 (10th Cir. 1981) ............................................................. 4

*Plaintiffs J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367 (D. Md. 2019) ... 12

*Sanchez v. Winfrey*, No. CIV.A.SA04CA0293RFNN, 2004 WL 1118718 (W.D. Tex. Apr. 28, 2004) ........................................................................................................................... 4

*Singh v. Sabol*, 1:14-cv-1927, 2015 WL 3519075 (M.D. Pa. June 4, 2015) ................ 4

*Tadros v. Noem*, 2:25-cv-4108 (D.N.J. filed June 13, 2025) ........................................ 6

*Ulysse v. Dep't Homeland Sec.*, 291 F. Supp. 2d 1318 (M.D. Fl. 2003) ................ 6, 7, 8

*United States v. Eilely*, 276 Fed. Appx. 270 (4th Cir. 2008) .................................. 3, 4, 5

*Velesaca v. Decker*, 458 F. Supp. 3d 224 (S.D.N.Y. 2020) ....................................... 12

*Woodcock v. Donnelly*, 470 F.2d 93 (1st Cir. 1972) ................................................ 4, 5

*Yiu Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451 (S.D.N.Y. 2018) .................................. 7

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ........................................................... 1, 9, 10

**Federal Statutes**

5 U.S.C. § 553 ................................................................................................. 12

5 U.S.C. § 706(2) .........................................................................................11, 14

8 U.S.C. § 1182(d)(5)(A) ................................................................................11

8 U.S.C. § 1226(a) ...........................................................................................11

8 U.S.C. § 1227(a)(1)(C) ................................................................................. 6

8 U.S.C. § 1231(a) ........................................................................................ 2, 3

8 U.S.C. § 1231(a)(1)(A) ................................................................................. 6

8 U.S.C. § 1231(a)(1)(B) ................................................................................. 6

8 U.S.C. § 1231(a)(1)(C) ................................................................................. 7

8 U.S.C. § 1231(a)(3) ...................................................................................... 6

**Federal Regulations**

8 C.F.R. § 1236.1(c)(8) ...................................................................................11

8 C.F.R. § 212.5(b) ..........................................................................................11

8 C.F.R. § 241.4(a) ........................................................................................... 6

8 C.F.R. § 241.4(g)(i) ....................................................................................... 6

8 C.F.R. § 241.4(l) ........................................................................................... 7

8 C.F.R. § 241.5 ...........................................................................................6, 11

8 C.F.R. § 287.3(d) ..........................................................................................11

# INTRODUCTION AND FACTUAL BACKGROUND

Petitioners-Plaintiffs ("Petitioners") brought this action to enjoin punitive and unconstitutional detention conditions in the "hold rooms" at the Immigration and Customs Enforcement ("ICE") Baltimore Field Office (the "Baltimore Hold Rooms"). As detailed in Petitioners' Motion for Preliminary Injunction (ECF No. 36-1), Respondent-Defendants ("Defendants") have held Petitioners and hundreds of noncitizens in the Baltimore Hold Rooms for days at a time, in unconstitutional and punitive conditions.

After enduring the punitive conditions at the Baltimore Hold Rooms, Petitioners have been subjected to ongoing, unlawful detention in punitive conditions in various ICE facilities across the country, most recently in New Mexico (Ms. N.N.) and Louisiana (Ms. R.G.).[1] Petitioners' ongoing detention is unlawful for at least four reasons, all of which are wholly independent of Petitioners' class claims challenging conditions at the Baltimore Hold Rooms.

First, Defendants lack statutory authority to detain Petitioners, as both are well past the 90-day period during which the government was required to remove them. 8 U.S.C. § 1231(a)(1)(A). Second, ICE abused its discretion and violated Petitioners' due process rights by arbitrarily revoking their longstanding release on their Orders of Supervision ("OSUPs") in violation of applicable regulations. Third, in violation of *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), Defendants have detained Petitioners even though their removal is not reasonably foreseeable, they have not been deemed a danger to the community or a flight risk, and thus their detention no longer serves any possible goal of civil immigration detention. And finally, Defendants have detained

---

[1] Petitioners file this memorandum and all exhibits using their initials and redacting all personally identifiable information. *See* Motion to Proceed Under Initials or Pseudonyms, ECF No. 7. Petitioners will, through undersigned counsel, share unredacted versions and the names of declarants with Defendants' counsel via email. Petitioners can, upon this Court's request, file unredacted versions of this filing and/or the names of declarants under seal.

Petitioner pursuant to an unlawfully implemented new policy depriving ICE of discretion to release noncitizens, which is contrary to law and violates the Administrative Procedures Act ("APA"). *See* Second Amended Complaint at ¶ 129–152 (outlining amended claims regarding Petitioners re-detention and the No-Release Policy).

Defendants' ongoing detention of Petitioners is unlawful and has separated them from their children—all of whom are U.S. citizens or Lawful Permanent Residents ("LPRs")—and communities in Maryland. At all the ICE facilities in which Petitioners have been detained, Defendants have deprived Petitioners of adequate medical care, and Petitioners' physical and mental health has declined sharply. As detailed below, Petitioners have established a likelihood of success on their individual claims and otherwise meet all requirements to obtain release pending a final decision on the merits of those claims.

## FACTUAL BACKGROUND

Petitioner Ms. N.N. is a national and citizen of Guatemala who has resided in the United States for more than a decade. In 2012, an Immigration Judge ("IJ") granted her relief from deportation in the form of withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(a). A few days after winning withholding of removal, she was released from ICE custody on an OSUP. She complied with all the conditions of the OSUP from 2012 until she was abruptly re-detained on May 7, 2025, at a routine ICE check-in. ICE did not tell Ms. N.N. why she was being detained at this routine check-in. She was held at the Baltimore Hold Rooms from May 7, 2025 to May 10, 2025, after which she was transferred to ICE detention facilities in New Jersey, Texas, and New Mexico. As of this filing, she remains detained in ICE custody in New Mexico. Ms. N.N. has Type II diabetes, depression, and anxiety, for which she takes several medications, though she has been deprived of her medications at every ICE facility where she has

been held. While detained, she has been separated from her home in Maryland, where she resides with her U.S. citizen and LPR children.

Petitioner Ms. R.G. is a national and citizen of El Salvador who has resided in the United States for over a decade. In 2017, an IJ granted her relief from deportation in the form of withholding of removal under the INA, 8 U.S.C. § 1231(a). After winning withholding of removal, she was released from ICE custody on an OSUP, with which she complied from 2017 until she was detained again on May 8, 2025, at a routine ICE check-in. ICE also did not inform Ms. R.G. as to why she was being detained, despite complying with the conditions of her release. Ms. R.G. was held at the Baltimore Hold Rooms from May 8, 2025, to May 10, 2025, after which she was transferred to ICE detention facilities in Louisiana, Arizona, and Colorado. As of this filing, she remains detained in ICE custody in Louisiana. She has thyroid issues, anemia, and depression, all of which she manages with medication, of which been deprived in every ICE facility where she has been detained. Since being detained, she has been separated from her home in Maryland, where she lives with her two U.S. citizen children and her elderly LPR mother, who is diabetic and suffers from severe arthritis.

## ARGUMENT

### I. Petitioners D.N.N. and V.R.G. Merit Release from Detention on Bail Pending a Final Determination on Their Petition.

A district court entertaining a petition for habeas corpus has inherent power to release the petitioner pending determination of the merits. *See United States v. Eiely*, 276 Fed. Appx. 270, 270–71 (4th Cir. 2008); *see also Coreas v. Bound,* 451 F.Supp.3d 407, 419 (D. Md. 2020); *Ozturk v. Trump*, -- F. Supp.3d --, 2025 WL 1420540, at *4 (D. Vt. May 16, 2025) ("The Court has the authority to grant release pending the adjudication of Ms. Ozturk's habeas petition. Therefore, the only question before the Court was whether Ms. Ozturk's release is appropriate under a *Mapp*

analysis."). This authority has ample support both in this District and across multiple circuits, including in the context of immigration detention. *See, e.g.*, *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986); *Lucas v. Hadden*, 790 F.2d 365, 366–67 (3d Cir. 1986); *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981); *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972); *Parks v. United States*, 1:22-cv-03058, 2025 WL 128725, at *8 (D. Md. Apr. 3, 2025); *Baker v. Sard*, 420 F.2d 1342, 1343–44 (D.C. Cir. 1969); *Deptula v. Lynch*, 1:15-cv-2228, 2016 WL 98152 at *4 (M.D. Pa. Jan. 8, 2016); *Leslie v. Holder*, 865 F. Supp. 2d 627, 639 (M.D. Pa. 2012); *Singh v. Sabol*, 1:14-cv-1927, 2015 WL 3519075 at *7 (M.D. Pa. June 4, 2015); *Sanchez v. Winfrey*, No. CIV.A.SA04CA0293RFNN, 2004 WL 1118718, at *2 (W.D. Tex. Apr. 28, 2004).

A habeas petitioner requesting release on bail during the pendency of her habeas petition must show (1) "substantial constitutional claims on which [s]he has a high probability of success," and (2) "exceptional circumstances making a grant of bail necessary for the habeas remedy to be effective." *Eliely*, 276 Fed. Appx. at 270; *see also Mapp*, 241 F.3d at 230 (considering (1) substantial statutory claim for relief, (2) extraordinary circumstances, and (3) whether a grant of bail is necessary to make the habeas remedy effective). Petitioners here have raised several substantial constitutional and statutory claims, including violations of their due process rights and rights to be free from detention in punitive conditions. Extraordinary or exceptional circumstances include serious deterioration of the petitioner's health while incarcerated, *Johnston v. Marsh*, 227 F.2d 528, 529 (3d Cir. 1955), or "a health emergency," *Woodcock*, 470 F.2d at 94. Petitioners each also have extraordinary medical and familial circumstances that warrant their release from

immigration detention, including serious health issues that have gone unaddressed in detention and U.S. citizen family members in need of their support.

### A. Petitioners Have Raised Substantial Constitutional and Statutory Claims on Which They Have a High Probability of Success.

Petitioners have raised substantial claims "on which [they have] a high probability of success." *Eliely*, 276 Fed. Appx. at 270. Courts have found that if a petitioner shows a "likelihood of success on the merits," she has satisfied this standard. *Woodcock*, 470 F.2d at 94; *Mapp*, 241 F.3d at 224. Petitioners here have suffered punitive detention through Defendants' violations of their constitutional and statutory rights. As detailed below, ICE has inflicted these deprivations of fundamental rights on Petitioners in at least four respects.

First, ICE has detained Petitioners well beyond and outside the scope of the INA's 90-day removal period, despite each having a final grant of protection from removal to their countries of origin and without a lawful means of securing their removal to an alternative country in the reasonably foreseeable future. Second, ICE violated Petitioners' due process rights and applicable regulations by revoking their release without notice or explanation. Third, in violation of controlling Supreme Court precedent, Defendants have detained Petitioners even though their removal is not reasonably foreseeable, and thus their detention no longer serves any possible goal of civil immigration detention. Finally, Defendants have unlawfully implemented a No-Release policy across the nation, which is arbitrary and capricious, implemented without proper procedures, and which contributed to and continues to cause the unnecessary detention of Petitioners. Whereas both Petitioners now find themselves more than twelve hundred miles away from their homes and families in Maryland, and their continued detention is unlawful, both Petitioners must be released on bail.

1. **Defendants Have No Authority to Detain Petitioners Beyond the 90-Day Removal Period, Which Elapsed Years Ago.**

Defendants lack authority to detain Petitioners, as both are well past the 90-day period during which the government was required to remove them. 8 U.S.C. § 1231(a)(1)(A) ("[T]he Attorney General shall remove the [noncitizen] from the United States within a period of 90 days").[2] Petitioners' 90-day removal periods expired years ago after their removal orders became final, at the latest, in 2012 (Ms. N.N.) and 2017 (Ms. R.G.) when they each received relief from an IJ in the form of "withholding of removal" to their countries of origin. *See* ECF Nos. 10-2, 10-5; *see also Tadros v. Noem,* 2:25-cv-4108, ECF No. 9 at 7 (D.N.J. filed June 13, 2025) (noting that the 90-day removal period started when the petitioner's grant of protection was affirmed by the Board of Immigration Appeals and elapsed 90 days later, even though the petitioner was released only two days after the order became administratively final).

Under the INA, ICE is only able to extend the 90-day detention period if the noncitizen thwarts or hinders the removal process; but absent those or certain other inapplicable circumstances,[3] ICE is supposed to release noncitizens on an OSUP. *See* 8 U.S.C. § 1231(a)(3); 8 C.F.R. § 241.5(a)–(b); *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 579 (2022) ("Individuals

---

[2] The 90-day removal period begins on the latest of (i) the date the order of removal becomes administratively final; (ii) if the order is judicially reviewed and the court orders a stay of removal, the date of the court's final order; or (iii) if the noncitizen is detained or confined (except under an immigrant process), the date the noncitizen is released from detention or confinement. *See* 8 U.S.C. § 1231(a)(1)(B); 8 C.F.R. § 241.4(g)(i); *Ulysse v. Dep't Homeland Sec.*, 291 F. Supp. 2d 1318, 1324 (M.D. Fl. 2003) ("[I]n other words, for [noncitizens] who are not serving criminal sentences, the 'removal period' begins on the later of either the date on which the order of removal becomes administratively final, or the date of the final order of a reviewing court.") (citations omitted).

[3] For example, noncitizens who are ordered removed under 8 U.S.C. § 1227(a)(1)(C) for violating their nonimmigrant status or conditions of entry into the U.S. may be held beyond the 90-day removal period. *See* 8 C.F.R. § 241.4(a).

released after the removal period remain subject to terms of supervision."); *Ulysse,* 291 F. Supp. 2d at 1324–25.

Notably, both Ms. N.N. and Ms. R.G. were released on an OSUP shortly after being granted withholding of removal, and they remained on that supervised release for years without any change to their status and without violating the conditions of their release. Their 90-day removal periods thus expired years ago, and 8 U.S.C. § 1231(a)(1)(C) "contains no provisions for pausing, reinitiating, or refreshing the removal period after the 90-day clock runs to zero." *See Cordon-Salguero v. Noem et al.*, No. 25-cv-1626 (D. Md. June 18, 2025)[4]; *Yiu Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 462 (S.D.N.Y. 2018) (holding that ICE had no authority to detain noncitizen after the 90-day removal period without a finding of dangerousness or flight risk); *Ulysse*, 291 F. Supp. 2d at 1326.

### 2. Defendants Violated Petitioners' Due Process Rights by Arbitrarily Revoking Their Release Without Any Notice or Explanation.

ICE abused its discretion and violated Petitioners' due process rights by arbitrarily revoking both Ms. N.N. and Ms. R.G.'s release on their OSUPs. Under the relevant regulations, release can only be revoked if the noncitizen violates the conditions of their release or if the Executive Associate Commissioner makes specific findings justifying the revocation. 8 C.F.R. § 241.4(l)(1)–(2). While ICE does have some discretion under 8 C.F.R. § 241.4(l) to revoke a noncitizen's release, that discretion is not boundless and is subject to other procedures, including

---

[4] Transcript of the oral decision granting release during the pendency of the noncitizen's pending petition for writ of habeas corpus, attached as Exhibit A.

a prompt informal interview[5] and subsequent custody review procedures.[6] It is also subject to the constitutional demands of due process.

As noted above, both Petitioners had been faithfully complying with their OSUPs with ICE for years when ICE suddenly re-detained them. ICE gave no reasoning for this re-detention, much less justification for revoking their previously-granted releases. *See* Exhibit B, Declaration of D.N.N. at ¶ 3; Exhibit C, Declaration of V.R.G. at ¶ 3. ICE did not give them any notice of revocation of their release that was signed by the Executive Associate Commissioner or anyone else. *See Ceesay v. Kurzdorfer*, No. 25-cv-267, 2025 WL 1284720, at *16 (W.D.N.Y. May 2, 2025) ("[T]he Executive Associate Commissioner [of] INS is equivalent to the Executive Associate Director [of] ICE."). At no time did ICE seek to reopen their removal proceedings or claim that either had violated the conditions of their release, become dangers to the community, or posed any flight risk. *Id.* Indeed, ICE could not do so: both Petitioners had been complying with their OSUPs, and their circumstances remained largely identical to when they were released by ICE years prior. *See Ulysse*, 291 F. Supp. 2d at 1326–27, n.13 (ordering the noncitizen's release and noting that "[t]he Court also questions what possible policy objective would be accomplished by incarcerating [Petitioner], at the taxpayers' expense . . . Obviously, Respondents have no concern that [Petitioner] is a flight risk or a danger to society because they made no effort to remove or detain her sooner").

---

[5] A noncitizen whose release is revoked due to violating conditions of their release is entitled to notice of the reasons for the revocation, as well as "an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(l)(1). The noncitizen can be released after that interview.

[6] If a noncitizen is not released after the informal interview, *see supra* n. 5, ICE must review the noncitizen's custody under the normal post-order custody review process, which "will ordinarily be expected to occur within approximately three months after release is revoked." 8 C.F.R. § 241.4(l)(3).

### 3. Petitioners' Removal is Not Reasonably Foreseeable and Their Ongoing Detention Does Not Serve the Goals of Civil Immigration Detention.

Even assuming *arguendo* that ICE had the authority to re-detain them, neither Petitioner's removal is reasonably foreseeable, and thus their continued detention is unlawful. Generally, civil immigration detention is for the sole purposes of (1) ensuring a noncitizen's appearance during removal proceedings and/or (2) preventing danger to the community. *Zadvydas,* 533 U.S. at 690. Immigration detention, whether in application or character, *cannot* be implemented as a form of punishment. *See id.*

Within the context of the removal period, the purpose of detention is to facilitate removal. *Id.* at 682. In *Zadvydas*, the Supreme Court "read [8 U.S.C.] § 1231 to authorize continued detention of a[] [noncitizen] following the 90-day removal period for only such time as is reasonably necessary to secure the [noncitizen's] removal." *Demore v. Kim*, 538 U.S. 510, 527 (2003) (citing *Zadvydas*, 533 U.S. at 699). However, where there is little possibility of removal, immigration detention presents substantive due process concerns because "the need to detain the non-citizen to ensure the [noncitizen's] availability for future immigration proceedings" is "weak or nonexistent." *Zadvydas*, 533 U.S. at 690–92.

Defendants' ongoing detention of Petitioners does not serve any of the possible justifications for civil immigration detention. In fact, Defendants have offered no justification whatsoever for re-detaining Petitioners. There has been no attempt to reopen their respective immigration proceedings, nor have Defendants alleged any danger to the community or flight risk that necessitated detaining Petitioners. Indeed, they could not plausibly do so: Petitioners have been complying with their OSUPs for many years and neither has been convicted of any crimes after being released on those OSUPs. As detailed *infra*, neither poses a flight risk, as they both

have strong family and community ties in Maryland and have demonstrated their commitment to complying with all conditions of their release.[7]

Furthermore, Defendants cannot remove Petitioners to their countries of origin, as both have been granted withholding of removal under the INA, and removal to an alternative country is speculative at best. Since ICE handed each Petitioner a single-page document two months ago stating that it intends to try removing them to Mexico, ICE has not provided any indication that Mexico would even accept Petitioners. Even if Mexico were to for some reason agree to accept Petitioners, Petitioners would both be entitled to seek fear-based relief from removal to Mexico, which would trigger additional, lengthy proceedings.[8] *See Munoz-Saucedo v. Pittman*, 25-cv-2258 at 15 (D.N.J. filed June 24, 2025) (noting that third country removals have "been historically rare" and that even if a third country were found for removal, the petitioner was entitled to further proceedings to seek fear-based relief from that third country removal). As neither Petitioner poses a danger to the community or a flight risk and their removal is not reasonably foreseeable, their detention is no longer permissible under *Zadvydas* and is essentially detention for the sake of detention, which is inherently punitive.

### 4. Petitioners Were Detained and Remain Detained Because Defendants Implemented an Unlawful, Arbitrary and Capricious No-Release Policy Without Notice and Comment.

Petitioners' unlawful ongoing detention is also a result of ICE's new No-Release Policy, which violates the APA. *See* ECF No. 40-3 at 2 ("ERO field offices *no longer* have the option to

---

[7] To the extent this Court has any concerns about flight risk, the choice here is not between detention and unfettered freedom, it "is between imprisonment and supervision under release conditions that may not be violated." *See Zadvydas*, 533 U.S. at 679–80.

[8] Indeed, both Petitioners have already expressed fear of removal to Mexico, the country to which Defendants expressed intent to remove Petitioners in May. As of the date of this filing, however, neither Petitioner has received a Reasonable Fear Interview ("RFI") regarding their fear of removal to Mexico.

discretionarily release [noncitizens], nor decline to take [noncitizens] into custody from [their] counterparts in Homeland Security Investigations (HSI) or U.S. Customs and Border Protection (CBP)." (emphasis added)). Under the APA, agency action may be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or in excess of statutory jurisdiction or authority. 5 U.S.C. § 706(2); *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003); *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). Here, the Defendants' new No-Release Policy directly contravenes Defendants' statutory obligation to consider discretionary release (i.e. is contrary to law), was issued without the proper procedure, and is arbitrary and capricious.

First, the No-Release Policy is contrary to law because it requires Defendants to abdicate their obligation to provide individualized determinations of whether detention is required or whether discretionary release is appropriate pursuant to multiple statutes and regulations. *See* 8 U.S.C. §§ 1226(a) (requiring individualized initial custody determinations and granting the authority to release noncitizens without certain criminal histories on bond or conditional parole), 1182(d)(5)(A) (granting the authority to offer noncitizens temporary, case-by-case parole into the U.S.); 8 C.F.R. §§ 1236.1(c)(8) (granting the authority to discretionarily release certain noncitizens who do not pose a danger or a flight risk), 287.3(d) (requiring that, for certain noncitizens, a determination be made within 48 hours whether detention or release on bond or recognizance is appropriate), 212.5(b) (detailing groups of noncitizens who may be released on a case-by-case basis, as long as they are not a danger or a flight risk), 241.5(a)–(b) (granting the ability to set terms of release on an order of supervision and release with or without a bond).

Courts have repeatedly held that these statutory and regulatory obligations are mandatory and Defendants cannot detain noncitizens without engaging in the required individualized

assessment. *See, e.g.*, *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020) (noting that ICE "do[es] not dispute[] that 8 U.S.C. § 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination"); *Marczak v. Greene*, 971 F.2d 510, 515 (10th Cir. 1992) (interpreting prior version of parole regulations and noting that "a district director who decides parole applications on the basis of broad, non-individualized policies engages in . . . extra-procedural rule-making" and "in each case a district director must determine whether a particular person is likely to flee, and whether that person's continued detention would be in the public interest"). The No-Release policy is thus contrary to law and violates the APA. *See Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 387 (D.C. Cir. 2018) (finding an agency action contrary to law where it "contravene[s] the plain text of [the agency's] own regulations.").

Second, agencies are required to provide notice and an opportunity for interested parties to participate in the proposed rulemaking when promulgating a legislative rule. 5 U.S.C. § 553(b)–(c). The No-Release Policy is a new, substantive rule, not an interpretive rule, which does not fall into any of the categories that are exempt from the APA's notice and comment requirements. 5 U.S.C. § 553(b) (listing the exemptions as "interpretive rules, general statements of policy, or rules of agency organization, procedure, practice."); *see also Plaintiffs J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 377 (D. Md. 2019). "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). As discussed above, the No-Release Policy is inconsistent—indeed, entirely contrary to—existing regulations, and it effects a substantive change in existing law and policy. Whereas prior to the No-Release Policy ICE regularly exercised its discretion not to detain individuals and release those that were detained, and discretionary release was regularly sought by detained noncitizens, ICE

now categorically will not release anyone from detention. By contrast, an "interpretive rule is merely a *clarification*," rather than reversal, "of an existing statute or rule." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (quotation marks and citations omitted) (emphasis added).

Nor is the No-Release Policy a statement of policy exempt from public notice. "The question raised by the policy exception 'is whether a statement is . . . of present binding effect'; if it is, then the APA calls for notice and comment. *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C.Cir.1988) (alterations in original). The No-Release Policy, in contrast to a policy statement, establishes binding rules on all field offices without leaving room for any exercise of discretion. Indeed, it does the precise opposite: it *removes* any discretion. *See also Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (describing a policy statement as one that "merely provides *guidance* to agency officials in exercising their discretionary power while preserving their flexibility and their opportunity to make individualized determinations" in contrast to a "*binding norm*" that "fills out the statutory scheme") (cleaned up and citations omitted) (emphasis in original).

Finally, the No-Release Policy does not constitute a rule of agency organization, procedure, or practice. Such procedural rules are "primarily directed toward improving the efficient and effective operations of an agency"; they "do not themselves alter the rights or interests of parties[.]" *Mendoza*, 754 F.3d at 1023 (quoting *Batterton v. Marshall*, 648 F.2d 694, 702 n.34, 707 (D.C. Cir. 1980)). Yet the interests of Petitioners in being free of unlawful restraint is undoubtedly altered by the No-Release Policy.

In promulgating the No-Release Policy, Defendants produced a Policy that is both substantively and procedurally flawed. Substantively, the No-Release Policy is arbitrary and capricious because Defendants offered no reasoned analysis for this sudden change in policy; failed to consider important aspects of the issue, including limited detention capacity; and declined to grapple with the fact that this Policy violates multiple statutory and regulatory provisions, as well as multiple ICE policies.[9] *See Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 705 (4th Cir. 2019) (holding that DHS acted arbitrarily and capriciously by changing its policy "without any explanation" for why the analysis underlying its previous policy was no longer reliable). Procedurally, Defendants gave no notice of this Policy, nor was there any opportunity for interested parties to offer comments, data, or arguments regarding this new Policy. Either of these flaws—substantive or procedural—are together and separately grounds for vacating this agency action under 5 U.S.C. § 706(2)(D).

These violations directly contributed to and continue to cause the unlawful detention of Petitioners. As noted above, Defendants lacked the authority to re-detain Petitioners as an initial matter, but once Defendants re-arrested Petitioners, they were, under statute and regulation, free to make individualized determinations as to whether detention was appropriate for either Petitioner and consider discretionary release. Under Defendants' No-Release Policy, however, no such determination was made, depriving Petitioners of that individualized assessment and potential release. Had Defendants completed individualized assessments of Petitioners' circumstances, it is nearly certain that Petitioners would have been released—as detailed *infra*, neither Petitioner is a

---

[9] *See e.g.* ICE Directive 11032.4 (concerning detention and release of pregnant, postpartum, and nursing individuals), ICE Directive 11063.2 (concerning detention and release of individuals with mental health concerns as well as those deemed incompetent by the immigration courts); ICE Directive 11002.1 (concerning release of arriving noncitizens with a credible fear of persecution or torture). Copies of these directives are attached as Exhibit D.

danger to their community or a flight risk, and both have extraordinary family and health circumstances justifying their release. Indeed, they each remained free from detention for years before the unlawful No-Release Policy, and they were re-detained simply because the Baltimore ICE Field Office felt compelled by the No-Release Policy to detain them. *See* Second Amended Complaint, ECF No. 52 at ¶ 29 (noting Defendants' stated arrest quotas of 1,200 to 1,500 people per day); Nationwide Waiver, ECF No. 40-3 at 2 (noting No-Release Policy that applies to all Field Offices).

**B. Petitioners Have Established Extraordinary and Exceptional Circumstances Justifying Bail, Which is Necessary to Make the Habeas Remedy Effective.**

Having established a likelihood of success on the merits of their constitutional and statutory claims, the remaining inquiry is whether "extraordinary circumstances" exist that justify immediate release for Petitioners. *See Coreas*, 2020 WL 55933338 at *17. Courts have generally defined "exceptional" to include issues such as substantial claims on which a petitioner has a high likelihood of success, deterioration of a petitioner's health, short periods of detention that would lapse before effective collateral review, or extraordinary delay in processing a habeas corpus petition. *See id.* at *20; *Parks*, 2025 WL 1287225 at *8 (collecting cases). Ultimately, the exceptional circumstances inquiry turns on whether the relevant circumstances "mak[e] a grant of bail necessary for the habeas remedy to be effective." *Coreas*, 2020 WL 55933338 at *20.

Here, as discussed at length *supra*, Petitioners have demonstrated a high likelihood of success on several substantial constitutional and statutory issues, including the unlawful revocation of their release, continued detention despite no reasonably foreseeable removal, and lack of discretionary release opportunities. These serve as independent exceptional circumstances that warrant a grant of bail, as an ongoing constitutional violation is a *per se* form of irreparable harm. *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) ("The loss of [constitutional] freedoms,

for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Unlawful incarceration has been determined to constitute "a harm which cannot be redressed following a trial" and thus satisfies the irreparable harm requirement. *Forchion v. Intensive Supervised Parole,* 240 F. Supp. 2d 302, 310 (D.N.J. 2003). Further, Petitioners have endured unconstitutionally punitive conditions while unlawfully in ICE custody, both while at the Baltimore Hold Rooms and in other facilities. *See generally* ECF No. 50, Second Amended Complaint; *see also* Exh. B at ¶ 6 (describing how Ms. N.N. was held in an outdoor, tent facility in El Paso, TX, where she was forced to sleep on the ground and was deprived of medical care). Finally, Petitioners have uniquely compelling family circumstances warranting their release on bail.

1. **Petitioners are Not Receiving Adequate Medical Care for Their Chronic Medical Conditions and Have Developed New and Serious Medical Concerns in ICE Custody.**

Beyond the ongoing constitutional violations, both Petitioners are exceptionally strong candidates for bail. *See Leslie,* 865 F.Supp.2d at 636, 639 (holding a noncitizen must demonstrate under the standard that she is "an exceptionally strong candidate for bail") (internal citations omitted). Petitioners' respective health conditions—most notably, diabetes and a thyroid disorder—constitute extraordinary circumstances that warrant release on bail. Defendants have failed to give both Petitioners adequate medical care throughout their detention, exacerbating their conditions which are, in any event, very difficult for Ms. N.N. and Ms. R.G. to manage in a detained setting.

Ms. N.N. suffers from diabetes, depression, and anxiety, and has been deprived of her medication to at least some extent at every ICE facility where she has been detained. *See* Exh. B at ¶¶ 5–8 (noting deprivation of medication at facilities in New Jersey, Texas, and New Mexico); Exhibit E, D.N.N. medical records (noting diagnosis of Type II diabetes, Ozempic prescription,

and ongoing treatment for depression). After being transferred out of the Baltimore Hold Rooms—where Ms. N.N. was denied access to her diabetes medication, Ozempic, for at least 24 hours—Ms. N.N. was transferred to Delaney Hall in New Jersey, where she was denied medication for an entire week. Exh. B at ¶ 5. Even after ICE began giving Ms. N.N. her prescription medication for her diabetes and depression, Ms. N.N. was not given her other medications. *Id*. After approximately a month at Delaney Hall, Ms. N.N. was transferred to a makeshift tent facility in El Paso, Texas, where she did not get any of her prescription medication whatsoever. *Id*. at ¶ 6. Eventually, ICE gave Ms. N.N. another medication which she was not prescribed, allegedly to manage her diabetes, but Ms. N.N. had to discontinue taking that pill because it caused intense pain in her head and stomach. *Id*. While in El Paso, ICE never gave Ms. N.N. her proper prescriptions for her diabetes and depression, nor did they ever check her blood sugar. *Id*. Even though Ms. N.N. was detained at the El Paso facility for two weeks, ICE staff told her that it was a "temporary" facility, and they could not give her much medical care. *Id*. Finally, Ms. N.N. was transferred to Otero in New Mexico, where she has so far been deprived of most of her medications. *Id*. at ¶ 8. Ms. N.N. has additionally not been able to check her blood sugar regularly and has not been provided with food that is suitable for her Type II diabetes. *Id*. at ¶¶ 6–7. The mental and physical strain of detention and the inadequate medical care provided by ICE have resulted in her abnormally high blood pressure. *Id*. at ¶ 8.

Ms. R.G. has experienced similar neglect and inadequate care: at each ICE facility, she has been deprived of her medication to manage her thyroid condition. *See* Exh. C ¶¶ 8–9 (noting she did not receive her medication at the ICE facilities in Colorado and Louisiana, including a 10-day delay in Louisiana after she was transferred there); *see also* Exhibit F, V.R.G. medical records (noting diagnosis of hyperthyroidism). After being transferred from Baltimore to Colorado, Ms.

R.G.'s EKG came back abnormal, indicating a heart rate irregularity. *Id*. at ¶ 8. As Ms. R.G. has not previously experienced heart issues, she believes this is because she has not received her medication regularly to manage her thyroid condition. *Id*. In Louisiana, Ms. R.G. was not given any medication for ten days, resulting in difficulty breathing and loss of her voice. *Id*. at ¶ 9; Exh. C at 98. Ms. R.G. struggles to sleep because it is so difficult to breathe, and even when she is able to sleep, she wakes up to intense pain in her throat. Exh. B at ¶ 9.

Both Petitioners have been deprived of adequate medication and medical care, and ICE has not properly addressed their chronic and new medical concerns. The decline in Petitioners' health is itself a "basis for finding extraordinary circumstances" and counsels in favor of release on bail. *Ozturk,* 2025 WL 1420540, at *8 ("Ms. Ozturk's declining health in custody provides another basis for finding extraordinary circumstances.").

### 2. Petitioners are the Primary Caretakers for Multiple LPR and U.S. Citizen Children and Family Members who Need Their Support.

Additionally, both Petitioners have strong family and community ties, which constitute extraordinary circumstances that counsel for release and mitigate any flight risk Defendants may allege exists. *See Leslie*, 865 F.Supp.2d at 640–41 ("We consider these strong family ties as ties that likely bind [Petitioner] to abide by bail . . . ."). Both Ms. N.N. and Ms. R.G. have multiple children, all of whom are U.S. citizens or LPRs; those children depend on Petitioners as a primary support for their households. *See* Exh. B at ¶¶ 9–11; Exh. C at ¶¶ 11–14.

Ms. N.N. has a four-year-old U.S. citizen daughter, O.C.N., who has exhibited signs of autism for which Ms. N.N. was in the process of seeking diagnosis and treatment before she was detained. Exh. B at ¶ 9; Exhibit G, O.C.N. School Records and Treatment Plans; Exhibit H, Letter of Support from E.A.C. Ms. N.N. also cares for her son, J.N.N., and her nephew whom she views as her son, R.N.M. Exh. B at ¶¶ 10–11; Exhibit I, Letter of Support from J.N.N. In addition to

caring for her daughter, son, and nephew, Ms. N.N. was in the process of assuming legal guardianship for a teenage girl who was abandoned by her parents, which she cannot complete while she is detained. Exh. B at ¶¶ 10–11 (noting that Ms. N.N. has an August court hearing to complete the process to become a legal guardian); Exhibit J, Notice of Special Immigrant Juvenile Status Hearing for August 29, 2025.

Ms. R.G. is also the primary caretaker of two U.S. citizen sons, ages 12 and 18. Exh. C at ¶¶ 11–12; Exhibit K, Birth Certificates. Ms. R.G.'s younger son, I.J.R., underwent bilateral ear surgery shortly before she was detained, and has been unable to receive full post-surgical care because Ms. R.G. has been in ICE detention. Exh. C at ¶ 11. Ms. R.G. also missed her older son R.R.R.'s high school graduation while she was detained at the ICE facility in Colorado, unable to celebrate this life milestone with him. *Id*. at ¶ 12; Exhibit L, R.R.R. Diploma; Exhibit M, Letter of Support from R.R.R. Ms. R.G's older son has been forced to assume the role of caretaker not only for his younger brother, but for Ms. R.G.'s elderly mother, who has severe arthritis and diabetes. Exh. C at ¶¶ 12–13; Exhibit N, Letter of Support from A.G.R. Ms. R.G. was the primary caretaker for her mother and her sons—they have always relied on her for not only financial support, but all other physical and emotional care, and are struggling immensely without her. Exh. C at ¶ 14; Exhibit O, Letters of Support from E.R.G., M.R.F., and N.P.

Petitioners have always complied with routine check-ins with ICE since their grants of protection, for 13 and 8 years, respectively. They were both gainfully employed, paid taxes and were part of their local communities. Exhibit P, D.N.N. Tax Return; Exhibit Q, V.R.G. Tax Return; Exhibit R, Letter of Support from Pastor Pedro Fuentes. Petitioners pose neither a flight risk nor a

danger to their communities[10]—as Defendants have recognized for years by maintaining Petitioners on their OSUPs—and are exceptionally strong candidates for bail. Moreover, because ICE cannot effectuate Petitioners' removal on any reasonably foreseeable timeline, forcing Petitioners to wait until the final adjudication of the merits of the instant case would simply be to delay release without cause, making an immediate grant of bail "necessary for the habeas remedy to be effective." *Coreas*, 2020 WL 55933338 at *20. And Petitioners' freedom from detention would facilitate their participation in the instant class action lawsuit and their roles as class representatives. For instance, it would be highly difficult for Petitioners to testify comprehensively regarding the conditions at the Baltimore Holding Rooms from remote detention centers in New Mexico and Louisiana.

## CONCLUSION

Petitioners have raised several substantial violations of their constitutional due process and statutory rights, including a lack of authority for their re-detention, unlawful revocation of their release, a lack of foreseeable removal, and deprivation of individualized assessment for release under the No-Release Policy. In the same vein, they have demonstrated a number of extraordinary circumstances that make their grant of bail necessary to render the habeas remedy effective and to allow them to effectively represent the putative class in this matter. Petitioners therefore request that this Court order their release on any conditions the Court deems appropriate.

---

[10] Ms. N.N. has no criminal convictions independent of her immigration matters, and Ms. R.G. has one prior conviction for robbery in 2009, for which she completed her sentence and was released. In both cases, neither has been convicted of any crime since they were previously released on OSUPs. *See Munoz-Saucedo*, 25-cv-2258 at 18 ("Even assuming [dangerousness] was a relevant consideration [under *Zadvydas*], given ICE's decision to release [Petitioner] in 2023 and Petitioner's conduct during his two-years of supervised release there is no evidence to show an appreciable risk sufficient to overcome all the other evidence refuting that continued detention is reasonable.")

Dated: July 14, 2025

Respectfully submitted,

/s/ Jared A. Levine
Jared A. Levine (NY Bar No. 4897211)*
Daniella Schmidt (NY Bar No. 5186283)**
Luke Taeschler (NY Bar No. 5308325)**
Emily Werkmann (NY Bar No. 5750229)**
**CROWELL & MORING LLP**
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com
DSchmidt@crowell.com
LTaeschler@crowell.com
Ewerkmann@crowell.com

Jerome A. Murphy (D. Md. Bar No. 27678)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2895
JMurphy@crowell.com

Ian Austin Rose (D. Md. Bar No. 22079)
Daniel Melo (N.C. Bar No. 48654)*
Amelia Dagen (D.C. Bar No. 90004838)*
**AMICA CENTER FOR IMMIGRANT RIGHTS**
**NATIONAL IMMIGRATION PROJECT**
1025 Connecticut Ave. NW
Suite 701
Washington, DC 20036
(202) 788-2509
Austin.rose@amicacenter.org
Dan.melo@amicacenter.org
Amelia@amicacenter.org

Sirine Shebaya (D. Md. Bar No. 07191)
Matthew Vogel (LA Bar No. 35363)*
Yulie Landan (CA Bar No. 348958)*
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Rd. NW
Suite 175 #896645
Washington, DC 20009
(202) 656-4788
sirine@nipnlg.org
matt@nipnlg.org
yulie@nipnlg.org

*Pro bono counsel for Plaintiffs*

* Admitted *Pro Hac Vice*

** *Pro Hac Vice Forthcoming*

## EXHIBIT LIST

| | |
|---|---|
| Exhibit A | *Cordon-Salguero v. Noem, et al.*, Transcript of Order Granting Release (dated June 18, 2025) |
| Exhibit B | Second Supplemental Declaration of D.N.N. |
| Exhibit C | Second Supplemental Declaration of V.R.G. |
| Exhibit D | ICE Directives Regarding Discretionary Release |
| Exhibit E | D.N.N. Medical Records [redacted] |
| Exhibit F | V.R.G. Medical Records [redacted] |
| Exhibit G | Records Pertaining to O.E.C.N., Daughter of D.N.N. [redacted] |
| Exhibit H | D.N.N. Letter of Support from E.A.C. (Partner) |
| Exhibit I | D.N.N. Letter of Support from J.N.N. (Son) |
| Exhibit J | Hearing Notice for Aug., 29, 2025 – D.N.N. Custody Hearing [redacted] |
| Exhibit K | Birth Certificates of V.R.G.'s Children [redacted] |
| Exhibit L | R.R.R.'s High School Diploma [redacted] |
| Exhibit M | V.R.G. Letter of Support from R.R.R. (Son) [redacted] |
| Exhibit N | V.R.G. Letter of Support from A.G.R. (Mother) [redacted] |
| Exhibit O | V.R.G. Letters of Support from M.Y.R.F. (Sister), E.M.R.G. (Sister), and N.P. (Friend) [redacted] |
| Exhibit P | D.N.N. Tax Return [redacted] |
| Exhibit Q | V.R.G. Tax Return [redacted] |
| Exhibit R | V.R.G. Letter of Support from Pastor Pedro Fuentes [redacted] |