IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| D.N.N. and V.R.G., *on behalf themselves and all others similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> NIKITA BAKER, *in her official capacity as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations Baltimore Field Office,* et al., <br><br> *Defendants*. | **SURREPLY MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Civil Action No.: 1:25-cv-01613 |

**DEFENDANTS' SUR REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

In their Reply Memorandum in further Support of their Motion for Preliminary Injunction (Reply), Plaintiffs fail to establish a likelihood of imminent future injury with respect to their constitutional claims because the claimed risk of harm they face is premised on hypothetical future conditions that are necessarily speculative and highly variable. While Plaintiffs seek to advance their claims based on testimonial assertions of harms experienced by previous detainees (which Defendants have argued do not establish per se constitutional violations), the likelihood that any putative plaintiff will encounter a similar adverse consequence remains entirely speculative and depends on the convergence of multiple independent variables along with the actions of immigration officers and facility operators. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013). Accordingly, the public interest is best served by allowing the protocols implemented by government professionals at the Holding Facility to remain, and Plaintiff's extraordinary request for a preliminary injunction should be denied.

## ARGUMENT

### I. Plaintiffs' Claims are Not Justiciable

#### A. The Mootness of Plaintiffs' D.N.N. and V.R.G. is Relevant.

Although Plaintiffs seek to avail themselves of the "inherently transitory" exception to the mootness doctrine to afford them standing, its application depends on circumstances Plaintiffs fail to establish here. *See* Defs.' Class Certification Opp'n (ECF No. 46) (Class Opp'n) at 10-11 ("Named Plaintiffs have not demonstrated that they face some likelihood of becoming involved in the same controversy in the future." (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980))). Plaintiffs' claims also do not relate back because the record does not demonstrate that purported injuries to other class members will persist. *Compare* Declaration of Jose Guerrero (ECF No. 40-1) (Guerrero Decl.) ¶¶ 15, 21-32 (describing current conditions and provisions) *with* Second Am. Compl. (alleging speculative future harms). The record is dubious with respect to

whether named Plaintiffs' alleged injuries are typical of potential class members. *See* Class Opp'n at pp. 13-23 (noting issues with commonality and typicality). Thus, the Court cannot be assured that some class members will retain a live claim throughout the proceedings. *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 325-26 (4th Cir. 2022). For these reasons, named Plaintiffs' claims are moot and no exception applies.

### B. Plaintiffs Lack Article III Standing.

#### 1. Plaintiffs Fail to Demonstrate a Requisite Injury-in Fact for the Feared Future Harms.

Contrary to Plaintiffs' assertion, Defendants' argument that future putative class members must face a substantial risk of injury to establish standing is not misplaced. *See* Reply at 3-4. Though it is true that some courts find a putative class need only establish that its class representatives have standing to afford standing to the entire class, disjuncture between injury to named plaintiffs and unnamed class members is taken up regardless. *See, e.g.*, *McWhorter v. Serv. Corp. Int'l*, 748 F. Supp. 3d 459, 471 (S.D. Tex. 2024) (comparing the class-certification approach, "under which courts first determine whether named plaintiffs have standing to pursue their own claims, then approach any disjuncture between injury to named plaintiffs and unnamed class members as an issue of class certification under Rule 23," with the standing approach, "under which courts approach the disjuncture as part of the initial standing inquiry"). Here, the instant circumstances only reveal how disjointed the named Plaintiffs are for the putative class. The putative class, which Plaintiffs elect to define as inclusive of all detainees who will stay at the Holding Facility, is unequivocally seeking forward-looking injunctive relief. "Standing to seek . . . forward-looking injunctive relief requires [Plaintiffs] to show that [they are] suffering an *ongoing* injury." *Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphasis added). But named Plaintiffs are not suffering an ongoing injury at the Holding Facility, because they are no longer there.

Moreover, the central focus of named Plaintiffs' alleged constitutional injuries pertain to

the purported denial of medical care under a theory of deliberate indifference. This claim requires a showing both that a serious medical condition exists and that independent decisionmakers turned a blind eye to it. "Where the alleged injury requires a lengthy chain of assumptions, including "guesswork as to how independent decisionmakers will exercise their judgment," the injury is too speculative to be "certainly impending." *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 569 (D. Md. 2016) (citing *Clapper*, 133 S. Ct. at 1150). Plaintiffs' assertion that the unproven allegations of two individuals with preexisting health conditions—presumably selected because they had such preexisting health conditions—are appropriate to accord standing to an amorphous group of unknown individuals who are not defined in any way by health risk factors—simply lacks merit. *See id.* at 570 ("The key to the speculative nature of this theory of harm is its dependence on a chain of assumptions that must occur before the harm materializes.").

Finally, although Plaintiffs contend that the evidence they have submitted make their right to relief "indisputably clear," they curiously also attempt to support their claim for relief through reliance on an entirely speculative future event devoid of any factual support. Plaintiffs argue that the court should issue the injunction because "Defendants have announced the goal of reaching 7,000 nationwide arrests a day," before adding further conjecturing that "absent court intervention the already deplorable conditions at the Baltimore Hold Rooms will further deteriorate, and thousands of detained individuals will suffer irreparable harm." Reply at 6. But rumors cannot form the basis of a cognizable injury for purposes of Article III standing. *See Keystone Shipping Co. v. United States*, 729 F. Supp. 136, 140 (D.D.C. 1990) (finding that plaintiffs lacked standing based in part on the fact that they only provided broad allegations of injury based off rumors of an event yet to occur). Plaintiffs' attempt to advance their claims on speculation is meritless and should accordingly be rejected.

        2. <u>The Testimony of Nonparties Should Not Be Considered in Evaluating a Likelihood of Success on the Merits.</u>

Plaintiffs rely heavily on the testimony of attorneys relating the hearsay testimony of former detainees at the Baltimore Holding Facility. *See* ECF Nos. 6-2; 31-5-8; 10; 12-16; 36-5. These attorneys are neither class representatives nor putative plaintiffs. Moreover, the clients of these attorneys whose alleged experience at the Holding Facility they recount—with the exception of those pertaining to Ms. NN and Ms. RG, are neither class representatives nor putative plaintiffs. Therefore, this testimony should not be considered for purposes of determining whether Plaintiffs have made the requisite showing of any injury in fact so as to establish standing.

### C. This Court Lacks Jurisdiction to Impose Broad Restrictions on the Government's Ability to Detain Aliens as Part of Its Removal Operations.

Plaintiffs recently raised that their detention violates the INA. *See* Second Am. Compl. ¶¶ 147-152. The jurisdiction of federal courts is presumptively limited. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("[P]ossess[ing] only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." (cleaned up)).

First, 8 U.S.C. § 1252(g) deprives the Court of jurisdiction to review claims arising from any decision or action to "execute removal orders." *See Jennings v. Rodriguez*, 583 U.S. 281, 292-95 (2018). Congress spoke clearly, providing that "no court" has jurisdiction over "any cause or claim" arising from the execution of removal orders, "notwithstanding any other provision of law," whether "statutory or nonstatutory," including habeas, mandamus, or the All Writs Act. 8 U.S.C. § 1252(g). By its terms, this jurisdiction-stripping provision precludes habeas review under 28 U.S.C. § 2241, as well as review under the APA, of claims arising from a decision or action to "execute" a final order of removal. *See Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*, 525 U.S. 471, 482 (1990); *cf. United States v. Texas*, 599 U.S. 670, 680 (2023) ("In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution polices. That complicated balancing process in turn leaves courts without meaningful standards for assessing

4

those policies."). The discretionary determination detain an alien at the Holding Facility before transferring the detainee to an appropriate place of detention as part of a removal effort pursuant to the government's authority under 8 U.S.C. § 1231(g) is just such an unreviewable "action" taken to execute a final removal order. *See AAADC*, 525 U.S. at 485.

Second, 8 U.S.C. § 1252(a)(2)(B)(ii) similarly strips the Court of jurisdiction to grant Plaintiffs' request, where it bars review of "any other decision or action of the [Executive] the authority for which is specified under this subchapter to be in the discretion of the [Executive]." 8 U.S.C. § 1252(a)(2)(B)(ii). Here, the Executive's authority under § 1231(g) to decide the location of detention for individuals detained pending removal falls within the scope of the review bar in § 1252(a)(2)(B)(ii). That is because, under § 1231(g), DHS "necessarily has the authority to determine the location of detention of an alien in deportation proceedings," including to transfer detainees from one detention site to another. *Gandarillas-Zambrana v. Bd. Immigr. Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995). The Executive's broad discretion to determine appropriate places of detention pending removal has repeatedly been recognized by federal courts after careful review of § 1231(g). *See, e.g.*, *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the Secretary "was not required to detain [Plaintiff] in a particular state" given the Secretary's "statutory discretion" under § 1231(g)).

Lastly, this Court does not have jurisdiction to grant Petitioners' desired relief under § 1252(g), which strips courts of jurisdiction over, among other things, claims arising from the execution of removal orders. The transfer and detention of the detainees at issue—who all have final orders of removal—for the purpose of effectuating their removals are plainly actions taken to "execute removal orders against" them. *See* 8 U.S.C. § 1252(g).; *see also Hamama v. Adducci*, 912 F.3d 869, 874 (6th Cir. 2018) ("Under a plain reading of the text of the statute, the Attorney General's enforcement of long-standing removal orders falls squarely under the Attorney

5

General's decision to execute removal orders and is not subject to judicial review." (citing *AAADC*, 525 U.S. at 483 (1999))).

## II.  Plaintiffs Do Not Satisfy the Requirements for Preliminary Relief

As an initial matter, Plaintiffs erroneously assert that the injunction they seek is not mandatory because they merely ask the court to "preserve status quo ante from February 2025, before Defendants' decision to operate the Baltimore Hold Rooms as a residential detention facility." Reply at 5. While Plaintiffs correctly note that the Fourth Circuit defines the "status quo" as the "last uncontested status between the parties which preceded the controversy," their application of this principle is meritless. *See* Reply at 5 (citing *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). Quite plainly, there existed no relationship or status of any kind between the parties existed in February 2025 because neither named Plaintiffs nor the putative class members were detained in the facility at the time. Instead, the last uncontested status proceeding the controversy between the parties would have occurred in early May 2025 when named Plaintiffs entered the Holding Facility. At that time, the facility was being used in the same capacity as it is now, as a temporary detention center, and thus Plaintiffs' request to enjoin Defendants from operating the Holding Facility as a temporary detention facility is necessarily mandatory rather than prohibitory. *See Toure v. Hott*, 458 F. Supp. 3d 387, 393 (E.D. Va. 2020) (referencing the relief sought by Plaintiffs seeking to enjoying operations at an ICE detention facility based on condition of confinement claim during COVID-19 as that of a "mandatory inunction"). Thus, the type of relief Plaintiffs seek is aptly characterized as "extraordinary" and "disfavored," and Plaintiffs' attempt to minimize its import should be rejected. *See League of Women Voters v. North Carolina*, 769 F.3d 224, 235-36 (4th Cir. 2014).

Also without merit is Plaintiffs' assertion that "directing Defendants to revert to their prior use of the Baltimore Hold Rooms as a non-residential facility will not require that they take on

6

new burdens or obligations." Reply at 5. As Defendants previously argued, ICE uses the Holding Facility while processing aliens and locating facilities for their long-term detention. Guerrero Decl. ¶ 12. The Holding Facility provides a critical in ICE's effort to effectuate removals in the area in an efficient manner, and absent its availability, ICE's capacity to do so would likely be jeopardized. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. (ECF No. 40) (PI Opp'n) at 2-3. The arguments Plaintiffs advance in their Reply thus fall well short of bearing the "heavy burden" of making a "clear showing that [he] is likely to succeed at trial on the merits." *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347, 351 (4th Cir. 2009).

### A. Plaintiffs are Unlikely to Succeed on the Merits.

#### 1. Plaintiffs' Due Process Rights to Sanitary Conditions are not Being Violated.

Defendants set forth the standards and protocols the Holding Facility employs to ensure that the temporary detainees are afforded humane conditions and provided basic necessities of life as required by the Constitution, including adequate food, clothing, shelter, sanitation, medical care and personal safety. PI Opp'n at 14-15. Rather than grapple with that evidence to carry their burden of showing a likelihood of success on the merits—especially in light of prospective claims of constitutional injuries and broadly-defined class—Plaintiffs focus on a series of distractions.[1]

First, Plaintiffs baselessly assert that Defendants do not dispute the conditions complained of in Plaintiffs' supporting declarations. Reply at 6. To the contrary, Defendants' Opposition detailed at length the manner in which the Baltimore Holding Facility meets its obligation to

---

[1] In their Opposition, Defendants argued that Plaintiffs cannot show a likelihood of success on the merits on their request for preliminary injunction in part because the Court lacks subject matter jurisdiction over Plaintiffs' habeas claims. In their Reply, Plaintiffs contend that their request for preliminary injunction "does not involve habeas claims" and Defendants' habeas arguments are "irrelevant." Reply at 5. Plaintiffs thus concede that habeas corpus does not provide a remedy for claims implicating a challenge to conditions of confinement.

provide the basic necessities to detainees. PI Opp'n at 13-17. Specifically, the facility provides: water upon request and three meals per day (taking dietary limitations and requests into account in purchasing meals); inflated mattresses and blankets for any individuals staying overnight; jumper suits (sweatsuit top and bottom), socks, and sneakers upon arrival, and jackets for individuals upon request; toiletries that include a toothbrush, toothpaste, and moist towelettes for use while in the Holding Facility; and equips each cell with a sink and toilet that is separated from the open area by a mid-height privacy wall. Guerrero Decl. ¶¶ 21-26.

Second, Plaintiffs' assertion that the Holding Facility "violate the minimum requirements for criminal detention facilities" under the Federal Performance Based Detention Standards and Maryland's Adult Detention Center Standards is both erroneous and misguided. *See* Reply at 6. The Federal Performance Based Detention Standards are designed for use in reviewing non-federal facilities that house federal detainees.

The Maryland Adult Detention Standards pertains to state and local facilities in the state. *See* https://www.dpscs.state.md.us/agencies/mccs.shtm/MarylandCommission. Neither policy governs the Holding Facility and these policies inform the management of detention centers with mandates and objectives dissimilar to the Holding Facility, which houses detainees for a matter of days and is intended as a uniquely transitional detention need of the federal government. *See* Guerrero Decl. ¶¶ 16-20.

Third, Plaintiffs' Reply proceeds on the fallacy that the second-hand testimony of their two proposed class representatives or other nonparties concerning their alleged past experiences in the Holding Facility are sufficient to show a likelihood of success on the merits of their prospective conditions of confinement claim for the putative class. *See* Reply at 6-7. But Plaintiffs cannot impute the purported past experiences of two individuals to putative detainees who will at some unknown point in the indefinite future stay for some unknown (but certainly brief) duration of time

8

in a cell with a variable number of people. Their effort to do so is only more strained by the fact that the class as they define it is not limited to individuals who have a medical condition or possess any degree of medical risk, as the named Plaintiffs each did. This is inadequate to warrant relief. *See Chambliss*, 189 F. Supp. 3d at 570 ("[The] key to the speculative nature of this theory of harm is its dependence on a chain of assumptions that must occur before the harm materializes.") Moreover, Plaintiffs' Reply does not contest that central to the constitutional analysis of a conditions of confinement claim is the duration of detention. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). As Defendants previously argued (Opp'n at 14-15), the Baltimore Holding Facility is a transitional facility where detainees are stationed for a matter of hours or days before being transferred to extended-term detention centers. Guerrero Decl. ¶¶ 6, 12, 16, 19 ("ERO Baltimore aims to hold individuals no longer than twelve hours.").

Finally, Plaintiffs' Reply largely overlooks that, as the Supreme Court has explained, it is not the potentially objectionable conditions that matter, the dispositive question instead is "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Wolfish*, 441 U.S. at 538. Plaintiffs' argument that each challenged condition of confinement, and not the confinement itself, must be tied to a legitimate government purpose to be found nonpunitive, is misplaced. To the extent the conditions at the Holding Facility are suboptimal or unpleasant, they are endemic to its functionality as a temporary detention facility. The purpose of the Holding Facility is to process aliens arrested pursuant to removal proceedings or while awaiting removal before being transported to an ICE detention facility. Guerrero Decl. ¶ 6; *see Demore v. Kim*, 538 U.S. 510, 523 (2003) ("For over a century, the Supreme Court has affirmed detention as a "constitutionally valid aspect of the deportation process."). The Holding Facility plays a critical role in ensuring public safety during the removal process by filling a notable gap in federal detention capacity in the State of Maryland, which

9

prohibits detention facilities within the State from contracting with ICE to detain aliens in removal proceedings. Guerrero Decl. ¶¶ 12, 14, 17, 19. If ICE could not temporarily detain aliens during the time it locates facilities outside Maryland with available housing space to provide extended-term detention, it would likely be unable to process individuals for detention or effectuate arrests as required pursuant to the INA. *Id.* ¶¶ 12, 14, 19; *see Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Plaintiffs do not dispute, nor can they, that the Supreme Court has consistently recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives. *See Jennings*, 138 S. Ct. at 836; *Demore*, 538 U.S. at 520-522; *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). Nor is detention pending removal an "excessive" means of achieving those interests. The government's legitimate interest in detaining individuals is heightened by the fact that proposed class may include aliens who committed serious crimes. Guerrero Decl. ¶ 13. Accordingly, Plaintiffs fail to allege an Eighth Amendment violation.

       2. <u>Plaintiffs Due Process Rights to Medical Care are not Being Violated.</u>

Plaintiffs' assertion that its putative class of detainees with no identified health risks or pre-existing conditions will be denied basic access to medical care is fatally premised on a speculative causal change and bellied by the record evidence of protocols to ally such risk. Their Reply does nothing to establish Plaintiffs are likely to succeed on the merits of a claim that requires them to show that a now-anonymous future detainee—no matter his age, health profile, or duration of confinement—is at substantial risk of a) experiencing a serious medical need; the b) that will be known to, but disregarded by, facility personnel; and 3) then result in harm to the individual.

It is plainly false that Defendants do not dispute any assertion that Ms. N.N. or Ms. R.G. has made a showing of deliberate indifference such that either would prevail on a claim that her Due Process rights had been violated. But, more consequentially, the claims of named Plaintiffs

10

cannot be used as a proxy to meet their burden of a likelihood of success vis a vis putative class members. PI Opp'n at 17-19. Plaintiffs do not define their class to account for medical conditions and present no evidence that future class members are likely to present with serious medical conditions, much less face excessive risk of officials' reckless action or inaction.

Further, although Plaintiffs assert that Defendants incorrectly discuss their deliberate indifference claims in the context of both an objective and subjective component, the authority they cite does nothing to alter that analysis. *See* Reply at 8 (citing *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023)). Indeed, this Circuit noted that the deliberate indifference test "includes objective and subjective elements." *Short*, 87 F.4th at 612-13. The objective element requires an objectively "serious" medical condition, satisfied where it is "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The subjective element requires that the prison official acted with deliberate indifference to inmate health or safety, meaning that the official "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id*. As discussed above, Plaintiffs cannot pass the first inquiry because an objectively serious medical condition bears no inherent relationship to their proposed class and thus is entirely speculative. Such a claim is only further attenuated by the record evidence that ICE has established protocols at the Holding Facility sufficient to diffuse risk of a serious medical condition being unmet by access to care. *See* Guerrero Decl. ¶¶ 28-30 (describing how family members are invited to bring medication to the facility and, in the absence of this occurring, any detainee still requiring medication is to be taken to the nearby University of Maryland Medical Center or Johns Hopkins Hospital). Indeed, where courts have granted injunctions based on prospective injuries at detention facilities, it is typically in circumstances where class members are uniquely vulnerable to a risk of contracting a serious illness, such as in the instance of COVID-19. *See Thakker v. Doll*,

11

451 F. Supp. 3d 358, 367 (M.D. Pa. 2020) ("Not only are the facilities themselves uniquely suited to rapidly spread COVID-19, but also Petitioners themselves are members of high-risk groups that are likely to feel the effects of the virus more keenly than the average individual."). Accordingly, Plaintiffs fail to show a likelihood of success on the merits of either claim.

### B. Plaintiffs Have Not Shown Irreparable Harm.

Relatedly, because irreparable harm "requires plaintiffs to demonstrate that irreparable injury is likely in the absence of an injunction" a "possibility of irreparable harm" is insufficient to warrant a preliminary injunction. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002). Plaintiffs have, at best, shown a mere possibility of a Due Process violation. Moreover, Plaintiffs must show the harm to "be neither remote nor speculative, but actual and imminent." As argued above, putative class members fear harms that are speculative and not imminent. Plaintiffs' Reply comes no closer to explaining how such an amorphous putative class—not limited to any sub-population or curtailed in any way—will suffer irreparable harm in the absence of an order ceasing current operations at the facility. *See id.*

### C. The Balance of Interests and Public Interest Favor Respondents.

Although Plaintiffs contend they do not seek to shut down the Holding Facility, their prayer for relief plainly asks this Court to do just that. *See* Mot. at 1, (asking the Court to enjoin Defendants from "operating the hold rooms. . . . as a residential (i.e. overnight or multi-day) facility"). Plaintiffs also erroneously contend that, "[n]othing about this relief precludes Defendants from enforcing the law, detaining removable noncitizens, or promptly removing them." Reply at 14. On the contrary, and as discussed *supra*, such an order would restrict ICE's capacity to temporarily detain aliens during the time required to locate housing facilities outside Maryland to provide extended-term detention, which would in turn negatively impact its ability to process individuals for detention and effectuate arrests—i.e. to enforce the nation's immigration

12

laws. *See* Guerrero Decl. ¶¶ 12, 14, 17, 19. Moreover, given the evidence that protocols to provide for the detainees' basic necessities and access to medical care are in place, *see id.* ¶¶ 15, 20-31, the allegations here should not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), including the "efficient administration of the immigration laws at the border," including the enforcement of expedited removal orders. *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (citing *Landon*, 459 U.S. at 34). The Court should therefore deny Plaintiffs' request for emergency relief.[2]

## III.    Plaintiffs' Claims Under the APA Fail

### A.    Plaintiffs' Arguments that the Challenged Decisions Were Final Agency Action is Misplaced.

In the Fourth Circuit, courts cannot maintain jurisdiction if the action being challenged lacks finality under the APA. *See, e.g.*, *Jake's Fireworks Inc. v. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024). Plaintiffs contend that decisions made by the agency to alter the length of time the hold-rooms can be used as residential facilities are final agency actions despite noting that in the last half year, Defendants have altered the policy twice. *See* Reply at 9 (citing Defendants' February 5, 2025 and June 24, 2025 Memoranda).

As established in Defendants' Opposition, an agency action is final if (1) the action "mark[s] the consummation of the agency's decision-making process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *See* PI Opp'n 24-25 (quoting *Bennett v.*

---

2  Because no Due Process rights have been violated, it's unnecessary for the Court to consider the bond requirement. However, if the Court should issue an injunction, the Court retains the discretion to set the bond amount as it sees fit or waive the security requirement. *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013).

*Spear*, 520 U.S. 154, 177-78 (1997)). A case is fit for judicial decision where "the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992), as amended (Nov. 2, 1992). Here, the February 5, 2025 policy has already been superseded by the intervening June 24, 2025 policy. These internal decisions are subject to change at the agency's discretion. *See* Opp'n at 24; Reply at 9 (acknowledging time limitations in the policy). Plaintiffs fail to meet the first prong of the final agency action test because the actions taken by Defendants are of a tentative or interlocutory nature.

### B. ICE's Challenged Actions Were Neither Arbitrary and Capricious Nor Contrary to Law.

Contrary to Plaintiffs' negative inference that the change in policy was related to the volume of individuals currently moving through the holding facility, *see* Reply at 11, the record establishes the need for increased holding space while ICE locates other facilities with available housing for long-term detention. *See* Guerrero Decl. ¶¶ 10-13. ICE is not attempting to make the holding facilities a form of long-term housing for detainees, but rather is addressing the lack of space at the Baltimore facility and looking for suitable alternatives that don't include releasing detainees. Plaintiffs argue that adjudicating their APA claim here would not require Defendants to seek a court's permission before implementing policy changes. *See* Reply at 11 n.14. But allowing this challenge to move forward under the APA would open the door for individuals to challenge every policy decision made by arguing that it was arbitrary or capricious not to release those legally detained instead of altering a facility's structure or purpose. The agency did depart from a prior policy, but they have articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *See* PI Opp'n at 25-27.

### C. Plaintiffs' Cannot Advance an Accardi Claim.

The *Accardi* doctrine's purpose is to prevent the arbitrariness which is inherently

14

characteristic of an agency's violation of its own procedures. *United States v. Heffner*, 420 F.2d 809, 812 (4th Cir. 1969). Plaintiffs cite *Heffner* for the proposition that *Accardi* can be applied to the agency decision at issue in this case. Reply at 12. However, the facts of *Heffner* are inapposite. In *Heffner*, the IRS issued instructions to all Special Agents of the Intelligence Division to notice individuals being interviewed that they were suspected of criminal tax fraud and to give the full Miranda warnings before seeking incriminating statements. *Id.* at 811. Two agents failed to comply with the agency instructions, and the court found that failure to be a violation of the *Accardi* doctrine because the agency established protection through the instructions and its agents could not proceed without regard to them. *Id.* at 812. This application of the *Accardi* doctrine is not relevant because Defendants issued a new policy, not unlike the IRS issuing instructions. However, Plaintiffs in this case challenge a policy, not actions by rogue agents failing to comply with it. This extension of the *Accardi* doctrine goes beyond the scope of the doctrine and should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

BRETT A. SCHUMATE
Assistant Attorney General

DEVIN BARRETT
Senior Litigation Counsel

MADELYN J. PHINNEY
Trial Attorney
United States Department of Justice, Civil Division
Office of Immigration Litigation

*/s/ Brendan T. Moore*
BRENDAN T. MOORE
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
202.880.0330

15

Attorneys for Defendants