IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**D.N.N**, *et al.*,

         *Petitioners-Plaintiffs*,

    **v.**

**NIKITA BAKER,** *et al.*,

         *Respondents-Defendants*.

Civil No.: **1:25-cv-01613-JRR**

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on the Motion for Class Certification (ECF No. 31; the "Class Certification Motion") and Motion for Preliminary Injunction (ECF No. 36; the "PI Motion") filed by Petitioners-Plaintiffs[1] D.N.N. and V.R.G., on behalf of themselves and all others similarly situated. The court has reviewed all papers filed in accordance with the parties' agreed-upon briefing schedule. As set forth in greater length below, the court has determined that no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, Plaintiffs' Class Certification Motion will be denied, and the PI Motion will be denied as moot.

## I.  <u>BACKGROUND</u>

Plaintiffs[2] initiated this action on May 9, 2025, with the filing of a "Class Action Complaint for Declaratory Relief, Complaint for Injunctive Relief, and Petition for a Writ of Habeas Corpus." (ECF No. 1.) Following two subsequent amendments, the Second Amended Class Action Complaint for Declaratory Relief, Complaint for Injunctive Relief, and Petition for a Writ of

---

[1] For convenience, the court refers to D.N.N. and V.R.G. as "Plaintiffs."
[2] When this action was initiated on May 9, 2025, D.N.N. was the sole Plaintiff. On May 12, 2025, an amended pleading was filed to include Plaintiff V.R.G. (ECF No. 6.)

Habeas Corpus is now operative.  (ECF No. 52; the "Second Amended Complaint.")  Plaintiffs bring this action asserting violations of the Administrative Procedure Act ("APA") and the Fifth Amendment to the United States Constitution on behalf of themselves and all those similarly situated, namely "civilly detained people confined in U.S. Immigration and Customs Enforcement ('ICE') holding cells operated by ICE's Baltimore Field Office (the 'Baltimore Hold Rooms')." *Id.* ¶ 1.  Plaintiffs assert 11 causes of action.[3]  Relevant here, the first seven counts, which pertain to Plaintiffs and the putative Class members, are as follows:

> **Count I**: Violation of the APA, 5 U.S.C. § 706—Waiver of Policy;

> **Count II**: Violation of the Due Process Clause of the Fifth Amendment—Deviation from Policy;

> **Count III**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Sleep;

> **Count IV**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Hygienic and Sanitary Conditions;

> **Count V**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Adequate Medical Care;

> **Count VI**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Adequate Food and Water; and

> **Count VII**: Violation of the Due Process Clause of the Fifth Amendment and 8 U.S.C. § 1229a(b)—Deprivation of Access to Counsel

(ECF No. 52 ¶¶ 74–132.)

---

[3] On July 11, 2025, Plaintiffs sought leave to file an amended complaint, which the Government did not oppose.  Given Federal Rule of Civil Procedure 15(a)'s instruction that the court "should freely give leave when justice so requires," and in view of the Government's non-opposition, *see* FED. R. CIV. P. 15(a)(2), the court granted the motion to amend. The amendment has little to no effect on the court's disposition of the pending Motions, both of which were filed prior to amendment of the complaint and concern the asserted class claims. The amended pleading adds Plaintiffs' individual claims raised for the first time in the Second Amended Complaint.

Shortly after initiation of this action, Plaintiffs D.N.N. and V.R.G. sought, and were granted, an order enjoining their removal from the continental United States pending further order of the court pursuant to the All Writs Act. (ECF Nos. 10, 14.) Then, on June 6, 2025, Plaintiffs filed their Class Certification Motion, seeking to certify the following class: "All persons who are now or in the future will be detained at the Baltimore Hold Rooms." (ECF No. 31-1 at p. 2). On June 12, 2025, Plaintiffs filed their PI Motion, seeking to enjoin the alleged punitive and unconstitutional detention conditions in the Baltimore Hold Rooms. (ECF No. 36.) Of import here, the PI Motion "seeks class relief against short term detention conditions." (ECF No. 56 at p. 4.) In accordance with the parties' agreed-upon briefing schedule (and the Government's surreply to the PI Motion, permitted with leave of court), briefing on the Class Certification Motion was completed on July 21, 2025, and for the PI Motion on July 24, 2025. The scheduled hearing on the PI Motion is set for July 29, 2025.

### A. About Named Plaintiffs

The record indicates as follows: D.N.N. is a national and citizen of Guatemala. (ECF No. 52 ¶ 18.) She has lived in the United States for more than 10 years. *Id.* She was granted a withholding of removal in 2012 and released on an Order of Supervision ("OSUP"). *Id.* She complied with all conditions of her OSUP. *Id.* D.N.N. is diagnosed with Type-2 diabetes, anxiety, and depression for which she takes medications. (ECF No. 52 ¶ 18; ECF No. 1-15 ¶¶ 3–4.)

V.R.G. is a national and citizen of El Salvador. (ECF No. 52 ¶ 20; ECF No. 6-2 ¶ 2.) She has lived in the United States for more than 10 years. *Id.* She was granted a withholding of removal in 2017 and released on an OSUP. (ECF No. 52 ¶ 20; ECF No. 6-2 ¶ 2.) She complied with all conditions of her OSUP. (ECF No. 52 ¶ 20.) V.R.G. has a thyroid condition for which she takes daily medication. (ECF No. 52 ¶ 20; ECF No. 6-2 ¶ 4.)

D.N.N. and V.R.G. were initially detained at the Baltimore Hold Rooms on May 7 and 8, 2025, respectively. (ECF No. 1-15 ¶ 2; ECF No. 6-2 ¶ 2.) They both were detained at their routine check-ins (ECF No. 1-15 ¶ 2; ECF No. 6-2 ¶ 2) and remained there until May 10, 2025, when they were transferred to other locations. (ECF No. 31-2 ¶ 1; ECF No. 31-3 ¶ 1.) As of July 14, 2025, D.N.N. is held in New Mexico and V.R.G. is held in Louisiana. (ECF No. 53-3 ¶ 8; ECF No. 53-4 ¶ 9.)

In support of their Class Certification Motion, each Plaintiff asserts: "I understand that this lawsuit is brought by myself and another person on behalf of all the people who are currently detained or will be detained in the future in the Baltimore Holding Rooms. I intend to represent these people and accept my responsibilities as a class representative." (ECF No. 31-2 ¶ 3; ECF No. 31-3 ¶ 3.)

## B. ICE's Enforcement and Removal Operation Holding Facilities

At issue here, ICE's Office of Enforcement and Removal Operations ("ERO") issued a directive on "Operations of ERO Holding Facilities," identified as Policy Number 11087.2, on January 31, 2024.[4] (ECF No. 1-8; "Directive 11087.2.") Directive 11087.2 sets forth the "policy and procedures for operating holding facilities" in ICE field offices. *Id.* § 1.1. A "holding facility" is "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." *Id.* § 3.2 (footnote omitted). "Short-term confinement" refers to "a period not to exceed 12 hours, absent exceptional circumstances." *Id.* § 3.2 n.3. A "hold room" is "[a] holding cell, cell block, or other secure enclosure within a holding facility." *Id.* § 3.3. Under Directive 11087.2, the Executive Associate Director for ERO (here,

---

[4] There is no dispute that Directive 11087.2 is an internal directive not subject to APA rule-making requirements at 5 U.S.C. § 553.

Executive Assistant Director Genalo) "is responsible for ensuring compliance with the provisions of this Directive," and Field Office Directors or Deputy and Assistant Field Office Directors (here, Director Baker and Assistant Director Burki) "are responsible for ensuring that field office personnel follow the procedures in this Directive for operating holding facilities located within their respective field offices." *Id.* §§ 4.1, 4.3.

Relevant here, under Directive 11087.2, ERO Officers are responsible for, *inter alia*:

> Ensuring that each holding facility maintains sufficient supervision of detainees by taking into consideration the physical layout of each holding facility; the composition of the detainee population; the prevalence of substantiated and unsubstantiated incidents of sexual abuse, harassment and assault; the findings and recommendations of sexual abuse, harassment and assault incident review reports; and any other relevant factors, including but not limited to, the length of time detainees spend in custody at the holding facility;

> Ensuring that detainees are provided a meal at least every six hours;

> Ensuring that hold rooms are safe, clean, equipped with restroom facilities, and clear of objects that could be used as weapons against ERO personnel, contractors, or detainees.

(Directive 11087.2, ECF No. 1-8 §§ 4.4.1.2–3.)

The following procedures and requirements similarly apply for ERO Officers:

> Account for and continuously monitor detainees and empty holding facilities upon the conclusion of daily operations in those field office locations operating on a daily schedule. Absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours.

> Monitor detainees for any apparent indications of a mental or physical health condition or signs of hostility, self-harm, or harm to others that may require closer supervision or emergency medical care.

> .            .            .

> Provide detainees with access to drinking water in hold rooms at all times.

> If the hold room is not equipped with restroom facilities, ERO
> officers should position themselves within direct sight or earshot of
> the hold room so that detainees may request and have regular access
> to restroom facilities.

> .                    .                    .

> Allow detainees to keep personal inhaled medication on their person
> and have access to other prescribed medication as necessary.

*Id.* §§ 5.1.1–2; 5.2.2–3; 5.7.2.

On January 30, 2025, Director Baker (then Deputy Field Office Director) submitted a memorandum to Assistant Director Burke, ICE's Assistant Director of Custody Management, requesting "a waiver for the ERO Baltimore Field Office 12-hour hold room utilization time, as it relates to [Directive] 11087.2." (ECF No. 40-2.) The memo sought an extension of 48 hours beyond the 12 hours set by Directive 11087.2. *Id.* Therein, Baker explained:

> The ERO Baltimore Field Office does not have any detention space
> within our area of responsibility (AOR). As a result, the Baltimore
> Field Office must request detention space nationwide to facilitate
> the transfer of aliens arrested by our law enforcement officers. This
> process has caused significant hold room times for the ERO
> Baltimore Field Office while awaiting transfer approval requests.

*Id.*[5] Baker further offered that the Executive Order of January 20, 2025, declaring immigration a national emergency, resulted in detention space being "less readily available," including in the Baltimore Hold Rooms. *Id.* Baker's request was approved by Burke on February 5, 2025. *Id.*

On June 24, 2025, Burke issued a nationwide waiver of Directive 11087.2's 12-hour hold room utilization limit for all ICE ERO Field Offices. (ECF No. 40-3.) The waiver "allows for

---

[5] In 2021, Maryland enacted the Dignity Not Detention Act, which, *inter alia*, "prohibit[s] certain governmental entities from entering into agreements facilitating immigration-related detention by private entities; prohibit[s] governmental entities from entering into certain agreements to house immigration-related detainees; [and] require[es] governmental entities to terminate certain existing contracts for the detention of immigration-related detainees . . . ." Detention Not Dignity Act, H.B. 16, 2021 Leg., 443rd Sess. (Md. 2021).

aliens who are recently detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency to be housed in a holding facility for up to, but not exceeding, 72 hours, absent exceptional circumstances." *Id.*

As the basis for the waiver, Burke cites two Executive Orders that resulted in increased enforcement efforts, and that "ERO's average daily population has significantly increased to over 54,000." *Id.* The two cited Executive Orders are those titled "Protecting the American People Against Invasion," and "Securing Our Borders." The Protecting the American People Against Invasion order provides, *inter alia*:

> The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025). Relatedly, among other things, the Securing Our Borders order calls for the following:

> The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025).

Both Directive 11087.2 and the waiver of the 12-hour hold room utilization time at the Baltimore Hold Rooms have been in effect throughout this litigation and were in effect at the time of Plaintiffs' detention.

### C.  Conditions of the Baltimore Hold Rooms

Over the course of this action, Plaintiffs have submitted declarations from themselves (ECF Nos. 31-2, 31-3), individuals previously detained in the Baltimore Hold Rooms (ECF Nos. 31-5, 31-6, 31-8, 31-9, 31-10, 31-11, 31-15), and counsel (ECF Nos. 1-15, 6-2, 31-7, 31-12, 31-13, 31-16, 36-5) regarding the conditions of the Baltimore Hold Rooms from February 4, 2025 (ECF No. 31-14), through May 10, 2025 (ECF Nos. 31-2, 31-3), with one person detained from June 9 to 12 12, 2025 (ECF No. 36-5).[6]

Declarants attest to the conditions experienced, observed, or learned of (in the instance of counsel declarants) from a client.[7]  They detail being detained in "very small," "little" rooms (ECF Nos. 31-6 ¶ 7; ECF No. 31-7 ¶ 4; ECF No. 31-8 ¶ 5; ECF No. 31-11 ¶ 5; ECF No. 31-15 ¶ 6); some declarants estimate room size as between 7x8 and 8x17 feet.  (31-5 ¶ 5; ECF No. 31-10 ¶ 7;

---

[6] Contrary to the Government's concern, the court does not consider these declarations as those of putative class members but rather as evidence in support of Plaintiffs' Motions.

[7] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted."  *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 352 (D. Md. 2021), *aff'd*, No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd*, No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

Further, as this court has previously explained:

> [A]s one of the leading treatises on class actions explains, "[c]ourts have not achieved consensus on whether only evidence that is admissible under the Rules of Evidence may be considered in deciding whether a class may be certified." 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:12 (16th ed. Oct. 2019 update) (collecting cases taking differing positions).

*Todd v. XOOM Energy Maryland, LLC*, No. GJH-15-154, 2020 WL 4784767, at *7 (D. Md. Aug. 18, 2020).  Where the Government has not challenged the admissibility of such evidence as to class certification, the court will consider it in ruling on the Motion.  The Government remains free to assert admissibility challenges as this action proceeds.

31-11 ¶ 5; ECF No. 31-15 ¶ 6.)  Some people were in a room alone (ECF No. 31-14 ¶ 6); others were joined in the room by more than 30 others.  (ECF No. 36-5 ¶ 10.)  They attest to rooms with a single toilet, devoid of privacy.  (ECF No. 6-2 ¶ 7; ECF No. 31-5 ¶ 6; ECF No. 31-7 ¶ 7; ECF No. 31-8 ¶ 8; ECF No. 31-12 ¶ 10; ECF No. 31-13 ¶ 17; ECF No. 31-14 ¶ 8.)

For its part, the Government does not contradict or directly challenge these assertions; rather, the Government explains that the Baltimore Hold Rooms consist of "three large and two small cells."  (ECF No. 40-1 ¶ 7.)  The large cells, according to the Government, are capable of holding "up to 35 individuals," and the small cells are capable of holding "up to 15 individuals."[8] *Id.*  Each cell contains a toilet and sink "separated from the open area by a mid-height privacy wall." *Id.* ¶ 15.

The declarants detail stays of multiple days, with no change of clothes, toothbrushes or toothpaste, showers, or towels.  (ECF Nos. 1-15 ¶ 6; 6-2 ¶ 8; 31-6 ¶ 9; 31-7 ¶ 7; 31-8 ¶ 8; 31-9 ¶ 8; 31-10 ¶ 8; 31-11 ¶ 7; 31-14 ¶ 10; 31-15 ¶ 8; 36-5 ¶ 11.)  They similarly describe inadequate sleeping conditions, including rooms being illuminated at all times, being forced to sleep on concrete floors with no pillow or blankets, and (for some) access to inflatable mattresses but without pillows, blankets, sheets, or adequate space.  (ECF Nos. 6-2 ¶ 9; 31-5 ¶ 6; 31-6 ¶ 8; 31-7 ¶¶ 5–6;  31-10 ¶ 7; 31-11 ¶ 6; 31-12 ¶ 10; 31-14 ¶ 9; 31-15 ¶¶ 7–8.)  The Government offers that "ERO Baltimore issues individuals a set of toiletries that include [sic] a toothbrush, toothpaste, and moist towelettes for use while in the Holding Facility," as well as sweatsuits, socks, and sneakers upon arrival.  (ECF No. 40-1 ¶¶ 22, 25.)  It further states that "ERO Baltimore provides

---

[8] The Government states that the "small cells are rarely used and are generally reserved for individuals requiring segregation for safety purposes."  (ECF No. 40-1 ¶ 8.)  This appears consistent with the declaration of April Amaya Luis who believed her stay in an empty room was due to her identity.  (ECF No. 31-14 ¶ 6.)

inflated mattresses and blankets for any individuals in the Holding Facility overnight and has done so since March 17, 2025." *Id.* ¶ 21.

The declarants detail receiving only three bottles of water per day (at mealtimes) (ECF Nos. 1-15 ¶ 3; 6-2 ¶ 6; 31-7 ¶ 8; 31-9 ¶ 5; 31-10 ¶ 8; 31-15 ¶ 7); inadequate meals and insufficient food (ECF Nos. 6-2 ¶ 6; 31-5 ¶ 7; 31-9 ¶¶ 5–6; 31-10 ¶ 8; 31-13 ¶ 17; 31-15 ¶ 11; 36-5 ¶ 12); food without consideration of relevant medical needs (ECF No. 1-15 ¶ 3); and poor quality food (ECF Nos. 31-7 ¶ 8; 31-8 ¶ 6; 31-11 ¶ 7; 31-15 ¶ 7). In response, the Government asserts that "ERO Baltimore provides water to any individual upon request and there is a sink in each cell," and that it has purchased meals from local restaurants, snacks from local convenience stores, and ready-to-eat meals from a vendor. (ECF No. 40-1 ¶¶ 24, 26–27.) The Government contends further that it provides detainees with three meals a day and that its officers "take dietary limitations and requests into account in providing meals." *Id.* ¶ 26.

Finally, the declarants state that, during their time in the Baltimore Hold Rooms, detainees were not provided access to their medication (ECF Nos. 1-15 ¶¶ 3–5; 6-2 ¶ 4; 31-7 ¶ 7; 31-8 ¶ 6; 31-10 ¶ 12; 31-11 ¶ 9; 31-12 ¶¶ 12–13), a medical professional (ECF Nos. 31-8 ¶ 6; 31-12 ¶ 12), or counsel (ECF Nos. 31-6 ¶¶ 4, 11; 31-12 ¶ 11; 31-14 ¶ 13; 31-15 ¶ 9.) The Government offers:

> During an arrest, ERO Officers ask aliens if they have any medical conditions, require any ongoing medical treatment, or need to bring any medication with them. ERO Baltimore authorizes family members to bring medication to aliens who did not have it with them at the time of arrest. ERO Baltimore requests family members bring both necessary prescription[s] and over the counter medication.
>
> Medication is placed in an individual's property bag to be distributed as scheduled. ERO Baltimore maintains a log to ensure individuals receive medications as prescribed.
>
> If aliens require medication during their time in the Holding Facility, they are taken to the University of Maryland Medical Center,

approximately three blocks from the Holding Facility, or Mercy Hospital, approximately four blocks from the facility.

ERO Baltimore offers all aliens the opportunity to make a phone call upon arrival at the Holding Facility.

Each cell has a phone for free public use by all individuals at any time. Upon request, ERO Baltimore will allow individuals to use phones outside of the cells to address private issues.

(ECF No. 40-1 ¶¶ 28–32.)

## II.    CLASS CERTIFICATION MOTION

### A.  Legal Standard

"The class-action device, which allows a representative party to prosecute [her] own claims and the claims of those who present similar issues, is an exception to the general rule that a party in federal court may vindicate only [her] own interests." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006). It "is a carefully constructed compromise in our legal system— one which Article III courts play a critical role in maintaining." *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 683 (4th Cir. 2024).

Plaintiffs seeking to certify a class must meet the criteria set forth in Federal Rule of Civil Procedure 23. First, the moving party must comply with the requirements of Rule 23(a). It provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

11

FED. R. CIV. P. 23(a).   The prerequisites are commonly referred to as "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).   "The first two prerequisites (numerosity and commonality) focus on the absent or represented class while the latter two tests (typicality and adequacy) address the desired qualifications of the class representative."[9]   1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 1:2 (6th ed. 2025).   "The Fourth Circuit also reads into Rule 23 an implied requirement of 'ascertainability,' meaning that the [] court can readily identify the class members in reference to objective criteria."  *McMillan v. Kansas City Life Ins. Co.*, 762 F. Supp. 3d 443, 457 (D. Md. 2025) (citation omitted); *see Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019) (same); *EQT Prod.*, 764 F.3d at 358 (same).

After satisfying the aforementioned criteria, the moving party must then show that the class action falls into one of the Rule 23(b) categories.   Plaintiffs here seek classification under Rule 23(b)(2), which permits class treatment where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   FED. R. CIV. P. 23(b)(2).

"As a general matter, the limits of Rule 23 are designed to ensure vigorous adversarial process, efficient adjudication of class-wide questions, and a practical means of identifying and notifying those who may be affected by a judgment."  *Krakauer*, 925 F.3d at 655.  It is not "a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Instead, a plaintiff must "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule

---

[9] The latter three categories tend to merge.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 n.3 (2011) (quoting *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157–158, n.13 (1982)); *see Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998) (same).

23(a)," and "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (emphasis in original) (citation omitted).

While "[i]t is the plaintiffs' burden to demonstrate compliance with Rule 23, . . . the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod.*, 764 F.3d at 358 (citing *Wal-Mart*, 564 U.S. at 350–51); *see Krakauer*, 925 F.3d at 654 (explaining that "the district court must rigorously examine the core issues of the case at the certification stage").

This rigorous analysis does not grant the court "license to engage in free-ranging merits inquiries at the certification stage;" rather, the court "consider[s] merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *EQT Prod.*, 764 F.3d at 358 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Indeed, "in a class certification analysis, the court determines whether the Rule 23 requirements have been satisfied without considering whether the proposed class is likely to prevail on the merits." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 188 (4th Cir. 2024) (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362, 366 (4th Cir. 2004)).

## B. Standing and Mootness Challenges

The court first addresses the Government's jurisdictional challenges raised in opposition to Plaintiff's Class Certification Motion. The Government argues that Plaintiffs lack standing because their individual claims have been rendered moot. (ECF No. 46 at pp. 9–13.) The Government conflates the "separate, though related doctrines" of standing and mootness, both of which relate to justiciability. *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *8 (D. Md. Sept. 18, 2020); *see Flast v. Cohen*, 392 U.S. 83, 95 (1968) (footnotes omitted) (regarding

justiciability). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980)); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (noting, however, that describing "mootness" as "standing set in a time frame," per *Arizonans for Off. Eng.*, is "not comprehensive").

The Constitution extends the judicial power of Article III courts to "cases" or "controversies." U.S. CONST. ART. III, § 2, cl. 1. The doctrine of standing, among others, "implements" this limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). "Article III standing is 'part and parcel of the constitutional mandate that the judicial power of the United States extend only to cases and 'controversies.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In the context of class actions, courts "analyze standing based on the allegations of personal injury made by the named plaintiffs." *Baehr*, 953 F.3d at 252 (quoting *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018)).

The court is persuaded, and the Government does not dispute (at least not as to class certification), that at the time this action commenced, the named Plaintiffs alleged cognizable

injuries in fact caused by the Government and capable of judicial redress.  (ECF No. 46 at pp. 9–13.)  "Standing 'is concerned with the presence of injury, causation, and redressability at the time a complaint is filed,' whereas mootness 'scrutinizes the presence of these elements after filing—*i.e.*, at the time of a court's decision.'"  *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 844 (D. Md. 2025) (quoting *Garcia v. U.S. Citizenship & Immgr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016)).  The Government's argument does not concern standing at commencement; it concerns whether an ongoing case or controversy exists.  *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (explaining that "[i]t is the doctrine of mootness, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of the lawsuit'") (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)).  Accordingly, its challenge is properly characterized as one of mootness, not standing.  *See DL v. D.C.*, 302 F.R.D. 1, 19 (D.D.C. 2013), *aff'd,* 860 F.3d 713 (D.C. Cir. 2017) (explaining that "[e]vents subsequent to the filing of the complaint may *moot* the plaintiffs' claims, but the plaintiffs do not lose *standing*" (emphasis in original)); *Hinton v. D.C.*, 567 F. Supp. 3d 30, 48 (D.D.C. 2021) (same).

Like standing, mootness affects this court's jurisdiction.  "Federal courts have no power to hear moot cases."  *Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 564 (4th Cir. 2024) (quoting *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006)).  "A case or controversy dissipates when it becomes moot; that is 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *Lancaster v. Sec'y of Navy*, 109 F.4th 283, 288–89 (4th Cir. 2024) (quoting *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013)).  The requirement that a party possess a cognizable interest in the outcome of the action to bring suit "extend[s] past the filing of the complaint,"—"an actual controversy" is required "at all stages of

review." *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 325 (4th Cir. 2022) (quoting *Arizonans for Off. Eng.*, 520 U.S. at 67).

Importantly, the mootness doctrine is "flexible," and there are "several settled exceptions." *Id.* (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400 (1980)). One exception, relevant here, is "class-action specific 'relation back.'"[10] *Id.* Under this exception, the court may certify a class, despite a named plaintiff's individual claim having been rendered moot, where "*other* class members 'will continue to be subject to the challenged conduct and the claims raised are . . . inherently transitory.'" *Id.* (emphasis in original) (quoting *Genesis Healthcare*, 569 U.S. at 76). "[T]he essence of the exception" is "in the 'uncertainty about whether a claim will remain alive.'" *Id.* at 326 (4th Cir. 2022) (quoting *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010)).

The Supreme Court has repeatedly recognized such an exception, noting that "[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Geraghty*, 445 U.S. at 399. Thus, "termination of a class representative's claim does not moot the claims of the unnamed members of the class" even where "the class was not certified until after the named plaintiffs' claims had become moot." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991) (first quoting *Gerstein v. Pugh*, 420 U.S. 103, 110–11 n.11(1975); then quoting *Schall v. Martin,* 467 U.S. 253, 256 n.3 (1984)); *see Nielsen v. Preap*, 586 U.S. 392, 403–404 (2019) (rejecting mootness argument and explaining that the case had not become moot where a class was not certified at the time the plaintiff's claims became moot and where the alleged harms were inherently transitory) (quoting *Riverside*, 500 U.S. at 52).

---

[10] Plaintiffs do not seek to invoke the "capable of repetition but evading review" exception. (ECF No. 31-1 at pp. 17–18; ECF No. 63 at p. 2 n.1.) Indeed, that exception does not appear to be applicable here. *See Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 325 (4th Cir. 2022) (explaining that this exception "applies only when there is a reasonable expectation that the same complaining party will be subject to the same action again") (citation omitted).

As the Court summarized:

> The "inherently transitory" rationale was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course. A plaintiff might seek, for instance, to bring a class action challenging the constitutionality of temporary pretrial detentions. In doing so, the named plaintiff would face the considerable challenge of preserving his individual claim from mootness, since pretrial custody likely would end prior to the resolution of his claim. See *Gerstein, supra.* To address this problem, the Court explained that in cases where the transitory nature of the conduct giving rise to the suit would effectively insulate defendants' conduct from review, certification could potentially "relate back" to the filing of the complaint. *Id.,* at 110, n. 11, 95 S.Ct. 854; *McLaughlin, supra,* at 52, 111 S.Ct. 1661. But this doctrine has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy.

*Genesis Healthcare*, 569 U.S. at 76–77; *see also Nielsen*, 586 U.S. at 403–404 (explaining, in a case with a class composed of noncitizens subject to detention, that because the "type of injury ends as soon as the decision on removal is made, it is transitory," and "the fact that the named plaintiffs obtained some relief before class certification does not moot their claims").

The court is persuaded that the claims at issue are of a similarly transitory nature as reflected in the above-cited authority. The claims relate to the treatment and conditions at the Baltimore Hold Rooms, a (relatively) short-term detention facility. This case bears favorable resemblance to the temporary pretrial detention hypothetical in *Genesis Healthcare*: the detention at the Baltimore Hold Rooms is likely to end (and indeed appears to have ended) prior to resolution of the claim for the named Plaintiffs. *See also Coreas*, 2020 WL 5593338, at *9 (holding that the petitioners claims were "inherently transitory because based on the nature of immigration proceedings," and that "their detention can suddenly end before a court can rule on a class certification motion"). In the absence of this recognized doctrine, such circumstances "would

effectively insulate [the Government's] conduct from review." *Genesis Healthcare*, 569 U.S. at 76. Further, in this circumstance, the Government is uniquely situated to "create 'a significant possibility that any single named plaintiff would be [dismissed] prior to certification.'"[11] *Jonathan R.*, 41 F.4th at 326. Like the circumstances in *Jonathan R.*, here, the length of detention is "exceedingly unpredictable," and "the duration of Plaintiffs' claims remains largely" at the Government's discretion. *Id.* (citation modified).

The Government's arguments that this exemption is inapplicable here are not compelling. As discussed above, the court is persuaded that the claims at issue are inherently transitory such that the relation back exception to mootness applies. Moreover, while the court appreciates that the Government contends that Plaintiffs fail to meet their burden as to the Rule 23(a) prerequisites, such arguments go to the merits of class certification, not whether the claims as pled are moot.[12]

---

[11] To be clear, the court does not find, nor do Plaintiffs contend, that the Government has intentionally rendered Plaintiffs' claims moot.

[12] The Government also relies upon the Supreme Court's decision in *Genesis Healthcare* to assert that "the relation back doctrine is 'explicitly limited to cases in which the named plaintiff's claim remains live at the time the district court [considers] class certification.'" (ECF No. 46 at p. 12) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74–75 (2013)). The portion of the decision the Government cites relates to "a separate, but related, line of cases" distinct from the line of cases addressing "inherently transitory" class action claims. *Genesis*, 569 U.S. at 75. In discussing the inherently transitory line of cases, the Court noted:

> The "inherently transitory" rationale was developed to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course. A plaintiff might seek, for instance, to bring a class action challenging the constitutionality of temporary pretrial detentions. In doing so, the named plaintiff would face the considerable challenge of preserving his individual claim from mootness, since pretrial custody likely would end prior to the resolution of his claim. See *Gerstein, supra*. To address this problem, the Court explained that in cases where the transitory nature of the conduct giving rise to the suit would effectively insulate defendants' conduct from review, certification could potentially "relate back" to the filing of the complaint. *Id.,* at 110, n. 11, 95 S.Ct. 854; *McLaughlin, supra,* at 52, 111 S.Ct. 1661. But this doctrine has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy. See, *e.g., Swisher v. Brady,* 438 U.S. 204, 214, n. 11, 98 S.Ct. 2699, 57 L.Ed.2d 705 (1978); *Spencer v. Kemna,* 523 U.S. 1, 17–18, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

*Id.* at 75–77. The court is not persuaded that *Genesis* supports a finding of mootness upon the facts here.

With respect to the Class Certification Motion, the court is satisfied that its subject matter jurisdiction is intact and not impaired by the mootness of Plaintiffs' individual claims.

## C. Rule 23(a) Factors

As explained *supra*, Plaintiffs bear the burden of proving that the requirements of Rule 23 are "*in fact*" met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (emphasis in original). Based upon the record before it, the court is not persuaded that burden has been met. There exist significant material deficiencies that, based on the court's requisite rigorous analysis, bar certification. The court addresses two such material deficiencies here.

### 1. Deficiency in Adequacy of Representation

First, Plaintiffs fail to satisfy the adequacy prong, meaning they have not proven they "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998). A class representative must "be of a character to vigorously pursue the case." *Monroe v. City of Charlottesville, Virginia*, 579 F.3d 380, 385 (4th Cir. 2009) (citing 7A *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure* § 1766 (3d ed. 2005)).

To determine whether a named plaintiff is an adequate representative, the court looks to "(1) whether the named plaintiffs . . . have any conflicts of interest with other class members; and (2) whether the named plaintiffs . . . will prosecute the action vigorously on behalf of the entire class." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 150 (D. Md. 2022), *vacated and remanded sub nom.*, 78 F.4th 677 (4th Cir. 2023), and *reinstated by*, 345 F.R.D. 137 (D. Md. 2023) (citation modified); *see Parker v. Asbestos Processing, LLC*, No. 0:11-CV-

01800-JFA, 2015 WL 127930, at *8 (D.S.C. Jan. 8, 2015) (same); *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007) (explaining that the adequacy inquiry "focuses on two questions"—"has plaintiff demonstrated the requisite level of knowledge and control of the litigation to ensure that he will vigorously prosecute the claims asserted here" and "has plaintiff demonstrated the requisite credibility to ensure that he will act as a fiduciary with respect to the class he seeks to represent").

The first prong concerns conflicts of interest. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594–95 (1997) (citing *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)). That is not of concern here; the court discerns no conflicts of interest between (or among) Plaintiffs and the class they seek to represent, nor does the Government contend any specific conflicts exist.[13]

The second prong requires the court to determine whether the named plaintiffs will vigorously prosecute this action on behalf of the class they seek to represent. While "the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative," *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003), where a named Plaintiff "lacks *any* understanding of the class representative's role in litigation, adequacy may not be satisfied." *Monroe v. City of Charlottesville, Virginia*, 579 F.3d 380, 385 (4th Cir. 2009) (emphasis in original). "Findings that a representative lacks sufficient interest, credibility, or either knowledge or an understanding of the case—although a knowledge or understanding of all the intricacies of the litigation is not required—are grounds for denying class certification." *Id.*

---

[13] To the extent the Government's adequacy challenges relate to typicality and commonality, the court considers such argument as it pertains to commonality.

Ultimately, the court must ensure (and be persuaded) that the named Plaintiffs "are not simply lending their names to a suit controlled entirely by the class attorney." *Id.* (citation omitted).

Comparative examples are helpful.  District courts have found the adequacy requirement satisfied where named plaintiffs showed they had "participated actively in this case by reviewing pleadings [and] responding to significant discovery," *In re Marriott*, 341 F.R.D. at 151; "participated in discovery," "asked appropriate questions," and testified at deposition about class representative responsibilities, *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *14 (E.D. Va. Mar. 1, 2017); sat for deposition and "expressed a clear understanding of the duties of a class representative and a willingness to perform the role," *Baugh v. The Fed. Sav. Bank*, No. CV SAG-17-1735, 2020 WL 7074589, at *2 (D. Md. Dec. 3, 2020); "explain[ed] the basic facts underlying the litigation, . . . described the harm she and other class members suffered," and explained the ways in which the class representative "does the heavy lift" for class members, *Edmondson v. Eagle Nationwide Mortg. Co.*, No. CV SAG-16-3938, 2024 WL 3029121, at *4 (D. Md. June 17, 2024); and demonstrated "[knowledge of] the basis of his claims," "discussed a previous motion to dismiss," "identified documents he produced for this case, among other things," and "sat for a deposition," *McDonald v. Lab'y Corp. of Am. Holdings*, No. 1:22CV680, 2024 WL 4513580, at *5 (M.D.N.C. Oct. 17, 2024).

The court turns to the record before it.  There is no evidence before the court that Plaintiffs know or understand the claims asserted, that they have reviewed any pleadings, that they are familiar with the motions that have been filed that bear upon or pertain to the class, that they have any awareness of the conditions of the Baltimore Hold Rooms since their departure months ago (at which point some of their claims were mooted), or that they have any understanding of the duties of a class representative.  The only evidence in the record upon which this court is asked to

rest its conclusion that Plaintiffs are adequate representatives is their identical (and rather rote) attestation: "I understand that this lawsuit is brought by myself and another person on behalf of all the people who are currently detained or will be detained in the future in the Baltimore Holding Rooms. I intend to represent these people and accept my responsibilities as a class representative." (ECF Nos. 31-1, 31-3 ¶ 3.)

Although the adequacy hurdle is not particularly challenging to clear, *see Gunnells*, 348 F.3d at 430, *supra*, Plaintiffs have not satisfied it here. Their conclusory assertions provide no basis upon which the court can reasonably conclude that they possess any understanding of what class representative responsibilities are or what representation entails. The assertions provide no foundation on which this court can conclude that Plaintiffs are "not simply lending [their] name to a suit controlled entirely by the class attorney." *Monroe*, 579 F.3d at 385, *supra*. To be clear, the court makes no finding that, in fact, that is what has happened here. It may well be that Plaintiffs have thoughtfully considered their roles as class representatives and understand their associated duties. The issue, however, is that Plaintiffs fail to put anything in front of the court on this point. As a result, Plaintiffs have not met their burden.[14]

---

[14] Plaintiffs' failure to produce any evidence in support of adequacy is further concerning where the Government raised this precise concern in its opposition, stating "the record does not demonstrate Plaintiffs fully comprehend their representational responsibilities," and that "[Plaintiffs'] declarations demonstrate no understanding of their role[s] and responsibilities as class representatives." (ECF No. 46 at p. 21.) Plaintiffs' response misses the mark and misapprehends the gravity entirely. Instead of shoring up their record, they dispense with the matter in a conclusory footnote: "the named Plaintiffs clearly understand their responsibilities as evidenced by their agreement to testify at the forthcoming hearing on this motion and the motion for preliminary injunction. And the Court is welcome to probe their understanding at that time." (ECF No. 63 at p. 13 n.10.) Plaintiffs bear the burden of demonstrating each Rule 23(a) factor; and they failed to request a hearing on the Class Certification Motion (content to rest on their papers). The Class Certification Motion is now fully briefed. While the court advised counsel (during the last status conference) they should be prepared to be heard on the Class Certification Motion at the upcoming hearing, the hearing on the PI Motion has never been designated as an evidentiary hearing on the Class Certification Motion. Nor have the parties proceeded as if that were the case.

### 2. *Deficiency in Commonality*

Even absent consideration of the adequacy concerns noted above, additional material deficiencies exist as to commonality.  To satisfy the commonality requirement, there must be "questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original) (citation omitted).  Common answers may be impeded by "[d]issimilarities within the proposed class."  *Id.*  While "[a] single common question will suffice, . . . it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (quoting *Wal-Mart*, 564 U.S. at 350, 359).  "A question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citation omitted).

Commonality requires that class members "have suffered the same injury"; however, it is insufficient to assert merely that "they have all suffered a violation of the same provision of law."  *Wal-Mart*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  By way of example, the Supreme Court in *Wal-Mart* pointed to Title VII of the Civil Rights Act of 1964 ("Title VII").  Title VII, the Court explained, "can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact . . . ."  *Id.* at 350.  Thus, "the mere claim by employees of the same company that they have suffered a Title VII injury . . . gives no cause to believe that all their claims can productively be litigated at once."  *Id*.  Instead, the "claims must depend upon a common contention," one of "such a nature

that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 349–50.

Plaintiffs aver "a common core of material facts," "common policies and practices at the Baltimore Hold Rooms," and the following common questions of law:

> Whether Defendants' practices of failing to provide detained people with beds or adequate bedding; overcrowding holding cells; and illuminating the cells around the clock—which alone or in combination interfere with Plaintiffs' and putative Class members' ability to sleep—violate the Due Process Clause of the Fifth Amendment and/or the Administrative Procedures Act?

> Whether Defendants' practices of overcrowding the holding cells; and failing to provide detained people with toothbrushes or toothpaste, or with soap, showers, or with clean clothes or access to laundry—which alone or in combination deprive Plaintiffs and putative Class members of shelter that satisfies safety and sanitation standards—violate the Due Process Clause of the Fifth Amendment and/or the Administrative Procedure Act?

> Whether Defendants' practices of failing to provide for adequate medical care and consistent administration of prescription drugs to detained people deprive Plaintiffs and putative Class members of a safe and healthy environment in violation of the Due Process Clause of the Fifth Amendment and/or the Administrative Procedure Act?

> Whether Defendants' practices of providing insufficient quantities of food and insufficient drinking water deprive Plaintiffs and putative Class members of adequate food and water in violation of the Due Process Clause of the Fifth Amendment and/or the Administrative Procedure Act?

> Whether Defendants' failure to enforce the ICE Hold Room Policy and their practice of consistently detaining Plaintiffs and putative Class members in the Baltimore Hold Rooms for periods exceeding 12 hours, as well as denying medical care, and adequate water and meals, violates Section 706 of the Administrative Procedure Act and/or the Due Process Clause of the Fifth Amendment?

(ECF No. 31-1 at pp. 13–14.)

Assuming without deciding that a common question exists as to Counts I and II, which allege violation of the APA and Fifth Amendment by the Government's waiver of the 12-hour hold room utilization time at the Baltimore Field Office, that common question does not extend to the remaining claims based upon conditions of confinement (Counts III through VI) (and not the waiver).[15]

Following the example of *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), Plaintiffs assert common practices in support of their APA and Fifth Amendment claims regarding the Baltimore Hold Rooms,).[16] The court is not persuaded that saves the day here. In *Parsons*, the Ninth Circuit, Plaintiffs argue, rejected an argument akin to the Government's here that "Eighth Amendment healthcare and conditions-of-confinement claims are inherently case specific and turn on many individual inquiries," explaining that such a view "rests . . . on a fundamental misunderstanding of *Wal-Mart,* Eighth Amendment doctrine, and the plaintiffs' constitutional claims."[17] *Id.* at 676. The Ninth Circuit explained that the focus of the claims was not insufficient care on any particular occasion, but rather that policies and practices "of statewide and systemic application [that] expose all individuals in custody to a substantial risk of serious harm." *Id.*

Importantly, the Fourth Circuit has cautioned:

> Allegations of generalized policies are not usually sufficient for the
> purposes of class certification. Appellate courts are skeptical, for

---

[15] The court acknowledges that Count VII, which concerns access to counsel, is perhaps an outlier in comparison to traditional conditions of confinement claims, but it suffers the same defects as the others, so the court considers them together.

[16] Briefly, Plaintiffs' reliance on detention related claims arising from the COVID-19 pandemic are not particularly persuasive in the court's consideration of commonality, as many have more narrowly drawn classes than the one proposed here, *see, e.g.*, *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *2 (D. Md. Sept. 18, 2020) ("[a]ll persons who are or will in the future be held in ICE detention in Maryland who are age 50 or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19"); and the common contention in *Coreas* rested on health and safety risks amidst the COVID-19 pandemic.

[17] Further of note, in *Parsons v. Ryan*, the certified class and subclass, while certainly larger, were more narrowly drawn and specific in scope than the class proposed here—"[a]ll prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC," and [a]ll prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in [certain housing units]." 754 F.3d 657, 672 (9th Cir. 2014).

instance, when plaintiffs or district courts rely on nebulous references to "systemic failures" or "systemic deficiencies" to satisfy commonality. *See, e.g., J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 842 (5th Cir. 2012). Such vagueness may mask a multitude of disparities. Plaintiffs may invoke overly general policies precisely because "they are at a loss for a more specific thread to tie claims together." *In re White*, 64 F.4th 302, 314 (D.C. Cir. 2023). Indeed, it is circular logic for plaintiffs to create a laundry list of factually diverse claims and then assert that these claims, in turn, prove the existence of a uniform company policy. We endeavor to ensure that commonality is not based on such "semantic dexterity." *Brown*, 785 F.3d at 909.

"Rule 23 does not allow for [ ] a 30,000 foot view of commonality," *In re White*, 64 F.4th at 314, and courts have the obligation to "examine whether differences between class members impede the discovery of common answers," *Brown*, 785 F.3d at 909; *see also Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541 ("[P]laintiff[s] [must] demonstrate that the class members 'have suffered the same injury'"). Here it is unclear from the district court's analysis that the many types of claims plaintiffs advance can be united by a common question of liability. The district court pointed to no specific documentation or concrete evidence narrowing the broad theoretical policy by which [the defendant] allegedly mandated all different forms of off-the-clock work and time-shaving.

*Stafford*, 123 F.4th at 680 (citation modified).

Not only is *Stafford* controlling law, the facts and analysis at issue there are simply more on par with the circumstances at issue here, especially against the backdrop of the Court's holding in *Wal-Mart*.[18]  The court is not persuaded that Plaintiffs' repeated assertions of practices at the Baltimore Hold Rooms are sufficient to satisfy commonality, notwithstanding the Ninth Circuit's holding in *Parsons*.

First, here, unlike in *Parsons*, Plaintiffs' claims assert myriad forms of conduct and purported practices, supported by declarations describing both common and unique experiences,

---

[18] The court acknowledges *Stafford* pertained to a labor class, and that the proposed class and claims here resemble those in *Parsons*; nonetheless, for the reasons set forth herein, the court finds *Stafford* squarely on point and that Plaintiffs fail, in any event, to present evidence of the nature and scope the *Parsons* court had before it.

most of which are from months prior to initiation of this action.  The asserted overarching practices do not all fall under the general category of medical care, for example, as was the case in *Parsons*;[19] they instead span practices related to medical care, access to counsel, sanitation, sleeping conditions, and provision of food and water.  Moreover, some the purported unconstitutional practices did not affect those detained (*e.g.*, some individuals complained of crowding while others did not experience this condition). Plaintiffs' claims span many conditions flowing from various asserted policies, as opposed to conditions related to a specific need or harm, and specific (and common) policies related thereto.  To the court, this suggests Plaintiffs' assertion of broad policies or practices is more akin to the "generalized policies" and "nebulous references to 'systemic failures' or 'systemic deficiencies" in *Stafford.  See* 123 F.4th at 680, *supra*.

Finally, and crucially, the *Parsons* court had far greater evidence with which it could assure itself that the "policies and practices . . . [were] defined with sufficient precision and specificity." 754 F.3d at 683.  The common contention rested on their "alleged exposure, as a result of specified statewide [] policies and practices that govern the overall conditions." *Id.*  The evidence here does not support a similar finding.  Rather, the record before the court is insufficient to transcend beyond generalized assertions of failures and deficiencies, or even a general exercise of discretion resulting in the harm alleged in the Baltimore Hold Rooms.  *See Stafford*, 123 F.4th at 680 and *Wal-Mart*, 564 U.S. at 356, *supra*; *see also Parsons*, 754 F.3d at 663 (noting that plaintiffs supported "general allegations" of systematic Eighth Amendment violations with "detailed references to nearly a dozen specific [] policies and practices, including inadequate staffing, outright denials of care, lack of emergency treatment, failure to stock and provide critical medication, grossly substandard dental care, and failure to provide therapy and psychiatric medication to mentally ill inmates").

---

[19] The *Parsons* plaintiffs also had a discrete subclass for isolation-related violations.

27

While evidence may come to light to aid Plaintiffs in their efforts to identify overarching practices with specificity, at this moment, the court has too sparse a foundation upon which to find the existence of same, especially for the range of claims asserted.  The breadth of this action—a broad class bringing a wide swath of myriad conditions-related claims—coupled with minimal foundation on which to allege specific, uniform practices that affect, or pose the same risk to, all, fails to satisfy Rule 23 commonality.  Certification of the class for all asserted class claims would "risk[] including individuals who would not have a right to recovery but for the sweeping scope of the class certification itself."  *Stafford*, 123 F.4th at 681 (citing *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)).  In so concluding, the court does not find that class claims pertaining to overarching practices are impermissible as a matter of law, but rather Plaintiffs have failed to draw their proposed class and its claims satisfactorily.

In view of the material deficiencies as to adequacy and commonality, the court will deny the Class Certification Motion.

## III.    <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Also pending before the court is Plaintiffs' PI Motion.  The Government argues that the court cannot enter a preliminary injunction here where the Plaintiffs' claims at issue are moot. Plaintiffs contend in response that the mootness of their individual claims is "irrelevant" because the PI Motion seeks only class-wide relief.  Because the issue of mootness is dispositive here, the court limits its discussion to this question.

As discussed above, this court "lack[s] jurisdiction to decide moot cases because [its] constitutional authority extends only to actual cases or controversies."  *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (quoting *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)).  The mootness doctrine "constitutes a part of the constitutional limits of federal court jurisdiction."

*Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)).  "A case or controversy dissipates when it becomes moot; that is 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Lancaster v. Sec'y of Navy*, 109 F.4th 283, 288–89 (4th Cir. 2024) (quoting *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013)).

A claim "can become moot either due to a change in factual circumstances, or due to a change in the law." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (quoting *BankWest, Inc., v. Baker,* 446 F.3d 1358, 1364 (11th Cir. 2006)).  "Generally speaking, one such [factual] circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim." *Id.* (quoting *Friedman's, Inc. v. Dunlap,* 290 F.3d 191, 197 (4th Cir. 2002)).

There is no dispute here that Plaintiffs' individual claims at issue in the PI Motion (Counts I through VII) are moot based on their transfer out of the Baltimore Hold Rooms.  (ECF No. 56 at p. 4.)  There is no indication or apparent likelihood that they will be returned to the Baltimore Hold Rooms.  In view of the fact that their individual claims at issue in the PI Motion are moot, as well as the court's concurrent denial of the Class Certification Motion, there is no live issue presented by the PI Motion.  The court therefore must deny the PI Motion as moot.

In so holding, the court makes no finding as to the merits of the PI Motion.

## IV.    CONCLUSION

For the reasons set forth herein, the Class Certification Motion (ECF No. 31) will be denied, and the PI Motion (ECF No. 36) will be denied as moot.

The court very much understands and appreciates that the parties have been working diligently to prepare for the scheduled hearing on the PI Motion.  It serves no one, however—not

Plaintiffs, not the Government, not counsel, and not this court—to convene what is sure to be a long, challenging, and expensive hearing where the court has (days before the hearing is to begin) determined that the class certification standard has not been met, given the effect of same on the requested preliminary injunctive relief.  Therefore, the hearing shall be canceled, and the parties shall confer and within seven days submit three agreed-upon dates/time for an in-person, on-the-record status conference.  To ensure the parties have sufficient time to review this order and prepare for the upcoming status conference, all pending deadlines shall be held in abeyance pending further order of this court.


July 25, 2025                                                   /S/
                                                   _____
                                                   Julie R. Rubin
                                                   United States District Judge