**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| D.N.N. *and* V.R.G., *on behalf themselves and all others similarly situated*, | |
| *Petitioners-Plaintiffs*, | **MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION** |
| v. | |
| JEREMY BACON, *et al.,* | Civil Action No.: 1:25-cv-01613 |
| *Respondents-Defendants*. | |

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ............................................................................................3

I.   ICE's Standards and Policies for Detention Facilities and Enforcement and
     Removal Operations ("ERO") Hold Rooms ...........................................................3

II.  Defendants' Decision to Waive the Hold Room Policy and Operate the
     Hold Rooms as a Residential Facility......................................................................5

III. 2025 Baltimore Hold Room Conditions ..................................................................6

     A.   Crowding and Sanitation.................................................................................6

     B.   Access to Medical Care and Medication .......................................................10

IV.  Representative Plaintiffs........................................................................................15

CLASS CERTIFICATION ARGUMENT ......................................................................15

LEGAL STANDARD.......................................................................................................17

I.   Rule 23(a) Requirements for Class Certification Have Been Satisfied ...........17

     A.   The Proposed Class Is So Numerous That Joinder Is Impracticable .................17

     B.   The Class Presents Common Questions of Law and Fact ...................................19

     C.   The Claims of the Named Plaintiffs are Typical of the Claims of
          the  Members of the Proposed Class..................................................................23

     D.   The Named Plaintiffs Will Adequately Protect the Interests of the
          Proposed Class and Their Counsel are Qualified ................................................25

II.  The Rule 23(b) Requirements for Class Certification Have Been Satisfied....................26

III. Plaintiffs' Transfer from the Baltimore Hold Rooms is Irrelevant................................28

PRELIMINARY INJUNCTION ARGUMENT........................................................................28

LEGAL STANDARD....................................................................................................28

IV.  Plaintiffs are Likely to Succeed on the Merits of their Fifth Amendment
     Punitive Conditions Claims (Counts IV–V). ...................................................29

     A.   Defendants Deprive Putative Class Members of Hygienic,
          Sanitary, and Safe Conditions in Violation of the Fifth Amendment
          (Count IV). ...........................................................................................30

     B.   Defendants Deprive Putative Class Members of Adequate Medical
          Care in Violation of the Fifth Amendment (Count V).....................................35

V.      PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY TO
        PREVENT IRREPARABLE HARM TO THE PLAINTIFFS ....................................43

VI.     BOTH THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES
        WEIGHS IN FAVOR OF GRANTING PRELIMINARY INJUNCTIVE
        RELIEF ..............................................................................................................43

VII.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR
        REQUIRE PLAINTIFFS TO PROVIDE A NOMINAL SECURITY ..........................44

CONCLUSION.................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
No. 25-cv-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) ....................................................44

*Amica Center for Immigrant Rights et al v. ICE*,
1:25-cv-2386 (D. Md. 2025) .........................................................................................................7

*Awalt v. Marketti*,
74 F. Supp. 3d 909 (N.D. Ill. 2014) ...........................................................................................40

*Bell v. Wolfish*,
441 U.S. 520 (1979)...............................................................................................................28, 31

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) .......................................................................................................27

*Blackmore v. Kalamazoo Cnty.*,
390 F.3d 890 (6th Cir. 2004) .................................................................................................38, 41

*Campbell v. Cauthron*,
623 F.2d 503 (8th Cir. 1980) .......................................................................................................31

*Carver v. Knox Cnty., Tenn.*,
753 F. Supp. 1370 (E.D. Tenn. 1989)..........................................................................................36

*CASA, Inc. v. Trump*,
793 F. Supp. 3d 703 (D. Md. 2025).............................................................................................25

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) .......................................................................................................43

*City of Canton, Ohio v. Harris*,
489 U.S. 378 (1989).....................................................................................................................38

*Clark v. Daddysman*,
No. 16-cv-0921, 2018 WL 1453333 (D. Md. Mar. 22, 2018) .....................................................34

*Clarke v. U.S. DHS*,
No. 25-CV-6773, 2025 WL 3674471 (E.D.N.Y. Dec. 18, 2025)..................................................3

*ClearOne Advantage, LLC v. Kersen*,
710 F. Supp. 3d 425 (D. Md. 2024).............................................................................................29

*Colon v. Passaic Cnty*,
   No. No. 08-cv-4439 DM, 2009 WL 1560156 (D.N.J. May 27, 2009) ....................................19

*Connor v. Md. Dep't of Health*,
   No. 24-cv-1423, 2025 WL 1167846 (D. Md. Apr. 22, 2025)..................................................23

C*oreas v. Bounds*,
   451 F. Supp. 3d 407 (D. Md. 2020) ......................................................................................29

*Coreas v. Bounds*,
   No. 20-cv-0780, 20-cv-1304, 2020 WL 5593338 (D. Md. Sept. 18, 2020) .................... *passim*

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*,
   375 F.2d 648 (4th Cir. 1967) ................................................................................................17

*Dawson v. Kendrick*,
   527 F. Supp. 1252 (S.D. W. Va. 1981)..............................................................................36, 39

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ................................................................................................23

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989)..............................................................................................................30

*Doe v. Lally*,
   467 F. Supp. 1339 (D. Md. 1979)..........................................................................................16

*EQT Prod. Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ................................................................................................26

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
   No. CV 25-3417 (BAH), 2025 WL 3465518 (D.D.C. Dec. 2, 2025)....................................16

*Est. of Funabiki by & through Funabiki v. Cnty. of Whitman*,
   No. 2:21-cv-00089, 2024 WL 4425682 (E.D. Wash. Oct. 5, 2024)......................................36

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..............................................................................................................22

*Ferguson v. Cape Girardeau Cnty.*,
   88 F.3d 647 (8th Cir. 1996) ..................................................................................................31

*Fox ex rel. Fox v. Peters*,
   No. 09 C 5453, 2011 WL 6378826 (N.D. Ill. Dec. 19, 2011) ..............................................41

*G.G. ex rel. Grimm v. Gloucster Cnty. School Bd.*,
   822 F.3d 709 (4th Cir. 2016) ................................................................................................29

iv

*G.T. v. Bd. of Educ. of Cnty. of Kanawha,*
    117 F.4th 193 (4th Cir. 2024) ................................................................19

*Gahr v. Marion Cnty.,*
    No. 6:22-CV-01188, 2025 WL 835648 (D. Or. Mar. 17, 2025).............................39

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982)............................................................................26

*Genesis Healthcare Corp. v. Symczyk,*
    569 U.S. 66 (2013)..............................................................................28

*Ginest v. Bd. of Cnty. Comm'rs. of Carbon Cnty.,*
    333 F. Supp. 2d 1190 (D. Wyo. 2004)......................................................41

*Glomski v. Cnty. of Oakland,*
    No. 05-70503, 2007 WL 925681 (E.D. Mich. Mar. 28, 2007)..............................38

*Gonzalez v. Noem,*
    No. 25-cv-13323, 2025 WL 3170784 (N.D. Ill. Nov. 5, 2025) ...............................3

*Gonzalez* v. *Noem,*
    No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) ..................................... *passim*

*Gordon v. Cnty. of Orange,*
    6 F.4th 961 (9th Cir. 2021) ..................................................................36

*Greer v. Cnty. of San Diego,*
    726 F. Supp. 3d 1058 (S.D. Cal. 2023)......................................................40

*Gunnells v. Healthplan Servs., Inc.,*
    348 F.3d 417 (4th Cir. 2003) ................................................................25

*Hernandez v. Cnty. of Monterey,*
    No. 5:13-cv-2354-PSG, 2015 WL 399975 (N.D. Cal. Jan. 29, 2015)....................20

*Heyer v. United States Bureau of Prisons,*
    849 F.3d 202 (4th Cir. 2017) ................................................................29

*Hill v. Nicodemus,*
    979 F.2d 987 (4th Cir. 1992) ................................................................28

*Hubbard v. Taylor,*
    538 F.3d 229 (3d Cir. 2008)..................................................................31

*In re Titanium Dioxide Antitrust Litig.,*
    284 F.R.D. 328 (D. Md. 2012)................................................................17

v

*In re Under Armour Sec. Litig.*,
  631 F. Supp. 3d 285 (D. Md. 2022).................................................................................18

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  7 F.4th 227 (4th Cir. 2021) ............................................................................................17

*J.D. v. Azar*,
  925 F.3d 1291 (D.C. Cir. 2019).....................................................................................23

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
  338 F.R.D. 33 (D. Md. 2020)..........................................................................................23

*Jonathan R. by Dixon v. Just.*,
  41 F.4th 316 (4th Cir. 2022)..........................................................................................28

*Jones v. Murphy*,
  256 F.R.D. 519 (D. Md. 2009)........................................................................................16

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) .......................................................................................17

*Karn v. PTS of Am., LLC*,
  590 F. Supp. 3d 780 (D. Md. 2022) ..........................................................................30, 34

*L.G.M.L. v. Noem*,
  No. 25-cv-2942, 2025 WL 2671690 (D.D.C. Sept. 18, 2025)....................................16

*Lacy v. Cook Cnty., Illinois*,
  897 F.3d 847 (7th Cir. 2018) .........................................................................................16

*Lareau v. Manson*,
  651 F.2d 96 (2d Cir. 1981).........................................................................................31, 36

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ............................................................................................43

*League of Women Voters of N. Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .....................................................................................28, 29

*Lloyd v. Gen. Motors Corp.*,
  266 F.R.D. 98 (D. Md. 2010)..........................................................................................26

*Lopez v. Nevada ex rel. Nevada Dep't of Corr.*,
  No. 2:21-cv-01161, 2023 WL 6383616 (D. Nev. Sept. 29, 2023)..........................36

*M.H. v. Cnty. of Alameda*,
  62 F. Supp. 3d 1049 (N.D. Cal. 2014) ..........................................................................36

*Martin v. Gentile,*
    849 F.2d 863 (4th Cir. 1988) ........................................................................35

*Martino v. Carey,*
    563 F. Supp. 984 (D. Or. 1983) ...................................................................36

*Maryland v. United States Dep't of Agric.,*
    No. 25-cv-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025) ......................44

*Menocal v. GEO Grp., Inc.,*
    882 F.3d 905 (10th Cir. 2018) .....................................................................16

*Mercado* v. *Noem,*
    No. 25-cv-6568, 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) .................... *passim*

*Mondragon v. Scott Farms, Inc.,*
    No. 5:17-cv-356, 2019 WL 6125928 (E.D.N.C. Nov. 18, 2019) ................18

*Monroe* v. *City of Charlottesville, Virginia,*
    579 F.3d 380 (4th Cir. 2009) ......................................................................25

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    767 F. Supp. 3d 243 (D. Md. 2025) ............................................................44

*Nken v. Holder,*
    556 U.S. 418 (2009)....................................................................................29

*Owino v. CoreCivic, Inc.,*
    60 F.4th 437 (9th Cir. 2022) .......................................................................16

*Pablo Sequen, v. Albarran,*
    No. 25-cv-06487, 2025 WL 3283283 (N.D. Cal. Nov. 25, 2025) ................. *passim*

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014), *reh'g denied*, 784 F.3d 571 (9th Cir. 2015)
    ...........................................................................................................16, 19, 22, 24

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013) ......................................................................44

*Pederson v. La. State Univ.,*
    213 F.3d 858 (5th Cir. 2000) ......................................................................18

*PFLAG, Inc. v. Trump, et al.,*
    No. 25-337, 2025 WL 510050 (D. Md. Feb. 14, 2025).............................29

*Postawko v. Mo. Dep't of Corr.,*
    910 F.3d 1030 (8th Cir. 2018) .............................................................19, 24

*Quadrelli v. Moniz*,
  No. 20-cv-10685, 2020 WL 3051778 (D. Mass. June 8, 2020)........................................19, 24

*Reese v. Bounds*,
  No. 20-cv-3080, 2021 WL 849108 (D. Md. Mar. 5, 2021) .......................................................35

*Rodriguez Guerra v. Perry*,
  1:23-cv-1151, 2024 WL 3581226 (E.D. Va. Apr. 26, 2024).....................................................18

*Sanchez v. McAleenan*,
  No. 19-cv-1728, 2020 WL 5849491 (D. Md. Sept. 30, 2020)...................................................23

*Sanchez v. Young Cnty.*,
  Texas, 956 F.3d 785 (5th Cir. 2020)........................................................................................36

*Savino v. Souza*,
  453 F. Supp. 3d 441 (D. Mass. 2020) ................................................................................20, 27

*Scott v. Clarke*,
  61 F. Supp. 3d 569 (W.D. Va. 2014) ........................................................................................18

*Short v. Hartman*,
  87 F.4th 593 (4th Cir. 2023) .............................................................................................30, 35

*Stafford v. Bojangles' Restaurants, Inc*,
  123 F.4th 671 (4th Cir. 2024) ..........................................................................................16, 20

*Thornhill v. Breazeale*,
  88 F. Supp. 2d 647 (S.D. Miss. 2000).......................................................................................41

*Tillery v. Owens*,
  719 F. Supp. 1256 (W.D. Pa. 1989)..........................................................................................40

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...............................................................................19, 21, 26, 27

*Walker v. S. Health Partners*,
  576 F. Supp. 3d 516 (E.D. Ky. 2021) .................................................................................38, 41

*Walker v. Schult*,
  717 F.3d 119 (2d Cir. 2013)......................................................................................................33

*Wallace v. Hounshel*,
  No. 1:06-cv-1560, 2009 WL 734714 (S.D. Ind. Mar. 19, 2009) .............................................38

*Ward v. Dixie Nat. Life Ins. Co.*,
  595 F.3d 164 (4th Cir. 2010) ....................................................................................................25

viii

*Whitehurst v. Lackawanna Cnty.,*
  No. 3:17-CV-00903, 2020 WL 6106616 (M.D. Pa. Mar. 5, 2020) ...................................38, 41

*Wiertella v. Lake Cnty.,*
  Ohio, 141 F.4th 775 (6th Cir. 2025) .......................................................................................39

*Williams v. City of Philadelphia,*
  270 F.R.D. 208 (E.D. Pa. 2010)...............................................................................................22

*Williams v. Griffin,*
  952 F.2d 820 (4th Cir. 1991) ...................................................................................................34

*Williamson v. Stirling,*
  912 F.3d 154 (4th Cir. 2018) .............................................................................................28, 30

*Wilson v. Seiter,*
  501 U.S. 294 (1991)..................................................................................................................33

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)......................................................................................................................29

*Youngberg v. Romeo,*
  457 U.S. 307 (1982)..................................................................................................................29

*Zadvydas v. Davis,*
  533 U.S. 678 (2001)..................................................................................................................29

*Zepeda Rivas v. Jennings,*
  445 F. Supp. 3d 36 (N.D. Cal. 2020) .......................................................................................20

*Zolnowski v. Cnty. of Erie,*
  944 F. Supp. 1096 (W.D.N.Y. 1996)..................................................................................31, 33

**Rules**

Fed. R. Civ. P. 23(a)(1)...............................................................................................................17

Fed. R. Civ. P. 23(a)(2)...............................................................................................................19

Fed. R. Civ. P. 23(a)(3)..........................................................................................................23, 24

Fed. R. Civ. P. 23(a)(4)...............................................................................................................25

Fed. R. Civ. P. 23(b) ...............................................................................................................17, 26

Fed. R. Civ. P. 23(b)(2)...............................................................................................17, 19, 26, 27

Fed. R. Civ. P. 65.........................................................................................................................28

Fed. R. Civ. P. 65(c) ....................................................................................................................44

**Other Authorities**

The Common-Question Requirement Post Wal-Mart, 7A Fed. Prac. & Proc. Civ.
     § 1763.1 (4th ed.) .................................................................................................................19

x

## **INTRODUCTION**

On February 9, 2025, the Acting Field Officer Director for the Baltimore Hold Rooms ("BHR") wrote to U.S. Immigration and Customs Enforcement ("ICE") to "formally request the provision of medical personnel" in response to an "increasing number of arrest cases presenting medical concerns." Ex. 1.[1] The BHR—which is designed to hold people for under 12 hours—was exceeding its "maximum capacity [of] 56 individuals," and taking "two or more days" to transfer people to long-term facilities. *Id*. As a result, ICE "urgently requires assistance in administering medications, conducting vital checks, and assessing whether individuals need to be transported to the hospital. **The absence of medical staff to provide this support could potentially lead to liability issues or, in the worst-case scenario, fatalities.**" *Id*. at 2 (emphasis added).

Since February 2025, the known risk of fatalities has radically increased. Defendants never provided the requested medical staff and instead adopted an **unwritten** policy increasing the BHR's "maximum capacity" to 135 people. Defendants pack upwards of 40 people into cells as small as 480 square feet, where detained individuals are (i) forced to share a single open toilet; (ii) denied access to fresh air, exercise, or reading materials; (iii) unable to tell what time or day it is, and (iv) deprived of adequate sleeping conditions. Defendants have held hundreds of people for periods exceeding 72 hours, and some for as long as ten days.

Defendants' medical policies expose everyone in the BHR to serious risk of harm and death. The BHR has no doctors, nurses, or health professionals of any kind. ICE does not conduct medical screening, and none of their officers are trained to identify medical or mental health issues, provide medical assistance, or administer medication. Remarkably, there are **no written policies of any kind** governing how the facility provides access to medical care or medication.

---

[1] All exhibits are attached to the declaration of Jared A. Levine, dated December 23, 2025.

Plaintiffs first moved for class certification and a preliminary injunction in June 2025. After this Court denied those motions without prejudice on July 25, 2025 (ECF No. 74), Plaintiffs engaged in expedited discovery, including the deposition of Assistant Field Office Director Jose Guerrero, who had primary responsibility for overseeing the care of individuals detained at the BHR from May 2025 to November 2025. Through discovery, Plaintiffs have identified the discrete policies that have led to dangerous and unconstitutional conditions in the BHR.

As to overcrowding at the BHR, Defendants have: (1) not adopted any written policy limiting the number of people detained at the BHR; (2) adopted an unwritten policy increasing detention capacity from 56 to 135 people; (3) adopted an unwritten policy limiting "large" hold rooms (420 sq. ft. to 559 sq. ft) to 35 people and small hold rooms (126 sq. ft. to 128 sq. ft.) to 15 people; and (4) failed to adopt any compliance mechanism to enforce even these unwritten policies, resulting in the detained population of the "large cells" regularly exceeding 35 people.

As to medical care at the BHR, Defendants: (1) have not adopted any written policies concerning medical care or medication; (2) do not conduct medical screening, and instead have officers with no relevant training conduct a cursory intake process without using a medical questionnaire, checking vitals, or screening for infectious diseases; (3) do not train any officers to administer medication or identify mental or physical health issues; and (4) do not have any way to obtain medication for detained individuals, do not have any healthcare professionals at the facility, and routinely fail to provide timely access to medication and medical care.

In addition to evidence obtained in discovery, Plaintiffs submit declarations from recently detained individuals attesting to the increasingly inhumane and dangerous conditions resulting from these policies. *See* Exs. 8–13. To further facilitate the Court's assessment of Defendants' policies and practices, Plaintiffs are also submitting expert declarations from: (1) Dr. Joe

2

Goldenson, a correctional medicine expert, who has concluded that Defendants' medical policies "present[] a serious risk of harm to detained individuals and staff," (Ex. 3 at ¶ 32); and (2) Dr. Graeme Blair, a social scientist with expertise in data analysis who has analyzed Defendants' detention data. Ex. 4.

Finally, in recent months, three separate courts have certified classes of detained individuals in other ICE ERO holding facilities—the same type of facilities as the BHR—and issued orders enjoining materially identical conditions of confinement: (1) *Gonzalez* v. *Noem*, No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) ("Chicago ICE Litigation") (certifying class) and 2025 WL 3170784, at *2 (N.D. Ill. Nov. 5, 2025) (granting TRO); (2) *Mercado* v. *Noem*, No. 25-cv-6568, 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025) ("NY ICE Litigation") (granting preliminary injunction and provisionally certifying class); and (3) *Pablo Sequen, v. Albarran*, No. 25-cv-06487, 2025 WL 3283283 (N.D. Cal. Nov. 25, 2025) ("SF ICE Litigation") (granting preliminary injunction and provisionally certifying class).

As yet another judge concluded last week, "ICE has been deploying its 'holding rooms' in a manner that shocks the conscience" and "[t]hese revelations of abysmal, unlawful treatment come at the end of a year in which ICE reported the death of 25 detainees held in its custody." *Clarke v. U.S. DHS*, No. 25-CV-6773, 2025 WL 3674471, at *7 (E.D.N.Y. Dec. 18, 2025). In the absence of this Court's intervention, Defendants will continue to expose thousands of people to a serious risk of trauma, injury, and "in the worst-case scenario, fatalities." Ex. 1.

## **FACTUAL BACKGROUND**

I.      **ICE's Standards and Policies for Detention Facilities and Enforcement and Removal Operations ("ERO") Hold Rooms**

The Department of Homeland Security ("DHS") and ICE oversee an extensive network

3

of civil detention facilities throughout the country. The vast majority[2] of these facilities are governed by ICE's 475-page Performance-Based National Detention Standards ("PBNDS"), which contain *highly* detailed standards and requirements for ensuring that individuals are detained in "the most humane manner possible with a focus on providing sound conditions and care." Ex. 5 at i. These standards apply to, among others, "[s]tate or local government facilities used by ERO . . . to hold detainees for more than 72 hours." *Id*. at 1. They do not apply, however, to holding cells that, like the BHR, are located inside ERO's own facilities.

Instead, ERO's own holding facilities are governed by Directive 11087.2, "Operations of ERO Holding Facilities" (the "Hold Room Policy") (ECF No. 1-8). In contrast to the PBNDS, the Hold Room Policy is a cursory 15-page document with more limited directives focused on "supervision and monitoring, detainee placement and searches, sexual abuse prevention and reporting[.]" *Id*. § 1.1. The absence of detailed guidance on issues like food and medical care is consistent with the defined purpose of hold rooms, which is short-term confinement with "***not to exceed*** 12 hours, absent exceptional circumstances." *Id*., § 3.2 n.3 (emphasis added). The Hold Room Policy contains only the following superficial medical care directives:

- "Ensur[e] that detainees are properly screened so that those with serious mental health disorders or conditions are expeditiously identified and those who exhibit signs of acute mental health distress are referred to mental health professionals[.]" *Id*. § 4.3.1

- "Monitor detainees for any apparent indications of a mental or physical health condition or signs of hostility, self-harm, or harm to others[.]" *Id*. § 5.1.2

- "Allow detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary." *Id*. § 5.7.2

- "Be aware of the location of emergency medical supplies and equipment" and "[r]espond immediately to observed or reported medical emergencies and contact local emergency

---

[2] State and local facilities that are not dedicated to detaining noncitizens are governed by ICE's 226-page National Detention Standards, which contain materially identical standards. *See* Ex. 6.

4

medical services when a detainee is determined to need urgent medical care." § 5.9

The minimal medical directives stand in stark contrast to the PBNDS's nearly 70 pages of detailed requirements for medical care (Ex. 5 at 257–326), including, among *many* others:

- "As soon as possible, but no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions." *Id*. at 266.

- "The health intake screening shall be conducted using the [ICE Health Services Corp] IHSC Intake Screening Form (IHSC 795A) or equivalent and shall be completed prior to the detainee's placement in a housing unit." *Id*. at 267, 283 (intake screening form)

- "Detainees who arrive at a detention facility with prescribed medications or who report being on such medications, shall be evaluated by a qualified health care professional as soon as possible, but not later than 24 hours after arrival, and provisions shall be made to secure medically necessary medications." *Id*. at 273.

## II. Defendants' Decision to Waive the Hold Room Policy and Operate the Hold Rooms as a Residential Facility

Prior to February 2025, the BHR was operated exclusively as a "short term" facility that held only a handful of individuals at a time for periods of 12 or fewer hours, in compliance with the Hold Room Policy. ECF No. 40-2. But on February 5, 2025, after executive orders calling for the increased detention of noncitizens, the BHR received "a waiver for the ERO Baltimore Field Office 12-hour hold room utilization time" with a new limit of up to 60 hours. *Id.*

On June 24, 2025, ICE expanded the Baltimore waiver to cover all ICE ERO Field Offices (the "Nationwide Waiver"). ECF No. 40-3. The Nationwide Waiver further extended the permitted detention duration "up to, but not exceeding, 72 hours, absent exceptional circumstances." *Id.* The nationwide waiver states that:

> As a result of increased enforcement efforts, ERO's average daily population has significantly increased to over 54,000. This increase has put additional strain on finding and coordinating transfers of aliens to available beds within the required timeline detailed in Directive 11087.2. Further, ERO field offices no longer have the option to discretionarily release aliens . . . .

*Id*. Notably, the Nationwide Waiver only waived the 12-hour detention limit from the Hold Room Policy; "[a]ll other hold room and hold facilities requirements continue to apply to ensure the safety, security and humane treatment of those in custody." *Id*.

### III.    2025 Baltimore Hold Room Conditions

#### A.    Crowding and Sanitation

In February 2025, Defendants issued a formal memorandum stating that the BHR's maximum detention capacity is 56 people. Ex. 1. The BHR contains five holding cells with a combined size of 1,728 square feet. *See* Ex. 7 at 4. This includes:

- Three "large" cells used to hold members of the general population, one reserved for women and two reserved for men: Male Hold Room 1 (559 Sq. Ft.), Female Hold Room 2 (420 Sq. Ft.), and Male Hold Room 3 (495 Sq. Ft.); and

- Two small cells reserved for individuals who need to be segregated based on health or safety concerns: ISO Hold Room 4 (128 Sq. Ft.) and ISO Hold Room 5 (126 Sq. Ft.).[3]

In discovery, Defendants have represented that each of the three large cells can hold 35 people and each of the two small cells can hold 15 people, such that they now consider the BHR's maximum detention capacity to be 135 individuals (241.07% of the 56-person capacity stated in February 2025). ECF No. 40-1 at ¶ 7; *see also* Ex. 2 at 54:8–55:5, 61:4–15. Defendants have no written policies reflecting the newly claimed detention capacities. Ex. 2 at 55:1–9 (large cells), 61:4–11 (small cells). In fact, Officer Guerrero could not recall how he learned of these numbers, who created them, or how they were calculated. *Id*. at 56:4–57:2; 63:1–64:2.

Defendants do not conduct any type of oversight to ensure compliance with these unwritten limits: they do not monitor cell occupancy rates, ensure occupancy remains under the 35-person limit for the large cells, or keep records of the number of individuals detained in each

---

[3] Defendants generally keep these smaller cells empty so they will be available in the event they are needed to segregate individuals for safety or health purposes. Ex. 2 at 103:2-19.

cell. *Id*. at 59:5–61:3. Instead, private security contractors ("PPS Officers") keep a running tally of the individuals in each cell with erasable marker on a whiteboard. *Id*. at 60:3–13.

In 2024, Defendants detained only a handful of people each day in the BHR. Ex. 4 at ¶ 13. But between February 1, 2025 and October 15, 2025, Defendants detained 3,250 people in the BHR. *Id*. at ¶ 11. In that period, over *half* (1,725 people) were detained at a time when the total detention population exceeded the maximum of 56 people stated in ICE's February Memo. *Id*. at ¶ 14. Indeed, during that time period, 601 men were detained while the male population exceeded 70, which would require these individuals to be held in one of the two large male hold rooms with more than 35 other individuals, *i.e.* in excess of Defendants' newly claimed cell capacity of 35, and well over the previously-understood capacity of 56 people for the entire facility. *Id*. at 14[4].

| Number of detainees held at least one day when the total population was at most… | |
|---|---|
| 0–56 detainees total | 1,525 (47%) |
| 57–70 | 676 (21%) |
| 71–90 | 643 (20%) |
| 91–110 | 167 (5%) |
| >110 | 239 (7%) |

| Number of male detainees held at least one day while male population was at least… | |
|---|---|
| >30 male detainees (>15 per room) | 2,448 |
| >50 male detainees (>25 per room) | 1,596 |
| >70 male detainees (>35 per room) | 601 |
| >80 male detainees (>40 per room) | 382 |
| >90 male detainees (>45 per room) | 362 |

---

[4] The data from *Amica Center for Immigrant Rights et al v. ICE*, 1:25-cv-2386 (D. Md. 2025) does include a cell designation for a partial subset of the detention data. Accounting for individuals for whom no cell was noted ("NR" chart), these charts also demonstrate that the population of each cell regularly exceeds 25 individuals and sometimes exceeds 40 individuals. Ex. 4 at ¶ 20.

Declarations from individuals detained at the BHR confirm that Defendants routinely pack as many as 20 to 50 individuals into the large holding cells. *See e.g.*, Doe Decl., Ex. 8 at ¶ 6 ("about 50 other men"); Akaolisa Decl., Ex. 9 at ¶ 6 ("approximately 40 people"); Garcia-Vigil Decl., Ex. 10 at ¶ 6 ("approximately 28 men"); Tlapanco Peralta Decl., Ex. 13 at ¶ 6 ("approximately 50 people"); Salazer Monge Decl., Ex. 12 at ¶ 7 (between 15 and 40 men).[5]

The overcrowded conditions in these cells are exacerbated by the extended duration of detention. Only 143 (or 4% of) detained individuals were held for fewer than 12 hours. Ex. 4 at ¶ 15. Again, under the PBNDS, 12 hours is the outermost limit for providing, *inter alia*, full medical screening. Comparatively, 1,377 (or 18% of) detained individuals were detained in excess of 60 hours and 894 (or 27%) have been detained for more than the extended limit of 72 hours under the Nationwide Waiver. Ex. 4 at ¶ 15.[6]

| Duration of stay in hold room | Feb 1 – Oct 15, 2025 | Feb 1 – Jun 23, 2025 | Jun 24 – Oct 15, 2025 |
| --- | --- | --- | --- |
| 0–12 hours | 143 (4%) | 86 (5%) | 57 (4%) |
| 12–24 | 271 (8%) | 220 (13%) | 51 (3%) |
| 24–36 | 336 (10%) | 262 (15%) | 74 (5%) |
| 36–48 | 645 (20%) | 341 (19%) | 304 (20%) |
| 48–60 | 505 (15%) | 196 (11%) | 309 (20%) |
| 60–72 | 483 (15%) | 216 (12%) | 267 (18%) |
| 72–96 | 595 (18%) | 254 (14%) | 341 (22%) |
| 96–120 | 189 (6%) | 123 (7%) | 66 (4%) |
| >120 | 110 (3%) | 60 (3%) | 50 (3%) |

In some instances, overcrowding is so bad that detained individuals are forced to sleep

---

[5] *See* Nieves Decl. at ¶ 7 (ECF No. 31-10) ("about twenty other men."); Parra Decl. at ¶ 6 (ECF No. 31-5) (same); Girod Decl. at ¶ 5 (ECF No. 31-7) ("between fifteen and twenty-five"); Cruz Decl. at ¶ 7 (ECF No. 31-6) (13 women); Gordon Decl., at ¶ 14 ("over 30 men") (ECF No. 36-5).

[6] *See also* Akaolisa Decl., Ex. 9 at ¶ 5 (five days); Garcia-Vigil Decl., Ex. 10 at ¶ 5 (five days); Martir de Medina Decl., Ex. 11 at ¶ 6 (four days); Salazer Monge Decl., Ex. 12 at ¶ 6 (10 days) Parra Decl. at ¶ 5 (six days) (ECF No. 31-5); Cruz Decl. at ¶ 6 (five days) (ECF No. 31-6); Girod Decl. at ¶ 10 (seven days) (ECF No. 31-7); B.R.R. Decl. at ¶ 5 (six days) (ECF No. 31-8); Vasquez Decl. at ¶ 8 (seven days) (ECF No. 31-9); Amaya Luis Dec. at ¶ 5 (seven days) (ECF No. 31-14).

sitting up or are unable to move around in the cell. *See* Parra Decl. at ¶ 6 (ECF No. 31-5) ("I had to [sleep] sit[ting] on the floor because there was no room to extend my body."); Cruz Decl. at ¶ 7 (ECF No. 31-6) ("[W]e could all lie down but only if we squeezed together."); Girod Decl. at ¶ 5 (ECF No. 31-7) ("Sometimes, there wasn't enough room for everyone to even lay down on the floor, so people had to sleep sitting up."); O.P.L Decl. at ¶ 6 (ECF No. 31-11) ("When we had the mattresses on the floor . . . there was nowhere to move."); Akaolisa Decl., Ex. 9 at ¶ 5 ("We could not lie down because the room was so small and we had to sleep sitting down."); Garcia-Vigil Decl., Ex. 10 at ¶ 6 ("It was so crowded that I could barely move.").

These crowded rooms contain a single open toilet with no privacy, requiring detained individuals to expose themselves to one another repeatedly while using the bathroom. *See, e.g.*, Akaolisa Decl., Ex. 9 at ¶ 7 ("[T]here was no privacy as [the toilet] was in an open area."); Garcia-Vigil Decl., Ex. 10 at ¶ 7 ("the toilet "was [in] an open area and someone else had to shield the person using it to ensure a bit of privacy."); Salazer Monge Decl., Ex. 12 at ¶ 9 ("[Y]ou can see people use the toilet, it is not private. The ICE staff did not clean the toilet."); Peralta Decl., Ex. 13 at ¶ 8 ("[T]he bathrooms were out in the open, I had no privacy and [they] were dirty.").[7] The cells are cleaned, at most, once or twice a week, and, because they must be emptied for cleaning, cannot be cleaned at all during periods of significant overcrowding. Ex. 2 at 231:12–233:3.

There are no showers or bathing facilities at the BHR (*id*. at 160:18–161:2), and Defendants provide only intermittent access to basic hygiene items, including clean clothes,

---

[7] *See also* Jenkins Decl. at ¶ 10 (ECF No. 31-12) ("The restroom was inside the holding cell and was disgusting. There was no privacy."); Parra Decl. at ¶ 6 (ECF No. 31-5) ("If we had to use the bathroom, everyone was able to see."); Girod Decl. at ¶ 7 (ECF No. 31-7) ("Due to the crowding, there was no privacy when [he] needed to use the bathroom."); Hyde Decl. at ¶ 7 (ECF No. 6-2) ("[I]t is impossible . . . to use the toilet with any privacy."); Hyde Decl. at ¶ 4 (ECF No. 56-1) ("the other women had fashioned an aluminum blanket into a curtain around the toilet for privacy[.]").

toothbrushes, feminine hygiene items, and soap. *See, e.g.*, Garcia-Vigil Decl., Ex. 10 at ¶ 7 ("I was only able to take a shower on the seventh day of being detained after leaving Baltimore."); Salazer Monge Decl., Ex. 12 at ¶ 8 ("They sometimes gave us tablets of toothpaste, but not every day. I asked for a toothbrush and was told to use my finger to clean my teeth."); Doe Decl., Ex. 8 at ¶ 9. (no soap, toothbrushes, or toothpaste); Hyde Decl. at ¶ 8 (ECF No. 6-2) (denied the ability to "to shower or change clothes" and was instead occasionally provided "a couple of baby wipes"); Cruz Decl. at ¶ 9 (ECF No. 31-6) ("We remained in the clothes we were wearing when detained for the next five days. There was no toothbrush, no deodorant, and no other hygiene products, except soap, which was useless without a shower"); Girod Decl. at ¶ 7 (ECF No. 31-7) ("[N]o one was given a change of clothes. No one was given soap or access to toothbrushes/toothpaste.").[8]

## B.     Access to Medical Care and Medication

Despite converting the BHR into a *de facto* residential facility, Defendants have not adopted or implemented **any written policies governing access to medical care**. Instead, Defendants represent that they have only the following unwritten policies:

**Medical Screening**: Defendants have no written guidance or policies for the provision of medical screening. Ex. 14 at 7; Ex. 7 at 3. Defendants "don't conduct medical screening. We ask [] generic question[s] . . . what is your medical state or do you have any medical issues. We are

---

[8] *See also* B.R.R. Decl. at ¶ 8 (ECF No. 31-8) ("There was nothing to shower or bathe. . . There was no change of clothes given either"); O.P.L Decl. at ¶ 7 (ECF No. 31-11) ("We were not given anything to bathe, to shower, or to brush our teeth. We were not given a change of clothes."); Amaya-Luis Decl. at ¶ 10 (ECF No. 31-14) ("[F]or more than seven days . . . I was not able to change my clothes . . . There was no way to clean yourself [.]"); Ponce Decl. at ¶ 8 (ECF No. 31-15) ("I had no shower and no change of clothes."); Gordon Decl. at ¶ 11 (ECF No. 36-5) ("he had not been allowed to shower or change clothes . . . He was not given any toothpaste."); Hyde Decl. at ¶ 5 (ECF No. 56-1) ("[T]hey did not have sanitary pads or tampons to give her.").

not doctors. We are not nurses. We are immigration enforcement agents." Ex. 2 at 180:6–13.

Upon arrival at the BHR, newly-detained individuals meet with PPS Officers who ask "questions [about] family members, medical problems or issues, medications[,] if [they] brought any, any jewelry, any money, any cell phones, any property" and record this information by hand on an intake sheet. *Id*. at 171:21–172:18. The intake form contains a "medical issues" field but does not include any specific questions. *Id*. at 175:7–177:17. The PPS Officers do not have any training in conducting medical screenings. *Id*. at 179:2–10. Pursuant to the unwritten policy, PPS Officers ask generic questions like "do you have any medical issues," did you bring any medications, and "what is your medical condition"? *Id*. at 172:4–8, 176:3–7; 177:16-17. And "whatever the [noncitizen] claims he has, [the officer] writes" on the intake form. *Id*. at 177:11–17. The handwritten intake sheet travels with the detained individual and is not scanned or retained by BHR. *Id*. at 173:17–174:18.

Next, detained individuals meet with an ICE deportation officers ("DOs")  who "do not get training in medical screenings." *Id*. at 182:12–13, 180:21–181:4 (the BHR is "not a full-up facility . . . other facilities that are more established . . . they have nurses and doctors that do medical screenings. We do not."). As an unwritten policy, DOs ask only "generic questions" including "what is your medical condition," "what is your medical state" "what type of medication" are you taking,  and "[d]o you have any mental health issues? Do you feel suicidal?" *Id*. at 172:10–13; 182:12–17; 228:22–229:3. Whatever information the individual voluntarily discloses is recorded in in ICE's electronic database. *Id*. at 179:11–21. The intake process is entirely reliant on individuals to disclose their information in response to these generic questions. *Id*. at 175:22–17:17. Defendants acknowledge this can lead to issues: "At initial intake they say no, I have no medical issues. Come to find out a day later, hey, I need my medication. Well, what

11

do you take? The next thing you know, he's diabetic or he has a heart condition, cholesterol . . ." *Id*. at 176:3–14.

As part of the intake process, Defendants do not conduct any physical exams, record vital signs (pulse, blood pressure or body temperature), or screen in any way for infectious diseases like COVID. *Id*. at 184:6–19 ("Again, we are not a facility. We are an ICE hold room. We don't have the medical personnel here to -- to accomplish that"); *id*. at 224:2– 224:11.

**Medication Access**: Defendants have no written guidance or policies for the provision of medication. Ex. 14 at 10; Ex. 7 at 3. Defendants also have no ability to provide prescription medications at the BHR: they do not store commonly needed medications (*e.g.* insulin), do not have an onsite pharmacy, and do not have a contract with any pharmacy. Ex. 2 at 190:8–191:8. If someone does not have their medication, DOs will call their friends and family and ask them to bring it to the BHR. Ex. 14 at 10. Some friends and family "are hesitant [to bring in medication] because we are Immigration, they're afraid, to be quite honest . . ." Ex. 2 at 168:20–169:17.

If people are detained with medication, it is stored "in a cabinet." *Id*. at 187:13–17. DOs hand out medications but do not keep any written record indicating the proper dosage or schedule. Instead, PPS Officers are responsible to "pull" people out at mealtimes based on the intake forms (to which DOs do not have access), and a DO (who has no training in distributing medication) follows the instructions on the bottle or, if the individual says "I take one, two pills, we give them one, two pills, that's it." *Id*. at 195:9–197:15. If someone requires "as needed" medication (*e.g.* insulin), they must "knock on the door" and hope to get the attention of a DO. *Id*. at 199:1–5.

According to Officer Guerrero, if people need medication and cannot locate someone to bring it to the BHR, the unwritten policy requires that they be transported to the hospital to obtain their medication. *Id*. at 200:9–14. But every trip to the hospital imposes significant burdens on

12

Defendants: each individual must be transported by two private security officers, and one or two DOs must follow and remain at the hospital. *Id*. at 201:2–203:1.

Defendants' own records confirm that virtually no one is ever transported to the hospital to obtain medication. From February 1, 2025 to September 26, 2025, Defendants transported a total of 25 people to the hospital (*i.e.* less than three per month). Ex. 15.[9] As Dr. Goldenson explains (Ex. 3 at ¶25):

> Of this number, only 6 individuals appear to have been brought to the hospital solely to obtain medication. Population data supplied by ICE reflects that the number of people detained at the facility during this time period was in excess of 2,800. The fact that fewer than ten were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications.

**Medical Care Access**: Defendants do not have any "written procedures, policies, or formal training materials…for providing medical or mental health services." Ex. 2 at 241:2–6; *see also* Ex. 14 at 10; Ex. 7 at 3. There are no licensed doctors, nurses, social workers or other healthcare or mental health providers of any kind at the facility, and Defendants do not bring any of these professionals to the facility. Ex. 2 at 214:14—215:18; *see also* Ex. 7 at 3.  DOs also are not trained to monitor "for indications of mental or physical health conditions." *Id*. at 234:1–10.

Officer Guerrero testified that, if anyone asks to see a doctor, "seems to be sick" or "is claiming to be sick, we take them to the hospital." *Id*. at 185:19–186:4. Once again, this testimony is flatly contradicted by Defendants' records, which confirm that Defendants transported only 25 people to the hospital between February 1, 2025 and September 26, 2025 (*i.e.* less than three per month). Ex. 15. Ex. 3 at ¶ 25 ("If there were truly only 25 individuals transferred from the facility for medical or medication related issues, it indicates that, to a reasonable degree of certainty,

---

[9] Pursuant to the Parties' Stipulated Confidentiality Agreement, ECF No. 119, Plaintiffs file Exhibit 15 under seal with an accompanying Motion to Seal.

there are many individuals who required a medical evaluation and did not receive one.").

**Resulting Conditions at the BHR**: Reports from those detained at the BHR confirm that individuals are routinely denied timely access to medications and medical care. *See* Salazar Monge Decl., Ex. 12 at ¶¶ 14–15 (Defendants refused to bring Leukemia patient to doctor, told him to have a friend bring in his medication and, as result, prevented him from taking medication for 48 hours); Doe Decl., Ex. 8, at ¶ 11 ("I said I needed medicine for my high blood pressure, but [ICE] told me to wait and did not give me medicine."); ¶ 12 ("My attorney had to file a motion in federal court to force ICE to take me to the hospital. They finally took me to the hospital" and "[t]he doctors told ICE I should stay at the hospital because my blood pressure was so high and I was having chest pain, so they said I might have a heart attack."); Akaolisa Decl., Ex. 9 at ¶ 9 ("[P]eople who were diabetic requested medications, but ICE officers did not provide any medications or a health provider . . . nor were they taken to any hospital for treatment."); Garcia-Vigil Decl., Ex. 10 at ¶ 7 (people with "broken bones, suffering from diabetes, and high-blood pressure [] were not given any medical attention"); Martir de Medina Decl., Ex. 11 at ¶¶ 3, 8 ("I got one of my terrible migraines. I repeatedly asked for pain medicine for my head and was told that the ICE officers did not have any. My friend . . . was having such terrible head pain that she was sobbing for two days, and the ICE officers denied her as well.")[10]

---

[10] *See also* Justiniano Decl. at ¶¶ 3–5 (ECF No 1-15) (denied access to diabetes medication for over 24 hours and advised that Defendants "did not have the capacity to [dispense medication] at this facility"); Jenkins Decl. at ¶¶ 12–13 (ECF No. 31-12) (denied HIV medication for several days); Hyde Decl. at ¶ 4 (ECF No. 6-2) (denied thyroid medication and medical treatment for days); B.R.R. Decl. at ¶ 6 (ECF No. 31-8) ("For these three days, I asked to see a doctor, they said that there was no doctor, and they wouldn't be able to help me."); O.P.L. Decl. at ¶ 9 (ECF No. 31-11) ("I saw him ask for insulin and the officials did not give him any . . . he was on the floor and was having difficulty breathing . . . they had to take him to the hospital.").

## IV.    Representative Plaintiffs

Ms. N.N. was held in the BHR for approximately 72 hours in a small cell where she was forced to sleep on an air mattress with up to seven other women. Justiniano Decl. (ECF. No 1-15) ¶ 6; D.N.N. Decl. at ¶ 6 (ECF No. 31-2).

Ms. N.N. has Type II diabetes, for which she takes Ozempic. Justiniano Decl. (ECF No 1-15) at ¶ 4. After she was detained, on May 7 2025, Ms. N.N.'s children brought her Ozempic to the BHR, but ICE refused to give the medication to Ms. N.N. for at least 24 hours. *Id*. at ¶¶ 3–4. Only after persistent advocacy from her attorney (Ms. Justiniano) was Ms. N.N. given access to her diabetes medication. *Id*. at ¶¶ 3–4. Defendants also did not allow or provide for Ms. N.N. to regularly check her blood sugar, which she usually does at least three times a day prior to eating a meal. *Id*. at ¶¶ 5–6. On May 8 2025, Ms. Justiniano requested a medical exam for Ms. N.N. "given the lack of monitoring of her blood sugar levels, missed dosage of diabetes medicine, and inadequate diet." *Id*. Officer Rickets, an ICE officer, informed her, however, that "they did not have the capacity to provide such medical care at this facility because it was meant to be temporary, and she would receive this care wherever she was transferred." *Id*. at ¶ 5.

Ms. R.G. was detained at the BHR for approximately 48 hours. V.R.G. Decl. at ¶1 (ECF No. 32-3). She has a thyroid condition that requires daily medication. Hyde Decl. at ¶ 4 (ECF No. 6-2). While at the BHR, she was denied access to her medication and was not permitted to see a medical professional. *Id*.

### <u>CLASS CERTIFICATION ARGUMENT</u>

Plaintiffs move for certification of the following class: All persons who are now or in the future will be detained at the Baltimore Hold Rooms.[11] This case is appropriate for class

---

[11] The class definition is consistent with the indivisible nature of the requested relief, which will prevent the risk of serious harm to all individuals detained at the BHR. This Court, however, has

certification, as it challenges Defendants' policies and practices, which expose all individuals detained at the BHR to dangerous, punitive, and unconstitutional conditions.

Courts in this district and others routinely certify classes of detained and imprisoned individuals challenging conditions of confinement, including specifically in the context of civil immigration detention. *See, e.g.*, *Jones v. Murphy*, 256 F.R.D. 519, 522 (D. Md. 2009); *Coreas v. Bounds*, No. 20-cv-0780, 20-cv-1304, 2020 WL 5593338, at *7 (D. Md. Sept. 18, 2020); *Doe v. Lally*, 467 F. Supp. 1339, 1344 (D. Md. 1979); *Owino v. CoreCivic, Inc*., 60 F.4th 437, 444 (9th Cir. 2022); *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 865 (7th Cir. 2018); *Menocal v. GEO Grp., Inc*., 882 F.3d 905, 925 (10th Cir. 2018); *Parsons v. Ryan*, 754 F.3d 657, 681–82 (9th Cir. 2014), *reh'g denied*, 784 F.3d 571 (9th Cir. 2015) (en banc).

Indeed, in recent months, three separate courts have certified classes of detained individuals in virtually identical ICE holding facilities. *See Chicago ICE Litigation*, 2025 WL 3204602 at *5 ("certifying class of "[a]ll immigration detainees who are detained and those who will be detained in the future at the Broadview ICE facility"); *NY ICE Litigation*, 2025 WL 2658779 at *22 (provisionally certifying class of "all immigration detainees who now or will be detained for 12 or more hours by [ICE] at 26 Federal Plaza"); *SF ICE Litigation*, 2025 WL 3283283 at *22 (provisionally certifying class of "[a]ll persons who are now or will be detained in a holding cell in ICE's San Francisco Field Office").[12]

---

discretion to narrow the definition if necessary or to "certify[] subclasses *sua sponte*." *Stafford v. Bojangles' Restaurants, Inc*, 123 F.4th 671, 682 (4th Cir. 2024) (internal citation omitted).

[12] Unlike the D.C. Circuits, courts in the Fourth Circuit have not generally adopted the term "provisional certification." But "[p]rovisional certification does not lessen the rigor of Rule 23" and regardless of the nomenclature, "the court proceeds with the understanding that '[a]n order that grants ... class certification may be altered or amended before final judgment[.]" *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. CV 25-3417 (BAH), 2025 WL 3465518, at *31 (D.D.C. Dec. 2, 2025) (quoting *L.G.M.L. v. Noem*, No. 25-cv-2942, 2025 WL 2671690 (D.D.C. Sept. 18, 2025) and Fed. R. Civ. P. 23(c)(1)(C)).

16

As detailed below, Plaintiffs and the proposed Class unquestionably satisfy the requirements for class certification under Rule 23(a). Likewise, Plaintiffs' claims fall squarely within Rule 23(b)(2), as "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

## LEGAL STANDARD

To obtain certification, a class must satisfy all four elements of Fed. R. Civ. P. Rule 23(a): numerosity, commonality, typicality, and adequacy. If the class satisfies each of these requirements, the Court must also find that the proposed class action fits into one of the categories of class action under Fed. R. Civ. P. 23(b).[13] If the class satisfies each of these requirements, the Court must also find that the proposed class action fits into one of the categories of class action under Fed. R. Civ. P. 23(b).

### I.     Rule 23(a) Requirements for Class Certification Have Been Satisfied

#### A.     The Proposed Class Is So Numerous That Joinder Is Impracticable

To satisfy the numerosity requirement, the proposed class must be sufficiently numerous such that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Fourth Circuit has certified classes as small as 18 members. *See Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967); *see also Coreas*, 2020 WL 5593338, at *10 (certifying class of 29 detained individuals). When a proposed class has more than 40 members, courts presume that joinder is impracticable. *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021); *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 337 (D. Md. 2012);

---

[13] The Fourth Circuit has held that "[t]here is no threshold ascertainability requirement in [a] Rule 23(b)(2) case, which seeks only declaratory and injunctive relief[.]" *Kadel v. Folwell*, 100 F.4th 122, 161 (4th Cir. 2024), *judgment vacated on other grounds*, 145 S. Ct. 2838 (2025).

*Chicago ICE Litigation,* 2025 WL 3204602, at *2.

"Where general knowledge and common sense indicate the class is so large that joinder of all members is impracticable, the numerosity requirement is satisfied." *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 300 (D. Md. 2022) (internal quotation and citation omitted). In particular, "the fact that the class includes unknown, unnamed future members . . . weighs in favor of certification." *Coreas*, 2020 WL 5593338, at *10 (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000)). This is especially the case where, as here, class members are present and future "immigration detainees" who "may lack legal status and could be removed from the United States at any time, [are] inherently 'transient,' lack sophistication, and do not always speak English well." *Id.*, 2020 WL 5593338, at *11; *SF ICE Litigation*, 2025 WL 3283283, at *18 (emphasizing ICE's detention population "changes continually over time"); *NY ICE Litigation,* 2025 WL 2658779, at *19 (emphasizing "the volume of ICE arrests" and "considerable turnover in the detainee population at 26 Fed").[14]

Here, Defendants' own records confirm that 3,250 separate individuals were detained in the BHR between February 1, 2025 and October 15, 2025, for an average of over 400 per month. Ex. 4 at ¶ 11. At this rate, the number of individuals who will be detained at BHR during the pendency of this litigation could easily exceed 10,000. And joinder of these individuals is particularly impracticable given the transient nature of this population, their absence of financial resources, lack of counsel, lack of familiarity with the legal system, and limited English proficiency. *See Coreas*, 2020 WL 5593338, at *11. Thus, "the numerosity requirement

---

[14] *See also Rodriguez Guerra v. Perry*, 1:23-cv-1151, 2024 WL 3581226, at *1 (E.D. Va. Apr. 26, 2024) (finding joinder impracticable given "the inherently fluid nature of detention[.]"); *Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) (prisoner class); *Mondragon v. Scott Farms, Inc.*, No. 5:17-cv-356, 2019 WL 6125928, at *4 (E.D.N.C. Nov. 18, 2019) (migrant worker class).

obviously is met." *NY ICE Litigation,* 2025 WL 2658779, at \*19

### B.        The Class Presents Common Questions of Law and Fact

Rule 23(a)(2) requires questions of law or fact that are common to the class and that "class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted).  To satisfy the commonality requirement, a "single common question will suffice" if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (internal quotation and citation omitted).

"While a putative class seeking damages for [constitutional violations] claims might struggle to satisfy Rule 23(a)(2), a class certified under Rule 23(b)(2) seeking only injunctive and declaratory relief suffers no such difficulty." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1038–39 (8th Cir. 2018) (affirming certification of prisoner class action); *see also* The Common-Question Requirement Post Wal-Mart, 7A Fed. Prac. & Proc. Civ. § 1763.1 (4th ed.) ("[N]umerous prisoner suits challenging an unlawful or unconstitutional course of conduct by prison officials have met the Rule 23(a)(2) standard[.]") (collecting cases). Courts find commonality in detention cases where, as here, plaintiffs have:

> alleged exposure, as a result of specified . . . policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent . . . although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single . . . policy or practice that creates a substantial risk of serious harm.

*Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014); *see also Quadrelli v. Moniz*, No. 20-cv-10685, 2020 WL 3051778, at \*5 (D. Mass. June 8, 2020) (class certification is proper where inmates "have alleged a general risk of harm due to a policy or practice, even if there might additionally be a unique or distinct impact as to an individual putative class member"); *Colon v.*

19

*Passaic Cnty*, No. No. 08-cv-4439 DM, 2009 WL 1560156, at \*3 (D.N.J. May 27, 2009) ("Plaintiffs constitutional claims . . . all arise out of the overcrowding and otherwise squalid conditions . . . . requir[ing] the demonstration of common proofs[.]").[15]

This is not a case in which Plaintiffs have alleged "nebulous references to 'systemic failures' or 'systemic deficiencies." *Stafford,* 123 F.4th at 680. Through preliminary discovery, Plaintiffs have identified specific and discrete policies that produce a serious and unconstitutional risk of harm to everyone detained at the BHR.

Plaintiffs have identified at least the following common questions of law:

- Does Defendants' failure to implement written policies limiting the number of people detained at the BHR result in punitive conditions that violate the Fifth Amendment?

- Does Defendants' unwritten policy increasing the purported detention capacity at the BHR from 56 to 135 people result in punitive conditions violating the Fifth Amendment?

- Does Defendants' unwritten policy of limiting the number of people detained in large and small holding rooms to 35 people and 15 people, respectively, lead to punitive conditions violating the Fifth Amendment?

- Does Defendants' failure to adopt any compliance mechanism to enforce their unwritten cell population limits lead to punitive conditions violating the Fifth Amendment?

- Do Defendants' medical screening policies constitute deliberate indifference to serious medical needs that violate the Fifth Amendment because the officers who conduct the intake process (i) have no training in medical screening, (ii) do not use a medical questionnaire, (iii) do not check vitals, and (iv) do not screen for infectious diseases?

- Do Defendants' medical care policies constitute deliberate indifference to serious medical needs that violate the Fifth Amendment because they do not train officers to (i)

---

[15] *See also Coreas*, 2020 WL 5593338, at \*13 (commonality satisfied for group of detained noncitizens); *Savino v. Souza*, 453 F. Supp. 3d 441, 451 (D. Mass. 2020) ("[A] common question of law and fact in this case is whether the government must modify the conditions of confinement."); *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 38 (N.D. Cal. 2020) (commonality satisfied in detained noncitizen lawsuit over "conditions of confinement at the facilities"); *Hernandez v. Cnty. of Monterey*, No. 5:13-cv-2354-PSG, 2015 WL 399975, at \*18 (N.D. Cal. Jan. 29, 2015) (without class actions "it is unlikely that … prison conditions that violate the Eighth Amendment could ever be corrected by legal action" (citations omitted)).

20

administer medication or (ii) identify mental or physical health conditions?

- Do Defendants' medical care policies constitute deliberate indifference to serious medical needs that violate the Fifth Amendment because (i) they do not have any mechanism to obtain prescription medication on behalf of detained individuals; (ii) do not have any medical staff or bring medical professionals to the facility; and (iii) as a result, cannot provide timely access to medication or medical care?

- Does Defendants' failure to adopt written medical care policies constitute deliberate indifference to serious medical needs that violates the Fifth Amendment?

Here, the commonality requirement is plainly satisfied because the Class asserts discrete unconstitutional policies and practices that impact—and injure—every individual detained at the BHR. A class-wide proceeding answering each of these common questions will "generate common *answers* apt to drive the resolution of the litigation." *See Wal-Mart*, 564 U.S. at 350.

Three different courts have recently found commonality satisfied in materially identical class action lawsuits challenging detention conditions at ICE Hold Rooms. *See SF ICE Litigation*, 2025 WL 3283283, at *19 (allegations concerning "sleep, hygiene, and medical care turn on a [common] determination of whether" these "conditions that are motivated by an intent to punish, are similar to or more restrictive than the conditions imposed upon criminal detainees, and serve legitimate government interests."); *NY ICE Litigation*, 2025 WL 2658779 at *20 (whether "ICE's standards and practices regarding . . . crowding comport with constitutional standards" is a common legal question and "[m]ultiple issues of fact are common to the putative class . . . including whether ICE provides . . . adequate bedding, meals, hygiene products, access to medical care, [and] medication[.]"); *Chicago ICE Litigation*, 2025 WL 3204602, at *2–3 (finding a common question of whether defendants have "a policy or practice of placing immigration detainees into overcrowded hold rooms" and noting injuries like "lack of access to medical care" are "common to all proposed class members[.]")

Here, Plaintiffs ultimately satisfy the commonality requirement because "every [detained

21

individual] suffers exactly the same constitutional injury when he is exposed to a single [facility-wide ICE] policy or practice that is punitive in nature," despite the fact that "the challenged conditions may ultimately result in different future harm for different" individuals. *SF ICE Litigation*, 2025 WL 3283283, at \*19 (citations omitted). For example, every person detained at BHR suffers the same injury when they are detained without adequate medical screening, exposing them to the risk of communicable diseases or deprivation of critical medication.

When determining whether a policy is constitutional, it does not matter "whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk"; for example, when prison officials know of rampant inmate rape and do nothing about it, "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." *Farmer v. Brennan*, 511 U.S. 825 ,843–44 (1994).

Here, every person who will be detained at the BHR faces a serious risk of harm simply by entering a facility governed by Defendants' punitive and unconstitutional policies. Some individuals may be lucky enough to arrive on a day that is less crowded, may not need access to medication or a doctor, or may not be exposed to an individual with an infectious disease. But for the purposes of commonality, it does not matter that the challenged policies and practices "may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single . . . policy or practice that creates a substantial risk of serious harm. *Parsons*, 754 F.3d at 678; *see also Williams v. City of Philadelphia*, 270 F.R.D. 208, 215 (E.D. Pa. 2010) ("[T]hat overcrowding affects each class member differently (or not at all) is therefore insufficient to defeat class certification.").

**C.    The Claims of the Named Plaintiffs are Typical of the Claims of the Members of the Proposed Class**

Under Fed. R. Civ. P. 23(a)(3), the class representative's claims and defenses must be "typical of the claims or defenses of the class" such that they simultaneously tend to advance the interests of the absent class members. In contrast to commonality, "typicality concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). The named plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the plaintiff's own individual claim. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466–67 (4th Cir. 2006).

As the court in *Coreas* explained:

> In analyzing this question, a court compares the class representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and determines the extent to which those facts would also prove the claims of the absent class members . . . The claims do not have to be factually or legally identical, but the class claims should be fairly encompassed by those of the named plaintiffs.

2020 WL 5593338, at *13.

When conducting a typicality inquiry in a 23(b) injunction-only class challenge to unlawful policies, "[v]ariations among the specific harms and risks sustained by each Plaintiff and class member individually" do not undermine typicality because plaintiffs seek only "injunctive relief that will apply evenly to each Plaintiff and each member of the proposed class." *Connor v. Md. Dep't of Health*, No. 24-cv-1423, 2025 WL 1167846, at *12 (D. Md. Apr. 22, 2025); *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 56 (D. Md. 2020) ("[R]egardless of their individual differences, each prospective class member pursues the same claims for the same result[,] . . . an order enjoining the application of those policies.") (internal citation omitted); *Sanchez v. McAleenan*, No. 19-cv-1728, 2020 WL 5849491, at *5 (D. Md. Sept. 30, 2020) (a

"claim may differ factually and still be 'typical' . . . if 'it arises from the same ... course of conduct that gives rise to the claims of other class members.") (citation omitted).

For this reason, courts routinely find typicality satisfied in cases seeking only injunctive relief from unlawful detention policies. *See, e.g., Chicago ICE Litigation*, 2025 WL 3204602, at *4 (named plaintiffs were subjected to "deplorable physical conditions," and their claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory.") (citation omitted); *NY ICE Litigation*, 2025 WL 2658779, at *20 (while named Plaintiff's medical circumstances varied, "such a minor variation does not destroy typicality" because named Plaintiff "faced a substantial risk of being denied necessary treatment."); *Postawko*, 910 F.3d at 1039 ("In this suit for prospective injunctive and declaratory relief, the potential for minor 'factual variations' does not undermine" typicality) (citation omitted).[16]

By virtue of having been detained in the BHR and having been exposed to the same policies as putative Class Members, Ms. D.N.N. and V.R.G.'s claims are typical of the putative class. Moreover, Plaintiff D.N.N. suffered unsanitary conditions and crowding in addition to inadequate medical care. Justiniano Decl. at ¶¶ 5–7 (ECF No 1-15). And Plaintiff V.R.G. suffered unsanitary conditions and inadequate medical care. Hyde Decl. at ¶¶ 4–9 (ECF No. 6-2). Thus, the named Plaintiffs collectively experienced each of the injuries alleged on behalf of the Class. *See* ECF No. 6 at 21–26. The named Plaintiffs and putative Class Members are united in their

---

[16] *See also Quadrelli*, 2020 WL 3051778, at *6 ("Movants are thus typical of the class in that they are exposed to the same risks of being detained in Unit C-3 as other class members and because their alleged harm arises out of 'the same events or course of conduct[.]'") (citation omitted); *Parsons*, 754 F.3d at 686 ("It does not matter that the named plaintiffs may have in the past suffered varying injuries . . . Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member").

interest and injury, share a common core of salient facts, raise common legal claims, and require common answers to redress their injuries.  Thus, the element of typicality is met.

D.    **The Named Plaintiffs Will Adequately Protect the Interests of the Proposed Class and Their Counsel are Qualified**

Finally, the named plaintiffs must "fairly and adequately protect the interests of the class" without a conflict of interest with the absent class members. Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts examine whether a named plaintiff and their counsel have a "fundamental" conflict of interest. "A conflict is not fundamental when, as here, all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 431 (4th Cir. 2003)) (alterations in original).

This Court previously held that with respect to the common interest requirement of Fed. R. Civ. P 23(a)(4), the Court "discerns no conflicts of interest between (or among) Plaintiffs and the class they seek to represent." ECF No. 74 at 20. There is no conflict where, as here, all members share a common objective on the same facts and law.

In determining whether a named plaintiff is an adequate representative, this Court also looks to whether the named "plaintiffs prosecute the action vigorously." *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 723 (D. Md. 2025). Here, Plaintiffs are not simply lending their names to a suit controlled entirely by the class attorney. *Monroe* v. *City of Charlottesville, Virginia*, 579 F.3d 380, 385 (4th Cir. 2009). On the contrary, Plaintiffs have a keen understanding of the class representative's role in litigation, as evidenced by their December 19, 2025 and December 22, 2025 attestations and have been advised extensively by counsel on what such a responsibility entails, including the claims asserted, the motions and pleadings filed with this court, and

25

updates regarding the conditions of the Baltimore Hold Rooms since their departure. Ex. 18, V.R.G. Suppl. Decl. at ¶¶ 5–9 (discussing contact with attorneys, understanding of these filings, and role of class representative); Ex. 19 D.N.N. Suppl. Decl., at ¶¶ 4–9 (same).

The adequacy prerequisite also requires consideration of "the competency of class counsel." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). In this case, the proposed Class is represented by expert immigration and detention law counsel from esteemed public interest organizations Amica Center for Immigrant Rights and the National Immigration Project. In addition, the proposed Class is represented by Crowell & Moring LLP, a highly sophisticated international law firm. "Class counsel are highly experienced and have the intellectual and financial resources necessary to prosecute a sophisticated class action." *Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98, 104 (D. Md. 2010).[17]

## II.    The Rule 23(b) Requirements for Class Certification Have Been Satisfied

Plaintiffs also meet the requirements of Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "[T]he key to the (b)(2) class is the indivisible nature of the . . . remedy warranted." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (quoting *Wal-Mart*, 564 U.S. at 360); *see also NY ICE Litigation*, 2025 WL 2658779, at *22 (holding that provisional certification under Rule 23(b)(2) is appropriate "because defendants have acted on grounds generally applicable to the class —subjecting them to the same set of policies governing their confinement . . . — thereby making appropriate final injunctive relief with respect to the

---

[17] *See* Decl. of Ian Austin Rose, dated December 22, 2025, Ex. 20; Decl. of Sirine Shebaya (ECF No. 31-18); Decl. of Jerome Murphy (ECF No. 31-19); *see also* Ex. 18 at ¶ 11 and Ex. 19 at ¶ 11 (class representatives' request for undersigned counsel to be approved as class counsel).

class as a whole."); *SF ICE Litigation*, 2025 WL 3283283, at *21–22 (provisionally certifying a Rule 23(b)(2) class as it "seeks uniform relief regarding ICE's 12-hour detention waiver and the conditions of confinement at [the facility], where every member of the class is or will be detained); *Chicago ICE Litigation*, 2025 WL 3204602, at *5 (certifying a Rule 23(b)(2) class).

Here, Defendants' policies put at risk every person detained in the BHR; enjoining those policies will benefit every person detained there in the future. *See, e.g.*, *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) ("[T]his is a paradigmatic Rule 23(b)(2) case: The meaningful, valuable injunctive relief . . . is indivisible, benefitting all [] members of the (b)(2) Class at once.") (internal quotation marks and citations omitted); *Coreas,* 2020 WL 5593338, at *15 (when everyone "is subjected to unconstitutional policies or conditions of confinement, the Court could order certain global relief"); *Savino*, 453 F. Supp. 3d at 453 (Rule 23(b)(2) satisfied by request for "an injunction ordering the government to reduce crowding of Detainees").

As the court in the *Chicago ICE Litigation* explained, cases "challenging the conditions of confinement are often certified as class actions" because defendants "can in effect maintain only a single standard of conduct as to the conditions at [a facility]," and contending with individual suits would "saddle the defendant with the impossible task of complying with various incompatible standards for a single holding facility." 2025 WL 2658779, at *5. "The [Rule 23(b)(2)] requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole. That is the case here[.]" *SF ICE Litigation*, 2025 WL 3283283, at *21 (quotation marks and citation omitted). Here, as with the other hold room cell litigation throughout the country, "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. 338 at 360.

### III.     Plaintiffs' Transfer from the Baltimore Hold Rooms is Irrelevant

As this Court recently reiterated:

That the class claims at issue may be moot as to the individual Plaintiffs does not render the class claims moot in toto by operation of the "class-action specific 'relation back'" exception *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 325 (4th Cir. 2022). Indeed, Plaintiffs allege a circumstance where "other class members 'will continue to be subject to the challenged conduct and the claims raised are . . . inherently transitory.'" *Id.* (emphasis in original) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013)) . . .[C]claims that relate to the treatment and conditions at the Baltimore Hold Rooms, a (relatively) short-term detention facility—are of such a transitory nature.

ECF No. 122 at 12; *see also* ECF No. 74 at 13–19 (rejecting Defendants' mootness argument).

## PRELIMINARY INJUNCTION ARGUMENT

"While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment, a [civil] detainee . . . may not be subjected to punishment of any description." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992); *see also Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018) ("Put most simply, it is settled that [civil] detainees possess a constitutional right 'to be free from punishment.'") (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Where detention includes unconstitutional conditions, such as the placement in excessively crowded and unsanitary conditions or the denial of access to adequate medical care, it is punitive and unlawful on its face. The conditions at the BHR are clearly punitive in nature and have remained ongoing for months, necessitating emergent court intervention to restore the rights of those detained there.

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, this Court may issue a preliminary injunction "to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but ... [s]uch an injunction restores, rather than

28

disturbs, the status quo ante." *Id*. (citation omitted).

A party seeking a preliminary injunction must establish four factors: "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "When a government entity is a party to the case, the third and fourth factors merge." *PFLAG, Inc. v. Trump, et al.*, No. 25-337, 2025 WL 510050, at *5 (D. Md. Feb. 14, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[18]

## IV.    Plaintiffs are Likely to Succeed on the Merits of their Fifth Amendment Punitive Conditions Claims (Counts IV–V).

Plaintiffs have established a likelihood of success on the merits for Counts IV and V, which assert that Defendants have violated the Due Process Clause of the Fifth Amendment[19] by subjecting civilly detained individuals to punitive conditions, including through the denial of (i) sanitary, hygienic, and safe conditions and (ii) medical care.

"Civil detainees 'are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017) (*quoting Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)). When a civilly detained individual challenges conditions of confinement, "the

---

[18] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucster Cnty. School Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017).

[19] Because immigration detention is civil in nature, challenges to conditions of confinement in immigration facilities arise under the Fifth Amendment and are subject to the same constitutional analysis as pre-trial detention. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also C̄oreas v. Bounds*, 451 F. Supp. 3d 407, 420 (D. Md. 2020).

controlling inquiry for such a claim is whether the conditions imposed . . . constitute punishment." *Williamson,* 912 F.3d at 174 (4th Cir. 2018) (quotation omitted). In the Fourth Circuit, there is no requirement of subjective intent; a civilly detained individual prevails "on the purely objective basis that the 'governmental action' they challenge is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024) (citation omitted).

### A.    Defendants Deprive Putative Class Members of Hygienic, Sanitary, and Safe Conditions in Violation of the Fifth Amendment (Count IV).

Defendants have violated the constitutional obligation to provide for Plaintiffs' and putative Class Members' shelter, clothing, medical care, and safety while in their custody in the BHR. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 199–200 (1989). "It is a 'settled rule that housing inmates in a grossly overcrowded and unsanitary facility violates the inmates' rights to be free from cruel and unusual punishments.'" *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 812 (D. Md. 2022) (citation omitted).

Defendants disregard their constitutional obligation by overcrowding the BHR. Defendants routinely pack as many as 50 detained noncitizens into rooms that are intended to hold only a handful of individuals at a time. *See, e.g.*, Ex. 4 at ¶¶ 14, 20; Nieves Decl. at ¶ 7 (ECF No. 31-10) ("about twenty people"); Gordon Decl. at ¶ 14 ("over 30 men") (ECF No. 36-5); Akaolisa Decl., Ex. 9 at ¶ 6 ("approximately 40 people"); Tlapanco Peralta., Ex. 13 at ¶ 6 ("approximately 50 people"). Even assuming detention populations never exceeded Defendants' new maximum capacity of 35 people per large cell, that would result in each person being allotted 14 square feet per person in the 495 square foot Male Hold Room 3.[20] In view of similar conditions, the court in

---

[20] Allotted space per cell: 15.97 sq. ft./person in Cell 1 (559 sq. ft.); 12.00 sq. ft./person in Cell 2 (420 sq. ft.); and 14.14 sq. ft./person in Cell 3 (495 sq. ft.). *See* Ex. 7 at 4.

*NY ICE Litigation* has ordered Defendants "to limit the occupancy of hold rooms to ensure at least 50 square feet per each detained individual." 2025 WL 2658779, at *6

Even in a criminal detention facility, where cells provide "inmates with as little as eighteen square feet of living space[,]" "[w]e have no trouble concluding that such crowded conditions constitute cruel and unusual punishment for those convicted inmates who are kept in their cramped cells for all but a few hours each week." *Campbell v. Cauthron*, 623 F.2d 503, 506 (8th Cir. 1980). And, in the context of a pre-trial detention facility, detaining individuals in rooms providing less than 23 square feet per prisoner "do[es] not provide minimum decent housing under any circumstances for any period of time." *Lareau v. Manson*, 651 F.2d 96, 107–08 (2d Cir. 1981); *see also Zolnowski v. Cnty. of Erie*, 944 F. Supp. 1096, 1113 (W.D.N.Y. 1996) (holding pretrial detainees in spaces affording about 26 square feet per prisoner violates due process).

The square footage alone is not dispositive, and "the court must look to a number of factors, including the size of the detainee's living space, the length of the confinement, the amount of time spent in the confined area each day, and the opportunity for exercise." *Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650 (8th Cir. 1996); *Hubbard v. Taylor*, 538 F.3d 229, 233 (3d Cir. 2008) (same). For example, in *Bell*, the Supreme Court found that it was constitutionally permissible to hold two "pretrial detainees" in a seventy-five square foot cell (37.5 square feet per person) because "[d]etainees are required to spend only seven or eight hours each day in their rooms, during most or all of which they presumably are sleeping . . . During the remainder of the time, the detainees are free to move between their rooms and the common area." *Bell*, 441 U.S. at 543. Here, in contrast to *Bell*, individuals are kept in far more crowded quarters and remain locked in their cell for the entire duration of their stay without any opportunity for exercise or recreation. Ex. 2 at 251:5–252:4 (no access to exercise, a day room, outdoor space, TV, magazines, books,

31

recreation materials, clocks).

Notably, the conditions at the BHR are radically below the minimum requirements even for criminal detention facilities under the Federal Performance Based Detention Standards. These require that contracting facilities provide "a minimum of 35 square feet of space per detainee," "one [toilet] for every 12 detainees in male facilities and one for every eight detainees for female facilities," and "one shower for every 12 detainees."[21] The fact that conditions at the BHR are *radically* below the minimum standard required for convicted criminals in federal facilities strongly supports Plaintiffs' claims that the conditions at the BHR are punitive and therefore unconstitutional. Defendants can provide no legitimate nonpunitive objective that would justify inflicting the indignities of these conditions on civilly detained individuals at the BHR.

These overcrowded quarters also result in conditions that significantly interfere with the ability of individuals to sleep at the BHR. *See* Parra Decl. at ¶ 6 (ECF No. 31-5) (when sleeping, "I had to sit on the floor because there was no room to extend my body."); Cruz Decl. at ¶ 7 (ECF No. 31-6) ("The room was crowded; we could all lie down but only if we squeezed together."); Girod Decl. ¶ 5 (ECF No. 31-7) ("Sometimes, there wasn't enough room for everyone to even lay down on the floor, so people had to sleep sitting up.").[22] While Defendants now claim to provide every person detained overnight with a 2-foot by 6-foot "camping mattress," placing 35 or more of these mattresses in any of the large hold rooms would completely eliminate any walking space

---

[21] U.S. Dep't of Justice, *Federal Performance Based Detention Standards* (May 1, 2025), www.usmarshals.gov/sites/default/files/media/document/federal-performance-based-detention-standards-12.pdf, at 79, 94.

[22] Jenkins Decl. at ¶ 10 (ECF No. 31-12) ("[He] was cold and shivering when he woke up."); Amaya-Luis Decl. at ¶ 9 (ECF No. 31-14) ("I was so cold . . the jacket is the only thing I had to stay warm."); Akaolisa Decl., Ex. 9 at ¶ 5 ("We could not lie down because the room was so small and we had to sleep sitting down."); Salazar Decl., Ex. 12 at ¶ 12–13 ("It was very cold in the cells all the time, maybe between 45 and 50 degrees. . . [the] thin foil blankets [weren't] enough to stay warm at night.").

and require people to sleep in the toilet area or underneath benches. Ex. 2 at 143:9–144:13.

Sleep is critical to human existence and conditions that prevent sleep violate constitutional rights. *See e.g. Wilson v. Seiter,* 501 U.S. 294, 304 (1991) (depriving prisoners of blankets in low cell temperatures could violate the Eighth Amendment); *Walker v. Schult*, 717 F.3d 119, 126–27 (2d Cir. 2013) (collecting cases); *NY ICE Litigation*, 2025 WL 2658779, at *28–29 (detained individuals forced to sleep sitting up or in proximity to open toilets in cells without temperature controls, with lights on all the time, which "deprive[d] detainees of a basic human need and pose[d] an unreasonable risk of harm to their physical and psychological well-being."); *SF ICE Litigation*, 2025 WL 3283283, at *25 (denial of beds, blankets, imposition of cold temperatures is punitive).

Adding to these indignities, the BHR contains only a single open toilet per cell with no privacy, requiring up to 50 detained individuals to expose themselves to one another repeatedly while using the bathroom. *See, e.g.*, Akaolisa Decl., Ex. 9 at ¶ 7 ("[T]here was no privacy as [the toilet] was in an open area."); Garcia-Vigil Decl., Ex. 10 at ¶ 7 ("If someone wanted to use the toilet, it was an open area and someone else had to shield the person using it to ensure a bit of privacy.")[23]; *see also Zolnowski*, 944 F. Supp. at 1113 (finding punitive conditions where Defendants "often house[] ten to twenty prisoners with only one toilet."). Another court to recently consider conditions at the New York City hold rooms—with cells containing the same toilets with mid-height "privacy walls"—noted that these walls cannot provide "reasonable privacy," when part of their design is to permit ICE to "maintain sight supervision" in the cells. *NY ICE Litigation*, 2025 WL 2658779, at *10. Moreover, Defendants do not keep the cells or toilets clean; at most,

---

[23] Jenkins Decl. at ¶ 10 (ECF No. 31-12) ("The restroom was inside the holding cell and was disgusting. There was no privacy."); Parra Decl. at ¶ 6 (ECF No. 31-5) ("If we had to use the bathroom, everyone was able to see."); Hyde Decl. at ¶ 7 (ECF No. 6-2) Girod Decl. at ¶ 7 (ECF No. 31-7) (describing bathroom as "very dirty").

33

the cells and toilets are cleaned once or twice a week, and when they are at their most crowded, cannot be cleaned at all. Ex. 2 at 231:12–20; *see also* Salazar Monge Decl., Ex. 12 at ¶ 9 ("The ICE staff did not clean the toilet . . . so we asked for something to clean it because it was dirty.").

Further compounding the overcrowded and unsanitary conditions, Defendants detained individuals have no ability to shower, meaningfully clean themselves, or change clothes. Factual Background Section III.A. Courts in this Circuit have found constitutional violations where, as here, defendants' conduct leads to overcrowding and unsanitary conditions. *See, e.g.*, *Williams v. Griffin*, 952 F.2d 820, 825 (4th Cir. 1991) (allegations that, *inter alia*, plaintiff's cell toilet was shared by twelve inmates and constantly unclean deemed sufficient to sustain claim); *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 811 (D. Md. 2022) (granting summary judgment to plaintiff who was forced to ride in van that smelled of "defecation, urine, vomit, old food"); *see also Clark v. Daddysman*, No. 16-cv-0921, 2018 WL 1453333, at *10 (D. Md. Mar. 22, 2018) (confining individuals "in a cell containing human waste" is dangerous to the individual's health).

In other recent cases involving similar deprivation of hygienic conditions in other hold rooms, courts have uniformly held that such conditions violate the detained individuals' constitutional rights. *NY ICE Litigation*, 2025 WL 2658779, at *29 ("[A]n unsanitary environment and the denial of basic personal hygiene items deprive detainees of 'minimal civilized measure of life's necessities and [subject them] to unreasonable health and safety risks.'") (citation omitted); *SF ICE Litigation*, 2025 WL 3283283, at *26; *Chicago ICE Litigation*, 2025 WL 3204602, at *1.

In sum, Defendants cannot defend what are clearly punitive and unconstitutional policies and conditions at the BHR. Prior to February 2025, Defendants had never used the BHR as a residential facility, and there were no issues of overcrowding or unsanitary conditions. Defendants will continue to use the BHR as a residential facility during the pendency of this litigation.

34

Accordingly, this Court should issue the accompanying Proposed Order directing Defendants to ensure that no person detained by ICE at the Baltimore Hold Rooms is held or detained in any hold room or other room, cell, or other space:

(a)    having a floor area (exclusive of floor area within 8 feet from any toilet) less than 50 square feet multiplied by the number of such Detained Individuals held therein;

(b)    that is not furnished with a clean bedding mat and blanket for sleeping for each Detained Individual held overnight. Additional blankets must be provided on request;

(c)    that is not cleaned thoroughly at least once each day by ICE staff or ICE contracted employees;

(d)    that is not furnished with adequate supplies of hygiene products to give each Detained Individual adequate daily supplies of soap, towels, toilet paper, oral hygiene items (including toothbrushes and toothpaste), and feminine hygiene products. Individuals must be permitted to keep the provided hygiene products on their person.

**B.    Defendants Deprive Putative Class Members of Adequate Medical Care in Violation of the Fifth Amendment (Count V).**

Defendants have also violated their constitutional obligation to provide adequate medical care for Plaintiffs and putative Class Members while in their custody in the BHR through the denial of adequate medical screening, policies, training, and care. A civilly detained individual "'makes out a due process violation if he shows 'deliberate indifference to serious medical needs[.]'" *Reese v. Bounds*, No. 20-cv-3080, 2021 WL 849108, at *7 (D. Md. Mar. 5, 2021) (quoting *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988)). The Fourth Circuit adopted an "objective test" for claims by civilly detained individuals, dispensing with a prior requirement that a plaintiff establish a defendant's subjective knowledge of a serious risk of harm. *Short,* 87 F.4th at 611. There can be no serious dispute that Defendants' conduct rises to the level of deliberate indifference by detaining individuals for days at a time without adequate medical screening or access to medical care and medication.

35

**Inadequate Screening**: Courts have repeatedly held that "an adequate medical system must include a screening of all incoming inmates within a reasonable period in order to determine if the inmate has any condition that requires treatment and to check for the existence of any contagious disease." Initial screening when entering facility, 1 *Rights of Prisoners* § 4:5 (5th ed. 2025); *see also Gordon v. Cnty. of Orange*, 6 F.4th 961, 971–72 (9th Cir. 2021) (newly detained individuals have a "constitutional right to have a proper medical screen conducted to ensure the medically appropriate protocol was initiated"); *Lareau v. Manson,* 651 F.2d 96, 109 (2d Cir. 1981) (plaintiffs do not need "evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy . . . the failure to screen created an indiscriminate threat to all inmates.").[24]

Moreover, "the provision of medical care is grossly deficient" where newly detained individuals "are medically screened by a staff wholly untrained in the detection of physical or mental illness and unprepared to respond properly." *Dawson v. Kendrick*, 527 F. Supp. 1252, 1307 (S.D. W. Va. 1981); *Carver v. Knox Cnty., Tenn*., 753 F. Supp. 1370, 1391 (E.D. Tenn.), *aff'd in part, rev'd in part*, 887 F.2d 1287 (6th Cir. 1989) ("[M]any of these prisoners are only screened by a member of the staff who is untrained in the detection of physical or mental illness and,

---

[24] *Martino v. Carey*, 563 F. Supp. 984, 989 (D. Or. 1983) (finding care inadequate because "[t]here was no medical screening of inmates upon their admission" and "[t]here was no examination for communicable diseases[.]"); *Sanchez v. Young Cnty*., Texas, 956 F.3d 785, 795 (5th Cir. 2020) (raising concern over "policies where jailers are not required to complete suicide- or medical-screening forms"); *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1077 (N.D. Cal. 2014) ("[F]ailure to medically screen new inmates may constitute deliberate indifference to medical needs."); *Est. of Funabiki by & through Funabiki v. Cnty. of Whitman*, No. 2:21-cv-00089, 2024 WL 4425682, at *5 (E.D. Wash. Oct. 5, 2024) (right to adequate medical care includes "medical personnel screening pretrial detainees for critical medical needs") (internal citations omitted); *Lopez v. Nevada ex rel. Nevada Dep't of Corr.*, No. 2:21-cv-01161, 2023 WL 6383616, at *14 (D. Nev. Sept. 29, 2023) (a "failure to conduct a mental health assessment . . . clearly violates the right to adequate mental health care.").

consequently, unprepared to respond fully and properly. It is generally recognized that prompt

medical screening is a medical necessity in pre-trial detention facilities.").

As detailed in Factual Background Section III.B, there is no meaningful medical screening

at the BHR. As Officer Guerrero explained at his deposition:

> A:    [W]e do not have medical screening here. We're not nurses and doctors. We
>        ask generic questions.
>
> Q:    And I understand that. But, again, my question is just a little bit different. I'm
>        asking do any of the officers working at the holding facility get trained in
>        conducting medical screenings?
>
> A:    No, we do not get training in medical screenings. We are not nurses and doctors.
>        We are immigration enforcement agents. Hence the reason why we ask generic
>        questions, what is your medical state and what is your medical -- what is your
>        medical condition, if any.

Ex. 2 at 182:5–17. While the absence of medical screening may have been sufficient for the BHR

when it was holding only a handful of people for fewer than 12 hours at a time, that is no longer

the case.

As Dr. Goldenson explains:

> [O]fficers at the facility do not perform adequate medical/mental health screening
> when detained individuals enter the facility. They do not use a structured
> questionnaire . . . [they] do not inquire about specific medical conditions, drug or
> alcohol usage, suicidal ideation, or symptoms of possible infectious diseases. In
> addition, they do not check vital signs (temperature, pulse, blood pressure, and
> respiratory rate) . . .[which] are an essential means of detecting serious health
> problems such as infections and acute medical problems . . . Officers do not receive
> any education or training related to obtaining a health history or in the identification
> of signs/symptoms of potential serious medical conditions . . . This places other
> detained individuals, as well as staff, at serious risk of harm[.]

Ex. 3 at ¶¶ 18-21. The policies of the BHR also stand in stark contrast to the minimum requirements

for Baltimore City jails, as outlined in the November 2015 Settlement Agreement, entered in

*Duvall et al. v. Hogan et al.*, 1:94-cv-02541, ECF 541-2 (Dec, 23, 2015), which is still in effect

today. Ex. 17. Among other things, these facilities are required to ensure that initial medical and

37

mental health screening is performed by a registered nurse within four hours of arrival. *Id*. at 3. Similarly, under the PBNDS, "no later than 12 hours after arrival, all detainees shall receive, by a health care provider or a specially trained detention officer, an initial medical, dental and mental health screening and be asked for information regarding any known acute or emergent medical conditions." Ex. 6 at 266. And these screenings must be conducted using 7-page detailed screening questionnaire. *Id*. at 283. Defendants' screening policies are woefully inadequate, unconstitutional, and pose a risk of serious harm to everyone detained at the BHR.

**Inadequate Training**: As the Supreme Court noted nearly 50 years ago, where certain duties are "assigned to specific officers . . . the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers [] can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Courts have repeatedly held that the failure to provide basic medical training to those responsible for the safety of detained individuals rises to the level of constitutional violation. *See*, *e.g. Blackmore v. Kalamazoo Cnty*., 390 F.3d 890, 900 (6th Cir. 2004) ("[T]he seriousness of prisoner's need for medical care is obvious, and [] the record presents an issue of fact regarding the total lack of any County policies, practices, and adequate training[.]"); *Walker v. S. Health Partners*, 576 F. Supp. 3d 516, 546 (E.D. Ky. 2021) (emphasizing that "non-medically trained staff [were] expected to recognize and react to medical emergencies without any guidance or training"); *Glomski v. Cnty. of Oakland*, No. 05-70503, 2007 WL 925681, at *7 (E.D. Mich. Mar. 28, 2007) (noting county's "failure to train its officers on how to properly respond to an inmate's obvious, medical emergency").[25]

---

[25] *Wallace v. Hounshel*, No. 1:06-cv-1560, 2009 WL 734714, at *11–12 (S.D. Ind. Mar. 19, 2009) ("A reasonable jury could find that the need to train jail officers with regard to handling an inmate's complaints of chest pain was obvious[.]"); *Whitehurst v. Lackawanna Cnty*., No. 3:17-CV-00903,

As detailed in Factual Background Section III.B,, there are no licensed health professionals of any kind at BHR. And as Officer Guerrero confirmed at his deposition, the officers do not receive medical training of any kind:

> Q:    [T]here is no specific medical training that is provided to the officers working at the holding facility, correct?
>
> A:    That is correct, because we're not medical personnel . . . Again, we're not a facility. We're a hold room.

Ex. 2 at 221:4-9. As Dr. Goldenson explains, officers who are responsible for the medical welfare of detained individuals should be trained in "in the acute manifestations of common chronic illnesses, intoxication and withdrawal, adverse reactions to medications, signs and symptoms of mental illness, suicide prevention, precautions and procedures with respect to infectious diseases, and maintaining patient confidentiality." Ex. 3 at ¶ 29. Defendants' failure to provide adequately trained staff poses a serious and unconstitutional risk of harm to individuals detained at the BHR.

**Delayed or Denied Medical Treatment and Medication**: Courts have repeatedly held that the failure to provide timely medical care and access to medications violates the Constitution. *See*, *e.g.*, 527 F. Supp. at 1307 ("Persons such as epileptics and diabetics, who have an immediate need to continue their treatments, are unlikely to be carrying their medications at the time of arrest . . . . By the decision to imprison, the state creates immediate medical needs and thus obligates itself to provide appropriate care."); *Wiertella v. Lake Cnty.*, Ohio, 141 F.4th 775, 782 (6th Cir. 2025) ("If an inmate experiences symptoms of depression because he is not timely receiving his

---

2020 WL 6106616, at *18 (M.D. Pa. Mar. 5, 2020), report and recommendation adopted, No. CV 3:17-903, 2020 WL 6083409 (M.D. Pa. Oct. 15, 2020) (jury could find that "failure to ensure adequate training of medical and correctional staff to screen, observe, and report on the medical status of inmates constituted deliberate indifference"); *Gahr v. Marion Cnty.*, No. 6:22-CV-01188, 2025 WL 835648, at *13 (D. Or. Mar. 17, 2025) ("The consequences of failing to provide mental health training to the nursing staff in an environment where suicide is the highest leading cause of death is obvious.").

psychiatric medication, this can constitute serious harm" and a violation arises if any "prescribed plan of treatment . . . was unnecessarily interrupted"); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 938–39 (N.D. Ill.), supplemented, 75 F. Supp. 3d 777 (N.D. Ill. 2014) (policy of deliberate indifference could be established where "six other detainees [] did not receive the medical care or medication they needed while they were at the Jail"); *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1077 (S.D. Cal. 2023) ("Plaintiff also missed his dose his second day in custody because the doctor did not see him and no medical staff followed up to ensure that he received his medication."); *Tillery v. Owens*, 719 F. Supp. 1256, 1302 (W.D. Pa. 1989), aff'd, 907 F.2d 418 (3d Cir. 1990) ("Prison officials show deliberate indifference if they prevent an inmate from receiving recommended treatment or deny him access to medical personnel capable of evaluating his need for treatment.").

As detailed in Factual Background Section III.B, Defendants have no meaningful policies for ensuring that detained individuals receive timely access to medication or medical care. As Dr. Goldenson explains:

> At the Baltimore ICE Holding Facility, if a detained individual states he/she is taking medication, the officers ask if a family member or friend can bring the medication to the facility. This is not an adequate system as the family/friends may not be able to bring the medication to the facility timely, and the patient will be forced to go without needed medication. In addition, this is not a safe practice as the staff do not know what drug is actually being brought into the facility.

Ex. 3 at ¶ 24. While Defendants claim to be taking individuals who need medication or care to the hospital, Defendants' records confirm this is not the case, as only 25 individuals were transported to the hospital for any reason in a nine-month period, even though at least 232 people had noted health concerns, including diabetes and HIV. Ex. 4 at ¶ 21. As Dr. Goldenson explains:

> If there were truly only 25 individuals transferred from the facility for medical or medication related issues, it indicates that, to a reasonable degree of certainty, there are many individuals who required a medical evaluation and did not receive one.

Ex. 3 at ¶ 31. Dr. Goldenson concludes that Defendants' failure "to ensure the continuity of

40

essential medications, and to provide adequate access to medical care in the Baltimore ICE

Holding Facility presents a serious risk of harm to detainees and staff." *Id*. at ¶ 32.

**Absence of Written Policies**:

Remarkably, Defendants have no written policies of any kind governing medical screening

or access to medical care or medication. *See* Ex. 7 at 3; Ex. 2 at 241:2–6. Courts have held that a

showing of deliberate indifference may be established where, as here, Defendants do "not have a

formal written policy on how to deal with prisoner illnesses." *Blackmore v. Kalamazoo Cnty.*, 390

F.3d 890, 900 (6th Cir. 2004); *Ginest v. Bd. of Cnty. Comm'rs. of Carbon Cnty.*, 333 F. Supp. 2d

1190, 1207–08 (D. Wyo. 2004) ("Whatever unwritten policies Colson has enacted to regulate the

jail's medical program are not adequate or are improperly disseminated[.]"); *Walker v. S. Health

Partners*, 576 F. Supp. 3d 516, 546 (E.D. Ky. 2021) ("He conceded that there was no written policy

advising corrections staff when to call 911").[26]

As Dr. Goldenson explains: "Policies and procedures present a written framework that

provides guidance and direction to both medical and detention staff in correctional facilities on the

provision of necessary health care services in an effective manner. They reduce the occurrence of

adverse events and enhance patient and staff safety." Ex. 3 at ¶ 32, n.12. As an example, "[i]t is

imperative that there be written policies and procedures that provide guidance and direction to

---

[26] *Whitehurst v. Lackawanna Cnty.*, No. 3:17-CV-00903, 2020 WL 6106616, at *18 (M.D. Pa. Mar. 5, 2020), *report and recommendation adopted*, No. 3:17-cv-903, 2020 WL 6083409 (M.D. Pa. Oct. 15, 2020) ("[A] reasonable jury could conclude that [defendants'] failure to establish policies to address the basic medical and psychiatric care needs of inmates" was "deliberate indifference to the serious medical needs[.]"); *Fox ex rel. Fox v. Peters*, No. 09 C 5453, 2011 WL 6378826, at *8 (N.D. Ill. Dec. 19, 2011) (plaintiffs stated claim for deliberate indifference because "Wexford had no written policy governing the distribution of medicine to inmates" and "the lack of any such policy led to a series of failures to provide appropriate medical care to inmates"); *Thornhill v. Breazeale*, 88 F. Supp. 2d 647, 652 (S.D. Miss. 2000) ("Lamar County Jail had no written policies in place for the detection and prevention of suicide.").

staff" on issues like "obtaining a health history or in the identification of signs/symptoms of potential serious medical conditions such as alcohol/drug intoxication or withdrawal, suicidal ideation, or infectious diseases." *Id*. at ¶ 8. Defendants' failure to implement basic written policies poses a dangerous and unconstitutional risk of harm to individuals detained at the BHR.

**Requested Relief**: Defendants' policies evince a depraved indifference to the wellbeing of noncitizens detained at the BHR. Indeed, despite being responsible for the wellbeing of those detained at the BHR, Defendants never even asked Officer Guerrero to review the complaint in this action or any of the many third-party declarations attesting to serious mistreatment and medical neglect. Ex. 2 at 18:10-19:21. Nor have Defendants even bothered to investigate these claims. *Id*. Defendants' medical policies may have been adequate prior to February 2025, before Defendants converted the BHR into a residential facility, they now pose a serious risk of injury, and "in the worst-case scenario, fatalities." Ex. 1. Accordingly, this Court should issue the accompanying Proposed Order directing Defendants to provide adequate medical care and screening to detained individuals in the BHR, including specifically to:

(a)     ensure that a medical professional or specially trained detention officer will conduct a basic medical screening on each Detained Individual within 12 hours, prior to placing them in a hold room with other detained individuals. Screening will be sufficient to identify and begin necessary treatment of those with mental or physical illness and injury; to provide access to prescription medication without interruption; to recognize, segregate, and treat those with communicable diseases; to provide medically necessary special diets; and to recognize and provide necessary services to Detained Individuals with physical disabilities;

(b)     Provide prompt access to over-the-counter pain medication and, within 24 hours after intake, provide access to any prescription medications necessary to ensure continuity of treatment for Detained Individuals with a prescription for medication, and provide Detained Individuals the right to possess, receive, and retain their prescribed medication on their person at all times, consistent with any prescription; and

(c)     Provide prompt access to medical care when requested by a Detained Individual, regardless of the language spoken to make the request, including access to the

42

services of licensed medical personnel, without charge, between the hours of 7 a.m. and 9:30 p.m. In the case of emergencies, respond immediately and provide access to emergency medical care at all times.

## V.     PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM TO THE PLAINTIFFS

The putative Class Members will clearly continue to suffer irreparable harm in the absence of an injunction. With respect to their constitutional claims, "[i]t has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (internal citation and quotation omitted). Absent an injunction, extended confinement in the overcrowded, unsanitary BHR will continue to cause putative Class Members personal injury, mental anguish, emotional trauma, and potential death, for which monetary damages are inadequate. *See SF ICE Litigation*, 2025 WL 3283283, at \*27 (finding irreparable harm due to the loss of constitutional rights and irreparable physical harms); NY ICE Litigation, 2025 WL 2658779, at \*24 ("[P]laintiff has established irreparable harm by demonstrating that putative class members 'face imminent risk to their health, safety, and lives.'").

## VI.     BOTH THE PUBLIC INTEREST AND THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF GRANTING PRELIMINARY INJUNCTIVE RELIEF

Putative Class Members will continue to suffer significant irreparable harm to their life and liberty in the absence of the requested injunctive relief. In contrast, Defendants are "in no way harmed by the issuance of [an injunction] which prevents [them] from" engaging in policies "likely to be found unconstitutional." *Leaders of a Beautiful Struggle,* 2 F.4th at 346. Moreover, the public interest weighs heavily in Plaintiffs' favor because "it is well-established that the public interest favors protecting constitutional rights." *Id*.; *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) ("[U]pholding constitutional rights surely serves the public

43

interest.") (citation omitted).[27]

## VII.    THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR REQUIRE PLAINTIFFS TO PROVIDE A NOMINAL SECURITY

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." Under Fourth Circuit law, "the district court retains the discretion to set the bond amount as it sees fit or [even] waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977, 981 (4th Cir. 2022). Courts have "frequently waived the bond requirement in cases where a fundamental constitutional right is at stake." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (setting "a nominal bond of zero dollars"); *Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) ("District courts have discretion to set the required security at a nominal amount . . . and this approach has long been followed in public-interest litigation cases") (citation omitted); *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 25-cv-00702, 2025 WL 833917, at *25 (D. Md. Mar. 17, 2025) (setting nominal bond of $100).

A court in this district has previously waived the bond requirement in a case involving civilly detained noncitizens seeking preliminary injunctive relief related to unconstitutional conditions at Defendants' facilities. *Coreas,* 458 F.Supp.3d at 362. This Court should do the same here or, in the alternative, set a nominal bond of $1.

---

[27] *See also* ECF No. 38, Amicus Brief of Maryland Attorney General (discussing how BHR conditions would violate Maryland state facility standards and create "severe public health risks," and finding that "[b]alancing the equities, the harm to the United Stats from an injunction is slight.").

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motions and issue an order (i) certifying the class of "[a]ll persons who are now or in the future will be detained at the Baltimore Hold Rooms" and (ii) ordering the injunctive relief reflected in the accompanying Proposed Order.

Dated: December 23, 2025

Respectfully submitted,

*/s/ Jared A. Levine*
Jared A. Levine (NY Bar No. 4897211)*
Daniella A. Schmidt (NY Bar No. 5186283)*
Luke Taeschler (NY Bar No. 5308325)*
Emily Werkmann (NY Bar No. 5750229)*
**CROWELL & MORING LLP**
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com
DSchmidt@crowell.com
LTaeschler@crowell.com
Ewerkmann@crowell.com

Jerome A. Murphy (D. Md. Bar No. 27678)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2895
JMurphy@crowell.com

Ian Austin Rose (D. Md. Bar No. 22079)
Amelia Dagen (D.C. Bar No. 90004838)*
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Ave. NW
Suite 701
Washington, DC 20036
(202) 788-2509
Austin.rose@amicacenter.org
Amelia@amicacenter.org

Sirine Shebaya (D. Md. Bar No. 07191)
Yulie Landan (CA Bar No. 348958)*
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Rd. NW
Suite 175 #896645
Washington, DC 20009
(202) 656-4788
sirine@nipnlg.org
yulie@nipnlg.org

*Pro bono counsel for Plaintiffs*

\* Admitted *Pro Hac Vice*

45