**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| D.N.N. and V.R.G., *on behalf themselves and all others similarly situated*, | |
| *Petitioners-Plaintiffs*, | **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND PRELIMINARY INJUNCTION** |
| v. | |
| JEREMY BACON, *et al.*, *Respondents-Defendants*. | Civil Action No.: 1:25-cv-01613 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION AND PRELIMINARY INJUNCTION**

i

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    FACTUAL BACKGROUND................................................................................2

    A. Detention Background ...................................................................................2

        1.  Presidential Executive Orders....................................................................2

        2.  Maryland Sanctuary Law...........................................................................3

    B. Baltimore Hold Room Operational Practices ...........................................4

        1.  Overview of Hold Rooms............................................................................4

           a.  *Intake Procedures* ........................................................................5

           b.  *Other Operational Procedures Temporary Detainees* ...............6

III.   LEGAL STANDARDS ........................................................................................9

    a.  Class Certification under Rule 23 (a) and (b)..........................................9

    b.  Fifth Amendment Due Process Standard for Pretrial Detainees ..........10

ARGUMENT.......................................................................................................... 11

I.    Plaintiffs Fail to Meet All Rule 23(a) Requirements...................................11

    A.  Plaintiffs Fail to Meet All Rule 23(a) Overbroad ..................................11

    B.  The Proposed Class Lacks the Commonality Required Under Rule 23(a)(2).......14

        1.  The Challenged Practices Are Not Broadly Applicable to all Putative Class Members ................................................................................15

        2.  Plaintiffs Fail to Identify Common Questions that Will Generate Answers Driving Resolution of Litigation................................................19

        3.  Commonality Cannot Be Found Where Challenged Practices Require Individualized

Inquiries ...................................................................................................21

    4.   The Chicago, New York, and San Francisco Litigation Are Not Instructive Here ...................................................................................................22

  C.  The Named Plaintiffs' Claims Are Not Sufficiently Typical of the Claims of the Proposed Class.................................................................................22

  D.  The Named Plaintiffs Are Not Adequate Class Representatives..........................24

II.     The Proposed Class Does Not Satisfy Rule 23(b)(2)'s Requirements .......................25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION.................................................................................................25

I.     Petitioners Claims are Moot and Thus Lack Standing to Pursue Injunctive Relief ....26

II.    Plaintiffs Do Not Satisfy the Requirements for Preliminary Relief ...........................26

  A.  Plaintiffs Do Not Demonstrate a Likelihood of Success on the Merits................28

    1.  Plaintiffs' Due Process Rights are not Being Violated....................................28

      a.  *Plaintiffs Fail to Show a Fifth Amendment Violation*................................28

      b.  *Plaintiffs Fail to Allege an Eighth Amendment Due Process Violation*....34

    2.  The Waiver of the 12-hour Policy was not Arbitrary or Capricious Under the APA ...................................................................................................38

  B.  Plaintiffs Have Not Shown Irreparable Harm ...................................................40

  C.  The Balance of Interests and Public Interest Favor Respondents .......................41

CONCLUSION.................................................................................................42

## TABLE OF AUTHORITIES

### CASES

*Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*,

    105 F.4th 554 (4th Cir. 2024) ........................................................................ 26

*Aggarao v. MOL Ship Mgmt. Co.*,

    675 F.3d 355 (4th Cir. 2012) ......................................................................... 27

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,

    750 F.2d 1470 (9th Cir. 1985) ....................................................................... 42

*AmChem Prods., Inc. v. Windsor*,

    521 U.S. 591 (1997)........................................................................... 10, 24, 25

*American Hosp. Supply Corp. v. Hospital Prods., Ltd.*,

    780 F.2d 589 (7th Cir. 1986) ......................................................................... 27

*Andrews v. Cross*,

    No. 5:10-CV113, 2012 WL 707478 (N.D. W. Va. Mar. 5, 2012) ........................................... passim

*Arizona v. United States*,

    567 U.S. 387 (2012)....................................................................................... 41

*Aslanturk v. Hott*,

    459 F. Supp. 3d 681 (E.D. Va. 2020) ............................................................ 43

*Bell v. Wolfish*,

    441 U.S. 520 (1979)................................................................................. passim

*Beverati v. Smith*,

    120 F.3d 500 (4th Cir. 1997) ......................................................................... 36

*Blackie's House of Beef, Inc. v. Castillo*,

    659 F.2d 1211 (D.C. Cir. 1981)...................................................................... 43

*Bond v. Marriott Int'l, Inc.*,

　296 F.R.D. 403 (D. Md. 2014) ................................................................. 10

*Brooks v. Vassar*,

　462 F.3d 341 (4th Cir. 2006) ................................................................. 26

*Broussard v. Meineke Discount Muffler Shops, Inc.*,

　155 F.3d 331 (4th Cir. 1998) ............................................................. 22, 23

*Califano v. Yamasaki*,

　442 U.S. 682 (1979)............................................................................... 9

*Caribbean Marine Servs. Co. v. Baldrige*,

　844 F.2d 668 (9th Cir. 1988) ................................................................. 40

*Dawson v. Kendrick*,

　527 F. Supp. 1252 (S.D.W. Va. 1981)................................................... 39

*Deiter v. Microsoft Corp.*,

　436 F.3d 461 (4th Cir. 2006) ................................................................. 23

*Demore v. Kim*,

　538 U.S 510. ..................................................................... , 34, 37

*Diaz v. Garland*,

　53 F.4th 1189 (9th Cir. 2022) ............................................................... 25

*Dilworth v. Adams*,

　841 F.3d 246 (4th Cir. 2016) ................................................................. 35

*Dixon v. Justice*,

　41 F.4th 316 (4th Cir. 2022) ................................................................. 26

*Farmer v. Brennan*,

　511 U.S. 825, (1994)............................................................. 13, 17, 18, 20

v

*Friends of the Earth, Inc. v. Laidlaw Environmental Services,*

    528 U.S. 167 (2000) ........................................................................................... 26

*Gen. Tel. Co. of Southwest v. Falcon,*

    457 U.S. 147 (1982) ....................................................................................... 9, 14

*Gordon v. Cnty. of Orange,*

    6 F.4th 961 (9th Cir. 2021) ........................................................................ 38, 39

*Harris v. Fleming,*

    839 F.2d 1232 (7th Cir. 1998) ......................................................................... 34

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.,*

    736 F.3d 1239 (9th Cir. 2013) ......................................................................... 42

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.,*

    17 F.3d 691 (4th Cir. 1994) ............................................................................. 27

*Ingraham v. Wright,*

    430 U.S. 651 (1977) ......................................................................................... 35

*Iosello v. Lawrence,*

    No. 03 C 987, 2005 WL 2007147 (N.D. Ill. Aug. 18, 2005) ........................... 23

*Jackson v. Lightsey,*

    775 F.3d 170 (4th Cir. 2014) ........................................................................... 35

*Jama v. Immigration and Customs Enforcement,*

    543 U.S. 335 (2005) ......................................................................................... 38

*Jennings v. Rodriguez,*

    138 S. Ct. 830 (2018) ....................................................................... 24, 25, 32, 37

*Kadel v. Folwell,*

    100 F.4th 122 (4th Cir. 2024) .......................................................................... 15

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,

    571 F.3d 672 (7th Cir. 2009) ........................................................................... 11

*Lancaster v. Sec'y of Navy*,

    109 F.4th 283 (4th Cir. 2024) ......................................................................... 26

*Lareau v. Manson*,

    651 F.2d 96 (2d Cir. 1981) ........................................................................ 35, 39

*League of Women Voters v. North Carolina*,

    769 F.3d 224 (4th Cir. 2014) ......................................................................... 28

*Martin v. Gentile*,

    849 F.2d 863 (4th Cir. 1988) ......................................................................... 37

*Mercando v. Noem*,

    No. 25-cv-6568, 2025 WL 2658779 .............................................................. 12

*MicroStrategy Inc. v. Motorola, Inc.*,

    245 F.3d 335 (4th Cir. 2001) ......................................................................... 27

*Miltier v. Beorn*,

    896 F.2d 848 (4th Cir. 1990) ......................................................................... 38

*Montgomery v. Housing Auth. of Baltimore City*,

    731 F. Supp. 2d 439 (D. Md. 2010) ............................................................... 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ......................................................................................... 41

*Nken v. Holder*,

    556 U.S. 418 (2009) ....................................................................................... 43

*Parsons v. Ryan*,

    754 F.3d 657 (9th Cir. 2014) ......................................................................... 17

*Pashby v. Delia,*

709 F.3d 307 (4th Cir. 2013) ........................................................................................... 27

*Perry v. Judd,*

471 F. App'x 219 (4th Cir. 2012) ..................................................................................... 27

*Real Truth About Obama, Inc. v. Fed. Election Comm'n,*

575 F.3d 342 (4th Cir. 2009) ........................................................................................... 27

*Rish v. Johnson,*

131 F.3d 1092 (4th Cir.1997) ...................................................................................... 29, 30

*Robles v. Prince George's Cty., Md.,*

302 F.3d 262 (4th Cir. 2002) ........................................................................................... 12

*RoDa Drilling Co. v. Siegal,*

552 F.3d 1203 (10th Cir. 2009) ....................................................................................... 28

*Scotts Co. v. United Indus. Corp.,*

315 F.3d 264 (4th Cir. 2002) ........................................................................................... 43

*Slade v. Hampton Roads Reg'l Jail,*

407 F.3d 243 (4th Cir. 2005) ........................................................................................... 10

*Stafford v. Bojangles' Restaurants, Inc.,*

123 F.4th 671 (4th Cir. 2024) ....................................................................................passim

*Stead v. Skinner,*

No. 10-4526, 2011 U.S. Dist. LEXIS 99347 (N.D. Ill. Sep. 2, 2011) ............................. 34

*Tesch v. City of Greenlake,*

157 F.3d 465, 476 (7th Cir. 1998). ............................................................................. 33, 35

*Thompson v. Brown,*

C/A No. 3:11-cv-318-TMC-JRM, 2011 WL 6012592, at *1–2 (D.S.C. Nov. 8, 2011)………34

*Thompson v. Commonwealth of Virginia,*

    878 F.3d 89 (4th Cir. 2017) ............................................................................ 18, 37

*Toure v. Hott,*

    458 F. Supp. 3d 387 (E.D. Va. 2020) ...................................................................... 28

*United States v. Martinez-Fuerte,*

    428 U.S. 543 (1976)................................................................................................ 43

*United States v. South Carolina,*

    720 F.3d 518 (4th Cir. 2013) .................................................................................. 27

*Villanova v. Abrams,*

    972 F.2d 792 (7th Cir. 1992) ............................................................................ 16, 32

*Wal-Mart Stores, Inc. v. Dukes,*

    564 U.S. 338 (2011)......................................................................................... passim

*Warth v. Seldin,*

    422 U.S. 490 (1975)................................................................................................ 26

*Whitnack v. Douglas Cnty.,*

    16 F.3d 954 (8th Cir. 1994) .................................................................................... 35

*Williams v. Ozmint,*

    716 F.3d 801 (4th Cir. 2013) .................................................................................. 26

*Williamson v. Stirling,*

    912 F.3d 154 (4th Cir. 2018) ............................................................................ 11, 32

*Wilson v. Seiter,*

    501 U.S. 294, 111 S. Ct. 2321 (1991)...............................................................32, 40

*Winter v. Natural Resources Defense Council, Inc.,*

    555 U.S. 7 (2008)................................................................................................... 42

*Youngberg v. Romeo,*

    457 U.S. 307 (1982)...................................................................................................... 44

*Zadvydas v. Davis,*

    533 U.S. 678 (2001)................................................................................................ 32, 37

## STATUTES

8 U.S.C. § 1182(d)(5) .................................................................................................... 37

8 U.S.C. § 1226(a) .......................................................................................................... 41

8 U.S.C. § 1229(e) .......................................................................................................... 41

8 U.S.C. § 1231(g) .......................................................................................................... 42

8 U.S.C. § 1357(a) .......................................................................................................... 41

8 U.S.C. §§ 1182 ............................................................................................................ 41

## RULES

Fed. R. Civ. P. 23(a) .................................................................................................. 10, 11

Fed. R. Civ. P. 23(b)(2) .............................................................................................. 10, 25

## REGULATIONS

8 C.F.R. § 236.1(c)(8)..................................................................................................... 37

## I.    INTRODUCTION

Two former immigration detainees at the U.S. Immigration and Customs Enforcement ("ICE")

Enforcement and Removal Operations ("Baltimore ERO") Holding Rooms in Baltimore, Maryland

("Hold Rooms" or "BHR") filed this putative class action claiming that Defendants are subjecting

detained individuals to punitive detention conditions in violation of the Administrative Procedure Act

("APA") and their Fifth Amendment Due Process rights. *See generally* Am. Compl. ECF No. 6.

On July 25, 2025, this Court denied Plaintiffs' motions for class certification and preliminary

injunction, ECF No. 74, but subsequently allowed Plaintiffs expedited written and oral discovery in

support of renewed motions for the same relief. ECF No. 81. Plaintiffs propounded written discovery

requests, which were answered by Defendants, and also took the deposition of a government witness.

With a robust factual record now present, it reflects that Plaintiffs' allegations concerning punitive

conditions of confinement at the BHR are unsupported and unfounded.

Pretrial detainees are entitled to the basic necessities of human life including adequate food,

clothing, shelter, sanitation, medical care and personal safety, all of which the BHR sufficiently

provide. The evidence and the law thus establish that the conditions of confinement at the BHR do not

run afoul of Fifth Amendment guarantees. Accordingly, the Court should not certify the proposed

class.

Plaintiffs' proposed class definition, comprised of hypothetical current and future ICE

individuals detained at the BHR in Baltimore, remains unchanged and overbroad. The putative class is

drawn so broadly in fact—encompassing *any* detainee who enters the facility for *any* duration of time

without regard to any enhanced risk profile such as pre-existing medical conditions—that it ensures

wide variation, rather than consistency, in exposure to challenged practices and policies of the BHR

and disallows a common plausible risk of harm. As argued below, Plaintiffs' arguments fail to

overcome the fundamental problem of "dissimilarities within the proposed class" that are

determinative of the deprivation inquiry and necessarily "impede the generation of common answers."

Moreover, Plaintiffs cannot establish constitutional claims with a high probability of success on the merits. As described in detail below, Plaintiffs fail to allege a plausible claim for relief under either the Fifth Amendment or the APA, and their deliberate indifference claim fails because they cannot demonstrate irreparable harm. A preliminary injunction is also unwarranted here because the balance of the equities and the public interest weigh in Defendants' favor. Therefore, the Court should deny Plaintiffs' renewed motions.

## II.    FACTUAL BACKGROUND

### A. Detention Background

1. <u>Presidential Executive Orders</u>

On January 20, 2025, President Trump issued Executive Orders including "Protecting the American People Against Invasion" and "Securing Our Borders." *See* Executive Orders, available at https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/; https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders. These Executive Orders declared a national emergency and ordered "the detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States." *See* "Securing Our Borders" at 1. ICE issued the Nationwide Hold Room Waiver ("Detention Policy") in response to President Trump's Executive Orders declaring a national emergency and because the daily population of detained aliens had increased due to President Trump's commitment to enforcing the immigration laws of the United States. ECF No. 40-3, Detention Policy. The Detention Policy "allows for aliens who are recently detained, or are being transferred to or from a court, detention facility, or holding facility, or other agency to be housed in a holding facility, for up to, but not exceeding 72 hours, absent exceptional circumstances." *See id*. Under the Detention Policy, ICE and DHS remain committed to ensuring the safety of detainees. *See id*. at 2. Respondents must follow the existing and extensive policies,

procedures, and guidance governing holding facilities. *See id*. ICE will only hold detainees "for the least amount of time required for their processing, transfer, release, or repatriation." *Id*. The amount of time a particular detainee is detained varies based on different circumstances and factors, such as availability of detention centers, arrest numbers, and transportation schedules. *See* Ex. A, Deposition Transcript of Jose Guerrero at 132:20-133:4; 140:22-141:10; 131:4-12; 135:2-10; *See* Ex. B, BHR Detainee In & Out Times.[1]  The Detention Policy will remain in effect for "one calendar year," when Respondents will review it and determine if it needs to be extended. See ECF NO. 40-3 at 1.

### 2. Maryland Sanctuary Law

On July 1, 2021, Maryland enacted the "Dignity Not Detention Act," legislation that "prohibits state and local law enforcement from entering into agreements to detain aliens for federal civil immigration violations." ECF No. 40-2 at 1. As the Baltimore Field Office waiver request explains, "[t]his law eliminated all detention space for the ERO Baltimore Field Office within the state of Maryland." *Id*. Prior to the law's enactment, three Maryland counties—Frederic, Howard, and Worcester—contracted with ICE to provide detention space for immigration detainees. *See* Ex. C, *Baltimore Sun* article. The counties allotted varying amounts of capacity, with Worcester County providing space for up to 200 aliens. *Id*. As a result of the law's passage, every individual temporarily detained at the BHR must be transferred to an out-of-state facility, a logistical challenge that does not exist in jurisdictions with available local or regional detention space. Guerrero Decl, ¶ 17. Absent the availability of the BHR, ERO Baltimore would not be able to process individuals for detention and would be unable to effectuate arrests as required pursuant to the Immigration and

---

1  This spreadsheet document was produced in response to Plaintiffs' written discovery requests. The spreadsheet provided the daily population totals, inclusive of in and out times, for each detainee at the BHR from February 1, 2025 through September 12, 2025, a period of time proposed by Plaintiffs and set by the court. While population figures used by Defendants herein are sourced to this document, the figures used by Plaintiffs are not. The figures that Plaintiffs instead use throughout their briefing, and to which their proffered expert refers, are an amalgamation of various generated datasheets, and do not track with the relevant discovery period set by this Court.

Nationality Act. Guerrero Decl, ¶ 7.

### B.  Baltimore Hold Room Operational Practices

#### 1.  Overview of Hold Rooms

The purpose of the BHR is to process aliens arrested pursuant to removal proceedings or while awaiting removal before being transported to an ICE detention facility. Guerrero Decl. at ¶ 6. These individuals are almost exclusively either in the process of being removed from the United States subject to final orders of removal or subject to mandatory detention under the Immigration and Nationality Act (INA) during their removal proceedings. *Id*. at ¶ 12. Aliens are held at the BHR until they can be transferred to a detention facility. The BHR plays a critical role in ensuring public safety during the removal process by filling a notable gap in federal detention capacity in the State of Maryland. *Id.* at ¶¶ 14, 19.

The BHR implements the written Directives and Guidelines provided by "Operations of ERO Holding Facilities," January 31, 2024, and the relevant portions of 2025 National Detention Standards pertaining to hold rooms. *See* Ex. D, Defendants' Responses to Plaintiffs' Interrogatories; National Detention Standards, ECF. No 127-8. The BHR consists of three larger rooms and two smaller rooms. Guerrero Decl, ¶¶ 7, 10. Of the three larger rooms, the two largest rooms are used for male detainees. *Id*. The third room, which is slightly smaller, is used for female detainees. The large rooms may hold up to 35 individuals. *Id.* ERO uses the two small rooms when circumstances require it—either to segregate individuals who present a safety risk to others based on criminal history or medical illness, or on rare occasions to help accommodate an overflow population when the total population exceeds capacity (to reduce crowding). Guerrero Decl, ¶ 8; Ex. A at 103:15-19; 106:21-107:1; 114:22-115:8. Since May 2025, the two small rooms have not held more than five people at any given time. Ex. A at 107: 6-19. In addition to a metal bench, each room has a toilet and a sink that is separated from the rest of the cell by a privacy wall to maintain sight supervision for safety and security and reasonable privacy for detainees. Guerrero Decl. at ¶ 15; Ex. A at 121:10-20. The privacy

wall stands approximately four feet tall. *Id.* It is not possible for one individual to access the sink while another individual is using the toilet, nor is it possible to view an individual in the act of using the toilet without "either look[ing] around the wall or hover[ing] over the wall to see somebody. Ex. A at 123: 4-6; 122:12-17. The population is fluid and may change dramatically from day to day, depending on detention center availability and flight schedules. Guerrero Decl, ¶ 11.

a.   *Intake Procedures*

BHR employs a two-phase intake system. Ex. A at 171: 21-172:13. When an alien arrives at the Hold Rooms, ERO-Baltimore personnel conduct an initial interview with the individual, which includes taking inventory of any personal property and making inquiry into whether the individual has any medical issues or conditions or is currently taking any medication. Ex. A at 171: 21-172:13; 177:12-13; 185:10-18 ("When an individual states that he or she feels sick or shows signs of sickness of whatever they're claiming to have, we immediately take them to" a medical center.).

Pertinent information is documented on an intake form. The intake form used by ERO Baltimore is a physical document that travels with the individual to the next facility. Ex. A at 173:14-21; 174:7-9. If necessary, personnel use interpreter services through a "language line" that ICE provides. Ex. A at 183:15-16. The language line covers "multiple dialects, multiple languages." Ex. A at 183:17-22. Upon completion of the interview, the individual is asked to review the documented information and attest to its accuracy. Ex. A at 174:17-18. Fingerprinting and identification of any criminal background also occurs during the intake process. Ex. A at 75:1-5; 136:2-4.

Thereafter, personnel conduct a second interview. During this interview, personnel again make inquiry whether the individual has any medical conditions or issues. Ex. A at 177:18-22. ERO Baltimore accomplishes this through the use of broad questions such as, "What is your medical state?" or "What is your medical condition, if any?" Ex. A at 182:15-17. This second round of inquiry is important to help ensure accurate documentation, as individuals sometimes don't disclose medical issues initially. Ex. A at 176:15-177:4: 177:21-178:3 Along with information related to the alien's

immigration background and alleged statutory violation, any medical information gathered during this interview is recorded on an electronic form and maintained electronically. Ex. A at 179:16-21, 184:3-5.

ERO Baltimore authorizes family members to bring medication to aliens who did not have it with them at the time of arrest and requests that family members bring both necessary prescription and over-the-counter medication. Ex. A at 186:7-8; 186:9-10; *see also* Ex. A at 176:20-22, 177:1-4 (explaining that personnel relate that "The alien says that he takes medication and can you please bring it, can you facilitate that?"). When communicating with family members, it is common for personnel to make clear to family members that they will not be arrested when they drop off the detainee's medication. Ex. A at 169: 18-22. Detainee medication is placed in an individual's property bag and stored in a   cabinet easily accessible to BHR personnel to be distributed as scheduled, and ERO Baltimore maintains a log to ensure individuals receive medications as prescribed. Guerrero Decl*,* ¶ 29; Ex. A 187:13-17. If a detainee requires medication during their time in the BHR, they are taken to the University of Maryland Medical Center, approximately three blocks from the BHR, or Johns Hopkins Hospital, approximately one mile from the facility. *Id*. at ¶ 30; Ex. A 185:10-18. Detainees are permitted to keep asthma inhalers and attached glucose meters on their person. Ex. A at 186:17-22; 187:7-10. Upon completion of these preliminary actions, ERO Baltimore immediately begins the process of matching the individual with a long-term detention facility where he or she can be transferred. Ex. A at 136:12-16.

b.   *Other Operational Procedures for Temporary Detainees*

ERO Baltimore provides mattresses and blankets for any individuals residing in the Hold Rooms overnight. Guerrero Decl., ¶ 21. ERO Baltimore provides water with every meal and also makes it available to any individual upon request at any time of day or night. Ex. A at 155: 2-20. Non-English speaking detainees may communicate their request in their native language. For Spanish-only speaking, there is always Spanish speaking ERO personnel on duty. Ex. A at 156: 9-16. For detainees who speak other languages, language lines are made available to them. Ex. A at 156:17-157:9.

Although the Hold Rooms do not contain showers, ERO Baltimore provides each detainee with a hygiene kit consisting of soap, moist towelettes, and toothbrushes so that detainees can maintain personal hygiene. Guerrero Decl., ¶ 25. The general practice is that detainees brush their teeth at night and again in the morning, but toothbrushes are also made available for detainees who wish to brush their teeth during the day. Ex. A at 158:11-16. Additionally, ERO makes numerous other items available to detainees upon request, including jumper suits (sweatsuit top and bottom), socks, sneakers, jackets, additional toothbrushes, toothpaste and wet wipes; and sanitary undergarments for women who are or may be on their menstrual cycle. Ex. A at 148:17-20; 149:10-22; 152: 7-10. At the time booking procedures are initiated, detainees are informed that these items are available to them. Ex. A at 149: 18-22.

The BHR personnel receive training specific to interacting with individuals who present with apparent mental health illnesses or may be experiencing mental health crises or other challenges, which include verbal re-assurance or deescalation techniques. Additionally, ERO Baltimore personnel are trained to contact outside medical assistance when medical mental health needs arise within the facility, and surveillance of any detainee exhibiting signs of hostility, depression, or similar behaviors. *See* ECF. No 127-8, Section 2.5-D; Ex. D at 8-9. During the evening hours and throughout the night, the lights are dimmed but not completely turned off for the safety of the detainees. Ex. A at 55: 13-19.

The elimination of in-state detention space, combined with an "increased nationwide operating posture" has "significantly impacted the ERO Baltimore field office hold room times while pending approval and transfer of aliens for detention space." ECF No. 40-2 at 1; Ex. A at 116:4-20. The out-of-state facilities that have available bed space and can accommodate a detainee at the BHR at any particular time varies and is unpredictable. Ex. A at 139: 8-15; 140:2-4. Accordingly, ERO Baltimore must often make inquiries with numerous facilities on ad hoc basis in search of detention space. 136:12-21; 137:19-138:1. Complicating matters further, some aliens at the BHR have additional restrictions such as security classification and medical needs that further narrow the universe of

8

detention facilities for which they are eligible to transfer. Ex. A at 93:9-22; 94:7-16; 136:12-16. Thus, even when a particular facility has available space, it may not be a match for transfer depending on the individual. Ex. A at 132:20-133:4. Specialized transport considerations may also come into play depending on an alien's security level or medical needs. Ex. A at 93:9-22; 94:7-16. On some occasions, these logistical challenges result in an individual's detention extending beyond 72-hours. Ex. A at 132:20-133:4; 140:22-141:10. Other exceptional circumstances that can necessitate a detainee staying beyond 72 hours include occasions in which a detainee has a pending court hearing in the District of Maryland in the coming days. Ex. A at 128:13-21; 131:4-12.

ERO Baltimore tracks the duration of detention for all detainees processed into the Hold Rooms. Ex. A at 75:21-76:3; 88:15-22-89:18; 89:22-90:19; 91:20-92:2; 93:9-22. ERO Baltimore uses a triage system to help ensure that when a detainee's time in detention approaches 72 hours, their departure is given prioritization and the detainee is moved as promptly as possible. 91:3-5; 93:7-11; 135:2-10. Internal reports are generated throughout the day as a tracking mechanism to "continually monitor individuals on the time they're booked into the hold room and the time they're booked out of the hold room." Ex. A at 91:20-92:2.

Based on the data contained in the Daily Population Totals for the BHR throughout the period beginning February 1, 2025 and ending September 12, 2025 (then present), ECF No. 81, sent in response to Plaintiffs' discovery requests, the average daily population during this period was approximately 15 to 18 individuals. *See* Ex. E, Declaration of Minnettia Durant, Unit Chief Law, Enforcement Systems and Analysis, DHS; ¶ 6. On approximately 80% of total days in the period, the daily population totaled 20 individuals or less. Ex. E, ¶ 7. Additionally, the average length of stay for individuals processed through the Baltimore Hold Room during the relevant period was approximately 2.3 days. *Id*. at ¶ 9.

With respect to sleeping accommodations, the overnight population were previously provided air mattresses. Guerrero Decl, ¶ 21. In recent months, however, ERO Baltimore replaced the air

mattresses with firm mattresses. Ex. A at 142: 3-15. These mattresses provide improved sleeping conditions because they are less bulky, offer greater cushion, more effectively maintain firmness, and are easier to clean and disinfect. *Id*. In addition to providing disposable aluminum blankets, ERO Baltimore now also makes available cotton blankets to any overnight detainee who desires one, which are then cleaned before their reuse. *Id*.

With respect to meals, ERO Baltimore previously offered detainees a variety of sandwich options. In recent months, ERO Baltimore began to provide Meals Ready to Eat ("MREs") to each detainee. Ex. A at 46:12-14. The MREs more effectively accommodate dietary limitations at an individual level—including low sodium and low sugar options to accommodate medical restrictions, and vegetarian meals to accommodate religious practices and personal preference. Ex. A at 162: 6-16; 163-15; 166: 3-167:3; 167: 14-168:13. Additionally, the MREs track FDA guidelines and help ensure detainees maintain a balanced diet with adequate caloric intake. *Id*.

## III.    LEGAL STANDARDS

### a.    Class Certification under Rule 23 (a) and (b)

The class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To fall within this narrow exception, Plaintiffs must "affirmatively demonstrate" their compliance with each element of Rule 23—"that is, [they] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. This is not just a "mere pleading standard." *Id*. "[A]ctual, not presumed, conformance" with Rule 23 is "indispensable," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982), and certification is proper only if the Court is satisfied "after a rigorous analysis" that Plaintiffs have shown that each requirement of the Rules has been met. *Wal-Mart Stores, Inc.*, 564 U.S. at 350-51.

To merit class certification, Plaintiffs must demonstrate each element of Rule 23(a) is met: (1)

the class is so numerous that joinder is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the named Plaintiffs are typical of claims or defenses of the class ("typicality"); and (4) the named Plaintiffs and counsel will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a). The four requirements of the rule governing class certification, numerosity, commonality, typicality, and adequate representation, effectively limit the class claims to those fairly encompassed by the named plaintiff's claims. *Bond v. Marriott Int'l, Inc.*, 296 F.R.D. 403 (D. Md. 2014); *see also* Fed. R. Civ. P. 23(a).

In addition to meeting the requirements set forth in Rule 23(a), the proposed class must also qualify under one of the subsets of Rule 23(b). *AmChem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Relevant to Plaintiffs' motion, Rule 23(b)(2) permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

### b. Fifth Amendment Due Process Standard for Pretrial Detainees

To prevail on a substantive due process claim, a pretrial detainee must show unconstitutional punishment by proving that the challenged conditions were either "(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018) (finding that a pretrial detainee's "detention in solitary confinement for three-and-a-half years was punitive, and thus unconstitutional") (quoting *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 251 (4th Cir. 2005)).

### ARGUMENT

### I.    Plaintiffs Fail to Meet All Rule 23(a) Requirements

Plaintiffs' renewed motion for class certification, ECF No. 127, should be denied because the

11

proposed class fails to meet the requirements of Federal Rules of Civil Procedure 23(a). While Defendants do not contest numerosity, Plaintiffs' failure to satisfy commonality, typicality, and adequacy are fatal defects requiring denial of certification.

### A.    The Class Definition is Overbroad

If the class definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad. *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009). As illustrated below, Plaintiffs' proposed class, all persons who are now or will be detained at the BHR, *see* Am. Compl. ECF No. 6, is fatally overbroad because it at a very minimum "risk[s] including individuals who would not have a right to recovery but for the sweeping scope of the class certification itself." *See Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 681 (4th Cir. 2024). There are several distinct populations of detainees who would not be entitled to legal relief on one or more individual claims if the proposed class were to be certified.

For example, concerning Plaintiffs' Sleep Deprivation claim, (claim 3), it is plain that putative class members who do not spend a single night at the Hold Rooms face no risk of experiencing sleep deprivation rising to the level of a constitutional violation. The discovery evidence produced in the litigation reflects that about 13% of detainees were held for less than 24 hours, many of whom would not have stayed overnight at the Hold Rooms. Ex. E. Were Plaintiffs proposed class certified, it would risk allowing improper recovery to a sizeable and not insignificant portion of the class. *See Stafford*, 123 F.4th 671, 681 (4th Cir. 2024).

With respect to the alleged overcrowding (claim 4), the constitutional analysis necessarily differs based on the duration of confinement. *See Bell v. Wolfish*, 441 U.S. 520, 540 (1979) (courts "must look to a number of factors, including . . . the length of the confinement"). First, putative plaintiffs who were detained for less than twelve hours cannot properly claim a constitutional injury. *See Robles v. Prince George's Cty., Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (finding pretrial detainee must show that official action was not "de minimis" to invoke due process protections); *Mercando v.*

*Noem*, No. 25-cv-6568, 2025 WL 2658779, at *18 (S.D.N.Y. Sept. 17, 2025 (finding that "[i]t is only once a detainee is held for a substantial amount of time that alleged constitutional violations arise" and determining that 12 hours or more was the "minimum amount of time in detention" that "would yield a class that would satisfy the requirements of Rule 23(a).")*.* The discovery evidence produced in this case reflects that about 13% of individuals were held for 24 hours or less at the BHR before transfer. Ex. E. The putative class if certified can thus reasonably be expected to have a similar percentage of plaintiffs who were detained for a de minimis period of time, and thus necessarily not facing plausible harm rising to the level of constitutional deprivation*.*

Regarding Plaintiff's claim for alleged deprivation of adequate medical care (Claim 5), in addition to the segment of the putative class that would remain at the BHR for an insubstantial amount of time and necessarily have no plausible constitutional claim, any individuals with no known or obvious medical need would also at a minimum be foreclosed from recovery. *Farmer v. Brennan*, 511 U.S. at 834 (Mandatory deliberate indifference must reflect an awareness of a risk of complication).

For these reasons, Plaintiffs' proposed class is not readily identifiable by objective criteria and fatally overbroad by attempting to include individuals who may not suffer the same alleged injuries or who otherwise are not entitled to class wide relief. Indeed, Plaintiffs define their class with maximum breadth such—encompassing any detainee who enters the facility for any duration of time without regard to any enhanced risk profile—that it ensures wide variation, rather than consistency, in the experiences of class members with respect to relationship between the conditions and their constitutionality. As such, Plaintiffs' putative class ensures overbreadth. *See Stafford,* 123 F.4th at 681.

### B.  The Proposed Class Lacks the Commonality Required Under Rule 23(a)(2)

Under the commonality prerequisite, the plaintiff must demonstrate that the class members have suffered "the same injury." *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). The plaintiff cannot overcome this hurdle "merely" by establishing that the proposed class members "have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc.,* 564 U.S. at 350. The class

13

claims "must depend on a common contention," which "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. The Supreme Court has made clear that this requirement is not satisfied by merely identifying some question that is technically common to all class members. *Wal-Mart*, 564 U.S. at 350. Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury," and that their "claims must depend upon a common contention" whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 349-50 (quotation and emphasis omitted). In the Fourth Circuit, courts rigorously apply *Wal-Mart's* commonality standard, requiring plaintiffs to show that "the central questions of the action are susceptible of common, generalized proof, rather than individual factual inquiries." *Stafford,* 123 F.4th at 680. "What matters to class certification . . . is not the raising of common questions even in droves but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quotation and alteration omitted). The Fourth Circuit has emphasized that courts must carefully examine whether purported common questions will actually generate common answers and must be wary of certification in cases "rife with individual issues." *Stafford*, 123 F.4th at 680-82; *Kadel v. Folwell*, 100 F.4th 122, 158 (4th Cir. 2024). Plaintiffs cannot satisfy this exacting standard. Their claims require intensely individualized inquiries that overwhelm any purported common questions.

 1. <u>The Challenged Practices Are Not Broadly Applicable to all Putative Class Members</u>

 Plaintiffs attempt to satisfy commonality by framing their claims as challenges to discrete policies: unwritten capacity limits, inadequate medical screening, lack of medical training, etc. Pls' Motion at 17-19. But challenging a conditions-based practice is insufficient to establish commonality

where, as here, the policy's application and effects vary dramatically among class members based on their highly variable individualized circumstances.

A. *Overcrowding and Hygiene Claims*

With respect to overcrowding, Plaintiffs challenge BHR practices concerning allowable capacities with respect to individual cell and total detainee population. Pls' Motion at 20. While Defendants argue below that the conditions of confinement are constitutionally sound and do not present an undue risk of harm, the challenged practice is at bottom not common to the entire class because, as discovery evidence establishes, only a minority of class members would even plausibly be subject to that practice. The discovery evidence reflects that on approximately 20% of the days in the relevant period, the daily population totaled 10 or fewer individuals. Ex. E. On approximately 60% of the days in the relevant time period, the daily population totaled between 11 and 20 individuals. Thus, on 80% of the days in the discovery period, 20 or fewer individuals were detained at the BHR. Ex. E. No less critically, a high population total—whether it be in a particular cell or the total facility—is not in and of itself determinative of a constitutional injury and neither is a policy or practice permitting high capacities. *See Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) ("[T]he cost of confinement to the person confined . . . is smaller the shorter the detention"). Resolving whether a broadly applicable alleged practice of crowding is plausibly unconstitutional such that it puts putative class members at a substantial risk of harm involves an assessment of the cumulative effect of crowding alongside the duration of confinement. *Wolfish*, 441 U.S. 520, 540 (1979) (courts "must look to a number of factors, including . . . the length of the confinement, the fact that a detainee was detained in a cell with the maximum capacity is not determinative of a constitutional injury). As reflected in the discovery data, the average length of the confinement is quite short—approximately 2.3 days. There is thus no evidence from which to conclude the existence of a class-wide policy, plausibly unconstitutional policy. What's more, the individual hold rooms are segregated by gender. Female detainees are a small segment of the BHR detainee population. Even if the Court considered Plaintiffs' expert report—which it should not—that

15

report reflects that the female population was less than 20% of the detainee population and that the cell population remained at under 12 individuals the vast majority of the time and never exceeded 15 individuals. *See* ECF. No 127-6. The cells are also segregated by those individuals who for health or security reasons must be separated. *See* Factual Background Section II.B. The evidence shows that the populations in these two rooms max out at five individuals. *Id*. The BHR thus does not maintain plausibly unconstitutional practices that are widely applicable to the putative class. Even with respect to those cells housing the male population (1 and 2), the evidence shows that there is not a common practice of housing 35 individuals in the cell. In the relevant time period, the population totals for the entire facility (all hold rooms combined) reached 35 no more than 5% of the covered days. *Id*.

Indeed, the Supreme Court rejected this exact approach in *Wal-Mart*. There, plaintiffs challenged Wal-Mart's policy of giving local managers discretion over pay and promotion decision "policy" that applied to all 1.5 million class members. 564 U.S. at 342-43. The Court held this was insufficient for commonality because the policy's application and effects varied among class members based on individualized decisions and circumstances. *Id*. at 352-54. The Court emphasized that "proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a pattern or practice of discrimination. . . . [but] the dissimilarities" among class members were fatal to certification. *Id*. at 352-54. The Court stated: "Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored." *Id*. at 352 (quotation omitted). The same principle defeats certification here. Even if Defendants' policies do not on their face apply to a subset of the population, neither are they broadly applicable to the entire class. On the contrary, the application and effects of the challenged practices vary dramatically based on individual circumstances including cell placement, detention duration, medical needs, detention center availability, post 72-hour exceptional circumstances determinations such that "common answers" do not exist.

Plaintiffs cite *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), for the proposition that "every

inmate suffers exactly the same constitutional injury when he is exposed to a single . . . policy or practice that creates a substantial risk of serious harm." Pls.' Mem. at 22 (quoting *Parsons*). But *Parsons*, a Ninth Circuit case, is neither controlling nor instructive—and in fact is readily distinguishable. *Parsons* involved a long-term state prison medical care system where the court found systemic, uniform deficiencies affecting all inmates' access to care throughout their incarceration. 754 F.3d at 678. The *Parsons* class was thus homogenous in that it was necessarily exposed to the challenged policies and practices. Significantly, the district court identified "10 statewide ADC policies and practices to which *all members of the class were subjected*, and seven statewide ADC policies and practices which *affected all members of the subclass*." *Id*. at 678 (emphasis added). While *Parsons* dealt with future-oriented risk posed to the prison population, class members faced certain exposure to the challenged policies, and almost assuredly—as prisoners in a correctional facility serving out sentences—for an extended period of time. Further, the challenged practices were plausibly unconstitutional on their face. These policies and practices were the "glue" that held together the putative class; either each of the policies and practices was unlawful as to every inmate or it was not. The circumstances in the instant case stand in stark contrast—where a policy that may allow a maximum of 35 individuals in a cell is immaterial because only a very narrow percentage of the class will ever be subject to it and where that circumstance alone does not begin to settle a constitutional inquiry.

### 2. *Plaintiffs' Denial of Medical Care Claims*

With respect to Plaintiffs' denial of medical care contentions, a plaintiff may only sustain a deliberate indifference claim against a prison official where such officials are "failing to render medical assistance." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). But the prison officials must know of the medical need or disregard an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. at 834. Plaintiffs erroneously claim that every person detained at BHR suffers the same injury when they are detained without adequate medical screening."   Pls'

Motion at 22.   Plaintiffs' putative class is not cabined in any way to individuals with pre-existing health complications or vulnerabilities. Mandatory deliberate indifference must reflect an awareness of a risk of complication. *Farmer*, 511 U.S. at 834. Further, the evidence in this case shows that detainees were transported to the hospital for refills of their medication when it ran out, reflecting that the BHR is tending to medical needs when they arise. *See* Ex. F. The evidence futher shows they are bringing detainees to the hospital when other medical complaints manifest. *See Id*; Karn v. PTS of Am., LLC, 590 F. Supp. 3d 780, 815 (D. Md. 2022) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Plaintiffs instead ask this court to find a plausible constitutional violation in what the evidence does not show—that is, they speculate that the number of detainees who were brought to the hospital for prescription refills was too few, and thus, there must have been more detainees who needed medication but did not get it. This is meritless.

Plaintiffs' complaints about the absence of screening performed by medical professionals and alleged inadequate access to prescription medications are practices that pertain only to a narrow segment of the broadly defined class. Putting aside for the moment other problems with plaintiffs' arguments, those alleged practices only conceivably implicate 8th Amendment protections for individuals with disclosed medical issues or needs—a small segment of the putative class. Thus, as in *Wal-mart*, "the dissimilarities among class members" are fatal to Plaintiffs' certification request. *Id*. at 352-54.

      3.  <u>Plaintiffs Fail to Identify Common Questions that Will Generate Answers Driving Resolution of Litigation</u>

The "common questions of law" Plaintiffs set forth proceed from false premises or are merely argumentative suppositions unsupported by the evidence. Pls' Motion at 20. For example, Plaintiffs pose the questions:

- "*Does Defendants' unwritten policy increasing the purported detention capacity at the BHR from 56 to 135 people result in punitive conditions violating the Fifth Amendment*?"

As the discovery evidence establishes, Defendants do not have a practice of detaining 135 people in the hold rooms. Any contention that there is a widely applicable policy of detaining 135 people at the hold rooms is simply false. Defendants have not stated that there is a detention capacity of 135. Rather, Plaintiffs arrive at the "135" number by adding the individual capacity maximum figures from five rooms and assuming each of those rooms is used or could be used to hold those individual totals simultaneously and for a non *deminimis* duration of time. The discovery evidence reflects, however, that this is not the practice of the BHR. BHR's practice is to use the small cells to house individuals that need to be segregated from the general population—whether due to violent criminal background, health problems, or for their own personal safety. Infrequently, it is also used to reduce overcrowding when population totals are high. Officer Guerrero testified that he has never used the small hold rooms to house more than five individuals at one time nor is he aware of any instances where a small room has held more than five individuals. There is not a practice of having detainees sleep in the small rooms. "Once the people are moved or shifted, they come back in the big room for sleeping."

Second, as discussed above, the inquiry into the constitutionality of alleged overcrowding in jails is not limited to population totals, especially in instances where, as here, the population is transient and the totals highly variable. *Wolfish*, 441 U.S. at 542 (courts "must look to a number of factors, including . . . the length of the confinement, the fact that a detainee was detained in a cell with the maximum capacity is not determinative of a constitutional injury). The constitutional inquiry further requires a consideration of the relationship between any challenged practice and the governmental purpose. Plaintiffs' attempt to take disparate circumstances—occasions when population of the large cells rose to 35, with prospective circumstances—the small cells being briefly used to accommodate fifteen people (which there is not record of having yet occurred) and fuse them together to position them as a practice that occurs simultaneously, frequently, and for non *deminimis* durations so as to be a widely applicable practice that is plausibly unconstitutional—is devoid of merit. The

stated policy is no policy at all and thus its application certainly not common to all classmembers.

- *Does Defendants' failure to implement written policies limiting the number of people detained at the BHR result in punitive conditions that violate the Fifth Amendment*?:

    As discussed, the discovery evidence establishes that cell crowding occurs only on rare

occasions; and at population totals nowhere near the levels Plaintiffs—in disregard of the evidence

they sought through discovery—claim. So this question has been answered definitively in the negative.

- "*Does Defendants' failure to adopt any compliance mechanism to enforce their unwritten cell population limits lead to punitive conditions violating the Fifth Amendment*?:

    The evidence answers this question in the negative for the same reasons. However, even were

there frequent occasions with high volume cell counts in the large rooms, the question would still not

be common to the class. That is, there is no evidence that detainees who are or will be detained in the

female cells or in the small cells (with a practice of allowing a maximum capacity of five individuals)

are subjected to the privations of crowding over an extended duration so as to present a question of

whether its punitive, and thus the practice of limiting that population to a cap that doesn't implicate

constitutional inquiries —compliance mechanism or not—cannot be constitutionally infirm.

Compliance mechanisms related to population limits for the larger cell—a subset of the population—

necessarily cannot generate answers for the entire class.

    Plaintiffs' purported common questions pertaining to the denial of medical care claim all fail

for a similar reason—the class does not pre-select for medical vulnerability in any fashion and

deliberate indifference requires awareness of a risk of complication that is not remotely common to the

class. Farmer v. Brennan, 511 U.S. at 834.

### 4. Commonality Cannot Be Found Where Challenged Practices Require Individualized Inquiries

Maryland's 2021 legislation, the Maryland Dignity Not Detention Act, prohibits state and local

law enforcement from entering into agreements to detain aliens for federal civil immigration violations

and eliminated the several hundred beds of detention space for the ERO Baltimore Field Office within

the state of Maryland. Factual Background Section II.A. The law necessitates that every individual

detained at the BHR must be transferred to an out-of-state detention facility—a logistical challenge that does not exist in jurisdictions with available local or regional detention space. *Id.* The elimination of in-state detention space, combined with an "increased nationwide operating posture" that has made detention space less readily available, has thus "significantly impacted the ERO Baltimore field office hold room times while pending approval and transfer of aliens for detention space." *Id.* The effect of this external legal constraint is that the duration of time an individual stays at the BHR is influenced by individualized logistical considerations such as:

- Facility Matching: Which out-of-state facilities can accommodate a detainee in light of any particular security classification or medical needs restrictions associated with the individual; i.e, specialized maximum-security facilities with limited availability nationwide; facilities equipped to handle specific medical conditions (e.g., dialysis, psychiatric care, disease management)

- Temporal Availability: Do those specific facilities have bed space available during this person's detention period (as nationwide capacity fluctuates)?

- Geographic Distance: How far must this person be transported, and what specialized transport resources if any are required?

- Transport Logistics: What specialized transport if any is required for an individual's security level or medical needs?
  Thus, for many individuals, extended detention is a downstream effect of external factors

beyond the BHR's control. Were in-state detention facilities still available, facility matching would still occur but the additional detention beds in close proximity would allow significantly shorter transfer distances and alleviate logistical constraint. The additional time detainees reside at the BHR has a corresponding residual impact on the population total at the BHR. At an individual level, a proper inquiry into the constitutionality of detention for a conditions of confinement claim would need consider—the need to transfer the detainee to an out-of-state facility, any individual needs of the detainee related to security or medical concerns, and the available options during that individual's detention period. No single finding can resolve whether all individuals' detention durations were constitutional.

5.   The Chicago, New York, and San Francisco Litigation Are Not Instructive Here

The court should decline Plaintiffs' request to read district court decisions from other circuits as precedential as they are replete with differences. Pls' Motion at 34. Those cases were decided at different procedural stages with different evidentiary records, including limited factual development. Here, the Defendants have completed substantial discovery propounded by Plaintiffs, including the deposition of Officer Guerrero, which revealed the individualized nature of detention decisions in ways that may not have been apparent in other cases at earlier stages. Further, the cited cases apply the law of the Seventh, Second, and Ninth Circuits, which are not obligated to follow the Fourth Circuit's rigorous approach to commonality analysis articulated in *Stafford*, which emphasized that courts must carefully scrutinize whether purported common questions will actually generate common answers and must be wary of certification in cases "rife with individual issues." 123 F.4th at 680-82.

**C.    The Named Plaintiffs' Claims Are Not Sufficiently Typical of the Claims of the Proposed Class**

The class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998). Essentially, the typicality requirement ensures that "only those plaintiffs who can advance the same factual and legal arguments may be grouped together as a class." *Id.* at 340. "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so goes the claims of the class.'" *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citing Broussard, 155 F.3d at 340). That is, a plaintiff's claims are not typical if "proving them does not necessarily prove all the proposed class members' claims." *Iosello v. Lawrence*, No. 03 C 987, 2005 WL 2007147, at *5 (N.D. Ill. Aug. 18, 2005).

An examination of the named Plaintiffs' factual assertions supporting the legal claims highlight disparities between the representatives and putative class. Neither of the named Plaintiffs claims to have suffered most of the injuries alleged in the Amended Complaint, and thus their claims are not

typical of the class they intend to represent. For example, according to Plaintiffs' ICE is "packing [putative class members] into overcrowded and filthy cells." *Id.* at 1. Conversely, according to Ms. R.G.'s own testimony, there were only a total of "two other women detained with her." Hyde Decl. ¶ 9. Additionally, although Plaintiffs seek to advance a claim for denial of access to counsel, neither named plaintiff complains of issues accessing counsel. Further, the food provisions were upgraded months ago. While Ms. R.G. described the food as being minimal, often consisting of small rations such as a cup of noodle soup, the BHR now offers MREs for three meals a day, including meals that accommodate dietary and health restrictions. Hyde Decl. ¶ 6; Factual Background Section II.B.

Thus, Plaintiffs fail to adequately establish "how proof of their claims would be typical of the proof of the claims of absent class members." *Deiter*, 436 F.3d at 467. And when the court assesses the "extent to which those facts would also prove the claims of the absent class members," *id.*, it should accordingly determine that because they do not, because Plaintiffs have not satisfied the requisite typicality. As such, Plaintiffs' motion for class certification should fail.

### D.    The Named Plaintiffs Are Not Adequate Class Representatives

Plaintiffs also fail to demonstrate they are adequate class representatives. Rule 23(a)(4) requires that the named parties be able to "fairly and adequately protect the interests of the class." *Anchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625-26 (cleaned up). Here, Plaintiffs have not demonstrated they are adequate class counsel for two reasons: (i) there is reason to doubt they fully understand their representational responsibilities, and (ii) their claims do not demonstrate they suffer the same injury and possess the same interests.

First, the record does not demonstrate Plaintiffs fully comprehend their representational responsibilities. Plaintiffs' renewed declarations do not cure several of the deficiencies the court identified in finding that they had not satisfied the adequacy requirement in their original motion for class certification, including providing evidence that they "know or understand the claims asserted,"

have "reviewed any pleadings," or that "they have any awareness of the conditions of the Baltimore Hold Rooms since their departure months ago," ECF No. 74 at 22. Indeed, only more time has passed since their departure from the BHR in May, 2025. *See* Declaration of D.N.N., ECF 127-21; Declaration of V.R.G., 127-20. When a class representative does not understand their responsibilities, they cannot adequately protect the interests of the class. *See, e.g.*, *Anchem Prods., Inc.*, 521 U.S. at 626-27 (affirming lower court's finding that sub-class representatives who negotiated on behalf of the entire class, not just their sub-class, were not adequate class representatives because they did not properly understand their representational responsibilities).

Second, as discussed *supra*, Argument I. B; C. Plaintiffs' alleged injuries lack commonality and typicality of the class they seek to represent. Typicality and adequacy are often interrelated Rule 23(a) requirements." *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n.5. Here, because Plaintiffs injuries are not common to and typical of the proposed class, Plaintiffs' interests diverge from the class and thus they are not adequate class representatives. *See, e.g.*, *Anchem Prods., Inc.*, 521 U.S. at 625-26 (noting class representatives must possess the same interest as the putative class).

## II.    The Proposed Class Does Not Satisfy Rule 23(b)(2)'s Requirements

The commonality requirement is especially rigorous when applied to a class that seeks certification under Rule 23(b)(2), because it must show that "a single injunction or declaratory judgment would provide relief to each member of the class." *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 360)). For certification under Rule 23(b)(2), Plaintiffs must show that Defendants have "acted or refused to act on grounds that apply generally to the class" so that "relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In other words, the challenged conduct must be of the kind that "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360.

Contrary to Plaintiffs' assertion, the class for which they seek certification is far from a "paradigmatic Rule 23(b)(2) case," Pls'Motion at 27, citing *Berry v. Schulman*, 807 F.3d 600, 609 (4th

Cir. 2015). *Berry* involved the certification of a (b)(2) class for settlement purposes. The court found it "paradigmatic" because the conduct of the defendant, "was uniform with respect to each of the class members." Unlike in *Berry*, the conduct—i.e. the complained of conditions—is decidedly not uniform with respect to each of the class members. As noted, as a matter of policy and application, populations experience different conditions. The putative class members detained in room 3-5—female detainees and segregated populations of detainees respectively—are unequivocally a) detained in separate cells than the male population in cells 1 and 2 that b) are significantly less populated than males. The non-uniform conditions cannot beget a single, uniform determination as to the merits of Plaintiffs' claims.

Second, because Petitioners allege Defendants' policies violate their rights under the Due Process Clause of the Fifth Amendment, the Court should hesitate to resolve such claims via a Rule 23(b)(2) class action. As the Supreme Court has cautioned, courts should consider "whether a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve [Petitioners'] Due Process Clause claims. Due process is flexible, we have stressed repeatedly, and it calls for such procedural protections as the particular situation demands." *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (internal quotation makes omitted) (second alteration in original); *see also Diaz v. Garland*, 53 F.4th 1189, 1213 (9th Cir. 2022) (noting that "the Due Process Clause does not mandate procedures that reduce the risk of erroneous deprivation to zero" and that "[d]ue process is a flexible concept that varies with the particular situation"). Because Plaintiffs' putative classes, as defined, include dissimilarly situated individuals, the Court could not enter a single declaratory judgment to resolve class wide Due Process claims. Therefore, Plaintiffs have not carried their burden to show they are entitled to class certification and their motion should be denied.

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

### I. Named Plaintiffs' Claims are Moot and Thus Lack Standing to Pursue Injunctive Relief.

Like standing, mootness affects this court's jurisdiction. "Federal courts have no power to hear

moot cases." *Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 564 (4th Cir. 2024) (quoting *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006)). "A case or controversy dissipates when it becomes moot; that is 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Lancaster v. Sec'y of Navy*, 109 F.4th 283, 288–89 (4th Cir. 2024) (quoting *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013)). The requirement that a party possess a cognizable interest in the outcome of the action to bring suit "extend[s] past the filing of the complaint,"—"an actual controversy" is required "at all stages of review." *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 325 (4th Cir. 2022) (quoting *Arizonans for Off. Eng.*, 520 U.S. at 67). Previously, this Court found that, with respect to Plaintiffs' Class Certification Motion, the relation-back exception applied and its subject matter jurisdiction was intact and not impaired by the mootness of Plaintiffs' individual claims. ECF No. 74 at 19. However, the preliminary injunction is a different matter. "[A] plaintiff must demonstrate standing separately for each form of relief sought." *See Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 185 (2000). To have standing, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). The named Plaintiffs cannot show that they will be irreparably harmed by alleged policies and practices to which they are no longer subject. As such, they lack standing to pursue the claims.

## II.    Plaintiffs Do Not Satisfy the Requirements for Preliminary Relief.

Plaintiffs' motion for a preliminary injunction fails because they do not satisfy any of the four elements required to obtain the relief they seek. As this Court has explained:

> The standard for granting a preliminary injunction requires the moving party to show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. All four factors must be shown, and the movant bears the burden on each.

*Montgomery v. Housing Auth. of Baltimore City*, 731 F. Supp. 2d 439, 441-42 (D. Md. 2010) (internal citations omitted).

Generally, preliminary injunctions aim "to preserve the relative positions of the parties" and "protect the status quo." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013). The Fourth Circuit has defined the "status quo" as the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). An injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). Because issuing a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way[,] '[t]he danger of a mistake' in this setting 'is substantial.'" *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). The movant must show more than a "grave or serious question for litigation"; instead, he bears the "heavy burden" of making a "clear showing that [he] is likely to succeed at trial on the merits." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347, 351 (4th Cir. 2009).

Plaintiffs do not seek to merely maintain the status quo—the general purpose of a temporary restraining order or a preliminary injunction. *See Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012). Plaintiffs erroneously assert that the injunction they seek is not mandatory because they merely ask the court to preserve status quo from February 2025, before Defendants sought a waiver to increase the capacity of the BHR for the reasons previously discussed. *See* Pls' Motion at 28-29. Plaintiffs' argument is meritless. Quite plainly, no relationship or status of any kind existed between the parties in February 2025 because neither named Plaintiffs nor the putative class members were detained in the facility at the time. Instead, the last uncontested status proceeding the controversy between the parties would have occurred in early May 2025 when named Plaintiffs entered the BHR. At that time, the facility was being used in the same capacity as it is now, as a temporary detention center, and thus Plaintiffs' request to enjoin Defendants from operating the BHR as a temporary detention facility is necessarily mandatory rather than prohibitory. *See Toure v. Hott*, 458 F. Supp. 3d 387, 393 (E.D. Va. 2020). Thus, the type of

relief Plaintiffs seek is aptly characterized as "extraordinary" and "disfavored," and Plaintiffs' attempt to minimize its import should be rejected. *See League of Women Voters v. North Carolina*, 769 F.3d 224, 235-36 (4th Cir. 2014). To obtain the extraordinary relief they seek, courts require "a heightened showing of the four factors." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 (10th Cir. 2009). Because Plaintiffs cannot meet the requirements of a regular showing of the four factors required for a preliminary injunction—let alone the heightened showing—this Court should deny their motion.

### A. The Court Should Not Consider Plaintiffs' Improper Evidence

1. <u>Plaintiffs' Declarations Should be Barred (Plaintiffs' Exs. 8-13)</u>

Plaintiffs submit declarations from detainees to support their motion for class certification and preliminary injunction. *See* Declarations of Edward Doe, Geoffrey Akolisa, Gustavo Vigil, Yamileth Arely Martir de Medina, Alexander Antonio Salazar Monge, and Angel Tlapanco Peralta (Plaintiffs' Exs. 8-13). Defendants object to these declarations on the basis that the statements are largely based on speculation rather than the personal knowledge of the declarants in violation of Fed. R. Evid. 602; are rife with hearsay in violation of Fed. R. Evid. 801 (c); and are irrelevant in violation of Fed. R. Evid. 401-403.

First, many statements of the declarants contain descriptions of experiences sourced to third parties and not based on their own personal knowledge. *See, e.g*., Akaolia Declaration, Ex. 9 (describing "some people" requesting medications who did not receive said medication); Garcia-Vigil Declaration, Ex. 10 (describing "people" in discomfort who "were not given any medical attention"). These same declarations often describe purported hold room conditions based on conversations or discussions with unspecified or unnamed "people" or "individuals." *See, e.g*., Martir de Medina Declaration, Ex. 11 (describing ICE officer who allegedly denied the request of her "friend"); Peralta Declaration, Ex. 13 (describing "another detainee who requested medical assistance"). This double hearsay is unreliable and improper. Fed. R. Evid. 801 (c). Further, these same declarations make generalized statements that are wholly tangential if not irrelevant to this action. *See, e.g*., Peralta

Declaration, Ex. 13 (describing the conditions of the Jenna/LaSalle holding room); Monge Declaration, Ex. 12 (describing receiving "little bottles of water, not the regular size"). Moreover, the Court granted Plaintiffs' request for expedited discovery in this action for the purpose of eliciting evidence that may substantiate their class claims. ECF No. 81. The robust testimonial and documentary evidence produced pursuant to Plaintiffs' discovery requests is now before the court and far more reliable than the anecdotal and highly-selective accounts of individuals who are not putative class members. Finally, Plaintiffs submit a declaration from a "John Doe." Doe Declaration, Ex. 8 (describing medical care after being transferred to Georgia). The Court previously denied "Plaintiffs' Motion to Proceed Under Initials or Pseudonyms" as it pertained to putative class members ECF Nos. 70; 7. For all these reasons, the Court should not consider these submissions.

2.   The Testimony of Plaintiffs' Experts and their Underlying Reports Should Be Barred

Federal Rule of Evidence 702 provides that an expert may testify in the form of an opinion if the expert's scientific, technical, or other specialized knowledge will help the jury understand the evidence or determine a basic fact in issue; the testimony is based on sufficient facts or data; is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. Application of this rule involves two primary inquiries: (1) whether the proposed testimony is reliable; and (2) whether it is relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005).

Further, "throughout the admissibility determination, a judge must be mindful of other evidentiary rules, such as FRE 403, which permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of, *inter alia*, unfair prejudice or confusion of the issues. *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir. 1995), cert. denied, 515 U.S. 1168 (1995) (quoting *Daubert*, 509 U.S. at 595).

29

Plaintiffs seek to avail themselves of the testimony of medical physician Joseph Goldenson to "render opinions concerning the medical screening and medical care of detainees in the Baltimore ICE holding facility" ECF NO. 127-5 at 4. Goldenson relies on comparators that he concedes through his own testimony are unfounded. *Id.* Specifically, these opinions offer comparative analyses between ICE's 2011 Performance-Based National Detention Standards and alleged BHR practices concerning access to medical care.   *Id.* at 2-5. However, Goldenson concedes that PBNDS does not appear to apply to ERO holding facilities, such as the BHR. *Id.* at 3, ¶ 10. Additionally, the declaration is rife with unsubstantiated speculation couched as expertise. *Id.* at ¶ ¶ 12 , 25 (opining that "the fact that fewer than ten [detainees] were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications."). Further, Goldenson's declaration incorporates summaries of separate declarations espousing speculation and hearsay. *See* 13, ¶ 27 (V.R.G. speculating it was "unlikely" her son would be able to bring her medication; B.R.R. hearsay statement that "the man asked the officers for insulin"; O.P.L. hearsay testimony that a "man ask[ed] for insulin and the officials did not give him any."). Thus, Goldenson' conclusions proceed on dubious and unreliable methodology, which is only compounded by their dependence on inadmissible hearsay. Resultingly, Goldenson's proffered testimony is unreliable and unfairly prejudicial.

Plaintiffs also seek to use the testimony of political science professor Graeme Blair to "examine trends in detentions at the ICE-run detention facility known as the Baltimore Holding Room." ECF 127-6 at 4. As it relates to this litigation, Plaintiffs requested, and received, data pertaining to detentions encompassing a period of seven months between February 1, 2025, to September 12, 2025. *See* Factual Background Section II.B; Ex. E. While this data from the court-sanctioned seven-month period provides statistical information that covers the timeframe to which Plaintiffs sought to limit their inquiries into Defendants' policies and practices relevant to their claims, the report of Graeme Blair eschews both this data set and the sanctioned time period in favor of external data from different time periods unrelated to the instant litigation. Specifically, Blair uses for analysis a sub-set of data

associated with *CILP v. ICE*, No. 2:24-cv-10444 (C.D. Cal. Dec. 4, 2024), bearing the facility code "BALHOLD" covering the time period of February 1, 2025 to October 15, 2025, which he presumes encompasses only detainees in the Baltimore Holding Room; and data sets relating to *Amica Center for Immigrant Rights, et al. v. ICE*, 1:25-c-v2386 (D. Md. 2025), purportedly representing daily logs maintained by the ICE Field Office from an even more dissimilar window of time (January 7, 2025 to June 4, 2025). The interpretation and manipulation of data sets received from proceedings unrelated, in time or scope, to the instant litigation, compounded by unverified metrics to accurately quantify detentions at the BHR, is problematic with respect to its reliability and relevance.

Thus, the reports of "medical expert" Joseph Goldenson and "data expert" Graeme Blair fail to meet the evidentiary standards of FRE 702 for reliability and relevance pertaining to this instant litigation and pose a significant likelihood of unfair prejudice to Defendants. Fed. R. Evid. 403.

3.    Plaintiffs' Untimely Disclosed and Unauthenticated Video Should Not Be Considered

Finally, on January 26, 2026, Plaintiffs requested and received leave to file a physical exhibit, which contained video footage purportedly taken by a detainee at the BHR in recent days. ECF No. 129. The videographer is unidentified and the date, time, and location at which the video was taken are unidentified and/or unverifiable. Because the video lacks any foundation, *see* Fed. R. Evid. 602, and is based on hearsay, Fed. R. Evid. 801(c), it is unreliable and should be excluded from the body of evidence considered by this court in its review of the instant motions.

**B. Plaintiffs Do Not Demonstrate a Likelihood of Success on the Merits.**

1.    Plaintiffs' Due Process Rights are not Being Violated.

a.    *Plaintiffs Fail to Show a Fifth Amendment Violation.*

The evidence and the law establish that the conditions of confinement at the Baltimore Hold Room do not afoul of Fifth Amendment guarantees.

Pretrial detainees are "entitled to the basic necessities of human life," including "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Andrews*, 2012 WL 707478, at *4. "Only

those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis" for a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991). "Loss of freedom of choice and privacy are inherent incidents" of pretrial detention, but discrete "punitive measures" imposed during pretrial detention intrude on a protected liberty interest. *Wolfish*, 441 U.S. at 535-37. Punishment may be shown through express intent or a restriction or condition that is not "reasonably related to a legitimate governmental objective." *Wolfish*, 441 U.S. at 535; *see also Williamson v. Stirling*, 912 F.3d 154, 178 (4th Cir. 2018).

The BHR operates as waypoint for apprehended aliens who are processed by the government for removal at a staging area or for detention at a long-term facility while their removal is awaited, assessed or adjudicated. Factual Background Section, II.B. The BHR provides an essential logistical role in facilitating these objectives and absent its availability, ERO Baltimore's capacity to effectuate arrests and process individuals for detention pursuant to the INA would be severely diminished. *Id*. The Supreme Court has consistently recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives and for over a century has affirmed detention as a "constitutionally valid aspect of the deportation process." *See Jennings*, 138 S. Ct. 830, 836 (2018); *Demore*, 538 U.S. at 520-523; *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). From the time of the completion of intake, ERO Baltimore purposely sets forth on identifying availability at a residential facility, whereupon they are then transferred. The procedures and policies in place legitimately further those goals and permit the government to "impose reasonable restrictions" during the period of temporary detention. While detainees at the BHR are likely to experience a lack of privacy and other unpleasant conditions attendant to pretrial detention, the conditions are not punitive and Plaintiffs' arguments to the contrary lack merit. *Rish v. Johnson,* 131 F.3d 1092, 1096 (4th Cir.1997) ("only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement").The evidence in this case demonstrates that

ERO-Baltimore provides adequate food, clothing, and personal hygiene products to individuals during the brief time they are detained at the BHR before being transported to a detention facility and has worked diligently in recent months to further enhance accommodations. ERO-Baltimore provides inflated mattresses and blankets for any individuals in the BHR overnight, jumper suits (sweatsuit top and bottom), socks, and sneakers upon arrival, and jackets for individuals upon request. Factual Background Section II.B. Each hold room contains a sink and toilet that is separated from the open area by a mid-height privacy wall. *Id.* ERO Baltimore also issues individuals a set of toiletries that include a toothbrush, toothpaste, and moist towelettes for use while in the BHR. *Id.*

Plaintiffs appear to concede the absence of merit to their second amended complaint assertion that the BHR provided inadequate food and water to detainees, as their briefing is devoid of any mention of it. *See* generally Pls' Motion. This is justified, as ERO Baltimore provides bottled water with every meal as well as upon request at any time of day or night. Factual Background Section, II.B. Further, ERO Baltimore now provides ("MREs") that more effectively accommodate dietary restrictions and preferences at an individual level—including low sodium, low sugar, and vegetarian options meals to accommodate health and medical concerns and religious practices. *Id*. The meals track FDA guidelines and help ensure detainees maintain a balanced diet with adequate caloric intake. *Id*. Nor does requiring a detainee "to wear the same clothes, or receive beverages only with meals, or sleep on his mattress on the floor for less than two full days rise[] to the level of severity necessary to state a constitutional violation." *Tesch*, 157 F.3d at 476.

Plaintiffs' contention that the toilet "require[es] detained individuals to expose themselves to one another repeatedly while using the bathroom" is false. The half-wall partition provides screening necessary to maintain bodily privacy—while at the same time not compromising security interests. The restraint on full-privacy may be unpleasant, but full privacy in this context is not a constitutional guarantee. *See Andrews v. Cross*, Civ. A. No. 5:10-CV113, 2012 WL 707478, at *2 (N.D. W. Va Mar. 5, 2012) (finding that "[p]rivacy in using the toilet, comfort, and a pleasant-smelling cell are not

guaranteed to inmates by the constitution;" and "simply because the plaintiff's mattress was on the floor . . . does not amount to a deprivation of sanitary living conditions"). Also incorrect is Plaintiffs' assertion that Defendants provide only intermittent access to toothbrushes, feminine hygiene items, and soap. Pls' Motion at 9. The evidence elicited in discovery reflects that, in addition to providing personal hygiene items at the time of book-in, ERO Baltimore makes additional toothbrushes, toothpaste and wet wipes; and sanitary undergarments for women who are or may be on their menstrual cycle. Factual Background Section II.B. And while Plaintiffs complain of not being able to change clothes, the BHR makes available upon request jumper suits (sweatsuit top and bottom), socks, sneakers, jackets are available. *Id*. Along with a sink and toilet in each room, the allowance of these provisions upon request to help ensure personal hygiene is more than constitutionally adequate in short-term detention settings. *See Stead v. Skinner*, No. 10-4526, 2011 U.S. Dist. LEXIS 99347 (N.D. Ill. Sep. 2, 2011) (finding that a female detainee's inability to take a shower for approximately five days did not violate her due process rights where she otherwise had access to a working toilet and sink); *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1998) (failure to provide plaintiff with toilet paper for five days, or with soap, toothbrush, and toothpaste for 10 days was not a violation of his constitutional rights because plaintiff suffered no physical harm and the conditions were temporary)); *Thompson v. Brown*, C/A No. 3:11-cv-318-TMC-JRM, 2011 WL 6012592, at *1–2 (D.S.C. Nov. 8, 2011) (rejecting conditions of confinement claim where the plaintiff claimed "his mattress and blanket were confiscated for six days, he was not allowed to have any toilet tissue for six days, his clothes were taken away from him for six days, his cell was cold, he had no running water in his cell, and he was forced to sleep on a steel cot for six days"). It is only extreme conditions of detention that are sufficient to establish a Fifth Amendment claim, and the evidence belies any contention that BHR hygienic conditions are extreme—they are not.

Although the holding rooms experience spikes in population, Plaintiffs greatly distort the extent to which this occurs. During the relevant discovery period, the total population at the BHR never exceeded 40 people. Conversely, the total population remained between 11-20 people on 60% of

occasions. Ex. E. Indeed, the BHR population is fluid and changes significantly from day to day depending on numerous factors including detention center availability and flight schedules. As the Supreme Court has stressed, there is, of course, a de minimis level of imposition with which the Constitution is not concerned." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977). "In determining whether an imposition is de minimis, it is appropriate to evaluate both its severity and its duration." *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (cleaned up); *see also Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) ("[T]he cost of confinement to the person confined . . . is smaller the shorter the detention . . . ."); *Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016) (finding triable question of punishment where pretrial detainee in disciplinary segregation detained for 85 days was confined to his cell for 23 hours each day and denied all personal contact except with attorneys or clergy). While Plaintiffs contend that the square footage per individual is inadequate when the two large hold rooms at the BHR contain 35 people. Pls' Motion at 30. They cite to *Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981), for the proposition that even 18 square feet of living space has been found violative of the constitution. Pls' Motion at 31. But *Lareau* held that subjecting sentenced inmates at a New York jail to overcrowding "violates their constitutional rights when imposed for an excessive period of time," which the court determined to be at least *30* days. *Lareau*, 651 F.2d at 109. Plaintiffs concede that crowding alone is not tantamount to punishment and violative of Due Process, but overlook the extent to which the duration of stay and other distinct circumstances inform the constitutional inquiry. *See Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994) (rejecting Eighth Amendment claim related to "deplorabl[y]" filthy cell conditions—including feces, vomit, mucus, urine, and rotting food—because of the short duration of the exposure). Indeed, the court's reasoning in *Lareau* and others like it lays bare a critical distinction that is overlooked or minimized throughout Plaintiffs' briefing arguments: while detainees at the hold rooms may technically qualify as pretrial detainees, there is a marked difference between their circumstances and those of pretrial detainees at jails. Though, at the outer reaches, aliens at BHR may stay 72 hours or perhaps hours more in exceptional circumstances, jails largely house

persons awaiting trial or with sentences in excess of one year and the average detention time for jail residents is approximately 33 days. *See* Center for Disease Control, noting 2021 averages. https://wwwnc.cdc.gov/eid/article/30/13/23-0705_article. Moreover, the discovery evidence in this case reflects that the convergence of higher populations and a duration of stay exceeding 72 hours occurred very seldomly—as 74% of individuals were released within 72 hours and the average stay was 2.3 days across all populations. Ex. E at ¶ 9. In the Fourth Circuit, more serious conditions for longer periods of time have been found not to violate the Constitution. See *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (accepting Plaintiff's allegations for purposes of summary judgment that cells were unbearably hot, infested with vermin, smeared with human feces and urine, flooded with water from a leaky toilet above, and where food provided was cold and provided in smaller portions, but holding that such conditions were not "so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life"). Finally, Plaintiffs' arguments are misplaced because they fail to take account of the rational relationship between the crowded conditions and the legitimate governmental purpose at hand.

In *Wolfish*, Petitioners were detainees held in a federal facility awaiting trial and argued that they had been deprived of their statutory and constitutional rights because of overcrowded conditions and other objectionable restrictions. *Id.* at 527. As the Court explained, however, what mattered was not that certain conditions imposed by the detention facility were potentially objectionable; the dispositive question instead was "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. So long as the conduct at issue served the latter purpose and was not excessive, it was not an impermissible "punishment." *Id.* at 538-39. Because the petitioners' confinement in *Wolfish* reasonably served a legitimate governmental interest, their claims failed. *Id.* at 560-62.

Similar to the petitioners in *Wolfish*, Plaintiffs' claims fail here because their detention serves the legitimate governmental interest of protecting the public and ensuring that the nation's immigration laws

are properly enforced. As noted above, the Supreme Court has consistently recognized that preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens, are legitimate governmental objectives. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *Demore*, 538 U.S. at 520-522; *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). The Supreme Court has affirmed detention as a "constitutionally valid aspect of the deportation process," *Demore*, 538 U.S. at 523, and Congress has vested discretion in ER to determine whether continued custody of an individual detainee is necessary to further the government's objectives—discretion that ERO-Baltimore exercises through individualized assessments of flight risk, danger to the community, and other factors. *See* 8 U.S.C. § 1182(d)(5); 8 C.F.R. § 236.1(c)(8). Accordingly, the hygienic conditions of confinement at the BHR are constitutionally sound and Plaintiffs are unlikely to succeed on the merits of their challenges.

b. *Plaintiffs Fail to Allege an Eighth Amendment Due Process Violation.*

Plaintiffs argue that their continued detention also violates their due process rights under the Eighth Amendment by providing inadequate medical care. *See* Pls' Motion at 35-40. With respect to a denial of adequate care claim, a plaintiff must also establish deliberate indifference to serious medical needs. *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (internal quotations omitted). A plaintiff "makes out a due process violation if he shows deliberate indifference to serious medical needs . . . because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment *where the need for such treatment is apparent*." (emphasis added). "The deliberate indifference standard is a two-pronged test: (1) the prisoner must be exposed to a substantial risk of serious harm, and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97-98 (4th Cir. 2017). Because the conditions present at the Hold Rooms ensure the basic necessities of life and are unquestionably related to paramount government purpose, Plaintiffs cannot succeed on the merits of their claim.

37

Following their arrest, ERO Baltimore asks temporary detainees if they have any medical conditions, require any ongoing medical treatment, or need to bring any medication with them. Guerrero Decl. at ¶ 28. ERO Baltimore authorizes family members to bring medication to aliens who did not have it with them at the time of arrest. *Id*. If aliens require medication during their time in the BHR, they are taken to the University of Maryland Medical Center, approximately three blocks away, or Johns Hopkins Hospital, approximately one mile from the Facility. Guerrero Decl. at ¶ 17. The support Plaintiffs offer to show that they are exposed to a substantial risk of serious harm is speculative. *See* Pls.' Mot. at 17 (predicting that ICE will "subject[ ] putative Class Members to significant risk of harm by detaining them for days at a time without even basic access to medical care."). Indeed, if aliens require medication during their time in the BHR, they are taken to the University of Maryland Medical Center or Johns Hopkins. Guerrero Decl. at ¶ 30;

Second, even if Plaintiffs could show that their continued detention exposes them to a substantial risk of serious harm, they certainly cannot show that the Government is acting with deliberate indifference to knowingly disregard that risk. The standard for deliberate indifference is "higher [ ] for culpability than mere negligence or even civil recklessness[,]" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The Fourth Circuit has defined actions which constitute deliberate indifference as treatment a petitioner must show that the treatment he receives, or lack thereof, is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Contrary to Plaintiffs' suggestion, courts have not routinely found that due process requires medically screening detainees in short-term detention and the cases they cite fail to advance their arguments. *See* Pls' Motion at 36. *Gordon v. Cnty. of Orange*, 6 F.4th 961, 972 (9th Cir. 2021) concerned the competency of care offered. The court noted that "what is really being litigated" against [the defendant nurse] is whether she used the proper medical screening form to ensure the initiation of a medically appropriate protocol while Gordon was detained." The plaintiff in that case had alleged that

he reported his heroin use, but jail medical staff never utilized the proper protocol. The court found that because the defendant nurse "acted as gatekeeper by serving as the screening nurse," she was "therefore responsible for identifying an inmate's urgent medical needs." The plaintiff thus had "a clearly established constitutional right to have a *proper* medical screen conducted to ensure the medically appropriate protocol was initiated." Similarly, *Dawson v. Kendrick*, 527 F. Supp. 1252, 1307 (S.D.W. Va. 1981) dealt with the haphazard provision of medical care at a jail, including unqualified medical personnel. In its discussion, the court noted that prisons universally confiscate medications brought in by new convicts and prisoners—thus leaving prisoners without medication or a way of obtaining it. The rendering of competent medical care was thus more paramount in this setting. *Dawson v. Kendrick*, 527 F. Supp. at1307. At the BHR, conversely, medications in the alien's possession at the time of arrest are inventoried and provided to the detainees throughout their stay. Factual Background Section II.B. If the alien does not have their medication, ERO Baltimore contact families and request that the medications be brought in. And, as exhibited by medical documents produced to Plaintiffs in discovery at their request, if problems with prescriptions remain or run out, ERO Baltimore transports aliens to the hospital for refills of their prescription. *Lareau v. Manson*, 651 F.2d at 103 concerned sub-standard medical care over an extended period of time in addition to pervasive overcrowding. Neither *Gordon*, *Lareau*, or *Dawson* stand for the proposition that there exists a constitutional right for individuals in brief period of detentions to have medical screening performed. And while Plaintiffs may believe that the BHR would more effectively provide preventive care were it to have medically-trained physicians on site to perform screenings, they point to no legal authority for the proposition that physicians are required onsite at temporary detention facilities to comport with the Eighth Amendment. Nor is there merit to Plaintiffs' suggestion that Performance-Based National Detention Standards ("PBNDS") should serve as a proxy for the constitutionality of conditions at the BHR. *Wolfish,* 441 U.S. at 543 n. 27, noting that guidelines from institutions such as the American Correctional Association "establish goals recommended by the organization in question" and not the constitutional minima. Plaintiffs argue that the multiple inquiries

ERO Baltimore personnel make into each alien's health status as a part of the intake process are inadequate to account for unknown conditions they may have. Pls' Motion at 37-38. But this speculation is neither supported by the evidence nor near sufficient to establish deliberate indifference. As noted, Defendants produced in discovery medical transport logs reflecting all transports from the BHR to medical facilities during the relevant period. *See* Ex. F, BHR Medical Transport Logs. Those logs do not reflect a single detainee complaint or course of treatment for a previously unknown medical condition or an acute exacerbation of an existing condition such as to suggest a denial of urgent care needed, and Plaintiffs do not contend otherwise. In order for the medical need of an inmate to be "sufficiently serious" to rise to the level of an Eighth Amendment violation if not properly treated, it must be "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Andrews*, 2012 WL 707478, at *4. Further, Plaintiffs do not put forth any evidence of instances where either the named plaintiffs or any other of the many former detainees whose testimony they have sought to avail themselves of has been treated for acute trauma following transfer to a detention facility for an unaddressed medical need. Instead, Plaintiffs offer their own speculation and that of their proffered expert that there must have been detainees in need of urgent medical care that were not transported to medical facilities by ERO Baltimore. Pls' Motion at 38-39. This contention—devoid of evidentiary support—is simply inadequate to establish a likelihood of success on their Eighth Amendment claim. Nor is there merit to Plaintiff's' contention that purported inadequate medical training is plausibly unconstitutional. In *Walker v. S. Health Partners*, 576 F. Supp. 3d 516, 546 (E.D. Ky. 2021), cited by Plaintiffs, the court actually not only noted that "the absence of doctors at a detention facility does not equate to a   constitutional violation, but, unlike int that case, the BHR does provide training to its personnel concerning "a duty to call 911" when medical aid is needed.

40

As illustrated by the protocols for access to medical care ERO Baltimore has put in place, Factual Background Section II.B, the Defendants are not acting with a deliberate indifference to the risk of harm, nor do putative plaintiffs face a substantial risk that of serious harm in the future.

2.  The Waiver of the 12-hour Policy was not Arbitrary or Capricious Under the APA

Plaintiffs are also unlikely to succeed on the merits of their claims that the government acted arbitrarily or capriciously in waiving the 12-hour policy. With regard to review of agency policies, the Supreme Court has held that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Moreover, Congress has codified in the INA the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in or otherwise removable from the United States to effectuate their removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. Consistent with that authority and the Executive Branch's "broad" and "undoubted power" over the enforcement of this Nation's immigration laws, *Arizona v. United States*, 567 U.S. 387, 394 (2012), ICE has long exercised its detention authority in executing removal operations, including the considerations that go into determining where an alien under a removal order is detained, transferred, or removed.  Those decisions necessarily "implicate our relations with foreign powers and require consideration of changing political and economic circumstances." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005) (internal quotation marks omitted). Accordingly, courts should decline to hear any challenge that suggest the agency's discretionary decisions about the location of individuals in detention are arbitrary and capricious. Such a ruling would interfere with the complex,

delicate, and considered process by which removal decisions are made in light of the particularized facts within the agency's command. The use of a particular detention site is purely an operational choice made entirely in the agency's discretion and attendant to the determinative final removal order. *See* 8 U.S.C. § 1231(g).

In terms of policymaking, the decision by the agency to amend the 12-hour holding rule to 60-hours is reasoned and supported by evidence. The purpose of the BHR is to process aliens arrested pursuant to removal proceedings before they are transported to an ICE detention facility.   Guerrero Decl. at ¶ 6. Absent the availability of the BHR, ERO would not be able to process individuals for detention and would be unable to effectuate any arrests as required under the INA. *Id.* at ¶ 10. The agency exercised its judgement in determining a necessary change to existing policy given the volume of individuals currently moving through the BHR. The decision made by the agency to waive the 12-hour policy is exactly the type of discretionary authority considered by the INA. It was a rational outcome given the influx of individuals moving through the federal building and cannot be found to be sufficiently arbitrary and capricious so as to produce a claim under the APA.

### C.  Plaintiffs Have Not Shown Irreparable Harm.

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Conclusory or speculative allegations are not enough to establish a likelihood of irreparable harm. *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding irreparable

harm not established by statements that "are conclusory and without sufficient support in facts").

As stated *supra Section II-A-ii*, Plaintiffs allege that only ordering ICE to cease its operations at the Baltimore BHR will spare them the heightened risk of adverse consequences from the temporary stays there. This is not only speculative, but it is unlikely. Plaintiffs do not explain how the amorphous putative class—not limited to any sub-population or curtailed in any way—will suffer irreparable harm in the absence of an order shutting down the facility.   Further, to sufficiently satisfy the requirement of irreparable harm, Petitioner must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22, 129 S.Ct. 365. The mere "possibility of irreparable harm" will not do. *Id*. Not only must this harm be likely but the alleged harm must "be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp*., 315 F.3d 264, 283 (4th Cir. 2002). Also lacking merit is Plaintiffs' assertion that the absence of full medical screening by healthcare professionals at the BHR yields an unacceptable risk of spreading a communicable disease. *See Aslanturk v. Hott*, 459 F. Supp. 3d 681, 696 (E.D. Va. 2020) (finding no precedent for contention that "the fact of detention itself becomes an 'excessive' condition solely due to the risk of a communicable disease outbreak - even one as serious as COVID-19.").

### C.   The Balance of Interests and Public Interest Favor Respondents

It is well-settled that the public interest in enforcement of United States immigration laws is significant.   *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law." (internal marks omitted)).

Concerns about access to adequate sanitary conditions and medical care is, of course, shared by

all.    However, given the vast expanse and indiscriminate nature of Plaintiffs' requested relief, the balance of interests clearly favors Defendants.    The disruptive effect of such an order would likely serve to prevent the agency from arresting individuals subject to orders of removal, including some criminal aliens.    Moreover, the public interest is best served by allowing the orderly medical processes and protocols implemented by government professionals. *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) (urging judicial deference and finding presumption of validity regarding decisions of medical professionals concerning conditions of confinement). And without the BHR, ERO Baltimore cannot execute its detention authority and enforce the United States' immigration laws effectively. This type of burden and attendant harm, and its potential impact on ERO-Baltimore operations, is too great to be permissible at this preliminary stage. Because Plaintiffs cannot show that the balance of hardships and public interest tips in their favor, the Court should deny Plaintiffs' request for preliminary relief.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motions for class certification and preliminary injunction should be denied.

Respectfully submitted,

BRETT A. SCHUMATE
Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

*/s/ Brendan T. Moore*
BRENDAN T. MOORE
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Tel: (202) 880-0330
E-mail: Brendan.t.moore@usdoj.gov

Attorneys for Defendants