IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

D.N.N, *et al.*,

        *Plaintiffs*,

v.

VERNON LIGGINS, *et al.*,[1]

        *Defendants*.

Civil No.: 1:25-cv-01613-JRR

<u>**MEMORANDUM OPINION**</u>

    Pending before the court is Plaintiffs[2] D.N.N. and V.R.G.'s Renewed Motion for Class Certification and Preliminary Injunction.  (ECF No. 127; the "Motion.")  Following briefing by the parties, the court convened a hearing on the Motion on March 3, 2026.  For the reasons that follow, by accompanying order, as to both requests, the Motion will be granted as set forth herein.

I.    <u>**BACKGROUND**</u>

    Plaintiffs[3] initiated this action on May 9, 2025, with the filing of a "Class Action Complaint for Declaratory Relief, Complaint for Injunctive Relief, and Petition for a Writ of Habeas Corpus." (ECF No. 1.)  Following two subsequent amendments, the Second Amended Class Action Complaint for Declaratory Relief, Complaint for Injunctive Relief, and Petition for a Writ of Habeas Corpus[4] is now operative.  (ECF No. 52; the "Second Amended Complaint.")  For themselves, and on behalf of all those similarly situated, Plaintiffs assert violations of the

---

[1] Marcos Charles was named Acting Executive Associate Director of the Immigration and Customs Enforcement and Removal Operations.  Pursuant to Federal Rule of Civil Procedure 25(d), Madam Clerk shall substitute Marcos Charles for Marcos Charles for Kenneth Genalo as a Defendant in this action.
[2] Plaintiffs dismissed their claims for habeas relief.  Therefore, the court refers to the parties as Plaintiffs and Defendants, as no party petitions the court for a writ of habeas corpus.  (ECF Nos. 112, 113.)
[3] When this action was initiated on May 9, 2025, D.N.N. was the sole Plaintiff.  On May 12, 2025, an amended pleading was filed to include Plaintiff V.R.G.  (ECF No. 6.)
[4] *See* footnote 1, *supra*.

Administrative Procedure Act ("APA"), the Fifth Amendment to the United States Constitution, and the Immigration and Nationality Act ("INA").  *Id.*  The putative class members Plaintiffs seek to represent are "civilly detained people confined in U.S. Immigration and Customs Enforcement ('ICE') holding cells operated by ICE's Baltimore Field Office (the 'Baltimore Hold Rooms')."  *Id.* ¶ 1.  Following amendment and dismissal of certain counts, Plaintiffs presently assert six counts:

> **Count I**: Violation of the APA, 5 U.S.C. § 706—Waiver of Policy;[5]
>
> **Count III**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Sleep;
>
> **Count IV**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Hygienic and Sanitary Conditions;
>
> **Count V**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Adequate Medical Care;
>
> **Count VI**: Violation of the Due Process Clause of the Fifth Amendment—Deprivation of Adequate Food and Water; and
>
> **Count VII**: Violation of the Due Process Clause of the Fifth Amendment and the INA, 8 U.S.C. § 1229a(b)—Deprivation of Access to Counsel.

(ECF No. 52 ¶¶ 74–132; ECF Nos. 112, 113, 122, 123.)

On July 25, 2025, the court denied without prejudice Plaintiffs' motion for class certification and denied as moot their motion for preliminary injunction as to the class.  (ECF Nos. 74, 75.)  Thereafter, it ordered expedited discovery in advance of Plaintiffs' forthcoming renewed combined motion for class certification and preliminary injunction.  (ECF No. 81.)  Plaintiffs now bring the instant Motion to certify a class defined as "[a]ll persons who are now or in the future

---

[5] The court previously dismissed Plaintiffs' Count II for violation of the Due Process Clause of the Fifth Amendment based on the *Accardi* doctrine, but ruled that Plaintiffs remain free to rely on the *Accardi* doctrine in support of their APA claim under Count I.  (ECF No. 122 at pp. 18–24.)

will be detained at the Baltimore Hold Rooms," and for entry of a preliminary injunction. (ECF No. 127.)

### A. Named Plaintiffs

The record indicates as follows: D.N.N. is a national and citizen of Guatemala. (ECF No. 52 ¶ 18.) She has lived in the United States for more than 10 years. *Id.* She was granted a withholding of removal in 2012 and released on an Order of Supervision ("OSUP"). *Id.* She complied with all conditions of her OSUP. *Id.* D.N.N. is diagnosed with Type-2 diabetes, anxiety, and depression for which she takes medications. (ECF No. 52 ¶ 18; Justinano Decl., ECF No. 1-15 ¶¶ 3–4.)

V.R.G. is a national and citizen of El Salvador. (ECF No. 52 ¶ 20; Hyde Decl., ECF No. 6-2 ¶ 2.) She has lived in the United States for more than 10 years. *Id.* She was granted a withholding of removal in 2017 and released on an OSUP. (ECF No. 52 ¶ 20; Hyde Decl., ECF No. 6-2 ¶ 2.) She complied with all conditions of her OSUP. (ECF No. 52 ¶ 20.) V.R.G. has a thyroid condition for which she takes daily medication. (ECF No. 52 ¶ 20; Hyde Decl., ECF No. 6-2 ¶ 4.)

D.N.N. and V.R.G. were initially detained at the Baltimore Hold Rooms on May 7 and 8, 2025, respectively. (Justiniano Decl., ECF No. 1-15 ¶ 2; Hyde Decl., ECF No. 6-2 ¶ 2.) D.N.N. was detained in the Baltimore Hold Rooms for approximately 72 hours in a small cell with seven other women. (Justiniano Decl., ECF. No 1- 15 ¶ 6; D.N.N. Decl., ECF No. 31-2 ¶ 1.) V.R.G. was detained in the Baltimore Hold Rooms for approximately 48 hours in a small cell also with seven other women.[6] (V.R.G. Decl., ECF No. 31-3 ¶ 1.) They were both detained upon appearing at their routine check-ins, (Justiniano Decl., ECF No. 1-15 ¶ 2; Hyde Decl., ECF No. 6-2 ¶ 2), and

---

[6] V.R.G. testified to this at the hearing convened on this Motion.

remained at the Baltimore Hold Rooms until May 10, 2025, when they were transferred to other locations.  (D.N.N. Decl., ECF No. 31-2 ¶ 1; V.R.G. Decl., ECF No. 31-3 ¶ 1.)  As of February 13, 2026, D.N.N. is detained in New Mexico; V.R.G. is detained in Louisiana.  (D.N.N. Suppl. Decl. II, ECF No. 149-6 ¶ 1; V.R.G. Suppl. Decl. II, ECF No. 149-7 ¶ 1.)  Plaintiffs allege that, during their detention in the Baltimore Hold Rooms, Defendants unreasonably restricted their ability to communicate with or meet with their attorneys, and denied them the ability to make telephone calls.  (ECF No. 52 ¶ 130.)[7]  *See also* Justiniano Decl., ECF No. 1-15 ¶¶ 2–3.

During their detention in the Baltimore Hold Rooms, D.N.N. was not initially given her medication, was not allowed to (or provided with the means to) check her blood sugar regularly, and was not given a medical exam as requested by her attorney, *see* Justiniano Decl., ECF No. 1-15 ¶¶ 3–6; V.R.G. was not given her daily medication or transported to a medical facility for examination by a medical professional related to same, *see* Hyde Decl., ECF No. 6-2 ¶ 4.

As noted earlier, Plaintiffs "seek[] to represent a class of people who are detained in the Baltimore [Hold] Rooms now or who may be detained there in the future."  (D.N.N. Suppl. Decl., ECF No. 127-21 ¶ 4; V.R.G. Suppl. Decl., ECF No. 127-20 ¶ 4.)  Both Plaintiffs attest to their understanding of "the responsibilities involved in being" a class representative, including the need to "keep informed" about the progress of the case, the need to consider the interests of the class, and the need to communicate with counsel regarding decisions during each stage of the case.  (D.N.N. Suppl. Decl., ECF No. 127-21 ¶¶ 4–8; V.R.G. Suppl. Decl., ECF No. 127-20 ¶¶ 4–8.)  They both attest that they have worked with counsel to prepare for hearings and to give testimony.  (D.N.N. Suppl. Decl., ECF No. 127-21 ¶ 8; V.R.G. Suppl. Decl., ECF No. 127-20 ¶ 8.)  They both also attest that they understand "what this case is about and what [they] are asking the Court to

---

[7] Duplicate paragraph numbers erroneously appear at page 29 of the Second Amended Complaint.  The court here refers to the first paragraph 130.

order," the legal claims at issue, and that they have reviewed major documents in this case, including the operative pleading and motions papers.  (D.N.N. Suppl. Decl. II, ECF No. 149-6 ¶¶ 6–10; V.R.G. Suppl. Decl. II, ECF No. 149-7 ¶¶ 6–10.)

### B.  ICE's Enforcement and Removal Operation Holding Facilities

The Department of Homeland Security ("DHS") and ICE maintain civil detention facilities throughout the country, with the vast majority of such facilities governed by ICE's Performance-Based National Detention Standards ("PBNDS").  (2011 PBNDS, ECF No. 127-7.)  The PBNDS provide: "Detention is an important and necessary part of immigration enforcement.  Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care."  *Id.* at i.  The PBNDS do not apply to holding cells, including the Baltimore Hold Rooms.

At issue here, ICE's Office of Enforcement and Removal Operations ("ERO") issued a directive on "Operations of ERO Holding Facilities," identified as Policy Number 11087.2, on January 31, 2024.  (ECF No. 1-8; "Directive 11087.2.")  Directive 11087.2 specifically sets forth the "policy and procedures for operating holding facilities" in ICE field offices.  *Id.* § 1.1.  A "holding facility" is "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency."  *Id.* § 3.2 (footnote omitted).  "Short-term confinement" refers to "a period not to exceed 12 hours, absent exceptional circumstances."  *Id.* § 3.2 n.3.  A "hold room" is "[a] holding cell, cell block, or other secure enclosure within a holding facility."  *Id.* § 3.3.

As Defendants contend, the purpose of the Baltimore Hold Rooms is "to process [noncitizens] arrested pursuant to removal proceedings, or pending removal from the United

States, before being transported to an ICE detention facility." (Guerrero[8] Decl., ECF No. 40-1 ¶ 6.) Under Directive 11087.2, the Executive Associate Director for ERO (here, Executive Assistant Director Charles) "is responsible for ensuring compliance with the provisions of this Directive," and Field Office Directors or Deputy and Assistant Field Office Directors (here, Director Liggins and Assistant Director Burki) "are responsible for ensuring that field office personnel follow the procedures in this Directive for operating holding facilities located within their respective field offices." *Id.* §§ 4.1, 4.3.

Relevant here, under Directive 11087.2, ERO Officers are responsible for, *inter alia*:

> Ensuring that each holding facility maintains sufficient supervision of detainees by taking into consideration the physical layout of each holding facility; the composition of the detainee population; the prevalence of substantiated and unsubstantiated incidents of sexual abuse, harassment and assault; the findings and recommendations of sexual abuse, harassment and assault incident review reports; and any other relevant factors, including but not limited to, the length of time detainees spend in custody at the holding facility;

> Ensuring that detainees are provided a meal at least every six hours;

> Ensuring that hold rooms are safe, clean, equipped with restroom facilities, and clear of objects that could be used as weapons against ERO personnel, contractors, or detainees.

(Directive 11087.2, ECF No. 1-8 §§ 4.4.1.1–3.)

The following procedures and requirements similarly apply to ERO Officers:

> Account for and continuously monitor detainees and empty holding facilities upon the conclusion of daily operations in those field office locations operating on a daily schedule. Absent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours.

> Monitor detainees for any apparent indications of a mental or physical health condition or signs of hostility, self-harm, or harm to others that may require closer supervision or emergency medical care.

---

[8] Jose Guerrero was the Assistant Field Office Director of ICE's Baltimore Office.

.                    .                    .

> Provide detainees with access to drinking water in hold rooms at all times.
>
> If the hold room is not equipped with restroom facilities, ERO officers should position themselves within direct sight or earshot of the hold room so that detainees may request and have regular access to restroom facilities.

.                    .                    .

> Allow detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary.

*Id.* §§ 5.1.1–2; 5.2.2–3; 5.7.2.

In contrast to Directive 11087.2, which is designed for application to hold rooms and stays of fewer than 12 hours, the PBNDS contain detailed requirements, spanning 69 pages, to "ensure[] that detainees have access to appropriate and necessary medical, dental and mental health care, including emergency services." (2011 PBNDS, ECF No. 127-7 at p. 257–326.) They similarly provide detailed requirements for personal hygiene to "ensure[] that each detainee is able to maintain acceptable personal hygiene practices through the provision of adequate bathing facilities and the issuance and exchange of clean clothing, bedding, linens, towels and personal hygiene items." *Id.* at pp. 327–30.

On January 30, 2025, then-Deputy Field Office Director Baker submitted a memorandum to Assistant Director Monica Burke, ICE's Assistant Director of Custody Management, requesting "a waiver for the ERO Baltimore Field Office 12-hour hold room utilization time, as it relates to [Directive] 11087.2." (ECF No. 40-2.) The memorandum sought an extension of 48 hours beyond the 12 hours set by Directive 11087.2. *Id.* Therein, Baker explained:

> The ERO Baltimore Field Office does not have any detention space within our area of responsibility (AOR). As a result, the Baltimore

> Field Office must request detention space nationwide to facilitate the transfer of aliens arrested by our law enforcement officers. This process has caused significant hold room times for the ERO Baltimore Field Office while awaiting transfer approval requests.

*Id.*[9]  Baker further offered that the Executive Order of January 20, 2025, declaring immigration a national emergency, resulted in detention space being "less readily available," including in the Baltimore Hold Rooms.  *Id.*  Burke approved Baker's request on February 5, 2025.  *Id.*  When questions arose regarding meal provisions made necessary by the longer maximum period of detention, Baltimore Hold Rooms officials referred to the 2011 PBNDS for guidance that Directive 11087.2 failed to provide in view of its limited purpose.  (Correspondence of April 1, 2025, ECF No. 149-5.)

On June 24, 2025, Burke issued a nationwide waiver of Directive 11087.2's 12-hour hold room utilization limit for all ICE ERO Field Offices.  (ECF No. 40-3; the "Waiver.")  This nationwide Waiver, which effectively expands the above-referenced February 2025 waiver applicable to the Baltimore Hold Rooms, "allows for aliens who are recently detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency to be housed in a holding facility for up to, but not exceeding, 72 hours, absent exceptional circumstances."  *Id.*  Importantly, Burke's Waiver provided that "[a]ll other hold room and hold facilities requirements continue to apply to ensure the safety, security and humane treatment of those in custody in hold rooms and hold facilities."  *Id.*

As the basis for the Waiver, Burke cites two Executive Orders that resulted in increased enforcement efforts, and the fact that "ERO's average daily population has significantly increased

---

[9] In 2021, Maryland enacted the Dignity Not Detention Act, which, *inter alia*, "prohibit[s] certain governmental entities from entering into agreements facilitating immigration-related detention by private entities; prohibit[s] governmental entities from entering into certain agreements to house immigration-related detainees; [and] require[es] governmental entities to terminate certain existing contracts for the detention of immigration-related detainees . . . ." Detention Not Dignity Act, H.B. 16, 2021 Leg., 443rd Sess. (Md. 2021).

to over 54,000." *Id.*  The two cited Executive Orders are those titled "Protecting the American People Against Invasion" and "Securing Our Borders."  The former provides, *inter alia*:

> The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens.  The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025).  Relatedly, among other things, the Securing Our Borders order calls for the following:

> The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States.  The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025).

Both Directive 11087.2 and the waiver of the 12-hour hold room utilization limit at the Baltimore Hold Rooms have been in effect throughout this litigation and were in effect at the time of Plaintiffs' detention.

## C. Conditions of the Baltimore Hold Rooms

The Baltimore Hold Rooms have a maximum detention capacity of 56 people.  (February 9, 2025, Request, ECF No. 127-3.)  The Baltimore Hold Rooms are composed of five holding cells, with three larger cells of 559 square feet (used for male detainees), 495 square feet (used for male detainees), and 420 square feet (used for female detainees), and two smaller cells of 128 and

126 square feet.  (Defs.'s Suppl. Interrog. Resp., ECF No. 127-9 at p. 4.)  This composition ensures individuals are provided with no less than approximately 31 square feet of space at maximum occupancy.  The smaller rooms are limited to use where ERO segregates individuals for medical or safety and security reasons, such as where an individual presents a safety risk to others based on criminal history, where segregation is needed due to medical illness or gender identity, and, occasionally, to reduce crowding.  (Guerrero Dep. Tr., ECF No. 127-4 at 104:10–22, 106:21–107:1.)

Notwithstanding the maximum detention capacity limit (*see* February 9, 2025, Request, ECF No. 127-3, *supra*), former-Assistant Field Office Director Jose Guerrero testified that each of the larger cells can hold up to 35 people, and each of the smaller cells can hold up to 15 people, resulting in a maximum capacity of 135.  (Guerrero Decl., ECF No. 40-1 ¶ 7; Guerrero Dep. Tr., ECF No. 127-4 at 54:8–55:5, 61:4–15.)  A larger cell at maximum capacity, per Guerrero's testimony, would permit each individual just over 15 square feet of space.  Guerrero testified further that, although Defendants do not monitor and record cell occupancy rates themselves, they engage a private security contractor to monitor the number of people in each cell, which the contractor does by marking on a whiteboard.  (Guerrero Dep. Tr., ECF No. 127-4 at 59:5–61:3.)  Guerrero testified he is unaware of any records maintained by Defendants to "track the number of individuals held in the cells" at the Baltimore Hold Rooms.  *Id.* at 60:14–20.  Defendants, however, later confirmed that Defendants' contractor, PPS, does in fact create paper records setting forth daily cell count data.  (ECF No. 154-1.)  Following confirmation of same, this court convened a conference and required Defendants to produce these cell count sheets (as well as additional information) to Plaintiffs, consistent with this court's order of preliminary discovery.  While

Defendants provided answers to the questions at issue, they did not produce the cell count sheets on the basis that they no longer exist.  (ECF Nos. 158-1, 158-2.)

According to Dr. Graeme Blair, Plaintiffs' data analysis expert,[10] from February 1 to October 15, 2025, more than 50% of the individuals detained in the Baltimore Hold Rooms were detained on a day when the population exceeded the total capacity of 56 people.[11]  (Blair Rep., ECF No. 127-6 ¶ 14.)  The daily population of the Baltimore Hold Rooms exceeded 100 detainees on seven days during the discovery period (February 1, 2025 to September 12, 2025), with the population reaching 123 at its height.  (Blair Rep. II, ECF No. 149-4 ¶ 8.)  Dr. Blair's data analysis

---

[10] At the hearing, the court accepted Dr. Blair as an expert in data analysis in accordance with the Federal Rules of Evidence.  The court found his testimony highly relevant, helpful to the court to understand the facts before it, credible, and persuasive.  For these reasons, as well as for the reason set forth *infra* at footnotes 11, 12, and 25, the court considers Dr. Blair's expert opinion in its evaluation of the Motion.

[11] Defendants contend that the data analysis set forth in Dr. Blair's Report "eschews both this data set [produced by Defendants in discovery] and the sanctioned [discovery] time period in favor of external data from different time periods unrelated to the instant litigation."  (ECF No. 141 at p. 30.)  In essence, Defendants challenge Plaintiffs' reliance on data obtained from ICE through FOIA litigation outside of what Defendants produced in this action.  Defendants also argue that the court should disregard Dr. Blair's opinions because his data analysis and resultant opinions are based on the number of people detained in the Baltimore Hold Rooms on a given day (during the relevant period), as opposed to the number of people detained at precisely the same moment on a given day.

The court is not persuaded that Plaintiffs' sourcing of relevant data outside of Defendants' discovery production renders Plaintiffs' data and related analysis unreliable, especially where Defendants' challenges are entirely speculative (*e.g.*, that the facility code "BALHOLD" may not encompass only detainees in the Baltimore Hold Rooms).  Defendants do not contend the data provided by ICE in the separate FOIA litigation is inauthentic, and Dr. Blair's Second Report reveals immaterial and few disparities between data relied upon in his first report and data produced here in discovery.  (Blair Report II, ECF No. 149-4 at ¶ 7.)  Further, while Dr. Blair's reports do not set forth calculations of the number of individuals detained at the same time in a precise hour or minute, the court finds Dr. Blair's daily populations reliable and highly probative as to crowding; importantly, the court found Dr. Blair's testimony entirely credible and logical with respect to the immaterial effect substitution of his daily head count calculations with hourly (or minute-to-minute) simultaneous facility population calculations would have on his analysis and expert opinions rendered.  Moreover, as addressed *infra*, Defendants' own representations support and corroborate the numbers addressed here on at least some occasions.  Relatedly, Defendants were content to rely on and harness Dr. Blair's analysis where they felt it served their interests, including to argue that there are fewer female than male detainees overall such that women and men do not experience the same overcrowding (and therefore the constitutionality of the conditions detainees face cannot be assessed absent person-by-person individualized evaluation).

Finally, while the court is mindful (and does not disregard) that it is Plaintiffs who bear the burden on the Motion in its totality, Defendants do not offer data to contrast or contradict Dr. Blair's report because, they contend, their internal head count records no longer exist.  Plaintiffs did not seek a ruling as to spoliation of evidence or a related adverse evidentiary inference, because, as Plaintiffs' counsel asserted at the hearing: "We don't need it."

as to overcrowding and capacity is further supported by additional records before this court as explained below.[12]

First, Plaintiffs submit declarations from detainees attesting that Defendants detained more than 35 people in the larger cells on many occasions across different time periods.[13]  (Doe Decl., Ex. 8, ECF No. 127-10 ¶ 6 (detained in mid-December 2025 with "about 50 other men"); Akaolisa Decl., Ex. 9, ECF No. 127-11 ¶ 6 (detained in late August 2025 with "approximately 40 people"); Salazer Monge Decl., Ex. 12, ECF No. 127-14 ¶ 7 (detained in mid-November 2025 with "more than 40 people"); Tlapanco Peralta Decl., Ex. 13, ECF No. 127-15 ¶ 6 (detained in late October 2025 with "approximately 50 people")).

Second, these over-capacity conditions are reflected in the now widely-viewed video from inside the Baltimore Hold Rooms depicting what appears to be a larger cell holding male detainees.[14]  (Video Ex., ECF No. 129.)  Similarly, cell count sheets of the Baltimore Hold Rooms

---

[12] Defendants' challenge to Dr. Blair's reports set forth in its papers is based in large part on the now-withdrawn declaration of Minnettia Durant (ECF No. 134-2), Unit Chief of the Statistical Tracking Unit ("STU") in the Law Enforcement and Systems Analysis ("LESA") Division within ERO at ICE.  Durant attests that the daily population of the Baltimore Hold Rooms was under 30 people 100% of the time.  This is untrue.  Acknowledging that Durant's sworn attestation is false, Defendants withdrew the declaration at the hearing.  The court, therefore, disregards Durant's declaration.

[13] Defendants object to the court's consideration of Plaintiffs' proffered declarations (to the extent they are based on experiences of third parties and hearsay).  As explained in the memorandum opinion at ECF No. 74, "[b]ecause preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 352 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).  The court, therefore, considers the declarations offered under penalty of perjury.

[14] Defendants contend that the video should not be considered because "[t]he videographer is unidentified and the date, time, and location at which the video was taken are unidentified and/or unverifiable," and because the video is based on, or amounts to, hearsay.  (ECF No. 141 at p. 31.)  Importantly, Defendants do not challenge that the video depicts the inside of the Baltimore Hold Rooms during a time in the recent months or within the discovery period.  To the contrary, during the hearing, Defendants confirmed it depicts the interior of the Baltimore Hold Rooms during a winter storm.  *See also*, JT Moodee Lochman et al., *Maryland Lawmaker Describes "Horrendous" Conditions Inside Baltimore ICE Facility, Speaks Out After Viral Overcrowding Video* (Feb. 1, 2026, at 16:54 EST), https://www.cbsnews.com/baltimore/news/ice-facility-conditions-immigration-enforcement/ [https://perma.cc/XH8V-V9N4]; Dennis Valera, *ICE Blames Weather After Viral Video Allegedly Shows Dozens Packed Inside Baltimore Holding Rooms* (Jan. 30, 2026, 13:23 EST), https://www.cbsnews.com/baltimore/news/ice-weather-video-holding-room-immigration/ [https://perma.cc/JA7B-J4H5].  Against this backdrop, and considering the

for December 10, 14, and 17, 2025, also shown by media outlets, reveal, *inter alia*, occupancies exceeding capacity, including a larger cell holding 38, 43, 47, 50, and 56 people at a time.  (Cell Count Sheets, ECF No. 149-2.)  Where a cell of 559 square feet confines 56 people, each person has a total of approximately 10 square feet of space, and that number assumes that space not consumed by a human is not taken up by other items, like a toilet and benches.  Ten square feet is about the size of a baby crib mattress or bath towel.

Third, evidence of these conditions is further found in the accounts of U.S. Representative Jamie Raskin, who visited the Baltimore Hold Rooms on February 12, 2026, and reported seeing "60 men packed into a room shoulder-to-shoulder," *see* Raskin Tweet, ECF No. 149-1, and Maryland Representative April McClain Delaney, who visited the Baltimore Hold Rooms on December 30, 2025, and reported seeing "probably 50 people" in one cell, *see* Delaney Article, ECF No. 149-3.[15]

Finally, Defendants' own representations throughout this action confirm occupancies in excess of 35 people per cell or 56 people total in the Baltimore Hold Rooms.  *See* ECF No. 40 at p. 3 (Defendants' papers detailing that "[t]he average population of the Holding Facility on any given day during the months of May and June this year has been approximately 60-65 individuals"); Guerrero Decl., ECF No. 40-1 ¶¶ 11–12 (same and noting a "high" of "approximately 100" individuals); Guerrero Dep. Tr., ECF No. 127-4 at 79:10–21, 106:3–13

---

myriad declarations attesting to overcrowding and other issues corroborated and depicted in the video, the court finds it appropriate to consider the video in ruling on the Motion for preliminary injunction with due consideration to Defendants' challenge; and the court disregards the speaking content of the recording, as translated from Spanish to English at ECF No. 129-1.  Regardless of whether the speaker is speaking contemporaneous with the making of the video recording, the speaker purports to describe what is depicted in the video.  Therefore, the court disregards that aspect of the video entirely.  *See also* footnote 13 *supra*.

[15] The court considers these exhibits for the reasons set forth *supra* at footnotes 13 and 14.  Because these statements are also political in nature, the court discounts their weight accordingly with respect to reliability and potential bias or agenda of the speaker.

(Guerrero testifying that he has personally witnessed the population of a single cell exceed 40 individuals and that the Baltimore Hold Rooms population has "hit a hundred" people).

Between February 1 and October 15, 2025, more than 95% of detainees of the Baltimore Hold Rooms were detained longer than 12 hours.  (Blair Rep., Ex. 4, ECF No. 127-6 ¶ 15.)  During this same period, 27% of Baltimore Hold Room detainees were held for longer than the 72 hours permitted per the Waiver.  *Id.*  Defendants do not dispute that individuals were detained for longer than 72 hours, but contend this happened only where it was determined that "exceptional circumstances exist."[16]  (ECF No. 141 at p. 9.)   Baltimore Hold Room detainees are confined in windowless cells, with no clocks or calendars, and have no access to outdoor space, television, magazines, books, or other recreational material.  (Guerrero Dep. Tr., ECF No. 127-4 at 251:10–22; Amaya-Luis Decl., ECF No. 31-14 ¶ 7.)

As recited in the court's previous opinion, throughout this litigation, Plaintiffs have submitted many sworn declarations regarding the conditions of the Baltimore Hold Rooms from February 4, 2025 (ECF No. 31-14), through December 15, 2025 (ECF No. 127-12)—their own (ECF Nos. 31-2, 31-3), as well as those of previous Baltimore Hold Room detainees (ECF Nos. 31-5, 31-6, 31-8, 31-9, 31-10, 31-11, 31-15, 127-12, 127-13, 127-14, 127-15),[17] and counsel (ECF

---

[16] Defendants present to the court that extended detention results from "external challenges" beyond their control. (ECF No. 141 at p. 21.)  As the court explained in its previous opinion, albeit on a different point, Defendants will not be heard to justify the deprivation of constitutional conditions of confinement on circumstances entirely of their own making, "exceptional" or not.  (ECF No. 122 at p. 27 n.20, quoting *Mercado v. Noem*, 800 F. Supp. 3d 526, 577 (S.D.N.Y. 2025)).

[17] Plaintiffs simultaneously file a Motion to Proceed Under Pseudonym as to Declarant Edward Doe at ECF No. 151 (the "Pseudonym Motion"), seeking to permit Mr. Doe to file his declaration pseudonymously.  Because the court is satisfied that pseudonym use is warranted based on consideration of the factors set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993), the Pseudonym Motion will be granted.  The court incorporates its analysis set forth in its memorandum opinion at ECF No. 69, which is similarly applicable here.  Mr. Doe offers testimony regarding his immigration status, including his particular asylum-seeking status, and his health information, which are personal and sensitive topics. *See, e.g.*, *Hisp. Int. Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1247, n.8 (11th Cir. 2012) (collecting cases regarding pseudonym use in immigration-related case); *Int'l Refugee Assistance Project v. Trump*, No. CV TDC-17-0361, 2017 WL 818255, at *2 (D. Md. Mar. 1, 2017) (discussing immigration status as sensitive and highly personal); *Doe v. Chesapeake Med. Sols., LLC*, Civ. No. SAG-19-2670, 2020 WL 13612472, at *1 (D. Md. Feb. 26, 2020) (discussing information related to medical conditions as sensitive and highly personal).

Nos. 1-15, 6-2, 31-7, 31-12, 31-13, 31-16, 36-5).[18]    These declarants attest to conditions

experienced, observed, or learned of (from clients in the instance of counsel declarants).

Specifically, these declarants attest to inadequate sleeping conditions, including rooms

illuminated at all times, being forced to sleep on concrete floors with no pillows or blankets, and

(for some) access to inflatable mattresses but without pillows, blankets, sheets, or adequate space.

(Hyde Decl., ECF No. 6-2 ¶ 9; Parra Decl. ECF No. 31-5 ¶ 6; 31-6 ¶ 8; Cruz Decl. 31-7 ¶¶ 5–7;

Girod Decl., 31-10 ¶ 5, 7; O.P.L. Decl., ECF No. 31-11 ¶ 6; Jenkins Decl., ECF No. 31-12 ¶ 10;

Amaya-Luis Decl., ECF No. 31-14 ¶ 9.)    In addition, they report the cells are incredibly cold.

(Hyde Decl., ECF No. 6-2 ¶ 9; Vasquez Decl., ECF No. 31-9 ¶ 7; Nieves Decl., ECF No. 31-10 ¶

7; O.P.L. Decl., ECF No. 31-11 ¶ 7; Jenkins Decl., ECF No. 31-12 ¶ 10; Amaya-Luis Decl., ECF

No. 31-14 ¶ 9; Martir de Medina Decl., ECF No. 127-13 ¶ 7; Salazar Monge Decl., ECF No. 127-

14 ¶ 12.)

More recent submissions depict similar sleeping conditions.    An August 2025 Baltimore

Hold Rooms detainee reports he was detained for approximately five days with 40 other people,

---

Mr. Doe raises a reasonable fear that if such information were shared, he would face a risk of retaliation by ICE
officials (including of re-detention) and retaliation connected with public dissemination of his immigration and asylum
status. *Cf. E.E.O.C. v. Spoa, LLC*, No. CIV. CCB13-1615, 2013 WL 5634337, at *3 (D. Md. Oct. 15, 2013). While
Mr. Doe's age does not weigh in favor of pseudonym use here, Defendants' government status does. Further,
Defendants contend in conclusory fashion that Mr. Doe's anonymity impairs their capacity to investigate the claims
in this action, confront Mr. Doe's assertions, conduct discovery, and present a full defense. They offer no explanation
or description as to how or why Mr. Doe's pseudonym use impairs these matters. Mr. Doe's testimony, although
relevant, is not of central importance. Nothing about his pseudonym use renders Defendants unable to depose or call
Mr. Doe as a witness (as they already seemingly have). At most, this factor is neutral. Accordingly, upon
consideration of the *James* factors, the court is satisfied Mr. Doe's pseudonym use is appropriate here. The court will
therefore grant the Pseudonym Motion.

[18] In reply, Plaintiffs reference a news article that includes a video interview with an alleged whistleblower who was
employed within the Baltimore Hold Rooms. (ECF No. 149 at p. 1.) They reference the additional assertions of
inhumane conditions within the Baltimore Hold Rooms, *see id.* at pp. 1, 7, as well as purported cell count sheets
showing well over 35 people maintained in cells, *see* ECF No. 149-2. While the court notes these accounts mirror
other evidence before the court, given the speaker's anonymity, minimal indicia of reliability, and concerns regarding
speaker bias, the court declines to consider the whistleblower's statements at this time. Plaintiffs separately offer the
cell count sheets, which Defendants confirm exist, noting "cards with cell information have been used at the [Baltimore
Hold Rooms]." (ECF No. 154-1 at p. 1.) Against this backdrop, and as Defendants pose no objection to consideration
of these sheets, the court considers them.

with little space to move, and that people had to sleep sitting up due to the absence of space. (Akaolisa Decl., Ex. 9, ECF No. 127-11 ¶¶ 5–7.)   An October 2025 Baltimore Hold Rooms detainee also reports detention for five days, with approximately 28 men in a room so crowded he could barely move.  (Garcia-Vigil Decl., Ex. 10, ECF No. 127-12 ¶¶ 5–6.)  He states the detainees were not given mattresses until his second night of detention.  *Id.* ¶ 6.  Again, video footage from within the Baltimore Hold Rooms corroborates these attestations—men can be seen tightly packed together, lying on the ground without mattresses, outfitted with only aluminum blankets.  (Video Ex., ECF No. 129.)   Defendants contend that detainees held overnight in the Baltimore Hold Rooms are provided with air mattresses and blankets, and that the lights are dimmed (not extinguished) overnight due to safety concerns.  (Guerrero Decl., ECF No. 40-1 ¶ 21; Guerrero Dep. Tr., ECF No. 127-4 at 55:13–19.)

It is undisputed that each cell is equipped with a single open toilet, separated by a mid-height privacy wall.[19]  (Guerrero Decl., ECF No. 40-1 ¶ 15.)  The declarants, their individual detentions collectively spanning a broad period, report that, notwithstanding the privacy wall, the toilet area was often unsanitary and devoid of privacy.   (Akaolisa Decl., ECF No. 127-11 ¶ 7; Garcia-Vigil Decl., ECF No. 127-12 ¶ 7, 9; Salazer Monge Decl., Ex. 12, ECF No. 127-14 ¶ 9; Peralta Decl., ECF No. 127-15 ¶ 8; Parra Decl., ECF No. 31-5 ¶ 6; Girod Decl., ECF No. 31-7 ¶ 7; Jenkins Decl., ECF No. 31-12 ¶ 10.)   Declarants also share that at times they were not provided toilet paper.  (Hyde Decl., ECF No. 6-2 ¶ 7; O.P.I. Decl., ECF No. 31-11 ¶ 7.)

According to Guerrero, the cells are supposed to be cleaned once or twice a week, depending on when they can be emptied.  (Guerrero Dep. Tr., ECF No. 127-4 at 231:18–233:3.)

---

[19] Defendants assert that one detainee cannot observe another detainee using the toilet without "either look[ing] around the wall or hover[ing] over the wall to see somebody."  (Guerrero Dep. Tr., ECF No. 127-4 at 122:6–123:6.)  Given the evidence of co-occurring overcrowding, the court is not persuaded the toilet is private or nearly so.

But Declarants tell a different story—detailing regularly unclean cells and toilets. (Garcia-Vigil Decl., Ex. 10, ECF No. 127-12 ¶ 7; Salazer Monge Decl., Ex. 12, ECF No. 127-14 ¶ 8; Hyde Decl., ECF No. 6-2 ¶ 7.)

The declarants, their individual multi-day detentions collectively spanning many months, consistently describe unhygienic conditions that include no or limited change of clothes, toothbrushes or toothpaste, soap, showers or baths, or feminine hygiene products. (Garcia-Vigil Decl., ECF No. 127-12 ¶ 7; Salazer Monge Decl., ECF No. 127-14 ¶ 8; Doe Decl., ECF No. 127-10 ¶ 9; Hyde Decl., ECF No. 6-2 ¶ 8; Cruz Decl., 31-6 ¶ 9; Girod Decl., 31-7 ¶ 7; D.R.R. Decl., 31-8 ¶ 8; O.P.L., ECF No. 31-11 ¶ 7; Amaya-Luis Decl., ECF No. 31-14 ¶ 10; Ponce Decl., 31-15 ¶ 8; Gordon Decl., ECF No. 36-5 ¶ 11; Hyde Decl., ECF No. 56-1 ¶ 5.) Notwithstanding the foregoing declarations, Defendants contend they outfit every detainee with a hygiene kit that includes "soap, moist towelettes, and toothbrushes" and that jumper suits, socks, sneakers, jackets, toothbrushes, toothpaste, wet wipes, and menstrual undergarments for women are available upon request.[20] (Guerrero Decl., ECF No. 40-1 ¶ 25; Guerrero Dep. Tr., ECF No. 127-4 at 148:17–150:6, 151:7–152:10.)[21]

---

[20] It bears noting that declarants attest that ICE officers refuse to speak to them. *See, e.g.*, Akaolisa Decl., ECF No. 127-11 ¶11 ("When I requested to speak to an ICE officer I was simply ignored and I was never able to speak to an ICE officer while detained at Baltimore ICE Field Office. I requested to speak with ICE Officer Floor but he never agreed to speak with me."); Garcia-Vigil Decl., ECF No. 127-12 ¶ 10 ("Due to my difficulty in speaking English, I was only given Spanish written materials to help with communication, but the ICE agents never offered to assist or communicated with anyone of us who were being held at the Baltimore Field Office holding room."); Tlapanco Peralta Decl., ECF No. 127-15 ¶ 9 ("While in the Baltimore ICE Hold Rooms I was never given the opportunity to speak through an interpreter and I refused to sign any papers that the officers asked me to sign since I cannot write or read in English."). Even if it is true that Defendants have, for example, menstrual pads on request, refusal to acknowledge such a request renders the supplies unavailable to detainees who need them.

[21] While not the focus of the current preliminary injunction aspect of the Motion, the court notes that declarants, including Plaintiffs, also detail receiving only three bottles of water per day (at mealtimes) (ECF Nos. 1-15 ¶ 3; 6-2 ¶ 6; 31-7 ¶ 8; 31-9 ¶ 5; 31-10 ¶ 8; 31-15 ¶ 7; 127-14 ¶ 11); inadequate meals and insufficient food (ECF Nos. 6-2 ¶ 6; 31-5 ¶ 7; 31-9 ¶¶ 5–6; 31-10 ¶ 8; 31-13 ¶ 17; 31-15 ¶ 11; 36-5 ¶ 12); food without consideration of relevant medical needs or religious practices (ECF No. 1-15 ¶ 3; 127-10 ¶ 10); and poor quality food (ECF Nos. 31-7 ¶ 8; 31-8 ¶ 6; 31-11 ¶ 7; 31-15 ¶ 7, 127-14 ¶ 10, 127-15 ¶ 8). Defendants do not dispute that only three bottles of water are provided daily (at mealtimes). (Guerrero Dep. Tr., ECF No. 127-4 at 155:2–4.) They contend that additional water is available upon request. *Id.* at 155:5–8. *But see* footnote 20, *supra*. Individuals who are detained are provided with Meals Ready to Eat ("MREs"). (Guerrero Dep. Tr., ECF No. 127-4 at 46:6–18.)

Finally, the declarants attest that, while detained at the Baltimore Hold Rooms, they or others they observed were not provided access to their medications, *see* Justiniano Decl., ECF No. 1-15 ¶¶ 3–5; Hyde Decl., ECF No. 6-2 ¶ 4; Girod Decl., ECF No. 31-7 ¶ 7; B.R.R. Decl., ECF No. 31-8 ¶ 6; Nieves Decl., ECF No. 31-10 ¶ 12; O.P.L. Decl., ECF No. 31-11 ¶ 9; Jenkins Decl., ECF No. 31-12 ¶¶ 12–13; Doe Decl., ECF No. 127-10 ¶ 11, or a medical professional when they did not have access to their medications as needed, *see* Justiniano Decl., ECF No. 1-15 ¶¶ 3–5; Hyde Decl., ECF No. 6-2 ¶ 4; B.R.R. Decl., ECF No. 31-8 ¶ 6; Jenkins Decl., ECF No. 31-12 ¶ 12; Doe Decl., ECF No. 127-10 ¶ 12; Akaolisa Decl., ECF No. 127-11 ¶ 9; Garcia-Vigil Decl., ECF No. 127-12 ¶ 7; Martir de Medina Decl., ECF No. 127-13 ¶¶ 3, 8; Salazar Monge Decl., ECF No. 127-14 ¶¶ 14–15.

As examples, one declarant attests he was not taken to the hospital when he did not have access to his Leukemia medication. (Salazar Monge Decl., ECF No. 127-14 ¶¶ 14–15.) An attorney declarant detailed an individual with HIV who was detained and not provided with his medication for the treatment of his HIV despite repeated requests. (Jenkins Decl., ECF No. 31-12 ¶¶ 6, 12.) Another declarant describes "six or seven people who needed medical attention due to broken limbs . . . and signs of being beaten by ICE," but no such medical attention was provided. (Garcia-Vigil, ECF No. 127-12 ¶ 9.) Another declarant describes being deprived of his high blood pressure medication and finally being seen by a medical professional only upon court order; his blood pressure was "high," and he was "having chest pains." (Doe Decl., ECF No. 127-10 ¶ 11–12.) Two declarants report observing a diabetic man lying on the floor unresponsive before any medical treatment was sought. (B.R.R. Decl., ECF No. 31-8 ¶ 7; O.P.L. Decl., ECF No. 31-11 ¶ 9.)

Defendants do not conduct a medical screening of Baltimore Hold Rooms detainees; instead, they pose "generic questions," such as "what is your medical state?" and "what is your medical condition, if any?"[22] They conduct no physical exams and record no vitals. (Guerrero Dep. Tr., ECF No. 127-4 at 180:6–182:17, 184:6–13.) Defendants assert that they do ask about medications. *Id.* at 172:4–13. They state this screening occurs on two occasions, first before the private security contractors ("PPS Officers"), and next before the ICE deportation officers. *Id.* at 171:21–172:18, 180:6–182:17. Defendants provide no medical screening or other relevant training to the individuals tasked with these measures, *see id.*, and "do not have anyone onsite who is licensed to provide any medical or mental health care services." (Defs.'s Suppl. Interrog. Resp., ECF No. 127-9 at p. 3-4.) When medication is provided by, or on behalf of, a detainee, it is supposed to be stored in a cabinet "inside the main hub."[23] (Guerrero Dep. Tr., ECF No. 127-4 at 187:11–17.)

According to Defendants, where a detainee requires medication not on his person and which cannot be brought to the Baltimore Hold Rooms by a family member or other third party, or if a detainee experiences a medical emergency, Defendants "seek third-party medical intervention for the detainee" by "transporting the detainee to the nearest hospital or medical facility, or by calling 911." (Defs.'s Suppl. Interrog. Resp., ECF No. 127-9 at p. 3-4; Guerrero

---

[22] Defendants contend interpreters are provided via a "language line." (ECF No. 141 at p. 6.) The court notes evidence offered by Plaintiffs from detainees suggesting interpreter services were not made available. *See, e.g.*, Akaolisa Decl., ECF No. 127-11 ¶10 ("I do not have a difficulty communicating in English but other people in the holding room at Baltimore ICE Field Office of Hispanic origin could not communicate with the ICE officers as a result of not being proficient in English."); Garcia-Vigil Decl., ECF No. 127-12 ¶ 10 ("Due to my difficulty in speaking English, I was only given Spanish written materials to help with communication, but the ICE agents never offered to assist or communicated with anyone of us who were being held at the Baltimore Field Office holding room."); Peralta Decl., ECF No. 127-15 ¶ 9 ("While in the Baltimore ICE Hold Rooms I was never given the opportunity to speak through an interpreter and I refused to sign any papers that the officers asked me to sign since I cannot write or read in English.").

[23] Guerrero testified refrigerated storage is used for medications that require it. (Guerrero Dep. Tr., ECF No. 127-4 at 187:18–22.)

Dep. Tr., ECF No. 127-4 at 199:12–203:1.)  Defendants do not document when a detainee is transported to the hospital, except to make a tracking-related entry in ICE's tracking database. (Guerrero Dep. Tr., ECF No. 127-4 at 203:2–21.)

Between February 1 and September 26, 2025, Defendants' records show that detainees were transported to local hospitals on 25 occasions.  (Emergency Referrals, ECF No. 128-1.)  Of these 25 referrals, it appears that eight concerned transport for needed medication or medication management.  *Id.*  Between February 1 and October 15, 2025, Defendants detained 3,250 people in the Baltimore Hold Rooms.  (Blair Rep., ECF No. 127-6 ¶ 11.)  Plaintiffs' medical expert, Dr. Joseph Goldenson,[24] opines: "The fact that fewer than ten were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications." (Goldenson Rep., ECF No. 127-5 ¶ 25.)[25]  As Plaintiffs note, the Centers for Disease Control and Prevention data support this conclusion given the percentage of individuals who use prescription drugs.[26]

Internal communications regarding operations of the Baltimore Hold Rooms provide information on Defendants' awareness of the issues regarding medical screening and response.

---

[24] At the hearing, the court accepted Dr. Goldenson as an expert in the field of correctional medicine in accordance with the Federal Rules of Evidence.  The court found his testimony highly relevant, helpful to the court to understand the facts before it, credible, and persuasive.  For these reasons, as well as for the reason set forth *infra* at footnote 25, the court considers Dr. Goldenson's expert opinions.

[25] In their papers, Defendants argue the court should not consider the opinions of Plaintiffs' experts, Drs. Goldenson and Blair, as to Plaintiffs' request for preliminary injunction.  On inquiry of the court at the hearing, Defendants clarified that their objections go to weight not admissibility.  For the reasons set forth *supra* at footnotes 10, 11, 12, and 24, and on the record at the hearing convened on this Motion, the court overrules these objections and considers the reports.  Further, the court is unpersuaded by Defendants' conclusory assertion that the reports "fail to meet the evidentiary standards" of Federal Rules of Evidence 401 and 403 (regarding relevant evidence and exclusion of same if substantially outweighed by unfair prejudice).  The evidence is obviously relevant and highly probative; further, Defendants' claim of "unfair prejudice" is utterly devoid of description or substance.  They fail even to state what is "unfair."  As is well-recognized, "[a]ll relevant evidence is 'prejudicial' in the sense that it may prejudice the party against whom it is admitted. Rule 403, however, is concerned only with 'unfair' prejudice." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1134 (4th Cir. 1988).

[26] NAT'L CTR. FOR HEALTH STAT., *Therapeutic Drug Use* (Jan 10, 2026), available at https://www.cdc.gov/nchs/fastats/drug-use-therapeutic.htm [https://perma.cc/V59L-VUDD].

For example, within days of the initial waiver of the Baltimore Hold Room 12-hour hold room utilization limit, then-Acting Field Office Director Francine Bowie contacted the Unit Chief of ICE's Detention Oversight Unit to request medical staffing relating to the initial Waiver. (February 9, 2025, Request, ECF No. 127-3.)   Her request seeks "the provision of medical personnel to assist in managing the increasing number of arrest cases presenting medical concerns."  *Id.*  It further provides:

> As a 48-hour facility without on-site medical staff, it is imperative that individuals requiring medication or medical attention are transported to the University of Maryland Hospital. This situation is incurring significant costs to the government, as some noncitizens necessitate hospital visits twice daily. Each transport to the hospital requires the presence of two officers, which detracts from the operational capacity of Baltimore's field officers. Additionally, there are ongoing challenges with the University of Maryland Hospital, which has indicated the possibility of refusing service for cases deemed non-urgent. It has been observed that there are no additional hospitals that have been vetted within the Baltimore area, and the ICE Health Services Corps (IHSC) does not actively seek out a vendor.

*Id.*  Based on the foregoing, Bowie wrote: "Baltimore urgently requires assistance in administering medications, conducting vital checks, and assessing whether individuals need to be transported to the hospital.  The absence of medical staff to provide this support could potentially lead to liability issues or, in the worst-case scenario, fatalities."  *Id.*

## II.    CLASS CERTIFICATION REQUEST

### A.  Legal Standard

"The class-action device, which allows a representative party to prosecute [its] own claims and the claims of those who present similar issues, is an exception to the general rule that a party in federal court may vindicate only [its] own interests."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006).  It "is a carefully constructed compromise in our legal system—one

which Article III courts play a critical role in maintaining." *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 683 (4th Cir. 2024). It is built upon the premise that "litigation by representative parties adjudicates the rights of all class members." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998)).

Plaintiffs seeking to certify a class must meet the criteria set forth in Federal Rule of Civil Procedure 23.[27] First, the moving party must comply with the requirements of Rule 23(a). It provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). These prerequisites are commonly referred to as "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). "The first two prerequisites (numerosity and commonality) focus on the absent or represented class while the latter two tests (typicality and adequacy) address the desired qualifications of the class representative." 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 1:2 (6th ed. 2025).

---

[27] "The Fourth Circuit also reads into Rule 23 an implied requirement of 'ascertainability,' meaning that the [] court can readily identify the class members in reference to objective criteria."[27] *McMillan v. Kansas City Life Ins. Co.*, 762 F. Supp. 3d 443, 457 (D. Md. 2025) (citation omitted); *see Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019) (same); *EQT Prod.*, 764 F.3d at 358 (same). While Defendants make a cursory reference challenging Plaintiffs' ability to meet this implied requirement, *see* ECF No. 141 at p. 13, the Fourth Circuit recently clarified that "[t]here is no threshold ascertainability requirement in [a] Rule 23(b)(2) case, which seeks only declaratory and injunctive relief from a discriminatory policy." *Kadel v. Folwell*, 100 F.4th 122, 161 (4th Cir. 2024), *judgment vacated on other grounds*, 145 S. Ct. 2838 (2025); *see CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 717 n.3 (D. Md. 2025) (discussing same).

After satisfying these criteria, the moving party must then show that the class action falls into one of the Rule 23(b) categories. Plaintiffs seek classification under Rule 23(b)(2), which permits class treatment where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

"As a general matter, the limits of Rule 23 are designed to ensure vigorous adversarial process, efficient adjudication of class-wide questions, and a practical means of identifying and notifying those who may be affected by a judgment." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019). It is not "a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, a plaintiff must "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," and "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (emphasis in original) (citation omitted).

While "[i]t is the plaintiffs' burden to demonstrate compliance with Rule 23, . . . the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod.*, 764 F.3d at 358 (citing *Wal-Mart Stores* U.S. at 350–51); *see Krakauer*, 925 F.3d at 654 (explaining that "the district court must rigorously examine the core issues of the case at the certification stage"). This rigorous analysis does not grant the court "license to engage in free-ranging merits inquiries at the certification stage;" rather, the court "consider[s] merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *EQT Prod.*, 764 F.3d at 358 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Indeed,

"in a class certification analysis, the court determines whether the Rule 23 requirements have been satisfied without considering whether the proposed class is likely to prevail on the merits." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 188 (4th Cir. 2024) (citing *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362, 366 (4th Cir. 2004)).

## B. Scope of the Proposed Class

The court first considers the scope of the proposed class. Again, the proposed class is defined as follows: "All persons who are now or in the future will be detained at the Baltimore Hold Rooms." (ECF No. 127.) Defendants argue that the class definition is overly broad in that it "risk[s] including individuals who would not have a right to recovery but for the sweeping scope of the class certification itself." *Stafford v. Bojangles' Restaurants, Inc*, 123 F.4th 671, 681 (4th Cir. 2024); *see* ECF No. 141 at pp. 12–13. Plaintiffs urge, however, that the class is properly drawn as "all individuals who will be detained at the [Baltimore Hold Rooms] face a potential risk of harm stemming from the challenged policies." (ECF No. 149 at p. 24.)

"Generally, . . . there is no requirement that all class members be known to have been injured; it is sufficient if the class consists of individuals who could potentially have been injured by Defendants' conduct." *Does 4, 7, 22, 27, 28 , & 29 v. Musk*, 350 F.R.D. 246, 255 (D. Md. 2025) (citing cases). Still, "[a]n appropriate class definition should provide proper detail to identify whether or not a prospective class member was injured . . . ." *Stafford*, 123 F.4th at 682. "There is no brightline rule for how such a definition should read, and district courts have discretion in their phrasing." *Id.*

While the court must of course consider whether the class definition "risk[s] including individuals who would not have a right to recovery but for the sweeping scope of the class certification itself," *see id.* at 681, that does not present an issue of overbreadth here

where, as Plaintiffs assert, the common thread is the risk of harm directly tied to the manner in which Defendants operate the Baltimore Hold Rooms. "The present case . . . involves claims of an explicit, overarching policy . . . , which necessarily impacted" all individuals detained in the Baltimore Hold Rooms by exposing them to the resultant associated risks of constitutional harm. *See Does*, 350 F.R.D. at 256. In the court's view, therefore, the overbreadth risk Defendants describe is not at issue. Accordingly, the court will consider the class definition as drawn: All persons who are now or in the future will be detained at the Baltimore Hold Rooms.

## C. Rule 23(a) Factors

As explained, Plaintiffs bear the burden of proving that the requirements of Rule 23 are "*in fact*" met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (emphasis in original). As set forth below, the court is persuaded that Plaintiffs meet their burden.

### 1. Numerosity

To satisfy the numerosity requirement, the proposed class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "No specified number is needed to maintain a class action." *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). But "as a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting 1 *Newberg on Class Actions* § 3:12 (5th ed. 2021)). "Plaintiffs need not establish the precise number of class members at the certification stage to satisfy the numerosity requirement so long as they provide 'a reasonable estimate of the number of class members.'" *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 146 (D. Md. 2022) (quoting *Harris v. Rainey*, 299 F.R.D. 486, 489 (W.D. Va. 2014)). "[T]he burden is on the plaintiffs to show that

other class members exist and that their joinder is impracticable; a court may not rely on mere speculation that numerosity has been satisfied." *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 447 (D. Md. 2018).

Plaintiffs present convincing, reliable evidence that 3,250 separate individuals were detained in the Baltimore Hold Rooms from February 1 through October 15, 2025. Considering the typical duration of litigation of this scope alongside that 8.5-month slice of detention data, "the number of individuals who will be detained at [the Baltimore Hold Rooms] during the pendency of this litigation could easily exceed 10,000." (ECF No. 127-1 at p. 18; Blair Rep., ECF No. 127-6 ¶ 11.) The court finds the numerosity requirement is plainly met, and Defendants pose no challenge on that front.

This prospective class size "raises a presumption of impracticability of joinder based on numbers alone." *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th at 234, *supra*. Further, as Plaintiffs note, "[t]he fact that the class includes unknown, unnamed future members . . . weighs in favor of certification." *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *10 (D. Md. Sept. 18, 2020) (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000)); *see J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (noting that "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them'" (quoting 1 *Newberg on Class Actions* § 3:15)). The "special characteristics" of noncitizen detainees further support the impracticability of joinder. *See Coreas*, 2020 WL 5593338, at *11 (noting that "[a]s immigration detainees who may lack legal status and could be removed from the United States at any time, they are inherently 'transient,' lack sophistication, and do not always speak English well" (citing cases)).

Accordingly, the numerosity requirement is satisfied.

## 2. *Commonality*

As explained, to satisfy the commonality requirement, there must be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). In the foundational case of *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court explained: "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011) (emphasis in original) (citation omitted); *see G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (discussing same). Common answers may be impeded by "[d]issimilarities within the proposed class." *Wal-Mart Stores*, 564 U.S. at 350. And, although "[a] single common question will suffice, . . . it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) (quoting *Wal-Mart Stores*, 564 U.S. at 350, 359). "A question is not common . . . if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (citation omitted); *see Yost v. Elon Prop. Mgmt. Co.-Lexford Pools 1/3, LLC*, No. CV ELH-21-1520, 2023 WL 185178, at *6 (D. Md. Jan. 13, 2023) (same).

Commonality requires that class members "have suffered the same injury;" importantly, it is insufficient to assert merely that "they have all suffered a violation of the same provision of law." *Wal-Mart Stores*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Instead, the "claims must depend upon a common contention," one of "such a nature that it is capable of classwide resolution," meaning the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 349– 50. As the court discussed in its previous memorandum opinion, "Rule 23 does not allow for a

27

30,000 foot view of commonality." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 680 (4th Cir. 2024).[28]  "Allegations of generalized policies are not usually sufficient for the purposes of class certification," as "nebulous references to 'systemic failures' or 'systemic deficiencies'" may "mask a multitude of disparities." *Stafford*, 123 F.4th at 680 (citing cases).  Courts thus "have the obligation to 'examine whether differences between class members impede the discovery of common answers.'" *Id.* (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 909 (4th Cir. 2015)).

The court previously concluded that Plaintiffs had failed to meet the commonality requirement because (at that time) their claims rested on allegations of broad policies or practices that were more akin to the generalized policies at issue in *Stafford*.  With the aid of preliminary discovery, Plaintiffs now clear this hurdle.  As the court details herein, Plaintiffs' claims rest on identified, discrete, specific policies—all of which stem from Defendants' *de facto* utilization and conversion of the Baltimore Hold Rooms beyond their intended purpose, an action Plaintiffs contend is arbitrary and capricious, and unconstitutional.  Plaintiffs, for themselves and the proposed class, commonly contend that, in doing so, Defendants have subjected, and will subject, Baltimore Hold Room detainees to unconstitutional conditions of confinement, that such conditions are punitive, and that Defendants act with deliberate indifference in doing so.  Plaintiffs do not rely on "nebulous references to 'systemic failures' or 'systemic deficiencies;'" rather, they point to Defendants' specific, concrete policies and practices affecting all Baltimore Hold Room detainees.  *See Stafford*, 123 F.4th at 680, *supra*.

---

[28] To the extent Plaintiffs contend that the caselaw and instruction on commonality cited above, as set forth in *Stafford,* is entirely inapplicable here because *Stafford* concerned a Rule 23(b)(3) class, the court disagrees.  *See Oliver v. Navy Fed. Credit Union*, 167 F.4th 106, 116 (2026) (discussing the *Stafford* commonality analysis in the context of Rule 23(b)(2)).  The court is cognizant of the interplay between the commonality and predominance inquiries in a Rule 23(b)(3) class; but that aspect of the opinion does not render *Stafford* inapposite or inapplicable with respect to its discussion of commonality in general.

The proposed class members share common questions.  The obvious common contention central to this action is whether the specific policies and practices employed in the Baltimore Hold Rooms, flowing from the Waiver and the transition of the Baltimore Hold Rooms away from their intended purpose, is arbitrary and capricious, and unconstitutional.  The answer to this question applies uniformly to the proposed class members and is not impeded by "[d]issimilarities within the proposed class," as all putative class members are exposed to the same treatment and conditions—conditions where they are deprived of sleep, hygienic and sanitary conditions, adequate medical care, adequate food and water, and access to counsel, all of which flows from the challenged Waiver.  *See Wal-Mart Stores*, 564 U.S. at 350, *supra.*  Specific to the policies that flow from Defendants' overarching practices, Plaintiffs pose additional common questions of law capable of class-wide resolution, including but not limited to:

> "Does Defendants' failure to implement written policies limiting the number of people detained at the [Baltimore Hold Rooms] result in punitive conditions that violate the Fifth Amendment?"

> "Does Defendants' unwritten policy increasing the purported detention capacity at the [Baltimore Hold Rooms] from 56 to 135 people result in punitive conditions violating the Fifth Amendment?"

> "Does Defendants' failure to adopt any compliance mechanism to enforce their unwritten cell population limits lead to punitive conditions violating the Fifth Amendment?"

> "Does Defendants' failure to adopt written medical care policies constitute deliberate indifference to serious medical needs that violates the Fifth Amendment?"

(ECF No. 127-1 at pp. 20–21.)  Common factual questions similarly underlie these claims, including regarding Defendants' provision hygienic and sanitary supplies, food and water, medical care, access to counsel, and sleeping supplies.  These questions are at the heart of class-wide alleged injuries and will "generate common *answers* apt to drive the resolution of the litigation."

*See Wal-Mart Stores*, 564 U.S. at 349–50, *supra*.   Said another way, answers to these questions do not turn on the individual circumstances of each class member.  *See Thorn*, 445 F.3d at 319, *supra*.

Recently, other district courts addressing similar class claims arising from ICE hold room conditions also found common questions.  *See also, e.g.*, *Pablo Sequen v. Albarran*, — F. Supp. 3d — , No. 25-CV-06487-PCP, 2025 WL 3283283, at *19 (N.D. Cal. Nov. 25, 2025) (finding "common questions as to whether the policies and practices governing conditions of confinement at 630 Sansome, to which all members of the class have been or will be subjected, are constitutional"); *Gonzalez v. Noem*, No. 25 C 13323, 2025 WL 3204602, at *3 (N.D. Ill. Nov. 17, 2025) (finding common questions where "the alleged total denial of access to counsel would injure all detainees at Broadview" and "the alleged practice of agents pressuring detainees to sign legally binding documents, lack of access to medical care, and lack of access to appropriate toilet facilities would injure all detainees"); *Mercado v. Noem*, 800 F. Supp. 3d 526, 562 (S.D.N.Y. 2025) (finding common questions of fact as to "adequate bedding, meals, hygiene products, access to medical care, medication, and confidential communication with attorneys" and common questions of law as to whether ICE standards and policies regarding same violate detainees' constitutional rights).[29]

Defendants' opposition to the instant Motion confirms common questions at the heart of their defenses that are capable of class-wide resolution and will prove central to the asserted claims—including whether Defendants have a legitimate nonpunitive governmental purpose for the challenged conditions, and whether Defendants' policies and practices as to these conditions are constitutionally adequate.  These defense oriented common questions flow directly from the claim-based common questions discussed above as to Defendants' policies and practices.

---

[29] Defendants urge that these cases are not instructive because they were decided on more preliminary records.  The court is not persuaded that materially affects its consideration of the Motion.

Defendants assert that the answer to these questions are of material consequence in the court's preliminary injunction consideration of whether Plaintiffs are likely to prevail on the merits. Clearly, this defense does not turn on the individual circumstances of a particular detainee—indeed, Defendants effectively concede as much in marshaling this frontline defense in opposition to Plaintiffs' motion for preliminary injunction. By Defendants' own argument, these are common questions "of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *EQT Prod.*, 764 F.3d at 360, *supra*.

Defendants' challenges on commonality are otherwise unpersuasive. First, Defendants focus in some measure on the merits of Plaintiffs' claims, not the existence of common questions. The proper inquiry for class certification is not whether Plaintiffs will prevail on common questions raised, but rather whether Rule 23 is satisfied. *See EQT Prod.*, 764 F.3d at 358, *supra*. Further, Defendants argue commonality is not satisfied because policy "application and effects vary dramatically among class members based on their highly variable individualized circumstances." (ECF No. 141 at pp. 14–15.) Defendants mistake the point.

Plaintiffs identify an overarching practice, manifested in specific, discrete policies, that generates common questions of law about those policies, the resolution of which will "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores*, 564 U.S. at 350 (emphasis in original). That there may exist "[m]inor differences in the underlying facts of individual class members' cases," does not "defeat a showing of commonality" against the backdrop of the common questions of law at issue. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 53 (D. Md. 2020) (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997)); *see Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200 (E.D. Va. 2015) (quoting *DiFelice v. U.S. Airways, Inc.,* 235 F.R.D. 70, 78 (E.D. Va. 2006)) (same). Indeed, any

factual differences at issue here do not preclude certification because "the class members share the same legal theory," and that theory is the basis for the common questions of law at issue.[30] *J.O.P.*, 338 F.R.D. at 55 (quoting *Bullock v. Bd. of Educ. of Montgomery Cnty.*, 210 F.R.D. 556, 560 (D. Md. 2002)); *see Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (recognizing that "many inmates can simultaneously be endangered by a single policy" upon the court's consideration of "whether the plaintiffs were exposed to a substantial risk of harm to which prison officials were deliberately indifferent").

As Plaintiffs note, the analysis of the Ninth Circuit in *Parsons* well illustrates this point:

> What all members of the putative class and subclass have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent. As the district court recognized, although a presently existing risk may eventually result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm. *See, e.g., Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Helling,* 509 U.S. at 33, 113 S. Ct. 2475; *cf. Plata,* 131 S.Ct. at 1923 ("For years the medical and mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result.").

754 F.3d at 678.[31]  This analysis is compelling in view of the alleged facts, and theories and grounds of recovery (and defenses).

---

[30] This is especially true of Plaintiffs' APA claim, which is premised on a change in policy affecting all putative class members in the same manner; it is neither concerned with nor dependent upon the specific factual circumstances of each class member.  The claim simply asks "whether that waiver is sufficiently reasoned or whether it is arbitrary and capricious in violation of the APA."  *See Pablo Sequen*, 2025 WL 3283283, at *19.

[31] The persuasiveness of *Parsons v. Ryan* here does not face the same barriers the court discussed in its previous opinion denying without prejudice Plaintiffs' motion for class certification; as the court explains above, Plaintiffs now have identified common questions that do not rely on "[a]llegations of generalized policies" or "nebulous references to 'systemic failures' or 'systemic deficiencies.'"  *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 683 (4th Cir. 2024).  Defendants challenge application of *Parsons* here because, there, the members of the proposed class were

Based on the foregoing, the court finds Plaintiffs satisfy the commonality requirement.

### 3. *Typicality*

To satisfy the typicality requirement, "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The typicality requirement goes to the heart of a representative parties' ability to represent a class, particularly as it tends to merge with the commonality and adequacy-of-representation requirements." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Thus, a named plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim." *Id.* at 466–67. "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) (citation omitted).

"That is not to say that typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). While the claims "do not have to be factually or legal identical, . . . the class claims should be fairly encompassed by those of the named plaintiffs." *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 447 (D. Md. 2018) (citing *Broussard*, 155 F.3d at 344). Indeed, "[a] 'claim may differ factually and still be typical of the claims of class members if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members[.]'" *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 55 (D. Md. 2020) (quoting *Bullock v. Bd. of Educ. of Montgomery Cnty.*, 210 F.R.D. 556, 560 (D. Md. 2002)). To that end, the court

---

all subject to the statewide policies and practices at issue. It appears Defendants mistake Plaintiffs' claims; commonality here rests precisely on common exposure to conditions created by Defendants' policies and practices, and the shared (common) resultant exposure to constitutional injury.

"compares the class representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and determines the extent to which those facts would also prove the claims of the absent class members." *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *13 (D. Md. Sept. 18, 2020) (citing *Deiter*, 436 F.3d at 467).

For the same reasons discussed as to commonality, the court similarly finds Plaintiffs claims are typical of the overall proposed class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.2 (2011) (noting that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge"). Plaintiffs detail detention in the Baltimore Hold Rooms well in excess of 12 hours, during which they allege they were not provided (at least at some point) necessary medication or examination by a medical professional; that they were not provided adequate (and medically-sensitive) food and water; that they were held in unclean cells and denied basic hygiene items; that they were subjected to inadequate sleeping conditions; and that they were unreasonably restricted in their ability to meet with their attorneys. These are indeed typical of the class they seek to represent.

Defendants contend otherwise—that because Plaintiffs did not experience overcrowding in the cells, their claims are not typical.[32] Even assuming without finding that Plaintiffs did not experience overcrowding in their cells, this argument misses the mark. As set forth above, Plaintiffs' claims need not be "perfectly identical" to the claims of the proposed class members. *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). This is especially so in the present circumstance where "the claims of class members . . . arise from the same event or practice or course of conduct that gives rise to the claims of other class members[.]'" *See J.O.P.*, 338 F.R.D.

---

[32] The court notes the credible testimony of V.R.G. at the hearing on the Motion wherein she testified that she (like D.N.N.) was held in a cell with eight women total, and that such conditions resulted in minimal personal space.

at 55.  Plaintiffs do not bring a constitutional claim to recover based on overcrowding; instead, Plaintiffs urge that overcrowding exacerbates the conditions on which their claims are based, claims that concern conditions Plaintiffs did experience firsthand.  The differences Defendants alight upon do not "strike[] at the heart" of the Plaintiffs' proposed class claims.  *See Deiter*, 436 F.3d at 467, *supra*.  *See also Connor v. Maryland Dep't of Health*, No. CV MJM-24-1423, 2025 WL 1167846, at *12 (D. Md. Apr. 22, 2025) (finding typicality where the case "involves a claim for declaratory and injunctive relief that will apply evenly to each Plaintiff and each member of the proposed class").  That certain class members may experience more severe overcrowding (and resulting effects) than did Plaintiffs does not defeat typicality.  Notwithstanding the differences Defendants point to, "each prospective class member pursues the same claims for the same result." *J.O.P.*, 338 F.R.D. at 56.

Accordingly, the court finds Plaintiffs meet the typicality requirement.

### 4.  *Adequacy*

As the court explained in its previous memorandum opinion, to satisfy the adequacy requirement, Plaintiffs must show that they "will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members."  *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998).  A class representative must "be of a character to vigorously pursue the case."  *Monroe v. City of Charlottesville, Virginia*, 579 F.3d 380, 385 (4th Cir. 2009) (citing 7A *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure* § 1766 (3d ed. 2005)).

To determine whether a named plaintiff is an adequate representative, the court looks to "(1) whether the named plaintiffs . . . have any conflicts of interest with other class members; and (2) whether the named plaintiffs . . . will prosecute the action vigorously on behalf of the entire class." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 150 (D. Md. 2022), *vacated and remanded sub nom.*, 78 F.4th 677 (4th Cir. 2023), and *reinstated by*, 345 F.R.D. 137 (D. Md. 2023) (citation modified); *see Parker v. Asbestos Processing, LLC*, No. 0:11-CV-01800-JFA, 2015 WL 127930, at *8 (D.S.C. Jan. 8, 2015) (same); *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007) (explaining that the adequacy inquiry "focuses on two questions"—"has plaintiff demonstrated the requisite level of knowledge and control of the litigation to ensure that he will vigorously prosecute the claims asserted here" and "has plaintiff demonstrated the requisite credibility to ensure that he will act as a fiduciary with respect to the class he seeks to represent").

The first prong concerns conflicts of interest. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594–95 (1997) (citing *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Here, again, the court discerns no conflicts of interest between (or among) Plaintiffs and the class they seek to represent; nor do Defendants contend otherwise.

The second prong requires the court to consider whether the named Plaintiffs will vigorously prosecute this action on behalf of the class they seek to represent. As the court explained in its earlier memorandum opinion, this is not a high bar. Indeed, "the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003). Instead,

the court's concern arises where a named plaintiff "lacks *any* understanding of the class representative's role in litigation, adequacy may not be satisfied." *Monroe v. City of Charlottesville, Virginia*, 579 F.3d 380, 385 (4th Cir. 2009) (emphasis in original). "Findings that a representative lacks sufficient interest, credibility, or either knowledge or an understanding of the case—although a knowledge or understanding of all the intricacies of the litigation is not required—are grounds for denying class certification." *Id.* Ultimately, the court must ensure (and be persuaded) that the named Plaintiffs "are not simply lending their names to a suit controlled entirely by the class attorney." *Id.* (citation omitted).

While the court previously found the record too paltry as to Plaintiffs' adequacy, they have certainly corrected that here. Plaintiffs offer declarations attesting to their understanding of the claims asserted, their responsibilities as class representatives, and the need to communicate regarding litigation decisions with counsel, as well as efforts they have undertaken to prepare for hearings, give testimony, and review the records in this case. (D.N.N. Suppl. Decl., ECF No. 127-21 ¶¶ 4–8; V.R.G. Suppl. Decl., ECF No. 127-20 ¶¶ 4–8; D.N.N. Suppl. Decl. II, ECF No. 149-6 ¶¶ 6–10; V.R.G. Suppl. Decl. II, ECF No. 149-7 ¶¶ 6–10.) *See, e.g., Edmondson v. Eagle Nationwide Mortg. Co.*, No. CV SAG-16-3938, 2024 WL 3029121, at *4 (D. Md. June 17, 2024) (noting the named plaintiff "explain[ed] the basic facts underlying the litigation, . . . described the harm she and other class members suffered," and explained the ways in which the class representative "does the heavy lift" for class members); *McDonald v. Lab'y Corp. of Am. Holdings*, No. 1:22CV680, 2024 WL 4513580, at *5 (M.D.N.C. Oct. 17, 2024) (noting the named plaintiff demonstrated "[knowledge of] the basis of his claims," "discussed a previous motion to dismiss," "identified documents he produced for this case, among other things," and "sat for a deposition"). Plaintiffs also both testified at the hearing convened on the instant Motion.

The court is satisfied upon the record before it that Plaintiffs "will prosecute the action vigorously on behalf of the entire class."[33]  *See In re Marriott Int'l, Inc.*, 341 F.R.D. at 150, *supra*. That Plaintiffs may not have a deep knowledge or understanding of the intricacies of Fifth Amendment law is neither required nor a reasonable expectation.  *See Monroe*, 579 F.3d at 385, *supra*.  Plaintiffs meet the adequacy requirement.

The court finds that Plaintiffs ably establish all Rule 23(a) factors.  The court next addresses class treatment under Rule 23(b).

### D.  Rule 23(b) Analysis

Plaintiffs seek certification under Rule 23(b)(2).  As discussed above, under Rule 23(b)(2), "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).  "'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).  As the Supreme Court further explained in *Wal-Mart Stores*:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, 84 N.Y.U.L.Rev., at 132. In other words, Rule 23(b)(2) applies only when a single

---

[33] For the reasons set forth above as to typicality and commonality, the court does not find Defendants' related challenges to adequacy compelling. (ECF No. 141 at p. 24.) Further, the court disagrees with Defendants' contention that the record "does not demonstrate Plaintiffs fully comprehend their representational responsibilities." *Id.* at p. 23. To the contrary, Plaintiffs attest on that very subject, including their knowledge of the claims and their efforts to stay aware of the continuing conditions of the Baltimore Hold Rooms. As explained above, "the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003).  Instead, concern arises where the record suggests that a representative plaintiff "lacks *any* understanding of the class representative's role in litigation, adequacy may not be satisfied." *Monroe v. City of Charlottesville, Virginia*, 579 F.3d 380, 385 (4th Cir. 2009) (emphasis in original).  That is not at all the case here.

> injunction or declaratory judgment would provide relief to each
> member of the class. It does not authorize class certification when
> each individual class member would be entitled to a *different*
> injunction or declaratory judgment against the defendant. Similarly,
> it does not authorize class certification when each class member
> would be entitled to an individualized award of monetary damages.

*Id.* at 360–61 (emphasis in original).

Plaintiffs seek here to enjoin Defendants from subjecting class members "to the illegal and unconstitutional conditions, acts, omissions, policies, and practices" created by Defendants' operation of the Baltimore Hold Rooms, as well as a declaration that the Waiver violates the APA. (ECF No. 52 at p. 33.)  For the reasons set forth above, the court agrees that such injunctive and declaratory relief "would provide relief to each member of the class." *Wal-Mart Stores*, 564 U.S. at 360–61.  Plaintiffs demonstrate to the court's satisfaction that this case does not present a circumstance where "each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*  Defendants' arguments on this point predominantly restate their assertions as to commonality and typicality, and are unavailing. Individual differences of putative class members are not of the sort that would frustrate the purpose of class litigation, which is to say that final injunctive and declaratory relief, as sought, would provide relief to all class members notwithstanding their individual differences or circumstances.

Accordingly, the court finds that Rule 23(b)(2) is satisfied.  The court will therefore grant the Motion to the extent it seeks class certification as follows: the court will certify a Rule 23(b)(2) class to include all persons who are, or will be, detained at the Baltimore Hold Rooms.

## E.  Appointment of Class Counsel

Upon certifying a class, the court must appoint class counsel.[34]  FED. R. CIV. P. 23(g)(1).

In doing so, the court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

FED. R. CIV. P. 23(g)(1)(A); *see Bell v. Brockett*, 922 F.3d 502, 511 (4th Cir. 2019) (same).  Courts

may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent

the interests of the class."  FED. R. CIV. P. 23(g)(1)(B).  Rule 23(g)'s required considerations

"provide critical safeguards against the due process concerns inherent in all class actions."  *Bell v.*

*Brockett*, 922 F.3d 502, 511 (4th Cir. 2019).

As class counsel, Plaintiffs ask the court to appoint counsel from two public interest

organizations—the Amica Center for Immigrant Rights and the National Immigration Project—as

well as Crowell & Moring LLP.  (ECF No. 127-1 at p. 26.)  Plaintiffs assert that proposed class

counsel are experts in immigration and detention law as well as international law; proposed

---

[34] "Although Rule 23(a)(4) provides that a class action may be maintained only if the representative *parties* will fairly and adequately protect the interests of the class, courts have long used Rule 23(a)(4) as an invitation to scrutinize the adequacy of class *counsel* as well as the adequacy of the class *representatives*."  1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:52 (6th ed. 2025) (emphasis in original) (citations omitted); *see Sharp Farms v. Speaks*, 917 F.3d 276, 290 (4th Cir. 2019) (citing same).  However:

> In 2003, Congress amended Rule 23 to add subdivision 23(g). The new provision, which is entitled "Class Counsel," provides both substantive standards and procedures governing the appointment of class counsel.
> The Advisory Committee noted that Rule 23(g) migrated the discussion of counsel's adequacy away from 23(a)(4), writing: "Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision."

*Newberg and Rubenstein on Class Actions* § 3:80 (6th ed. 2025) (footnotes and citations omitted); *see In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 150 (D. Md. 2022), *vacated and remanded sub nom.*, 78 F.4th 677 (4th Cir. 2023), and *reinstated by*, 345 F.R.D. 137 (D. Md. 2023) (noting that "[w]hile district courts' adequacy analysis under Rule 23(a)(4) traditionally evaluated the adequacy of class representatives *and* class counsel, the 2003 amendments to Rule 23 indicate that courts should change this approach," in view of the Rule 23(g)).

counsel offer declarations attesting to their experience in class-wide detention litigation, *see* Rose Decl., ECF No. 127-22 ¶ 2; Shebaya Decl., ECF No. 31-18 ¶ 2, with expertise in federal immigration, civil rights, and administrative actions, including class actions, *see* Rose Decl., ECF No. 127-22 ¶¶ 3–4; Shebaya Decl., ECF No. 31-18 ¶¶ 4–5, 7–9; Murphy Decl., ECF No. 31-19 ¶¶ 5–6, 10–11.

On the court's first-hand observation during this litigation thus far, including the pleadings and papers filed, discovery sought, counsel's conduct during hearings and conferences, including courtesy and professionalism toward opposing counsel, it is plain that proposed counsel have undertaken extensive work in prosecuting this action, come to court with demonstrated subject matter expertise, and conduct themselves as admirable officers of the court in all respects. Defendants do not oppose the appointment of Plaintiffs' counsel pursuant to Rule 23(g).

Based on the foregoing, and upon consideration of the Rule 23(g)(1) factors, the court finds that proposed class counsel will "fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B). Proposed counsel from the Amica Center for Immigrant Rights, the National Immigration Project, and Crowell & Moring LLP will be appointed as class counsel.

## III.   **PRELIMINARY INJUNCTION REQUEST**

The court turns now to Plaintiffs' request for preliminary injunction on behalf of the class pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (noting that "a preliminary injunction is 'an extraordinary remedy never awarded as of right'"). As such, preliminary injunctive relief is to be "granted only sparingly and in limited

circumstances." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 351 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)).

Plaintiffs seeking preliminary injunctive relief "must establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors the requested injunctive relief; and 4) that relief is in the public interest." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019)). When, as here, the Government is the party opposing a motion for preliminary injunction, the balance of equities and public interest factors merge. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). These now well-known factors were established by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). "[P]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing cases); *see St. Michael's Media, Inc.*, 566 F. Supp. 3d at 351 (same).

As an important preliminary matter, the parties dispute the type of preliminary injunction sought. "A preliminary injunction may be characterized as being either prohibitory or mandatory." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). A prohibitory injunction is one that "aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Id.* (quoting *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)). In contrast, a mandatory injunction is one that "alters the status quo." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). While both are extraordinary

remedies, a mandatory injunction is "disfavored" and "warranted only in the most extraordinary circumstances." *Id.* (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)).

The Fourth Circuit defines the "status quo" as "the last uncontested status between the parties which preceded the controversy." *Pashby*, 709 F.3d at 320; *see Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779, 815 (D. Md. 2025) (explaining that "the 'status quo,' for purposes of injunctive relief, 'is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy'") (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)). That an injunction "require[s] a party who has recently disturbed the status quo to reverse its actions," does not convert a prohibitory injunction into a mandatory injunction because "such an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters*, 769 F.3d at 236 (citation modified) (quoting *Aggarao*, 675 F.3d at 378).

"[T]o justify a mandatory injunction, . . . the movant must demonstrate a clear and convincing probability of success." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 612 F. Supp. 3d 563, 579 (E.D. Va. 2020) (quoting *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016)); *see 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 411 (4th Cir. 2025) (noting a "heightened standard for issuing a mandatory preliminary injunction"). A mandatory injunction should "normally . . . be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).

Plaintiffs contend they seek a prohibitory injunction "only to ensure the individuals detained at the [Baltimore Hold Rooms] are held in safe, non-punitive conditions, as was the case before February 2025." (ECF No. 149 at p. 5.) Defendants, in contrast, urge that the relief sought

is a mandatory injunction because Plaintiffs seek more than to "merely maintain the status quo." (ECF No. 141 at p. 27.)

As an initial matter, the court agrees with Plaintiffs that the status quo is not, as Defendants urge, the time when Plaintiffs entered the Baltimore Hold Rooms. Instead, the point in time representing the status quo is February 2025 immediately prior to issuance of the Waiver—*i.e.*, just before Defendants began operating the Baltimore Hold Rooms in a manner that led to the alleged unconstitutional conditions. As explained, the status quo is not "the circumstances existing at the moment the lawsuit or injunction request was actually filed"; it is the "last uncontested status between the parties which preceded the controversy." *See Maryland*, 770 F. Supp. 3d at 815, *supra*. The last uncontested status here is pre-Waiver February 2025.

The court finds that the preliminary injunction sought here seeks to return the Baltimore Hold Rooms to its status quo in February 2025 by removing the conditions that have since developed—the overcrowding, the lack of hygienic and sanitary holding conditions, and the inadequate medical screening and care. While there are certainly changed circumstances that require requested relief that is perhaps different than Defendants' exact practice in February 2025, the court is not persuaded that converts the sought preliminary injunction from prohibitory to mandatory.

As it existed in February 2025, the Baltimore Hold Rooms had a maximum capacity of 56 people. (February 9, 2025, Request, ECF No. 127-3.) Defendants' operation of the Baltimore Hold Rooms under Directive 11087.2 required that officers ensure sufficient supervision, with consideration of the physical layout of the Baltimore Hold Rooms, the composition of individuals detained there, and lengths of stay. (Directive 11087.2, ECF No. 1-8 § 4.4.1.1.) It required the Baltimore Hold Rooms be "safe" and "clean." *Id.* § 4.4.1.3. It required ERO "[m]onitor detainees

for any apparent indications of a mental or physical health condition or signs of hostility, self-harm, or harm to others that may require closer supervision or emergency medical care." *Id.* 5.1.2. The requested preliminary injunction provides relief that addresses these very policies and thus seeks to return the Baltimore Hold Rooms to the status quo of pre-Waiver February 2025, when it presumably operated in accordance with those policies. The Motion, therefore, seeks a prohibitory injunction. That such relief must account for a material change of circumstances (of Defendants' making) does not remove it from the ambit of relief that requires Defendants "who [have] recently disturbed the status quo to reverse [their] actions."[35] *See League of Women Voters of N. Carolina*, 769 F.3d at 236, *supra*.

### A. Likelihood of Success on the Merits

"A plaintiff seeking a preliminary injunction must make a clear showing that he is likely to succeed at trial and to suffer irreparable harm in the absence of preliminary relief." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)). Of import here, Plaintiffs contend they are likely to succeed on the merits of their Fifth Amendment conditions of confinement claims as set forth at Counts IV and V, specifically that Defendants deprive putative class members of hygienic, sanitary, and safe conditions, as well as adequate medical screening and care, at the Baltimore Hold Rooms. (ECF No. 127-1 at pp. 29–30.)

---

[35] In any event, for the reasons set forth herein, even were the court to conclude the requested preliminary injunction was mandatory *en toto*, the court is satisfied Plaintiffs demonstrate a clear and convincing probability of success on all points on which they seek preliminary injunctive relief, and that the exigencies of the situation demand same. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 612 F. Supp. 3d 563, 579 (E.D. Va. 2020); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).

### 1. *Mootness and Standing*[36]

Before turning to the substantive merits of Plaintiffs' claims, the court first considers Defendants' argument, asserted for the third time, that the court should deny Plaintiffs' request for preliminary injunction because they lack standing to pursue injunctive relief. Notwithstanding the court's repeated rejection of this argument and clarification of its view of the law, Defendants continue to conflate the "separate, though related doctrines" of standing and mootness, both of which relate to justiciability. *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *8 (D. Md. Sept. 18, 2020); *see Flast v. Cohen*, 392 U.S. 83, 95 (1968) (footnotes omitted) (regarding justiciability). "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980)); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (noting, however, that describing "mootness" as "standing set in a time frame," per *Arizonans for Off. Eng.*, is "not comprehensive").

"Standing 'is concerned with the presence of injury, causation, and redressability at the time a complaint is filed,' whereas mootness 'scrutinizes the presence of these elements after filing—*i.e.*, at the time of a court's decision.'" *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 844 (D. Md. 2025) (quoting *Garcia v. U.S. Citizenship & Immgr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016)). Defendants' argument does not concern standing at the commencement of this action; it concerns whether an ongoing case or controversy exists. *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (explaining that "[i]t is the doctrine of

---

[36] As the Fourth Circuit recently clarified, "the 'likelihood of success on the merits' refers to the party's likelihood of success *in the lawsuit before the court*, including both merits *and* jurisdictional issues." *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 169 n.3 (4th Cir. 2025) (emphasis in original) (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). As such, the court considers "jurisdictional issues like standing . . . as part of the first *Winter* factor." *Id.*

mootness, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of the lawsuit'") (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)).  Accordingly, Defendants' challenge is properly characterized as one of mootness, not standing.  *See DL v. D.C.*, 302 F.R.D. 1, 19 (D.D.C. 2013), *aff'd,* 860 F.3d 713 (D.C. Cir. 2017) (explaining that "[e]vents subsequent to the filing of the complaint may *moot* the plaintiffs' claims, but the plaintiffs do not lose *standing*" (emphasis in original)); *Hinton v. D.C.*, 567 F. Supp. 3d 30, 48 (D.D.C. 2021) (same).

The court has repeatedly addressed the mootness of Plaintiffs' individual claims in this action.  Citing no on-point authority, Defendants contend that the present circumstance calls for a different outcome than the court's previous analysis because "the preliminary injunction is a different matter."  (ECF No. 141 at p. 26.)  The court discerns no difference that would produce a different outcome.  Plaintiffs request entry of a preliminary injunction on behalf of the class as class representatives.  The court has already held that mootness of the claims as to them individually does not impair their ability to seek relief on behalf of the class as class representatives pursuant to the "class-action specific 'relation back'" exception.  *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 325 (4th Cir. 2022).  Plaintiffs allege a circumstance where "*other* class members 'will continue to be subject to the challenged conduct and the claims raised are . . . inherently transitory.'"  *Id.* (emphasis in original) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013)).  The court agrees.

Defendants offer no persuasive argument or authority that this exception is (or should be held) inapplicable to requests for preliminary injunction.  And case law indicates to the contrary.  *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (explaining, on an appeal pertaining to a preliminary injunction, that "[o]ur cases leave no doubt, however, that by obtaining class

certification, plaintiffs preserved the merits of the controversy for our review"); *see also Dubon Miranda v. Barr*, 463 F. Supp. 3d 632, 641 (D. Md. 2020), *vacated and remanded sub nom. on other grounds Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) (explaining, on a Rule 65 motion that mootness of lead plaintiffs' claims for injunctive relief caused by their release from ICE custody "does not prevent courts from reaching the merits in a case involving 'inherently transitory claims' such as these"). This makes good sense. If Defendants were correct, the Executive would effectively be insulated from any form of injunctive relief on exercise of its sole power and discretion to moot an individual's claim. *See Jonathan R.*, 41 F.4th at 326. As in *Jonathan R.*, here, the length of detention is "exceedingly unpredictable" and "the duration of Plaintiffs' claims remains largely" at Defendants' discretion. *Id.* (citation modified).

Accordingly, as the court has previously concluded, and for the reasons set forth herein, Plaintiffs' request for preliminary injunction on behalf of the class does not fail on grounds of mootness of Plaintiff's individual claim status.

### 2. *Fifth Amendment Claims*

As discussed above, Plaintiffs contend they are likely to succeed on the merits of their Fifth Amendment conditions of confinement claims as set forth in Counts IV and V, urging that the conditions of confinement at the Baltimore Hold Rooms are unlawfully punitive and reflect deliberate indifference to the health, safety, and medical needs of individuals detained therein.

"Civil detainees who challenge the conditions of their confinement are protected by the Due Process Clauses of the Fifth and Fourteenth Amendments." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 420 (D. Md. 2020) (citing *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982)). The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V. "[T]he Due Process Clause applies to all 'persons' within

the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  As the Supreme Court has explained:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See *Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct., at 2458 ("When a person is institutionalized—and wholly dependent on the State[,] . . . a duty to provide certain services and care does exist"). The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— *e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble, supra,* 429 U.S., at 103–104, 97 S.Ct., at 290–291; *Youngberg v. Romeo, supra,* 457 U.S., at 315–316, 102 S.Ct., at 2457–2458.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (footnote omitted).

Civil detainees "possess at least the same rights as convicted prisoners," *Williamson v. Stirling*, 912 F.3d 154, 176 (4th Cir. 2018) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)), and "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017) (same).  These protections include the right to reasonable safety and adequate medical care. *Coreas v. Bounds*, 451 F. Supp. 3d 407, 421 (D. Md. 2020); *see Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (explaining that these protections "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . reasonable measures to guarantee the safety of the inmates") (citation omitted).

The Fifth Amendment's due process guarantees protect civil detainees "from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 608–09 (4th Cir. 2023) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). The "controlling inquiry" when a civil detainee challenges her conditions of confinement as unconstitutional "is whether the conditions imposed on the pretrial detainee constitute 'punishment.'" *Williamson*, 912 F.3d at 174 (citing *Bell*, 441 U.S. at 535–39). Relatedly, when the Government civilly detains an individual, it violates the detainee's Fifth Amendment due process guarantees when it is deliberately indifferent to an excessive risk. *Short*, 87 F.4th at 603. This principle is rooted in the notion that "[t]he infliction of . . . unnecessary suffering is inconsistent with contemporary standards of decency . . . ." *Estelle v. Gamble*, 429 U.S. 97, 103–104 (1976).

To prevail in showing deliberate indifference to unsafe conditions and medical needs, as asserted here, Plaintiffs must demonstrate two elements. First, Plaintiffs must demonstrate a "'deprivation of a basic human need' that is 'objectively sufficiently serious,'" meaning that it poses either "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from the [detainee's] unwilling exposure to the challenged conditions." *Hammock v. Watts*, 146 F.4th 349, 360 (4th Cir. 2025) (first quoting *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997); then quoting *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995)); *see Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019), *as amended* (May 6, 2019) (discussing same) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). The court is guided in this inquiry by "contemporary standards of decency," and conscious of "the evolving precepts of humanity and personal dignity." *Jones v. Solomon*, 90 F.4th 198, 208–09 (4th Cir. 2024) (quoting *Shakka*, 71 F.3d at 166). Second, Plaintiffs must show that

Defendants "acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Short*, 87 F.4th at 611.

a. Relevant Findings of Fact Based on the Challenged Conditions of Confinement

Based on the record before the court, the court makes the following preliminary findings of fact as to the challenged conditions of confinement in the Baltimore Hold Rooms:

- Individuals detained in the Baltimore Hold Room are routinely held there overnight and in excess of 12 hours.

- Individuals detained in the Baltimore Hold Rooms are often held there for more than 72 hours.

- ICE routinely exceeds the maximum capacity of 56 individuals in the Baltimore Hold Rooms, and has detained more than 120 individuals in the Baltimore Hold Rooms in one day, which is over 200% of its maximum capacity.

- ICE routinely exceeds its own unofficially-assigned maximum capacity of 35 individuals in a larger cell at one time.

- Individuals detained in the Baltimore Hold Rooms are not able to bathe or shower.

- Individuals detained in the Baltimore Hold Rooms are routinely required to use the toilet with minimal or no privacy.

- Individuals detained in the Baltimore Hold Rooms are routinely subjected to unsanitary environments, including unclean cells and toilets.

- Individuals detained in the Baltimore Hold Rooms are not provided access to clean clothes or basic hygiene items on a routine basis; sometimes not at all.

- Individuals detained in the Baltimore Hold Rooms are routinely denied their medications or medical care, or not provided necessary access to same.

- ICE does not screen for medical needs of individuals detained in the Baltimore Hold Rooms.

b. Conditions of Confinement Claims

Plaintiffs urge that they are likely to succeed in on the merits of their claims that Defendants have violated the Fifth Amendment by subjecting members of the class to unhygienic, unsanitary,

and unsafe conditions of confinement, as well as inadequate medical screening and related conditions. (ECF No. 127-1 at pp. 30–42.) Consistent with the framework above, the court first considers whether Plaintiffs have made a clear showing that the challenged conditions—those of unsanitary and unhygienic conditions, and inadequate medical screening and care—deprive them of a basic human need and are sufficiently serious. *See Hammock*, 146 F.4th at, 360 and *Porter*, 923 F.3d at 355, *supra*. The court next considers Plaintiffs' showing that Defendants acted (or failed to act) in the face of an unjustifiably high risk of harm of a known or obvious risk, and whether Defendants actions (or inactions) were "rationally related to a legitimate nonpunitive governmental purpose" or "excessive in relation." *See Short*, 87 F.4th at 608–09, *supra*.

    i.    *Challenges to Unsanitary and Unhygienic Conditions*

In considering conditions of confinement, the court considers the totality of the circumstances of confinement in determining whether conditions of confinement are unconstitutional. *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991); *see Jones v. Solomon*, 90 F.4th 198, 209 (4th Cir. 2024) (discussing same). Plaintiffs make a clear showing that deprivation of hygienic, sanitary, and safe conditions is sufficiently serious such that it poses serious injury or substantial risk of serious harm from exposure. *See Hammock*, 146 F.4th at 360 and *Porter*, 923 F.3d at 355, *supra*. Due to the limited space and present circumstances in the Baltimore Hold Rooms, the record demonstrates that detained individuals are commonly confined to unclean cells, each with a virtually exposed, single, unclean toilet; these cells are filled beyond capacity with individuals unable to tend to their basic personal hygiene, at times for multiple days.

It is well-settled that housing individuals "in a grossly overcrowded and unsanitary facility" violates their constitutional rights. *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 812 (D. Md. 2022) (quoting *Brown v. Mitchell*, 308 F. Supp. 2d 682, 693 (E.D. Va. 2004)). Further,

"the denial of decent and basically sanitary living conditions and 'the deprivation of the basic elements of hygiene'" are "clear violations" of detainees' rights. *Hite v. Leeke*, 564 F.2d 670, 672 (4th Cir. 1977) (quoting *McCray v. Sullivan*, 509 F.2d 1332, 1336 (5th Cir. 1975)); *cf. Jones*, 90 F.4th at 209 (referencing *Hite* and noting it is clearly established "that inmates [are] entitled to 'decent and basically sanitary living conditions and . . . the basic elements of hygiene'").

The conditions, in view of their mutually enforcing effect in combination, are far from de minimis and demonstrate a sufficiently serious deprivation. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." (emphasis in original)).

The totality of the circumstances demonstrate a serious deprivation. This is not a case of a prisoner lacking access to clean toilet for a period of days, nor is it a case where a pretrial detainee cannot shower and is not provided with hygiene items for a period of days. Rather, the conditions here are compounded: civilly detained people are stuffed into unclean cells by the dozens, without basic hygiene essentials, while exposed to a virtually open unclean toilet (and those detained making use of same). These conditions woefully fail to comport with "contemporary standards of decency." *See Jones*, 90 F.4th at 208–09, *supra*. *See, e.g.*, *Williams*, 952 F.2d at 825 (4th Cir. 1991) (reversing district court's grant of summary judgment for defendants where prisoner plaintiff alleged unsanitary conditions and overcrowding, including *inter alia*, a cell toilet, shared by 12 inmates that was "constantly coated with urine day and night"); *Karn*, 590 F. Supp. 3d at 811 (discussing conditions including a van that smelled of "defecation, urine, vomit, old food"); *Clark*

*v. Daddysman*, No. CV TDC-16-0921, 2018 WL 1453333, at *10 (D. Md. Mar. 22, 2018) (discussing conditions including a cell with human waste); *Webb v. Deboo*, 423 F. App'x 299, 301 (4th Cir. 2011) (concluding that conditions including, *inter alia*, "severe overcrowding [] causing unsanitary conditions, the spread of disease, . . . and lack of access to medical care" could sustain an Eighth Amendment claim); *Fletcher v. Dykes*, No. CV TDC-17-0914, 2018 WL 3785143, at *7 (D. Md. Aug. 9, 2018) (discussing conditions including lack of sanitary items, including soap, and clothing); *Pellum v. Burtt*, No. 9:05-3339-JFA-GCK, 2008 WL 759084, at *3 (D.S.C. Mar. 20, 2008) (discussing conditions including denial of proper cell ventilation and access to hygiene items).

The two other district courts that have addressed conditions of ICE hold rooms have also found similar conditions likely violative of the Fifth Amendment. *See Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 3283283, at *25 (N.D. Cal. Nov. 25, 2025) (finding that "unsanitary conditions and denial of basic hygiene resources," including toothbrushes, soaps, and clothing, or access to washing one's body, likely violated detainees' due process rights); *Mercado v. Noem*, 800 F. Supp. 3d 526, 571–72 (S.D.N.Y. 2025) (finding objective deprivation based on unsanitary conditions on evidence of lack of shower/bath access, denial of basic hygiene items, shared use of toilets combined with overcrowding, and inadequate cleaning).

The court is well persuaded that such a combination of conditions supports Plaintiffs' claim that class members are being deprived of a basic human need that is sufficiently serious. *See Hammock*, 146 F.4th at 360, *supra*. The seriousness of the deprivation to which these civil detainees are subjected is all the more stark and compelling given that the caselaw cited above predominantly pertains to prisoners' rights under the Eighth Amendment. As reflected above, civil

detainees are entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *See Youngberg*, 457 U.S. at 322, *supra*.

Plaintiffs meet their burden to show a clear likelihood of success in proving that the deprivation of hygienic, sanitary, and safe conditions is sufficiently serious.

*ii.    Challenges to Inadequate Medical Screening and Care*

Plaintiffs similarly clearly show a likelihood of success in proving that the inadequate medical screening and care individuals receive when detained in the Baltimore Hold Rooms also poses serious injury or substantial risk of serious harm from exposure. *See Hammock*, 146 F.4th at 360 and *Porter*, 923 F.3d at 355, *supra*.

It is well-established that "'adequate . . . medical care' is a basic condition of humane confinement." *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). To show deliberate indifference as to same in the way Plaintiffs offer it here, Plaintiffs must show an objectively serious medical condition, *see Short v. Hartman*, 87 F.4th 593, 612 (4th Cir. 2023), or a substantial risk of serious harm resulting from the challenged conditions, *see Hammock*, 146 F.4th at 360, *supra*. Indeed, "'a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year' may violate the Constitution, even if 'the complaining inmate shows no serious current symptoms.'" *Coreas v. Bounds*, 451 F. Supp. 3d 407, 423 (D. Md. 2020) (quoting *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993)); *see Hammock*, 146 F.4th at 362 (discussing same). Such a claim reflects the longstanding recognition that "a remedy for unsafe conditions need not await a tragic event." *Helling v*, 509 U.S. at 33. Detention personnel "may not ignore a dangerous condition of confinement on the ground that the complaining inmate shows no serious current symptoms." *Hammock*, 146 F.4th at 362 (quoting *Webb*, 423 F. App'x at 300).

Where Defendants take individuals into custody for indeterminate periods absent medical screening, and/or fail or refuse to address their medical needs, on grounds that such a person's detention is limited, they create a condition that poses a substantial risk of serious harm to those individuals. Examples of this are legion in the evidence before the court.

First, Plaintiffs provide plentiful evidence that Defendants have failed to facilitate the medical care or medications of individuals with broken bones, diabetes, high blood pressure, HIV, and Leukemia—serious conditions, meaning those "diagnosed by a physician as mandating treatment or [in some cases] so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). *See also, e.g.*, *Scinto*, 841 F.3d at 230 (recognizing that "it is a '[w]ell-known' fact that diabetes is a 'common yet serious illness that can produce harmful consequences if left untreated for even a short period of time'") (citation omitted); *Barnes v. Bilak*, No. CV JKB-17-1057, 2018 WL 2289232, at *6 (D. Md. May 17, 2018) (recognizing that "hypertension is a serious medical need" and "a failure to treat same, if done with the requisite intent, would present a colorable Eighth Amendment claim"); *Craig v. Thompson*, No. 7:23CV00656, 2025 WL 2778858, at *8 (W.D. Va. Sept. 29, 2025) (recognizing that "[n]umerous courts in this Circuit and elsewhere have recognized that broken bones and other hand injuries are serious medical needs"); *Best v. Gajendragadkar*, No. 2:09-CV-00646, 2011 WL 1229779, at *13 (S.D.W. Va. Mar. 3, 2011), *report and recommendation adopted,* No. 2:09-CV-00646, 2011 WL 1229777 (S.D.W. Va. Mar. 29, 2011) (explaining "[t]here is no doubt that the plaintiff's HIV is a condition that has been diagnosed by a physician as mandating treatment, and, thus, is a serious medical need").

While Plaintiffs are not required to prove it, the court notes that, contrary to Defendants' contention, the record does show these conditions resulted in physical injuries. Beyond the broken bones identified above, Mr. Doe, for instance, attests he informed ICE officers about his health issues and medication, and was not provided medical attention or his medication. (Doe Decl., ECF No. 127-10 ¶ 11.) Only on court order was he was taken to a hospital, where medical professionals treated his elevated blood pressure and chest pain. *Id.* ¶ 12. B.R.R. reports observing a man who needed insulin "lying on the floor, unresponsive," before he was finally transported to the hospital. (B.R.R. Decl., ECF No. 31-8 ¶ 7.) Another witness detained during an overlapping period details a similar observation. (O.P.L. Decl., ECF No. 31-11 ¶ 9.)

Second, and related, Plaintiffs provide compelling evidence of Defendants' failure to ensure individuals have access to their medication. Defendants' contention that they provide medication as needed is flatly contradicted by multiple witnesses. Dr. Goldenson opines that, given the time frame and population data at issue, "[t]he fact that fewer than ten were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications," *see* Goldenson Rep., ECF No. 127-5 ¶ 25; and Bowie's Request of February 9, 2025, indicates the frequency with which hospital visits are needed. Defendants' reliance on their own summary of 25 emergency referrals for medical care, and only eight instances of individuals provided medication, does not overcome the persuasive wealth of evidence to the contrary, including, most notably, its own representations. (ECF No. 141 at p. 18; ECF No. 128-1.) The circumstances of medication deprivation are particularly persuasive when considering how individuals typically come to be detained—they show up for a routine check in, they are stopped in the middle of the street, they are picked up while driving to work. These are not circumstances where the average person is likely to have on her person possibly days' worth of

necessary medication; especially individuals whose medications are not in pill form and, for example, require administration by injection.

Finally, Plaintiffs provide robust evidence to support their contention that Defendants' response (or lack thereof) to individuals' medical needs is such that it "is sure or very likely to cause serious illness." *Coreas*, 451 F. Supp. 3d at 423, *supra*. It is undisputed that Defendants fail to conduct any medical screening of individuals detained for an indeterminate number of days alongside an indeterminate number of people, or that they have any written policies related to same. To the extent "generic questions" are asked, by Defendants' admission, these questions often fail to capture or identify individuals' medical needs; nor do such generic questions involve inquiry as to how an individual's medical condition might require assistance during detention. Defendants rely on (presumably) lay person detainees to communicate (in whatever languages they may speak) their medical needs and conditions, many of which are critical and chronic, to ICE officers with zero relevant training.

Civil detainees are entitled to basic medical screening and care when the Government removes their ability to attend to such matters themselves. *See Gordon v. Cnty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021) (acknowledging a "pretrial detainee's right to proper medical screening"); *Belcher v. Oliver*, 898 F.2d 32, 34–35 (4th Cir. 1990) (discussing the "general right of pretrial detainees to receive basic medical care," with some limitations). The record before this court is that individuals detained in the Baltimore Hold Rooms do not receive even this basic level of treatment. Plaintiffs make a clear showing of their likelihood of success in proving that Defendants' failure to attend to the medical needs of detainees poses a substantial risk of serious harm to individuals detained in the Baltimore Hold Rooms. *See Short*, 87 F.4th at 611.

iii.    *Deliberate Indifference and Punitive Conditions*

Based on the record before it, the court similarly finds Plaintiffs ably demonstrate their clear likelihood of success in proving that Defendants "acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Short*, 87 F.4th at 611 (quoting *Farmer*, 511 U.S. at 836). The conditions at issue are "self-evident." *See Mercado*, 800 F. Supp. 3d at 573. They are visible. They are plain. Whether it be Defendants' employees' personal observation, abundant news coverage of conditions, experiences of detainees shared here and elsewhere, or Defendants' admitted knowledge of the system pressures that result from operating the Baltimore Hold Rooms beyond their intended purpose, there is a wealth of diverse and persuasive evidence that the risk of harm is either known by Defendants or so obvious that it should be known.

It bears repeating that irrefutable evidence of Defendants' knowledge of the conditions to which it subjects civil detainees in the Baltimore Hold Rooms comes from within Defendants' own ranks. Then-Acting Field Office Director Bowie expressly described her concern about the risk of fatalities; then Assistant Field Office Director Guererro described his personal observations of cells filled well beyond capacity, and his knowledge that medical screenings are not conducted and that medical needs of individuals are not being captured upon their detention. Plaintiffs plainly and clearly show a high probability of success in demonstrating that Defendants knew about and recognized these conditions, and failed to act.

Defendants' offending acts or failures to act in the face of an unjustifiably high risk further stands in stark relief when considering the standards set forth in Directive 11087.2. The Waiver extended the hold room utilization limit, but the other directives remained intact. Supposedly. Such directives include that ERO officers must "[e]nsur[e] that hold rooms are safe [and] clean,"

and "[m]onitor detainees for any apparent indications of a mental or physical health condition or signs."  (Directive 11087.2, ECF No. 1-8 §§ 4.4.1.3, 5.1.2.)  The overwhelming evidence before the court at this stage is that these requirements are not being met, and Defendants know it.  Based on the record before it, Plaintiffs are well poised to demonstrate on the merits that Defendants have failed to follow even these standards and unconstitutional conditions are the result.

For these reasons, and those discussed below, the court similarly finds that Plaintiffs make a clear showing of their likelihood of success in proving that the challenged conditions are punitive. As reviewed above, the Fifth Amendment's due process guarantees protect civil detainees "from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'"  *Short*, 87 F.4th at 608–09 (quoting *Kingsley*, 576 U.S. at 398); *see Swink v. S. Health Partners Inc.*, 160 F.4th 438, 451 (4th Cir. 2025) (quoting *Short* and noting that that a pretrial detainee "need only show that the challenged government action was 'not rationally related to a legitimate nonpunitive purpose or [wa]s excessive in relation to that purpose' to establish deliberate indifference").   To prevail on their claims, therefore, Plaintiffs must show the complained-of conditions are "not reasonably related to a legitimate nonpunitive governmental objective," *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538–40 (1979)), or are "excessive in relation to that purpose." *Short*, 87 F.4th at 609 (citing *Kingsley*, 576 U.S. at 398).

Defendants contend that the challenged conditions are not punitive and, instead, are rationally related to a legitimate nonpunitive purpose, namely "preventing detained aliens from absconding and ensuring that they appear for removal proceedings, as well as protecting the community from dangerous criminal aliens,"[37] and, more broadly, "protecting the public and

---

[37] It is important to clarify that, despite Defendants' assertion that there is a legitimate governmental objective in "protecting the community from dangerous criminal aliens," there has been no record put before the court that

60

ensuring the nation's immigration laws are properly enforced." (ECF No. 141 at p. 32, 27.) There is no doubt that there is a legitimate governmental objective in detaining noncitizens in accordance with statutory authority.[38]  *See Coreas*, 451 F. Supp. 3d at 427 (recognizing "the legitimate governmental objective of ensuring an immigration detainee's presence at an immigration hearing"); *Toure v. Hott*, 458 F. Supp. 3d 387, 403 (E.D. Va. 2020) (recognizing that "[p]reventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective'") (quoting *Dawson v. Asher*, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020)).  That, however, is not persuasive here for multiple reasons.

First, as the Southern District of New York recognized, Defendants' own press releases and statements suggest the complained-of conditions are intended to be punitive:

> Statements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration. Indeed, DHS has launched a national advertising campaign encouraging self-deportation, and Secretary Kristi Noem[39] recently acknowledged that ICE selected a notoriously harsh state prison as an ICE detention center for aliens charged with violent crimes in part to encourage self-deportation.

---

noncitizens who have committed violent crimes make up any significant percentage of the individuals detained in the Baltimore Hold Rooms over the past year.

[38] Defendants contend in opposition that the individuals detained in the Baltimore Hold Rooms "are almost exclusively either in the process of being removed from the United States subject to final orders of removal or subject to mandatory detention under the Immigration and Nationality Act (INA) during their removal proceedings." (ECF No. 141 at p. 5.)  It bears mention that Defendants' now well-known position on mandatory detention of all noncitizens already present in the United States has been repeatedly challenged in federal districts courts across the country, with the overwhelming majority rejecting Defendants' position that 8 U.S.C. § 1225(b)(2) of the INA requires detention of all noncitizens in the United States who entered the United States without inspection.  *See, e.g.*, *Barco Mercado v. Francis*, No. 25-CV-6582 (LAK), 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025) (collecting an index of 362 opinions opining on "the administration's new position that *all* noncitizens who came into the United States illegally, but since have been living in the United States, *must be detained* until their removal proceedings are completed," with 350 of those, spanning "160 different judges sitting in about fifty different courts spread across the United States" finding, either on a preliminary or final basis, for petitioners challenging this position); Nate Raymond *et al.*, *Courts Have Ruled 4,400 Times that ICE Jailed People Illegally. It Hasn't Stopped.* Reuters (Feb. 14, 2026, at 5:07 EST), https://www.reuters.com/legal/government/courts-have-ruled-4400-times-that-ice-jailed-people-illegally-it-hasnt-stopped-2026-02-14/ [https://perma.cc/R69P-NZBL].

[39] According to national news media, Noem was relieved of her position on March 5, 2026.

*Mercado v. Noem*, 800 F. Supp. 3d 526, 575–76 (S.D.N.Y. 2025) (citing Defendants' press releases and websites, and statements by then-Secretary Noem).  Such public statements, as the *Mercado* court noted, support a showing that the conditions are, in fact, intended to be punitive.

Further, and more fundamentally, the record does not support how the challenged conditions serve Defendants' asserted legitimate interest.  *Matherly v. Andrews*, 859 F.3d 264, 275 (4th Cir. 2017) (noting that "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed") (quoting *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003)).  That Defendants fail to maintain clean cells and toilets, provide basic hygiene items, and tend to the medical needs of people they detain bears no apparent relationship to the legitimate governmental purpose in detaining noncitizens.  The only legitimate, nonpunitive governmental objective reasonably related to the specific complained-of conditions is the failure to turn the lights off at night for safety reasons.  Against the backdrop of myriad deplorable conditions, however, this fails to move the needle to Defendants' end.  In any event, Defendants fail to articulate why an alternative to keeping all the lights on overnight (that would allow individuals to sleep) might not achieve their legitimate safety purpose.  *See, e.g.*, *Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 3283283, at *25 (N.D. Cal. Nov. 25, 2025) (discussing the failure to consider alternatives to leaving the lights on including use of "low-light cameras to monitor cells" and "lighting only those hold rooms containing detainees deemed to be safety or self-harm risks").

The court is pointedly mindful that its consideration of this matter does not turn on its own "idea of how best to operate a detention facility." *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979).  But the debated issue here is not Defendants' legitimate governmental interest; it is that Defendants apparently dispense with even rudimentary decent, humane treatment of civil detainees, and so too

their constitutional rights as a result.  *See id.* (noting that the court's analysis must be of "inquiries [that] spring from constitutional requirements," with awareness that the court is not to instruct on "how to best operate a detention facility").

Plaintiffs make a clear showing that they are likely to succeed in showing that Defendants deprive individuals detained in the Baltimore Hold Rooms of hygienic, sanitary, and safe conditions, as well as basic medical screening and care, in violation of their rights guaranteed by the Fifth Amendment to the United States Constitution.

## B. Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citing cases).  "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'"  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).  Irreparable harm is harm that "cannot be fully rectified by the final judgment after trial."  *Id.*  (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).  Because "a deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury,'" *see Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), the irreparable harm factor is plainly met here where the court finds Plaintiffs are likely to prevail on their Fifth Amendment claims as set forth above.  Plaintiffs demonstrate that class members will likely be subjected to unconstitutional conditions in their confinement in the Baltimore Hold Rooms.  The unhygienic conditions, lack of sanitary care, and woefully inadequate screening (and treatment) of medical

issues pose obvious and serious risks of irreparable harm to class members' physical well-being. Even then-Acting Field Office Director Francine Bowie acknowledged that.  (February 9, 2025, Request, ECF No. 127-3, Bowie describing "urgent" need for assistance with medical needs of detainees, citing risk of "fatalities.")

Defendants argue the asserted irreparable harm is speculative.  As detailed at length above, the court strongly disagrees.

### C.  Balance of Equities and Public Interest

Finally, "Plaintiffs must show 'that the balance of equities tips in [their] favor' and 'that an injunction is in the public interest.'"  *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  As noted above, these factors merge where, as here, the Government is the party opposing the preliminary injunction.  *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)); *see Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022) (same).  The court considers "the 'harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted.'"  *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 509 (D. Md. 2023) (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019)).

Plaintiffs correctly note that Defendants are "in no way harmed by issuance of a preliminary injunction which prevents the [Government] from enforcing restrictions likely to be

found unconstitutional." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)). "If anything, the system is improved by such an injunction." *Id.* (quoting *Centro Tepeyac*, 722 F.3d at 191); *see CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 698–99 (D. Md. 2025) (same). Further, "upholding constitutional rights surely serves the public interest." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see Leaders of a Beautiful Struggle*, 2 F.4th at 346 (noting "it is well-established that the public interest favors protecting constitutional rights").

Defendants counter that these factors do not favor Plaintiffs because "the public interest in enforcement of United States immigration laws is significant" and the requested order would be "disruptive" and "would likely serve to prevent the agency from arresting individuals subject to orders of removal, including some criminal aliens." (ECF No. 141 at pp. 43–44.) The court does not see it that way at all. The requested preliminary injunction would in no way impede Defendants' ability to carry out the Executive's authority in matters of immigration; it merely would require that it be done within the confines of the Constitution.

> It is up to defendants to choose whether they wish to expend resources to conform [the Baltimore Hold Rooms] to those requirements, or to alter the rate at which they are funneling arrestees into [the Baltimore Hold Rooms] and other facilities, or to select or obtain facilities where detainees can be held in a humane and constitutional manner.

*Mercado v. Noem*, 800 F. Supp. 3d 526, 579 (S.D.N.Y. 2025) (as to "26 Fed"); *see Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 3283283, at *28 (N.D. Cal. Nov. 25, 2025) (same as to "630 Sansome").

The balance of equities and public interest plainly favor issuance of a preliminary injunction.

Plaintiffs satisfy all four *Winter* factors.

**D. Bond**

Pursuant to Federal Rule of Civil Procedure 65(c), this court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "This rule is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *District 17, UMWA v. A & M Trucking, Inc.,* 991 F.2d 108, 110 (4th Cir. 1993)).

In determining the amount of an injunction bond, courts "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order"; the inquiry thus "ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst Diafoil*, 174 F.3d at 421 n.3. While bond is mandatory, the court has discretion "to set the bond amount 'in such sum as the court deems proper,'" including a nominal amount, or waiver of the requirement by imposing a nominal bond amount of zero. *See id.* at 421 n.3 (citations omitted) (discussing a nominal bond); *Maryland Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (discussing a nominal bond amount of zero). Indeed, a nominal bond approach "has long been followed in public-interest litigation cases." *Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779, 820 (D. Md. 2025) (citing cases). And this court has frequently waived imposition of bond by imposing a nominal bond of zero dollars where "fundamental constitutional rights[s] [are] at stake." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md.), *opinion clarified,* 769 F. Supp. 3d 465 (D. Md. 2025), and *vacated and remanded on other grounds,* No. 25-1189, 2026 WL 321433 (4th Cir.

66

Feb. 6, 2026) (citing cases in order jurisdictions); *see also, e.g.*, *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 454 (D. Md. 2025); *Coreas v. Bounds*, 457 F. Supp. 3d 460, 464 (D. Md. 2020).

In view of the facts here, and where Defendants offer no argument as to entry of bond, the court finds a nominal bond is appropriate.  The court will, therefore, impose a nominal bond in the amount of zero dollars.

## IV.    CONCLUSION

For the reasons set forth herein, by separate order, the Motion (ECF No. 127) will be granted.[40]

March 6, 2026                                    /S/ _____
                                                Julie R. Rubin
                                                United States District Judge

---

[40] Based on the record before it, the court will include a non-retaliation provision in its order.  *See, e.g.*, ECF Nos. 7-1, 7-2, 31-12, 31-13, 127-12, 151-1.