IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| D.N.N., et al., Plaintiffs, | ) | |
| v. | ) | CASE NUMBER: 1:25-cv-1613-JRR |
| VERNON LIGGINS, et al., Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS
MOTION TO CERTIFY CLASS AND ISSUE PRELIMINARY INJUNCTION
BEFORE THE HONORABLE JULIE R. RUBIN
UNITED STATES DISTRICT JUDGE
Tuesday, March 3, 2026
Baltimore, Maryland - Courtroom 3A

A P P E A R A N C E S

FOR THE PLAINTIFFS:

BY: AMELIA DAGEN, ESQUIRE
Amica Center for Immigrant Rights
1025 Connecticut Avenue, NW, Suite 701
Washington, DC 20006

YULIE LANDAN, ESQUIRE
National Immigration Project
1763 Columbia Road, NW
Suite 175
Washington, DC 20009

DANIELLA SCHMIDT
JARED A. LEVINE, ESQUIRE
Crowell & Moring, LLP
2 Manhattan West
375 Ninth Avenue
New York, New York 10001

JEROME MURPHY
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

***Proceedings Recorded by Mechanical Stenography***
Transcript Produced by Computer-Aided Transcription

**FOR THE DEFENDANTS:**

**BY: BRENDAN MOORE, ESQUIRE**
**ANIELLO DeSIMONE, ESQUIRE**
**Department of Justice - Civil Division**
**450 5th Street, NW**
**Washington, DC 20001**

**Also Present:**
**Adriana Torossian, Spanish Interpreter**

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Graeme Blair | | | | |
| By Ms. Dagen: | 13 | | 39/45 | |
| By Mr. Moore: | | 25 | | 42/48 |
| Joe Goldenson | | | | |
| By Ms. Schmidt: | 50 | | 81 | |
| By Mr. DeSimone: | | 70 | | |
| V.R.G. | | | | |
| By Mr. Moore: | 85 | | | |
| By Ms. Dagen: | | 91 | | |
| D.N.N. | | | | |
| By Mr. DeSimone: | 94 | | | |

**P R O C E E D I N G S**

**(10:18 a.m.)**

**THE COURTROOM DEPUTY:** Calling the case of D.N.N. et al., v. Liggins, et al., case number JRR-25-cv-1613. The case is called for a hearing on preliminary injunction and class certification. And if the plaintiffs' counsel could put their appearance on the record, please.

**MS. DAGEN:** Good morning, Your Honor. Amelia Dagen for the plaintiffs.

**THE COURT:** Good morning.

**MS. LANDAN:** Good morning. Yulie Landan for plaintiffs.

**MR. LEVINE:** Good morning. Jared Levine for plaintiffs.

**THE COURT:** Good morning.

**MS. SCHMIDT:** Good morning. Daniella Schmidt for plaintiffs.

**MR. MURPHY:** Good morning, Your Honor. Jerome Murphy for plaintiffs.

**THE COURT:** Good morning all.

**MR. MOORE:** Good morning, Your Honor. Brendan Moore for defendants.

**THE COURT:** Good morning.

**MR. DeSIMONE:** Good morning, Your Honor. Aniello DeSimone for defendants.

**THE COURT:** Good morning. I know we are resolving some tech issues regarding one of our plaintiffs, but we will move along.

I have a couple of preliminary matters I want to address with Counsel. One is sequestration of fact witnesses. So I realize we have some proposed experts and that does not apply to them or to plaintiffs. But to the extent there are would be or will call fact witnesses in the courtroom I would ask that they be excused until they are to be called and they will all be admonished not to share or discuss with anyone else the content or purpose of their testimony until this is resolved.

And so is there anyone who needs to leave the courtroom?

**MS. DAGEN:** Your Honor, none for the plaintiffs. It is our understanding that the only fact witness the defendants had that plaintiffs planned to call is actually not available today.

**THE COURT:** Okay. Mr. Moore, anyone that you want to address?

**MR. MOORE:** No, Your Honor.

**THE COURT:** Okay. So I just have a couple of preliminary questions and then we can move on to the meat and why we are here. So I want to just confirm and I don't know to whom to address this question, Ms. Dagen, Mr. Levine, Ms. Landan, Ms. Schmidt, or Mr. Murphy, but I want to just confirm and I don't mean to profess any confusion, but I want to

confirm, Counsel, you are seeking certification as to all counts? I'm specifically inquiring as to the aspect of the action regarding lack of access to counsel. Are you seeking certification on that aspect of the claims?

**MS. LANDAN:** At this stage in the case we are specifically seeking certification for the claims that we are bringing the preliminary injunction for and we can amend the class certification as needed as we go further on the access to counsel claim.

**THE COURT:** Okay. So to be clear the class certification motion in its current form does not seek certification with respect to the access of counsel aspect of the case.

**MS. LANDAN:** Not today, Your Honor.

**THE COURT:** Okay, all right. Fair enough.

And I also want to just confirm, so in terms of the relief sought by the second amended complaint, it includes and I'm quoting: "Declare that the continued detention of plaintiffs and class members violates" and now I'm not quoting -- the APA and/or the due process clause of the Fifth Amendment to the U.S. Constitution. And I want to just confirm that that is pursuant to the claims in their present form and is not a vestige of the former habeas claims. In other words, that is based on what is pursued today here and now.

**MS. LANDAN:** Yes, Your Honor.

**THE COURT:** Okay. All right. Then I also would like -- Mr. Moore, I might be asking you to do something that I'm not sure if on the fly you're able to do and if you need to file a line later this afternoon, that's fine. But I'm taking a look at the caption of the second amended complaint. For purposes of my opinion I want to make sure that all of the identified defendant/respondents are current. In other words, those who are currently in those seats. So you don't have to identify them for me here and now, but I would like you if you would to file a line to identify, for example, who is now in the seat of Ms. Baker, et cetera, et cetera, et cetera, so that the caption can be clear and the Court's opinion can be clear.

**MR. MOORE:** Sure.

**THE COURT:** Okay, all right. I don't have any other housekeeping matters to address. And with that, I'm happy to hear from plaintiffs.

**MS. DAGEN:** Good morning, Your Honor.

**THE COURT:** Good morning.

**MS. DAGEN:** Yes, a few housekeeping items from us before we proceed with testimony. We are trying to keep this as streamlined as possible for Your Honor.

First, both parties have listed the experts, Professor Blair and Dr. Goldenson.

**THE COURT:** I see that.

**MS. DAGEN:** And so as both sides had planned to affirmatively call those witnesses, we've agreed amongst the parties that we will each have a total of 45 minutes with each expert, instead of going back and forth multiple times.

**THE COURT:** Fine.

**MS. DAGEN:** And second, Your Honor, plaintiffs have arranged for these experts to be here today for Your Honor's benefit. We are prepared to proceed with their testimony, but if there are any specific questions Your Honor has we do invite you to engage directly.

**THE COURT:** I am never shy.

**MS. DAGEN:** And finally, Your Honor, as a final development, in our reply brief we had using Professor Blair's expert analysis, noted that there was a misrepresentation in defendants' declaration from Ms. Durant regarding the population averages and populations at the Baltimore Holding Rooms. Defendants relied on that extensively in their opposition. And we've been in touch with defendants' counsel. They agreed that amendment is needed due to that misrepresentation.

And unfortunately we did plan to call Ms. Durant today regarding this misrepresentation. And last night after the close of business we were informed that she was not actually going to be available today.

**THE COURT:** And what are you requesting of me?

**MS. DAGEN:** So we are aware that there is nothing to be done about her lack of presence today, but we would just note that, Your Honor, in that case there is an amendment that seems to be forthcoming from defendants and the only evidence on this that is actually undisputed is that which our expert will proffer and we will walk through on testimony.

**THE COURT:** And how, if at all, does that affect your ability to present evidence today?

**MS. DAGEN:** We are fully ready to move forward. We do not think this is anything that will delay Your Honor's adjudication of these motions, but we are flagging that there does seem to be some amendment that is coming. Defendants' counsel informed us last night that that would happen and nothing was filed, so we are just wanting to make sure that Your Honor is aware of that.

**THE COURT:** Okay. Mr. Moore?

**MR. MOORE:** Thanks, Your Honor.

Just on Ms. Dagen's last note, I did flag that we wanted to offer to file an amended or corrected brief with respect to a particular series of statements. There's a handful of them, three or four. I didn't say it was coming last night, I actually wanted to address it with the Court first and make sure that it was something that you would like and we can do.

But the short of it is that plaintiffs' counsel in their

-- they flagged for us as they mentioned that in their reply brief they had their expert I guess kind of for the first time examine these daily book-in, book-outs that is an exhibit. It's an exhibit in our briefing, but it's also part of the discovery. So it was produced in discovery and it covers the relevant discovery period and it has book-in/book-outs.

And so Counsel let us know about the fact that the expert had this criticism of the declaration from Ms. Durant and was incredulous and then I guess more that the numbers that she gives which are kind of like percentiles: 60 percent of days, 20 percent of days, 20 percent of days, that kind of thing with respect to population levels could not be accurate.

**THE COURT:** In other words, the math isn't mathing, right? The numbers just don't go that way.

**MR. MOORE:** Right. And so the declaration itself was a request to essentially kind of crunch the numbers, to kind of provide some more global insight into this really big stack of records which is the population totals, book-in/book-out.

**THE COURT:** Right.

**MR. MOORE:** And so anyways, we agree with Counsel that what is communicated here throughout this statement refers to what she's talking about as population levels and often daily population levels. And we also agree that these could not be daily population levels in terms of total

population levels.

And so I do not think there was any intent on the part of Ms. Durant to misrepresent the numbers. In fact, we had produced this data so obviously it was in discovery and it would not have made sense for defendants to do so. I mean, the discovery is right there in front of everybody. However, I mean, it is fair to say that it absolutely, you know, by the plain meaning of what daily population levels is, it is inaccurate. And so it's something that we want to revise, correct our briefing to like withdraw that part of it.

As for like --

**THE COURT:** Well, I think you've done as much here.

**MR. MOORE:** Okay, okay, yeah. And just as to the rationale, like my best understanding of this now --

**THE COURT:** The rationale for Ms. Durant's errors?

**MR. MOORE:** Yes, if I could just briefly cover that. Because my understanding at the time we composed our brief I think was probably the same as opposing counsel's which was kind of the plain meaning of population totals, or daily population totals. And my best understanding of what Ms. Durant was actually providing was the new population totals daily. So the population totals that come online every day. And that mostly tracks, from the little I've been able to look into it and from my understanding that this is what she was providing is just like the new-in counts every day.

**THE COURT:** Well, I'm not interested in assigning intent or ill will.

**MR. MOORE:** Sure, but I just wanted to clarify.

**THE COURT:** Mr. Moore, let me finish what I'm saying.

**MR. MOORE:** I'm sorry.

**THE COURT:** I'm not here to assign any intent or ill will on the part of Ms. Durant or defendant respondents, or defendants, I should say. But your point is it's inaccurate; it's not helpful to the Court. I'm not going to consider it. You have withdrawn it; let's move on.

**MR. MOORE:** Got it.

**THE COURT:** Okay. Anything else on that point?

**MR. MOORE:** I don't believe so.

**THE COURT:** Okay.

Plaintiffs?

**MS. DAGEN:** No, Your Honor. Thank you.

**THE COURT:** Let's proceed.

**MS. DAGEN:** Okay, thank you.

Would Your Honor prefer that we speak at podium with witnesses?

**THE COURT:** Counsel can be wherever you are comfortable. That's for everyone.

**MS. DAGEN:** Perfect. Thank you, Your Honor.

In that case, plaintiffs would like to call our first

witness, Professor Graeme Blair.

**THE COURTROOM DEPUTY:** If you could raise your right hand, please.

**(Witness, sworn.)**

**THE COURTROOM DEPUTY:** Thank you, you may have a seat, please. And just make sure if you need to you can pull that microphone closer to you and speak directly into it. And can you state and spell your full name, please.

**THE WITNESS:** Graeme Blair, G-R-A-E-M-E B-L-A-I-R.

**THE COURTROOM DEPUTY:** Thank you.

**D I R E C T E X A M I N A T I O N**

**BY MS. DAGEN:**

Q. Good morning, Professor Blair, thank you so much for being here. Now that you've given your name for the record, can you tell us what is your profession?

A. I'm a professor of political science.

Q. What services were you retained to provide in this case, specifically?

A. I was asked to examine data on book-ins and book-outs from the Baltimore Holding Facility holding room.

Q. I believe there is a binder for the witness in front of you. Can you please open that to Exhibit 4? And you can take a second to look at that and then tell me what is that document.

A. This is the draft expert report that I wrote.

Q. And is that report a true and accurate statement of your analysis in this case when you wrote it?
A. It is.
Q. Is there an attachment to that report?
A. Yes.
Q. And what is that?
A. That's my CV.
Q. And is that CV an accurate reflection of your educational and professional experiences?
A. Yes.
Q. Because it's a very long CV, Professor Blair, I'm not going to have you walk through the whole thing, but can you please briefly tell the Court about your educational background?
A. I received a BA in political science from Reed College and a Ph.D. in political science from Princeton University.
Q. And can you briefly tell the Court about your academic and publication experiences?
A. I have published two books. One is on research design and data analysis, research design in the social sciences published by Princeton University Press; and the second book on community policing published by Cambridge University Press.
Q. And can you please briefly tell the Court about any other experiences from your CV that you found relevant in your work on this case that you haven't already mentioned?

A. Since 2025 I've served as the co-director of the Deportation Data Project which tries to obtain record level information on immigration enforcement in the United States.

**MS. DAGEN:** Your Honor, we would like to offer Professor Blair as an expert in data analysis for this hearing.

**THE COURT:** Any objection?

**MR. MOORE:** Yes, we would object.

**THE COURT:** Would you like to voir dire the witness?

**MR. MOORE:** Could we table that until after our examination?

**THE COURT:** Well, no. Because I'm deciding whether to accept his testimony as a witness so I need to hear it with that in mind. So if you'd like to voir dire the witness I'm happy to have you do that, Mr. Moore. Is the basis of your objection, Mr. Moore, qualifications or what?

**MR. MOORE:** It's not qualifications, Your Honor.

**THE COURT:** Okay. So on what basis are you objecting to the Court accepting Professor Blair's testimony as an expert in the field of data analysis?

**MR. MOORE:** Based on the methodology.

**THE COURT:** Could you be more specific?

**MR. MOORE:** Yeah. I mean, it's hard to, I guess, it's hard to do it in a question or two, but the methodology that the doctor is using is problematic in a couple of

different ways, one of which is there were datasets that were taken from outside the discovery and there was all sorts of ways that Dr. Blair kind of worked with the data, extracted certain categories from the data and then more or less kind of tried to match it up to -- ultimately tried to match it up to the data that was produced in discovery. And we think the ways in which that was done are questionable. So that's kind of one thing.

And then another thing is that ultimately what Dr. Blair is doing is giving his data inputs and analysis on population totals and he's working off the premise that the implied premise, if not the express, that the daily population totals are a direct indicator of overcrowding. Meaning the population total is synonymous with the people who are there simultaneously. And there is a big distinction between simultaneous presence and presence at some point in time during the day.

**THE COURT:** Understood. So it sounds to me, Mr. Moore, as though you're more taking issue with the conclusions drawn by Professor Blair based on the data in terms of it being a questionable conclusion that the Court should rely upon. It's not so much a methodology objection that I'm hearing. So you can explore that on cross.

**MR. MOORE:** Okay.

**THE COURT:** And I will revisit the issue if you want

to raise it again at the conclusion and suggest that I not consider Dr. Blair's or rather Professor Blair's testimony as an expert, but based on the voir dire presented to me I would agree and you don't object as to the experience of the witness that based on Professor Blair's education, experience, and training he would appear to be an expert in the field of data analysis. And I certainly am not a data analyst and it would be helpful to the Court and so I will accept his testimony as an expert in that field until and unless I rule differently. And I'm happy to hear that objection again from defendants at the conclusion of the testimony. Okay, Mr. Moore?

**MR. MOORE:** Thank you.

**THE COURT:** Okay.

**MS. DAGEN:** Thank you, Your Honor.

**BY MS. DAGEN:**

Q. Professor Blair, your report is already part of the record so in the interest of the Court's time and your time I'm just going to ask you some higher level questions about what was in the report that you just identified at Exhibit 4.

What datasets did you use in that report?

A. I used two datasets. One is a dataset produced by ICE in response to Freedom of Information Act's lawsuit that our program participated in filed by the Center for Immigration Law and Policy at UCLA. And that dataset represents detention, book-ins and book-outs for the Baltimore Hold Room

and all facilities nationally; and the second is a dataset that was produced under the Freedom of Information Act lawsuit by the Amica Center.

Q. And why did you use those datasets in writing this report?

A. Those datasets represent, to my best understanding, ICE's own internal records about who is held in the Baltimore hold facility at each moment in time. And so they are the best record that we have of how many people are there and how long they're there which were the core issues that I was asked to address.

Q. How, if at all, did you manipulate the data from these datasets in coming to your conclusions?

A. Very little. In terms of dataset produced by ICE for the Center for Immigration Law and Policy we added no rows, removed no rows. We looked for records that are duplicates of each other. The dataset has multiple rows in a very small number of cases because of two different bond decisions. And so we addressed that. And then we looked at how many people were present each day in that dataset based on their book-in and book-out times from the Baltimore Hold Room and I did the same with the second dataset.

Q. For clarification, when you were talking about the book-in/book-out dates, can you describe what those look like?

A. They're a date and time field so they represent the time

that ICE records that an individual was booked into the Baltimore Hold Room and the date and time that they were booked out of the Baltimore Hold Room.
Q. So using these datasets that you have now identified, what were your findings regarding population levels or crowding at the Baltimore Hold Room?
A. Overall the findings were that a very substantial portion of people who were held at any point during the analysis period which was from February to mid-October were present during conditions of overcrowding. And so 53 percent of people were present when the facility had more people than, as I understand it, ICE allows in that facility.
Q. And what is your understanding of what that level is of allowed population?
A. That there's approximately a 50 percent limit.
Q. And what were your findings regarding the duration of detention at the Baltimore Hold Rooms?
A. I looked at how long each person was detained in the hold room and there were about 28 percent of people were held for longer than 72 hours, which as I understand it was the longest amount of time that anyone was allowed to be held there.
Q. Can you please open the binder or flip to Exhibit 9 in that binder and take a look at that for a second. Can you tell us what is that document?
A. This is the second data expert report that I produced on

the Baltimore Hold Room.
Q. And is that a true and accurate statement of your analysis in the case at the time that you wrote that?
A. Yes.
Q. I'm sorry, I didn't hear the answer.
A. Yes.
Q. Okay, thank you. What were you asked to do with that second report?
A. In the second report I was asked to look at a set of data produced in discovery by defendants that also covered book-ins and book-outs from the Baltimore Hold Room.
Q. And what were you asked to do with that data?
A. Principally to replicate the analysis that I had conducted in my first expert report using this alternative dataset that was produced by defendants.
Q. What differences, if any, were there between the data provided by the defendants in this matter and the datasets that you identified and used in your first report?
A. When I replicated the main figure which shows the daily population counts in the hold room, you can see plainly that it's almost exactly the same. And so then looking at the data on a day-by-day basis, over 50 percent of the data exactly aligns in terms of the daily population counts. The largest difference was five, and that only occurred once. The rest of the differences were one or two persons different in terms of

the daily population count.
Q. So when you're saying "the largest difference was five," what does that mean?
A. Meaning that one dataset says that there are 20 people held in the hold room and the other one says 25.
Q. What percentage of days fell in that range that you said was more common, one to two person variation?
A. I'd have to look at the report.
Q. That's okay, you can take a look.
A. 96 percent of days fell within a difference of two people.
Q. And what, in your opinion, might explain these differences of one to two people in the populations?
A. I think there's a couple of different reasons, but probably the most likely is just that this data as I understand it is produced from the same dataset that the datasets were produced under FOIA, but at different times. And so as I understand it, ICE updates its data from time to time to reflect its best understanding of who was where. And so given that they were pulled on different days, those small number of changes I think could have explained this difference.
Q. And using the defendants' data in this case, in this second report, what analysis did you run?
A. I looked at the daily population counts. So I looked at

them across the period again from February through I believe the end of the dataset that was produced in discovery which was sometime in mid-September.

Q. And what were your findings? How did they compare with your first report?

A. Because the data is essentially identical, the findings are essentially identical. The numbers are very slightly different, but about half of people experienced conditions of overcrowding based on ICE's capacity figures for the Baltimore Hold Room; the same conclusion as from the first report.

Q. Besides the dataset that defendants produced that you reviewed for the second report, what other materials, if any, did you review in writing this second report?

A. I'm just going to review it quickly. I don't think any, yeah.

Q. More specifically -- I'm sorry, that was misleading phrasing. Were you able to review any declarations or reports that defendants produced in conjunction with the data? I apologize. They did come in the same document.

A. I apologize. I was able to review the declaration by Ms. Durant from ICE.

Q. And can you open your binder to Exhibit 8? Is that the declaration from Ms. Durant that you reviewed?

A. Yes.

Q. And when you reviewed this declaration from Ms. Durant in

conjunction with defendants' data in this case, what were your findings?

A. The declaration by Ms. Durant suggests that there were fewer than 30 people held on any day at the Baltimore Hold Room and I think that that's simply impossible to be consistent with the analysis that I conducted based on the three different datasets that catalog the book-ins and book-outs from the Baltimore Hold Room.

Q. Very briefly for the Court's benefit, how did you arrive at that assessment that it was impossible for Ms. Durant's declaration to be correct in saying that the population never exceeded approximately 30 people?

A. I took a few steps to confirm that my analysis was correct. First of all, I have done this analysis at the facility level before and so used the same methods and techniques. And then to be doubly sure I counted them manually. So I used a spreadsheet that looks exactly like the data that they produced in all three cases and counted each person who had been booked in as of a particular date and had not yet been booked out as of that date. And so I counted that person as having been present during that day.

And so then I counted up each of the people that were -- that had been booked in, but not yet booked out on that day and those added up to in many cases more than 100, up to 123. And so that suggested to me that it wasn't possible that only

30 people had ever been present during a day.

Q. Professor Blair, you've now talked about the percentage of people who were there when the population exceeded this 56 person cap I believe you said around 50. Can you talk a little bit about your findings from both reports as to higher levels of crowding when there were days exceeding 56 people?

A. There were numerous days on which there were more than 100 people held. In terms of the daily population count, I believe the highest was 123 people were held on one day and yeah.

Q. And you had noted a percentage of individuals held in excess of 72 hours when we were discussing your first report. Did you run any analysis on how many people were there for fewer than 12 hours?

A. I believe I did. I need to look.

Q. Feel free to reference your reports.

A. Could you just repeat the question?

Q. Yes, I'm sorry. You had previously here mentioned a percentage of individuals who were held in excess of 72 hours. My question was did you run any analysis on individuals who were held fewer than 12 hours?

A. The analysis that I ran was what proportion of people were held between zero and 12 hours and that was 4 percent.

Q. 4 percent?

A. 4 percent.

Q. Thank you.

**MS. DAGEN:** Your Honor, we would like to reserve the rest of our time with Professor Blair or redirect.

**THE COURT:** All right, very good. Bear with me for one moment. Go ahead, whoever is crossing.

**MR. MOORE:** Thank you, Your Honor.

**C R O S S - E X A M I N A T I O N**

**BY MR. MOORE:**

Q. Good morning, Dr. Blair.

A. Good morning.

Q. How are you doing this morning?

A. Good; how are you?

Q. Good, thanks. Do you like to go by "Doctor" or "Professor" or is it --

A. Either one is fine.

Q. Either one, okay. So your academic experiences I understand it is in political science, research design, and state violence; is that correct?

A. Yes.

Q. It's not detention facility management or correction standards or anything like that, is it?

A. I've spent the last year-and-a-half working on immigration enforcement including looking at issues of detention.

Q. Okay. Do you consider that your academic expertise?

A. One of them.
Q. Okay. Is that because you've been working on it for the last year or year-and-a-half?
A. Yes. I've been as co-director of the Deportation Data Project have been updating this data and analyzing it as part of my job.
Q. As you mentioned you're co-director in the data project, now that's the organization that supported the FOIA lawsuit you referred to; is that correct?
A. That's right.
Q. And that was the primary dataset in your first report?
A. That was one of the two datasets, yes.
Q. One of the two?
**THE COURT:** Professor, I'm going to ask you to speak a little more directly into the microphone. Your voice trails off and I want to make sure I hear you clearly.
**THE WITNESS:** Sure.
**BY MR. MOORE:**
Q. Okay. Correct me if I'm wrong, but every expert engagement on your CV, from *Mahdawi,* to *Khalil*, to *Chung*, to *Vasquez*, *Calderon* and this case was on behalf of plaintiffs; is that correct?
A. Yes, that's correct.
Q. So Dr. Blair, in your second report you described your counting methodology in some detail. To count the population

on a given day, you counted individuals whose book-in date was on or before that date and whose book-out date was on or after that date; is that correct?
A. Yes.
Q. Okay. Now just as an example, under that formula a person who is booked in at 11:30 p.m. say on June 13th and booked out 12:30 a.m. on June 14th would be counted in your population figure for both June 13th and 14th, correct?
A. That's correct.
Q. Okay. So your formula does not tell us how many people were in the facility at the same moment in time?
A. I don't think I can answer that with a yes or no answer. I think it -- some of those people would be there at the same time and some of them wouldn't.
Q. Okay. The intention of your data is not to represent the people who are there at the same time in the facility, fair? I mean, given what you just said, some people would be there at the same time and others wouldn't, right? It is not -- it is not purporting to represent the people that are there at the same time; is that fair?
A. It's not purporting to represent that alone, yes.
Q. So to determine simultaneous occupancy, you would need to analyze the actual book-in and book-outs -- excuse me, actual book-in and book-out times and not just dates to identify these overlapping windows. Do you agree with me?

A. Yes.
Q. Were you asked to do that analysis by Counsel?
A. No.
Q. Did you suggest that this analysis would be helpful to determining whether the hold rooms were crowded and how crowded they were?
A. I thought that the analysis that I conducted was an appropriate analysis to analyze overcrowding conditions.
Q. Okay. I believe your second report confirms that the discovery data includes book-in and book-out time fields for each individual, correct?
A. That's correct.
Q. By the way, your follow-up report, your second report attached to the plaintiffs' reply brief, that was the first time that you analyzed the defendants' data or the data that was produced by defendants in discovery; is that true?
A. All of the data is produced by ICE, but that is the first time that I analyzed the data produced by defendants in discovery.
Q. And I can clarify. When I say "defendants," I mean this litigation rather than an entity.
A. Sure.
Q. Yeah. So that timestamp data in that second report, that would have allowed a simultaneous occupancy calculation, wouldn't it have?

A. Yes. You could do an alternative analysis as you're suggesting.
Q. But you did not do one?
A. I did not do that, no. I felt that the analysis that we did was the easiest way to understand who was present in the hold room on a daily basis.
Q. Okay. And your duration data shows that 4 percent of detainees were held between zero and 12 hours and 8 between 12 and 24?
A. Yes, I believe so. Would you mind if I just checked the number?
Q. Sure.
A. Yes, that's correct.
Q. So these, again, these populations that I just mentioned were zero to 12 hours and the 12 to 24 hours?
A. That's correct.
Q. Now those individuals do appear in your population counts, correct?
A. That's right.
Q. And yet would you agree with me that they have minimal overlap with other detainees just by the fact of their limited time there?
A. I wouldn't consider 12 hours to be a minimal time.
Q. Okay. If an individual, again, in a hypothetical situation if an individual is at the hold rooms for 60 hours,

would you agree with me that an individual who is there for 12 hours or less had minimal overlap? I guess that's approximately 20 percent, right?
A. I would agree that it was approximately 20 percent.
Q. Okay. So your second report states that the population reached 35 or more on 60 percent of days and exceeded 100 on 7 days. Do I have that correct? I believe that's at paragraph 8 in your follow-up.
A. I'm sorry, can you tell me which exhibit it is again?
Q. 24. Labeled as Plaintiffs' 24.
A. Thank you. I've reviewed it. Would you mind just repeating the numbers that you asked about?
Q. Sure. The population reached 35 or more on 60 percent of days and -- take that first.
A. Yes.
Q. And then exceeded 100 on 7 days.
A. Yes, that's right.
Q. Okay. But you didn't identify the individuals who were present on the highest population days, did you?
A. Could you clarify what you mean by "identify the individuals"?
Q. Well, I don't mean by name or anything, but I mean just in terms of given that the data is anonymized to name, the individuals who were present on those highest population days. Like did you -- is there any discussion of those in your

report?

A. They certainly appear in the dataset and --

Q. But I mean, you didn't identify, you didn't identify their metrics, fair to say? You didn't tease out their metrics?

**THE COURT:** Mr. Moore, and possibly because I'm not the expert, I don't understand your question.

**MR. MOORE:** I can move on from this one; that's fine.

**THE COURT:** Well, I don't mean that you would have to move on; I just mean if you could clarify because I genuinely don't understand the question.

**BY MR. MOORE:**

Q. Is it accurate to say that the discovery data you analyzed in your second report includes individual level book-in and book-out stamps for each of these I believe 2,800-plus detainees?

A. Yes.

Q. Okay. Now in principle you could have matched each person's detention window against the population level during that window, could you not?

A. Yes.

Q. Okay. But you did not do that analysis?

A. I did not do that analysis in this second report, no.

Q. Okay. So you calculated the average daily population

using the discovery data as 42.8 individuals and then using your own dataset or CILP data as 42. Is that accurate? I believe that's at 15.

A. Yes, that's correct.

Q. Those are average figures?

A. That's correct, yes.

Q. And then you argued that the average is actually not a good measure of overcrowding and exposure because it conflates days with high populations and when more people are present what days with low populations; is that accurate?

A. Yes.

Q. So, I mean, isn't it fair to say by your reasoning a single summary statistic that blends different types of days together is not a reliable measure of what detainees actually experience?

A. No. I believe that I produced a set of statistics that accurately reflect the presence of overcrowding conditions.

Q. With respect to your daily present counts, a daily count of 123 on June 13th lumps together people who are there with people who are processed in and out in a matter of hours?

A. Yes.

Q. Okay. So to clarify, your daily population count includes anyone who was present at any point during a calendar day?

A. That's correct.

Q. Including people who were booked in and booked out within a few hours?

A. Yes. Which as I've shown are a very small percentage of the data.

Q. Did you analyze whether elevated population days tended to be followed quickly by population reductions?

A. I did not, but you can infer that from the figure that I produced.

Q. Which figure are you referring to?

A. I'm referring to the first figure in the first I guess either -- for example, the figure after paragraph 6 in the second declaration.

Q. Would you mind reading that?

A. Reading the figure?

Q. The paragraph 6.

A. Oh, sorry. Sure.

I reproduced the first chart from my earlier expert report which displays the number of people who were detained in the Baltimore Hold Room each day based on the data I extracted from the pdf. I also reproduced my earlier analysis also from ICE's own data obtained in FOIA litigation. In the chart below I include the original analysis based on data produced in *CILP v. ICE* (top panel) above the new analysis based on the data produced by defendants' counsel (bottom panel).

Q. Okay, I guess I'm a little confused on this. Is that -- because I was asking about whether you did an analysis or teased out whether elevated populations, high populations tended to be followed by population reductions. Can you just -- can you just identify for me in what you just read what does that, if that's what you're saying?

A. If you look at the chart you can see the day -- the population on the day after, the day before.

Q. Okay, thanks for clarifying; appreciate it. So is it fair to say you wouldn't rule out that many of the days or some days with high populations return to normal within say 24 hours?

**THE COURT:** What's "normal," Mr. Moore?

**MR. MOORE:** Fair question.

**BY MR. MOORE:**

Q. Some days with high population totals are followed by days with significant reductions?

A. I would say some are and some aren't.

Q. Okay. You acknowledged in your first report that you don't know the level of risk or PT columns are used, I believe it's PT columns; is that right?

A. Yes.

Q. Okay. And there are also fields in the dataset whose operational meaning you cannot explain?

A. Yes.

Q. You excluded rows marked canceled or pending arrest, but you retain nine rows with a release to destination which you assumed represented actual detentions; is that correct? Do I have that right?
A. Yes.
Q. And you did that without being able to confirm operationally what those entries represent, correct?
A. By looking across datasets that ICE produced that purport to represent the detained population I was able to -- my best understanding is that the dataset that I've analyzed represent the people who were present.
Q. Okay. But I was just trying to clarify it's an inference or deduction, but it's not something you've confirmed?
A. That's right.
Q. Now the field that's used to record health concerns, that's the same field used to record other information like gang affiliation and suicide risk and violence?
A. I believe so, yes.
Q. Would you agree with me that that health concern category is a broad category?
A. I guess I'm not sure how I would define "broad" or "narrow."
Q. Well, you certainly agree with me that it included multiple different categories of information, correct? I mean, in terms of the ones we just covered: Pregnancy,

suicide risk, violence?

A. Yes.

Q. It's fair to say it's not limited to a complaint of physical duress or physical pain or physical injury?

A. Insofar as it includes those other non health-related concerns, yes. I would agree with that.

Q. And that's just what I'm trying to confirm, that you agree that it includes non health-related concerns?

A. I only counted instances that involved health concerns.

Q. From that field?

A. From that field.

Q. Okay. Just based on the field, though, is it fair to say that the quote/unquote "health" could encompass things ranging from a minor complaint to a serious chronic illness?

**MS. DAGEN:** Your Honor, objection. This is outside the scope of his expertise. He doesn't know how ICE logs their own data.

**THE COURT:** Well, first of all, "objection" is fine. I don't want speaking objections.

Mr. Moore, did you want to respond? And if Counsel want to come up to the bench, they're welcome to.

**MR. MOORE:** My response would just be that because he, as he has testified, made an inference or deduction about this information, that I was asking what his understanding of it is. I don't think he has to be an expert or have --

**THE COURT:** I don't disagree. Mr. Moore, just reframe your question for me and we can proceed.

**MR. MOORE:** Sure.

**BY MR. MOORE:**

Q. Is it fair to say based on your understanding that the term "health" as it's used in this category can encompass concerns ranging from minor complaints to serious illness?

**THE COURT:** So I'm going to stop. So I think what I prefer the question to be because you're assuming that there is an understanding, is to simply ask you, Professor Blair, do you have an understanding of the scope of things that might be encompassed by that word?

Mr. Moore, is that satisfactory?

**MR. MOORE:** Sure.

**BY MR. MOORE:**

Q. Do you have an understanding of the scope?

A. I would assume that it represents relatively serious concerns in the sense that they require effort by an ICE field officer to record something in that field and that I would assume, but I agree I don't know that it would encompass something more serious.

Q. Okay. All right. This is related to something we covered, but I just wanted to confirm. You were not asked to calculate simultaneous occupancy which is to say how many individuals were in the facility at the same moment, correct?

A. That's correct.
Q. Were you asked to perform any kind of crossover analysis that might match individual detention duration to population levels on that same day?
A. Would you mind if I reviewed the first --
Q. Sure.
A. The first declaration. I think that's fair to say.
Q. Okay. All right. Isn't it also fair to say that tracking simultaneous occupancy is a better way to determine either whether there is crowding or the extent to which there is crowding?
A. I would agree that there are different ways that you could calculate exposure to overcrowding and that a choice has to be made. And so you could calculate how many people were present at the same time on the same day, at the same time in the same hour, at the same time in the same minute, at the same time in the same second. And I thought it was an appropriate choice to focus on how many people were present on the same day.
Q. Okay. And just to draw it out as an example, under your way of performing calculations, if today, March 3rd, 20 people were checked in at 12:01 a.m. and checked out at 8; another 20 checked in at 8:30 and checked out at 4:30; and another 20 checked in at 5 and checked out at 11:30 p.m., you would have that population total at 60?

A. If I'm understanding you correctly, yes.
Q. And yet in that scenario there's 20 people there, no more than 20 people at any given time?
A. Yes.

**MR. MOORE:** Okay, I don't have anything else.

**THE COURT:** Redirect.

**MS. DAGEN:** Thank you, Your Honor.

**R E D I R E C T   E X A M I N A T I O N**

**BY MS. DAGEN:**

Q. Mr. Blair, you were just discussing with Mr. Moore this hypothetical 20 people in, 20 people out; 20 people in, 20 people out; 20 people in, 20 people out if I was understanding correctly. Why, if at all, do you think that that would be an appropriate hypothetical or an inappropriate hypothetical given your understanding of the data?
A. I think there's two things to think about: One is that my best understanding is that the time field is used by skilled officers in an approximate way and not in an exact way. It is not the case that there is a timecard stamp machine where detainees are stamped in and out and rather when the field officer can, they fill that out. And so that's one reason that I chose to tease the days.

And I think the second is that as we discussed, a very small proportion of people were held for a very short time. And so it cannot be the case that all of this is explained by

people coming in and out because only 4 percent of people were there from zero to 12 hours. And if we looked at an even smaller number of hours that would be even fewer.

Q. I want to just draw your attention briefly to --

**THE COURT:** I'm going to interrupt you. I have a follow-up question for my own clarification.

So I understand you to say, Professor, that based on your understanding there is no, as there would be for sort of an employee punch card, there's no punch in/punch out of a detainee to mark in/out, but rather that those marcations are made by the ICE officer whose obligation it might be to mark those things in what we're calling sort of the book; is that correct?

**THE WITNESS:** That's my best understanding.

**THE COURT:** And so based on that premise, is it your testimony that to perform data analysis in the way that Mr. Moore has suggested might be better based on a clock in/clock out, book-in/book-out time, would not necessarily be an accurate reflection of the total bodies in the hold rooms at a given minute?

**THE WITNESS:** That's precisely why I prefer the daily population count that I produced. So yeah, yes.

**THE COURT:** Thank you.

Ms. Dagen.

**MS. DAGEN:** Thank you, Your Honor.

**BY MS. DAGEN:**

Q. Professor Blair, if you can turn to page 4 of your first report. I did want to elaborate briefly on something you had mentioned regarding the population on any given day. This is on page 4, paragraph 14. The first chart is the one that you mentioned when we first spoke regarding the number of people there over the 56 or over 110, for example, marking. Can you explain just briefly what the next charts are and what they show?

A. Are you referring to the two middle charts?

Q. Yes, that's correct.

A. Yes. Those are looking at a breakdown by the gender of the detainees and the gender of the population being held. Yeah.

Q. And can you explain a little bit, for example, the middle chart titled number of male detainees held at least one day when male population was at least, what that is showing specifically?

A. What that's showing is the -- what the largest population of male detainees that a male detainee experienced being present for which is relevant because the hold rooms are, as I understand, it's split by gender.

Q. And how did you calculate these two charts?

A. In a very similar way to the first chart except that I was only looking at the male population for the first table.

And so for that chart I looked at for each individual what was the total -- what was the daily population count of male detainees that were also present with that detainee, and then similarly for the female population.

Q. And can you explain how you got these numbers given your understanding of how many cells there are?

A. Yes. My understanding is that there are two cells that hold men or they're designated for holding men and one that's designated for holding women. So I was looking at how many -- I was breaking this down by how many people -- by the expected population per the capacity for each room. So breaking down the capacity for the facility by room.

Q. So, for example, in the last line of that middle chart you say over 90 male detainees, in parenthesis, over 45 per room with the understanding there are two cells. So if they split them evenly that's what happens; is that correct?

A. Yes.

Q. Okay.

**MS. DAGEN:** No further questions from the plaintiffs.

**THE COURT:** Anything else, Mr. Moore?

**MR. MOORE:** Yeah, just a few follow-ups. Thanks, Your Honor.

**R E C R O S S - E X A M I N A T I O N**

**BY MR. MOORE:**

Q. I wanted to follow up on this question that Ms. Dagen asked you. You talked about the individuals who were there for a very short period of time. And I believe you said that that's because there is simultaneous population with those individuals who are there for a short time, that's kind of the core reason why you don't think that doing your analysis based on simultaneous population is either important or the best way to do it?

A. Yes.

Q. Okay. However, this let's call it de minimis amount of time, say less than 12 hours, those people who comprise a small percentage according to your data, those aren't the only people that would impact simultaneous population counts, would they?

A. No. Anyone -- no.

Q. Okay. I mean, just to give another hypothetical, two people -- let's consider two people. The first comes in on March 1st and is there until March 6th, okay? The next person comes in on March 5th and he's there all the way to March 10th. Those people are each there for 60 hours or more, correct?

A. Yes.

Q. Okay. But they're there together, they cross over for a much shorter period of time?

A. Yes.

**MR. MOORE:** Okay. Nothing further.

**THE COURT:** Anything else?

**MS. DAGEN:** Your Honor, if it would be helpful for one or two moments, could I show Professor Blair the demonstratives we shared with the Court and Mr. Moore earlier? We had planned to use them with Ms. Durant, but as she's not here I think this might be helpful for the Court regarding what Mr. Moore just asked about again.

**THE COURT:** That's fine. I appreciate the parties have worked together with respect to Professor Blair's testimony as a witness called by both sides, so that's fine. I'm sort of keeping track of minutes left.

So Mr. Moore, I'm going to allow Ms. Dagen to do that and then I'll give you one final bite and then you'll have one final redirect bite and that's it.

**MS. DAGEN:** Thank you. May I approach the witness?

**THE COURT:** Yes.

**MS. DAGEN:** And then I have a copy for the Court as well.

**THE COURT:** Thank you.

**MS. DAGEN:** Your Honor, would you prefer that I use the projector for this? Everyone has a copy.

**THE COURT:** I have no preference. It is your preference that matters.

**MS. DAGEN:** Okay.

**F U R T H E R   R E D I R E C T   E X A M I N A T I O N**

**BY MS. DAGEN:**

Q. Professor Blair, does this look like a subset from the data that you did review from the defendants' production in this case?

A. Yes.

Q. Okay.

**MS. DAGEN:** And Your Honor, I would just note that this has the Bates stamp at the bottom.

**THE COURT:** Yes.

**MS. DAGEN:** Thank you.

**BY MS. DAGEN:**

Q. We talked about several hypotheticals here regarding this time in/time out on days. I do think it would be maybe helpful for the Court and you, Professor, to be able to look at this. Can you see that there are certain lines highlighted in this subset?

A. Yes.

**MS. DAGEN:** Just to move things along I would let the Court know that these are all individuals whose detention overlapped on June 12th?

**THE COURT:** So when you say "all," every person that's highlighted or every person --

**MS. DAGEN:** I'm sorry, everyone who is highlighted.

**THE COURT:** Every person who is highlighted had

simultaneous.

**MS. DAGEN:** Was either booked in before the 12th or on the 12th and then booked out after that point so they were there on June 12th. Does that appear to be correct from your analysis, Professor Blair? You can take a look at that for a second.

A. Yes. That appears to be correct.

Q. And do you see the tally marks on the left side?

A. Yes.

Q. And what's the highest tally mark? Where does it end?

A. It ends on 105.

Q. Okay. So based on your analysis and the way you checked the data and this demonstrative, is it your assessment that this would reflect that there were 105 individuals held at the Baltimore Hold Rooms on June 12th?

A. Yes.

Q. And understanding that there is timestamp data here and defendants have discussed this simultaneous time issue, if we picked say 3 p.m. on the 12th, if you could take a look and see how many people are in that category there at 3 p.m.

A. So I believe that would be 98. Because that's when after that the individuals were booked in after that time.

Q. Yes. I believe are you referring to lines or tally marks 1 -- sorry, 80 through 106? Sorry, not 80; apologies. 100 through 106 that were all booked in after 3 p.m.?

A. That's right.
Q. Okay. For clarity, Your Honor, we also did identify, I believe, that there were two lines, line 18 and 70 who were booked out before 3 p.m. So what would that bring the total to, Professor Blair?

**THE COURT:** When you say line 18 through 70, you mean the ones with the markings next to them?

**MS. DAGEN:** Yes. I unfortunately had no other way to identify them.

**THE COURT:** So line 18 that's marked on page 39 of 71 and thereafter?

**MS. DAGEN:** Yes, yes. So line 18 shows that that individual is booked out at 7:24 a.m. on the 12th, so before 3 p.m. And then line 70 which is on the following page was booked out at -- apologies, I meant line 69 was booked out at 11:25 a.m.

**THE WITNESS:** That would bring it to 96.

**BY MS. DAGEN:**
Q. So that means there were 96 people there at 3 p.m.?
A. That's right.
Q. How different in your opinion would the day-to-day calculations be that you provided and the minute-to-minute ones such as this one we just discussed?
A. Based on the fact that the proportion of people that were there for a short amount of time and the fact that the number

of people who were there for a very long amount of time is high, I think that they would be -- we could expect them to be similar to this amount of difference.

**MS. DAGEN:** Okay, thank you. We're done, Your Honor.

**THE COURT:** Mr. Moore, anything else for Professor Blair?

**MR. MOORE:** Just very briefly, Your Honor. Thank you.

**F U R T H E R R E C R O S S E X A M I N A T I O N**

**BY MR. MOORE:**

Q. Professor, you discussed this date I believe that's made as a demonstrative in your report at paragraph 10 of Plaintiffs' Exhibit 24 on page 3, right? I'm not going to ask you about the details of it, I'm just confirming that it is discussed in your report.

A. Yes.

Q. And --

A. I believe it's the day after or the day before that we're talking about.

Q. June 13th?

A. This analysis is from June 12th and the analysis that I did was on June 13th, for June 13th.

Q. I got it, okay. And the number of total days in the discovery period would be like approximately 180 or so?

A. Something like that, without having calculated it.
Q. Okay. And obviously this is just one day in time, right? I mean, you're talking about in your report June 13th. You're talking about a single day?
A. That's right.
Q. Okay.
A. I did it for two different representative days.
Q. Yeah. And I think you mentioned that is it, going off memory here, seven days or more that the population exceeded 100?
A. I believe that's correct.
Q. Okay. And again, that would be every individual who is physically present at some point that day?
A. That's right.
Q. Okay, not simultaneously?
A. That's right.
Q. Crowding is fundamentally about people who share space together, correct?
A. Yes.
Q. And if people do not share the space together, right, at least one of them cannot be crowded together?
A. Yes.
Q. Okay, thank you. That's all.
**THE COURT:** All right. Anything else?
**MS. DAGEN:** That's it from us; thank you.

**THE COURT:** All right, Professor Blair, you are excused. Thank you for your presence. You may step down.

**THE WITNESS:** Thank you.

**THE COURT:** Plaintiffs may call their next witness, please.

**MS. SCHMIDT:** Counsel, at this time we're going to call Dr. Joe Goldenson. He'll be appearing by video.

**BY MS. SCHMIDT:**

**(Witness, sworn.)**

**THE COURTROOM DEPUTY:** Thank you. And your name is spelled J-O-E and last name G-O-L-D-E-N-S-O-N; is that correct, sir?

**THE WITNESS:** Correct.

**THE COURTROOM DEPUTY:** Thank you.

**D I R E C T E X A M I N A T I O N**

**BY MS. SCHMIDT:**

Q. Good morning, Dr. Goldenson. Please state your name for the record.

A. Joe Goldenson.

Q. And what is your profession?

A. I'm a physician.

Q. And why were you retained for this case, Dr. Goldenson?

A. I was retained to review documents from the Baltimore holding facility related to condition of medical care and to specifically render opinions about the intake screening, the

medication policy, and access to care once people are housed in the facility.

Q. Dr. Goldenson, did you issue a report reflecting your opinion?

A. Yes, I did.

Q. Dr. Goldenson, we've provided you with copies of the exhibits marked for today's hearing. Can you please take a look at exhibit marked number 3?

A. Okay.

Q. Please tell the Court what it is you're looking at.

A. I'm looking at a copy of my report.

Q. And is it a true and accurate copy of your report from the time that you wrote it?

A. Yes, it is.

Q. Before I ask you any questions about your opinions in this matter, I'd like you to explain your professional background to the Court. Using the page numbers in the upper right-hand corner of your report, please turn to page 19.

A. Okay.

Q. Doctor, is that the beginning of your CV?

A. Yes, it is.

Q. Please take a look and please let the Court know if it's an accurate reflection of your professional experiences.

A. Actually, when I was reviewing this prior to today I realized that I had left out one of the cases that I testified

in. In 2016 I was an expert in a case involving the Arizona Border Patrol stations and for some reason I never entered that on my CV.

Q. Thank you, Doctor. Please tell the Court where you conducted your medical training.

A. I started, I did two years of medical school at the University of Michigan and then I transferred to Mount Sinai School of Medicine in New York where I got my MD degree. And then I did a residency in family practice at the University of California, San Francisco.

Q. Please tell the Court about your work in the San Francisco jail system.

A. I worked in the San Francisco County Jail for almost -- over 25 years and for about 25 of those years I was the medical director and/or the director of a health program. In that role I was responsible for overseeing the clinical care, developing policies and procedures, supervising the clinicians, providing direct care at times and I was responsible for personnel and budgetary issues also.

Q. Doctor, please tell the Court at the highest level about your experiences working as a court-appointed expert or monitor.

A. There are a number of cases in federal court where I was appointed to be a federal court monitor. The first time Pelican Bay State Prison in California which was one of the

first Super Max prisons in the country. That case expanded to all of the prisons in the California Department of Corrections and I became one of the experts in that case also. There were two other people and we worked together monitoring that.

And I also monitored jails, a jail in Tacoma, Washington and the Ohio State Penitentiary in Youngstown, Ohio for federal court.

Q. You mentioned a couple of times being retained as an expert --

A. I'm sorry, also Cook County Jail in Chicago.

Q. Thank you, Doctor.

You've mentioned a couple of times that you've been retained as an expert. Have you also served as a retained expert for parties in cases involving detention conditions?

A. Not specifically conditions. Mostly it had to do with medical care. And what we looked at though in terms of the medical care was all the policies and procedures, access, clinic space. So it did bump up against some space issues, but the primary purpose was to determine if people were receiving adequate care and access to care, as well as medication.

Sorry, go on.

Q. No. Please finish your response.

A. As well as whether the medication policies were adequate, whether they had care programs for people and a lot of it

involved the intake screening because it's one of the more essential parts of a health program in corrections is making sure that you screen everyone that comes in for medical and mental health problems.
Q. Thank you, Doctor. We don't have time to go through all of your professional and academic work, but please tell the Court what the National Commission on Correctional Health Care is and about your experience on that board.
A. The National Commission on Correctional Health Care is a nonprofit organization with representatives from correctional organizations, legal organizations, correctional health organizations and they promulgate standards that are used around the country to determine -- facilities use them to determine that the care that they're providing is adequate. And the NCCHC also has an accreditation program where facilities, if they choose to, can decide to get accredited based on their compliance with the standards.
Q. Thank you, Doctor. There's a long list of presentations and publications over the course of your CV. Please briefly tell the Court about your academic work.
A. It was pretty varied. I did work on the structure and administration of correctional health facilities, community health and the relationship to correctional care, tuberculosis, HIV, chronic care provisions. A lot of different areas I got involved in research on those. I also

was an editor, co-editor of two correctional health textbooks I guess you'd call them.

**MS. SCHMIDT:** Your Honor, at this time we'd like to offer Dr. Goldenson as an expert in correctional medicine.

**THE COURT:** Mr. Moore, does the defense wish to voir dire the doctor? And is there any objection?

**MR. DeSIMONE:** Your Honor, at this time no objection.

**THE COURT:** All right, thank you very much.

The Court does find based on Dr. Goldenson's testimony that he is an expert in the field of correctional medicine with respect to his education, training, and experience as he has testified. It certainly would be helpful to this Court to have a better understanding of what the doctor has expressed is the reason for his being here today with respect to intake screening and policies and practices and access to care in this case.

And I appreciate that the correctional settings which Dr. Goldenson has worked on may not be precisely on footing with a civil detention facility, but it is a satisfactory facsimile and I will accept his testimony as an expert as a result.

Go ahead.

**MR. DeSIMONE:** Your Honor, if the Government may, on your last point the Government would like to reserve its right after cross-examination similar to the prior expert witness to

raise any issues with regard to methodology that may convince the Court otherwise with regard to accepting his testimony as an expert witness.

**THE COURT:** Okay, so just so that Counsel is aware and the Court is aware, do you, in fact, now have an objection based on methodology?

**MR. DeSIMONE:** We do not.

**THE COURT:** Okay. Because the report has been produced. So as the report has been produced you have no objection as to methodology. You've waived objection on any other basis and so if Ms. Schmidt's examination of Dr. Goldenson's report runs afoul of the contents of his report I will certainly hear an objection based on methodology. But as you have no objection on methodology as reflected in his report, we'll sort of thread that needle if we get there, okay?

**MR. DeSIMONE:** Understood, Your Honor. Thank you.

**THE COURT:** Go ahead, Counsel.

**MS. SCHMIDT:** Thank you, Your Honor.

**BY MS. SCHMIDT:**

Q. Dr. Goldenson, your report is already in the record so in the interest of time I'm just going to ask you some very high-level questions.

First of all, what documents did you rely on to understand what policies and practices are in place at the

Baltimore Hold Rooms?
A. I reviewed ICE's enforcement and removal operations, policy and procedure on the operation of holding facilities. I reviewed documents produced by the defendants in response to interrogatories and other document requests made by the plaintiffs. I reviewed a memo from February 2025 from the acting field office director in Baltimore requesting medical staff to assist with some of the medical duties because the number of people presenting with medical issues was increasing. I reviewed the deposition of Officer Guerrero, who was the assistant, the office director in Baltimore and I also reviewed the performance-based national detention standards from 2011 that were revised in 2016 and also the national detention standards that were done in 2025. And I also referenced the NCCHC standards manual.
Q. And Doctor, the NCCHC, is that referring to the National Commission on Correctional Health Care?
A. Yes, it is.
Q. Thank you. Paragraphs 8 to 21 of your report discuss medical screening standards and detention settings. Can you please explain to the Court what a medical screening is and why conducting a medical screening is important?
A. Yes. So a medical screening is one of the most essential parts of a medical program in any correctional facility because it gives the staff the opportunity to figure out what

kind of medical and mental health problems people coming into the facility have so that if there are issues or if they need follow-up care that can be arranged.

In addition, there are certain things that are high risk for people coming into correctional facilities that need to be screened for specifically such as alcohol withdrawal and risks -- I'm sorry, alcohol use and drug use and the risk for withdrawal. Alcohol withdrawal, in my experience, has some of the highest morbidity and mortality of anything that happens in the first few days of detention.

The other thing that needs to be screened for is suicidal ideations. It's not uncommon unfortunately that people get arrested, they're filled with despair, lack of hope. They feel their lives are over. And it's also a time when there's a fairly high suicide rate during the initial few days that someone comes in. So it's extremely important that people get screened for suicide.

And, in fact, the ERO policy on detention facilities says that people coming into the facility need to be screened for mental health problems and any acute manifestations of mental illness so that if they do exist they can get the care they need and don't decompensate and become a danger to themselves and others.

Similarly, the performance-based standards outline that people coming into the facility need to be screened for

alcohol use and risk of withdrawal. Now I understand that those standards the way they're written back in 2016 when they were revised apply to facility -- long-term facilities and facilities that are contracted by ICE that keep people for more than 72 hours. There's a problem with that standard as far as I'm concerned. One is that in the Baltimore Holding Facility, the new policy is that they are keeping people for up to 72 hours and data shows that there are people who are being held there longer.

In terms of the risk of alcohol withdrawal and suicide risk, I think it's useful to look at what happens in the county jail. In a county jail a large proportion of individuals who get arrested are usually released within 48 hours to 7 days. Either they get bailed out, they go to court and they get another court date or whatever. Large numbers of people are released.

There's no standard that I've ever seen that says you can delay the intake screening for the 7 days or even the 48 hours to see who is going to still be in the facility. The intake screening needs to happen as soon as someone enters the facility because the risk involved in not doing it starts right at the moment the person walks through the door.

The other important piece of intake screening is screening for communicable diseases like tuberculosis and COVID. And this is extremely important especially in terms of

tuberculosis because if someone enters the facility and has tuberculosis and that's not identified, he or she can spread that to other detainees, to the staff, and then even the staff can bring it home to their families.

One of the biggest turning points in correctional medicine in my career was in the late '90s when there was a tuberculosis outbreak at Rikers Island in New York where a number of correctional officers got infected from prisoners who were being held there who had tuberculosis and then members of those officers' families also developed tuberculosis.

The performance-based standards which again, don't specifically apply to a short-term detention center, but they mandate that TB screening be done within 12 hours of entry into a facility because they're aware of how great the risk is. And in my opinion, if they're saying that it should be done within 12 hours, then that also should apply to these short-term facilities where people are being held anywhere from 24 hours to 7 days.

Q. Thank you, Doctor.

Please summarize your opinion for the Court of the medical screening practices at the Baltimore Hold Rooms.

**THE COURT:** Counsel, I'm going to ask you to just clarify with respect to the time period that you're referring to whether it's during the directives or during the discovery

period or what.

**MS. SCHMIDT:** Your Honor, we would be --

**THE COURT:** Doctor, is your audio working? Can you hear us?

**MR. DeSIMONE:** I think he froze.

**MS. SCHMIDT:** I will reach out to him, Your Honor.

**THE COURT:** I think his screen is frozen. So would you like to disconnect and reconnect?

**MR. DeSIMONE:** Your Honor, if it weren't too much of an inconvenience of the Court would we be able to have a short break to use the restroom?

**THE COURT:** Yes, absolutely. Whether it inconveniences me or not that is always a reason --

**MR. DeSIMONE:** Thank you. I didn't want to impose.

**THE COURT:** Let's take a ten-minute recess and in that time frame we'll see if we can reconnect with the doctor. Court is in recess.

**(Whereupon a recess was taken from 11:50 a.m. to 12:05 p.m.)**

**THE COURT:** Please be seated.

I understand Dr. Goldenson has been returned to us, yes? Okay, we're all set.

Before we do proceed with the doctor's testimony, I'll try to find a sweet spot, approximately 1:00 to take a 30-minute lunch break.

And with that, Ms. Schmidt, please inquire of Dr. Goldenson.

**MS. SCHMIDT:** Your Honor, I wanted to inquire of your question first. The duration we're going to focus on for his testimony is going to be the discovery period. So from February 2025 to September.

**THE COURT:** Okay. Just restate your question for clarification. Thank you. Appreciate that.

**BY MS. SCHMIDT:**

Q. Hi, Doctor. If you could, please summarize your opinion of the medical screening practices at the Baltimore Hold Rooms limited to the period of discovery in this case which is from February 2025 to September.

A. Yeah. Like I was starting to say, any medical program, needs, policies and procedures to provide direction and guidance to either the custody officers or the health care who are providing services whether that includes intake screening or medication administration. And my understanding is that there are no policies and procedures related to medical care at the Baltimore holding facility.

In addition, a critical piece of intake screening is that the individuals, again, whether it's medical staff or custody staff receive training in how to take an adequate medical history, what kind of observations to look for to see if people are exhibiting any signs of symptoms of alcohol

withdrawal, suicide ideation, whether they're coughing, whether they're having sweats, whether they're having trouble breathing, difficulty walking. I mean, all those things are necessary. And a way that's usually accomplished is that there's a structured questionnaire that goes through the questions that are important in determining what the health issues are of people coming into the facility and also list out the observations that they're supposed to make, including vital signs. And my understanding, again, is that none of these things exist. There's no screening form, they don't take vital signs.

And then what Officer Guerrero stated or testified in his deposition was that all they asked when people come in is do you have any medical or mental health issues and do you take any medications. And for the reasons that I just described that's totally inadequate. You need to be more specific. People often don't give good histories. They might not be aware, for example, if they have symptoms of TB. Or if they're feeling suicidal they might not volunteer that information.

And even Officer Guerrero said that people come into the jail, say they don't have any problems and then lo and behold you discover that they do have diabetes or heart disease. That's really not uncommon in corrections. And it's the reason why you have to be clear on the questions you're asking

and just not ask these open-ended questions where someone can just say yes or no, I don't have any problems.

Q. Thank you, Doctor.

I want to turn to the medication standards in detention centers in the Baltimore Hold Rooms. So in paragraphs 22 to 27 of your report you discuss access to medication. Can you explain to the Court the importance of access to medication at a short-term detention facility?

A. Yeah. I mean, if people have chronic medical problems like diabetes, hypertension, seizures, or if they're taking antibiotics for infections, those medications need to be continued whether you're in a short-term facility or a long-term facility. Any break in the medications can lead to harm to the individuals. So it's important that there be a system in place to ensure that people who are taking medications before they get detained are able to continue them.

Q. Doctor, please explain to the Court how short-term detention facilities generally provide access to medications.

A. Well, I think there are a variety of ways. Generally if someone can bring in the medication that they're taking and it's in a labeled bottle and the staff can look up online or in a drug book and verify that the medication that's supposed to be in the bottle is, in fact, the medication that is in the bottle, then the person can take the medication that they

bring in with them. It's unusual to do that.

In most jails and prisons, or jails specifically, they don't let people do that. They don't let people bring in their own medication because you never know exactly what's in the container and it could be dangerous substances, it could be stuff they want to sell. So generally they'll take the medication, put it in the property of the individual and then have some kind of system where they have a contract with a pharmacy to get the medication that the person needs.

Q. Dr. Goldenson, will you please summarize your opinion of the practices for providing access to medication at the Baltimore Hold Rooms, again, limiting it to the discovery period of February 2025 to September?

A. Yeah, I think it's totally inadequate. What Officer Guerrero testified was that if a person doesn't have the medication when they come in the door then they'll ask them to have either a friend or family member bring in the medication. Again, you don't know what that person is bringing into the jail. It could be a dangerous substance. It could be something that they want to sell to other people. But also, there's a good chance that the person who is being contacted for one reason or another is unable to find the medicine, to get the medicine and it will result in a delay, and sometimes significant delay in the person getting the medications they need for whatever medical problem they have.

So again, if someone comes in and says they're taking X, Y, or Z medications then what needs to happen is they need to have a contract with a local pharmacy where they can get the medications in a timely manner.

Q. Dr. Goldenson, your report references a hospital transport list that was produced by the defendants. Please explain what role that list played in forming your opinion.

A. Yeah. The data I was given listed the number of people taken to the hospital from the Baltimore holding facility, I think it was from February 1st to September 26, 2025. There were a total of approximately 25 people on that list and out of those 25, six specifically said they were taken to the hospital for medications. And that to me, given my experience is an absurdly low number of people coming into a facility.

At the time the report was -- that time period there were 2,800 people in the facility over that seven-month period. And generally, about 50 percent of people who enter a facility are taking medications. And that's pretty much consistent with what you see in the community also. So the fact that only six of 2,800 were taken to the hospital to get medication seems like a really unreasonably low number to me.

Q. Dr. Goldenson, your report also refers to a variety of declarations submitted by third parties in this case. Please explain what role those declarations played in forming your opinion.

A. They actually didn't play any role in my opinion because my report was completed before I started getting any of the declarations. I did read them and I included them in the report because I think they underscore what I was saying, but I was not relying on that information at all to come to my conclusions.

Q. Doctor, I want to turn your attention to the access to medical care at the detention centers and Baltimore Hold Rooms. In paragraphs 28 to 31 of your report you discuss access to medical care. Can you please explain to the Court your understanding of how the Baltimore Hold Rooms provide access to medical care?

A. So access to medical care means that if someone once they've been screened and housed in our holding cell or any other kind of cell that if they develop a medical issue, they can get that taken care of. That really requires monitoring by the staff on a daily basis to see if people are starting to show signs and symptoms of serious illnesses.

The ERO policy says that -- and again, the ERO policy applies to short-term facilities that says patients or individuals who are in the holding cells will be monitored for physical and mental health problems. Again, there are no policies and procedures. There are no training as to what to look for if someone is saying -- all they depend on is someone saying I need to see a doctor; I have a medical problem or I

have a mental health problem. If for some reason the person doesn't say that, which again, is not uncommon in these situations, then the officers would have no idea that someone was having a medical problem in the facility.

Q. Thank you, Doctor.

In a facility without doctors and nurses, what type of training is typically provided to officers on duty at that facility?

A. I'm sorry, could you repeat that?

Q. Sure. In a facility that has no doctors or nurses on site, what type of training is generally provided to officers on duty at such a facility?

A. Well again, the training is in how to take a good history from individuals who are exhibiting symptoms, what signs or symptoms to look for if people are exhibiting medical problems or say they have medical problems so that they -- and then what's extremely important is once the officer obtains that information they need to have access to a medical professional, whether it be a doctor or a nurse to get guidance on how to deal with the person's medical issue. They are not trained -- they're not licensed to make those kind of decisions on their own.

Q. Thank you, Doctor. And for the Court's benefit if you could summarize your opinion of the practices for providing access to medical care at the Baltimore Hold Room, again,

keeping to that discovery period of February 2025 to September.

A. Again, I think it was inadequate. As I said, the data I was given showed that approximately 25 people, six of whom needed medication only were sent to the local hospital. And again, with a population as large as 2,800, that seems like an absurdly low number of people who would require a medical evaluation.

And, in fact, the acting field office director in his February memo requested medical staff for evaluating people for giving out medications because the number of people with medical needs was increasing. And he obviously felt that just having the officers perform that role was not sufficient.

Q. Thank you, Doctor. Dr. Goldenson, how important is it for a detention facility to have written policies in place?

A. Well, it's extremely important. As I said, it's the way staff, whether it's medical staff or custody staff who are dealing with health issues or even custody staff who are dealing with custodial issues, it's the way that they can easily get the direction and guidance they need for what to do when presented with a problem that they're not familiar with or that they don't see very often.

Q. Dr. Goldenson, based on your review of all of the various documents that you outlined at the start of your testimony, what is your overall opinion regarding medical care at the

Baltimore ICE holding facility?

A. Overall I'd say it's fairly nonexistent. I feel like the lack of all the things I mentioned, including the screening, the medication policy, the policies and procedures, the training, training for the people who are being detained in that facility are at significant risk of harm and it's not acceptable.

Q. Thank you, Dr. Goldenson.

**MS. SCHMIDT:** Your Honor, I'd like to reserve my remaining time for rebuttal, but otherwise we have nothing further.

**THE COURT:** All right, thank you very much.

Mr. DeSimone.

**MR. DeSIMONE:** Thank you, Your Honor.

**C R O S S - E X A M I N A T I O N**

**BY MR. DeSIMONE:**

Q. Good afternoon, Dr. Goldenson.

A. Good afternoon.

Q. Dr. Goldenson, would it be fair to say that your career has primarily focused on medical care in jails and prisons, correct?

A. Primarily, yes.

Q. Okay. And those facilities were designed for long-term or indefinite detention, would you say that's accurate?

A. Not necessarily because as I said, jails have high

turnovers so a lot of the people going in and out of jail are there for very short periods of time. That's what makes working in jails a lot more challenging than working in a prison because generally when someone comes into a prison they're going to be there for a while and you can get to know them. Whereas in a jail, you really have to get to know them right away because you don't know how long they're going to be there.

Q. Understood.

**MR. DeSIMONE:** I think we're getting some interference.

**THE COURT:** Could we be sure that people's--

**THE WITNESS:** I can't hear what's being said.

**MR. DeSIMONE:** No, Dr. Goldenson, we were just fixing a microphone issue.

**BY MR. DeSIMONE:**

Q. Dr. Goldenson, just to turn back to my previous question, generally these facilities consist of correctional capacity within a longer term or indefinite as opposed to a strictly short-term basis. Would you say that's accurate?

A. With the caveat I just raised, yes.

Q. Okay, thank you. Dr. Goldenson, would you agree that the Baltimore holding facility is not subject to ICE's performance-based national detention standards which conform to the National Commission on Correctional Health Care

standards?

A. I think when they were -- as I said earlier, I think when they were written they did not because people were held in holding facilities for 24 hours, then 48 hours. Now people can be held up to 72 hours and the data shows that some people are there even longer. So the people who are there longer I would argue should receive the same care that people who are in facilities for more than 72 hours receive.

Q. Okay. Based on that response and I'll try to reframe the question: As we stand today, the Baltimore holding facility is not subject to the National Commission on Correctional Health Care standards. Is that accurate?

A. Correct.

Q. Okay. And your expert report, would it be accurate to say, is more in line with advocacy for conforming with that standard as opposed to stating that it is not in line with it?

A. I'm sorry; I didn't understand the last part.

Q. I'll rephrase it. It was a little tricky with the wording. What I'm trying to ask is whether your expert report is designed to advocate for the Baltimore holding facility having those standards in place, correct?

**MS. SCHMIDT:** Your Honor, I'm going to object to the use of the word "advocacy."

**THE COURT:** Sustained. Mr. DeSimone, there's nothing to suggest that Dr. Goldenson is anything but an

independent expert. I understand I think the nature in which you meant to use that word, but if you could rephrase I would appreciate it.

**MR. DeSIMONE:** My apologies, Your Honor.

**BY MR. DeSIMONE:**

Q. Dr. Goldenson, were you retained by counsel for the explicit purpose of advocating that the performance-based national detention standards should be in place at the Baltimore holding room?

**MS. SCHMIDT:** Your Honor I'm going to renew my objection.

**THE COURT:** The objection is sustained. So Counsel, my point is that this expert is here as an independent expert. He is not an advocate with skin in the game taking a position as an advocate. I understand the word advocate can have different meanings, but given the venue that's why I asked you not to use that word.

**MR. DeSIMONE:** Understood, Your Honor.

**BY MR. DeSIMONE:**

Q. Dr. Goldenson, apart from the 2016 experience that you had, have you had any other experiences applying your expertise within the immigration detention arena?

A. Actually now that you ask the question I think I may have been involved in an ICE long-term facility in California a long time ago and I really don't remember the details, but it

sounds familiar to me that I may have done that.

Q. Okay. So other than the 2016 experience and the Southern California experience you don't have any other relevant experience with immigration detention and medical care therein, correct?

A. Correct.

Q. Thank you, Dr. Goldenson. And Dr. Goldenson, your declaration doesn't include, cite any authority specifically addressing appropriate medical standards for short-term immigration holding facilities, correct?

A. You're saying they don't?

Q. My question is does your report, excuse me, include any citation to authority that's binding on short-term immigration holding facilities?

**THE COURT:** Counsel, what do you mean by "binding"?

**MR. DeSIMONE:** The applicability to any standards that are in effect, Your Honor.

**THE WITNESS:** Well, as I said, I think the ERO policy on holding facilities does apply to short-term facilities because it applies to holding facilities. So there are a couple of mandates within those policies that would apply. One was the need for mental health screening and the other was the need for monitoring of people who are in the facility.

**BY MR. DeSIMONE:**

Q. Understood, Doctor. But could you reconcile that statement with paragraph 10 of your report where you state that the PBNDS does not appear to apply to ERO holding facilities such as the Baltimore ICE holding facility?

A. Well, I think I explained that. As it's written it doesn't apply, but I think it was written in 2016 and I think one, it's wrong that it doesn't apply over certain issues like intake screening which is applicable to a short-term facility as well as a long-term facility. Also, medication availability which is as applicable and access to care when you're being held there. To me it doesn't matter if you're being held two days or six years, you need access if you have a medical problem. You need access to your medications and you need to be adequately intake screened.

Technically, the way it's written it does not apply, but I would argue that I could see where interpreting it a little differently some of the things should apply.

Q. Okay. Thank you, Dr. Goldenson. Moving on to your conclusions, your report at paragraph 25 states that the fact that fewer than 10 were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications?

A. I'm sorry, could you talk louder? I'm having trouble hearing you.

Q. I apologize. Can you hear me better now?

A. Yes.

Q. Your report at paragraph 25 states that the fact that fewer than 10 were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications; is that correct?

A. Yes.

Q. Okay. And as part of that conclusion you relied on detainee declarations in part. Is that accurate?

A. No, that's not true. I already said that I didn't see the declarations until I had already written my report.

Q. Okay. Thank you for that clarification. Doctor, as far as you are aware from your review of the documents in this case, detainees are directly asked by ICE personnel if they are on medications during their initial screening; is that correct?

A. Yes.

Q. Okay. And the detainees also have an ability to request from a next of kin or friend to bring their medication to them in the event that it's not on their person; is that also true?

A. Yes.

Q. Okay. In fact, in paragraph 27 you cited to plaintiff D.N.N. having a family member bringing her medication to the holding facility; is that accurate?

A. I'd have to look. What paragraph are you talking about?

Q. Paragraph 27.

A. Paragraph 27? Which one are you talking about?
Q. It would be the first bullet point under paragraph 27. I apologize that I wasn't clear. Midway through the paragraph.
A. Well, what it says is is that her son brought in the medicine but she didn't get it and that they couldn't bring in her medication for mental health issues.
But I just want to say, I wouldn't argue that no family member can bring in medication. I'm sure it does happen. I'm saying that's not an adequate system because it could result in delays and people not getting their medication when they need it. I'm sure sometimes it might work.
Q. Okay. Dr. Goldenson, did you ever verify whether plaintiff D.N.N. actually accessed that medication that was brought to her?
A. No. Like I said, I really was not using -- I put the declarations in the report because they were sent to me and it seemed like a good idea to include them, but I didn't use them at all to form my opinions. So I didn't need to go back and see what happened.
Q. Understood. Dr. Goldenson, if a detainee at the Baltimore holding rooms cannot have their prescriptions delivered to them from family or friends, they also have the option to be taken to a local hospital to obtain a prescription. Isn't that true?
A. Well, that's what Officer Guerrero said. But again,

there were so few people taken to the hospital that I doubt that's an adequate system.

Q. Okay. Wouldn't this option alleviate your concerns regarding medications being brought in from the outside by family and friends?

A. Yeah. I mean, if you could demonstrate that everyone who comes into the facility who was taking medications and the family can't get it there in a timely manner that they're taken to the emergency room and get the medication which they bring back to the facility and then they're given the medication, that would address the concern. As I said, the numbers don't lead me to believe that that's what's happening.

Q. Understood. Doctor, did you factor that detainees chose not to disclose that they're on medication during their stay at the Baltimore holding facility when reaching your conclusion?

A. Well, as I said, some people don't mention their medical problems or their medications and that's why you need to do a complete screening that asks a number of questions, not just an open-ended question, do you have any medical problems and do you take medications. The screening has to be very detailed. And your own staff, Officer Guerrero said that it's an issue where people come in and all of a sudden days later you might find out they have diabetes or heart disease. So you do know that and there needs to be a system in place to

address that.
Q. Okay. Dr. Goldenson, wouldn't the same scenario apply in longer term facilities that are subject to detailed medical questionnaires? Even in that context, isn't there always an ability that the detainee doesn't tell the truth about being on any medications?
A. Yeah. I mean, it definitely happens, but that's why you have safeguards in place to minimize the likelihood that that happens.

**MR. DeSIMONE:** Court's indulgence, Your Honor.

**THE COURT:** Take your time.

**BY MR. DeSIMONE:**

Q. Dr. Goldenson, you previously referred to generally 50 percent of the population are on some type of medication; is that correct?
A. Yes.
Q. Does that percentage comprise elective medicines in addition to life-sustaining medication?
A. Now generally it's prescribed medication.
Q. And would that include cosmetic --
A. I'm sorry, I can't hear you.
Q. Would that include medication that's cosmetic in nature as well?

**THE COURT:** I don't understand the question.

Q. For example --

A. I don't understand.

**THE COURT:** Doctor, I'm going to ask the attorney to clarify the question so that I can better understand the testimony. Thank you.

Mr. DeSimone.

**MR. DeSIMONE:** Thank you, Your Honor. For example, Botox, Your Honor, strictly for cosmetic purposes as opposed to life-sustaining medications for diabetes such as insulin.

**THE COURT:** Can you frame the question specifically because it's a little bit of cognitive dissonance to me, but you ask the question. Go ahead.

**MR. DeSIMONE:** Okay.

**BY MR. DeSIMONE:**

Q. Doctor, I'm just trying to understand the 50 percent of people being on medication, what that comprises. It comprises all medications in general or just vital life-sustaining medication which would be important to the correctional context?

A. The way it's usually defined is critical medications or essential medications. Critical are obviously ones that have to be taken right away; essential, you may have a little more leeway but still have to be taken within a day or so. You know, things like Botox or Tylenol or whatever the other things you had in mind would not apply to that 50 percent.

Q. Okay. Thank you for that clarification, Doctor, and

sorry that it took so long for me to get there.

**MR. DeSIMONE:** Your Honor, the Government has no further questions.

**THE COURT:** Ms. Schmidt.

**MS. SCHMIDT:** Your Honor, I just have one further question.

**R E D I R E C T E X A M I N A T I O N**

**BY MS. SCHMIDT:**

Q. Dr. Goldenson, if you were a court-appointed monitor for the Baltimore Hold Room facility, what measures would you implement to make it safe for the people who are detained there?

A. I would ensure that their policies and procedures in place concerning the areas that we've been talking about: Intake screening, access to care and medications, that there's adequate training, that the screening uses a questionnaire that they go through, that the medication policy be developed to the point where you're ensuring that people who come in on medications get to continue them in a timely manner, and that people who are housed there who develop issues like exacerbation of existing conditions or withdrawal or suicide ideation are identified so that those issues can be addressed before they cause harm to the individuals.

Q. Nothing further. Thank you, Dr. Goldenson.

**THE COURT:** Any final question, Mr. DeSimone?

**MR. DeSIMONE:** Nothing further. Thank you, Your Honor.

**THE COURT:** Thank you very much, Dr. Goldenson. I know that we had some technical difficulties there. We appreciate you being present and we're going to disconnect the line at this point. Thank you, Doctor.

**THE WITNESS:** Thank you.

**THE COURT:** Do plaintiffs have other witnesses to call?

**MS. DAGEN:** No, Your Honor. Plaintiffs are not calling any more witnesses. Just I understand that defendants may be calling the plaintiffs and I understand that Your Honor said we may break around 1. Given that they are online from their facilities, would it be possible to do testimony with them before we break?

**THE COURT:** Let's try to do that.

Counsel, are you intending to call either plaintiff?

**MR. MOORE:** Could we just have a quick minute to --

**THE COURT:** Just like a husher minute or a recess minute?

**MR. MOORE:** Just a husher minute.

**THE COURT:** Okay.

**MR. DeSIMONE:** Thank you, Your Honor.

**(Whereupon, defense counsel conferred privately.)**

**THE COURT:** All right, Counsel, Mr. DeSimone, Mr.

Moore I did realize that our interpreter is also standing by so I would take Ms. Dagen's point to heart and let's try to see if we can do this expeditiously.

Do you intend to call either plaintiff?

**MR. MOORE:** It's going to be fairly brief, but we'll just go ahead. We can go forward now, that's fine.

**THE COURT:** And are you calling both plaintiffs?

**MR. MOORE:** I believe so. Yes, Your Honor.

**THE COURT:** Who will you call as a witness?

**MR. MOORE:** So we would call Ms. V.R.G.

**THE COURT:** So I think it would make sense and I'm happy to hear suggestions, for Madam Interpreter to take the witness stand actually even though you are not testifying as a witness so that we can make sure the camera is zoomed in on you and our plaintiffs could see very clearly.

**MR. MOORE:** I had a conversation with plaintiffs' counsel this morning and they said that Ms. V.R.G. -- it doesn't matter to me at all, but would not need an interpreter, but D.N.N. would. So it's just --

**THE COURT:** I think that --

**MS. DAGEN:** Yes, Your Honor. At the last hearing that we did in September Ms. V.R.G. did testify in English. We are happy to ask her here on the record if she would prefer to use the interpreter since there is one available, but that's what happened last time.

**THE COURT:** Okay. So Madam Interpreter, your services may not yet be needed.

So would you like to inquire of your client whether she wishes to have an interpreter?

**MS. DAGEN:** Would you like to proceed in English or Spanish today?

**THE WITNESS:** Spanish, please.

**THE COURT:** Well then we will need your services; thank you.

**THE COURTROOM DEPUTY:** Madam Interpreter, if you could please raise your right hand.

**(Interpreter, sworn.)**

**THE COURTROOM DEPUTY:** If you could please provide and spell your full name, please.

**THE INTERPRETER:** Good afternoon. Adriana Torossian, A-D-R-I-A-N-A T-O-R-O-S-S-I-A-N, Spanish interpreter.

**THE COURT:** Thank you. And Counsel, before we proceed I will just say that in view of our use of an interpreter services that the Court will accommodate additional time, if necessary.

Go ahead, Counsel.

**MR. MOORE:** Thank you.

**THE COURTROOM DEPUTY:** So at this point I would direct my attention to plaintiff V.R.G. and have her raise her

right hand to be sworn in to testify, please.

**(Witness, sworn.)**

**THE COURTROOM DEPUTY:** Thank you. You can put your hand down. Thank you.

**D I R E C T E X A M I N A T I O N**

**BY MR. MOORE:**

Q. Good morning, Ms. R.G.
A. Good morning.
Q. How are you doing this morning?
A. Good. Thank you.
Q. Ms. R.G., you have provided sworn testimony in this matter previously; is that true?
A. Yes.
Q. And you've done that through something called a declaration. Does that sound familiar?
A. Correct.
Q. And recently you provided a declaration in December of 2025?
A. Yes.
Q. And then another one following that in February of 2026?
A. Yes.
Q. Okay, thank you. And you were in what we refer to as the hold rooms in Baltimore back in May of 2025; is that correct?
A. Yes.
Q. And when you were in the hold rooms in Baltimore in May

of 2025 how many women were in your cell?
A. Eight women.
Q. Okay. So you remember eight women being in your cell?
A. Yes.
Q. Just one moment; I'm sorry.
Do you ever remember saying that there were two other women in your cell?
A. It was six women apart from me and one other woman.
Q. Okay. So it's not correct that there were two other women in your cell?
A. There were more.
Q. You were detained at the hold rooms in Baltimore for approximately 48 hours; is that correct?
A. Yes.
Q. And are you aware that one of the central claims in this lawsuit that you're a plaintiff in is that the hold rooms are overcrowded?
A. Yes.
Q. Okay. In your personal experience at the hold rooms you did not experience overcrowding; is that correct?
A. Well, a little because there was not too much space for this amount of people.
Q. Okay. And that's seven people you're saying, correct? Or eight, I'm sorry.
A. It was eight with me.

Q. Okay. And you made some statements in your most recent declaration that you had conversations with other detainees at your current facility. Does that sound right?

A. Correct.

Q. Who did you speak with at the current facility you're at?

**THE INTERPRETER:** Permission to ask for repetition of the names?

**THE COURT:** Fine.

**(Interpreter clarified with the witness.)**

**THE WITNESS:** I spoke to two other people who came from that same correctional in Baltimore.

**MS. DAGEN:** Objection.

**THE COURT:** We need to let her -- well, okay. There's an objection. What's the objection?

**MS. DAGEN:** Apologies, Your Honor. Just given the sensitivity, these people did not provide declarations and they're not parties to this case so we are just concerned about names on the record.

**THE COURT:** So what I would propose -- I had the same concern -- is that counsel and Madam Interpreter come up to the bench so that I can share the names with Counsel, but that they will not be made a part of the public record and they will be redacted from the record to protect privacy.

Any objection to that?

**MR. MOORE:** No.

**THE COURT:** So Madam Interpreter, if you would attend Counsel at the bench.

**(Counsel and the interpreter approached the bench.)**

**THE COURT:** So what I want to do is disclose the names to Counsel, but then have them redacted from the record for privacy. So can you disclose the names to Counsel? We're going to make sure that our sealed record has the names, so I'm going to ask you to speak into the microphone.

**THE INTERPRETER:** I didn't get the spelling, but what I could understand is [redacted] and [redacted] or [redacted] I don't know.

**THE COURT:** Thank you, okay. All right, thank you.

And so Madam Court Reporter, you will redact that from the public transcript, just the names, and that will be in -- the unredacted portion will be under seal, on the sealed record I should say.

**THE COURT:** Okay, thank you very much.

**(Whereupon, Counsel returned to their trial tables.)**

**THE COURT:** The names have been provided to Counsel. And Counsel, you may proceed.

**BY MR. MOORE:**

Q. Okay. Ms. R.G., I believe that you have testified in your declaration that you heard things have stayed just as bad; is that correct?

**THE INTERPRETER:** I'm sorry. Can you repeat that

question, Counsel? I'm sorry.

Q. Sure. You stated in a declaration that you heard things have stayed just as bad at the hold rooms?

A. Correct, yes.

Q. And can you tell me what these individuals said specifically to you about things at the hold rooms that qualify as "just as bad"?

**THE INTERPRETER:** I'm sorry, I'm having trouble understanding.

**(The interpreter clarified with the witness.)**

A. Well, they felt like they were freezing in the cells. They didn't have any mattress to sleep on. They didn't have any covers. They were feeling sick and there were no doctors. And they were feeling like they were dying because they were extremely cold and their extremities were turning purple.

**BY MR. MOORE:**

Q. Okay, anything else?

A. No.

Q. Okay. Are you aware of any changes that have been made at the Baltimore Hold Rooms since your time there?

A. No.

Q. And is it accurate that you told your lawyer that you thought the food at the hold rooms was minimal?

A. Yes, there was little food.

Q. And you mentioned a cup of noodle soup or a pouch of

food?

**THE INTERPRETER:** I'm sorry, can you repeat that?

Q. Yeah. I think you mentioned a cup of noodle soup or a pouch of food as examples? You mentioned a cup of noodle soup or a pouch of food as examples?

A. Well, yeah. They were giving us some noodle soup and then in the evening they were giving us a bowl with rice and a little bit of meat and water.

Q. Are you aware of changes that have been made to meal services at the Baltimore Hold Rooms?

A. No.

Q. Have you heard from any of the people you have spoken to in your current facility that the meals that are provided at the hold rooms now accommodate all sorts of different diets?

A. No, I haven't met anybody coming from there now.

Q. Okay. When you say you haven't met anybody coming from there, do you mean besides the two people you spoke about earlier?

A. Yes.

Q. Are you aware of whether the facility has made changes to bedding or hygiene supplies since you were there?

A. No. Ever since I met those two people coming from there I don't have any knowledge of what's going on in there.

Q. Okay, thank you. And you mentioned in your most recent declaration that the constitutional rights of detainees you

believe are being violated?

A. Yes.

Q. Can you explain what rights of the Constitution you believe are being violated?

A. The Fifth Amendment.

Q. Okay. And what right are you referring to or rights, if you know?

**THE INTERPRETER:** Permission to clarify.

**THE COURT:** Yes.

**(The interpreter clarified with the witness.)**

A. The right to preserve our privacy, the right to communicate with our family members. We are not allowed to call them and have constant communication.

Q. Okay, thank you. Any other rights?

A. The right to be able to keep the appropriate hygiene, the right to have the food that we need to eat, that we want to eat. The right to have an appropriate space -- the appropriate items to sleep and to have good rest.

Q. Okay. That's all I have, Your Honor.

**THE COURT:** Any examination by plaintiffs' counsel?

**MS. DAGEN:** Yes, Your Honor. Very briefly.

**THE COURT:** Go ahead.

**C R O S S - E X A M I N A T I O N**

**BY MS. DAGEN:**

Q. Hi Ms. R.G. Thank you for joining us today.

You were detained in the Baltimore Hold Rooms in May, correct?
A. Yes.
Q. And while you were there you had no access to a shower, right?
A. Yes.
Q. And while you were detained the cell was dirty, correct?
A. Yes.
Q. And you were not given any medication for your medical conditions; is that correct?
A. Yes.
Q. And while you were detained in the Baltimore Hold Room did the number of women in your cell change at any time?
A. No, never.
Q. And after being in Baltimore you've been in contact with your attorneys, right?
A. Yes.
Q. And you've discussed this case with your attorneys, right?
A. Yes.
Q. And you were able to ask your attorneys questions that you had about this case, correct?
A. Yes.
Q. And you've discussed the papers, the arguments submitted in this case, correct?

A. Yes.
Q. And you and your attorney have discussed what it means to represent a class, a legal group of people, correct?
A. Yes.
Q. And you are willing to represent other people who are detained in Baltimore now or in the future, right?
**MR. MOORE:** Pardon me. I'd like to just object to the line of questioning to the extent of leading questions. I understand some is allowed, but --
**THE COURT:** I'll sustain as to leading.
**MS. DAGEN:** Thank you, Your Honor. Would you like me to rephrase that last question?
**THE COURT:** Yes, please.
**MS. DAGEN:** Apologies, Your Honor. One moment.
**THE COURT:** That's okay.
**BY MS. DAGEN:**
Q. What is your understanding of what the judge is deciding today?
**THE INTERPRETER:** I'm sorry, I believe I lost the last part. The audio cut off.
**THE COURT:** Okay, could you ask her to restate her answer?
A. Well, I understand that what has been decided is that there has to be -- all the changes that should happen so that the conditions of people improve in that detention center and

that people have the appropriate conditions.
Q. One moment, Your Honor.
A. Because that way it's not acceptable.
**MS. DAGEN:** Nothing else at this time. Thank you, Your Honor.
**THE COURT:** Anything else, Mr. Moore?
**MR. MOORE:** Nothing else, Your Honor.
**THE COURT:** Okay, all right. Thank you very much. V.R.G. -- would you explain to our plaintiff that her testimony is complete and we're going to call another witness?
**THE WITNESS:** Okay, thank you.
**THE COURT:** Mr. Moore, next witness? Or defense, next witness?
**MR. MOORE:** I'm sorry?
**THE COURT:** Next witness?
**MR. DeSIMONE:** Thank you, Your Honor.

**D I R E C T E X A M I N A T I O N**

**BY MR. DeSIMONE:**
Q. Good afternoon, Ms. D.N.N.
**THE COURTROOM DEPUTY:** I believe she needs to be sworn in first. To Ms. D.N.N., I'm going to have you raise your right hand so you can be sworn in to testify.
**(Witness, sworn.)**
**THE COURTROOM DEPUTY:** Thank you. You can put your hand down.

**THE COURT:** Mr. DeSimone, please proceed.

**BY MR. DeSIMONE:**

Q. Good afternoon Ms. D.N.N.

A. Good afternoon.

Q. Ma'am, you've provided several sworn declarations in this case; is that right?

A. Yes.

Q. And you recently provided a new declaration in February; is that correct?

A. Yes.

Q. And your attorneys read your declarations to you in full before you signed them; is that correct?

A. Yes.

Q. Ma'am, and you've also been detained during the entire duration of this case; is that also accurate?

A. Yes.

Q. And ma'am, would it be accurate to say you've relied on your attorneys to keep you informed regarding this case?

A. Yes.

Q. Ma'am, you were detained from approximately 9 a.m. on May 7, 2025 through the morning of May 10, 2025; is that accurate?

A. Yes.

Q. Ma'am, when you initially were brought to the Baltimore holding facility, did you disclose to the detention officers that you were on any medications?

**THE INTERPRETER:** Permission to clarify term?

**THE COURT:** Yes.

**THE INTERPRETER:** Sorry.

**(Interpreter clarified with the witness.)**

A. Well, when I was first arrested and the officer told me that morning on the 7th that I was going to be detained I disclosed that I was diabetic.

Q. Okay. And after you disclosed that you were a diabetic, did you request to have your medication brought to you, ma'am?

A. Yes. My son took it there the next day in the afternoon.

Q. Okay, ma'am. And were you able to take that medication during the approximate three days that you were detained at the Baltimore holding facility?

**THE INTERPRETER:** It's breaking up for me, Your Honor. I'm so sorry.

**THE COURT:** That's okay.

**(Interpreter clarifies with the witness.)**

A. They didn't tell me or say anything to me that day.

**THE COURT:** Counsel, can you restate your question? I don't think it's been answered.

**MR. DeSIMONE:** Sure, Your Honor.

**BY MR. DeSIMONE:**

Q. Ma'am, once your medication was delivered to the holding rooms in Baltimore, were you able to access it?

A. Not until the next day, like, at noon on the 8th.

Q. Okay. So just to confirm, at noon on the 8th you were able to take the medication for your diabetes?
A. Yes.
Q. Thank you, ma'am. Ma'am, are you aware of the current state of medicine access at the facility at this time?
A. Yes, now I do have it.
Q. Is there any reason to believe why any of the detainees at the Baltimore holding room couldn't ask for their medications similar to the way you requested for it?

**MS. DAGEN:** Objection.

**THE COURT:** Sustained. Madam Interpreter, can you tell her the objection has been sustained? The objection has been sustained and so the answer will not be given.

**THE WITNESS:** Okay.

**THE COURT:** Could you please explain to her that she did nothing wrong and that I was just ruling on an objection made by an attorney?

Mr. DeSimone, do you have other questions?

**MR. DeSIMONE:** Just a few, Your Honor. May I attempt to rephrase?

**THE COURT:** You may not ask her to speculate or a hypothetical.

**MR. DeSIMONE:** Okay, I'm just trying to ascertain her knowledge.

**THE COURT:** I don't need to know why you're asking.

I'm just telling you that you may not ask her to speculate.

**MR. DeSIMONE:** Your Honor, at this time we don't have any further questions.

**THE COURT:** Thank you.

Ms. Dagen, any questions for D.N.N.?

**MS. DAGEN:** Not at this time, Your Honor.

**THE COURT:** Thank you, Madam Interpreter. I appreciate your services under what I know are challenging circumstances. So if you could advise D.N.N. that her testimony is complete.

And we're going to take a lunch recess. So I'm going to ask Counsel in view of the fact that we have V.R.G. and D.N.N. here remotely is there any objection to disconnecting the remote feed so the facilities can be released from their obligation?

**MS. DAGEN:** Not from plaintiffs, Your Honor.

**MR. MOORE:** No.

**THE COURT:** So Madam Interpreter, if you would aid us one more time to advise our plaintiffs that are appearing remotely that we're going to terminate their access to observe the hearing.

Thank you, thank you.

Mr. Moore, Mr. DeSimone, do you have any other witnesses to call?

**MR. MOORE:** We do not, Your Honor.

**THE COURT:** Okay. And I take it you don't have rebuttal witnesses?

**MS. DAGEN:** No, Your Honor.

**THE COURT:** Okay, so the witness portion is concluded. The evidence portion is concluded. We will take a 30-minute recess -- let's make it 35 even. Everyone to return by 2 p.m. Then we will proceed with the balance of the hearing. Thank you.

**(Whereupon, recess was taken from 1:24 p.m. to 2:04 p.m.)**

**THE COURT:** Before we proceed, I do have some questions before we launch into the afternoon and this is really -- the majority or the entirety of it is really directed to plaintiffs' counsel.

So I did take the time during our break to sort of crosscheck myself to make sure I wasn't making a mistake, but I think I might have misunderstood your answer given earlier regarding the scope of the motions or the motion for class cert and PI.

So as to the PI, the proposed order includes of course there's no reference to count numbers which makes this a little bit more difficult, but as to the PI, the proposed order includes in its scope relief as to sleeping conditions and provisions and the papers, of course, make argument as to the deprivation and the associated risk. But other parts of

the papers before me appear to suggest that the requested preliminary relief is only as to Counts Four and Five regarding hygiene and medicines respectively.

As to class cert -- and again, this is just discussion. I'm certainly not at all making any findings, to be clear. It seems to me that the through line theory is the risk of harm associated with the plaintiffs' alleged condition and the theory of how plaintiffs meet the 23(a) factors with perhaps the exception of Count Seven as to rights of counsel is effectively the same for each count, including the APA count. And my understanding is that the PI is not sought on all counts, but that class cert is.

And given defendants' papers which I reviewed and defendants' examination here in the morning and the afternoon it was at least apparent to me that defendants were operating on the same understanding as I have.

So given that the habeas aspect of this case has gone away and D.N.N. and V.R.G.'s request to be class reps, I need you to clarify what is the scope of your class cert request on a count by count basis? With the understanding that I have not entertained and have no notion of yet a third round of class cert papers, and I'm quite serious when I say that.

**MS. LANDAN:** Understood, Your Honor. We entered into expedited discovery and we narrowed the request for that discovery based on how we wanted to pursue for the preliminary

injunction taken away from Your Honor's admonition to be surgical in it. So that is how we prepared the preliminary injunction motion and the class cert we tailored to that because they are being brought together. The class definition that plaintiffs propose would apply to any of the --

**THE COURT:** You're not answering my question. Your class definition is what it is. It certainly would apply to any count, right? I mean, I have some issues with it as to Count Six, but I'm putting that aside. The class definition I understand is broad, everybody who is held is going to be held.

My question is are you seeking class certification as to all remaining pending counts of the second amended complaint?

**MS. LANDAN:** Yes, Your Honor. We believe that all counts could be on a class-wide basis.

**THE COURT:** Okay. So putting that aside because that is what I believed to be the case and I think I was just additionally confused based on the exchange we had at the outset, which is not your fault.

And as to the PI you are requesting relief, you are requesting an injunction now as to Counts Four and Five only or other counts? Because the requested relief includes mention of sleep. The papers include mention of sleep and provision for proper sleep, et cetera, et cetera, et cetera. But the requested or the proposed order does not make

reference to pending counts. I need clarity. Everybody is looking down.

**MR. LEVINE:** Your Honor, I think the answer here is that the sleep component of our relief does fit into the request regarding the physical conditions and healthful conditions of the facility. I recognize that we did plead it as a separate count in the complaint.

**THE COURT:** So what count do you contend sleep conditions fits into with respect to hygiene and medicine?

**MR. LEVINE:** I guess I'm saying it fits into the hygiene and space claim as well insofar as we're talking about people having access to a hygienic safe place, restful, all the things that --

**THE COURT:** So bearing in mind that the *Winter* factors require me, as I know you know well, to consider likelihood of success on the merits, you are now claiming that you want a PI that includes as part of its scope, what you consider to be adequate sleeping conditions and notwithstanding the presence of a count that is specifically on that point, you are asking me to cram that into Count Four.

Would you like to take a moment?

**MR. LEVINE:** Yes, Your Honor, if we could have just one moment to confer about that.

**THE COURT:** We'll put the husher on and if you need me to get off the bench, that's fine too. I just want to move

this along. But before we move it along into argument I need to know what you're asking for. And again, it's not clear.

Okay, Mr. Levine, enlighten me.

**MR. LEVINE:** Thank you, Your Honor. We appreciate the opportunity to confer on that.

Given the question that the Court has posed, we do see now -- and I apologize for the oversight -- that there is a separately pleaded sleep claim here. And so we are comfortable sort of removing that element from our proposed order and our requested relief at this point in the context of this stage of the proceeding.

**THE COURT:** Okay. All right. So to be clear, I hear you saying that the PI is only as to the relief sought in Counts Four and Five of the second amended complaint and you are not seeking relief associated with the Count -- is it Three as to sleep?

**MR. LEVINE:** That is correct, Your Honor. And our understanding is that once the crowding issue is resolved there will be sufficient space and mattresses available to the people who are in the facility, yes.

**THE COURT:** Okay. All right.

Now we'll move on to argument, so I now understand class cert as to all. I will ask you to -- I might be getting ahead of myself a little bit, but I will ask you to pay particular attention to the question of typicality as to Count Six.

With that, I'm happy to hear argument as to the PI and the class cert.

**MR. LEVINE:** Thank you, Your Honor. And just before we get started, I'll be addressing the argument as to the PI and my co-counsel, Ms. Landan, will be addressing the class cert component.

**THE COURT:** All right.

**MR. LEVINE:** Your Honor, just across the street about 100 yards from this courtroom the defendants are holding people in cells that a hold room officer and whistleblower recently compared to the cabin of a slave ship. What the defendants are doing to members of this community in a Baltimore federal building is inhumane, it is shameful, and it is plainly unconstitutional. And unless this Court orders the defendants to change their practices it will only get worse.

We are seeking a preliminary injunction today based on two distinct violations of the Fifth Amendment as Your Honor just pointed out: One for overcrowding and unsanitary conditions; and one for inadequate medical care. And I'll begin by discussing the first claim.

The Baltimore Hold Rooms were not designed to function as an overnight or residential detention facility. They were designed to be a temporary holding space to hold no more than 56 individuals across all five cells combined and to hold individuals for no longer than 12 hours at a time. But since

February of 2025 defendants have been operating the hold rooms as a short-term residential facility holding people for days at a time and holding as many as 56 people in a single cell. Again, 56 was previously considered the maximum. And on December 14, 2025 defendants held 56 people in a single cell.

Now what's remarkable about today's hearing is that nearly every key fact is undisputed. Defendants concede that only 4 percent of individuals are transferred from the facility in under 12 hours and that the average duration of detention is now two-and-a-half days. And while defendants are only authorized to hold people for 72 hours at a time, they concede that nearly a quarter of those detained are held in the facility for more than 72 hours and some for as long as a week or more.

And to be clear, Your Honor, when someone is placed into one of these cells and held for four, five, six days or more they are not permitted to leave the cell for a single moment. They are stuck in a windowless room, 24 hours a day, sharing an open toilet with dozens of other people with no access to fresh air, sunlight, exercise, books, or even a clock or calendar to know what time of day it is.

These conditions are exacerbated by plainly unconstitutional crowding which is now also undisputed. Defendants have conceded that the Court should disregard Officer Durant's testimony which misrepresented the daily

population totals at the facility. What remains in evidence are Dr. Blair's summary of defendants' own detention data, the declarations of formerly detained individuals, and statements from elected representatives who inspected the hold rooms and reported seeing 50 to 60 people in a cell at a time.

As confirmed by this evidence, the defendants have displayed a callous disregard for the welfare of people in their custody. They concede they have no written policies limiting the number of people in the hold cells at all. They claim to have an unwritten policy limiting cell capacity to 35 people. But to be clear, Your Honor, even if defendants actually enforced that policy, holding 35 people in cells of this size means giving fewer than 15 square feet per person which is the size of a public restroom stall.

Courts as far back as 1981 held that it was unconstitutional to provide cell space of 18 square feet, 23 square feet, and 26 square feet per person. Those decisions are in our brief, our opening brief at page 31, and those decisions involve facilities where unlike here, people had at least some ability to leave their cells to exercise or shower.

Now even if defendants actually enforced a 35-person cell limit it would be unconstitutional, but they don't enforce the limit and the conditions are actually worse.

We're not talking about isolated instances of crowding. At page 4 of his first report Dr. Blair confirms that over 50

percent of those detained are held in cells of 25 or more people and that over 20 percent of those who were detained are held in a cell of 35 or more people.

There are routinely more than 40 or even 50 people in these cells yielding less than 10 square feet per person. And Your Honor, 10 square feet is the size of a baby's crib.

Now during discovery as the Court is well aware defendants represented in writing that they did not keep records reflecting the number of people held in these cells. Defendants have now confirmed that this representation was false and that they had cell records, but failed to produce them.

Your Honor, there are two possible explanations for defendants' failure to produce those records. The first is that defendants deliberately withheld material evidence from this court; and the second explanation is the one that defendants have given: This was an oversight. ICE officers have access to cell population records, but as a matter of practice they do not review them and as a result they omitted them from their production.

And I just want to pause on that for a moment. Because what the defendants are telling this Court is that they have the ability to track the number of people that are being held in these cells and that they have chosen not to do so.

Your Honor, if the defendants cared about crowding at

this facility they would be tracking crowding at this facility. They have not been reviewing these cell population records because they are indifferent to crowding in these cells.

Now plaintiffs have every right to seek an adverse inference as to crowding based on defendants' failure to produce cell data, their destruction of paper cell records, and the failure to produce Officer Durant for cross-examination. But Your Honor, we are not seeking an adverse inference. And we have made that decision because the evidence of crowding here is overwhelming and it is undisputed and there is no inference needed.

The unsanitary conditions in these cells are also undisputed. It is undisputed that upwards of 50 people are forced to share a single open toilet located in the corner of each cell. It is undisputed that individuals held in these cells for days at a time have no access to bathing facilities of any kind. And it is undisputed that defendants clean these cells at most once or twice a week and not at all when the cells are at their most crowded.

As reflected in the -- excuse me. Now defendants do claim to have unwritten policies for providing individuals with changes of clothing, basic toiletries and tampons, but the record is filled with declarations from individuals who are denied access to basic hygiene items. We've provided the

declaration from a woman who was forced to wear diapers for several days because defendants ran out of tampons. And the whistleblower who came forward last month reported that officers handed out blankets that were covered in feces, lice, urine, and vomit.

In response to that evidence the defendants offer nothing but conclusory statements without any supporting evidence that they follow their unwritten policies. These statements have no evidentiary value, especially given that defendants have no mechanism to enforce these unwritten policies or track their compliance.

I'll move on to inadequate medical care.

The medical practices at issue here are also undisputed. Here are the undisputed facts: The facility does not have any written medical policies. It does not conduct medical screening or screen for infectious diseases. It does not train officers how to identify emergent medical issues. It does not bring medical professionals of any kind to the facility. It does not have any relationship with a pharmacy to obtain prescription medications. Your Honor, this is the definition of deliberate indifference. If defendants cared about providing medical care for individuals in their custody they would have written policies. If defendants wanted to ensure that people had access to medication they would have contracted with a pharmacy. If defendants wanted to protect

people from exposure to infectious diseases they would screen for infections diseases.

Defendants have not taken the most basic steps to provide medical care for these individuals because they are indifferent to their medical needs. And I just want to note that in the Fourth Circuit there is no requirement of some kind of subjective intent to harm these people. It is sufficient just to show that there is an objective risk of harm to those in detention and that the defendants have failed to address it.

This Court heard from Dr. Goldenson how the practice at the hold rooms pose a serious risk of harm to every individual in detention, as well as ICE's own employees. He has identified the policies that a facility must implement to ensure the safety of those in custody and defendants know what those policies are because they follow them at their actual residential facilities.

Defendants know what policies they need to implement. They have simply chosen not to implement them at the Baltimore Hold Rooms. And defendants have not even attempted to rebut Dr. Goldenson's opinions that the conditions at this facility are dangerous, nor could they because the defendants themselves agree with Dr. Goldenson.

Again, I want to direct the Court's attention to Plaintiffs' Exhibit 1 which is the February 9, 2025 memo from

the acting field office director of Baltimore ERO to the chief of ICE's detention oversight unit. In that memo she wrote that Baltimore was formally requesting medical personnel. She wrote that the facility was exceeding its maximum capacity of 56 individuals and taking over two days to transfer people to other facilities. As a result she wrote that ICE, quote, "urgently requires assistance in administering medications, conducting vital checks, and assessing whether individuals need to be transported to the hospital. The absence of medical staff to provide this support could potentially lead to liability issues or in the worst-case scenario, fatalities."

Your Honor, we featured that memo prominently in our brief and in their opposition defendants did not mention it once. Their silence speaks volumes. The defendants cannot credibly tell this Court that the conditions at the hold room are acceptable when the defendants themselves have recognized that they pose a risk of death to individuals in their custody.

Unless the Court has any questions, I'll stop there and Ms. Landan can address class certification.

**THE COURT:** I have no questions; thank you.

**MS. LANDAN:** Your Honor just heard Mr. Levine discuss the scope of the harm that individual people have experienced and are continuing to experience in the Baltimore

Hold Rooms. And the reason that plaintiffs need a Rule 23(b)(2) class certified, indeed the reason this case is in many ways the paradigmatic Rule 23(b)(2) case is because every single person detained in the Baltimore Hold Rooms is exposed to a substantial risk of harm arising out of the lack of medical care and unsafe conditions from overcrowding, harms that arise from defendants' specific policies and practices or lack thereof.

The only way to ensure that the harms Mr. Levine discussed are remedied and to provide relief to all who go through the hold room is to certify a Rule 23(b)(2) class and issue a preliminary injunction. This Court should follow in the steps of the three different courts throughout the country that have certified a class in the exact same situation with less of an evidentiary foundation.

Just over seven months ago Your Honor denied plaintiffs' initial class certification motion. In that time and with the benefit of limited discovery, plaintiffs have been able to refine their request from one that might have relied on nebulous references to systemic failures or deficiencies, to one that states with specificity the several policies and practices that together lead to violations of the Fifth Amendment.

These are specific policies and practices of systemic application that expose all individuals in defendants' custody

at the Baltimore Hold Rooms to a substantial risk of serious harm simply by entering the facility. The identification of these specific policies, shored up by evidence in the record, show that the proposed class easily meets the requirements of 23(a) and (b)(2) and not overbroad.

Mr. Levine touched on most of the policies and practices that are laid out in our briefing so for time I will not go through each and every one.

I will note that in his deposition, Officer Guerrero testified no less than 13 times that it is a hold cell, not a full up facility and no less than 7 times that they are immigration officers, not nurses or doctors. As the Court in the Southern District of New York held in *Mercado* and I quote, "Defendants have elected to use a hold room as a de facto detention site, not as the short-term facility for occupancy of 12 or fewer hours for which it is designed and equipped. Defendants may not properly choose a facility that is unfit for a particular purpose and then use the inadequacies of that facility as a justification to deprive those detained of their rights."

As to the Rule 23(a) requirements, defendants rightfully do not oppose the numerosity requirement. Their own discovery data shows that between February 1, 2025 and September 12, 2025, there were 2,862 book-ins. As to commonality, the specificity with which plaintiffs now identify the specific

overarching policies and practices that lead to the punitive conditions easily meets the commonality requirement. With the benefit of the evidence plaintiffs obtained from experts, non-plaintiff declarations and the discovery data as well as Officer Guerrero's deposition, plaintiffs are not more similarly situated to the situation in *Parsons v. Ryan* than they were in July. Rather than nebulous policies relying solely on the disparate harms that declarants face, plaintiffs now have detailed references to specific policies and practices such as inadequate officer training, inadequate medical screening, inadequate population capacity limits, failure to track the population. And because Your Honor specifically identified the other claims as well, failure to provide sufficient water and food to those detained which expose all detained individuals to substantial risk of harm.

As in *Parsons*, these policies and practices are the glue that holds together the class. Either each of the specifically identified policies and practices are unlawful as to every detained individual or they are not. That common answer whether the specific policy is lawful or not is a common answer apt to drive forward the litigation. Nor does *Stafford*, a Rule 23(b)(3) labor case which discussed both commonality and the higher standard of predominance bar the certification of this class on commonality grounds.

Plaintiffs point this Court to two District of Maryland

cases certifying Rule 23(b)(2) classes decided after *Stafford*: *Connor v. Maryland Department of Health* and *Does v. Musk* decided a month after Your Honor's opinion. In *Connor*, the crux of the issue was the lack of oversight over nursing homes that exposed any mobility impaired individual in the facility to a substantial risk of serious harms caused by the failure in oversight. Each facility faced different issues and each mobility impaired individual was differently situated. But as the Court found, a common cause, this lack of oversight led to the exposure to a substantial risk of harm to the entire class.

As the Court there stated, plaintiffs need only identify one common contention based on a common legal theory capable of class-wide resolution to satisfy commonality. And having done that, whatever factual difference do exist among members of the proposed class cannot defeat the showing of commonality.

It no longer matters that declarants may describe both common and unique experiences, as the asserted overarching practices fall into the general categories we have described. As in *Connor*, whatever variety exists among the specific harms and risks suffered by the plaintiffs and the putative class members does not strike at the heart of the causes of action asserted in this case.

And as the *Does v. Musk*a case held in August where

plaintiffs are proceeding under Rule 23(b)(2) the concern in *Stafford* is that the lack of a more precise parameter prevents a fair determination of predominance is inapplicable. And precisely because any person detained in the hold rooms regardless of any preexisting medical conditions or whether they may ultimately be one of the lucky less than 5 percent who are held only for 12 hours or less, faces the substantial risk of serious harm. And so there's no overbreadth problem.

As the Ninth Circuit held in *Parsons*, that harm may range from no harm at all to death. But that exposure unites all in their claims.

That is precisely why defendants err in claiming that there is an overbreadth problem and why the class can be certified as is. And as the Courts did in *Pablo Sequen* and *Gonzalez*, the San Francisco and Illinois hold room cases, of course the Court may sue sponte amend the definition if it does find there's an overbreadth problem, just as it may at any point decertify the class.

While commonality looks at the absent class members, typicality looks at the relationship between the named plaintiffs' claims and the absent class members. And just as there are common questions and answers at the core of this case, so are plaintiffs' claims typical.

The illegality of defendants' specific policies and practices are central to both the named plaintiffs' claims, as

well as the absent class members. Both plaintiffs just as every putative class member was exposed to substantial risk of serious harm simply by being in the Baltimore Hold Room. They are therefore typical. The typicality threshold isn't the exact conformance of harm, but rather the named plaintiffs does not have individual claims or defenses that take away from the common claims of the putative class.

Here, the two named plaintiffs, V.R.G. and D.N.N., do not have any special defenses or claims. And while they were both exposed to a serious risk of substantial harm, both also experienced the full range of actual harms.

When they were held in the Baltimore Hold Room in May, V.R.G. for 48 hours and D.N.N. for 72 hours, they experienced overcrowding. They were exposed to the same policies concerning lack of medical screening and unsanitary conditions.

As to the food and water claim, Your Honor, we will note that there are still evidentiary questions about whether defendants have changed their actual policy about food. They claim that there are now the meals ready to eat, but the video that we submitted to the Court in the transcript at ECF 129-1, the overcrowded cell says we are enduring hunger. There is still an open question as to whether there is a policy and practice of insufficient food and water at this facility. And so the named plaintiffs are typical as to each of the claims

and not just the medical care and unsafe conditions we focused on in the briefing.

In its July order this Court also found the named plaintiffs inadequate based solely on the declarations in evidence. In response to this finding, plaintiffs have submitted two additional declarations each to erase any doubt of adequacy from the Court's mind. They also testified today confirming the accuracy of the those declarations, but they are aware of what's going on, what this case is about and are ready to serve as representatives.

What those declarations prove is that plaintiffs understand what is going on. That was true when they filed the lawsuit, when they prepared to testify for the canceled hearing in July, and today. The bar is not as high as defendants make it out to be, nor can defendants point to any actual situation in which it has become clear plaintiffs are unaware of the situation and the case. There is no requirement in the Fourth Circuit or elsewhere that requires the named plaintiffs know the day-to-day happenings in the facility, nor as *Gunnells* held do they need to know the complex legal theories or the Fifth Amendment behind the case. It is clear that they are adequate and in fact that they do understand these complexities. But that is not the standard.

Having met all the individual requirements of Rule 23(a), plaintiffs' next request the Court certify a 23(b)(2) class.

A (b)(2) class is easily met here because the defendants' policies and practices apply generally to the class. That is why this case is, as other conditions of confinement cases are, the paradigmatic 23(b)(2) class. The requested final injunctive relief and declaratory relief is appropriate for the class as a whole and is indivisible. It impacts every single person who will be in the Baltimore Hold Room. By seeking uniform injunctive and declaratory relief from the policies and practices that apply to the class as a whole, plaintiffs meet the 23(b)(2) requirements.

In the nearly 10 months since plaintiffs were first detained in the Baltimore Hold Rooms and brought this lawsuit, thousands of individuals have been detained in the same manner that shocks the conscience, in squalid conditions, exposed to serious medical and other constitutional harms. The only way to put a stop to defendants' unconstitutional actions is to certify a class and issue an injunction on behalf of that class.

We ask this Court to follow the long history of cases certifying classes to stop abuse and unconstitutional abuse in prisons and in the footsteps of the New York, San Francisco, and Illinois district courts facing the same issues in their own hold room facilities. Thank you.

**THE COURT:** Thank you. Ms. Landan, I appreciate the argument and the presentation. I want to draw your attention

specifically to Count Seven with respect to the alleged deprivation of access to counsel and address your clients' ability to meet I believe it's 23(a)(3) as to typicality.

**MS. LANDAN:** Yes, Your Honor. I believe that named plaintiffs had a difficulty reaching outside of the detention center when it came to access to counsel. Counsel had a hard time having access to their clients in detention.

**THE COURT:** Can you point to what records you are relying on that are before the Court to substantiate the claims as far as the class certification request is concerned?

**MS. LANDAN:** Yes, Your Honor.

For document ECF 1-15 in which Ms. Justinano talks about the experiences of plaintiff NN, it says that she had a hard time making contact with her client. She had to wait several hours in order to connect with her.

And then as to the other named plaintiff, I believe it's ECF number 6, 6-2, Your Honor, also a declaration from a lawyer, Ms. Hyde, about plaintiff V.R.G.

**THE COURT:** So ECF 1-15 and ECF 6-2; is that right?

**MS. LANDAN:** That's right, Your Honor. I believe Plaintiff D.N.N. which is ECF 1-15 discussed more of the difficulties with access to counsel than V.R.G. to be candid with the Court, but there were definitely issues with accessing counsel and per counsel accessing inside.

**THE COURT:** Okay, bear with me for one second.

**(Discussion held off the record.)**

**THE COURT:** Returning -- thank you for that. So I've got ECF 1-15 and 6-2 and I appreciate your candor to the Court.

My second line of questioning is to Count Seven and again, this is not a merits question; it's more of a question of the motion before the Court on certification and that is that the general, again, I use the word through line theory in the action for all counts is just sort of attendant risk of harm really in the nature of physical harm that accompanies the complained of deprivation.

What is the connective tissue between that theory of your case from a 10,000-foot view and Count Seven in terms of the commonality question that I have to address?

**MS. LANDAN:** And to confirm, Count Seven being access to counsel.

**THE COURT:** Correct.

**MS. LANDAN:** Your Honor, with the exposure to a policy or practice comes the attendant harms. If the evidence ends up showing -- and again, we'll remind the Court that this was constrained discovery. We haven't yet entered discovery as to all of the counts and we did not seek evidence particularly as to access to counsel. We believe that having been a short-term facility, they did not -- defendants did not have policies and practices that allowed them to use this as a

longer term facility. That is true as to access to medication and screening, but that is also true as to access to counsel and other legal documents, mail --

**THE COURT:** I hear you. What is the connective tissue to the physical harm risk that you've associated with every condition that you complain of?

**MS. LANDAN:** The risk here would be not having access to counsel that they are owed under the INA and the First Amendment.

**THE COURT:** I'm not -- go ahead.

**MS. LANDAN:** I'll also note that one of our plaintiffs was only able to get access to her medication after counsel intervened. And so counsel in many other cases as well has been integral in making contact with the facility and ensuring that other counts and other harms are not further perpetuated as well, Your Honor.

**THE COURT:** Yes, I understand.

**MS. LANDAN:** And that is true as to typicality to our named plaintiffs. But as to commonality one of our later declarations that we included with the renewed motions is from Mr. Doe who was only able to seek access to a hospital after their counsel filed the motion in federal court. So there is -- the counts are intertwined in that sometimes only a lawyer can get the facility to otherwise meet their requirements under the other counts as well. But also just to make their

case, quite frankly, when it comes to their immigration case.

**THE COURT:** Okay. I appreciate that. All right, thank you. I don't have any other questions. Thank you very much.

I'm not sure who will argue for defense. Mr. Moore, you look primed to speak so I assume that it is you.

**MR. MOORE:** It is me, Your Honor. Thank you.

Plaintiffs' renewed motions for class certification and preliminary injunction should be denied for three independent reasons: The factual record developed through expedited discovery demonstrates the conditions at Baltimore Hold Rooms are not putative and thus constitutional; plaintiffs' expert testimony is methodologically flawed and provides no reliable basis for injunctive relief; and three, plaintiffs fail to satisfy the demanding requirements of Rule 23 in that they are entitled to the extraordinary remedy they seek with an injunction.

First, the factual record demonstrates the conditions at the Baltimore Hold Rooms are constitutional.

**THE COURT:** Are we talking -- I'm so sorry to interrupt. Are we talking now about the PI or class cert? Because if you're talking about merits I don't know whether this fits into Rule 23.

**MR. MOORE:** I laid out three things, Your Honor and so no, I'm not talking about class cert.

**THE COURT:** Okay, go ahead. Apologies.

**MR. MOORE:** That's okay.

The foundation of plaintiffs' case is a selective and distorted account of conditions at the hold rooms. The actual discovery tells a different story. Defendants have consistently maintained protocols governing sanitation, hygiene, food service, and medical transport. The BHR maintains an unwritten, but consistently followed policy providing hygienic guidance, including soap and toothbrushes and feminine hygiene products upon request. Detainees are provided three meals a day, accommodate dietary restrictions including vegetarian options, water with every meal and upon request. That is what the testimony in the deposition that plaintiffs were awarded and obtained reveals.

Rather than engaging this record on its merits, plaintiffs have attempted instead to substitute inflammatory anecdotes: Congressional visits, a whistleblower interview broadcast on a local television station and videotaping at a hold room during a winter storm that caused flight and transport delays for ICE as stated in one of plaintiffs' exhibits. These accounts are inadmissible or entitled to little weight, at the very least. The Court should assess the constitutionality of conditions at the BHR based on the data, not episodic accounts selected for rhetorical impact.

Moreover, the BHR is a short-term processing facility and

it's not a long-term detention center. Its design and operational purpose reflect its function as a transient intake location. Three-quarters of the detainees are released within 72 hours, and the rest within a few days thereafter. The temporary and dynamic nature of the BHR population is central to understanding both the constitutional standard that governs conditions there and the impracticability of the sweeping injunctive relief that plaintiffs request.

Population spikes when they occurred were episodic and temporary. The vast majority of detainees by any measure experienced conditions during periods of moderate occupancy. Isolated incidents of high occupancy do not establish the kind of sustained failure required to support constitutional violation or class-wide injunctive relief.

Second, plaintiffs' proffered expert testimony is unreliable and should be discounted.

With respect to Dr. Blair, his analysis is critically deficient in respect that goes to the heart of the constitutional standard. What Dr. Blair purports to measure is the total number of individuals who pass through or were present at the BHR in a given calendar day. That figure in and of itself tells nothing about how many individuals were simultaneously present in a given cell at any particular time, nor for how long any individual detainee was confined under crowded conditions. Because Dr. Blair measures presence

rather than simultaneous crowding and records head counts rather than individual durations, his report cannot establish the conditions of which any particular detainee was actually exposed. And by the way, in response to Counsel's statements the overcrowding is very much disputed. The Durant declaration attempted to describe --

**THE COURT:** I thought you withdrew the Durant declaration.

**MR. MOORE:** I am. But I'm saying what -- if I could finish.

**THE COURT:** Okay.

**MR. MOORE:** The Durant declaration attempted to describe the data plaintiff sought and defendants produced in discovery. The data, aside from the Durant declaration, is there and remains unchanged. Professor Blair's opinion analyzed the data in a way he conceded is less instructive than simultaneous presence. He clearly as a professional data scientist knew of and could have provided the analysis on simultaneous presence and he could have performed crossover analysis showing how simultaneous presence and duration intersect. That would get at not just the people who were present together, i.e., crowding rather than many people who were not in the facility at the same time, but it would also show those people who have extended duration and crowding collide together. He clarified that he simply was not asked

to do so by plaintiffs. It's unclear why that is. It's unclear why they didn't want to bring an analysis to light that is more informative and illuminating. And importantly, defendants do not carry the burden; plaintiffs do.

The Supreme Court in *Bell v. Wolfish* makes clear that a conditions of confinement inquiry cannot be examined by cramped conditions in isolation. The constitutional significance of crowding depends critically on its intersection with other conditions and most importantly, the duration of exposure.

What might be constitutionally problematic for a detainee confined around the clock for an extended period may be permissible for one who occupies the same space for a matter of days or weeks. Dr. Blair's reports contains no crossover analysis, as I mentioned. Without that analysis plaintiffs cannot establish that any class member, let alone the class as a whole, was exposed to the intersection of these two factors.

Plaintiffs also rely on Blair's analysis to argue the class members were uniformly exposed to unconstitutional conditions. But as his own data reflects, his own analysis reflects, population levels varied dramatically day-to-day on numerous days. The variation defeats the uniformity premise of plaintiffs' claim and challenges the commonality requirement of Rule 23.

Dr. Goldenson's report proceeds from its conclusion

rather to them. Dr. Goldenson identifies no specific patient, no documented diagnosis, and no individual medical encounter and no confirmed adverse outcome. He conducted no site visit during the relevant period, reviewed no medical records during the relevant period, reviewed no medical records pertaining to the population and interviewed no detainees about their actual health experiences. His opinions consist of inferences drawn from population level statistics, comparisons to inapplicable detention standards, and legal characterizations of what the Constitution requires.

The height of the illogical opinions of Dr. Goldenson is this statistic that 49.9 percent of U.S. adults take at least one prescription medication and then extrapolating that out to say that that necessarily applies to the entire population at the hold rooms too.

**THE COURT:** I don't think that's what he testified to. Maybe I misunderstood, Mr. Moore. I understood him to say that approximately 50 percent of individuals in a correctional setting take medication, which he understood to be prescription medication and that that reflects the data of the community at large.

**MR. MOORE:** That may have been what he said today, but that's not what he says in his report, Your Honor. It's the reverse. He cites the CDC as a statistic and said by this metric we can therefore apply it. And I don't think that

analysis or science holds up.

**THE COURT:** Okay.

**MR. MOORE:** Dr. Goldenson also failed to adequately account for the operational context of the BHR, as I mentioned. His reliance on ICE's performance-based national detention standards which expressly apply only to facilities used for detention exceeding 72 hours is particularly inept given that three-quarters of the BHR detainees are released within that window.

His indication of the PBNDS as a benchmark is another marker of advocacy. He deploys a standard he knows does not apply to this facility because it supports the conclusion he is wishing to reach.

On the question of medical screening, Dr. Goldenson's suggestion that the absence of formal written protocols constitutes constitutional violations misstates the governing standard. The constitutional requirement is not that a detention facility maintains written policies, employee on-site medical staff or conduct formal intake screening. It's of course a facility not to be deliberately indifferent to known serious medical needs. Even under the objective standard a plaintiff needs show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.

Defendants' actual transport records document that individuals presenting medical needs of all varieties were transported for care. No detainee is alleged to have suffered a documented serious adverse health outcome from a denial of medical access at the BHR during the relevant period. The absence of written protocol standing alone does not establish unconstitutional indifference under any standard and Dr. Goldenson's failure to identify a single incidence of concrete medical harm suffered by detainee is telling.

In the reply brief, plaintiffs respond to a strawman in arguing Goldenson, quote, "has a reasonable basis to draw the conclusion that vastly more than 10 out of 2,800 individuals required access to medication." Of course Goldenson's opinion isn't that vastly more than 10 people detained at the holding rooms during the discovery period required access to medication, it's vastly more than 10 people went without necessary medications, required medications. Technically plaintiffs seem to try to lower the bar for their expert by altering his assertions or changing the constitutional inquiry to whether substantial number of detainees need prescription medications. Of course there are procedures in place that invite and allow detainees to bring in those medications -- their family members, excuse me, if they do not have them on them.

All right. I wanted to touch on the PI standard or not

so much the standard, but on the PI.

So the conditions of confinement as I mentioned do not violate the Fifth Amendment. Defendants maintain that at the BHR providing food, clothing sanitation, supplies, bedding and medical transport are reasonably related to the function of a important governmental function and reflect operational judgments that are entitled to judicial deference. It's plaintiffs who have a burden of course to show the challenged restrictions are not reasonably related to illegitimate non-putative governmental objective which would mean grappling with those objectives as a first measure. They have not meaningfully done so.

Plaintiffs' reliance on *Lareau*, Second Circuit case from 1991 as support for the proposition that crowding in a fish tank-type environment is unconstitutional for any period of time overstates that holding. That case, 45 years old and out of circuit involved conditions far more severe than those present here.

The case of *Short v. Hartman,* while adopting an objective standard as I mentioned, did not eliminate the requirement that plaintiffs demonstrate actual constitutional injury. That objective standard still requires showing the conditions posed a substantial risk of serious harm and that the challenged policies or conditions were not reasonably related to the governmental objectives. Something plaintiffs have

consistently not taken on in a way that is highly needed here.

The denial of medical care doesn't rise to a level of a constitutional violation either. Defendants do not dispute that the BHR lacks on-site medical personnel, but what plaintiffs cannot establish is that this operational reality has resulted in or creates a substantial risk of constitutional injury to class members.

The BHR provides emergency medical transport and officers are present at all times and are capable of identifying emergent situations that require 911 calls and detainees are held for short periods of time of course during which the statistical likelihood of a medical emergency for any given individuals is low.

The case law that plaintiffs relied upon to establish a constitutional requirement for formal medical screening, written protocols, and sick call procedures arises predominantly in the context of long-term correctional facilities, not short-term processing centers.

*Brown v. Plata* involved systemic medical care failures in a permanent state prison system with a population of a very large number, a context utterly unlike BHR which processes individuals through 72-hour cycle as the norm.

*Gordon v. County of Orange* and *Lareau v. Manson* relied upon by plaintiffs for the proposition that medical screening is constitutionally mandatory both address multi-week or

multi-month detention facilities, not processing facilities where the median stay is under three days. So plaintiffs' effort to import the constitutional infrastructure of a permanent detention facility into a short-term processing context does not have support in controlling Fourth Circuit authority.

In the reply, plaintiffs continue to suggest that legal decisions from other hold room litigation in other parts of the country should provide them a sort of legal presumption in this case. But as is well-known to the Court, different facts involving different litigants, different circumstances, and different procedural postures in different district courts do not apply, do not take the place for the evidentiary record in this case.

The balance of equities in public interest also weigh against relief. A preliminary injunction of this nature requiring systemic operational changes to federal immigration processing is a mandatory injunction requiring a heightened showing. Moreover, the public interest counts so strongly against judicial micromanagement of the federal immigration enforcement operations. The executive branch does posses broad and constitutionally grounded authority over immigration enforcement, including the custody and processing of individuals subject to removal orders. Courts have consistently recognized that decisions about locations,

conditions, and operational logistics of immigration detention involve complex policy judgments that are committed to the executive and are not appropriately second guessed through an injunction and entered on preliminary record.

Plaintiffs finally cannot satisfy the requirements of Rule 23. Under *Walmart*, commonality requires that the class members share a common contention whose truth or falsity will resolve mutually central to the claims in one stroke. Plaintiffs' proposed common questions whether conditions at the BHR constitutionally adequate, cannot be answered uniformly across a class that includes individuals within an array of substantially different circumstances. Individuals who are present on days of low occupancy may stay five days and individuals who arrive during the population spikes may stay for 48 hours or less. There are individuals who have no medical needs and then there are individuals who may have had undisclosed conditions.

Further, it cannot be disputed that detainees are separated by gender and that there are fewer female detainees than male. While the discovery data in this case did not track gender, Dr. Blair provides data on gender and shows according to that data the population is significantly less.

**THE COURT:** And so to that extent you find his testimony reliable?

**MR. MOORE:** Oh, yeah.

**THE COURT:** Fair enough.

**MR. MOORE:** Common for any lawyer advocating, isn't it?

The constitutionality of defendants' conduct is inseparable from the individualized exposure each detainee actually experienced and that individualized deviation defeats commonality here. Plaintiffs' invoke *Parsons v. Ryan* which they discussed, but the *Parsons* case involved a permanent state prison system with uniform policies applied to thousands of long -- I believe it was thousands of long-term intakes over months and years. The risk calculus is entirely different in a facility where three-quarters of detainees cycle through within 72 hours as I mentioned.

Typicality and adequacy are also not satisfied. With respect to typicality, plaintiffs have not established how proof of their claims would be typical of all claims of absent class members. The adequacy of the named plaintiffs is also highly questionable. The record as it stood prior to plaintiffs' supplemental declarations submitted for the first time in their reply show that the named plaintiffs have limited understanding of the scope and nature of the claims being prosecuted on their behalf.

Supplemental declarations filed in reply cannot substitute for the kind of demonstrated engagement with representative responsibilities that Courts evaluate. Under

the Fourth Circuit's rigorous approach to class certification as articulated in *Stanford v. Bojangles*, plaintiffs' showing fall short.

Finally, just to address a couple points, additional points from plaintiffs' reply and their argument. Citing a news story from local television, plaintiffs note that DHS confirmed that the video was, in fact, taken at the BHR. As I said they omit the part of the story that noted that there was extreme winter weather at that time and resulting delayed transfer of some detainees spiking the population at the hold rooms beyond even normal occasions where there are rises.

**THE COURT:** So am I to understand that during the extreme weather conditions that individuals continued to be checked in to be detained at the hold rooms despite the capacity at the time at which flights were no longer running?

**MR. MOORE:** I believe that is the case. I mean, that is how, like, a certain number of them could not go out as they normally would. I think -- I don't know if the same number, you know, came in, but I believe people did still --

**THE COURT:** Was that not a circumstance entirely under your clients' control? Not the weather, of course, because that's the weather. But in terms of continuing to bring in additional civil detainees to be held at the Baltimore Hold Rooms?

**MR. MOORE:** I think the reasons that particular

individuals are there are many and varied and I don't think it can be reduced to like a simple question of could they have skipped doing arrest enforcement at that time.

I also wanted to just briefly address the notion that this memo Counsel referred to, internal memo was so significant. The memo expressing concern about risk is neither uncommon nor an official position of course of the agency. It's a public servant doing their job. It needed no response for this very reason.

I think that's about it. So I'd just say for all the foregoing reasons and for the reasons stated in defendants' opposition to plaintiffs' renewed motions the Court should deny class certification and deny the motion for preliminary injunction relief.

**THE COURT:** Thank you, Mr. Moore. I have two questions and I don't mean this to sound humorous or sarcastic because I generally am not inviting argument, but earlier in the day both you and Mr. DeSimone at various times sort of sought to reserve on arguing as to Professor Blair or Dr. Goldenson on grounds of methodology that the Court should not consider their respective opinions or reports. And I understand you now and I don't mean that you've shifted, but I understand based on your argument here that your arguments as to both are targeting issues of weight and not asking the Court to render those opinions inadmissible on grounds of poor

methodology in the vein of Rule 702.

**MR. MOORE:** That's fair and accurate, yes.

**THE COURT:** All right, fair enough.

I also want to ask a question and again, I don't mean this to put you in my crosshairs, but this is now I think the third time I've heard the word "advocacy" used in connection with Dr. Goldenson. The first two times were with your co-counsel, Mr. DeSimone. So I understand the use of the word "advocate" has a sort of colloquial meaning, but it also obviously has a term of art in these walls. And so I want to be clear that nothing is before me to suggest that Dr. Goldenson does not have the independence of any other expert witness that the Court accepts.

And so I want to question Mr. Moore as to other than making argument that you disagree or your clients disagree with the sum and substance of his opinions and what he wants me to take from his testimony, are you making any assertion that Dr. Goldenson has some inappropriate interest in the outcome of this case in terms of lacking the requisite independence that the Court would expect of any expert witness?

**MR. MOORE:** No, I'm not making any such assertion.

**THE COURT:** Okay, I appreciate that clarification. Thank you.

Ms. Landan or Mr. Levine, do you wish to have very brief

rebuttal?

**MR. LEVINE:** Yes. Very, very brief, Your Honor.

Mr. Moore discussed the video and which shows some 50-plus people being put into a single cell and explained it as part of the winter storm. We've submitted the cell count sheets which show similar conditions on December 10th, December 17th, and December 14th. And that those same records indicate that in the female cells on December 10th, there were 20 women in a 420 square foot cell. That's 21 square feet per person. On December 17th, there were 29 women in that same cell which is 14.4 square feet per person. The same exact policies apply across the board to the male and the female cells. They both have the same unwritten policy of 35 limitation.

As to Dr. Blair's methodology, the defendants seem to criticize it because it is incapable of providing a scientific exact answer as to exactly how many people were held in each cell. Dr. Blair was asked to do a reasonable estimate based on the data that the defendants produced.

Now there are records in this world that would show us exactly how many people were held in those cells and the defendants are the only ones in possession of those records. Defendants allowed those records to be destroyed. Defendants have failed to produce those records. And quite frankly, Your Honor, defendants have not offered any actual evidence or any

analysis of their own data to suggest that Dr. Blair's conclusions are wrong in any meaningful way.

As to the cell data, Your Honor, I'm not sure which is a more frightening thought, that the defendants, the Government of the United States may have deliberately withheld evidence of constitutional violations from a federal court; or that the supervision of this facility has deteriorated so far that the Government of the United States cannot tell a federal court how many people it is holding in cells across the street.

This case has enormous repercussions not just for those in immigrant detention. I just want to point out that the Constitution, again, does not distinguish between immigrant detention and pretrial detention. There are between 4 and 500,000 Americans held in pretrial detention every year and if these conditions are acceptable here they are acceptable everywhere. If the Government can do this to noncitizens it can do this to all of us.

For all of the many reasons that we've stated we are asking the Court to grant class cert and to order the preliminary injunction that we've requested. Thank you.

**THE COURT:** All right. Thank you, Counsel.

I have one request, Mr. Moore, before I forget is to if you would, we talked about the line, about the correct names of all defendants. If you could file that by noon just so that I have a recitation of who is who in terms of titles.

**MR. MOORE:** Noon tomorrow?

**THE COURT:** Noon tomorrow would be very helpful. And I don't believe I have any further questions. I'm going to take a brief recess. I want to look at one particular point that I may have a question on and then I'll come back out in about five minutes, but I believe that that will be all. So court takes a brief recess.

**(Whereupon a recess was taken from 3:15 p.m. to 3:20 p.m.)**

**THE COURT:** You don't really have to have a seat because we're adjourned, but I had to come out and thank you all for a very cogent presentation and for sticking with the general rules of the scheduling order. So I will have a decision out as promptly as possible and court is adjourned. Thank you.

**(Whereupon, the proceeding was concluded at 3:20 p.m.)**

**CERTIFICATE OF OFFICIAL REPORTER**

I, Nadine M. Bachmann, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 16th day of March, 2026.

*-S-*

______________________________________

NADINE M. BACHMANN RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

## '

**'90s** [1] - 60:6

## 1

**1** [4] - 46:24, 82:13, 110:25, 113:23
**1-15** [4] - 120:12, 120:19, 120:21, 121:3
**10** [11] - 48:13, 75:2, 75:20, 76:3, 95:21, 107:5, 107:6, 119:11, 130:12, 130:14, 130:16
**10,000-foot** [1] - 121:13
**100** [7] - 23:24, 24:8, 30:6, 30:16, 46:24, 49:10, 104:9
**10001** [1] - 1:21
**1001** [1] - 1:23
**1025** [1] - 1:14
**105** [2] - 46:11, 46:14
**106** [2] - 46:24, 46:25
**10:18** [1] - 4:2
**10th** [3] - 43:20, 139:6, 139:8
**110** [1] - 41:7
**11:25** [1] - 47:16
**11:30** [2] - 27:6, 38:24
**11:50** [1] - 61:18
**12** [18] - 24:14, 24:21, 24:23, 29:8, 29:15, 29:23, 30:1, 40:2, 43:11, 60:14, 60:17, 104:25, 105:9, 113:16, 113:23, 116:7
**123** [3] - 23:24, 24:9, 32:19
**129-1** [1] - 117:21
**12:01** [1] - 38:22
**12:05** [1] - 61:19
**12:30** [1] - 27:7
**12th** [8] - 45:21, 46:2, 46:3, 46:4, 46:15, 46:19, 47:13, 48:22
**13** [2] - 3:3, 113:10
**13th** [7] - 27:6, 27:8, 32:19, 48:21, 48:23, 49:3
**14** [2] - 41:5, 105:5
**14.4** [1] - 139:11
**14th** [3] - 27:7, 27:8, 139:7
**15** [2] - 32:3, 106:13
**16th** [1] - 142:14
**175** [1] - 1:17
**1763** [1] - 1:17
**17th** [2] - 139:7, 139:10
**18** [5] - 47:3, 47:6, 47:10, 47:12, 106:16
**180** [1] - 48:25
**19** [1] - 51:18
**1981** [1] - 106:15
**1991** [1] - 131:14
**1:00** [1] - 61:24
**1:24** [1] - 99:9
**1:25-cv-1613-JRR** [1] - 1:4
**1st** [2] - 43:18, 66:10

## 2

**2** [2] - 1:20, 99:7
**2,800** [4] - 66:16, 66:20, 69:6, 130:12
**2,800-plus** [1] - 31:17
**2,862** [1] - 113:24
**20** [18] - 10:11, 21:4, 30:3, 30:4, 38:21, 38:22, 38:23, 39:2, 39:3, 39:11, 39:12, 107:2, 139:9
**20001** [1] - 2:4
**20004** [1] - 1:24
**20006** [1] - 1:15
**20009** [1] - 1:18
**2011** [1] - 57:13
**2016** [6] - 52:1, 57:13, 59:2, 73:20, 74:2, 75:6
**2025** [18] - 15:1, 57:6, 57:14, 62:6, 62:13, 65:13, 66:10, 69:1, 85:18, 85:23, 86:1, 95:21, 105:1, 105:5, 110:25, 113:23, 113:24
**2026** [3] - 1:9, 85:20, 142:14
**21** [2] - 57:19, 139:9
**22** [1] - 64:5
**23** [5] - 106:16, 123:15, 123:23, 127:24, 134:6
**23(a** [4] - 100:8, 113:5, 113:21, 118:24
**23(a)(3** [1] - 120:3
**23(b)(2** [8] - 112:2, 112:3, 112:11, 115:1, 116:1, 118:25, 119:4, 119:10
**23(b)(3** [1] - 114:22
**24** [9] - 29:9, 29:15, 30:10, 34:11, 48:14, 60:19, 72:4, 105:18
**25** [10] - 3:4, 21:5, 52:14, 66:11, 66:12, 69:4, 75:19, 76:2, 107:1
**26** [2] - 66:10, 106:17
**27** [5] - 64:6, 76:21, 76:25, 77:1, 77:2
**28** [3] - 19:19, 67:9, 142:8
**29** [1] - 139:10
**2:04** [1] - 99:9

## 3

**3** [9] - 1:9, 46:19, 46:20, 46:25, 47:4, 47:13, 47:19, 48:14, 51:8
**30** [3] - 23:4, 23:12, 24:1
**30-minute** [2] - 61:25, 99:6
**31** [2] - 67:9, 106:18
**35** [7] - 30:6, 30:13, 99:6, 106:10, 106:12, 107:3, 139:13
**35-person** [1] - 106:21
**375** [1] - 1:21
**39** [1] - 47:10
**39/45** [1] - 3:3
**3:15** [1] - 141:8
**3:20** [2] - 141:8, 141:16
**3A** [1] - 1:10
**3rd** [1] - 38:21

## 4

**4** [12] - 13:22, 17:19, 24:23, 24:24, 24:25, 29:7, 40:1, 41:2, 41:5, 105:8, 106:25, 140:13
**40** [1] - 107:4
**42** [1] - 32:2
**42.8** [1] - 32:1
**42/48** [1] - 3:4
**420** [1] - 139:9
**45** [3] - 8:4, 42:14, 131:16
**450** [1] - 2:3
**48** [6] - 59:13, 59:18, 72:4, 86:13, 117:13, 134:15
**49.9** [1] - 128:12
**4:30** [1] - 38:23

## 5

**5** [2] - 38:24, 116:6
**50** [13] - 3:5, 19:15, 20:22, 24:4, 66:17, 79:13, 80:14, 80:24, 106:5, 106:25, 107:4, 108:14, 128:18
**50-plus** [1] - 139:4
**500,000** [1] - 140:14
**53** [1] - 19:10
**56** [8] - 24:3, 24:6, 41:7, 104:24, 105:3, 105:4, 105:5, 111:5
**5th** [2] - 2:3, 43:19

## 6

**6** [3] - 33:11, 33:15, 120:17
**6-2** [3] - 120:17, 120:19, 121:3
**60** [7] - 10:10, 29:25, 30:6, 30:13, 38:25, 43:20, 106:5
**69** [1] - 47:15
**6th** [1] - 43:18

## 7

**7** [7] - 30:6, 30:16, 59:14, 59:18, 60:19, 95:21, 113:11
**70** [4] - 3:6, 47:3, 47:6, 47:14
**701** [1] - 1:14
**702** [1] - 138:1
**71** [1] - 47:11
**72** [13] - 19:20, 24:12, 24:19, 59:5, 59:8, 72:5, 72:8, 105:11, 105:13, 117:13, 125:4, 129:7, 135:13
**72-hour** [1] - 132:22
**753** [1] - 142:8
**7:24** [1] - 47:13
**7th** [1] - 96:6

## 8

**8** [5] - 22:22, 29:8, 30:8, 38:22, 57:19
**80** [2] - 46:24
**81** [1] - 3:5
**85** [1] - 3:8
**8:30** [1] - 38:23
**8th** [2] - 96:25, 97:1

## 9

**9** [3] - 19:22, 95:20, 110:25
**90** [1] - 42:14
**91** [1] - 3:8
**911** [1] - 132:10
**94** [1] - 3:10
**96** [3] - 21:10, 47:17, 47:19
**98** [1] - 46:21

## A

**a.m** [7] - 4:2, 27:7, 38:22, 47:13, 47:16, 61:18, 95:20
**ability** [6] - 9:9, 76:17, 79:5, 106:20, 107:23, 120:3
**able** [17] - 7:4, 11:23, 22:17, 22:20, 35:6, 35:9, 45:15, 61:10, 64:16, 91:15, 92:21, 96:11, 96:24, 97:2, 112:18, 122:12, 122:21
**above-entitled** [1] - 142:10
**absence** [3] - 111:9, 129:15, 130:6
**absent** [4] - 116:19, 116:21, 117:1, 135:16
**absolutely** [2] - 11:7, 61:12
**absurdly** [2] - 66:14, 69:7
**abuse** [2] - 119:20
**academic** [5] - 14:17, 25:16, 25:25, 54:6, 54:20
**accept** [3] - 15:13, 17:8, 55:21
**acceptable** [5] - 70:7, 94:3, 111:17, 140:15
**accepting** [2] - 15:19, 56:2
**accepts** [1] - 138:13
**access** [45] - 6:3, 6:8, 6:12, 51:1, 53:17, 53:20, 55:16, 64:6, 64:7, 64:19, 65:11, 67:7, 67:10, 67:12, 67:13, 68:18, 68:25, 75:10, 75:12, 75:13, 81:15, 92:4, 96:24, 97:5, 98:20, 102:12, 105:19, 107:18, 108:17, 108:25,

109:24, 120:2, 120:6, 120:7, 120:22, 121:16, 121:23, 122:1, 122:2, 122:8, 122:12, 122:21, 130:5, 130:13, 130:15
**accessed** [1] - 77:13
**accessing** [2] - 120:24
**accommodate** [3] - 84:20, 90:14, 124:11
**accompanies** [1] - 121:10
**accomplished** [1] - 63:4
**according** [2] - 43:12, 134:22
**account** [2] - 124:4, 129:4
**accounts** [2] - 124:21, 124:24
**accreditation** [1] - 54:15
**accredited** [1] - 54:16
**accuracy** [1] - 118:8
**accurate** [21] - 10:12, 14:1, 14:8, 20:2, 31:14, 32:2, 32:10, 40:19, 51:12, 51:23, 70:24, 71:20, 72:12, 72:14, 76:8, 76:23, 89:22, 95:15, 95:17, 95:21, 138:2
**accurately** [1] - 32:17
**acknowledged** [1] - 34:19
**across** [7] - 22:1, 35:8, 104:8, 104:24, 134:11, 139:12, 140:9
**Act** [1] - 18:2
**act** [1] - 129:23
**Act's** [1] - 17:22
**acted** [1] - 129:22
**acting** [3] - 57:7, 69:9, 111:1
**action** [3] - 6:3, 115:23, 121:9
**actions** [1] - 119:16
**actual** [12] - 27:23, 35:3, 110:16, 117:11, 117:19, 118:16, 124:4, 128:6, 130:1, 131:21, 139:25
**actually** [17] - 5:15, 8:24, 9:6, 9:23, 11:21, 32:7, 32:14, 51:24, 67:1, 73:23, 77:13, 83:13, 106:12, 106:21, 106:23, 126:3, 135:6
**acute** [1] - 58:20
**added** [2] - 18:15, 23:24
**addition** [3] - 58:4, 62:21, 79:18
**additional** [4] - 84:21, 118:6, 136:4, 136:23
**additionally** [1] - 101:18
**address** [15] - 5:4, 5:18, 5:23, 7:17, 9:23, 18:11, 78:11, 79:1, 110:10, 111:21, 120:2, 121:14, 132:25, 136:4, 137:4
**addressed** [2] - 18:19, 81:22
**addressing** [3] - 74:9, 104:4, 104:5
**adequacy** [3] - 118:7, 135:14, 135:17
**adequate** [10] - 53:20, 53:24, 54:14, 62:23, 77:9, 78:2, 81:16, 102:18, 118:22, 134:10
**adequately** [2] - 75:14, 129:3
**adjourned** [2] - 141:11, 141:14
**adjudication** [1] - 9:12
**administering** [1] - 111:7
**administration** [2] - 54:22, 62:18
**admonished** [1] - 5:10
**admonition** [1] - 101:1
**adopting** [1] - 131:19
**Adriana** [2] - 2:6, 84:15
**ADRIANA** [1] - 84:16
**adults** [1] - 128:12
**adverse** [4] - 108:5, 108:10, 128:3, 130:4
**advise** [2] - 98:9, 98:19
**advocacy** [4] - 72:15, 72:23, 129:11, 138:6
**advocate** [5] - 72:20, 73:14, 73:15, 138:9
**advocating** [2] - 73:7, 135:2
**affect** [1] - 9:8
**affiliation** [1] - 35:17
**affirmatively** [1] - 8:3
**afoul** [1] - 56:12
**after** [17] - 8:23, 15:10, 27:2, 33:11, 34:8, 46:3, 46:21, 46:22, 46:25, 48:19, 55:25, 92:15, 96:8, 115:1, 115:3, 122:12, 122:21
**afternoon** [10] - 7:5, 70:17, 70:18, 84:15, 94:19, 95:3, 95:4, 96:10, 99:12, 100:14
**against** [4] - 31:20, 53:18, 133:16, 133:20
**agency** [1] - 137:8
**ago** [2] - 73:25, 112:16
**agree** [15] - 10:21, 10:24, 17:4, 27:25, 29:20, 30:1, 30:4, 35:19, 35:23, 36:6, 36:8, 37:20, 38:12, 71:22, 110:23
**agreed** [2] - 8:3, 8:20
**ahead** [10] - 25:5, 55:22, 56:18, 80:11, 83:6, 84:22, 91:22, 103:23, 122:10, 124:1
**aid** [1] - 98:18
**Aided** [1] - 1:25
**air** [1] - 105:20
**al** [4] - 1:3, 1:5, 4:4
**alcohol** [6] - 58:6, 58:7, 58:8, 59:1, 59:10, 62:25
**aligns** [1] - 20:23
**alleged** [3] - 100:7, 120:1, 130:3
**alleviate** [1] - 78:3
**allow** [2] - 44:13, 130:22
**allowed** [7] - 19:14, 19:21, 28:24, 91:12, 93:9, 121:25, 139:23
**allows** [1] - 19:12
**almost** [2] - 20:21, 52:13
**alone** [3] - 27:21, 127:16, 130:6
**along** [4] - 5:3, 45:19, 103:1
**already** [5] - 14:25, 17:16, 56:21, 76:9, 76:10
**altering** [1] - 130:19
**alternative** [2] - 20:14, 29:1
**always** [2] - 61:13, 79:4
**Amelia** [1] - 4:8
**AMELIA** [1] - 1:13
**amend** [2] - 6:7, 116:16
**amended** [5] - 6:17, 7:6, 9:20, 101:13, 103:14
**amendment** [3] - 8:20, 9:4, 9:13
**Amendment** [7] - 6:21, 91:5, 104:17, 112:23, 118:21, 122:9, 131:3
**Americans** [1] - 140:14
**Amica** [2] - 1:14, 18:3
**among** [2] - 115:15, 115:21
**amongst** [1] - 8:3
**amount** [6] - 19:21, 43:10, 47:25, 48:1, 48:3, 86:22
**analysis** [46] - 8:15, 14:2, 14:20, 15:5, 15:20, 16:10, 17:7, 19:8, 20:3, 20:13, 21:24, 23:6, 23:13, 23:14, 24:13, 24:20, 24:22, 28:2, 28:4, 28:7, 28:8, 29:1, 29:4, 31:23, 31:24, 33:20, 33:22, 33:23, 34:2, 38:2, 40:16, 43:6, 46:5, 46:12, 48:22, 125:17, 126:18, 126:20, 127:2, 127:15, 127:18, 127:20, 129:1, 140:1
**analyst** [1] - 17:7
**analyze** [3] - 27:23, 28:8, 33:5
**analyzed** [5] - 28:15, 28:18, 31:15, 35:10, 126:16
**analyzing** [1] - 26:5
**AND** [1] - 1:8
**and/or** [2] - 6:20, 52:15
**anecdotes** [1] - 124:17
**Aniello** [1] - 4:24
**ANIELLO** [1] - 2:2
**anonymized** [1] - 30:23
**another** [9] - 16:9, 38:22, 38:23, 43:16, 59:15, 65:22, 85:20, 94:10, 129:10
**answer** [10] - 20:5, 27:12, 93:22, 97:13, 99:17, 102:3, 114:20, 114:21, 139:17
**answered** [2] - 96:20, 134:10
**answering** [1] - 101:6
**answers** [1] - 116:22
**antibiotics** [1] - 64:11
**anybody** [2] - 90:15, 90:16
**anyone** [6] - 5:10, 5:12, 5:17, 19:21, 32:23, 43:15
**anything** [14] - 9:11, 12:13, 25:21, 30:22, 39:5, 42:21, 44:2, 48:6, 49:24, 58:9, 72:25, 89:17, 94:6, 96:18
**anyways** [1] - 10:21
**anywhere** [1] - 60:18
**APA** [2] - 6:20, 100:10
**apart** [2] - 73:20, 86:8
**apologies** [6] - 46:24, 47:15, 73:4, 87:15, 93:14, 124:1
**apologize** [5] - 22:19, 22:20, 75:25, 77:3, 103:7
**apparent** [1] - 100:15
**appear** [6] - 17:6, 29:17, 31:2, 46:4, 75:3, 100:1
**appearance** [1] - 4:7
**appearing** [2] - 50:7, 98:19
**appears** [1] - 46:7
**applicability** [1] - 74:16
**applicable** [2] - 75:8, 75:10
**application** [1] - 112:25
**applied** [1] - 135:9
**applies** [3] - 67:20, 74:20, 128:14
**apply** [22] - 5:6, 59:3, 60:13, 60:17, 74:19, 74:22, 75:3, 75:6, 75:7, 75:15, 75:17, 79:2, 80:24, 101:5, 101:7, 119:2, 119:9, 128:25, 129:6, 129:12, 133:13, 139:12
**applying** [1] - 73:21
**appointed** [3] - 52:21, 52:24, 81:9
**appreciate** [12] - 34:9, 44:9, 55:18, 62:8,

73:3, 82:5, 98:8, 103:4, 119:24, 121:3, 123:2, 138:23
**approach** [2] - 44:16, 136:1
**approached** [1] - 88:3
**appropriate** [9] - 28:8, 38:18, 39:14, 74:9, 91:15, 91:17, 91:18, 94:1, 119:5
**appropriately** [1] - 134:3
**approximate** [2] - 39:18, 96:12
**approximately** [11] - 19:15, 23:12, 30:3, 30:4, 48:25, 61:24, 66:11, 69:4, 86:13, 95:20, 128:18
**apt** [1] - 114:21
**areas** [2] - 54:25, 81:14
**aren't** [2] - 34:18, 43:12
**arena** [1] - 73:22
**argue** [5] - 72:7, 75:16, 77:7, 123:5, 127:18
**argued** [1] - 32:7
**arguing** [2] - 130:11, 137:19
**argument** [10] - 99:24, 103:1, 103:22, 104:1, 104:4, 119:25, 136:5, 137:17, 137:23, 138:15
**arguments** [2] - 92:24, 137:23
**arise** [1] - 112:7
**arises** [1] - 132:16
**arising** [1] - 112:5
**Arizona** [1] - 52:1
**around** [4] - 24:4, 54:13, 82:13, 127:12
**arranged** [2] - 8:8, 58:3
**array** [1] - 134:12
**arrest** [2] - 35:1, 137:3
**arrested** [3] - 58:13, 59:13, 96:5
**arrive** [2] - 23:9, 134:14
**art** [1] - 138:10
**articulated** [1] - 136:2
**ascertain** [1] - 97:23
**aside** [3] - 101:9, 101:16, 126:14
**ask** [27] - 5:8, 17:18, 26:14, 37:10, 48:14, 51:15, 56:22, 60:23, 64:1, 65:16, 72:19, 73:23, 80:2, 80:11, 83:23, 87:6, 88:8, 92:21, 93:21, 97:8, 97:21, 98:1, 98:12, 103:23, 103:24, 119:19, 138:4
**asked** [16] - 13:19, 18:10, 20:7, 20:9, 20:12, 28:2, 30:12, 37:23, 38:2, 43:2, 44:8, 63:13, 73:16, 76:13, 126:25, 139:18
**asking** [9] - 7:3, 34:2, 36:24, 63:25, 97:25, 102:20, 103:2, 137:24, 140:19
**asks** [1] - 78:19
**aspect** [4] - 6:2, 6:4, 6:12, 100:17
**asserted** [2] - 115:19, 115:24
**assertion** [2] - 138:17, 138:22
**assertions** [1] - 130:19
**assess** [1] - 124:22
**assessing** [1] - 111:8
**assessment** [2] - 23:10, 46:13
**assign** [1] - 12:7
**assigning** [1] - 12:1
**assist** [1] - 57:8
**assistance** [1] - 111:7
**assistant** [1] - 57:11
**associated** [4] - 99:25, 100:7, 103:15, 122:5
**assume** [3] - 37:17, 37:20, 123:6
**assumed** [1] - 35:3
**assuming** [1] - 37:9
**attached** [1] - 28:14
**attachment** [1] - 14:4
**attempt** [1] - 97:20
**attempted** [4] - 110:20, 124:16, 126:6, 126:12
**attend** [1] - 88:2
**attendant** [2] - 121:9, 121:19
**attention** [6] - 40:4, 67:7, 84:25, 103:25, 110:24, 119:25
**attorney** [3] - 80:2, 93:2, 97:17
**attorneys** [5] - 92:16, 92:18, 92:21, 95:11, 95:18
**audio** [2] - 61:3, 93:20
**August** [1] - 115:25
**authority** [4] - 74:8, 74:13, 133:6, 133:22
**authorized** [1] - 105:11
**availability** [1] - 75:10
**available** [4] - 5:15, 8:25, 83:24, 103:19
**Avenue** [3] - 1:14, 1:21, 1:23
**average** [4] - 31:25, 32:5, 32:7, 105:9
**averages** [1] - 8:17
**awarded** [1] - 124:14
**aware** [14] - 9:2, 9:16, 56:4, 56:5, 60:15, 63:18, 76:12, 86:15, 89:19, 90:9, 90:20, 97:4, 107:7, 118:9
**away** [5] - 71:7, 80:21, 100:18, 101:1, 117:6

## B

**B** [1] - 13:9
**b)(2** [2] - 113:5, 119:1
**B-L-A-I-R** [1] - 13:9
**BA** [1] - 14:15
**baby's** [1] - 107:6
**Bachmann** [1] - 142:5
**BACHMANN** [1] - 142:17
**back** [8] - 8:5, 59:2, 71:17, 77:18, 78:10, 85:23, 106:15, 141:5
**background** [2] - 14:14, 51:17
**bad** [3] - 88:24, 89:3, 89:7
**bailed** [1] - 59:14
**baker** [1] - 7:12
**balance** [2] - 99:7, 133:15
**Baltimore** [69] - 1:10, 8:17, 13:20, 17:25, 18:7, 18:21, 19:2, 19:3, 19:6, 19:17, 20:1, 20:11, 22:9, 23:4, 23:8, 33:19, 46:15, 50:23, 57:1, 57:7, 57:11, 59:6, 60:22, 62:11, 62:20, 64:5, 65:12, 66:9, 67:8, 67:11, 68:25, 70:1, 71:23, 72:10, 72:20, 73:9, 75:4, 77:21, 78:15, 81:10, 85:23, 85:25, 86:12, 87:11, 89:20, 90:10, 92:1, 92:12, 92:15, 93:6, 95:23, 96:13, 96:24, 97:8, 104:13, 104:21, 110:19, 111:1, 111:3, 111:25, 112:4, 113:1, 117:3, 117:12, 119:7, 119:12, 123:11, 123:19, 136:24
**bar** [3] - 114:23, 118:14, 130:18
**based** [40] - 6:24, 15:21, 16:20, 17:3, 17:5, 18:20, 22:9, 23:6, 33:19, 33:22, 33:24, 36:12, 37:5, 40:7, 40:15, 40:17, 43:6, 46:12, 47:24, 54:17, 55:10, 56:6, 56:13, 57:12, 58:24, 60:12, 69:23, 71:24, 72:9, 73:7, 100:25, 101:18, 104:16, 108:6, 115:13, 118:4, 124:23, 129:5, 137:23, 139:18
**basic** [3] - 108:23, 108:25, 110:3
**basis** [11] - 15:15, 15:18, 20:22, 29:6, 56:11, 67:17, 71:20, 100:20, 101:15, 123:14, 130:11
**Bates** [1] - 45:9
**bathing** [1] - 108:17
**Bay** [1] - 52:25
**bear** [2] - 25:4, 120:25
**bearing** [1] - 102:14
**became** [1] - 53:3
**become** [2] - 58:22, 118:16
**bedding** [2] - 90:21, 131:4
**BEFORE** [1] - 1:8
**begin** [1] - 104:20
**beginning** [1] - 51:20
**behalf** [3] - 26:21, 119:17, 135:22
**behind** [1] - 118:21
**behold** [1] - 63:22
**being** [29] - 13:14, 16:21, 35:6, 41:13, 41:20, 53:8, 55:15, 59:9, 60:9, 60:18, 65:21, 70:5, 71:13, 75:11, 75:12, 78:4, 79:5, 80:15, 82:5, 86:3, 91:1, 91:4, 92:15, 101:4, 107:23, 117:3, 121:15, 135:22, 139:4
**believe** [40] - 12:14, 13:21, 22:1, 24:4, 24:9, 24:15, 28:9, 29:10, 30:7, 31:16, 32:3, 32:16, 34:20, 35:18, 43:3, 46:21, 46:23, 47:3, 48:12, 48:19, 49:11, 78:12, 83:8, 88:22, 91:1, 91:4, 93:19, 94:20, 97:7, 101:14, 120:3, 120:4, 120:16, 120:20, 121:23, 135:10, 136:16, 136:19, 141:3, 141:6
**believed** [1] - 101:17
**Bell** [1] - 127:5
**below** [1] - 33:22
**bench** [5] - 36:21, 87:21, 88:2, 88:3, 102:25
**benchmark** [1] - 129:10
**benefit** [5] - 8:9, 23:9, 68:23, 112:18, 114:3
**besides** [2] - 22:11, 90:17
**best** [9] - 11:14, 11:20, 18:6, 18:8, 21:19, 35:9, 39:17, 40:14, 43:7
**better** [5] - 38:9, 40:17, 55:14, 75:25, 80:3
**between** [10] - 16:15, 20:16, 24:23, 29:8, 113:23, 116:20, 121:12, 140:12, 140:13
**beyond** [1] - 136:11
**BHR** [14] - 124:7, 124:23, 124:25, 125:5, 125:21, 129:4, 129:8, 130:5, 131:4, 132:4, 132:8, 132:21, 134:10, 136:7
**big** [2] - 10:17, 16:15
**biggest** [1] - 60:5
**binder** [4] - 13:21, 19:22, 19:23, 22:22
**binding** [2] - 74:13, 74:15
**bit** [6] - 24:5, 41:15, 80:10, 90:8, 99:22,

103:24
**bite** [2] - 44:14, 44:15
**Blair** [31] - 3:3, 7:25, 13:1, 13:9, 13:13, 14:11, 15:5, 16:3, 16:9, 16:20, 17:16, 24:2, 25:3, 25:9, 26:24, 37:10, 39:10, 41:2, 44:4, 45:3, 46:5, 47:5, 48:7, 50:1, 106:25, 125:17, 125:19, 125:25, 134:21, 137:19, 139:18
**Blair's** [12] - 8:14, 15:19, 17:2, 17:5, 44:10, 106:2, 126:15, 127:14, 127:18, 139:15, 140:1
**blankets** [1] - 109:4
**blends** [1] - 32:13
**board** [2] - 54:8, 139:12
**bodies** [1] - 40:19
**Bojangles** [1] - 136:2
**bond** [1] - 18:18
**book** [30] - 10:3, 10:6, 10:19, 13:19, 14:21, 17:25, 18:20, 18:21, 18:24, 20:10, 20:11, 23:7, 23:8, 27:1, 27:2, 27:23, 27:24, 28:10, 31:16, 40:12, 40:18, 64:23, 113:24
**book-in** [7] - 10:3, 18:20, 27:1, 27:23, 27:24, 28:10, 31:16
**book-in/book-out** [3] - 10:19, 18:24, 40:18
**book-in/book-outs** [1] - 10:6
**book-ins** [5] - 13:19, 17:25, 20:10, 23:7, 113:24
**book-out** [5] - 18:21, 27:2, 27:24, 28:10, 31:16
**book-outs** [6] - 10:3, 13:19, 17:25, 20:11, 23:8, 27:23
**booked** [18] - 19:1, 19:3, 23:19, 23:20, 23:23, 27:6, 27:7, 33:1, 46:2, 46:3, 46:22, 46:25, 47:4, 47:13, 47:15
**books** [2] - 14:19, 105:20
**Border** [1] - 52:2
**both** [17] - 7:24, 8:2, 24:5, 27:8, 44:11, 83:7, 114:22, 115:18, 116:25, 117:1, 117:9, 117:10, 125:6, 132:25, 137:18, 137:24, 139:13
**Botox** [2] - 80:7, 80:23
**bottle** [3] - 64:22, 64:24, 64:25
**bottom** [2] - 33:24, 45:9
**bowl** [1] - 90:7
**branch** [1] - 133:21
**break** [6] - 61:11, 61:25, 64:13, 82:13, 82:15, 99:15
**breakdown** [1] - 41:12
**breaking** [3] - 42:10, 42:11, 96:14
**breathing** [1] - 63:3
**Brendan** [1] - 4:21
**BRENDAN** [1] - 2:2
**brief** [14] - 8:14, 9:20, 10:2, 11:17, 28:14, 83:5, 106:18, 111:14, 130:10, 138:25, 139:2, 141:4, 141:7
**briefing** [4] - 10:4, 11:10, 113:7, 118:2
**briefly** [12] - 11:16, 14:13, 14:17, 14:23, 23:9, 40:4, 41:3, 41:8, 48:8, 54:19, 91:21, 137:4
**bring** [15] - 47:4, 47:17, 60:4, 64:21, 65:1, 65:3, 65:17, 76:18, 77:5, 77:8, 78:10, 109:18, 127:2, 130:22, 136:23
**bringing** [3] - 6:7, 65:18, 76:22
**broad** [4] - 35:20, 35:21, 101:10, 133:22
**broadcast** [1] - 124:18
**brought** [9] - 75:20, 76:3, 77:4, 77:14, 78:4, 95:23, 96:9, 101:4, 119:12
**brown** [1] - 132:19
**budgetary** [1] - 52:19
**building** [1] - 104:13
**bullet** [1] - 77:2
**bump** [1] - 53:18
**burden** [2] - 127:4, 131:8
**business** [1] - 8:24
**BY** [37] - 1:13, 2:2, 13:12, 17:15, 25:8, 26:18, 31:13, 34:15, 37:4, 37:15, 39:9, 41:1, 42:25, 45:2, 45:12, 47:18, 48:11, 50:8, 50:16, 56:20, 62:9, 70:16, 71:16, 73:5, 73:19, 74:25, 79:12, 80:13, 81:8, 85:6, 88:21, 89:16, 91:24, 93:16, 94:18, 95:2, 96:22

## C

**C** [14] - 1:11, 4:1, 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17
**cabin** [1] - 104:11
**calculate** [4] - 37:24, 38:13, 38:14, 41:23
**calculated** [2] - 31:25, 49:1
**calculation** [1] - 28:24
**calculations** [2] - 38:21, 47:22
**calculus** [1] - 135:11
**Calderon** [1] - 26:21
**calendar** [3] - 32:23, 105:21, 125:21
**California** [5] - 52:10, 52:25, 53:2, 73:24, 74:3
**call** [18] - 5:8, 5:15, 8:3, 8:22, 12:25, 43:10, 50:4, 50:7, 55:2, 82:9, 82:17, 83:4, 83:9, 83:10, 91:13, 94:10, 98:24, 132:16
**called** [4] - 4:5, 5:9, 44:11, 85:14
**calling** [5] - 4:3, 40:12, 82:11, 82:12, 83:7
**callous** [1] - 106:7
**calls** [1] - 132:10
**Cambridge** [1] - 14:22
**came** [4] - 87:10, 109:3, 120:6, 136:19
**camera** [1] - 83:14
**can't** [3] - 71:13, 78:8, 79:21
**canceled** [2] - 35:1, 118:13
**candid** [1] - 120:22
**candor** [1] - 121:3
**cannot** [15] - 34:24, 39:25, 49:21, 77:21, 111:15, 115:16, 126:2, 127:6, 127:16, 132:5, 134:5, 134:10, 134:18, 135:23, 140:8
**cap** [1] - 24:4
**capable** [2] - 115:13, 132:9
**capacity** [8] - 22:9, 42:11, 42:12, 71:18, 106:10, 111:4, 114:11, 136:15
**caption** [2] - 7:6, 7:13
**card** [1] - 40:9
**care** [38] - 50:24, 51:1, 52:16, 52:18, 53:16, 53:17, 53:20, 53:25, 54:14, 54:23, 54:24, 55:16, 58:3, 58:21, 62:16, 62:19, 67:8, 67:10, 67:12, 67:13, 67:16, 68:25, 69:25, 70:20, 72:7, 74:4, 75:10, 81:15, 104:19, 109:12, 109:22, 110:4, 112:6, 118:1, 130:3, 132:2, 132:19
**Care** [5] - 54:7, 54:9, 57:17, 71:25, 72:12
**cared** [2] - 107:25, 109:21
**career** [2] - 60:6, 70:19
**carry** [1] - 127:4
**case** [60] - 4:3, 4:4, 6:5, 6:13, 9:4, 12:25, 13:17, 14:2, 14:25, 20:3, 21:23, 23:1, 26:21, 39:19, 39:25, 45:5, 50:22, 52:1, 53:1, 53:3, 55:17, 62:12, 66:23, 76:13, 87:17, 92:18, 92:22, 92:25, 95:6, 95:15, 95:18, 100:17, 101:17, 111:11, 112:2, 112:3, 114:22, 115:24, 115:25, 116:23, 118:9, 118:17, 118:21, 119:3, 121:13, 123:1, 124:3, 131:13, 131:16, 131:19, 132:14, 133:10, 133:14, 134:20, 135:8, 136:16, 138:19, 140:10
**CASE** [1] - 1:4
**cases** [11] - 18:18, 23:18, 23:24, 51:25, 52:23, 53:14, 115:1, 116:15, 119:3, 119:19, 122:13
**catalog** [1] - 23:7
**categories** [3] - 16:4, 35:24, 115:20
**category** [4] - 35:19, 35:20, 37:6, 46:20
**cause** [2] - 81:23, 115:9
**caused** [2] - 115:6, 124:19
**causes** [1] - 115:23
**caveat** [1] - 71:21
**CDC** [1] - 128:24
**cell** [31] - 67:14, 67:15, 86:1, 86:3, 86:7, 86:10, 92:7, 92:13, 105:3, 105:5, 105:17, 106:5, 106:10, 106:16, 106:21, 107:3, 107:11, 107:18, 108:2, 108:7, 108:16, 113:10, 117:22, 125:23, 139:4, 139:5, 139:9, 139:11, 139:18, 140:3
**cells** [24] - 42:6, 42:7, 42:15, 67:21, 89:11, 104:10, 104:24, 105:16, 106:9, 106:12, 106:20, 107:1, 107:5, 107:9, 107:24, 108:4, 108:13, 108:17, 108:19, 108:20, 139:8, 139:13, 139:21, 140:9
**center** [4] - 60:13, 93:25, 120:6, 125:1
**Center** [4] - 1:14, 17:23, 18:3, 18:15
**centers** [3] - 64:5, 67:8, 132:18
**central** [4] - 86:15, 116:25, 125:5, 134:8
**cert** [12] - 99:19, 100:4, 100:12, 100:19, 100:22, 101:3, 103:23, 104:2, 104:6, 123:21, 123:25,

140:19
**certain** [5] - 16:4, 45:16, 58:4, 75:7, 136:17
**certainly** [7] - 17:7, 31:2, 35:23, 55:13, 56:13, 100:5, 101:7
**certainty** [2] - 75:21, 76:4
**CERTIFICATE** [1] - 142:1
**certification** [16] - 4:6, 6:1, 6:4, 6:6, 6:8, 6:11, 6:12, 101:12, 111:21, 112:17, 114:24, 120:10, 121:7, 123:8, 136:1, 137:13
**certified** [3] - 112:2, 112:14, 116:14
**Certified** [1] - 142:6
**CERTIFY** [1] - 1:8
**certify** [4] - 112:11, 118:25, 119:17, 142:8
**certifying** [2] - 115:1, 119:20
**cetera** [6] - 7:12, 101:24
**challenged** [2] - 131:8, 131:24
**challenges** [1] - 127:23
**challenging** [2] - 71:3, 98:8
**chance** [1] - 65:21
**change** [2] - 92:13, 104:15
**changed** [1] - 117:19
**changes** [7] - 21:21, 89:19, 90:9, 90:20, 93:24, 108:23, 133:17
**changing** [1] - 130:19
**characterizations** [1] - 128:9
**chart** [8] - 33:17, 33:22, 34:7, 41:5, 41:16, 41:24, 42:1, 42:13
**charts** [3] - 41:8, 41:10, 41:23
**checked** [9] - 29:10, 38:22, 38:23, 38:24, 46:12, 136:14
**checks** [1] - 111:8
**Chicago** [1] - 53:10
**chief** [1] - 111:1
**choice** [2] - 38:13, 38:18
**choose** [2] - 54:16, 113:17
**chose** [2] - 39:22, 78:13
**chosen** [2] - 107:24, 110:19
**chronic** [3] - 36:14, 54:24, 64:9
**Chung** [1] - 26:20
**CILP** [2] - 32:2, 33:23
**Circuit** [5] - 110:6, 116:9, 118:18, 131:13, 133:5
**circuit** [1] - 131:17
**Circuit's** [1] - 136:1
**circumstance** [1] - 136:20
**circumstances** [3] - 98:9, 133:11, 134:12
**citation** [1] - 74:13
**cite** [1] - 74:8
**cited** [1] - 76:21
**cites** [1] - 128:24
**citing** [1] - 136:5
**civil** [2] - 55:20, 136:23
**Civil** [1] - 2:3
**claim** [9] - 6:9, 102:11, 103:8, 104:20, 106:10, 108:22, 117:17, 117:20, 127:23
**claiming** [2] - 102:16, 116:12
**claims** [19] - 6:4, 6:6, 6:22, 6:23, 86:15, 114:13, 116:11, 116:21, 116:23, 116:25, 117:6, 117:7, 117:9, 117:25, 120:10, 134:8, 135:16, 135:21
**clarification** [6] - 18:23, 40:6, 62:8, 76:11, 80:25, 138:23
**clarified** [5] - 87:9, 89:10, 91:10, 96:4, 126:25
**clarifies** [1] - 96:17
**clarify** [11] - 12:3, 28:20, 30:20, 31:11, 32:22, 35:12, 60:24, 80:3, 91:8, 96:1, 100:19
**clarifying** [1] - 34:9
**clarity** [2] - 47:2, 102:1
**class** [62] - 4:5, 6:8, 6:10, 6:19, 93:3, 99:18, 100:4, 100:12, 100:18, 100:19, 100:22, 101:3, 101:4, 101:7, 101:9, 101:12, 101:15, 103:22, 104:2, 104:5, 111:21, 112:2, 112:11, 112:14, 112:17, 113:4, 114:17, 114:24, 115:11, 115:14, 115:16, 115:22, 116:13, 116:18, 116:19, 116:21, 117:1, 117:2, 117:7, 118:25, 119:1, 119:2, 119:4, 119:6, 119:9, 119:17, 119:18, 120:10, 123:8, 123:21, 123:25, 125:14, 127:16, 127:19, 132:7, 134:6, 134:11, 135:17, 136:1, 137:13, 140:19
**CLASS** [1] - 1:8
**class-wide** [3] - 101:15, 115:14, 125:14
**classes** [2] - 115:1, 119:20
**clause** [1] - 6:20
**clean** [1] - 108:18
**clear** [14] - 6:10, 7:13, 7:14, 63:25, 77:3, 100:5, 103:2, 103:12, 105:15, 106:11, 118:16, 118:22, 127:5, 138:11
**clearly** [3] - 26:16, 83:15, 126:17
**client** [2] - 84:3, 120:14
**clients** [2] - 120:7, 138:15
**clients'** [2] - 120:2, 136:21
**clinic** [1] - 53:18
**clinical** [1] - 52:16
**clinicians** [1] - 52:18
**clock** [3] - 40:17, 105:20, 127:12
**close** [1] - 8:24
**closer** [1] - 13:7
**clothing** [2] - 108:23, 131:4
**co** [6] - 15:1, 26:4, 26:7, 55:1, 104:5, 138:8
**co-counsel** [2] - 104:5, 138:8
**co-director** [3] - 15:1, 26:4, 26:7
**co-editor** [1] - 55:1
**cogent** [1] - 141:12
**cognitive** [1] - 80:10
**cold** [1] - 89:15
**College** [1] - 14:15
**collide** [1] - 126:25
**colloquial** [1] - 138:9
**Columbia** [1] - 1:17
**columns** [2] - 34:20, 34:21
**combined** [1] - 104:24
**come** [12] - 11:22, 22:19, 36:21, 63:13, 63:21, 65:16, 67:5, 78:23, 81:18, 87:20, 141:5, 141:11
**comes** [9] - 43:17, 43:19, 54:3, 58:16, 66:1, 71:4, 78:7, 121:19, 123:1
**comfortable** [2] - 12:23, 103:9
**coming** [13] - 9:13, 9:22, 18:13, 40:1, 58:1, 58:5, 58:19, 58:25, 63:7, 66:14, 90:15, 90:16, 90:22
**Commission** [5] - 54:7, 54:9, 57:17, 71:25, 72:11
**committed** [1] - 134:2
**common** [12] - 21:7, 114:19, 114:21, 115:9, 115:13, 115:19, 116:22, 117:7, 134:7, 134:9, 135:2
**commonality** [12] - 113:24, 114:2, 114:23, 114:24, 115:14, 115:17, 116:19, 121:14, 122:19, 127:23, 134:6, 135:7
**communicable** [1] - 59:24
**communicate** [1] - 91:12
**communicated** [1] - 10:22
**communication** [1] - 91:13
**community** [5] - 14:22, 54:22, 66:19, 104:12, 128:21
**compare** [1] - 22:4
**compared** [1] - 104:11
**comparisons** [1] - 128:8
**complain** [1] - 122:6
**complained** [1] - 121:11
**complaint** [7] - 6:17, 7:6, 36:3, 36:14, 101:13, 102:7, 103:14
**complaints** [1] - 37:7
**complete** [3] - 78:19, 94:10, 98:10
**completed** [1] - 67:2
**complex** [2] - 118:21, 134:2
**complexities** [1] - 118:23
**compliance** [2] - 54:17, 109:11
**component** [2] - 102:4, 104:6
**composed** [1] - 11:17
**comprise** [2] - 43:11, 79:17
**comprises** [2] - 80:15
**Computer** [1] - 1:25
**Computer-Aided** [1] - 1:25
**concede** [3] - 105:7, 105:12, 106:8
**conceded** [2] - 105:24, 126:16
**concern** [5] - 35:19, 78:11, 87:20, 116:1, 137:6
**concerned** [3] - 59:6, 87:17, 120:10
**concerning** [2] - 81:14, 117:15
**concerns** [7] - 35:15, 36:6, 36:8, 36:9, 37:7, 37:18, 78:3
**concluded** [3] - 99:5, 141:16
**conclusion** [9] - 16:21, 17:1, 17:11, 22:10, 76:7, 78:16, 127:25, 129:12, 130:12
**conclusions** [5] - 16:19, 18:13, 67:6, 75:19, 140:2
**conclusory** [1] - 109:7
**concrete** [1] - 130:8
**condition** [3] - 50:24, 100:7, 122:6
**conditions** [50] - 19:10, 22:8, 28:8,

32:17, 53:14, 53:15, 81:21, 92:10, 93:25, 94:1, 99:23, 102:5, 102:6, 102:9, 102:18, 104:19, 105:22, 106:23, 108:13, 110:21, 111:16, 112:6, 114:2, 116:5, 117:16, 118:1, 119:3, 119:14, 123:11, 123:18, 124:4, 124:23, 125:7, 125:11, 125:25, 126:3, 127:6, 127:7, 127:9, 127:20, 131:2, 131:17, 131:22, 131:24, 134:1, 134:9, 134:17, 136:13, 139:6, 140:15
**conduct** [3] - 109:15, 129:19, 135:4
**conducted** [5] - 20:14, 23:6, 28:7, 52:5, 128:3
**conducting** [2] - 57:22, 111:8
**confer** [2] - 102:23, 103:5
**Conference** [1] - 142:12
**conferred** [1] - 82:24
**confined** [2] - 125:24, 127:12
**confinement** [3] - 119:3, 127:6, 131:2
**confirm** [11] - 5:22, 5:24, 6:1, 6:16, 6:22, 23:13, 35:6, 36:7, 37:23, 97:1, 121:15
**confirmed** [5] - 35:13, 106:6, 107:10, 128:3, 136:7
**confirming** [2] - 48:15, 118:8
**confirms** [2] - 28:9, 106:25
**conflates** [1] - 32:8
**conform** [1] - 71:24
**conformance** [2] - 117:5, 142:11
**conforming** [1] - 72:15
**confused** [2] - 34:1, 101:18
**confusion** [1] - 5:25
**congressional** [1] - 124:17
**conjunction** [2] - 22:18, 23:1
**connect** [1] - 120:15
**Connecticut** [1] - 1:14
**connection** [1] - 138:6
**connective** [2] - 121:12, 122:4
**Connor** [3] - 115:2, 115:3, 115:21
**conscience** [1] - 119:14
**consider** [8] - 12:10, 17:2, 25:25, 29:23, 43:17, 102:15, 102:18, 137:21
**considered** [1] - 105:4
**consist** [2] - 71:18, 128:7
**consistent** [2] - 23:6, 66:18
**consistently** [4] - 124:6, 124:8, 132:1, 133:25
**constant** [1] - 91:13
**constitutes** [1] - 129:16
**Constitution** [4] - 6:21, 91:3, 128:10, 140:12
**constitutional** [17] - 90:25, 119:15, 123:12, 123:19, 125:6, 125:13, 125:19, 127:7, 129:16, 129:17, 130:19, 131:21, 132:3, 132:7, 132:15, 133:3, 140:6
**constitutionality** [2] - 124:23, 135:4
**constitutionally** [4] - 127:11, 132:25, 133:22, 134:10
**constrained** [1] - 121:21
**contact** [3] - 92:15, 120:14, 122:14
**contacted** [1] - 65:21
**container** [1] - 65:5
**contains** [1] - 127:14
**contend** [1] - 102:8
**content** [1] - 5:11
**contention** [2] - 115:13, 134:7
**contents** [1] - 56:12
**context** [7] - 79:4, 80:18, 103:10, 129:4, 132:17, 132:21, 133:5
**continue** [3] - 64:16, 81:19, 133:7
**continued** [3] - 6:18, 64:12, 136:13
**continuing** [2] - 111:25, 136:22
**contract** [2] - 65:8, 66:3
**contracted** [2] - 59:4, 109:25
**control** [1] - 136:21
**controlling** [1] - 133:5
**conversation** [1] - 83:16
**conversations** [1] - 87:2
**convince** [1] - 56:1
**Cook** [1] - 53:10
**copies** [1] - 51:6
**copy** [4] - 44:18, 44:22, 51:11, 51:12
**core** [3] - 18:10, 43:6, 116:22
**corner** [2] - 51:18, 108:15
**correct** [65] - 11:10, 23:11, 23:14, 25:18, 26:9, 26:19, 26:22, 26:23, 27:3, 27:8, 27:9, 28:11, 28:12, 29:13, 29:16, 29:18, 30:7, 32:4, 32:6, 32:25, 35:3, 35:7, 35:24, 37:25, 38:1, 40:13, 41:11, 42:16, 43:21, 46:4, 46:7, 49:11, 49:18, 50:12, 50:13, 70:21, 72:13, 72:21, 74:5, 74:6, 74:10, 76:5, 76:15, 79:15, 85:16, 85:23, 86:9, 86:13, 86:20, 86:23, 87:4, 88:24, 89:4, 92:2, 92:7, 92:10, 92:22, 92:25, 93:3, 95:9, 95:12, 103:17, 121:17, 140:23, 142:9
**corrected** [1] - 9:20
**correction** [1] - 25:20
**Correctional** [5] - 54:7, 54:9, 57:17, 71:25, 72:11
**correctional** [17] - 54:10, 54:11, 54:22, 54:23, 55:1, 55:4, 55:11, 55:18, 57:24, 58:5, 60:5, 60:8, 71:18, 80:17, 87:11, 128:19, 132:17
**Corrections** [1] - 53:2
**corrections** [2] - 54:2, 63:24
**correctly** [2] - 39:1, 39:13
**cosmetic** [3] - 79:20, 79:22, 80:7
**coughing** [1] - 63:1
**couldn't** [2] - 77:5, 97:8
**Counsel** [24] - 5:5, 6:1, 10:7, 10:21, 28:2, 36:20, 56:4, 56:18, 73:12, 82:25, 84:18, 84:22, 87:21, 88:2, 88:3, 88:5, 88:6, 88:18, 88:19, 88:20, 89:1, 98:12, 137:5, 140:21
**counsel** [36] - 4:6, 6:3, 6:9, 6:12, 8:19, 9:14, 9:25, 12:22, 33:24, 50:6, 60:23, 73:6, 74:15, 82:17, 82:24, 83:17, 87:20, 91:20, 96:19, 99:14, 100:9, 104:5, 120:2, 120:6, 120:22, 120:24, 121:16, 121:23, 122:2, 122:8, 122:13, 122:22, 138:8
**Counsel's** [1] - 126:4
**counsel's** [1] - 11:18
**count** [17] - 21:1, 24:8, 26:25, 32:18, 32:22, 40:22, 42:2, 99:21, 100:10, 100:20, 101:8, 102:7, 102:8, 102:19, 139:5
**Count** [9] - 100:9, 101:9, 102:20, 103:15, 103:25, 120:1, 121:5, 121:13, 121:15
**counted** [7] - 23:16, 23:18, 23:20, 23:22, 27:1, 27:7, 36:9
**counting** [1] - 26:25
**country** [4] - 53:1, 54:13, 112:13, 133:9
**Counts** [3] - 100:2, 101:21, 103:14
**counts** [20] - 6:2, 11:25, 20:20, 20:23, 21:25, 29:18, 32:18, 43:13, 100:12, 101:13, 101:15, 101:22, 102:1, 121:9, 121:22, 122:15, 122:23, 122:25, 126:1, 133:19
**County** [3] - 52:13, 53:10, 132:23
**county** [2] - 59:12
**couple** [8] - 5:4, 5:20, 15:25, 21:14, 53:8, 53:12, 74:21, 136:4
**course** [11] - 54:19, 99:20, 99:24, 116:16, 129:20, 130:13, 130:21, 131:8, 132:11, 136:21, 137:7
**Court** [66] - 9:23, 12:10, 14:13, 14:17, 14:23, 15:19, 16:21, 17:8, 44:5, 44:7, 44:18, 45:15, 45:20, 51:10, 51:17, 51:22, 52:4, 52:11, 52:20, 54:7, 54:20, 55:10, 55:13, 56:2, 56:5, 57:21, 60:21, 61:10, 64:7, 64:18, 67:10, 84:20, 88:13, 103:6, 104:14, 105:24, 107:7, 107:22, 110:11, 111:16, 111:20, 112:12, 113:12, 114:25, 115:9, 115:12, 116:16, 117:21, 118:3, 118:25, 119:19, 120:9, 120:23, 121:4, 121:7, 121:20, 124:22, 127:5, 133:10, 137:12, 137:20, 137:25, 138:13, 138:20, 140:19, 142:7
**COURT** [170] - 1:1, 4:10, 4:15, 4:20, 4:23, 5:1, 5:17, 5:20, 6:10, 6:15, 7:2, 7:16, 7:20, 8:1, 8:6, 8:12, 9:1, 9:8, 9:17, 10:13, 10:20, 11:12, 11:15, 12:1, 12:4, 12:7, 12:13, 12:15, 12:18, 12:22, 15:7, 15:9, 15:12, 15:18, 15:22, 16:18, 16:25, 17:13, 25:4, 26:14, 31:6, 31:10, 34:13, 36:18, 37:1, 37:8, 39:6, 40:5, 40:15, 40:23, 42:21, 44:2, 44:9, 44:17, 44:20, 44:23,

45:10, 45:22, 45:25, 47:6, 47:10, 48:6, 49:24, 50:1, 50:4, 55:5, 55:9, 56:4, 56:8, 56:18, 60:23, 61:3, 61:7, 61:12, 61:15, 61:20, 62:7, 70:12, 71:12, 72:24, 73:12, 74:15, 79:11, 79:24, 80:2, 80:9, 81:4, 81:25, 82:3, 82:8, 82:16, 82:19, 82:22, 82:25, 83:7, 83:9, 83:11, 83:20, 84:1, 84:8, 84:18, 87:8, 87:13, 87:19, 88:1, 88:4, 88:12, 88:17, 88:19, 91:9, 91:20, 91:22, 93:10, 93:13, 93:15, 93:21, 94:6, 94:8, 94:12, 94:15, 95:1, 96:2, 96:16, 96:19, 97:11, 97:15, 97:21, 97:25, 98:4, 98:7, 98:18, 99:1, 99:4, 99:11, 101:6, 101:16, 102:8, 102:14, 102:24, 103:12, 103:21, 104:7, 111:22, 119:24, 120:8, 120:19, 120:25, 121:2, 121:17, 122:4, 122:10, 122:17, 123:2, 123:20, 124:1, 126:7, 126:11, 128:16, 129:2, 134:23, 135:1, 136:12, 136:20, 137:15, 138:3, 138:23, 140:21, 141:2, 141:10, 142:17
**court** [14] - 52:21, 52:23, 52:24, 53:7, 59:14, 59:15, 61:17, 81:9, 107:16, 122:22, 140:6, 140:8, 141:7, 141:14
**court's** [1] - 79:10
**Court's** [6] - 7:13, 17:17, 23:9, 68:23, 110:24, 118:7
**court-appointed** [2] - 52:21, 81:9
**COURTROOM** [12] - 4:3, 13:2, 13:5, 13:10, 50:10, 50:14, 84:10, 84:13, 84:24, 85:3, 94:20, 94:24
**courtroom** [3] - 5:8, 5:12, 104:9
**Courtroom** [1] - 1:10
**courts** [5] - 106:15, 112:13, 119:22, 133:12, 133:24
**Courts** [2] - 116:14, 135:25
**cover** [1] - 11:16
**covered** [4] - 20:10, 35:25, 37:23, 109:4
**covers** [2] - 10:5, 89:13
**COVID** [1] - 59:25
**cram** [1] - 102:20
**cramped** [1] - 127:7
**creates** [1] - 132:6
**credibly** [1] - 111:16
**crib** [1] - 107:6
**critical** [3] - 62:21, 80:19, 80:20
**critically** [2] - 125:17, 127:8
**criticism** [1] - 10:8
**criticize** [1] - 139:16
**CROSS** [1] - 3:2
**cross** [4] - 16:23, 43:23, 55:25, 108:9
**cross-examination** [2] - 55:25, 108:9
**crosscheck** [1] - 99:16
**crosshairs** [1] - 138:5
**crossing** [1] - 25:5
**crossover** [3] - 38:2, 126:19, 127:14
**crowded** [5] - 28:5, 28:6, 49:21, 108:20, 125:25
**crowding** [18] - 19:6, 24:6, 38:10, 38:11, 49:17, 103:18, 105:23, 106:24, 107:25, 108:1, 108:3, 108:6, 108:11, 126:1, 126:22, 126:24, 127:8, 131:14
**Crowell** [2] - 1:20, 1:23
**CRR** [1] - 142:17
**crunch** [1] - 10:16
**crux** [1] - 115:4
**cup** [3] - 89:25, 90:3, 90:4
**current** [6] - 6:11, 7:8, 87:3, 87:5, 90:13, 97:4
**currently** [1] - 7:9
**custodial** [1] - 69:19
**custody** [10] - 62:16, 62:22, 69:17, 69:18, 106:8, 109:22, 110:15, 111:19, 112:25, 133:23
**cut** [1] - 93:20
**CV** [8] - 14:7, 14:8, 14:11, 14:24, 26:20, 51:20, 52:3, 54:19
**cycle** [2] - 132:22, 135:13

## D

**D** [9] - 3:1, 4:1, 13:11, 39:8, 45:1, 50:15, 81:7, 85:5, 94:17
**D.N.N** [16] - 1:3, 3:9, 4:3, 76:22, 77:13, 83:19, 94:19, 94:21, 95:3, 98:5, 98:9, 98:12, 100:18, 117:8, 117:13, 120:21
**dAGEN** [1] - 45:19
**DAGEN** [55] - 1:13, 4:8, 5:13, 7:19, 7:21, 8:2, 8:7, 8:13, 9:2, 9:10, 12:17, 12:19, 12:24, 13:12, 15:4, 17:14, 17:15, 25:2, 36:15, 39:7, 39:9, 40:25, 41:1, 42:19, 44:3, 44:16, 44:18, 44:21, 44:25, 45:2, 45:8, 45:11, 45:12, 45:24, 46:2, 47:8, 47:12, 47:18, 48:4, 49:25, 82:10, 83:21, 84:5, 87:12, 87:15, 91:21, 91:24, 93:11, 93:14, 93:16, 94:4, 97:10, 98:6, 98:16, 99:3
**Dagen** [8] - 3:3, 3:8, 4:8, 5:23, 40:24, 43:1, 44:13, 98:5
**Dagen's** [2] - 9:19, 83:2
**daily** [21] - 10:3, 10:24, 10:25, 11:8, 11:19, 11:22, 16:12, 20:19, 20:23, 21:1, 21:25, 24:8, 29:6, 31:25, 32:18, 32:22, 40:22, 42:2, 67:17, 105:25
**danger** [1] - 58:22
**dangerous** [3] - 65:5, 65:19, 110:22
**DANIELLA** [1] - 1:19
**Daniella** [1] - 4:16
**Data** [2] - 15:2, 26:4
**data** [73] - 11:4, 13:19, 14:20, 15:5, 15:20, 16:3, 16:4, 16:6, 16:10, 16:20, 17:6, 17:7, 18:12, 19:25, 20:9, 20:12, 20:16, 20:21, 20:22, 21:15, 21:18, 21:23, 22:6, 22:18, 23:1, 23:18, 26:5, 26:7, 27:15, 28:10, 28:15, 28:17, 28:18, 28:23, 29:7, 30:23, 31:14, 32:1, 32:2, 33:4, 33:19, 33:21, 33:22, 33:24, 36:17, 39:15, 40:16, 43:12, 45:4, 46:13, 46:17, 59:8, 66:8, 69:3, 72:5, 106:2, 108:7, 113:23, 114:4, 124:23, 126:13, 126:14, 126:16, 126:17, 127:20, 128:20, 134:20, 134:21, 134:22, 139:19, 140:1, 140:3
**dataset** [17] - 17:21, 17:24, 18:1, 18:14, 18:17, 18:20, 18:22, 20:15, 21:4, 21:16, 22:2, 22:11, 26:11, 31:2, 32:2, 34:23, 35:10
**datasets** [12] - 16:1, 17:20, 17:21, 18:4, 18:6, 18:13, 19:4, 20:17, 21:17, 23:7, 26:12, 35:8
**date** [10] - 18:25, 19:2, 23:19, 23:20, 27:1, 27:2, 27:3, 48:12, 59:15
**Dated** [1] - 142:14
**dates** [2] - 18:24, 27:24
**day** [43] - 11:22, 11:25, 16:17, 18:20, 20:22, 23:4, 23:21, 23:23, 24:1, 24:9, 27:1, 32:24, 33:19, 34:7, 34:8, 38:4, 38:15, 38:19, 41:4, 41:16, 47:21, 48:19, 49:2, 49:4, 49:13, 80:22, 96:10, 96:18, 96:25, 105:18, 105:21, 118:19, 124:11, 125:21, 127:21, 137:18, 142:14
**day-by-day** [1] - 20:22
**day-to-day** [3] - 47:21, 118:19, 127:21
**days** [47] - 10:10, 10:11, 21:6, 21:10, 21:20, 24:6, 24:7, 30:6, 30:7, 30:14, 30:16, 30:19, 30:24, 32:9, 32:10, 32:13, 33:5, 34:10, 34:11, 34:16, 34:17, 39:22, 45:14, 48:24, 49:7, 49:9, 58:10, 58:15, 59:14, 59:18, 60:19, 75:12, 78:23, 96:12, 105:2, 105:10, 105:16, 108:17, 109:2, 111:5, 125:4, 127:14, 127:22, 133:2, 134:13
**DC** [4] - 1:15, 1:18, 1:24, 2:4
**de** [2] - 43:10, 113:14
**deal** [1] - 68:20
**dealing** [2] - 69:18, 69:19
**death** [2] - 111:18, 116:10
**December** [7] - 85:17, 105:5, 139:6, 139:7, 139:8, 139:10
**decertify** [1] - 116:18
**decide** [1] - 54:16
**decided** [3] - 93:23, 115:1, 115:3
**deciding** [2] - 15:12, 93:17
**decision** [2] - 108:10, 141:14
**decisions** [6] - 18:18, 68:22, 106:17, 106:19, 133:8, 133:25
**declarants** [2] - 114:8, 115:18
**declaration** [24] - 8:16, 10:8, 10:15, 22:20, 22:23, 22:25, 23:3, 23:11, 33:12, 38:7, 74:8, 85:15, 85:17, 87:2, 88:23, 89:2, 90:25, 95:8, 109:1, 120:17, 126:5, 126:8, 126:12, 126:14

**declarations** [20] - 22:17, 66:23, 66:24, 67:3, 76:8, 76:10, 77:16, 87:16, 95:5, 95:11, 106:3, 108:24, 114:4, 118:4, 118:6, 118:8, 118:11, 122:20, 135:19, 135:23
**declaratory** [2] - 119:5, 119:8
**declare** [1] - 6:18
**decompensate** [1] - 58:22
**deduction** [2] - 35:13, 36:23
**defeat** [1] - 115:16
**defeats** [2] - 127:22, 135:6
**defendant** [2] - 12:8, 129:22
**defendant/ respondents** [1] - 7:8
**defendants** [75] - 4:22, 4:25, 5:14, 8:18, 9:5, 11:5, 12:9, 17:10, 20:10, 20:15, 20:17, 22:11, 22:18, 28:16, 28:18, 28:20, 46:18, 57:4, 66:6, 82:11, 100:15, 104:9, 104:12, 104:15, 105:1, 105:5, 105:7, 105:10, 105:24, 106:6, 106:11, 106:21, 107:8, 107:10, 107:15, 107:17, 107:22, 107:25, 108:18, 108:21, 109:2, 109:6, 109:9, 109:21, 109:23, 109:25, 110:3, 110:9, 110:15, 110:18, 110:20, 110:22, 111:14, 111:15, 111:17, 113:17, 113:21, 116:12, 117:19, 118:15, 121:24, 124:5, 126:13, 127:4, 131:3, 132:3, 139:15, 139:19, 139:22, 139:23, 139:25, 140:4, 140:24
**DEFENDANTS** [1] - 2:1
**Defendants** [2] - 1:6, 113:14
**defendants'** [21] - 8:16, 8:19, 9:13, 21:23, 23:1, 28:15, 33:24, 45:4, 100:13, 100:14, 106:2, 107:14, 108:6, 112:7, 112:25, 116:24, 119:1, 119:16, 130:1, 135:4, 137:11
**defense** [4] - 55:5, 82:24, 94:12, 123:5
**defenses** [2] - 117:6, 117:9
**deference** [1] - 131:7
**deficiencies** [1] - 112:20
**deficient** [1] - 125:18
**define** [1] - 35:21
**defined** [1] - 80:19
**definitely** [2] - 79:7, 120:23
**definition** [5] - 101:4, 101:7, 101:9, 109:21, 116:16
**degree** [3] - 52:8, 75:21, 76:4
**delay** [4] - 9:11, 59:18, 65:23, 65:24
**delayed** [1] - 136:9
**delays** [2] - 77:10, 124:20
**deliberate** [1] - 109:21
**deliberately** [3] - 107:15, 129:20, 140:5
**delivered** [2] - 77:22, 96:23
**demanding** [1] - 123:15
**demonstrate** [2] - 78:6, 131:21
**demonstrated** [1] - 135:24
**demonstrates** [2] - 123:11, 123:18
**demonstrative** [2] - 46:13, 48:13
**demonstratives** [1] - 44:5
**denial** [2] - 130:4, 132:2
**denied** [3] - 108:25, 112:16, 123:9
**deny** [2] - 137:13
**Department** [3] - 2:3, 53:2, 115:2
**depend** [1] - 67:24
**depends** [1] - 127:8
**deploys** [1] - 129:11
**Deportation** [2] - 15:2, 26:4
**deposition** [5] - 57:10, 63:13, 113:9, 114:5, 124:13
**deprivation** [3] - 99:25, 120:2, 121:11
**deprive** [1] - 113:19
**DEPUTY** [12] - 4:3, 13:2, 13:5, 13:10, 50:10, 50:14, 84:10, 84:13, 84:24, 85:3, 94:20, 94:24
**describe** [4] - 18:24, 115:18, 126:6, 126:13
**described** [3] - 26:24, 63:15, 115:20
**design** [4] - 14:19, 14:20, 25:17, 125:1
**designated** [2] - 42:8, 42:9
**designed** [5] - 70:23, 72:20, 104:21, 104:23, 113:16
**DeSimone** [49] - 2:2, 3:6, 3:10, 4:24, 4:25, 55:7, 55:23, 56:7, 56:17, 61:5, 61:9, 61:14, 70:13, 70:14, 70:16, 71:10, 71:14, 71:16, 72:24, 73:4, 73:5, 73:18, 73:19, 74:16, 74:25, 79:10, 79:12, 80:5, 80:6, 80:12, 80:13, 81:2, 81:25, 82:1, 82:23, 82:25, 94:16, 94:18, 95:1, 95:2, 96:21, 96:22, 97:18, 97:19, 97:23, 98:2, 98:23, 137:18, 138:8
**despair** [1] - 58:13
**despite** [1] - 136:14
**destination** [1] - 35:2
**destroyed** [1] - 139:23
**destruction** [1] - 108:7
**detail** [1] - 26:25
**detailed** [3] - 78:22, 79:3, 114:9
**details** [2] - 48:15, 73:25
**detained** [29] - 19:18, 33:18, 35:9, 64:16, 70:5, 81:11, 86:12, 92:1, 92:7, 92:12, 93:6, 95:14, 95:20, 96:6, 96:12, 105:12, 106:3, 107:1, 107:2, 112:4, 113:19, 114:14, 114:15, 114:19, 116:4, 119:12, 119:13, 130:14, 136:14
**detainee** [12] - 40:10, 41:20, 42:3, 76:8, 77:20, 79:5, 125:24, 126:3, 127:11, 130:3, 130:9, 135:5
**detainees** [30] - 29:8, 29:21, 31:17, 32:14, 39:20, 41:13, 41:16, 41:20, 42:3, 42:14, 60:3, 76:13, 76:17, 78:13, 87:2, 90:25, 97:7, 124:10, 125:3, 125:10, 128:6, 129:8, 130:20, 130:22, 132:10, 134:18, 134:19, 135:12, 136:10, 136:23
**detention** [49] - 6:18, 17:25, 19:17, 25:20, 25:24, 31:20, 38:3, 45:20, 53:14, 55:20, 57:12, 57:14, 57:20, 58:10, 58:18, 60:13, 64:4, 64:8, 64:19, 67:8, 69:15, 70:24, 71:24, 73:8, 73:22, 74:4, 93:25, 95:24, 104:22, 105:10, 106:2, 110:9, 110:13, 111:2, 113:15, 120:5, 120:7, 125:1, 128:9, 129:6, 129:7, 129:18, 133:1, 133:4, 134:1, 140:11, 140:13, 140:14
**detentions** [1] - 35:3
**deteriorated** [1] - 140:7
**determination** [1] - 116:3
**determine** [5] - 27:22, 38:9, 53:19, 54:13, 54:14
**determining** [2] - 28:5, 63:6
**develop** [2] - 67:15, 81:20
**developed** [3] - 60:10, 81:17, 123:10
**developing** [1] - 52:17
**development** [1] - 8:14
**deviation** [1] - 135:6
**DHS** [1] - 136:6
**diabetes** [5] - 63:23, 64:10, 78:24, 80:8, 97:2
**diabetic** [2] - 96:7, 96:8
**diagnosis** [1] - 128:2
**diapers** [1] - 109:1
**did** [65] - 8:22, 9:19, 17:20, 18:4, 18:12, 18:21, 21:24, 22:4, 22:13, 22:19, 23:9, 24:13, 24:15, 24:20, 28:4, 29:3, 29:4, 29:5, 30:19, 30:25, 31:23, 31:24, 33:5, 33:7, 34:2, 35:6, 36:20, 41:3, 41:23, 45:4, 47:2, 48:23, 49:7, 51:3, 51:5, 52:6, 52:9, 53:18, 54:21, 56:24, 67:3, 72:3, 77:12, 78:13, 83:1, 83:22, 86:20, 87:5, 87:16, 92:13, 95:24, 96:9, 97:16, 99:15, 102:6, 107:8, 111:14, 116:14, 121:22, 121:24, 131:20, 134:20, 136:19
**didn't** [18] - 9:22, 20:5, 30:18, 31:3, 31:4, 61:14, 67:1, 72:17, 76:9, 77:5, 77:17, 77:18, 88:9, 89:12, 96:18, 127:2
**dietary** [1] - 124:11
**diets** [1] - 90:14
**difference** [6] - 20:24, 21:2, 21:10, 21:22, 48:3, 115:15
**differences** [3] - 20:16, 20:25, 21:13
**different** [26] - 16:1, 18:18, 20:25, 21:14, 21:17, 21:20, 22:8, 23:7, 32:13, 35:24, 38:12, 47:21, 49:7, 54:25, 73:16, 90:14, 112:13, 115:7, 124:5, 133:10, 133:11, 133:12, 134:12, 135:12
**differently** [3] - 17:9, 75:17, 115:8
**difficult** [1] - 99:22

**difficulties** [2] - 82:4, 120:22
**difficulty** [2] - 63:3, 120:5
**dire** [4] - 15:9, 15:14, 17:3, 55:6
**DIRECT** [1] - 3:2
**direct** [4] - 16:13, 52:18, 84:25, 110:24
**directed** [1] - 99:14
**direction** [2] - 62:15, 69:20
**directives** [1] - 60:25
**directly** [4] - 8:11, 13:7, 26:15, 76:13
**director** [9] - 15:1, 26:4, 26:7, 52:15, 57:7, 57:11, 69:9, 111:1
**dirty** [1] - 92:7
**disagree** [3] - 37:1, 138:15
**disclose** [4] - 78:14, 88:4, 88:6, 95:24
**disclosed** [2] - 96:7, 96:8
**disconnect** [2] - 61:8, 82:5
**disconnecting** [1] - 98:13
**discounted** [1] - 125:16
**discover** [1] - 63:23
**discovery** [33] - 10:5, 10:6, 11:4, 11:6, 16:2, 16:6, 20:10, 22:2, 28:10, 28:16, 28:19, 31:14, 32:1, 48:25, 60:25, 62:5, 62:12, 65:12, 69:1, 100:24, 100:25, 107:7, 112:18, 113:22, 114:4, 121:21, 123:11, 124:5, 126:14, 130:15, 134:20
**discuss** [5] - 5:10, 57:19, 64:6, 67:9, 111:24
**discussed** [13] - 39:23, 46:18, 47:23, 48:12, 48:16, 92:18, 92:24, 93:2, 112:10, 114:22, 120:21, 135:8, 139:3
**discussing** [3] - 24:12, 39:10, 104:20
**Discussion** [1] - 121:1
**discussion** [2] - 30:25, 100:4
**disease** [2] - 63:23, 78:24
**diseases** [4] - 59:24, 109:16, 110:1, 110:2
**disparate** [1] - 114:8
**displayed** [1] - 106:7
**displays** [1] - 33:18
**dispute** [1] - 132:3
**disputed** [2] - 126:5, 134:18
**disregard** [2] - 105:24, 106:7
**dissonance** [1] - 80:10
**distinct** [1] - 104:17
**distinction** [1] - 16:15
**distinguish** [1] - 140:12
**distorted** [1] - 124:4
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [4] - 113:13, 114:25, 142:7
**district** [2] - 119:22, 133:12
**Division** [1] - 2:3
**DIVISION** [1] - 1:2
**do** [84] - 7:3, 7:4, 8:10, 9:11, 9:24, 11:2, 11:5, 15:15, 15:24, 20:7, 20:12, 25:13, 25:25, 27:25, 28:2, 29:1, 29:3, 29:4, 29:17, 30:7, 31:23, 31:24, 35:3, 37:10, 37:16, 39:13, 43:8, 44:13, 45:14, 46:8, 49:20, 53:15, 56:5, 56:7, 58:21, 61:23, 63:13, 63:14, 63:23, 65:1, 65:3, 69:20, 74:15, 78:18, 78:20, 78:21, 78:25, 82:8, 82:14, 82:16, 83:3, 83:4, 86:6, 88:4, 90:17, 97:6, 97:18, 98:23, 98:25, 99:11, 102:8, 103:6, 107:19, 107:24, 108:21, 113:22, 115:15, 117:8, 118:20, 118:22, 125:12, 127:1, 127:4, 130:23, 131:2, 132:3, 133:12, 133:13, 138:25, 139:18, 140:16, 140:17, 142:7
**doctor** [14] - 15:25, 51:20, 52:20, 55:6, 55:14, 61:16, 64:18, 67:7, 67:25, 68:19, 76:11, 78:13, 80:2, 80:14
**Doctor** [16] - 25:13, 52:4, 53:11, 54:5, 54:18, 57:16, 60:20, 61:3, 62:10, 64:3, 68:5, 68:23, 69:14, 75:1, 80:25, 82:6
**doctor's** [1] - 61:23
**doctors** [4] - 68:6, 68:10, 89:13, 113:12
**document** [6] - 13:24, 19:24, 22:19, 57:5, 120:12, 130:1
**documented** [2] - 128:2, 130:4
**documents** [6] - 50:23, 56:24, 57:4, 69:24, 76:12, 122:3
**Doe** [1] - 122:21
**does** [37] - 5:6, 6:11, 9:8, 9:13, 21:3, 27:10, 34:6, 45:3, 46:4, 46:10, 55:5, 55:10, 74:12, 74:19, 75:3, 75:15, 77:8, 79:17, 85:15, 87:3, 101:25, 102:4, 109:14, 109:15, 109:16, 109:18, 109:19, 114:21, 115:23, 116:17, 117:6, 129:11, 130:6, 133:5, 133:21, 138:12, 140:12
**Does** [2] - 115:2, 115:25
**doing** [8] - 16:10, 25:11, 43:6, 59:21, 85:9, 104:12, 137:3, 137:8
**done** [12] - 9:3, 11:12, 16:7, 23:14, 48:4, 57:14, 60:14, 60:17, 74:1, 85:14, 115:15, 131:12
**door** [2] - 59:22, 65:16
**doubly** [1] - 23:16
**doubt** [2] - 78:1, 118:6
**down** [6] - 42:10, 42:11, 50:2, 85:4, 94:25, 102:2
**dozens** [1] - 105:19
**Dr** [65] - 7:25, 16:3, 16:9, 17:2, 25:9, 26:24, 50:7, 50:17, 50:22, 51:3, 51:6, 55:4, 55:10, 55:18, 56:11, 56:21, 61:21, 62:1, 65:10, 66:5, 66:22, 69:14, 69:23, 70:8, 70:17, 70:19, 71:14, 71:17, 71:22, 72:25, 73:6, 73:20, 74:7, 75:18, 77:12, 77:20, 79:2, 79:13, 81:9, 81:24, 82:3, 106:2, 106:25, 110:11, 110:21, 110:23, 125:17, 125:19, 125:25, 127:14, 127:25, 128:1, 128:11, 129:3, 129:14, 130:7, 134:21, 137:19, 138:7, 138:11, 138:18, 139:15, 139:18, 140:1
**draft** [1] - 13:25
**dramatically** [1] - 127:21
**draw** [4] - 38:20, 40:4, 119:25, 130:11
**drawn** [2] - 16:20, 128:7
**drive** [1] - 114:21
**drug** [2] - 58:7, 64:23
**due** [2] - 6:20, 8:20
**duplicates** [1] - 18:16
**Durant** [16] - 8:16, 8:22, 10:8, 11:3, 11:21, 12:8, 22:21, 22:23, 22:25, 23:3, 44:6, 108:8, 126:5, 126:7, 126:12, 126:14
**Durant's** [3] - 11:15, 23:10, 105:25
**duration** [9] - 19:16, 29:7, 38:3, 62:4, 95:15, 105:9, 126:20, 126:24, 127:10
**durations** [1] - 126:2
**duress** [1] - 36:4
**during** [25] - 16:17, 19:8, 19:10, 23:21, 24:1, 31:20, 32:23, 58:15, 60:25, 76:14, 78:14, 95:14, 96:12, 99:15, 107:7, 124:19, 125:11, 128:4, 130:5, 130:15, 132:11, 134:14, 136:12
**duties** [1] - 57:8
**duty** [2] - 68:7, 68:12
**dying** [1] - 89:14
**dynamic** [1] - 125:5


## E


**E** [31] - 1:11, 3:1, 4:1, 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17
**each** [25] - 8:4, 18:8, 18:17, 18:20, 19:18, 23:18, 23:22, 28:11, 31:16, 31:19, 33:19, 42:1, 42:11, 43:20, 100:10, 108:16, 113:8, 114:17, 115:7, 117:25, 118:6, 135:5, 139:17
**earlier** [7] - 33:17, 33:20, 44:5, 72:2, 90:18, 99:17, 137:17
**easiest** [1] - 29:5
**easily** [4] - 69:20, 113:4, 114:2, 119:1
**eat** [3] - 91:16, 91:17, 117:20
**ECF** [7] - 117:21, 120:12, 120:17, 120:19, 120:21, 121:3
**editor** [2] - 55:1
**education** [2] - 17:5, 55:12
**educational** [2] - 14:8, 14:13
**effect** [1] - 74:17
**effectively** [1] - 100:10
**effort** [2] - 37:18, 133:3
**eight** [4] - 86:2, 86:3, 86:24, 86:25
**either** [14] - 25:15, 25:16, 33:11, 38:10, 43:7, 46:2, 59:14, 62:16, 65:17, 82:17, 83:4, 114:17, 129:24, 132:3
**elaborate** [1] - 41:3
**elected** [2] - 106:4, 113:14
**elective** [1] - 79:17
**element** [1] - 103:9
**elevated** [2] - 33:5, 34:3
**eliminate** [1] - 131:20
**else** [11] - 5:10, 12:13, 39:5, 42:21, 44:2,

48:6, 49:24, 89:17, 94:4, 94:6, 94:7
**elsewhere** [1] - 118:18
**emergency** [3] - 78:9, 132:8, 132:12
**emergent** [2] - 109:17, 132:10
**employee** [2] - 40:9, 129:18
**employees** [1] - 110:13
**encompass** [3] - 36:13, 37:6, 37:20
**encompassed** [1] - 37:12
**encounter** [1] - 128:2
**end** [2] - 22:2, 46:10
**ended** [2] - 64:1, 78:20
**ends** [2] - 46:11, 121:20
**enduring** [1] - 117:22
**enforce** [2] - 106:22, 109:10
**enforced** [2] - 106:12, 106:21
**enforcement** [6] - 15:3, 25:23, 57:2, 133:21, 133:23, 137:3
**engage** [1] - 8:11
**engagement** [2] - 26:20, 135:24
**engaging** [1] - 124:15
**English** [2] - 83:22, 84:5
**enlighten** [1] - 103:3
**enormous** [1] - 140:10
**enough** [3] - 6:15, 135:1, 138:3
**ensure** [5] - 64:15, 81:13, 109:24, 110:15, 112:9
**ensuring** [2] - 81:18, 122:15
**enter** [1] - 66:17
**entered** [4] - 52:2, 100:23, 121:21, 134:4
**entering** [1] - 113:2
**enters** [2] - 59:20, 60:1
**entertained** [1] - 100:21
**entire** [3] - 95:14, 115:10, 128:14
**entirely** [2] - 135:11, 136:20
**entirety** [1] - 99:13
**entitled** [4] - 123:16, 124:21, 131:7, 142:10
**entity** [1] - 28:21
**entries** [1] - 35:7
**entry** [1] - 60:14
**environment** [1] - 131:15
**episodic** [2] - 124:24, 125:9
**equipped** [1] - 113:16
**equities** [1] - 133:15
**erase** [1] - 118:6
**ERO** [6] - 58:18, 67:19, 74:18, 75:3, 111:1
**err** [1] - 116:12
**errors** [1] - 11:15
**especially** [2] - 59:25, 109:9
**ESQUIRE** [5] - 1:13, 1:16, 1:19, 2:2, 2:2
**essential** [4] - 54:2, 57:23, 80:20, 80:21
**essentially** [3] - 10:16, 22:6, 22:7
**establish** [6] - 125:12, 126:2, 127:16, 130:6, 132:5, 132:14
**established** [1] - 135:15
**estimate** [1] - 139:18
**et** [10] - 1:3, 1:5, 4:3, 4:4, 7:12, 101:24
**evaluate** [1] - 135:25
**evaluating** [1] - 69:10
**evaluation** [1] - 69:8
**even** [17] - 40:2, 40:3, 59:18, 60:3, 63:21, 69:18, 72:6, 79:4, 83:13, 99:6, 105:20, 106:11, 106:21, 107:4, 110:20, 129:21, 136:11
**evening** [1] - 90:7
**evenly** [1] - 42:16
**event** [1] - 76:19
**ever** [5] - 24:1, 59:17, 77:12, 86:6, 90:22
**every** [18] - 11:22, 11:25, 26:19, 45:22, 45:23, 45:25, 49:12, 105:7, 108:5, 110:12, 112:3, 113:8, 114:19, 117:2, 119:6, 122:6, 124:12, 140:14
**everybody** [3] - 11:6, 101:10, 102:1
**everyone** [6] - 12:23, 44:22, 45:24, 54:3, 78:6, 99:6
**everywhere** [1] - 140:16
**evidence** [16] - 9:5, 9:9, 99:5, 106:1, 106:6, 107:15, 108:11, 109:6, 109:7, 113:3, 114:3, 118:5, 121:19, 121:22, 139:25, 140:5
**evidentiary** [4] - 109:9, 112:15, 117:18, 133:13
**exacerbated** [1] - 105:22
**exacerbation** [1] - 81:21
**exact** [5] - 39:18, 112:14, 117:5, 139:11, 139:17
**exactly** [6] - 20:21, 20:22, 23:17, 65:4, 139:17, 139:21
**examination** [6] - 15:11, 55:25, 56:11, 91:20, 100:14, 108:9
**examine** [2] - 10:3, 13:19
**examined** [1] - 127:6
**example** [10] - 7:11, 27:5, 33:11, 38:20, 41:7, 41:15, 42:13, 63:18, 79:25, 80:6
**examples** [2] - 90:4, 90:5
**exceeded** [5] - 23:12, 24:3, 30:6, 30:16, 49:9
**exceeding** [3] - 24:6, 111:4, 129:7
**except** [1] - 41:24
**exception** [1] - 100:9
**excess** [2] - 24:12, 24:19
**exchange** [1] - 101:18
**excluded** [1] - 35:1
**excuse** [4] - 27:23, 74:12, 108:21, 130:23
**excused** [2] - 5:9, 50:2
**executive** [2] - 133:21, 134:3
**exercise** [2] - 105:20, 106:20
**Exhibit** [6] - 13:22, 17:19, 19:22, 22:22, 48:14, 110:25
**exhibit** [4] - 10:3, 10:4, 30:9, 51:8
**exhibiting** [3] - 62:25, 68:14, 68:15
**exhibits** [2] - 51:7, 124:21
**exist** [3] - 58:21, 63:10, 115:15
**existing** [1] - 81:21
**exists** [1] - 115:21
**expanded** [1] - 53:1
**expect** [2] - 48:2, 138:20
**expected** [1] - 42:10
**expedited** [2] - 100:24, 123:10
**expeditiously** [1] - 83:3
**experience** [14] - 17:4, 17:5, 32:15, 54:8, 55:12, 58:8, 66:13, 73:20, 74:2, 74:3, 74:4, 86:19, 86:20, 111:25
**experienced** [7] - 22:8, 41:20, 111:25, 117:11, 117:13, 125:11, 135:6
**experiences** [10] - 14:9, 14:18, 14:24, 25:16, 51:23, 52:21, 73:21, 115:19, 120:13, 128:7
**expert** [37] - 8:5, 8:15, 9:6, 10:2, 10:7, 13:25, 15:5, 15:20, 17:3, 17:6, 17:9, 19:25, 20:14, 26:19, 31:7, 33:17, 36:25, 52:1, 52:21, 53:9, 53:13, 53:14, 55:4, 55:11, 55:21, 55:25, 56:3, 72:14, 72:19, 73:1, 73:13, 123:12, 125:15, 130:18, 138:12, 138:20
**expertise** [3] - 25:25, 36:16, 73:22
**experts** [5] - 5:6, 7:24, 8:8, 53:3, 114:3
**explain** [15] - 21:12, 34:24, 41:8, 41:15, 42:5, 51:16, 57:21, 64:7, 64:18, 66:7, 66:24, 67:10, 91:3, 94:9, 97:15
**explained** [4] - 21:21, 39:25, 75:5, 139:4
**explanation** [1] - 107:16
**explanations** [1] - 107:13
**explicit** [1] - 73:7
**explore** [1] - 16:23
**expose** [2] - 112:25, 114:15
**exposed** [9] - 112:4, 115:5, 117:2, 117:10, 117:14, 119:14, 126:4, 127:17, 127:19
**exposure** [8] - 32:8, 38:13, 110:1, 115:10, 116:10, 121:18, 127:10, 135:5
**express** [1] - 16:12
**expressed** [1] - 55:14
**expressing** [1] - 137:6
**expressly** [1] - 129:6
**extended** [2] - 126:24, 127:12
**extensively** [1] - 8:18
**extent** [4] - 5:7, 38:10, 93:8, 134:23
**extracted** [2] - 16:3, 33:20
**extraordinary** [1] - 123:16
**extrapolating** [1] - 128:13
**extreme** [2] - 136:9, 136:13
**extremely** [5] - 58:16, 59:25, 68:17, 69:16, 89:15
**extremities** [1] - 89:15

## F

**F** [2] - 45:1, 48:10
**face** [2] - 114:8, 129:23
**faced** [1] - 115:7
**faces** [1] - 116:7
**facilities** [34] - 18:1, 54:13, 54:16, 54:22, 57:3, 58:5, 58:18, 59:3, 59:4, 60:18, 64:19, 67:20, 70:23, 71:18, 72:4, 72:8, 74:10, 74:14, 74:19, 74:20, 75:4, 79:3, 82:14, 98:14, 106:19, 108:17, 110:17, 111:6, 119:23, 129:6, 132:18, 133:1
**Facility** [2] - 13:20, 59:7
**facility** [93] - 18:8, 19:11, 19:12, 23:15,

25:20, 27:11, 27:16, 37:25, 42:12, 50:24, 51:2, 55:20, 57:24, 58:2, 58:19, 58:25, 59:3, 59:19, 59:21, 60:1, 60:15, 62:20, 63:7, 64:8, 64:12, 64:13, 66:9, 66:14, 66:16, 66:17, 68:4, 68:6, 68:8, 68:10, 68:12, 69:15, 70:1, 70:6, 71:23, 72:10, 72:20, 73:24, 74:24, 75:4, 75:8, 75:9, 76:23, 78:7, 78:10, 78:15, 81:10, 87:3, 87:5, 90:13, 90:20, 95:24, 96:13, 97:5, 102:6, 103:20, 104:22, 105:2, 105:9, 105:13, 106:1, 108:1, 108:2, 109:14, 109:19, 110:14, 110:21, 111:4, 113:2, 113:11, 113:15, 113:17, 113:19, 115:5, 115:7, 117:24, 118:20, 121:24, 122:1, 122:14, 122:24, 124:25, 126:23, 129:12, 129:18, 129:20, 133:4, 135:12, 140:7
**facing** [1] - 119:22
**facsimile** [1] - 55:20
**fact** [20] - 5:5, 5:8, 5:14, 10:7, 11:3, 29:21, 47:24, 47:25, 56:5, 58:18, 64:24, 66:19, 69:9, 75:19, 76:2, 76:21, 98:12, 105:7, 118:22, 136:7
**facto** [1] - 113:14
**factor** [1] - 78:13
**factors** [3] - 100:8, 102:15, 127:17
**facts** [2] - 109:14, 133:10
**factual** [3] - 115:15, 123:10, 123:18
**fail** [1] - 123:14
**failed** [5] - 107:11, 110:9, 129:3, 129:23, 139:24
**failure** [8] - 107:14, 108:6, 108:8, 114:12, 114:13, 115:6, 125:13, 130:8
**failures** [2] - 112:20, 132:19
**fair** [18] - 6:15, 11:7, 27:16, 27:20, 31:4, 32:12, 34:10, 34:14, 36:3, 36:12, 37:5, 38:7, 38:8, 70:19, 116:3, 135:1, 138:2, 138:3
**fairly** [3] - 58:15, 70:2, 83:5
**fall** [2] - 115:20, 136:3
**false** [1] - 107:11
**falsity** [1] - 134:7
**familiar** [3] - 69:21, 74:1, 85:15
**families** [2] - 60:4, 60:10
**family** [9] - 52:9, 65:17, 76:22, 77:7, 77:22, 78:5, 78:8, 91:12, 130:23
**far** [6] - 59:6, 76:11, 106:15, 120:10, 131:17, 140:7
**fatalities** [1] - 111:12
**fault** [1] - 101:19
**featured** [1] - 111:13
**February** [14] - 19:9, 22:1, 57:6, 62:6, 62:13, 65:13, 66:10, 69:1, 69:10, 85:20, 95:8, 105:1, 110:25, 113:23
**feces** [1] - 109:4
**federal** [9] - 52:23, 52:24, 53:7, 104:13, 122:22, 133:17, 133:20, 140:6, 140:8
**FEDERAL** [1] - 142:17
**feed** [1] - 98:14
**feel** [3] - 24:16, 58:14, 70:2
**feeling** [3] - 63:19, 89:13, 89:14
**feet** [8] - 106:13, 106:16, 106:17, 107:5, 107:6, 139:9, 139:11
**fell** [2] - 21:6, 21:10
**felt** [3] - 29:4, 69:12, 89:11
**female** [4] - 42:4, 134:19, 139:8, 139:12
**feminine** [1] - 124:10
**few** [9] - 7:21, 23:13, 33:2, 42:22, 58:10, 58:15, 78:1, 97:19, 125:4
**fewer** [9] - 23:4, 24:14, 24:21, 40:3, 75:20, 76:3, 106:13, 113:16, 134:19
**field** [17] - 15:20, 17:6, 17:9, 18:25, 35:15, 35:16, 36:10, 36:11, 36:12, 37:18, 37:19, 39:17, 39:21, 55:11, 57:7, 69:9, 111:1
**fields** [2] - 28:10, 34:23
**Fifth** [6] - 6:20, 91:5, 104:17, 112:22, 118:21, 131:3
**figure** [9] - 20:19, 27:8, 33:7, 33:9, 33:10, 33:11, 33:14, 57:25, 125:21
**figures** [2] - 22:9, 32:5
**file** [4] - 7:5, 7:11, 9:20, 140:24
**filed** [5] - 9:15, 17:23, 118:12, 122:22, 135:23
**fill** [1] - 39:21
**filled** [2] - 58:13, 108:24
**final** [5] - 8:13, 44:14, 44:15, 81:25, 119:4
**finally** [3] - 8:13, 134:5, 136:4
**find** [6] - 55:10, 61:24, 65:22, 78:24, 116:17, 134:23
**finding** [1] - 118:5
**findings** [8] - 19:5, 19:7, 19:16, 22:4, 22:6, 23:2, 24:5, 100:5
**fine** [10] - 7:5, 8:6, 25:15, 31:9, 36:18, 44:9, 44:11, 83:6, 87:8, 102:25
**finish** [3] - 12:4, 53:23, 126:10
**First** [1] - 122:9
**first** [43] - 7:24, 9:23, 10:2, 12:25, 20:14, 20:18, 22:5, 22:10, 23:14, 24:12, 26:11, 28:14, 28:17, 30:14, 33:10, 33:17, 34:19, 36:18, 38:5, 38:7, 41:2, 41:5, 41:6, 41:24, 41:25, 43:17, 52:24, 53:1, 56:24, 58:10, 62:4, 77:2, 94:21, 96:5, 104:20, 106:25, 107:14, 119:11, 123:18, 131:11, 135:19, 138:7
**fish** [1] - 131:14
**fit** [1] - 102:4
**fits** [3] - 102:9, 102:10, 123:23
**five** [6] - 20:24, 21:2, 104:24, 105:16, 134:13, 141:6
**Five** [3] - 100:2, 101:21, 103:14
**fixing** [1] - 71:15
**flag** [1] - 9:19
**flagged** [1] - 10:1
**flagging** [1] - 9:12
**flawed** [1] - 123:13
**flight** [1] - 124:19
**flights** [1] - 136:15
**flip** [1] - 19:22
**fly** [1] - 7:4
**focus** [2] - 38:18, 62:4
**focused** [2] - 70:20, 118:1
**FOIA** [3] - 21:17, 26:8, 33:21
**follow** [10] - 28:13, 30:8, 40:6, 42:22, 43:1, 58:3, 109:8, 110:16, 112:12, 119:19
**follow-up** [4] - 28:13, 30:8, 40:6, 58:3
**follow-ups** [1] - 42:22
**followed** [4] - 33:6, 34:4, 34:16, 124:8
**following** [2] - 47:14, 85:20
**food** [12] - 89:23, 89:24, 90:1, 90:4, 90:5, 91:16, 114:14, 117:17, 117:19, 117:24, 124:7, 131:4
**foot** [1] - 139:9
**footing** [1] - 55:19
**footsteps** [1] - 119:21
**FOR** [3] - 1:1, 1:12, 2:1
**forced** [2] - 108:15, 109:1
**foregoing** [2] - 137:11, 142:8
**forget** [1] - 140:22
**form** [4] - 6:11, 6:23, 63:10, 77:18
**formal** [3] - 129:15, 129:19, 132:15
**formally** [1] - 111:3
**format** [1] - 142:11
**former** [1] - 6:23
**formerly** [1] - 106:3
**forming** [2] - 66:7, 66:24
**formula** [2] - 27:5, 27:10
**forth** [1] - 8:5
**forthcoming** [1] - 9:5
**forward** [4] - 9:10, 83:6, 109:3, 114:21
**found** [3] - 14:24, 115:9, 118:3
**foundation** [2] - 112:15, 124:3
**Four** [4] - 100:2, 101:21, 102:20, 103:14
**four** [2] - 9:22, 105:16
**Fourth** [4] - 110:6, 118:18, 133:5, 136:1
**frame** [2] - 61:16, 80:9
**Francisco** [5] - 52:10, 52:12, 52:13, 116:15, 119:21
**frankly** [2] - 123:1, 139:24
**free** [1] - 24:16
**Freedom** [2] - 17:22, 18:2
**freezing** [1] - 89:11
**fresh** [1] - 105:20
**friend** [2] - 65:17, 76:18
**friends** [2] - 77:22, 78:5
**frightening** [1] - 140:4
**front** [2] - 11:6, 13:21
**froze** [1] - 61:5
**frozen** [1] - 61:7
**full** [5] - 13:8, 84:14, 95:11, 113:11, 117:11
**fully** [1] - 9:10
**function** [4] - 104:21, 125:2, 131:5, 131:6
**fundamentally** [1] - 49:17
**further** [12] - 6:8, 42:19, 44:1, 70:11, 81:3, 81:5, 81:24, 82:1, 98:3, 122:15, 134:18, 141:3
**future** [1] - 93:6

## G

**G** [1] - 4:1
**game** [1] - 73:14
**gang** [1] - 35:17
**gender** [6] - 41:12, 41:13, 41:22,

134:19, 134:21
**general** [4] - 80:16, 115:20, 121:8, 141:13
**generally** [11] - 64:19, 64:20, 65:6, 66:17, 68:11, 71:4, 71:18, 79:13, 79:19, 119:2, 137:17
**genuinely** [1] - 31:12
**getting** [5] - 65:24, 67:2, 71:10, 77:10, 103:23
**give** [3] - 43:16, 44:14, 63:17
**given** [29] - 13:14, 21:20, 27:1, 27:17, 30:23, 39:3, 39:15, 40:20, 41:4, 42:5, 66:8, 66:13, 69:4, 73:16, 78:10, 82:13, 87:15, 92:9, 97:13, 99:17, 100:13, 100:17, 103:6, 107:17, 109:9, 125:21, 125:23, 129:8, 132:12
**gives** [2] - 10:10, 57:25
**giving** [5] - 16:10, 69:11, 90:6, 90:7, 106:13
**global** [1] - 10:17
**glue** [1] - 114:16
**Goldenson** [47] - 3:5, 7:25, 50:7, 50:17, 50:19, 50:22, 51:3, 51:6, 55:4, 55:19, 56:21, 61:21, 62:2, 65:10, 66:5, 66:22, 69:14, 69:23, 70:8, 70:17, 70:19, 71:14, 71:17, 71:22, 72:25, 73:6, 73:20, 74:7, 75:18, 77:12, 77:20, 79:2, 79:13, 81:9, 81:24, 82:3, 110:11, 110:23, 128:1, 128:11, 129:3, 130:11, 137:20, 138:7, 138:12, 138:18
**GOLDENSON** [1] - 50:11
**Goldenson's** [7] - 55:10, 56:12, 110:21, 127:25, 129:14, 130:8, 130:13
**gone** [1] - 100:17
**Gonzalez** [1] - 116:15
**good** [33] - 4:8, 4:10, 4:11, 4:13, 4:16, 4:21, 4:23, 4:24, 5:1, 7:19, 7:20, 13:13, 25:4, 25:9, 25:10, 25:12, 25:13, 32:8, 50:17, 63:17, 65:21, 68:13, 70:17, 70:18, 77:17, 84:15, 85:7, 85:8, 85:10, 91:18, 94:19, 95:3, 95:4
**Good** [3] - 4:15, 4:18, 4:20
**Gordon** [1] - 132:23
**got** [7] - 12:12, 42:5, 48:24, 52:8, 54:25, 60:8, 121:3
**governing** [2] - 124:6, 129:16
**Government** [6] - 55:23, 55:24, 81:2, 140:4, 140:8, 140:16
**governmental** [3] - 131:6, 131:10, 131:25
**governs** [1] - 125:6
**GRAEME** [1] - 13:9
**Graeme** [3] - 3:3, 13:1, 13:9
**grant** [1] - 140:19
**grappling** [1] - 131:10
**great** [1] - 60:15
**grounded** [1] - 133:22
**grounds** [3] - 114:24, 137:20, 137:25
**group** [1] - 93:3
**Guerrero** [7] - 57:10, 63:12, 63:21, 65:15, 77:25, 78:22, 113:9
**Guerrero's** [1] - 114:5
**guess** [9] - 10:2, 10:9, 15:23, 30:2, 33:10, 34:1, 35:21, 55:2, 102:10
**guessed** [1] - 134:3
**guidance** [4] - 62:16, 68:20, 69:20, 124:9
**Gunnells** [1] - 118:20

## H

**H** [2] - 45:1, 48:10
**habeas** [2] - 6:23, 100:17
**half** [4] - 22:8, 25:22, 26:3, 105:10
**hand** [7] - 13:3, 51:18, 84:11, 85:1, 85:4, 94:22, 94:25
**handed** [1] - 109:4
**handful** [1] - 9:21
**happen** [5] - 9:14, 59:20, 66:2, 77:8, 93:24
**happened** [2] - 77:19, 83:25
**happening** [1] - 78:12
**happenings** [1] - 118:19
**happens** [5] - 42:16, 58:9, 59:11, 79:7, 79:9
**happy** [6] - 7:17, 15:15, 17:10, 83:12, 83:23, 104:1
**hard** [4] - 15:23, 15:24, 120:6, 120:13
**harm** [24] - 64:14, 70:6, 81:23, 100:6, 110:7, 110:9, 110:12, 111:24, 112:5, 113:2, 114:15, 115:10, 116:8, 116:9, 116:10, 117:3, 117:5, 117:10, 121:10, 122:5, 129:24, 130:9, 131:23
**harms** [9] - 112:6, 112:9, 114:8, 115:6, 115:21, 117:11, 119:15, 121:19, 122:15
**Hartman** [1] - 131:19
**having** [16] - 23:21, 49:1, 63:2, 68:4, 69:13, 72:21, 75:23, 76:22, 89:8, 102:12, 115:14, 118:24, 120:7, 121:23, 122:7
**he'll** [1] - 50:7
**he's** [2] - 16:11, 43:19
**head** [1] - 126:1
**health** [26] - 35:15, 35:19, 36:5, 36:8, 36:9, 36:13, 37:6, 52:15, 54:2, 54:4, 54:11, 54:22, 54:23, 55:1, 58:1, 58:20, 62:16, 63:6, 63:14, 67:22, 68:1, 69:18, 74:22, 77:6, 128:7, 130:4
**Health** [6] - 54:7, 54:9, 57:17, 71:25, 72:12, 115:2
**health-related** [2] - 36:5, 36:8
**healthful** [1] - 102:5
**hear** [14] - 7:18, 15:13, 17:10, 20:5, 26:16, 56:13, 61:4, 71:13, 75:25, 79:21, 83:12, 103:13, 104:1, 122:4
**heard** [6] - 88:23, 89:2, 90:12, 110:11, 111:23, 138:6
**hearing** [10] - 4:5, 15:6, 16:23, 51:7, 75:24, 83:21, 98:21, 99:8, 105:6, 118:14
**heart** [5] - 63:23, 78:24, 83:2, 115:23, 125:18
**height** [1] - 128:11
**heightened** [1] - 133:18
**held** [48] - 18:7, 19:8, 19:19, 19:21, 21:5, 23:4, 24:8, 24:9, 24:11, 24:19, 24:21, 24:23, 29:8, 39:24, 41:13, 41:16, 46:14, 59:9, 60:9, 60:18, 72:3, 72:5, 75:11, 75:12, 101:10, 101:11, 105:5, 105:12, 105:16, 106:15, 107:1, 107:3, 107:9, 107:23, 108:16, 113:13, 115:25, 116:7, 116:9, 117:12, 118:20, 121:1, 132:11, 136:23, 139:17, 139:21, 140:14, 142:10
**helpful** [8] - 12:10, 17:8, 28:4, 44:3, 44:7, 45:15, 55:13, 141:2
**hereby** [1] - 142:7
**hi** [1] - 91:25
**Hi** [1] - 62:10
**high** [12] - 32:9, 34:3, 34:11, 34:16, 48:2, 56:23, 58:4, 58:15, 70:25, 118:14, 125:12, 129:23
**high-level** [1] - 56:23
**higher** [3] - 17:18, 24:5, 114:23
**highest** [6] - 24:9, 30:19, 30:24, 46:10, 52:20, 58:9
**highlighted** [4] - 45:16, 45:23, 45:24, 45:25
**highly** [2] - 132:1, 135:18
**histories** [1] - 63:17
**history** [3] - 62:24, 68:13, 119:19
**HIV** [1] - 54:24
**Hold** [38] - 17:25, 18:21, 19:2, 19:3, 19:6, 19:17, 20:1, 20:11, 22:10, 23:4, 23:8, 33:19, 46:15, 57:1, 60:22, 62:11, 64:5, 65:12, 67:8, 67:11, 68:25, 81:10, 89:20, 90:10, 92:1, 92:12, 104:21, 110:20, 112:1, 112:4, 113:1, 117:3, 117:12, 119:7, 119:12, 123:11, 123:19, 136:24
**hold** [40] - 18:7, 19:18, 20:20, 21:5, 28:5, 29:6, 29:25, 40:19, 41:21, 42:8, 85:23, 85:25, 86:12, 86:16, 86:19, 89:3, 89:6, 89:23, 90:14, 104:10, 104:23, 104:24, 105:1, 105:11, 106:4, 106:9, 110:12, 111:16, 112:11, 113:10, 113:14, 116:4, 116:15, 119:23, 124:4, 124:19, 128:15, 133:8, 136:10, 136:14
**holding** [36] - 13:20, 42:8, 42:9, 50:24, 57:3, 62:20, 66:9, 67:14, 67:21, 70:1, 71:23, 72:4, 72:10, 72:20, 73:9, 74:10, 74:14, 74:19, 74:20, 75:3, 75:4, 76:23, 77:21, 78:15, 95:24, 96:13, 96:23, 97:8, 104:9, 104:23, 105:2, 105:3, 106:12, 130:14, 131:16, 140:9
**Holding** [3] - 8:17, 13:20, 59:6
**holds** [2] - 114:17, 129:1
**home** [1] - 60:4
**homes** [1] - 115:4

**Honor** [111] - 4:8, 4:18, 4:21, 4:24, 5:13, 5:19, 6:14, 7:1, 7:19, 7:23, 8:7, 8:10, 8:13, 9:4, 9:16, 9:18, 12:17, 12:20, 12:24, 15:4, 15:17, 17:14, 25:2, 25:6, 36:15, 39:7, 40:25, 42:23, 44:3, 44:21, 45:8, 47:2, 48:5, 48:8, 55:3, 55:7, 55:23, 56:17, 56:19, 61:2, 61:6, 61:9, 62:3, 70:9, 70:14, 72:22, 73:4, 73:10, 73:18, 74:17, 79:10, 80:6, 80:7, 81:2, 81:5, 82:2, 82:10, 82:12, 82:23, 83:8, 83:21, 87:15, 91:19, 91:21, 93:11, 93:14, 94:2, 94:5, 94:7, 94:16, 96:15, 96:21, 97:19, 98:2, 98:6, 98:16, 98:25, 99:3, 100:23, 101:14, 102:3, 102:22, 103:4, 103:17, 104:3, 104:8, 104:17, 105:15, 106:11, 107:6, 107:13, 107:25, 108:9, 109:20, 111:13, 111:23, 112:16, 114:12, 117:17, 120:4, 120:11, 120:17, 120:20, 121:18, 122:16, 123:7, 123:24, 128:23, 139:2, 139:25, 140:3
**Honor's** [4] - 8:8, 9:11, 101:1, 115:3
**HONORABLE** [1] - 1:8
**hope** [1] - 58:13
**hospital** [11] - 66:5, 66:9, 66:13, 66:20, 69:5, 75:20, 76:3, 77:23, 78:1, 111:9, 122:21
**hour** [1] - 38:16
**hours** [45] - 19:20, 24:12, 24:14, 24:19, 24:21, 24:23, 29:8, 29:15, 29:23, 29:25, 30:2, 32:20, 33:2, 34:12, 40:2, 40:3, 43:11, 43:20, 59:5, 59:8, 59:14, 59:18, 60:14, 60:17, 60:19, 72:4, 72:5, 72:8, 86:13, 104:25, 105:9, 105:11, 105:13, 105:18, 113:16, 116:7, 117:13, 120:15, 125:4, 129:7, 134:15, 135:13
**housed** [3] - 51:1, 67:14, 81:20
**housekeeping** [2] - 7:17, 7:21
**however** [2] - 11:6, 43:10
**humorous** [1] - 137:16
**hunger** [1] - 117:22
**husher** [3] - 82:19, 82:21, 102:24
**Hyde** [1] - 120:18
**hygiene** [8] - 90:21, 91:15, 100:3, 102:9, 102:11, 108:25, 124:7, 124:10
**hygienic** [2] - 102:12, 124:9
**hypertension** [1] - 64:10
**hypothetical** [6] - 29:24, 39:11, 39:14, 43:16, 97:22
**hypotheticals** [1] - 45:13

**I**

**i.e** [1] - 126:22
**ICE** [20] - 17:21, 18:14, 19:1, 19:12, 21:18, 22:21, 28:17, 33:23, 35:8, 36:16, 37:18, 40:11, 59:4, 70:1, 73:24, 75:4, 76:13, 107:17, 111:6, 124:20
**ICE's** [8] - 18:6, 22:9, 33:21, 57:2, 71:23, 110:13, 111:2, 129:5
**idea** [2] - 68:3, 77:17
**ideation** [2] - 63:1, 81:22
**ideations** [1] - 58:12
**identical** [2] - 22:6, 22:7
**identification** [1] - 113:2
**identified** [9] - 7:8, 17:19, 19:4, 20:18, 60:2, 81:22, 110:14, 114:13, 114:18
**identifies** [1] - 128:1
**identify** [14] - 7:10, 7:11, 27:24, 30:18, 30:20, 31:3, 34:5, 47:2, 47:9, 109:17, 113:25, 115:12, 130:8
**identifying** [1] - 132:9
**ill** [2] - 12:2, 12:7
**illegality** [1] - 116:24
**illegitimate** [1] - 131:9
**Illinois** [2] - 116:15, 119:22
**illness** [3] - 36:14, 37:7, 58:21
**illnesses** [1] - 67:18
**illogical** [1] - 128:11
**illuminating** [1] - 127:3
**Immigrant** [1] - 1:14
**immigrant** [2] - 140:11, 140:12
**IMMIGRATION** [1] - 1:16
**immigration** [12] - 15:3, 25:23, 73:22, 74:4, 74:10, 74:13, 113:12, 123:1, 133:17, 133:20, 133:22, 134:1
**Immigration** [2] - 17:23, 18:15
**impact** [2] - 43:13, 124:24
**impacts** [1] - 119:6
**impaired** [2] - 115:5, 115:8
**implement** [4] - 81:11, 110:14, 110:18, 110:19
**implied** [1] - 16:11
**import** [1] - 133:3
**importance** [1] - 64:7
**important** [12] - 43:7, 57:22, 58:16, 59:23, 59:25, 63:6, 64:14, 68:17, 69:14, 69:16, 80:17, 131:6
**importantly** [2] - 127:3, 127:9
**impose** [1] - 61:14
**impossible** [2] - 23:5, 23:10
**impracticability** [1] - 125:7
**improve** [1] - 93:25
**in/book** [4] - 10:6, 10:19, 18:24, 40:18
**in/clock** [1] - 40:17
**in/out** [1] - 40:10
**in/punch** [1] - 40:9
**in/time** [1] - 45:14
**INA** [1] - 122:8
**inaccurate** [2] - 11:9, 12:9
**inadequacies** [1] - 113:18
**inadequate** [9] - 63:16, 65:14, 69:3, 104:19, 109:12, 114:10, 114:11, 118:4
**inadmissible** [2] - 124:21, 137:25
**inapplicable** [2] - 116:3, 128:8
**inappropriate** [2] - 39:14, 138:18
**incapable** [1] - 139:16
**incidence** [1] - 130:8
**incidents** [1] - 125:12
**include** [7] - 33:22, 74:8, 74:12, 77:17, 79:20, 79:22, 101:23
**included** [3] - 35:23, 67:3, 122:20
**includes** [12] - 6:17, 28:10, 31:15, 32:23, 36:5, 36:8, 62:17, 99:20, 99:23, 101:22, 102:17, 134:11
**including** [8] - 25:23, 33:1, 63:8, 70:3, 100:10, 124:9, 124:12, 133:23
**inconvenience** [1] - 61:10
**inconveniences** [1] - 61:13
**increasing** [2] - 57:10, 69:12
**incredulous** [1] - 10:9
**indeed** [1] - 112:2
**indefinite** [2] - 70:24, 71:19
**independence** [2] - 138:12, 138:20
**independent** [3] - 73:1, 73:13, 123:9
**indicate** [1] - 139:8
**indicates** [2] - 75:21, 76:4
**indication** [1] - 129:10
**indicator** [1] - 16:13
**indifference** [2] - 109:21, 130:7
**indifferent** [3] - 108:3, 110:5, 129:20
**individual** [21] - 19:1, 28:11, 29:24, 29:25, 30:1, 31:15, 38:3, 42:1, 47:13, 49:12, 65:7, 110:12, 111:24, 114:19, 115:5, 115:8, 117:6, 118:24, 125:24, 126:2, 128:2
**individualized** [2] - 135:5, 135:6
**individuals** [52] - 24:11, 24:19, 24:20, 27:1, 29:17, 30:18, 30:21, 30:24, 32:1, 37:25, 43:2, 43:5, 45:20, 46:14, 46:22, 59:13, 62:22, 64:14, 67:21, 68:14, 81:23, 89:5, 104:24, 104:25, 105:8, 106:3, 108:16, 108:22, 108:24, 109:22, 110:4, 111:5, 111:8, 111:18, 112:25, 114:15, 119:13, 125:20, 125:22, 128:18, 130:2, 130:12, 132:13, 132:22, 133:24, 134:11, 134:12, 134:14, 134:15, 134:16, 136:13, 137:1
**indivisible** [1] - 119:6
**indulgence** [1] - 79:10
**inept** [1] - 129:7
**infected** [1] - 60:8
**infections** [2] - 64:11, 110:2
**infectious** [2] - 109:16, 110:1
**infer** [1] - 33:7
**inference** [5] - 35:12, 36:23, 108:6, 108:10, 108:12
**inferences** [1] - 128:7
**inflammatory** [1] - 124:16
**information** [7] - 15:3, 35:16, 35:24, 36:24, 63:20, 67:5, 68:18
**Information** [2] - 17:22, 18:2
**informative** [1] - 127:3
**informed** [3] - 8:24, 9:14, 95:18
**infrastructure** [1] - 133:3

**inhumane** [1] - 104:13
**initial** [3] - 58:15, 76:14, 112:17
**initially** [1] - 95:23
**injunction** [15] - 4:5, 6:7, 101:1, 101:3, 101:21, 104:16, 112:12, 119:17, 123:9, 123:17, 133:16, 133:18, 134:4, 137:14, 140:20
**INJUNCTION** [1] - 1:8
**injunctive** [5] - 119:5, 119:8, 123:14, 125:8, 125:14
**injury** [3] - 36:4, 131:21, 132:7
**inputs** [1] - 16:10
**inquire** [3] - 62:1, 62:3, 84:3
**inquiring** [1] - 6:2
**inquiry** [2] - 127:6, 130:19
**ins** [5] - 13:19, 17:25, 20:10, 23:7, 113:24
**inseparable** [1] - 135:5
**inside** [1] - 120:24
**insight** [1] - 10:17
**insofar** [2] - 36:5, 102:11
**inspected** [1] - 106:4
**instances** [2] - 36:9, 106:24
**instead** [2] - 8:5, 124:16
**instructive** [1] - 126:16
**insufficient** [1] - 117:24
**insulin** [1] - 80:8
**intake** [13] - 50:25, 54:1, 55:15, 59:18, 59:19, 59:23, 62:17, 62:21, 75:8, 75:14, 81:15, 125:2, 129:19
**intakes** [1] - 135:10
**integral** [1] - 122:14
**intend** [1] - 83:4
**intending** [1] - 82:17
**intent** [4] - 11:2, 12:2, 12:7, 110:7
**intention** [1] - 27:15
**interest** [5] - 17:17, 56:22, 133:15, 133:19, 138:18
**interested** [1] - 12:1
**interference** [1] - 71:11
**internal** [2] - 18:7, 137:5
**interpreter** [9] - 83:1, 83:19, 83:24, 84:4, 84:17, 84:20, 88:3, 89:10, 91:10
**Interpreter** [13] - 2:6, 83:12, 84:1, 84:10, 84:12, 87:9, 87:20, 88:1, 96:4, 96:17, 97:11, 98:7, 98:18
**INTERPRETER** [11] - 84:15, 87:6, 88:9, 88:25, 89:8, 90:2, 91:8, 93:19, 96:1, 96:3, 96:14
**interpreting** [1] - 75:16
**interrogatories** [1] - 57:5
**interrupt** [2] - 40:5, 123:21
**intersect** [1] - 126:21
**intersection** [2] - 127:9, 127:17
**intertwined** [1] - 122:23
**intervened** [1] - 122:13
**interview** [1] - 124:17
**interviewed** [1] - 128:6
**invite** [2] - 8:11, 130:22
**inviting** [1] - 137:17
**invoke** [1] - 135:7
**involve** [2] - 106:19, 134:2
**involved** [8] - 36:9, 54:1, 54:25, 59:21, 73:24, 131:17, 132:19, 135:8
**involving** [3] - 52:1, 53:14, 133:11
**Island** [1] - 60:7
**isolated** [2] - 106:24, 125:12
**isolation** [1] - 127:7
**issue** [13] - 16:19, 16:25, 46:18, 51:3, 67:15, 68:20, 71:15, 78:23, 103:18, 109:13, 112:12, 115:4, 119:17
**ISSUE** [1] - 1:8
**issues** [23] - 5:2, 18:10, 25:23, 52:19, 53:18, 56:1, 57:9, 58:2, 63:7, 63:14, 69:18, 69:19, 75:7, 77:6, 81:20, 81:22, 101:8, 109:17, 111:11, 115:7, 119:22, 120:23, 137:24
**items** [3] - 7:21, 91:18, 108:25

## J

**jail** [8] - 52:12, 53:5, 59:12, 63:22, 65:19, 71:1, 71:6
**Jail** [2] - 52:13, 53:10
**jails** [6] - 53:5, 65:2, 70:20, 70:25, 71:3
**Jared** [1] - 4:13
**JARED** [1] - 1:19
**Jerome** [1] - 4:18
**JEROME** [1] - 1:22
**job** [2] - 26:6, 137:8
**JOE** [1] - 50:11
**Joe** [3] - 3:5, 50:7, 50:19
**joining** [1] - 91:25
**JRR-25-cv-1613** [1] - 4:4
**judge** [1] - 93:17
**JUDGE** [1] - 1:9
**judgments** [2] - 131:7, 134:2
**Judicial** [1] - 142:12
**judicial** [2] - 131:7, 133:20
**JULIE** [1] - 1:8
**July** [3] - 114:7, 118:3, 118:14
**June** [12] - 27:6, 27:7, 27:8, 32:19, 45:21, 46:4, 46:15, 48:21, 48:22, 48:23, 49:3
**Justice** [1] - 2:3
**justification** [1] - 113:19
**Justinano** [1] - 120:12

## K

**keep** [5] - 7:22, 59:4, 91:15, 95:18, 107:8
**keeping** [3] - 44:12, 59:7, 69:1
**key** [1] - 105:7
**Khalil** [1] - 26:20
**kin** [1] - 76:18
**kind** [21] - 10:2, 10:10, 10:11, 10:16, 10:17, 11:19, 16:3, 16:4, 16:7, 38:2, 43:5, 58:1, 62:24, 65:8, 67:15, 68:21, 108:18, 109:18, 110:7, 125:12, 135:24
**knew** [1] - 126:18
**know** [32] - 5:1, 5:22, 10:7, 11:7, 34:20, 36:16, 37:20, 45:20, 51:22, 65:4, 65:18, 71:5, 71:6, 71:7, 78:25, 80:23, 82:4, 88:11, 91:7, 97:25, 98:8, 102:15, 103:2, 105:21, 110:15, 110:18, 118:19, 118:20, 123:22, 136:18, 136:19
**knowledge** [2] - 90:23, 97:24
**known** [4] - 129:21, 129:24, 129:25, 133:10
**knows** [1] - 129:11

## L

**L** [1] - 13:9
**labeled** [2] - 30:10, 64:22
**labor** [1] - 114:22
**lack** [10] - 6:3, 9:3, 58:13, 70:3, 112:5, 112:8, 115:4, 115:9, 116:2, 117:15
**lacking** [1] - 138:19
**lacks** [1] - 132:4
**laid** [2] - 113:7, 123:24
**LANDAN** [16] - 1:16, 4:11, 6:5, 6:14, 7:1, 100:23, 101:14, 111:23, 120:4, 120:11, 120:20, 121:15, 121:18, 122:7, 122:11, 122:18
**landan** [1] - 5:24
**Landan** [5] - 4:11, 104:5, 111:21, 119:24, 138:25
**Lareau** [2] - 131:13, 132:23
**large** [5] - 59:12, 59:15, 69:6, 128:21, 132:21
**largest** [3] - 20:23, 21:2, 41:19
**last** [15] - 8:23, 9:14, 9:19, 9:22, 25:22, 26:3, 42:13, 50:11, 55:24, 72:17, 83:21, 83:25, 93:12, 93:20, 109:3
**late** [1] - 60:6
**later** [3] - 7:5, 78:23, 122:19
**launch** [1] - 99:12
**law** [1] - 132:14
**Law** [2] - 17:24, 18:15
**lawful** [1] - 114:20
**lawsuit** [6] - 17:22, 18:2, 26:8, 86:16, 118:13, 119:12
**lawyer** [4] - 89:22, 120:18, 122:23, 135:2
**lead** [5] - 64:13, 78:12, 111:10, 112:22, 114:1
**leading** [2] - 93:8, 93:10
**least** [7] - 41:16, 41:17, 49:21, 100:15, 106:20, 124:22, 128:12
**leave** [3] - 5:12, 105:17, 106:20
**led** [1] - 115:9
**leeway** [1] - 80:22
**left** [3] - 44:12, 46:8, 51:25
**legal** [8] - 54:11, 93:3, 115:13, 118:21, 122:3, 128:9, 133:7, 133:9
**less** [12] - 16:4, 30:2, 43:11, 107:5, 112:15, 113:10, 113:11, 116:6, 116:7, 126:16, 134:15, 134:22
**let's** [8] - 12:11, 12:18, 43:10, 43:17, 61:15, 82:16, 83:2, 99:6
**level** [11] - 15:2, 17:18, 19:13, 23:15, 31:15, 31:20, 34:20, 52:20, 56:23, 128:8, 132:2
**levels** [10] - 10:12, 10:23, 10:24, 10:25, 11:1, 11:8, 19:5, 24:6, 38:4, 127:21
**Levine** [7] - 4:13, 5:23, 103:3, 111:23, 112:9, 113:6, 138:25
**LEVINE** [10] - 1:19, 4:13, 102:3, 102:10, 102:22, 103:4, 103:17, 104:3, 104:8, 139:2
**liability** [1] - 111:11

**lice** [1] - 109:4
**licensed** [1] - 68:21
**life** [3] - 79:18, 80:8, 80:16
**life-sustaining** [3] - 79:18, 80:8, 80:16
**LIGGINS** [1] - 1:5
**Liggins** [1] - 4:4
**light** [1] - 127:2
**likelihood** [3] - 79:8, 102:16, 132:12
**likely** [1] - 21:15
**limit** [3] - 19:15, 106:22, 106:23
**limitation** [1] - 139:14
**limited** [5] - 29:21, 36:3, 62:12, 112:18, 135:21
**limiting** [3] - 65:12, 106:9, 106:10
**limits** [1] - 114:11
**line** [17] - 7:5, 7:11, 42:13, 47:3, 47:6, 47:10, 47:12, 47:14, 47:15, 72:15, 72:16, 82:6, 93:8, 100:6, 121:5, 121:8, 140:23
**lines** [3] - 45:16, 46:23, 47:3
**list** [5] - 54:18, 63:7, 66:6, 66:7, 66:11
**listed** [2] - 7:24, 66:8
**litigants** [1] - 133:11
**litigation** [4] - 28:21, 33:21, 114:21, 133:8
**little** [16] - 11:23, 18:14, 24:5, 26:15, 34:1, 41:15, 72:18, 75:16, 80:10, 80:21, 86:21, 89:24, 90:8, 99:22, 103:24, 124:22
**lives** [1] - 58:14
**LLP** [2] - 1:20, 1:23
**lo** [1] - 63:22
**local** [5] - 66:3, 69:5, 77:23, 124:18, 136:6
**located** [1] - 108:15
**location** [1] - 125:3
**locations** [1] - 133:25
**logistics** [1] - 134:1
**logs** [1] - 36:16
**long** [20] - 14:11, 18:9, 19:18, 48:1, 54:18, 59:3, 64:13, 70:23, 71:7, 73:24, 73:25, 75:9, 81:1, 105:13, 119:19, 125:1, 125:24, 132:17, 135:10
**long-term** [8] - 59:3, 64:13, 70:23, 73:24, 75:9, 125:1, 132:17, 135:10
**longer** [10] - 19:20, 59:9, 71:19, 72:6, 79:3, 104:25, 115:18, 122:1, 136:15
**longest** [1] - 19:20
**look** [24] - 7:6, 11:23, 13:23, 18:24, 19:23, 20:9, 21:8, 21:9, 24:15, 34:7, 45:3, 45:15, 46:5, 46:19, 51:8, 51:22, 59:11, 62:24, 64:22, 67:24, 68:15, 76:24, 123:6, 141:4
**looked** [8] - 18:16, 18:19, 19:18, 21:25, 40:2, 42:1, 53:16
**looking** [9] - 20:21, 25:23, 35:8, 41:12, 41:25, 42:9, 51:10, 51:11, 102:2
**looks** [3] - 23:17, 116:19, 116:20
**lost** [1] - 93:19
**louder** [1] - 75:23
**low** [6] - 32:10, 66:14, 66:21, 69:7, 132:13, 134:13
**lower** [1] - 130:18
**lucky** [1] - 116:6
**lumps** [1] - 32:19
**lunch** [2] - 61:25, 98:11

## M

**M** [14] - 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17, 142:5, 142:17
**ma'am** [10] - 95:5, 95:14, 95:17, 95:20, 95:23, 96:9, 96:11, 96:23, 97:4
**machine** [1] - 39:20
**Madam** [7] - 83:12, 84:1, 87:20, 88:1, 88:13, 98:7, 98:18
**madam** [2] - 84:10, 97:11
**made** [13] - 11:5, 36:23, 38:14, 40:11, 48:12, 57:5, 87:1, 87:22, 89:19, 90:9, 90:20, 97:17, 108:10
**Mahdawi** [1] - 26:20
**mail** [1] - 122:3
**main** [1] - 20:19
**maintain** [1] - 131:3
**maintained** [1] - 124:6
**maintains** [2] - 124:8, 129:18
**majority** [2] - 99:13, 125:10
**makes** [3] - 71:2, 99:21, 127:5
**making** [8] - 54:2, 99:16, 100:5, 120:14, 122:14, 138:15, 138:17, 138:22
**male** [9] - 41:16, 41:17, 41:20, 41:25, 42:2, 42:14, 134:20, 139:12
**management** [1] - 25:20
**mandate** [1] - 60:14
**mandates** [1] - 74:21
**mandatory** [2] - 132:25, 133:18
**Manhattan** [1] - 1:20
**manifestations** [1] - 58:20
**manipulate** [1] - 18:12
**manner** [4] - 66:4, 78:8, 81:19, 119:13
**Manson** [1] - 132:23
**manual** [1] - 57:15
**manually** [1] - 23:17
**many** [26] - 18:9, 18:19, 23:24, 24:13, 27:10, 34:10, 37:24, 38:14, 38:18, 42:6, 42:9, 42:10, 46:20, 75:22, 76:4, 86:1, 105:3, 112:3, 122:13, 125:22, 126:22, 137:1, 139:17, 139:21, 140:9, 140:18
**marcations** [1] - 40:10
**March** [7] - 1:9, 38:21, 43:18, 43:19, 142:14
**mark** [3] - 40:10, 40:11, 46:10
**marked** [4] - 35:1, 47:10, 51:7, 51:8
**marker** [1] - 129:11
**marking** [1] - 41:7
**markings** [1] - 47:7
**marks** [2] - 46:8, 46:23
**MARYLAND** [1] - 1:1
**Maryland** [4] - 1:10, 114:25, 115:2, 142:7
**match** [3] - 16:5, 38:3
**matched** [1] - 31:19
**material** [1] - 107:15
**materials** [1] - 22:12
**math** [1] - 10:13
**mathing** [1] - 10:13
**matter** [9] - 20:17, 32:20, 51:16, 75:11, 83:18, 85:12, 107:18, 127:13, 142:10
**matters** [4] - 5:4, 7:17, 44:24, 115:18
**mattress** [1] - 89:12
**mattresses** [1] - 103:19
**Max** [1] - 53:1
**maximum** [2] - 105:4, 111:4
**MD** [1] - 52:8
**meal** [2] - 90:9, 124:12
**meals** [3] - 90:13, 117:20, 124:11
**mean** [30] - 5:25, 11:5, 11:7, 15:23, 21:3, 27:17, 28:20, 30:20, 30:22, 31:3, 31:10, 31:11, 32:12, 35:25, 43:16, 47:7, 49:3, 63:3, 64:9, 74:15, 78:6, 79:7, 90:17, 101:8, 131:10, 136:16, 137:16, 137:22, 138:4
**meaning** [6] - 11:8, 11:19, 16:13, 21:4, 34:24, 138:9
**meaningful** [1] - 140:2
**meaningfully** [1] - 131:12
**meanings** [1] - 73:16
**means** [4] - 47:19, 67:13, 93:2, 106:13
**meant** [2] - 47:15, 73:2
**measure** [5] - 32:8, 32:14, 125:10, 125:19, 131:11
**measures** [2] - 81:10, 125:25
**meat** [2] - 5:21, 90:8
**Mechanical** [1] - 1:25
**mechanism** [1] - 109:10
**median** [1] - 133:2
**medical** [87] - 50:24, 52:5, 52:6, 52:15, 53:16, 53:17, 54:3, 57:7, 57:8, 57:9, 57:20, 57:21, 57:22, 57:23, 57:24, 58:1, 60:22, 62:11, 62:14, 62:19, 62:22, 62:23, 63:14, 64:9, 65:25, 67:8, 67:10, 67:12, 67:13, 67:15, 67:25, 68:4, 68:15, 68:16, 68:18, 68:20, 68:25, 69:7, 69:10, 69:12, 69:17, 69:25, 70:20, 74:4, 74:9, 75:13, 78:17, 78:20, 79:3, 92:9, 104:19, 109:12, 109:13, 109:15, 109:17, 109:18, 109:22, 110:4, 110:5, 111:3, 111:10, 112:6, 114:11, 116:5, 117:15, 118:1, 119:15, 124:7, 128:2, 128:4, 128:5, 129:14, 129:19, 129:21, 130:2, 130:5, 130:9, 131:5, 132:2, 132:4, 132:8, 132:12, 132:15, 132:19, 132:24, 134:16
**medication** [50] - 51:1, 53:21, 53:24, 62:18, 64:4, 64:6, 64:7, 64:21, 64:23, 64:24, 64:25, 65:4, 65:7, 65:9, 65:11, 65:16, 65:17, 66:20, 69:5, 70:4, 75:9, 76:18, 76:22, 77:6, 77:8, 77:10, 77:13, 78:9, 78:11, 78:14, 79:14, 79:18, 79:19, 79:22, 80:15, 80:17, 81:17, 92:9, 96:9, 96:11, 96:23, 97:2, 109:24, 122:1, 122:12, 128:13, 128:19, 128:20, 130:13, 130:16
**medications** [34] - 63:15, 64:11, 64:13, 64:16, 64:19, 65:24, 66:2, 66:4, 66:13, 66:18, 69:11, 75:13, 75:22, 76:5, 76:14, 78:4, 78:7, 78:18, 78:21, 79:6, 80:8, 80:16, 80:19, 80:20, 81:15, 81:19, 95:25, 97:9, 109:20, 111:7, 130:17, 130:21,

130:22
**medicine** [10] - 55:4, 55:11, 60:6, 65:22, 65:23, 75:21, 76:3, 77:5, 97:5, 102:9
**Medicine** [1] - 52:8
**medicines** [2] - 79:17, 100:3
**meet** [4] - 100:8, 119:10, 120:3, 122:24
**meets** [2] - 113:4, 114:2
**member** [5] - 65:17, 76:22, 77:8, 117:2, 127:16
**members** [14] - 6:19, 60:10, 91:12, 104:12, 115:15, 115:23, 116:19, 116:21, 117:1, 127:19, 130:23, 132:7, 134:7, 135:17
**memo** [8] - 57:6, 69:10, 110:25, 111:2, 111:13, 137:5, 137:6
**memory** [1] - 49:9
**men** [2] - 42:8
**mental** [9] - 54:4, 58:1, 58:20, 63:14, 67:22, 68:1, 74:22, 77:6
**mention** [4] - 78:17, 101:23, 111:14
**mentioned** [20] - 10:1, 14:25, 24:18, 26:7, 29:14, 41:4, 41:6, 49:8, 53:8, 53:12, 70:3, 89:25, 90:3, 90:4, 90:24, 127:15, 129:5, 131:2, 131:20, 135:13
**Mercado** [1] - 113:13
**Merit** [1] - 142:5
**merits** [4] - 102:16, 121:6, 123:22, 124:15
**met** [5] - 90:15, 90:16, 90:22, 118:24, 119:1
**methodologically** [1] - 123:13
**methodology** [12] - 15:21, 15:24, 16:22, 26:25, 56:1, 56:6, 56:10, 56:13, 56:14, 137:20, 138:1, 139:15
**methods** [1] - 23:15
**metric** [1] - 128:25
**metrics** [2] - 31:4, 31:5
**Michigan** [1] - 52:7
**micromanagement** [1] - 133:20
**microphone** [4] - 13:7, 26:15, 71:15, 88:8
**mid** [2] - 19:9, 22:3
**mid-October** [1] - 19:9
**mid-September** [1] - 22:3
**middle** [3] - 41:10, 41:15, 42:13
**midway** [1] - 77:3
**might** [15] - 7:3, 21:12, 37:11, 38:3, 40:11, 40:17, 44:7, 63:17, 63:19, 77:11, 78:24, 99:17, 103:23, 112:19, 127:11
**mind** [8] - 15:14, 29:10, 30:11, 33:13, 38:5, 80:24, 102:14, 118:7
**minimal** [4] - 29:20, 29:23, 30:2, 89:23
**minimis** [1] - 43:10
**minimize** [1] - 79:8
**minor** [2] - 36:14, 37:7
**minute** [9] - 38:16, 40:20, 47:22, 61:15, 82:18, 82:19, 82:20, 82:21
**minute-to-minute** [1] - 47:22
**minutes** [3] - 8:4, 44:12, 141:6
**misleading** [1] - 22:16
**misrepresent** [1] - 11:3
**misrepresentation** [3] - 8:15, 8:21, 8:23
**misrepresented** [1] - 105:25
**misstates** [1] - 129:16
**mistake** [1] - 99:16
**misunderstood** [2] - 99:17, 128:17
**mobility** [2] - 115:5, 115:8
**moderate** [1] - 125:11
**moment** [12] - 18:8, 25:5, 27:11, 37:25, 59:22, 86:5, 93:14, 94:2, 102:21, 102:23, 105:17, 107:21
**moments** [1] - 44:4
**monitor** [3] - 52:22, 52:24, 81:9
**monitored** [2] - 53:5, 67:21
**monitoring** [3] - 53:4, 67:16, 74:23
**month** [4] - 66:16, 109:3, 115:3, 133:1
**months** [3] - 112:16, 119:11, 135:11
**MOORE** [68] - 2:2, 4:21, 5:19, 7:15, 9:18, 10:15, 10:21, 11:13, 11:16, 12:3, 12:6, 12:12, 12:14, 15:8, 15:10, 15:17, 15:21, 15:23, 16:24, 17:12, 25:6, 25:8, 26:18, 31:8, 31:13, 34:14, 34:15, 36:22, 37:3, 37:4, 37:14, 37:15, 39:5, 42:22, 42:25, 44:1, 48:8, 48:11, 82:18, 82:21, 83:5, 83:8, 83:10, 83:16, 84:23, 85:6, 87:25, 88:21, 89:16, 93:7, 94:7, 94:14, 98:17, 98:25, 123:7, 123:24, 124:2, 126:9, 126:12, 128:22, 129:3, 134:25, 135:2, 136:16, 136:25, 138:2, 138:22, 141:1
**Moore** [34] - 3:4, 3:8, 4:21, 5:17, 7:3, 9:17, 12:4, 15:15, 15:16, 16:19, 17:11, 31:6, 34:13, 36:20, 37:1, 37:13, 39:10, 40:17, 42:21, 44:5, 44:8, 44:13, 48:6, 55:5, 83:1, 94:6, 94:12, 98:23, 123:5, 128:17, 137:15, 138:14, 139:3, 140:22
**morbidity** [1] - 58:9
**moreover** [2] - 124:25, 133:19
**Moring** [2] - 1:20, 1:23
**morning** [26] - 4:8, 4:10, 4:11, 4:13, 4:15, 4:16, 4:18, 4:20, 4:21, 4:23, 4:24, 5:1, 7:19, 7:20, 13:13, 25:9, 25:10, 25:11, 50:17, 83:17, 85:7, 85:8, 85:9, 95:21, 96:6, 100:14
**mortality** [1] - 58:9
**mostly** [2] - 11:23, 53:15
**MOTION** [1] - 1:8
**motion** [7] - 6:11, 99:18, 101:3, 112:17, 121:7, 122:22, 137:13
**motions** [5] - 9:12, 99:18, 122:20, 123:8, 137:12
**Mount** [1] - 52:7
**move** [11] - 5:3, 5:21, 9:10, 12:11, 31:8, 31:11, 45:19, 102:25, 103:1, 103:22, 109:12
**moving** [1] - 75:18
**Mr** [54] - 3:4, 3:6, 3:8, 3:10, 5:17, 5:23, 5:24, 7:3, 9:17, 12:4, 15:15, 15:16, 16:18, 17:11, 31:6, 34:13, 36:20, 37:1, 37:13, 39:10, 40:16, 42:21, 44:5, 44:8, 44:13, 48:6, 55:5, 70:13, 72:24, 80:5, 81:25, 82:25, 94:6, 94:12, 95:1, 97:18, 98:23, 103:3, 111:23, 112:9, 113:6, 122:21, 123:5, 128:17, 137:15, 137:18, 138:8, 138:14, 138:25, 139:3, 140:22
**MR** [112] - 4:13, 4:18, 4:21, 4:24, 5:19, 7:15, 9:18, 10:15, 10:21, 11:13, 11:16, 12:3, 12:6, 12:12, 12:14, 15:8, 15:10, 15:17, 15:21, 15:23, 16:24, 17:12, 25:6, 25:8, 26:18, 31:8, 31:13, 34:14, 34:15, 36:22, 37:3, 37:4, 37:14, 37:15, 39:5, 42:22, 42:25, 44:1, 48:8, 48:11, 55:7, 55:23, 56:7, 56:17, 61:5, 61:9, 61:14, 70:14, 70:16, 71:10, 71:14, 71:16, 73:4, 73:5, 73:18, 73:19, 74:16, 74:25, 79:10, 79:12, 80:6, 80:12, 80:13, 81:2, 82:1, 82:18, 82:21, 82:23, 83:5, 83:8, 83:10, 83:16, 84:23, 85:6, 87:25, 88:21, 89:16, 93:7, 94:7, 94:14, 94:16, 94:18, 95:2, 96:21, 96:22, 97:19, 97:23, 98:2, 98:17, 98:25, 102:3, 102:10, 102:22, 103:4, 103:17, 104:3, 104:8, 123:7, 123:24, 124:2, 126:9, 126:12, 128:22, 129:3, 134:25, 135:2, 136:16, 136:25, 138:2, 138:22, 139:2, 141:1
**Ms** [45] - 3:3, 3:5, 3:8, 5:23, 5:24, 7:12, 8:16, 8:22, 9:19, 10:8, 11:3, 11:15, 11:20, 12:8, 22:20, 22:23, 22:25, 23:3, 23:10, 40:24, 43:1, 44:6, 44:13, 56:11, 62:1, 81:4, 83:2, 83:10, 83:17, 83:22, 85:7, 85:11, 88:22, 91:25, 94:19, 94:21, 95:3, 98:5, 104:5, 111:21, 119:24, 120:12, 120:18, 138:25
**MS** [86] - 4:8, 4:11, 4:16, 5:13, 6:5, 6:14, 7:1, 7:19, 7:21, 8:2, 8:7, 8:13, 9:2, 9:10, 12:17, 12:19, 12:24, 13:12, 15:4, 17:14, 17:15, 25:2, 36:15, 39:7, 39:9, 40:25, 41:1, 42:19, 44:3, 44:16, 44:18, 44:21, 44:25, 45:2, 45:8, 45:11, 45:12, 45:19, 45:24, 46:2, 47:8, 47:12, 47:18, 48:4, 49:25, 50:6, 50:8, 50:16, 55:3, 56:19, 56:20, 61:2, 61:6, 62:3, 62:9, 70:9, 72:22, 73:10, 81:5, 81:8, 82:10, 83:21, 84:5, 87:12, 87:15, 91:21, 91:24, 93:11, 93:14, 93:16, 94:4, 97:10, 98:6, 98:16, 99:3, 100:23, 101:14, 111:23, 120:4, 120:11,

120:20, 121:15, 121:18, 122:7, 122:11, 122:18
**much** [15] - 11:12, 13:13, 16:22, 43:24, 55:9, 61:9, 66:18, 70:12, 82:3, 86:21, 88:17, 94:8, 123:4, 126:5, 131:1
**multi** [2] - 132:25, 133:1
**multi-month** [1] - 133:1
**multi-week** [1] - 132:25
**multiple** [3] - 8:5, 18:17, 35:24
**Murphy** [2] - 4:19, 5:24
**MURPHY** [2] - 1:22, 4:18
**Musk** [1] - 115:2
**Muska** [1] - 115:25
**must** [1] - 110:14
**mutually** [1] - 134:8
**myself** [2] - 99:16, 103:24

## N

**N** [27] - 1:11, 3:1, 4:1, 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17
**Nadine** [1] - 142:5
**NADINE** [1] - 142:17
**name** [8] - 13:8, 13:14, 30:22, 30:23, 50:10, 50:11, 50:17, 84:14
**named** [12] - 116:20, 116:25, 117:5, 117:8, 117:25, 118:3, 118:19, 120:4, 120:16, 122:19, 135:17, 135:20
**names** [9] - 87:7, 87:18, 87:21, 88:5, 88:6, 88:7, 88:14, 88:19, 140:23
**narrow** [1] - 35:22
**narrowed** [1] - 100:24
**NATIONAL** [1] - 1:16
**national** [5] - 57:12, 57:14, 71:24, 73:8, 129:5
**National** [5] - 54:7, 54:9, 57:16, 71:25, 72:11
**nationally** [1] - 18:1
**nature** [6] - 73:1, 79:22, 121:10, 125:5, 133:16, 135:21
**NCCHC** [3] - 54:15, 57:15, 57:16
**nearly** [3] - 105:7, 105:12, 119:11
**nebulous** [2] - 112:20, 114:7
**necessarily** [3] - 40:18, 70:25, 128:14
**necessary** [5] - 63:4, 75:22, 76:5, 84:21, 130:17
**need** [40] - 7:4, 13:6, 15:13, 24:15, 27:22, 58:2, 58:5, 58:19, 58:22, 58:25, 63:16, 64:11, 65:25, 66:2, 67:25, 68:18, 69:20, 74:22, 74:23, 75:12, 75:13, 75:14, 77:11, 77:18, 78:18, 83:18, 84:8, 87:13, 91:16, 97:25, 100:18, 102:1, 102:24, 103:1, 110:18, 111:9, 112:1, 115:12, 118:20, 130:20
**needed** [7] - 6:8, 8:20, 69:5, 84:2, 108:12, 132:1, 137:8
**needle** [1] - 56:15
**needs** [14] - 5:12, 58:11, 59:20, 62:15, 65:9, 66:2, 69:12, 78:25, 94:20, 110:5, 129:21, 129:22, 130:2, 134:16
**neither** [1] - 137:7
**never** [5] - 8:12, 23:11, 52:2, 65:4, 92:14
**new** [5] - 11:21, 11:25, 33:23, 59:7, 95:8
**New** [6] - 1:21, 52:8, 60:7, 113:13, 119:21
**new-in** [1] - 11:25
**news** [1] - 136:6
**next** [11] - 41:8, 43:18, 47:7, 50:4, 76:18, 94:12, 94:13, 94:15, 96:10, 96:25, 118:25
**night** [3] - 8:23, 9:14, 9:22
**nine** [1] - 35:2
**Ninth** [2] - 1:21, 116:9
**NN** [1] - 120:13
**non** [4] - 36:5, 36:8, 114:4, 131:10
**non-plaintiff** [1] - 114:4
**non-putative** [1] - 131:10
**noncitizens** [1] - 140:16
**none** [2] - 5:13, 63:9
**nonexistent** [1] - 70:2
**nonprofit** [1] - 54:10
**noodle** [4] - 89:25, 90:3, 90:4, 90:6
**noon** [5] - 96:25, 97:1, 140:24, 141:1, 141:2
**norm** [1] - 132:22
**normal** [3] - 34:11, 34:13, 136:11
**normally** [1] - 136:18
**NORTHERN** [1] - 1:2
**note** [8] - 9:4, 9:19, 45:8, 110:5, 113:9, 117:17, 122:11, 136:6
**noted** [3] - 8:15, 24:11, 136:8
**nothing** [13] - 9:2, 9:15, 44:1, 70:10, 72:25, 81:24, 82:1, 94:4, 94:7, 97:16, 109:6, 125:22, 138:11
**notion** [2] - 100:21, 137:4
**notwithstanding** [1] - 102:19
**number** [30] - 4:4, 18:18, 21:21, 29:11, 33:18, 40:3, 41:6, 41:16, 47:25, 48:24, 51:8, 52:23, 57:9, 60:8, 66:8, 66:14, 66:21, 69:7, 69:11, 78:19, 92:13, 106:9, 107:9, 107:23, 120:17, 125:20, 130:20, 132:21, 136:17, 136:19
**NUMBER** [1] - 1:4
**numbers** [11] - 10:9, 10:14, 10:16, 11:3, 22:7, 30:12, 42:5, 51:17, 59:15, 78:12, 99:21
**numerosity** [1] - 113:22
**numerous** [2] - 24:7, 127:22
**nurse** [1] - 68:19
**nurses** [3] - 68:6, 68:10, 113:12
**nursing** [1] - 115:4
**NW** [4] - 1:14, 1:17, 1:23, 2:3

## O

**O** [18] - 4:1, 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17
**object** [4] - 15:8, 17:4, 72:22, 93:7
**objecting** [1] - 15:19
**objection** [24] - 15:7, 15:16, 16:22, 17:10, 36:15, 36:18, 55:6, 55:8, 56:5, 56:10, 56:13, 56:14, 73:11, 73:12, 87:12, 87:14, 87:24, 97:10, 97:12, 97:16, 98:13
**objections** [1] - 36:19
**objective** [5] - 110:8, 129:21, 131:10, 131:19, 131:22
**objectives** [2] - 131:11, 131:25
**obligation** [2] - 40:11, 98:15
**observations** [2] - 62:24, 63:8
**observe** [1] - 98:20
**obtain** [5] - 15:2, 75:20, 76:3, 77:23, 109:20
**obtained** [3] - 33:21, 114:3, 124:14
**obtains** [1] - 68:17
**obvious** [1] - 129:24
**obviously** [5] - 11:4, 49:2, 69:12, 80:20, 138:10
**occasions** [1] - 136:11
**occupancy** [8] - 27:22, 28:24, 37:24, 38:9, 113:15, 125:11, 125:12, 134:13
**occupies** [1] - 127:13
**occurred** [2] - 20:24, 125:9
**October** [1] - 19:9
**OF** [3] - 1:1, 1:7, 142:1
**offer** [4] - 9:20, 15:4, 55:4, 109:6
**offered** [1] - 139:25
**office** [4] - 57:7, 57:11, 69:9, 111:1
**Officer** [10] - 57:10, 63:12, 63:21, 65:14, 77:25, 78:22, 105:25, 108:8, 113:9, 114:5
**officer** [7] - 37:19, 39:21, 40:11, 68:17, 96:5, 104:10, 114:10
**officers** [13] - 39:18, 60:8, 62:16, 68:3, 68:7, 68:11, 69:13, 95:24, 107:17, 109:4, 109:17, 113:12, 132:8
**officers'** [1] - 60:10
**OFFICIAL** [2] - 142:1, 142:17
**official** [1] - 137:7
**often** [3] - 10:24, 63:17, 69:22
**oh** [2] - 33:16, 134:25
**Ohio** [2] - 53:6
**old** [1] - 131:16
**omit** [1] - 136:8
**omitted** [1] - 107:19
**on-site** [2] - 129:19, 132:4
**once** [8] - 20:24, 51:1, 67:13, 68:17, 96:23, 103:18, 108:19, 111:15
**one** [70] - 5:2, 5:5, 14:19, 16:1, 16:8, 17:21, 20:25, 21:4, 21:5, 21:7, 21:13, 24:9, 25:5, 25:15, 25:16, 26:1, 26:12, 26:13, 29:3, 31:8, 39:16, 39:21, 41:5, 41:16, 42:8, 44:4, 44:14, 47:23, 49:2, 49:21, 51:25, 52:25, 53:3, 54:1, 57:23, 59:6, 60:5, 65:22, 74:22, 75:7, 77:1, 81:5, 83:24, 85:20, 86:5, 86:8, 86:15, 93:14, 94:2, 98:19, 102:23, 104:18, 104:19, 105:16, 107:16, 112:19, 112:21, 113:8, 115:13, 116:6, 120:25, 122:11, 122:19, 124:20, 127:13, 128:13, 134:8, 140:22, 141:4
**ones** [5] - 35:25, 47:7, 47:23, 80:20, 139:22

**online** [3] - 11:22, 64:22, 82:13
**open** [8] - 13:22, 19:22, 22:22, 64:1, 78:20, 105:19, 108:15, 117:23
**open-ended** [2] - 64:1, 78:20
**opening** [1] - 106:18
**operating** [2] - 100:15, 105:1
**operation** [1] - 57:3
**operational** [7] - 34:24, 125:2, 129:4, 131:6, 132:5, 133:17, 134:1
**operationally** [1] - 35:7
**operations** [2] - 57:2, 133:21
**opinion** [17] - 7:7, 7:13, 21:12, 47:21, 51:4, 60:16, 60:21, 62:10, 65:10, 66:7, 66:25, 67:1, 68:24, 69:25, 115:3, 126:15, 130:13
**opinions** [9] - 50:25, 51:15, 77:18, 110:21, 128:7, 128:11, 137:21, 137:25, 138:16
**opportunity** [2] - 57:25, 103:5
**oppose** [1] - 113:22
**opposed** [3] - 71:19, 72:16, 80:7
**opposing** [1] - 11:18
**opposition** [3] - 8:19, 111:14, 137:12
**option** [2] - 77:23, 78:3
**options** [1] - 124:12
**Orange** [1] - 132:23
**order** [8] - 99:20, 99:23, 101:25, 103:10, 118:3, 120:15, 140:19, 141:13
**orders** [2] - 104:14, 133:24
**organization** [2] - 26:8, 54:10
**organizations** [3] - 54:11, 54:12
**original** [1] - 33:22
**others** [2] - 27:18, 58:23
**otherwise** [3] - 56:2, 70:10, 122:24
**our** [32] - 5:2, 5:14, 8:14, 9:6, 10:4, 11:10, 11:17, 12:25, 15:10, 17:22, 25:3, 67:14, 83:1, 83:15, 84:19, 88:7, 91:11, 91:12, 94:9, 98:19, 99:15, 102:4, 103:9, 103:10, 103:17, 106:18, 111:13, 113:7, 122:11, 122:19
**outbreak** [1] - 60:7
**outcome** [3] - 128:3, 130:4, 138:19
**outline** [1] - 58:24
**outlined** [1] - 69:24
**outs** [7] - 10:3, 10:6, 13:19, 17:25, 20:11, 23:8, 27:23
**outset** [1] - 101:19
**outside** [4] - 16:2, 36:15, 78:4, 120:5
**over** [18] - 20:22, 41:7, 42:14, 43:23, 52:14, 54:19, 58:14, 66:16, 75:7, 106:25, 107:2, 111:5, 112:16, 115:4, 133:22, 135:11
**overall** [3] - 19:7, 69:25, 70:2
**overarching** [2] - 114:1, 115:19
**overbreadth** [3] - 116:8, 116:13, 116:17
**overbroad** [1] - 113:5
**overcrowded** [2] - 86:17, 117:22
**overcrowding** [12] - 16:13, 19:10, 22:9, 28:8, 32:8, 32:17, 38:13, 86:20, 104:18, 112:6, 117:14, 126:5
**overlap** [2] - 29:21, 30:2
**overlapped** [1] - 45:21
**overlapping** [1] - 27:25
**overnight** [1] - 104:22
**overseeing** [1] - 52:16
**oversight** [6] - 103:7, 107:17, 111:2, 115:4, 115:7, 115:9
**overstates** [1] - 131:16
**overwhelming** [1] - 108:11
**owed** [1] - 122:8
**own** [15] - 18:7, 32:2, 33:21, 36:17, 40:6, 65:4, 68:22, 78:22, 106:2, 110:13, 113:22, 119:23, 127:20, 140:1

## P

**P** [3] - 1:11, 4:1
**p.m** [15] - 27:6, 38:24, 46:19, 46:20, 46:25, 47:4, 47:14, 47:19, 61:19, 99:7, 99:9, 99:10, 141:8, 141:9, 141:17
**Pablo** [1] - 116:14
**page** [10] - 41:2, 41:5, 47:10, 47:14, 48:14, 51:17, 51:18, 106:18, 106:25, 142:11
**pain** [1] - 36:4
**panel** [1] - 33:23
**panel)** [1] - 33:25
**paper** [1] - 108:7
**papers** [6] - 92:24, 99:24, 100:1, 100:13, 100:22, 101:23
**paradigmatic** [2] - 112:3, 119:4
**paragraph** [14] - 30:7, 33:11, 33:15, 41:5, 48:13, 75:2, 75:19, 76:2, 76:21, 76:24, 76:25, 77:1, 77:2, 77:3
**paragraphs** [3] - 57:19, 64:5, 67:9
**parameter** [1] - 116:2
**pardon** [1] - 93:7
**parenthesis** [1] - 42:14
**Parsons** [5] - 114:6, 114:16, 116:9, 135:7, 135:8
**part** [14] - 10:4, 11:2, 11:10, 12:8, 17:16, 26:5, 72:17, 76:7, 76:8, 87:22, 93:20, 102:17, 136:8, 139:5
**participated** [1] - 17:23
**particular** [8] - 9:21, 23:19, 103:24, 113:18, 125:23, 126:3, 136:25, 141:4
**particularly** [2] - 121:23, 129:7
**parties** [6] - 7:24, 8:4, 44:9, 53:14, 66:23, 87:17
**parts** [4] - 54:2, 57:24, 99:25, 133:8
**pass** [1] - 125:20
**patient** [1] - 128:1
**patients** [1] - 67:20
**Patrol** [1] - 52:2
**pause** [1] - 107:21
**pay** [1] - 103:24
**PBNDS** [2] - 75:3, 129:10
**pdf** [1] - 33:20
**Pelican** [1] - 52:25
**pending** [3] - 35:1, 101:13, 102:1
**Penitentiary** [1] - 53:6
**Pennsylvania** [1] - 1:23
**people** [160] - 16:14, 18:9, 18:19, 19:8, 19:11, 19:19, 21:4, 21:11, 21:13, 22:8, 23:4, 23:12, 23:22, 24:1, 24:3, 24:6, 24:8, 24:9, 24:13, 24:22, 27:10, 27:13, 27:16, 27:17, 27:19, 32:9, 32:19, 32:20, 33:1, 33:18, 35:11, 38:14, 38:18, 38:21, 39:2, 39:3, 39:11, 39:12, 39:24, 40:1, 41:6, 42:10, 43:11, 43:13, 43:17, 43:20, 46:20, 47:19, 47:24, 48:1, 49:17, 49:20, 51:1, 53:4, 53:19, 53:25, 57:9, 58:1, 58:5, 58:12, 58:16, 58:19, 58:25, 59:4, 59:7, 59:8, 59:16, 60:18, 62:25, 63:7, 63:13, 63:17, 63:21, 64:9, 64:15, 65:3, 65:20, 66:8, 66:11, 66:14, 66:16, 66:17, 67:17, 68:15, 69:4, 69:7, 69:10, 69:11, 70:5, 71:1, 72:3, 72:4, 72:5, 72:6, 72:7, 74:23, 75:22, 76:4, 77:10, 78:1, 78:17, 78:23, 80:15, 81:11, 81:18, 81:20, 86:22, 86:23, 87:10, 87:16, 90:12, 90:17, 90:22, 93:3, 93:5, 93:25, 94:1, 102:12, 103:20, 104:10, 105:2, 105:3, 105:5, 105:11, 105:19, 106:5, 106:7, 106:9, 106:11, 106:12, 106:19, 107:2, 107:3, 107:4, 107:9, 107:23, 108:14, 109:24, 110:1, 110:7, 111:5, 111:24, 126:21, 126:22, 126:24, 130:14, 130:16, 136:19, 139:4, 139:17, 139:21, 140:9
**people's** [1] - 71:12
**per** [8] - 42:11, 42:14, 106:13, 106:17, 107:5, 120:24, 139:9, 139:11
**percent** [27] - 10:10, 10:11, 19:10, 19:15, 19:19, 20:22, 21:10, 24:23, 24:24, 24:25, 29:7, 30:3, 30:4, 30:6, 30:13, 40:1, 66:17, 79:14, 80:14, 80:24, 105:8, 107:1, 107:2, 116:6, 128:12, 128:18
**percentage** [7] - 21:6, 24:2, 24:11, 24:19, 33:3, 43:12, 79:17
**percentiles** [1] - 10:10
**perfect** [1] - 12:24
**perform** [3] - 38:2, 40:16, 69:13
**performance** [6] - 57:12, 58:24, 60:12, 71:24, 73:7, 129:5
**performance-based** [6] - 57:12, 58:24, 60:12, 71:24, 73:7, 129:5
**performed** [1] - 126:19
**performing** [1] - 38:21
**perhaps** [1] - 100:8
**period** [20] - 10:6, 19:9, 22:1, 43:3, 43:24, 48:25, 60:24, 61:1, 62:5, 62:12, 65:13, 66:15, 66:16, 69:1, 127:12, 128:4, 128:5, 130:5, 130:15, 131:15
**periods** [3] - 71:2, 125:11, 132:11

**permanent** [3] - 132:20, 133:4, 135:8
**permissible** [1] - 127:13
**permission** [2] - 87:6, 96:1
**Permission** [1] - 91:8
**permitted** [1] - 105:17
**perpetuated** [1] - 122:16
**person** [27] - 19:18, 21:7, 23:19, 23:21, 24:4, 27:6, 43:18, 45:22, 45:23, 45:25, 59:22, 64:25, 65:9, 65:15, 65:18, 65:21, 65:24, 68:1, 76:19, 106:13, 106:17, 107:5, 112:4, 116:4, 119:7, 139:10, 139:11
**person's** [2] - 31:20, 68:20
**personal** [1] - 86:19
**personnel** [4] - 52:19, 76:13, 111:3, 132:4
**persons** [1] - 20:25
**pertaining** [1] - 128:5
**Ph.D** [1] - 14:16
**pharmacy** [4] - 65:9, 66:3, 109:19, 109:25
**phrasing** [1] - 22:17
**physical** [7] - 36:4, 67:22, 102:5, 121:10, 122:5
**physically** [1] - 49:13
**physician** [1] - 50:21
**PI** [12] - 99:19, 99:20, 99:22, 100:11, 101:20, 102:17, 103:13, 104:1, 104:4, 123:21, 130:25, 131:1
**picked** [1] - 46:19
**piece** [2] - 59:23, 62:21
**place** [11] - 56:25, 64:15, 69:15, 72:21, 73:8, 78:25, 79:8, 81:14, 102:12, 130:21, 133:13
**placed** [1] - 105:15
**plain** [2] - 11:8, 11:19
**plainly** [3] - 20:20, 104:14, 105:22
**Plaintiff** [1] - 120:21
**plaintiff** [13] - 76:21, 77:13, 82:17, 83:4, 84:25, 86:16, 94:9, 114:4, 120:13, 120:16, 120:18, 126:13, 129:22
**Plaintiffs** [1] - 1:3
**plaintiffs** [74] - 4:9, 4:12, 4:14, 4:17, 4:19, 5:2, 5:7, 5:13, 5:15, 6:19, 7:18, 8:7, 12:16, 12:25, 26:21, 42:20, 50:4, 57:6, 82:8, 82:10, 82:12, 83:7, 83:15, 98:16, 98:19, 100:8, 101:5, 108:5, 112:1, 112:18, 113:25, 114:3, 114:5, 114:8, 114:25, 115:12, 115:22, 116:1, 117:1, 117:5, 117:8, 117:25, 118:4, 118:5, 118:11, 118:16, 118:19, 119:10, 119:11, 120:5, 122:12, 122:19, 123:14, 124:14, 124:16, 125:8, 127:1, 127:4, 127:15, 127:18, 130:10, 130:18, 131:8, 131:21, 131:25, 132:5, 132:14, 132:24, 133:7, 134:5, 135:15, 135:17, 135:20, 136:6
**PLAINTIFFS** [1] - 1:12
**Plaintiffs'** [3] - 30:10, 48:14, 110:25
**plaintiffs'** [26] - 4:6, 9:25, 28:14, 83:16, 91:20, 99:14, 100:7, 112:16, 116:21, 116:23, 116:25, 118:25, 123:8, 123:12, 124:3, 124:20, 125:15, 127:23, 131:13, 133:2, 134:9, 135:7, 135:19, 136:2, 136:5, 137:12
**plan** [1] - 8:22
**planned** [3] - 5:15, 8:2, 44:6
**plata** [1] - 132:19
**play** [1] - 67:1
**played** [2] - 66:7, 66:24
**plead** [1] - 102:6
**pleaded** [1] - 103:8
**please** [39] - 4:7, 13:3, 13:6, 13:8, 13:22, 14:13, 14:23, 19:22, 50:5, 50:17, 51:7, 51:10, 51:18, 51:22, 52:4, 52:11, 52:20, 53:23, 54:6, 54:19, 57:21, 60:21, 61:20, 62:1, 62:10, 64:18, 65:10, 66:6, 66:23, 67:10, 84:7, 84:11, 84:13, 84:14, 85:1, 93:13, 95:1, 97:15
**podium** [1] - 12:20
**point** [22] - 12:9, 12:13, 16:16, 19:8, 32:23, 46:3, 49:13, 55:24, 73:13, 77:2, 81:18, 82:6, 83:2, 84:24, 102:20, 103:10, 114:25, 116:18, 118:15, 120:8, 140:11, 141:5
**pointed** [1] - 104:18
**points** [3] - 60:5, 136:4, 136:5
**policies** [40] - 52:17, 53:17, 53:24, 55:16, 56:25, 62:15, 62:19, 67:23, 69:15, 70:4, 74:21, 81:13, 106:8, 108:22, 109:8, 109:10, 109:15, 109:23, 110:14, 110:16, 110:18, 112:7, 112:21, 112:24, 113:3, 113:6, 114:1, 114:7, 114:9, 114:16, 114:18, 116:24, 117:14, 119:2, 119:9, 121:25, 129:18, 131:24, 135:9, 139:12
**policing** [1] - 14:22
**policy** [18] - 51:1, 57:3, 58:18, 59:7, 67:19, 70:4, 74:19, 81:17, 106:10, 106:12, 114:20, 117:19, 117:23, 121:19, 124:8, 134:2, 139:13
**Policy** [2] - 17:24, 18:15
**political** [4] - 13:16, 14:15, 14:16, 25:17
**poor** [1] - 137:25
**population** [72] - 8:17, 10:12, 10:18, 10:23, 10:24, 10:25, 11:1, 11:8, 11:19, 11:20, 11:21, 11:22, 16:10, 16:12, 16:14, 19:5, 19:14, 20:20, 20:23, 21:1, 21:25, 23:11, 24:3, 24:8, 26:25, 27:8, 29:17, 30:5, 30:13, 30:19, 30:24, 31:20, 31:25, 32:22, 33:5, 33:6, 34:4, 34:8, 34:16, 35:9, 38:3, 38:25, 40:22, 41:4, 41:13, 41:17, 41:19, 41:25, 42:2, 42:4, 42:11, 43:4, 43:7, 43:13, 49:9, 69:6, 79:14, 106:1, 107:18, 108:2, 114:11, 114:12, 125:5, 125:9, 127:21, 128:6, 128:8, 128:14, 132:20, 134:14, 134:22, 136:10
**populations** [8] - 8:17, 21:13, 29:14, 32:9, 32:10, 34:3, 34:11
**portion** [4] - 19:7, 88:15, 99:4, 99:5
**pose** [2] - 110:12, 111:18
**posed** [2] - 103:6, 131:23
**position** [2] - 73:14, 137:7
**posses** [1] - 133:21
**possession** [1] - 139:22
**possible** [5] - 7:23, 23:25, 82:14, 107:13, 141:14
**possibly** [1] - 31:6
**postures** [1] - 133:12
**potentially** [1] - 111:10
**pouch** [3] - 89:25, 90:4, 90:5
**practice** [5] - 52:9, 107:19, 110:11, 117:24, 121:19
**practices** [21] - 55:16, 56:25, 60:22, 62:11, 65:11, 68:24, 104:15, 109:13, 112:7, 112:22, 112:24, 113:6, 114:1, 114:10, 114:16, 114:18, 115:20, 116:25, 119:2, 119:9, 121:25
**precise** [1] - 116:2
**precisely** [4] - 40:21, 55:19, 116:4, 116:12
**predominance** [2] - 114:23, 116:3
**predominantly** [1] - 132:17
**preexisting** [1] - 116:5
**prefer** [5] - 12:20, 37:9, 40:21, 44:21, 83:23
**preference** [2] - 44:23, 44:24
**pregnancy** [1] - 35:25
**PRELIMINARY** [1] - 1:8
**preliminary** [14] - 4:5, 5:4, 5:21, 6:7, 100:2, 100:25, 101:2, 104:16, 112:12, 123:9, 133:16, 134:4, 137:13, 140:20
**premise** [4] - 16:11, 16:12, 40:15, 127:22
**prepared** [3] - 8:9, 101:2, 118:13
**prescribed** [1] - 79:19
**prescription** [5] - 77:24, 109:20, 128:13, 128:20, 130:20
**prescriptions** [1] - 77:21
**presence** [10] - 9:3, 16:16, 32:17, 50:2, 102:19, 125:25, 126:17, 126:19, 126:20
**Present** [1] - 2:5
**present** [26] - 6:22, 9:9, 18:20, 19:9, 19:11, 23:21, 24:1, 29:5, 30:19, 30:24, 32:9, 32:18, 32:23, 35:11, 38:15, 38:18, 41:21, 42:3, 49:13, 82:5, 125:21, 125:23, 126:22, 131:18, 132:9, 134:13
**presentation** [2] - 119:25, 141:12
**presentations** [1] - 54:18
**presented** [2] - 17:3, 69:21
**presenting** [2] - 57:9, 130:2
**preserve** [1] - 91:11
**Press** [2] - 14:21,

14:22
**presumption** [1] - 133:9
**pretrial** [2] - 140:13, 140:14
**pretty** [2] - 54:21, 66:18
**prevents** [1] - 116:2
**previous** [1] - 71:17
**previously** [4] - 24:18, 79:13, 85:12, 105:4
**primarily** [2] - 70:20, 70:22
**primary** [2] - 26:11, 53:19
**primed** [1] - 123:6
**Princeton** [2] - 14:16, 14:21
**principally** [1] - 20:13
**principle** [1] - 31:19
**prior** [3] - 51:24, 55:25, 135:18
**prison** [4] - 71:4, 132:20, 135:9
**Prison** [1] - 52:25
**prisoners** [1] - 60:8
**prisons** [5] - 53:1, 53:2, 65:2, 70:20, 119:21
**privacy** [3] - 87:23, 88:6, 91:11
**privately** [1] - 82:24
**probably** [2] - 11:18, 21:15
**problem** [10] - 59:5, 65:25, 67:25, 68:1, 68:4, 69:21, 75:13, 116:8, 116:13, 116:17
**problematic** [2] - 15:25, 127:11
**problems** [11] - 54:4, 58:1, 58:20, 63:22, 64:2, 64:9, 67:22, 68:15, 68:16, 78:18, 78:20
**procedural** [1] - 133:12
**procedure** [1] - 57:3
**procedures** [9] - 52:17, 53:17, 62:15, 62:19, 67:23, 70:4, 81:13, 130:21, 132:16
**proceed** [11] - 7:22, 8:9, 12:18, 37:2, 61:23, 84:5, 84:19, 88:20, 95:1, 99:7, 99:11
**proceeding** [3] - 103:11, 116:1, 141:16
**proceedings** [1] - 142:10
**PROCEEDINGS** [1] - 1:7
**Proceedings** [1] - 1:25
**proceeds** [1] - 127:25
**process** [1] - 6:20
**processed** [1] - 32:20
**processes** [1] - 132:21
**processing** [6] - 124:25, 132:18, 133:1, 133:4, 133:18, 133:23
**produce** [5] - 107:11, 107:14, 108:7, 108:8, 139:24
**produced** [30] - 10:5, 11:4, 16:6, 17:21, 18:2, 18:14, 19:25, 20:10, 20:15, 21:16, 21:17, 22:2, 22:11, 22:18, 23:18, 28:16, 28:17, 28:18, 32:16, 33:8, 33:23, 33:24, 35:8, 40:22, 56:9, 57:4, 66:6, 126:13, 139:19
**Produced** [1] - 1:25
**production** [2] - 45:4, 107:20
**products** [1] - 124:10
**profess** [1] - 5:25
**profession** [2] - 13:15, 50:20
**professional** [6] - 14:9, 51:16, 51:23, 54:6, 68:19, 126:17
**professionals** [1] - 109:18
**Professor** [26] - 7:24, 8:14, 13:1, 13:13, 14:11, 15:5, 15:19, 16:20, 17:2, 17:5, 17:16, 24:2, 25:3, 25:14, 37:10, 40:7, 41:2, 44:4, 44:10, 45:3, 45:15, 46:5, 47:5, 48:6, 50:1, 137:19
**professor** [4] - 13:16, 26:14, 48:12, 126:15
**proffer** [1] - 9:7
**proffered** [1] - 125:15
**program** [6] - 17:23, 52:15, 54:2, 54:15, 57:24, 62:14
**programs** [1] - 53:25
**PROJECT** [1] - 1:16
**project** [1] - 26:7
**Project** [2] - 15:2, 26:5
**projector** [1] - 44:22
**prominently** [1] - 111:13
**promptly** [1] - 141:14
**promulgate** [1] - 54:12
**proof** [1] - 135:16
**proper** [1] - 101:24
**properly** [1] - 113:17
**property** [1] - 65:7
**proportion** [4] - 24:22, 39:24, 47:24, 59:12
**propose** [2] - 87:19, 101:5
**proposed** [8] - 5:6, 99:20, 99:22, 101:25, 103:9, 113:4, 115:16, 134:9
**proposition** [2] - 131:14, 132:24
**prosecuted** [1] - 135:22
**protect** [2] - 87:23, 109:25
**protocol** [1] - 130:6
**protocols** [3] - 124:6, 129:15, 132:16
**prove** [1] - 118:11
**provide** [13] - 10:17, 13:17, 62:15, 64:19, 67:11, 84:13, 87:16, 106:16, 110:3, 111:10, 112:10, 114:14, 133:9
**provided** [14] - 20:17, 47:22, 51:6, 68:7, 68:11, 85:11, 85:17, 88:19, 90:13, 95:5, 95:8, 108:25, 124:11, 126:18
**provides** [3] - 123:13, 132:8, 134:21
**providing** [12] - 11:21, 11:25, 52:18, 54:14, 62:17, 65:11, 68:24, 108:22, 109:22, 124:9, 131:4, 139:16
**provision** [1] - 101:24
**provisions** [2] - 54:24, 99:24
**PT** [2] - 34:20, 34:21
**public** [6] - 87:22, 88:14, 106:14, 133:15, 133:19, 137:8
**publication** [1] - 14:18
**publications** [1] - 54:19
**published** [3] - 14:19, 14:21, 14:22
**pull** [1] - 13:6
**pulled** [1] - 21:20
**punch** [2] - 40:9
**punitive** [1] - 114:1
**purple** [1] - 89:15
**purport** [1] - 35:8
**purporting** [2] - 27:19, 27:21
**purports** [1] - 125:19
**purpose** [5] - 5:11, 53:19, 73:7, 113:18, 125:2
**purposes** [2] - 7:7, 80:7
**pursuant** [2] - 6:22, 142:8
**pursue** [1] - 100:25
**pursued** [1] - 6:24
**put** [9] - 4:6, 65:7, 77:15, 85:3, 94:24, 102:24, 119:16, 138:5, 139:4
**putative** [5] - 115:22, 117:2, 117:7, 123:12, 131:10
**putting** [2] - 101:9, 101:16

**Q**

**qualifications** [2] - 15:16, 15:17
**qualify** [1] - 89:7
**quarter** [1] - 105:12
**quarters** [3] - 125:3, 129:8, 135:12
**question** [40] - 5:23, 15:24, 24:17, 24:20, 31:7, 31:12, 34:14, 37:2, 37:9, 40:6, 43:1, 62:4, 62:7, 71:17, 72:10, 73:23, 74:12, 78:20, 79:24, 80:3, 80:9, 80:11, 81:6, 81:25, 89:1, 93:12, 96:19, 101:6, 101:12, 103:6, 103:25, 117:23, 121:6, 121:14, 129:14, 137:2, 138:4, 138:14, 141:5
**questionable** [3] - 16:7, 16:21, 135:18
**questioning** [2] - 93:8, 121:5
**questionnaire** [2] - 63:5, 81:16
**questionnaires** [1] - 79:4
**questions** [25] - 5:21, 8:10, 17:18, 42:19, 51:15, 56:23, 63:6, 63:25, 64:1, 78:19, 81:3, 92:21, 93:8, 97:18, 98:3, 98:5, 99:12, 111:20, 111:22, 116:22, 117:18, 123:3, 134:9, 137:16, 141:3
**quick** [1] - 82:18
**quickly** [2] - 22:14, 33:6
**quite** [3] - 100:22, 123:1, 139:24
**quote** [3] - 111:6, 113:13, 130:11
**quote/unquote** [1] - 36:13
**quoting** [2] - 6:18, 6:19

**R**

**R** [25] - 1:8, 1:11, 4:1, 13:9, 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17
**R.G** [4] - 85:7, 85:11, 88:22, 91:25
**raise** [6] - 13:2, 17:1, 56:1, 84:11, 84:25, 94:21
**raised** [1] - 71:21
**ran** [2] - 24:22, 109:2
**range** [3] - 21:6, 116:9, 117:11
**ranging** [2] - 36:13, 37:7
**rate** [1] - 58:15
**rather** [11] - 17:2, 28:21, 39:20, 40:10, 114:7, 117:5, 124:15, 126:1, 126:2, 126:22, 128:1
**rationale** [2] - 11:14, 11:15
**reach** [2] - 61:6, 129:13
**reached** [2] - 30:6, 30:13
**reaching** [2] - 78:15, 120:5
**read** [3] - 34:5, 67:3, 95:11

**reading** [2] - 33:13, 33:14
**ready** [3] - 9:10, 117:20, 118:10
**reality** [1] - 132:5
**realize** [2] - 5:6, 83:1
**realized** [1] - 51:25
**really** [11] - 10:17, 63:24, 66:21, 67:16, 71:6, 73:25, 77:15, 99:13, 121:10, 141:10
**Realtime** [1] - 142:6
**reason** [12] - 39:22, 43:6, 52:2, 55:15, 61:13, 63:25, 65:22, 68:1, 97:7, 112:1, 112:2, 137:9
**reasonable** [4] - 75:21, 76:4, 130:11, 139:18
**reasonably** [3] - 131:5, 131:9, 131:24
**reasoning** [1] - 32:12
**reasons** [7] - 21:14, 63:15, 123:10, 136:25, 137:11, 140:18
**rebut** [1] - 110:20
**rebuttal** [3] - 70:10, 99:2, 139:1
**receive** [3] - 62:23, 72:7, 72:8
**received** [1] - 14:15
**receiving** [1] - 53:20
**recent** [2] - 87:1, 90:24
**recently** [3] - 85:17, 95:8, 104:11
**recess** [10] - 61:15, 61:17, 61:18, 82:19, 98:11, 99:6, 99:9, 141:4, 141:7, 141:8
**recitation** [1] - 140:25
**recognize** [1] - 102:6
**recognized** [2] - 111:17, 133:25
**reconcile** [1] - 75:1
**reconnect** [2] - 61:8, 61:16
**record** [26] - 4:7, 13:14, 15:2, 17:17, 18:9, 35:15, 35:16, 37:19, 50:18, 56:21, 83:23, 87:18, 87:22, 87:23, 88:5, 88:7, 88:16, 108:24, 113:3, 121:1, 123:10, 123:18, 124:15, 133:13, 134:4, 135:18
**Recorded** [1] - 1:25
**records** [20] - 10:18, 18:7, 18:16, 19:1, 107:9, 107:11, 107:14, 107:18, 108:3, 108:7, 120:8, 126:1, 128:4, 128:5, 130:1, 139:7, 139:20, 139:22, 139:23, 139:24
**RECROSS** [1] - 3:2
**redact** [1] - 88:13
**redacted** [2] - 87:23, 88:5
**redirect** [3] - 25:3, 39:6, 44:15
**REDIRECT** [1] - 3:2
**reduced** [1] - 137:2
**reductions** [3] - 33:6, 34:4, 34:17
**Reed** [1] - 14:15
**refer** [1] - 85:22
**reference** [3] - 24:16, 99:21, 102:1
**referenced** [1] - 57:15
**references** [3] - 66:5, 112:20, 114:9
**referred** [3] - 26:9, 79:13, 137:5
**referring** [7] - 33:9, 33:10, 41:10, 46:23, 57:16, 60:24, 91:6
**refers** [2] - 10:23, 66:22
**refine** [1] - 112:19
**reflect** [5] - 21:19, 32:17, 46:14, 125:2, 131:6
**reflected** [2] - 56:14, 108:21
**reflecting** [2] - 51:3, 107:9
**reflection** [3] - 14:8, 40:19, 51:23
**reflects** [3] - 127:20, 127:21, 128:20
**reframe** [2] - 37:2, 72:9
**regard** [2] - 56:1, 56:2
**regarding** [16] - 5:2, 6:3, 8:16, 8:23, 19:5, 19:16, 41:4, 41:6, 44:7, 45:13, 69:25, 78:4, 95:18, 99:18, 100:3, 102:5
**regardless** [1] - 116:5
**Registered** [1] - 142:5
**regulations** [1] - 142:11
**related** [8] - 36:5, 36:8, 37:22, 50:24, 62:19, 131:5, 131:9, 131:24
**relationship** [3] - 54:23, 109:19, 116:20
**relatively** [1] - 37:17
**release** [1] - 35:2
**released** [5] - 59:13, 59:16, 98:14, 125:3, 129:8
**relevant** [7] - 10:6, 14:24, 41:21, 74:3, 128:4, 128:5, 130:5
**reliable** [3] - 32:14, 123:13, 134:24
**reliance** [2] - 129:5, 131:13
**relied** [6] - 8:18, 76:7, 95:17, 112:19, 132:14, 132:23
**relief** [18] - 6:17, 99:23, 100:2, 101:20, 101:22, 102:4, 103:10, 103:13, 103:15, 112:10, 119:5, 119:8, 123:14, 125:8, 125:14, 133:16, 137:14
**rely** [3] - 16:21, 56:24, 127:18
**relying** [3] - 67:5, 114:7, 120:9
**remaining** [2] - 70:10, 101:13
**remains** [2] - 106:1, 126:15
**remarkable** [1] - 105:6
**remedied** [1] - 112:10
**remedy** [1] - 123:16
**remember** [3] - 73:25, 86:3, 86:6
**remind** [1] - 121:20
**remote** [1] - 98:14
**remotely** [2] - 98:13, 98:20
**removal** [2] - 57:2, 133:24
**removed** [1] - 18:16
**removing** [1] - 103:9
**render** [2] - 50:25, 137:25
**renew** [1] - 73:10
**renewed** [3] - 122:20, 123:8, 137:12
**repeat** [4] - 24:17, 68:9, 88:25, 90:2
**repeating** [1] - 30:12
**repercussions** [1] - 140:10
**repetition** [1] - 87:6
**rephrase** [4] - 72:18, 73:2, 93:12, 97:20
**replicate** [1] - 20:13
**replicated** [1] - 20:19
**reply** [8] - 8:14, 10:1, 28:14, 130:10, 133:7, 135:20, 135:23, 136:5
**report** [65] - 13:25, 14:1, 14:4, 17:16, 17:19, 17:20, 18:5, 19:25, 20:8, 20:9, 20:14, 20:18, 21:8, 21:24, 22:5, 22:10, 22:12, 22:13, 24:12, 26:11, 26:24, 28:9, 28:13, 28:23, 30:5, 31:1, 31:15, 31:24, 33:18, 34:19, 41:3, 48:13, 48:16, 49:3, 51:3, 51:11, 51:12, 51:18, 56:8, 56:9, 56:12, 56:15, 56:21, 57:19, 64:6, 66:5, 66:15, 66:22, 67:2, 67:4, 67:9, 72:14, 72:19, 74:12, 75:2, 75:19, 76:2, 76:10, 77:16, 106:25, 126:2, 127:25, 128:23
**reported** [3] - 106:5, 109:3, 142:9
**REPORTER** [2] - 142:1, 142:17
**Reporter** [3] - 88:13, 142:5, 142:6
**reports** [5] - 22:17, 24:5, 24:16, 127:14, 137:21
**represent** [10] - 18:6, 18:25, 27:15, 27:19, 27:21, 35:7, 35:9, 35:10, 93:3, 93:5
**representation** [1] - 107:10
**representative** [2] - 49:7, 135:25
**representatives** [3] - 54:10, 106:4, 118:10
**represented** [2] - 35:3, 107:8
**represents** [2] - 17:24, 37:17
**reproduced** [2] - 33:17, 33:20
**reps** [1] - 100:18
**request** [14] - 10:16, 76:17, 96:9, 100:18, 100:19, 100:24, 102:5, 112:19, 118:25, 120:10, 124:10, 124:13, 125:8, 140:22
**requested** [8] - 69:10, 97:9, 100:1, 101:22, 101:25, 103:10, 119:4, 140:20
**requesting** [5] - 9:1, 57:7, 101:20, 101:21, 111:3
**requests** [1] - 57:5
**require** [4] - 37:18, 69:7, 102:15, 132:10
**required** [4] - 125:13, 130:13, 130:15, 130:17
**requirement** [8] - 110:6, 113:22, 114:2, 118:18, 127:24, 129:17, 131:20, 132:15
**requirements** [7] - 113:4, 113:21, 118:24, 119:10, 122:24, 123:15, 134:5
**requires** [6] - 67:16, 111:7, 118:18, 128:10, 131:22, 134:6
**requiring** [2] - 133:17, 133:18
**requisite** [1] - 138:19
**research** [4] - 14:19, 14:20, 25:17, 54:25
**reserve** [4] - 25:2, 55:24, 70:9, 137:19
**residency** [1] - 52:9
**residential** [3] - 104:22, 105:2, 110:17
**resolution** [1] - 115:14
**resolve** [1] - 134:8
**resolved** [2] - 5:11, 103:18
**resolving** [1] - 5:1
**respect** [13] - 6:12, 9:20, 10:12, 32:18, 44:10, 55:12, 55:15, 60:24, 102:9, 120:1, 125:17, 125:18, 135:15
**respective** [1] - 137:21
**respectively** [1] - 100:3

**respond** [2] - 36:20, 130:10
**respondents** [1] - 12:8
**response** [9] - 17:22, 36:22, 53:23, 57:4, 72:9, 109:6, 118:5, 126:4, 137:9
**responsibilities** [1] - 135:25
**responsible** [2] - 52:16, 52:19
**rest** [4] - 20:24, 25:3, 91:18, 125:4
**restate** [3] - 62:7, 93:21, 96:19
**restful** [1] - 102:12
**restrictions** [2] - 124:11, 131:9
**restroom** [2] - 61:11, 106:14
**result** [5] - 55:21, 65:23, 77:9, 107:19, 111:6
**resulted** [1] - 132:6
**resulting** [1] - 136:9
**retain** [1] - 35:2
**retained** [7] - 13:17, 50:22, 50:23, 53:8, 53:13, 73:6
**return** [2] - 34:11, 99:6
**returned** [2] - 61:21, 88:18
**returning** [1] - 121:2
**reveals** [1] - 124:14
**reverse** [1] - 128:24
**review** [9] - 22:13, 22:14, 22:17, 22:20, 45:4, 50:23, 69:23, 76:12, 107:19
**reviewed** [13] - 22:12, 22:23, 22:25, 30:11, 38:5, 57:2, 57:4, 57:6, 57:10, 57:12, 100:13, 128:4, 128:5
**reviewing** [2] - 51:24, 108:2
**revise** [1] - 11:9
**revised** [2] - 57:13, 59:3
**revisit** [1] - 16:25
**rhetorical** [1] - 124:24
**rice** [1] - 90:7
**right** [65] - 6:15, 7:2, 7:16, 10:14, 10:15, 10:20, 11:6, 13:2, 25:4, 26:10, 27:18, 29:19, 30:3, 30:17, 34:21, 35:4, 35:14, 37:22, 38:8, 47:1, 47:20, 48:14, 49:2, 49:5, 49:14, 49:16, 49:20, 49:24, 50:1, 51:18, 55:9, 55:24, 59:22, 70:12, 71:7, 80:21, 82:25, 84:11, 85:1, 87:3, 88:12, 91:6, 91:11, 91:15, 91:16, 91:17, 92:5, 92:16, 92:19, 93:6, 94:8, 94:22, 95:6, 101:8, 103:12, 103:21, 104:7, 108:5, 120:19, 120:20, 123:2, 130:25, 138:3, 140:21
**right-hand** [1] - 51:18
**rightfully** [1] - 113:21
**Rights** [1] - 1:14
**rights** [6] - 90:25, 91:3, 91:6, 91:14, 100:9, 113:20
**rigorous** [1] - 136:1
**Rikers** [1] - 60:7
**rise** [1] - 132:2
**rises** [1] - 136:11
**risk** [32] - 34:20, 35:17, 36:1, 58:4, 58:7, 59:1, 59:10, 59:11, 59:21, 60:15, 70:6, 99:25, 100:6, 110:8, 110:12, 111:18, 112:5, 113:1, 114:15, 115:6, 115:10, 116:8, 117:2, 117:10, 121:9, 122:5, 122:7, 129:23, 131:23, 132:6, 135:11, 137:6
**risks** [2] - 58:6, 115:22
**RMR** [1] - 142:17
**Road** [1] - 1:17
**role** [5] - 52:16, 66:7, 66:24, 67:1, 69:13
**room** [20] - 13:20, 19:19, 20:20, 21:5, 29:6, 42:11, 42:12, 42:15, 73:9, 78:9, 97:8, 104:10, 105:18, 111:16, 112:11, 113:14, 116:15, 119:23, 124:19, 133:8
**Room** [17] - 17:25, 18:21, 19:2, 19:3, 19:6, 20:1, 20:11, 22:10, 23:5, 23:8, 33:19, 68:25, 81:10, 92:12, 117:3, 117:12, 119:7
**rooms** [24] - 28:5, 29:25, 40:19, 41:21, 77:21, 85:23, 85:25, 86:12, 86:16, 86:19, 89:3, 89:6, 89:23, 90:14, 96:24, 105:1, 106:4, 110:12, 116:4, 124:4, 128:15, 130:15, 136:11, 136:14
**Rooms** [22] - 8:18, 19:17, 46:15, 57:1, 60:22, 62:11, 64:5, 65:12, 67:9, 67:11, 89:20, 90:10, 92:1, 104:21, 110:20, 112:1, 112:4, 113:1, 119:12, 123:11, 123:19, 136:24
**round** [1] - 100:21
**routinely** [1] - 107:4
**rows** [5] - 18:15, 18:16, 18:17, 35:1, 35:2
**RUBIN** [1] - 1:8
**rule** [2] - 17:9, 34:10
**Rule** [13] - 112:1, 112:3, 112:11, 113:21, 114:22, 115:1, 116:1, 118:24, 123:15, 123:23, 127:24, 134:6, 138:1
**rules** [1] - 141:13
**ruling** [1] - 97:16
**run** [3] - 21:24, 24:13, 24:20
**running** [1] - 136:15
**runs** [1] - 56:12
**Ryan** [2] - 114:6, 135:7

## S

**S** [13] - 1:11, 4:1, 25:7, 42:24, 48:10, 70:15, 91:23, 142:16
**safe** [2] - 81:11, 102:12
**safeguards** [1] - 79:8
**safety** [1] - 110:15
**said** [24] - 21:6, 24:4, 27:17, 43:3, 63:21, 66:12, 69:3, 69:16, 70:25, 71:13, 72:2, 74:18, 76:9, 77:15, 77:25, 78:11, 78:17, 78:22, 82:13, 83:17, 89:5, 128:22, 128:24, 136:8
**same** [41] - 11:18, 18:22, 20:21, 21:16, 22:10, 22:19, 23:15, 27:11, 27:13, 27:16, 27:18, 27:20, 35:16, 37:25, 38:4, 38:15, 38:16, 38:17, 38:19, 72:7, 79:2, 87:11, 87:20, 100:10, 100:16, 112:14, 117:14, 119:13, 119:22, 126:23, 127:13, 136:18, 139:7, 139:10, 139:11, 139:13
**San** [5] - 52:10, 52:11, 52:13, 116:15, 119:21
**sanitation** [2] - 124:6, 131:4
**sarcastic** [1] - 137:16
**satisfactory** [2] - 37:13, 55:20
**satisfied** [1] - 135:14
**satisfy** [3] - 115:14, 123:15, 134:5
**scenario** [3] - 39:2, 79:2, 111:11
**scheduling** [1] - 141:13
**Schmidt** [5] - 3:5, 4:16, 5:24, 62:1, 81:4
**SCHMIDT** [17] - 1:19, 4:16, 50:6, 50:8, 50:16, 55:3, 56:19, 56:20, 61:2, 61:6, 62:3, 62:9, 70:9, 72:22, 73:10, 81:5, 81:8
**Schmidt's** [1] - 56:11
**school** [1] - 52:6
**School** [1] - 52:8
**science** [5] - 13:16, 14:15, 14:16, 25:17, 129:1
**sciences** [1] - 14:20
**scientific** [1] - 139:16
**scientist** [1] - 126:18
**scope** [9] - 36:16, 37:11, 37:16, 99:18, 99:23, 100:19, 102:17, 111:24, 135:21
**screen** [4] - 54:3, 61:7, 109:16, 110:1
**screened** [7] - 58:6, 58:11, 58:17, 58:19, 58:25, 67:14, 75:14
**screening** [33] - 50:25, 54:1, 55:16, 57:20, 57:21, 57:22, 57:23, 59:18, 59:20, 59:23, 59:24, 60:14, 60:22, 62:11, 62:17, 62:21, 63:10, 70:3, 74:22, 75:8, 76:14, 78:19, 78:21, 81:15, 81:16, 109:16, 114:11, 117:15, 122:2, 129:14, 129:19, 132:15, 132:24
**seal** [1] - 88:15
**sealed** [2] - 88:7, 88:15
**seat** [3] - 7:12, 13:6, 141:10
**seated** [1] - 61:20
**seats** [1] - 7:9
**second** [32] - 6:17, 7:6, 8:7, 13:23, 14:21, 18:1, 18:22, 19:23, 19:25, 20:8, 20:9, 21:24, 22:12, 22:13, 26:24, 28:9, 28:13, 28:23, 30:5, 31:15, 31:24, 33:12, 38:17, 39:23, 46:6, 101:13, 103:14, 107:16, 120:25, 121:5, 125:15, 134:3
**Second** [1] - 131:13
**seeing** [1] - 106:5
**seek** [5] - 6:11, 108:5, 121:22, 122:21, 123:16
**seeking** [8] - 6:1, 6:3, 6:6, 101:12, 103:15, 104:16, 108:9, 119:8
**seem** [3] - 9:13, 130:18, 139:15
**seemed** [1] - 77:17
**seen** [1] - 59:17
**seizures** [1] - 64:10
**selected** [1] - 124:24
**selective** [1] - 124:3
**sell** [2] - 65:6, 65:20
**sense** [3] - 11:5, 37:18, 83:11
**sensitivity** [1] - 87:16
**sent** [2] - 69:5, 77:16
**separate** [1] - 102:7
**separated** [1] - 134:19
**separately** [1] - 103:8
**September** [8] - 22:3, 62:6, 62:13, 65:13, 66:10, 69:2, 83:22, 113:23

**Sequen** [1] - 116:14
**sequestration** [1] - 5:5
**series** [1] - 9:21
**serious** [16] - 36:14, 37:7, 37:17, 37:21, 67:18, 100:22, 110:12, 113:1, 115:6, 116:8, 117:3, 117:10, 119:15, 129:21, 130:4, 131:23
**servant** [1] - 137:8
**serve** [1] - 118:10
**served** [2] - 15:1, 53:13
**service** [1] - 124:7
**services** [7] - 13:17, 62:17, 84:2, 84:8, 84:20, 90:10, 98:8
**set** [3] - 20:9, 32:16, 61:22
**setting** [1] - 128:19
**settings** [2] - 55:18, 57:20
**seven** [4] - 49:9, 66:16, 86:23, 112:16
**Seven** [5] - 100:9, 120:1, 121:5, 121:13, 121:15
**seven-month** [1] - 66:16
**several** [5] - 45:13, 95:5, 109:2, 112:21, 120:14
**severe** [1] - 131:17
**shameful** [1] - 104:13
**share** [6] - 5:10, 49:17, 49:20, 87:21, 108:15, 134:7
**shared** [1] - 44:5
**sharing** [1] - 105:18
**she's** [2] - 10:23, 44:6
**sheets** [1] - 139:6
**shifted** [1] - 137:22
**ship** [1] - 104:11
**shocks** [1] - 119:14
**shored** [1] - 113:3
**short** [26] - 9:25, 39:24, 43:3, 43:5, 47:25, 60:13, 60:18, 61:10, 64:8, 64:12, 64:18, 67:20, 71:2, 71:20, 74:9, 74:13, 74:19, 75:8, 105:2, 113:15, 121:24, 124:25, 132:11, 132:18, 133:4, 136:3
**Short** [1] - 131:19
**short-term** [17] - 60:13, 60:18, 64:8, 64:12, 64:18, 67:20, 71:20, 74:9, 74:13, 74:19, 75:8, 105:2, 113:15, 121:24, 124:25, 132:18, 133:4
**shorter** [1] - 43:24
**should** [18] - 12:9, 16:21, 60:16, 60:17, 72:7, 73:8, 75:17, 88:16, 93:24, 105:24, 112:12, 123:9, 124:22, 125:16, 129:24, 133:9, 137:12, 137:20
**show** [11] - 41:9, 44:4, 67:18, 110:8, 113:4, 126:24, 129:22, 131:8, 135:20, 139:6, 139:20
**showed** [1] - 69:4
**shower** [2] - 92:4, 106:20
**showing** [8] - 41:17, 41:19, 115:16, 121:20, 126:20, 131:22, 133:19, 136:2
**shown** [1] - 33:3
**shows** [8] - 20:19, 29:7, 47:12, 59:8, 72:5, 113:23, 134:21, 139:3
**shy** [1] - 8:12
**sick** [2] - 89:13, 132:16
**side** [1] - 46:8
**sides** [2] - 8:2, 44:11
**signed** [1] - 95:12
**significance** [1] - 127:8
**significant** [4] - 34:17, 65:24, 70:6, 137:6
**significantly** [1] - 134:22
**signs** [5] - 62:25, 63:9, 63:11, 67:18, 68:14
**silence** [1] - 111:15
**similar** [5] - 41:24, 48:3, 55:25, 97:9, 139:6
**similarly** [3] - 42:4, 58:24, 114:6
**simple** [1] - 137:2
**simply** [6] - 23:5, 37:10, 110:19, 113:2, 117:3, 126:25
**simultaneous** [14] - 16:16, 27:22, 28:24, 37:24, 38:9, 43:4, 43:7, 43:13, 46:1, 46:18, 126:1, 126:17, 126:19, 126:20
**simultaneously** [3] - 16:15, 49:15, 125:23
**Sinai** [1] - 52:7
**since** [7] - 15:1, 83:24, 89:20, 90:21, 90:22, 104:25, 119:11
**single** [10] - 32:13, 49:4, 105:3, 105:5, 105:17, 108:15, 112:4, 119:7, 130:8, 139:4
**sir** [1] - 50:12
**site** [5] - 68:11, 113:15, 128:3, 129:19, 132:4
**situated** [2] - 114:6, 115:8
**situation** [5] - 29:25, 112:14, 114:6, 118:16, 118:17
**situations** [2] - 68:3, 132:10
**Six** [2] - 101:9, 103:25
**six** [6] - 66:12, 66:20, 69:4, 75:12, 86:8, 105:16
**size** [3] - 106:13, 106:14, 107:6
**skilled** [1] - 39:18
**skin** [1] - 73:14
**skipped** [1] - 137:3
**slave** [1] - 104:11
**sleep** [9] - 89:12, 91:18, 101:23, 101:24, 102:4, 102:8, 103:8, 103:16
**sleeping** [2] - 99:23, 102:18
**slightly** [1] - 22:7
**small** [5] - 18:17, 21:20, 33:3, 39:24, 43:12
**smaller** [1] - 40:3
**soap** [1] - 124:9
**social** [1] - 14:20
**solely** [2] - 114:8, 118:4
**some** [39] - 5:2, 5:6, 9:13, 10:17, 16:16, 17:18, 26:25, 27:13, 27:14, 27:17, 34:11, 34:16, 34:18, 49:13, 52:2, 53:18, 56:22, 57:8, 58:8, 65:8, 68:1, 71:10, 72:5, 75:17, 78:17, 79:14, 82:4, 87:1, 90:6, 93:9, 99:11, 101:8, 105:13, 106:20, 110:6, 136:10, 138:18, 139:3
**someone** [12] - 58:16, 59:20, 60:1, 64:1, 64:21, 66:1, 67:13, 67:24, 68:3, 71:4, 105:15
**something** [12] - 7:3, 9:24, 11:9, 35:13, 37:19, 37:21, 37:22, 41:3, 49:1, 65:20, 85:14, 131:25
**sometime** [1] - 22:3
**sometimes** [3] - 65:23, 77:11, 122:23
**son** [2] - 77:4, 96:10
**soon** [1] - 59:20
**sorry** [28] - 12:6, 20:5, 22:16, 24:18, 30:9, 33:16, 45:24, 46:24, 53:10, 53:22, 58:7, 68:9, 72:17, 75:23, 79:21, 81:1, 86:5, 86:24, 88:25, 89:1, 89:8, 90:2, 93:19, 94:14, 96:3, 96:15, 123:20
**sort** [10] - 40:8, 40:12, 44:12, 56:15, 99:15, 103:9, 121:9, 133:9, 137:18, 138:9
**sorts** [2] - 16:2, 90:14
**sought** [5] - 6:17, 100:11, 103:13, 126:13, 137:19
**sound** [3] - 85:15, 87:3, 137:16
**sounds** [2] - 16:18, 74:1
**soup** [4] - 89:25, 90:3, 90:4, 90:6
**Southern** [2] - 74:2, 113:13
**space** [11] - 49:17, 49:20, 53:18, 86:21, 91:17, 102:11, 103:19, 104:23, 106:16, 127:13
**Spanish** [4] - 2:6, 84:6, 84:7, 84:16
**speak** [6] - 12:20, 13:7, 26:14, 87:5, 88:8, 123:6
**speaking** [1] - 36:19
**speaks** [1] - 111:15
**special** [1] - 117:9
**specific** [12] - 8:10, 15:22, 63:16, 112:7, 112:24, 113:3, 113:25, 114:9, 114:20, 115:21, 116:24, 128:1
**specifically** [18] - 6:2, 6:6, 13:18, 22:16, 41:18, 50:25, 53:15, 58:6, 60:13, 65:2, 66:12, 74:8, 80:9, 89:6, 102:19, 114:13, 114:18, 120:1
**specificity** [2] - 112:21, 113:25
**speculate** [2] - 97:21, 98:1
**spell** [2] - 13:8, 84:14
**spelled** [1] - 50:11
**spelling** [1] - 88:9
**spent** [1] - 25:22
**spikes** [2] - 125:9, 134:14
**spiking** [1] - 136:10
**split** [2] - 41:22, 42:16
**spoke** [3] - 41:6, 87:10, 90:17
**spoken** [1] - 90:12
**sponte** [1] - 116:16
**spot** [1] - 61:24
**spread** [1] - 60:2
**spreadsheet** [1] - 23:17
**squalid** [1] - 119:14
**square** [9] - 106:13, 106:16, 106:17, 107:5, 107:6, 139:9, 139:11
**stack** [1] - 10:18
**staff** [16] - 57:8, 57:25, 60:3, 62:22, 62:23, 64:22, 67:17, 69:10, 69:17, 69:18, 78:22, 111:10, 129:19
**Stafford** [3] - 114:22, 115:1, 116:2
**stage** [2] - 6:5, 103:11
**stall** [1] - 106:14
**stamp** [2] - 39:19, 45:9
**stamped** [1] - 39:20
**stamps** [1] - 31:16
**stand** [2] - 72:10, 83:13
**standard** [15] - 59:5, 59:17, 72:16, 114:23, 118:23, 125:6, 125:19,

129:11, 129:17, 129:22, 130:7, 130:25, 131:1, 131:20, 131:22
**standards** [20] - 25:21, 54:12, 54:17, 57:13, 57:14, 57:15, 57:20, 58:24, 59:2, 60:12, 64:4, 71:24, 72:1, 72:12, 72:21, 73:8, 74:9, 74:16, 128:9, 129:6
**standing** [2] - 83:1, 130:6
**Stanford** [1] - 136:2
**start** [1] - 69:24
**started** [3] - 52:6, 67:2, 104:4
**starting** [2] - 62:14, 67:17
**starts** [1] - 59:21
**State** [2] - 52:25, 53:6
**state** [7] - 13:8, 25:18, 50:17, 75:2, 97:5, 132:20, 135:9
**stated** [6] - 63:12, 89:2, 115:12, 124:20, 137:11, 140:18
**statement** [4] - 10:22, 14:1, 20:2, 75:2
**statements** [6] - 9:21, 87:1, 106:3, 109:7, 109:8, 126:4
**STATES** [2] - 1:1, 1:9
**States** [5] - 15:3, 140:5, 140:8, 142:6, 142:12
**states** [4] - 30:5, 75:19, 76:2, 112:21
**stating** [1] - 72:16
**station** [1] - 124:18
**stations** [1] - 52:2
**statistic** [3] - 32:13, 128:12, 128:24
**statistical** [1] - 132:12
**statistics** [2] - 32:16, 128:8
**stay** [4] - 78:14, 133:2, 134:13, 134:15
**stayed** [2] - 88:23, 89:3
**stenographically** [1] - 142:9
**stenographically-reported** [1] - 142:9
**Stenography** [1] - 1:25
**step** [1] - 50:2
**steps** [3] - 23:13, 110:3, 112:13
**sticking** [1] - 141:12
**still** [6] - 59:19, 80:22, 117:18, 117:23, 131:22, 136:19
**stood** [1] - 135:18
**stop** [4] - 37:8, 111:20, 119:16, 119:20
**storm** [2] - 124:19, 139:5
**story** [3] - 124:5, 136:6, 136:8
**strawman** [1] - 130:10
**streamlined** [1] - 7:23
**street** [2] - 104:8, 140:9
**Street** [1] - 2:3
**strictly** [2] - 71:19, 80:7
**strike** [1] - 115:23
**stroke** [1] - 134:8
**strongly** [1] - 133:19
**structure** [1] - 54:21
**structured** [1] - 63:5
**stuck** [1] - 105:18
**stuff** [1] - 65:6
**subject** [4] - 71:23, 72:11, 79:3, 133:24
**subjective** [1] - 110:7
**submitted** [6] - 66:23, 92:24, 117:21, 118:6, 135:19, 139:5
**subset** [2] - 45:3, 45:17
**substance** [2] - 65:19, 138:16
**substances** [1] - 65:5
**substantial** [12] - 19:7, 112:5, 113:1, 114:15, 115:6, 115:10, 116:7, 117:2, 117:10, 130:20, 131:23, 132:6
**substantially** [1] - 134:12
**substantiate** [1] - 120:9
**substitute** [2] - 124:16, 135:24
**success** [1] - 102:16
**such** [7] - 47:23, 58:6, 68:12, 75:4, 80:8, 114:10, 138:22
**sudden** [1] - 78:23
**sue** [1] - 116:16
**suffered** [3] - 115:22, 130:3, 130:9
**sufficient** [4] - 69:13, 103:19, 110:8, 114:14
**suggest** [7] - 17:1, 28:4, 72:25, 100:1, 133:7, 138:11, 140:1
**suggested** [2] - 23:25, 40:17
**suggesting** [1] - 29:2
**suggestion** [1] - 129:15
**suggestions** [1] - 83:12
**suggests** [1] - 23:3
**suicidal** [2] - 58:11, 63:19
**suicide** [7] - 35:17, 36:1, 58:15, 58:17, 59:10, 63:1, 81:21
**Suite** [2] - 1:14, 1:17
**sum** [1] - 138:16
**summarize** [4] - 60:21, 62:10, 65:10, 68:24
**summary** [2] - 32:13, 106:2
**sunlight** [1] - 105:20
**Super** [1] - 53:1
**supervising** [1] - 52:17
**supervision** [1] - 140:7
**supplemental** [2] - 135:19, 135:23
**supplies** [2] - 90:21, 131:4
**support** [4] - 111:10, 125:13, 131:14, 133:5
**supported** [1] - 26:8
**supporting** [1] - 109:7
**supports** [1] - 129:12
**supposed** [2] - 63:8, 64:23
**Supreme** [1] - 127:5
**sure** [29] - 7:4, 7:7, 7:15, 9:15, 9:24, 13:6, 23:16, 26:16, 26:17, 28:22, 29:12, 30:13, 33:16, 35:21, 37:3, 37:14, 38:6, 54:3, 68:10, 71:12, 77:8, 77:11, 83:14, 88:7, 89:2, 96:21, 99:16, 123:5, 140:3
**Sure** [1] - 12:3
**surgical** [1] - 101:2
**sustain** [1] - 93:10
**sustained** [6] - 72:24, 73:12, 97:11, 97:12, 97:13, 125:13
**sustaining** [3] - 79:18, 80:8, 80:16
**sweats** [1] - 63:2
**sweeping** [1] - 125:7
**sweet** [1] - 61:24
**sworn** [10] - 13:4, 50:9, 84:12, 85:1, 85:2, 85:11, 94:21, 94:22, 94:23, 95:5
**symptoms** [5] - 62:25, 63:18, 67:18, 68:14, 68:15
**synonymous** [1] - 16:14
**system** [8] - 52:12, 64:15, 65:8, 77:9, 78:2, 78:25, 132:20, 135:9
**systemic** [4] - 112:20, 112:24, 132:19, 133:17

## T

**T** [21] - 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 70:15, 81:7, 85:5, 91:23, 94:17
**table** [2] - 15:10, 41:25
**tables** [1] - 88:18
**Tacoma** [1] - 53:5
**tailored** [1] - 101:3
**take** [33] - 13:22, 19:23, 21:9, 30:14, 46:5, 46:19, 51:7, 51:22, 61:15, 61:24, 62:23, 63:11, 63:14, 64:25, 65:6, 68:13, 78:21, 79:11, 83:2, 83:12, 96:11, 97:2, 98:11, 99:1, 99:5, 99:15, 102:21, 117:6, 128:12, 128:19, 133:13, 138:17, 141:4
**taken** [17] - 16:2, 61:18, 66:9, 66:12, 66:20, 67:16, 77:23, 78:1, 78:9, 80:21, 80:22, 99:9, 101:1, 110:3, 132:1, 136:7, 141:8
**takes** [1] - 141:7
**taking** [10] - 7:6, 16:19, 64:10, 64:15, 64:21, 66:1, 66:18, 73:14, 78:7, 111:5
**talk** [2] - 24:4, 75:23
**talked** [4] - 24:2, 43:2, 45:13, 140:23
**talking** [14] - 10:23, 18:23, 48:20, 49:3, 49:4, 76:24, 77:1, 81:14, 102:11, 106:24, 123:20, 123:21, 123:22, 123:25
**talks** [1] - 120:12
**tally** [3] - 46:8, 46:10, 46:23
**tampons** [2] - 108:23, 109:2
**tank** [1] - 131:15
**tank-type** [1] - 131:15
**targeting** [1] - 137:24
**TB** [2] - 60:14, 63:18
**tease** [2] - 31:4, 39:22
**teased** [1] - 34:3
**tech** [1] - 5:2
**technical** [1] - 82:4
**technically** [2] - 75:15, 130:17
**techniques** [1] - 23:16
**television** [2] - 124:18, 136:6
**tell** [20] - 13:15, 13:23, 14:13, 14:17, 14:23, 19:24, 27:10, 30:9, 51:10, 52:4, 52:11, 52:20, 54:6, 54:20, 79:5, 89:5, 96:18, 97:12, 111:16, 140:8
**telling** [3] - 98:1, 107:22, 130:9
**tells** [2] - 124:5, 125:22
**temporary** [3] - 104:23, 125:5, 125:10
**ten** [1] - 61:15
**ten-minute** [1] - 61:15
**tended** [2] - 33:5, 34:4
**term** [31] - 37:6, 59:3, 60:13, 60:18, 64:8, 64:12, 64:13, 64:18, 67:20, 70:23, 71:19, 71:20, 73:24, 74:9, 74:13, 74:19, 75:8, 75:9, 79:3, 96:1, 105:2, 113:15, 121:24, 122:1, 124:25, 125:1, 132:17, 132:18, 133:4, 135:10, 138:10
**terminate** [1] - 98:20
**terms** [16] - 6:16, 10:25, 16:20, 18:14, 20:23, 20:25, 24:8,

30:23, 35:25, 53:16, 59:10, 59:25, 121:13, 136:22, 138:19, 140:25
**testified** [9] - 36:23, 51:25, 55:13, 63:12, 65:15, 88:22, 113:10, 118:7, 128:16
**testify** [4] - 83:22, 85:1, 94:22, 118:13
**testifying** [1] - 83:13
**testimony** [28] - 5:11, 7:22, 8:9, 9:7, 15:13, 15:19, 17:2, 17:8, 17:11, 40:16, 44:11, 55:10, 55:21, 56:2, 61:23, 62:5, 69:24, 80:4, 82:14, 85:11, 94:10, 98:10, 105:25, 123:13, 124:13, 125:15, 134:24, 138:17
**textbooks** [1] - 55:1
**thank** [94] - 12:17, 12:19, 12:24, 13:5, 13:10, 13:13, 17:12, 17:14, 20:7, 25:1, 25:6, 30:11, 40:23, 40:25, 44:16, 45:11, 48:4, 48:8, 49:23, 49:25, 50:2, 50:3, 50:10, 50:14, 52:4, 53:11, 54:5, 54:18, 55:9, 56:17, 56:19, 57:19, 60:20, 61:14, 62:8, 64:3, 68:5, 68:23, 69:14, 70:8, 70:12, 70:14, 71:22, 74:7, 75:18, 76:11, 80:4, 80:6, 80:25, 81:24, 82:1, 82:3, 82:6, 82:7, 82:23, 84:9, 84:18, 84:23, 85:3, 85:4, 85:10, 85:22, 88:12, 88:17, 90:24, 91:14, 93:11, 94:4, 94:8, 94:11, 94:16, 94:24, 97:4, 98:4, 98:7, 98:22, 99:8, 103:4, 104:3, 111:22, 119:23, 119:24, 121:2, 123:3, 123:7, 137:15, 138:24, 140:20, 140:21, 141:11, 141:15
**Thank** [3] - 39:7, 44:20, 91:25
**thanks** [4] - 9:18, 25:13, 34:9, 42:22
**that's** [87] - 7:5, 12:23, 14:7, 16:7, 21:9, 23:5, 26:8, 26:10, 26:23, 27:9, 28:12, 29:13, 29:16, 29:19, 30:2, 30:7, 30:17, 31:8, 32:3, 32:4, 32:6, 32:25, 34:6, 35:14, 35:15, 35:16, 36:7, 38:1, 38:7, 39:21, 40:14, 40:21, 41:11, 41:19, 42:8, 42:16, 43:4, 43:5, 44:9, 44:11, 44:15, 45:23, 46:21, 47:1, 47:10, 47:20, 48:12, 49:5, 49:11, 49:14, 49:16, 49:23, 49:25, 60:2, 63:4, 63:16, 63:24, 64:23, 66:18, 70:24, 71:2, 71:20, 73:16, 74:13, 76:9, 77:9, 77:25, 78:2, 78:12, 78:18, 79:7, 79:22, 83:6, 83:25, 86:23, 91:19, 93:15, 96:16, 102:25, 120:20, 124:2, 128:16, 128:23, 136:22, 137:10, 138:2, 139:9
**them** [42] - 5:7, 7:10, 9:21, 22:1, 23:16, 26:1, 27:14, 42:16, 44:6, 47:7, 47:9, 48:2, 49:21, 54:13, 55:2, 64:17, 65:1, 65:16, 67:3, 71:6, 76:18, 77:17, 77:22, 81:19, 82:15, 88:5, 91:13, 95:12, 107:12, 107:19, 107:20, 110:16, 110:19, 121:25, 128:1, 130:23, 130:24, 133:9, 136:17
**themselves** [3] - 58:22, 110:23, 111:17
**then** [43] - 5:21, 7:2, 10:9, 13:23, 16:4, 16:9, 18:19, 20:21, 23:16, 23:22, 30:16, 32:1, 32:7, 42:3, 44:14, 44:18, 46:3, 47:14, 52:7, 52:9, 60:3, 60:9, 60:17, 63:12, 63:22, 64:25, 65:7, 65:16, 66:2, 68:3, 68:16, 72:4, 78:10, 84:8, 85:20, 88:5, 90:7, 113:18, 120:16, 128:13, 134:16, 141:5
**Then** [1] - 99:7
**theories** [1] - 118:21
**theory** [5] - 100:6, 100:8, 115:13, 121:8, 121:12
**there's** [19] - 9:21, 19:15, 21:14, 39:2, 39:16, 40:9, 54:18, 58:14, 59:5, 59:17, 63:5, 63:10, 65:21, 72:24, 81:15, 87:14, 99:21, 116:8, 116:17
**thereafter** [2] - 47:11, 125:4
**therefore** [2] - 117:4, 128:25
**therein** [1] - 74:5
**thereof** [1] - 112:8
**they'll** [2] - 65:6, 65:16
**they're** [26] - 18:10, 18:25, 36:21, 42:8, 43:23, 54:14, 58:13, 59:2, 60:15, 60:16, 63:1, 63:2, 63:8, 63:19, 64:10, 64:21, 66:1, 68:21, 69:21, 71:5, 71:7, 78:8, 78:10, 78:14, 87:17
**thing** [5] - 10:11, 14:12, 16:8, 16:9, 58:11
**things** [17] - 36:13, 37:11, 39:16, 40:12, 45:19, 58:4, 63:3, 63:10, 70:3, 75:17, 80:23, 80:24, 88:23, 89:2, 89:6, 102:13, 123:24
**think** [54] - 9:11, 11:2, 11:12, 11:18, 16:6, 21:14, 21:21, 22:14, 23:5, 27:12, 27:13, 36:25, 37:8, 38:7, 39:13, 39:16, 39:23, 43:6, 44:7, 45:14, 48:2, 49:8, 59:11, 61:5, 61:7, 64:20, 65:14, 66:10, 67:4, 69:3, 71:10, 72:2, 73:1, 73:23, 74:18, 75:5, 75:6, 83:11, 83:20, 90:3, 96:20, 99:17, 101:17, 102:3, 128:16, 128:25, 136:18, 136:25, 137:1, 137:10, 138:5
**third** [3] - 66:23, 100:21, 138:6
**though** [4] - 16:19, 36:12, 53:16, 83:13
**thought** [5] - 28:7, 38:17, 89:23, 126:7, 140:4
**thousands** [3] - 119:13, 135:9, 135:10
**thread** [1] - 56:15
**Three** [1] - 103:16
**three** [13] - 9:22, 23:7, 23:18, 96:12, 112:13, 123:9, 123:14, 123:24, 124:11, 125:3, 129:8, 133:2, 135:12
**three-quarters** [3] - 125:3, 129:8, 135:12
**threshold** [1] - 117:4
**through** [22] - 9:7, 14:12, 22:1, 46:24, 46:25, 47:6, 54:5, 59:22, 63:5, 77:3, 81:17, 85:14, 95:21, 100:6, 112:11, 113:8, 121:8, 123:10, 125:20, 132:22, 134:3, 135:13
**throughout** [2] - 10:22, 112:13
**thus** [1] - 123:12
**time** [87] - 10:2, 11:17, 16:16, 17:17, 18:8, 18:25, 19:2, 19:21, 20:3, 21:18, 21:19, 25:3, 27:11, 27:14, 27:16, 27:18, 27:20, 28:10, 28:15, 28:18, 29:22, 29:23, 38:15, 38:16, 38:17, 39:3, 39:17, 39:24, 40:18, 43:3, 43:5, 43:11, 43:24, 45:14, 46:18, 46:22, 47:25, 48:1, 49:2, 50:6, 51:13, 52:24, 54:5, 55:3, 55:7, 56:22, 58:14, 60:24, 61:16, 66:15, 70:10, 71:2, 73:25, 79:11, 83:25, 84:21, 89:20, 92:13, 94:4, 97:5, 98:2, 98:6, 98:19, 99:15, 104:25, 105:3, 105:11, 105:21, 106:5, 108:17, 112:17, 113:7, 120:7, 120:14, 125:23, 126:23, 131:16, 132:11, 135:20, 136:9, 136:15, 137:3, 138:6
**timecard** [1] - 39:19
**timely** [3] - 66:4, 78:8, 81:19
**times** [12] - 8:5, 18:21, 21:17, 27:24, 52:18, 53:8, 53:12, 113:10, 113:11, 132:9, 137:18, 138:7
**timestamp** [2] - 28:23, 46:17
**tissue** [2] - 121:12, 122:5
**titled** [1] - 41:16
**titles** [1] - 140:25
**TO** [1] - 1:8
**today** [19] - 5:16, 6:14, 6:24, 8:8, 8:22, 8:25, 9:3, 9:9, 38:21, 51:24, 55:15, 72:10, 84:6, 91:25, 93:18, 104:16, 118:7, 118:14, 128:22
**today's** [2] - 51:7, 105:6
**together** [13] - 32:14, 32:19, 43:23, 44:10, 49:18, 49:20, 49:21, 53:4, 101:4, 112:22, 114:17, 126:22, 126:25
**toilet** [2] - 105:19, 108:15
**toiletries** [1] - 108:23
**told** [2] - 89:22, 96:5
**tomorrow** [2] - 141:1, 141:2
**too** [4] - 61:9, 86:21, 102:25, 128:15
**took** [3] - 23:13, 81:1, 96:10
**toothbrushes** [1] - 124:9
**top** [1] - 33:23
**Torossian** [2] - 2:6, 84:16
**TOROSSIAN** [1] - 84:16
**total** [10] - 8:4, 10:25, 16:14, 38:25, 40:19, 42:2, 47:4, 48:24, 66:11, 125:20
**totally** [2] - 63:16, 65:14

**totals** [9] - 10:18, 11:19, 11:20, 11:21, 11:22, 16:11, 16:12, 34:16, 106:1
**touch** [2] - 8:19, 130:25
**touched** [1] - 113:6
**track** [5] - 44:12, 107:23, 109:10, 114:12, 134:21
**tracking** [2] - 38:9, 108:1
**tracks** [1] - 11:23
**trails** [1] - 26:15
**train** [1] - 109:17
**trained** [1] - 68:21
**training** [12] - 17:6, 52:5, 55:12, 62:23, 67:23, 68:7, 68:11, 68:13, 70:5, 81:16, 114:10
**transcript** [4] - 88:14, 117:21, 142:9, 142:11
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:7
**Transcription** [1] - 1:25
**transfer** [2] - 111:5, 136:10
**transferred** [2] - 52:7, 105:8
**transient** [1] - 125:2
**transport** [6] - 66:6, 124:7, 124:20, 130:1, 131:5, 132:8
**transported** [2] - 111:9, 130:3
**trial** [1] - 88:18
**tricky** [1] - 72:18
**tried** [2] - 16:5
**tries** [1] - 15:2
**trouble** [3] - 63:2, 75:23, 89:8
**true** [13] - 14:1, 20:2, 28:16, 51:12, 76:9, 76:19, 77:24, 85:12, 118:12, 122:1, 122:2, 122:18, 142:9
**truth** [2] - 79:5, 134:7
**try** [5] - 61:24, 72:9, 82:16, 83:2, 130:18
**trying** [6] - 7:22, 35:12, 36:7, 72:19, 80:14, 97:23
**tuberculosis** [7] - 54:24, 59:24, 60:1, 60:2, 60:7, 60:9, 60:11
**Tuesday** [1] - 1:9
**turn** [5] - 41:2, 51:18, 64:4, 67:7, 71:17
**turning** [2] - 60:5, 89:15
**turnovers** [1] - 71:1
**twice** [1] - 108:19
**two** [39] - 14:19, 15:24, 17:21, 18:18, 20:25, 21:7, 21:10, 21:13, 26:12, 26:13, 39:16, 41:10, 41:23, 42:7, 42:15, 43:16, 43:17, 44:4, 47:3, 49:7, 52:6, 53:4, 55:1, 75:12, 86:6, 86:9, 87:10, 90:17, 90:22, 104:17, 105:10, 107:13, 111:5, 114:25, 117:8, 118:6, 127:17, 137:15, 138:7
**two-and-a-half** [1] - 105:10
**Tylenol** [1] - 80:23
**type** [4] - 68:6, 68:11, 79:14, 131:15
**types** [1] - 32:13
**typical** [4] - 116:23, 117:4, 117:25, 135:16
**typicality** [7] - 103:25, 116:20, 117:4, 120:3, 122:18, 135:14, 135:15
**typically** [1] - 68:7

## U

**U** [2] - 45:1, 48:10
**U.S** [2] - 6:21, 128:12
**U.S.C** [1] - 142:8
**UCLA** [1] - 17:24
**ultimately** [3] - 16:5, 16:9, 116:6
**unable** [1] - 65:22
**unaware** [1] - 118:17
**unchanged** [1] - 126:15
**unclear** [2] - 127:1, 127:2
**uncommon** [4] - 58:12, 63:24, 68:2, 137:7
**unconstitutional** [9] - 104:14, 105:23, 106:16, 106:22, 119:16, 119:20, 127:19, 130:7, 131:15
**under** [18] - 18:2, 21:17, 27:5, 38:20, 77:2, 88:15, 98:8, 105:9, 116:1, 122:8, 122:25, 125:24, 129:21, 130:7, 133:2, 134:6, 135:25, 136:21
**underscore** [1] - 67:4
**understand** [34] - 19:12, 19:20, 21:16, 21:18, 25:17, 29:5, 31:7, 31:12, 40:7, 41:22, 56:25, 59:1, 61:21, 72:17, 73:1, 73:15, 79:24, 80:1, 80:3, 80:14, 82:11, 82:12, 88:10, 93:9, 93:23, 101:10, 103:22, 118:12, 118:23, 122:17, 136:12, 137:22, 137:23, 138:8
**understanding** [36] - 5:14, 11:14, 11:17, 11:20, 11:24, 18:6, 19:13, 21:19, 35:10, 36:24, 37:5, 37:10, 37:11, 37:16, 39:1, 39:12, 39:15, 39:17, 40:8, 40:14, 42:6, 42:7, 42:15, 46:17, 55:14, 62:18, 63:9, 67:11, 89:9, 93:17, 100:11, 100:16, 100:20, 103:18, 125:6, 135:21
**understood** [10] - 16:18, 56:17, 71:9, 73:18, 75:1, 77:20, 78:13, 100:23, 128:17, 128:19
**undisclosed** [1] - 134:17
**undisputed** [10] - 9:6, 105:7, 105:23, 108:11, 108:14, 108:16, 108:18, 109:13, 109:14
**unfit** [1] - 113:17
**unfortunately** [3] - 8:22, 47:8, 58:12
**uniform** [2] - 119:8, 135:9
**uniformity** [1] - 127:22
**uniformly** [2] - 127:19, 134:11
**unique** [1] - 115:19
**unit** [1] - 111:2
**UNITED** [2] - 1:1, 1:9
**United** [5] - 15:3, 140:5, 140:8, 142:6, 142:12
**unites** [1] - 116:10
**University** [5] - 14:16, 14:21, 14:22, 52:7, 52:9
**unjustifiably** [1] - 129:23
**unlawful** [1] - 114:18
**unless** [3] - 17:9, 104:14, 111:20
**unlike** [2] - 106:19, 132:21
**unreasonably** [1] - 66:21
**unredacted** [1] - 88:15
**unreliable** [1] - 125:16
**unsafe** [2] - 112:6, 118:1
**unsanitary** [3] - 104:18, 108:13, 117:15
**until** [7] - 5:9, 5:11, 15:10, 17:9, 43:18, 76:10, 96:25
**unusual** [1] - 65:1
**unwritten** [6] - 106:10, 108:22, 109:8, 109:10, 124:8, 139:13
**up** [21] - 16:5, 23:22, 23:24, 28:13, 30:8, 36:21, 40:6, 43:1, 53:18, 58:3, 59:8, 64:22, 72:5, 87:20, 96:14, 113:3, 113:11, 121:20, 129:1
**updates** [1] - 21:18
**updating** [1] - 26:5
**upon** [5] - 16:22, 124:10, 124:12, 132:14, 132:24
**upper** [1] - 51:17
**ups** [1] - 42:22
**upwards** [1] - 108:14
**urgently** [1] - 111:7
**urine** [1] - 109:5
**us** [16] - 7:21, 9:14, 10:1, 10:7, 13:15, 19:24, 27:10, 49:25, 61:4, 61:21, 90:6, 90:7, 91:25, 98:19, 139:20, 140:17
**use** [20] - 17:20, 18:4, 44:6, 44:21, 54:13, 58:7, 59:1, 61:11, 72:23, 73:2, 73:17, 77:17, 83:24, 84:19, 113:14, 113:18, 121:8, 121:25, 138:8
**used** [12] - 17:21, 20:18, 23:15, 23:17, 34:20, 35:15, 35:16, 37:6, 39:17, 54:12, 129:7, 138:6
**useful** [1] - 59:11
**uses** [1] - 81:16
**using** [9] - 8:14, 15:25, 19:4, 20:14, 21:23, 32:1, 51:17, 77:15
**usually** [3] - 59:13, 63:4, 80:19
**utterly** [1] - 132:21

## V

**v** [14] - 1:4, 4:4, 33:23, 114:6, 115:2, 115:25, 127:5, 131:19, 132:19, 132:23, 135:7, 136:2
**V.R.G** [11] - 3:7, 83:10, 83:17, 83:22, 84:25, 94:9, 98:12, 117:8, 117:13, 120:18, 120:22
**V.R.G.'s** [1] - 100:18
**value** [1] - 109:9
**variation** [2] - 21:7, 127:22
**varied** [3] - 54:21, 127:21, 137:1
**varieties** [1] - 130:2
**variety** [3] - 64:20, 66:22, 115:21
**various** [2] - 69:23, 137:18
**Vasquez** [1] - 26:21
**vast** [1] - 125:10
**vastly** [3] - 130:12, 130:14, 130:16
**vegetarian** [1] - 124:12
**vein** [1] - 138:1
**venue** [1] - 73:16
**verify** [2] - 64:23, 77:12
**VERNON** [1] - 1:5
**very** [35] - 14:11, 18:14, 18:17, 19:7, 22:7, 23:9, 25:4, 33:3, 39:23, 39:24, 41:24, 43:3, 48:1, 48:8, 55:9, 56:22, 69:22, 70:12, 71:2, 78:21, 82:3, 83:15, 88:17, 91:21, 94:8,

123:3, 124:22, 126:5, 132:20, 137:9, 138:25, 139:2, 141:2, 141:12
**vestige** [1] - 6:23
**video** [4] - 50:7, 117:20, 136:7, 139:3
**videotaping** [1] - 124:18
**view** [3] - 84:19, 98:12, 121:13
**violate** [1] - 131:3
**violated** [2] - 91:1, 91:4
**violates** [1] - 6:19
**violation** [2] - 125:14, 132:3
**violations** [4] - 104:17, 112:22, 129:16, 140:6
**violence** [3] - 25:18, 35:17, 36:1
**visit** [1] - 128:3
**visits** [1] - 124:17
**vital** [4] - 63:9, 63:11, 80:16, 111:8
**voice** [1] - 26:15
**voir** [4] - 15:9, 15:14, 17:3, 55:5
**volumes** [1] - 111:15
**volunteer** [1] - 63:19
**vomit** [1] - 109:5

**W**

**wait** [1] - 120:14
**waived** [1] - 56:10
**walk** [2] - 9:7, 14:12
**walking** [1] - 63:3
**walks** [1] - 59:22
**walls** [1] - 138:10
**Walmart** [1] - 134:6
**want** [36] - 5:4, 5:17, 5:22, 5:24, 5:25, 6:16, 6:21, 7:7, 11:9, 16:25, 26:16, 36:19, 36:20, 40:4, 41:3, 61:14, 64:4, 65:6, 65:20, 67:7, 77:7, 88:4, 91:16, 102:17, 102:25, 107:21, 110:5, 110:24, 119:25, 127:2, 138:4, 138:10, 138:14, 140:11, 141:4
**wanted** [11] - 9:19, 9:23, 12:3, 37:23, 43:1, 62:3, 100:25, 109:23, 109:25, 130:25, 137:4
**wanting** [1] - 9:15
**wants** [1] - 138:16
**Washington** [5] - 1:15, 1:18, 1:24, 2:4, 53:5
**wasn't** [3] - 23:25, 77:3, 99:16
**water** [5] - 90:8, 114:14, 117:17, 117:24, 124:12
**ways** [6] - 16:1, 16:3, 16:7, 38:12, 64:20, 112:3
**we'd** [1] - 55:3
**we'll** [6] - 56:15, 61:16, 83:5, 102:24, 103:22, 121:20
**we've** [8] - 8:3, 8:19, 51:6, 81:14, 108:25, 139:5, 140:18, 140:20
**wear** [1] - 109:1
**weather** [4] - 136:9, 136:13, 136:21, 136:22
**week** [3] - 105:14, 108:19, 132:25
**weeks** [1] - 127:14
**weigh** [1] - 133:15
**weight** [2] - 124:22, 137:24
**welcome** [1] - 36:21
**welfare** [1] - 106:7
**well-known** [1] - 133:10
**went** [3] - 75:22, 76:5, 130:16
**weren't** [1] - 61:9
**West** [1] - 1:20
**what's** [10] - 34:13, 46:10, 65:4, 68:17, 71:13, 78:12, 87:14, 90:23, 105:6, 118:9
**whatever** [5] - 59:15, 65:25, 80:23, 115:15, 115:21
**whereas** [1] - 71:6
**Whereupon** [6] - 61:18, 82:24, 88:18, 99:9, 141:8, 141:16
**wherever** [1] - 12:22
**whether** [30] - 15:12, 28:5, 33:5, 34:2, 34:3, 38:10, 53:24, 53:25, 60:25, 61:12, 62:17, 62:22, 63:1, 63:2, 64:12, 68:19, 69:17, 72:19, 77:12, 84:3, 90:20, 111:8, 114:20, 116:5, 117:18, 117:23, 123:22, 130:20, 134:9
**which** [60] - 9:6, 10:10, 10:18, 11:18, 15:2, 16:1, 16:7, 18:10, 19:9, 19:20, 20:19, 22:2, 24:7, 30:9, 33:3, 33:9, 33:18, 35:2, 37:24, 38:10, 41:21, 47:14, 52:25, 55:18, 60:12, 62:12, 68:2, 71:24, 73:1, 75:8, 75:10, 77:1, 78:9, 80:17, 99:21, 100:13, 101:19, 105:23, 105:25, 106:14, 110:25, 113:16, 113:25, 114:14, 114:22, 118:16, 120:12, 120:21, 126:3, 128:19, 129:6, 131:10, 132:11, 132:21, 135:7, 136:15, 139:3, 139:6, 139:11, 140:3
**while** [9] - 71:5, 92:4, 92:7, 92:12, 105:10, 116:19, 117:9, 131:19, 134:20
**whistleblower** [3] - 104:10, 109:3, 124:17
**whoever** [1] - 25:5
**whole** [4] - 14:12, 119:6, 119:9, 127:17
**whom** [2] - 5:23, 69:4
**whose** [6] - 27:1, 27:2, 34:23, 40:11, 45:20, 134:7
**why** [18] - 5:22, 18:4, 39:13, 40:21, 43:6, 50:22, 57:22, 63:25, 73:16, 78:18, 79:7, 97:7, 97:25, 116:12, 116:13, 119:3, 127:1, 127:2
**wide** [3] - 101:15, 115:14, 125:14
**will** [42] - 5:2, 5:8, 5:9, 8:4, 9:7, 9:11, 12:2, 12:8, 16:25, 17:8, 55:21, 56:13, 61:6, 65:10, 65:23, 67:21, 83:9, 84:8, 84:19, 84:20, 87:22, 87:23, 88:13, 88:14, 88:15, 97:13, 99:5, 99:7, 103:19, 103:23, 103:24, 104:5, 104:15, 113:7, 113:9, 117:17, 119:7, 123:5, 134:7, 141:6, 141:13
**willing** [1] - 93:5
**window** [3] - 31:20, 31:21, 129:9
**windowless** [1] - 105:18
**windows** [1] - 27:25
**Winter** [1] - 102:14
**winter** [3] - 124:19, 136:9, 139:5
**wish** [2] - 55:5, 138:25
**wishes** [1] - 84:4
**wishing** [1] - 129:13
**withdraw** [1] - 11:10
**withdrawal** [7] - 58:6, 58:8, 59:1, 59:10, 63:1, 81:21
**withdrawn** [1] - 12:11
**withdrew** [1] - 126:7
**withheld** [2] - 107:15, 140:5
**within** [15] - 21:10, 33:1, 34:11, 59:13, 60:14, 60:17, 71:19, 73:22, 74:21, 80:22, 125:3, 125:4, 129:9, 134:11, 135:13
**without** [8] - 35:6, 49:1, 68:6, 75:22, 76:5, 109:7, 127:15, 130:16
**Witness** [4] - 13:4, 50:9, 85:2, 94:23
**witness** [27] - 5:14, 13:1, 13:21, 15:9, 15:13, 15:14, 17:4, 44:11, 44:16, 50:4, 55:25, 56:3, 83:9, 83:13, 83:14, 87:9, 89:10, 91:10, 94:10, 94:12, 94:13, 94:15, 96:4, 96:17, 99:4, 138:13, 138:21
**WITNESS** [15] - 3:2, 13:9, 26:17, 40:14, 40:21, 47:17, 50:3, 50:13, 71:13, 74:18, 82:7, 84:7, 87:10, 94:11, 97:14
**witnesses** [8] - 5:5, 5:8, 8:3, 12:21, 82:8, 82:11, 98:23, 99:2
**Wolfish** [1] - 127:5
**woman** [2] - 86:8, 109:1
**women** [10] - 42:9, 86:1, 86:2, 86:3, 86:7, 86:8, 86:10, 92:13, 139:9, 139:10
**word** [8] - 37:12, 72:23, 73:2, 73:15, 73:17, 121:8, 138:6, 138:8
**wording** [1] - 72:19
**words** [3] - 6:24, 7:8, 10:13
**work** [6] - 14:24, 52:11, 54:6, 54:20, 54:21, 77:11
**worked** [5] - 16:3, 44:10, 52:13, 53:4, 55:19
**working** [7] - 16:11, 25:22, 26:2, 52:21, 61:3, 71:3
**world** [1] - 139:20
**worse** [2] - 104:15, 106:23
**worst** [1] - 111:11
**worst-case** [1] - 111:11
**wouldn't** [8] - 27:14, 27:18, 28:25, 29:23, 34:10, 77:7, 78:3, 79:2
**writing** [3] - 18:4, 22:13, 107:8
**written** [14] - 59:2, 69:15, 72:3, 75:5, 75:6, 75:15, 76:10, 106:8, 109:15, 109:23, 129:15, 129:18, 130:6, 132:16
**wrong** [4] - 26:19, 75:7, 97:16, 140:2
**wrote** [7] - 13:25, 14:2, 20:3, 51:13, 111:2, 111:4, 111:6

**X**

**X** [14] - 3:1, 13:11, 25:7, 39:8, 42:24, 45:1, 48:10, 50:15, 66:1, 70:15, 81:7, 85:5, 91:23, 94:17

**Y**

**Y** [1] - 66:2
**yards** [1] - 104:9
**yeah** [18] - 11:13, 15:23, 22:15, 24:10,

28:23, 40:22, 41:14, 42:22, 49:8, 62:14, 64:9, 65:14, 66:8, 78:6, 79:7, 90:3, 90:6, 134:25
**year** [4] - 25:22, 26:3, 140:14
**year-and-a-half** [2] - 25:22, 26:3
**years** [6] - 52:6, 52:14, 75:12, 131:16, 135:11
**yes** [118] - 7:1, 7:21, 11:16, 14:5, 14:10, 15:8, 20:4, 20:6, 22:24, 24:18, 25:19, 26:4, 26:12, 26:23, 27:4, 27:12, 27:21, 28:1, 29:1, 29:10, 29:13, 30:15, 30:17, 31:18, 31:22, 32:4, 32:6, 32:11, 32:21, 33:3, 34:22, 34:25, 35:5, 35:18, 36:2, 36:6, 39:1, 39:4, 40:22, 41:11, 41:12, 42:7, 42:17, 43:9, 43:22, 43:25, 44:17, 45:6, 45:10, 45:18, 46:7, 46:9, 46:16, 46:23, 47:8, 47:12, 48:17, 49:19, 49:22, 51:5, 51:14, 51:21, 57:18, 57:23, 61:12, 61:21, 64:2, 70:22, 71:21, 76:1, 76:6, 76:16, 76:20, 79:16, 83:8, 83:21, 85:13, 85:19, 85:21, 85:24, 86:4, 86:14, 86:18, 89:4, 89:24, 90:19, 91:2, 91:9, 91:21, 92:3, 92:6, 92:8, 92:11, 92:17, 92:20, 92:23, 93:1, 93:4, 93:13, 95:7, 95:10, 95:13, 95:16, 95:19, 95:22, 96:2, 96:10, 97:3, 97:6, 101:14, 102:22, 103:20, 120:4, 120:11, 122:17, 138:2, 139:2
**yet** [7] - 23:20, 23:23, 29:20, 39:2, 84:2, 100:21, 121:21
**yielding** [1] - 107:5
**York** [6] - 1:21, 52:8, 60:7, 113:13, 119:21
**you'd** [2] - 15:14, 55:2
**you'll** [1] - 44:14
**Youngstown** [1] - 53:6
**YULIE** [1] - 1:16
**Yulie** [1] - 4:11

## Z

**Z** [1] - 66:2
**zero** [4] - 24:23, 29:8, 29:15, 40:2
**zoomed** [1] - 83:14

## §

**§** [1] - 142:8