**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| D.N.N. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Vernon Liggins, *et al.,*<br><br>*Defendants*. | **MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION**<br><br>Civil Action No.: 1:25-cv-01613 |

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................2

A. The Court Issued a Preliminary Injunction on March 6, 2026. ............................2

B. Defendants Have Violated the Court-Imposed Cell Capacity Limits. ....................5

1. Defendants Filed Certifications of Compliance While Simultaneously Violating the Order's Crowding Limits. ........................................................ 6

2. The Court's Order Produces Clear Per-Cell Occupancy Limits. ..................... 7

3. Plaintiffs Identified Cell Crowding Violations on July 30. .............................. 8

4. Plaintiffs' Data Expert Confirmed Pervasive and Repeated Violations. ......................... 10

C. Defendants Violated Medication-Access and Statement of Rights Requirements. ..................11

LEGAL STANDARD ..................................................................................................15

ARGUMENT ............................................................................................................16

I. Defendants Have Violated the Court's Order. .........................................................16

A. Defendants Violated the Order's Provisions on Crowding....................................17

B. Defendants Violated the Order's Provisions on Medication Access and the Statement of Rights. ..........................................................18

II. The Class Has Suffered Harm as a Result of Defendants' Non-Compliance. ..............................................................................19

III. The Requested Relief Is Necessary and Warranted to Ensure Compliance with the Court's Order. ........................................................20

CONCLUSION ...........................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Rubio*,
No. 18-cv-1388, 2026 WL 322996 (D.D.C. Feb. 6, 2026) ........ 15

*Ashcraft v. Conoco, Inc.*,
218 F.3d 288 (4th Cir. 2000) ........ 15, 16, 17, 19

*Deering Milliken, Inc. v. FTC*,
647 F.2d 1124 (D.C. Cir. 1978) ........ 15

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 19

*Enovative Techs., LLC v. Leor*,
86 F. Supp. 3d 445 (D. Md. 2015) ........ 16

*In re Gen'l Motors Corp.*,
61 F.3d 256 (4th Cir. 1995) ........ 20

*GlaxoSmithKline, LLC v. Brooks*,
No. 8:22-cv-00364, 2022 WL 1443735 (D. Md. May 5, 2022) ........ 17, 19

*Hite v. Leeke*,
564 F.2d 670 (4th Cir. 1977) ........ 3

*Karn v. PTS of Am., LLC*,
590 F. Supp. 3d 780 (D. Md. 2022) ........ 3

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) ........ 5

*Ledo Pizza Sys., Inc. v. Singh*,
No. CIV. WDQ-13-2365, 2014 WL 1347113 (D. Md. Apr. 3, 2014) ........ 17, 19

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ........ 19

*Nunez v. New York City Dep't of Correction*,
758 F. Supp. 3d 190 (S.D.N.Y. 2024) ........ 15, 16

*OCÉ N. Am., Inc. v. MCS Servs., Inc.*,
No. WMN-10-0984, 2011 WL 13217391 (D. Md. Sept. 7, 2011) ........ 15

*Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*,
608 F. App'x 130 (4th Cir. 2015) ..........2, 15

*Schwartz v. Rent-A-Wreck of Am.*,
261 F. Supp. 3d 607 (D. Md. 2017) ..........20

*Shillitani v. United States*,
384 U.S. 364 (1966) ..........15

*Short v. Hartman*,
87 F.4th 593 (4th Cir. 2023) ..........5

**Other Authorities**

Fed. R. Civ. P. 62(c)(1) ..........15

## INTRODUCTION

As confirmed by Defendants' own documents and multiple declarations from previously detained individuals, Defendants have defied this Court's March 6, 2026 Preliminary Injunction Order (ECF No. 171, the "Order") regularly, routinely, and with alarming indifference—from the first day the Order took effect through the five months since. As set forth in the accompanying August 11, 2026 Expert Report of Professor Graeme Blair ("Blair Report"), and as further detailed below, Defendants' cell population records reveal pervasive and continuous violations of this Court's occupancy limits. Between March 7, 2026 and June 30, 2026, at least one cell exceeded its court-imposed maximum occupancy on 69 of 116 days—59% of the review period. In addition, declarations from previously Detained Individuals (1) establish that Defendants have failed to comply with the Order's requirements regarding the provision of a written statement of rights and (2) strongly indicate inadequate compliance with the requirement regarding access to medication—violations that Plaintiffs' counsel raised with Defendants' counsel as early as July 2, 2026, and to which Defendants have failed to provide any meaningful response.

This Court's Order imposed specific, unambiguous, and constitutionally compelled obligations on Defendants. Among them, Defendants are "ENJOINED AND RESTRAINED, pending final determination of this action, from . . . Detaining any person at the Baltimore Hold Rooms . . . in any room, cell, or other space . . . in a manner where . . . [e]ach Detained Individual has personal space of less than 31 square feet (exclusive of floor area within eight feet from any toilet)." The Order further requires Defendants to "[p]rovide prompt access to over-the-counter pain medication upon request and, within 24 hours following intake, provide access to any prescription medications necessary to ensure continuity of treatment for Detained Individuals with a prescription for medication." *Id.* at 2–3. Finally, the Order requires that "within one hour following arrival of a Detained Individual to Baltimore Hold Rooms, Defendants must provide

written notice in English and Spanish informing them of their right to the provisions and services noted herein." *Id*. at 3. The Order was not aspirational. It was not a suggestion. It was a binding preliminary injunction, issued by this Court to protect the certified Class from unconstitutionally punitive conditions that violate the Fifth Amendment's due process guarantees.

This Court has broad authority to enforce the terms of its orders and to issue additional directives to secure compliance. *See, e.g., Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*, 608 F. App'x 130, 131 (4th Cir. 2015). Defendants' months-long pattern of non-compliance—encompassing systematic overcrowding, the denial of timely access to medication, and the failure to provide the court-ordered statement of rights—demands the Court's intervention to enforce its Order. Plaintiffs respectfully ask this Court to enter remedial orders sufficient to compel immediate and ongoing compliance with the Order.

## FACTUAL BACKGROUND

### A. The Court Issued a Preliminary Injunction on March 6, 2026.

On March 6, 2026, this Court granted Plaintiffs' Renewed Motion for Class Certification and Preliminary Injunction, certifying a class of "all persons who are now, or will be, detained at the Baltimore Hold Rooms," pursuant to Federal Rule of Civil Procedure 23(b)(2). ECF No. 171. In doing so, the Court made detailed factual findings about the conditions to which members of the certified class had been, and continued to be, subjected inside the Baltimore Hold Rooms. *See* ECF No. 170 at 9–21 (describing conditions in the hold rooms).

The Court found that "ICE routinely exceeds [its previously designated] maximum capacity of 56 individuals in the Baltimore Hold Rooms," and "has detained more than 120 individuals in the Baltimore Hold Rooms in one day, which is over 200% of its maximum capacity." *Id*. at 51. The Court further found that "ICE routinely exceeds its own unofficially-assigned maximum capacity of 35 individuals in a larger cell at one time," *id*., and that cell

counts revealed occupancies for "a larger cell holding 38, 43, 47, 50, and 56 people at a time," *id*. at 13. The Court observed that "[w]here a cell of 559 square feet confines 56 people, each person has a total of approximately 10 square feet of space," an area that is "about the size of a baby crib mattress or bath towel." *Id*.

The Court recognized that housing individuals "in a grossly overcrowded and unsanitary facility" violates their constitutional rights. *Id*. at 52 (citing *Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 812 (D. Md. 2022)). The Court also affirmed that "the denial of decent and basically sanitary living conditions and 'the deprivation of the basic elements of hygiene'" are "clear violations" of the detained individuals' rights. ECF No. 170 at 53 (quoting *Hite v. Leeke*, 564 F.2d 670, 672 (4th Cir. 1977)). The Court thus found that the conditions at the Baltimore Hold Rooms demonstrated a "sufficiently serious deprivation" because they had "a mutually enforcing effect"; in other words, overcrowding compounding the lack of hygiene, compounding the exposure to an open toilet, compounding the denial of medical care. *Id*. The Court concluded that as of the date of the Order, "civilly detained people are stuffed into unclean cells by the dozens, without basic hygiene essentials, while exposed to a virtually open unclean toilet," in conditions that "woefully fail to comport with 'contemporary standards of decency.'" *Id*. at 53.

The Court made equally detailed findings regarding Defendants' failure to provide adequate medical screening and access to over-the-counter and prescription medication. The Court found that "Defendants do not conduct a medical screening of Baltimore Hold Rooms detainees; instead, they pose 'generic questions'" and "[c]onduct no physical exams and record no vitals." *Id*. at 33. The Court found that Defendants "do not have anyone onsite who is licensed to provide any medical or mental health care services," *id*., and that they "provide no medical

screening or other relevant training to the individuals tasked with these measures." *Id*.

The Court credited extensive evidence that Defendants had "failed to facilitate the medical care or medications of individuals with broken bones, diabetes, high blood pressure, HIV, and Leukemia." *Id*. at 56. The Court found that, under Defendants' practices, medication was provided to a detained individual only if it was on the detained individual's person at the time of detention or "brought to the Baltimore Hold Rooms by a family member or other third party." *Id*. at 19. Importantly, this Court recognized that this practice was wholly inadequate, given that individuals are commonly detained upon appearing at routine check-ins or stopped in the course of daily life, "circumstances where the average person is [not] likely to have on her person possibly days' worth of necessary medication." *Id*. at 57–58. The Court credited the opinion of Plaintiffs' medical expert, Dr. Joseph Goldenson, that "[t]he fact that fewer than ten [individuals] were brought to the hospital to obtain medicine indicates to a reasonable degree of certainty that many people went without necessary medications." *Id*. at 57.

The Court further credited then-Acting Field Office Director Bowie's internal request for medical staffing, in which she warned that "Baltimore urgently requires assistance in administering medications, conducting vital checks, and assessing whether individuals need to be transported to the hospital," and that "[t]he absence of medical staff to provide this support could potentially lead to liability issues or, in the worst-case scenario, fatalities." *Id*. at 21. Based on these findings, the Court held that Plaintiffs made "a clear showing of their likelihood of success in proving that Defendants' failure to attend to the medical needs of detainees poses a substantial risk of serious harm to individuals detained in the Baltimore Hold Rooms." *Id*. at 58.

In concluding that these conditions were impermissibly punitive, the Court further found that the risk of harm was "self-evident," "visible," and "plain," and that Defendants "acted or

failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 59 (*quoting Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023)). The Court determined (1) that the challenged conditions were "not 'rationally related to a legitimate nonpunitive governmental purpose'" and were "'excessive in relation to that purpose,'" *id*. at 50 (*quoting Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)), and (2) that Plaintiffs made "a clear showing that they are likely to succeed in showing that Defendants deprive individuals detained in the Baltimore Hold Rooms of hygienic, sanitary, and safe conditions, as well as basic medical screening and care, in violation of their rights guaranteed by the Fifth Amendment to the United States Constitution." *Id.* at 62.

Based on that conclusion, this Court issued a detailed and unambiguous preliminary injunction, which was effective immediately. ECF No. 171.

**B. Defendants Have Violated the Court-Imposed Cell Capacity Limits.**

From the time the Court issued its preliminary injunction, the Defendants have violated that Order's limits on cell capacity regularly, with violations recorded on 59% of the days between March 7, 2026—the first day after the Court's Preliminary Injunction—and June 30, 2026.[1] Exhibit A, Blair Report at ¶ 10.

The Court's March 6, 2026 Order is specific and unambiguous. It provides that Defendants "are ENJOINED AND RESTRAINED, pending final determination of this action, from . . . Detaining any person at the Baltimore Hold Rooms . . . in any room, cell, or other space . . . in a manner where . . . [e]ach Detained Individual has personal space of less than 31 square feet

[1] Pursuant to ongoing discovery requests, Defendants have thus far produced spreadsheets recording the daily population of the Baltimore Hold Room from January 2025–June 30, 2026. Production of these spreadsheets concluded on July 29, 2026. As relevant to this Motion, Plaintiffs focus on the 116 spreadsheets covering the period from the beginning of the preliminary injunction through the end of the produced data.

(exclusive of floor area within eight feet from any toilet)." ECF No. 171 at 2. The Order left no room for discretion, delay, or partial compliance. Instead, it imposed a bright-line, mathematically precise limit on the number of human beings Defendants may confine in each cell. The Order further required Defendants, "within 60 days of entry of this Order," to "adopt written procedures to ensure compliance with this order, and file a line with the court certifying same." *Id*. at 3. And the Order required Defendants, "within 72 hours of issuance of this order," to "transmit a copy of this order to all of Defendants' officers, employees, agents, and contractors who have responsibilities related to the subject matters of this order," and to "file a line with the court certifying same." *Id*. Defendants were thus required not only to obey the Order, but to institutionalize compliance and to ensure that every person responsible for its implementation had actual notice of its terms.

**1. Defendants Filed Certifications of Compliance While Simultaneously Violating the Order's Crowding Limits.**

Defendants made two written representations of compliance to this Court. First, on March 9, 2026, Defendants filed a Notice certifying that transmittal of the Court's Order had been made, "pursuant to the Order." ECF No. 172 at 1. Second, on May 5, 2026, Defendants filed a further Notice, certifying that "written procedures [for compliance] have been adopted." ECF No. 184 at 1. Defendants thus represented to this Court that they had both disseminated the Order to all responsible personnel and adopted written procedures to ensure total compliance.

Defendants' own cell population records, however, reveal that, at the time these certifications were filed, Defendants were routinely and systematically violating the Order. Indeed, the March 9, 2026, certification of transmittal was filed only two days after the most severe overnight violation in the dataset: on March 7, 2026, Cell 3 held 30 individuals, compared with the court-imposed limit of 16. Ex. A at Appendix B. And the May 5, 2026 certification of adopted

compliance procedures was filed at the beginning of a month in which violations would occur on 24 of 31 calendar days. *Id*. at ¶ 13. Whatever procedures Defendants adopted, they manifestly failed to ensure compliance with the Order.

### 2. The Court's Order Produces Clear Per-Cell Occupancy Limits.

The maximum lawful occupancy for each cell at the Baltimore Hold Rooms is a straightforward calculation derived from the Court's Order. The Order mandates a minimum of 31 square feet of personal space per detained individual, exclusive of floor area within eight feet of any toilet. ECF No. 171. Applied to the usable floor area of each cell, this standard produces a clear numerical occupancy limit.

The relevant cell dimensions are those Defendants themselves disclosed in their September 16, 2025, supplemental response to Interrogatory No. 11: Male Hold Room #1 at 559 square feet, Female Hold Room #2 at 420 square feet, Male Hold Room #3 at 495 square feet, ISO Hold Room #4 at 128 square feet, and ISO Hold Room #5 at 126 square feet. ECF No. 127-9 at 4. Each cell's toilet is corner-mounted, producing an exclusion zone of approximately 50.27[2] square feet, depicted as a quarter-circle with an eight-foot radius in the illustrative image below:




[2] This calculation is conservative. Plaintiffs measure the eight-foot radius from the corner where the walls meet, rather than from where the edge of the toilet, which likely protrudes over an additional two feet into the cell. Because the toilet extends away from the corner, the true exclusion zone is likely several square feet larger than the 50.27-square-foot figure used here.

Subtracting that zone and dividing the remaining usable area by 31 square feet per person yields the court-mandated maximum occupancy for each cell, as set forth below.

| Cell | Total Sq. Ft. | Toilet Exclusion | Usable Sq. Ft. | Maximum Occupancy |
|---|---|---|---|---|
| Cell 1 (Male Hold Room #1) | 559 | ~50.27 | ~508.73 | 16 |
| Cell 2 (Female Hold Room #2) | 420 | ~50.27 | ~369.73 | 11 |
| Cell 3 (Male Hold Room #3) | 495 | ~50.27 | ~444.73 | 14 |
| Cell 4 (ISO Hold Room #4) | 128 | ~50.27 | ~77.73 | 2 |
| Cell 5 (ISO Hold Room #5) | 126 | ~50.27 | ~75.73 | 2 |

These limits flow directly and mathematically from the Court's Order and the cell dimensions disclosed by Defendants in their own interrogatory responses. There is no dispute about the cell dimensions and, therefore, no genuine dispute about the capacity limits the Court's Order imposes on each cell.

### 3. Plaintiffs Identified Cell Crowding Violations on July 30.

Immediately upon receiving the 2026 cell data sheets on July 29, 2026, *see supra* FN 1, Plaintiffs' counsel conducted an initial review to assess Defendants' compliance with the Court's Order regarding crowding. On July 30, 2026, Plaintiffs' counsel sent a detailed letter to Defendants' counsel setting forth their methodology, preliminary findings, and concerns. *See* Exhibit B, Plaintiffs' Letter re: Apparent Violations of the Court's Order (the "July 30 Letter").

The July 30 Letter first derived the maximum lawful occupancy for each cell using the same methodology and inputs set forth in Section B.2 above and arrived at these per-cell maximum occupancy limits: 16 persons for Cell 1, 11 for Cell 2, 14 for Cell 3, and 2 each for Cells 4 and 5. *Id.* at 1–2. The July 30 Letter then described how two distinct analyses were conducted for each cell on each date: first, a midnight/overnight analysis counted all individuals detained as of midnight each day. *Id.* at 2–3. Second, a noon analysis identified every individual

physically present in each assigned cell at 12:00 p.m. on a given log date. *Id*. at 3. The July 30 Letter revealed that every cell exceeded its court-imposed limit on at least one date under the overnight analysis. *Id*. (noting that Cell 1 exceeded the max capacity on 10 dates, Cell 2 on 7 dates, Cell 3 on 14 dates, Cell 4 on 1 date, and Cell 5 on 8 dates). The noon analysis revealed an even more troubling pattern: Cell 1 exceeded its limit on 22 dates, Cell 2 on 8 dates, Cell 3 on 22 dates, Cell 4 on 1 date, and Cell 5 on 10 dates. *Id*. at 3–4. The violations were distributed across the entire review period of March through June, including the most severe multi-cell event on June 16, 2026, when four of five cells simultaneously exceeded their court-imposed limits. *Id*. at 4 (noting violations on 6 dates in March, 16 of 30 days in April, 14 of 31 days in May, and 13 of 30 days in June).

Based on the preliminary analysis of Defendants' cell data, the July 30 Letter asked that Defendants' counsel confer with their client and, if Defendants believed they had complied, provide supporting evidence, including any compliance policies and daily monitoring documentation, by August 5, 2026. *Id*. at 1. The July 30 Letter also notified Defendants that, absent adequate evidence of compliance, Plaintiffs would seek relief from the Court. *Id*. The letter noted that Plaintiffs were engaging with Plaintiffs' data expert to independently verify the preliminary findings and expressly reserved the right to supplement or amend them. *Id*.

On August 11, 2026, Defendants' counsel responded to the July 30 Letter. *See* Exhibit C, Email Thread, Subject "Apparent Violations of the Court's March 6, 2026 Preliminary Injunction Order." Notably, Defendants did not provide any contrary occupancy figures, nor did they identify the maximum occupancy limits they had been applying to each cell. *Id*. They also did not describe any procedures they had employed to monitor or maintain compliance with the Order's crowding requirements. *Id*. Indeed, Defendants made no representations whatsoever

regarding Defendants' compliance with this Court's Order. *Id*.

Instead, Defendants raised two generalized methodological objections. *Id*. First, Defendants questioned Plaintiffs' calculation of the toilet exclusion zone as a quarter-circle with an eight-foot radius, asserting that they "did not employ a zone of exclusion of 50+ feet" and that they "would respectfully disagree with any notion that compliance required the government to use the 'quarter circle' methodology." *Id*. But Defendants did not identify what exclusion zone, if any, they had applied, nor did they explain how any alternative methodology would be consistent with the plain language of the Order, which requires that personal space be calculated "exclusive of floor area within eight feet from any toilet." *Id*. Second, Defendants raised vague concerns about Plaintiffs' use of the cell data sheets to assess simultaneous population totals without identifying any specific errors in the data or offering any alternative population figures. *Id*. Defendants stated that their "inquiry . . . is still occurring," but provided no timeline for completion and provided no evidence of compliance whatsoever, as requested by the July 30 Letter. *Id*., Ex. B at 1. In sum, Defendants' response neither denied the violations nor demonstrated compliance; it offered only vague methodological quibbles while leaving entirely unaddressed the central question of whether Defendants had, in fact, exceeded the court-imposed occupancy limits on the dates identified.

#### 4. Plaintiffs' Data Expert Confirmed Pervasive and Repeated Violations.

Through his expert analysis, Professor Blair has confirmed that the magnitude of Defendants' violations is actually far greater than those preliminarily identified in Plaintiffs' July 30 Letter. *See generally* Ex. A. Between March 7, 2026 and June 30, 2026, at least one cell in the Baltimore Hold Rooms exceeded its court-imposed maximum occupancy on 69 of 116 days, or 59% of all days in the review period. *Id*. at ¶ 10. Cell 3 alone was in violation of the Order on 44

days (38% of all days) and Cell 1 was in violation on 37 days (32% of all days). *Id*. These were not momentary violations: Professor Blair's analysis confirms that individual cells exceeded the court-ordered limits for a combined total of 1,311 hours during the review period, with Cell 3 alone in violation for 551 hours and Cell 1 for 365 hours. *Id*. at ¶ 14. On 26 days, individual cells exceeded the court-ordered limits for periods of 12 to 24 hours, and on multiple dates Cell 3 was in continuous violation for a full 24 hours. *Id*. at ¶ 13 (noting extended violations on March 7, May 7, May 11, May 19, and May 22, 2026). And these were not minor violations: Professor Blair identified more than 40 instances in which the number of individuals detained in a cell exceeded the court-ordered limit by 50% or more, including 18 instances in which it exceeded the limit by 100% or more. *Id*. at ¶ 16.

These figures likely represent undercounts, as Professor Blair notes that the cell number was not recorded for some individuals, and there were 13 days on which more than five individuals had no cell number recorded. *Id*. at ¶ 12. Critically, Professor Blair's Report also confirms that individuals are not merely passing through the Baltimore Hold Rooms; rather, they are held for significant periods of time, including in these overcrowded conditions. *Id*. at ¶ 15. Specifically, Professor Blair found that there were "1,159 stays involving 1,154 individuals that lasted longer than 24 hours among people booked in between March 7, 2026, and June 30, 2026." *Id*. The overcrowding documented in the Report is thus not a fleeting condition experienced in transit, but a sustained deprivation endured by individuals confined for days at a time in cells packed far beyond the limits this Court determined were constitutionally required.

### C. Defendants Violated Medication-Access and Statement of Rights Requirements.

The Court's Order is similarly specific and unambiguous with respect to medication access and the provision of a statement of rights. The Order enjoins Defendants from "[d]etaining a

Detained Individual at the Baltimore Hold Rooms without adequate medical care and screening," and it specifically requires Defendants to "[p]rovide prompt access to over-the-counter pain medication upon request and, within 24 hours following intake, provide access to any prescription medications necessary to ensure continuity of treatment for Detained Individuals with a prescription for medication, and provide Detained Individuals the right to possess any personal inhaled medication on their person." ECF No. 171 at 2–3. The Order further requires that Defendants "[e]nsure that a medical professional or specially trained detention officer conduct a basic medical screening on each Detained Individual within 12 hours of entry," sufficient to, *inter alia*, "provide access to prescription medication without interruption." *Id*. at 2. And the Order separately requires that "within one hour following arrival of a Detained Individual to Baltimore Hold Rooms, Defendants must provide written notice in English and Spanish informing them of their right to the provisions and services noted herein," and that "[i]f a Detained Individual is illiterate or has limited English or Spanish proficiency, Defendants must provide in-person or telephonic interpretation." *Id*. at 3.

These requirements imposed specific, time-bound obligations on Defendants to ensure that every person detained at the Baltimore Hold Rooms receives timely access to medication and written notice of their court-ordered rights. And as with the crowding requirements, Defendants certified to this Court that they had transmitted the Order and adopted written procedures to ensure compliance with the Order. ECF Nos. 172, 184 at 1.

On July 2, 2026, Plaintiffs' counsel sent an email to Defendants' counsel identifying ongoing concerns regarding Defendants' non-compliance with the Order's medication access and statement-of-rights requirements. *See* Exhibit D, Email Thread, Subject "Concerns of PI Non-Compliance." The email reported that, based on interviews with various individuals

detained at the Baltimore Hold Rooms, Plaintiffs had "consistently heard that the PI is not being fully implemented." *Id*. Specifically, Plaintiffs' counsel reported that "individuals are not receiving the required notice of their rights upon arrival at the Hold Rooms," and that there continue to be "issues around access to medication—specifically, Defendants are still not providing over-the-counter medications, and friends and family are being asked to bring prescriptions to the Hold Rooms, sometimes leaving detained individuals without necessary medications for several days." *Id*. Plaintiffs' counsel stated that, "[b]ased on these reports, it appears that Defendants may be in violation of the PI," and requested confirmation by July 9, 2026, "that these issues have been addressed and that Defendants are now in full compliance," warning that "[s]hould the non-compliance continue, we will need to raise the matter with the Court." *Id*.

Defendants' counsel acknowledged receipt on July 2, 2026, and committed to "reach out to Defendants and circle back by July 9th." *Id.* On July 9, 2026, Defendants' counsel responded with a single-sentence assertion: "Defendants are in compliance with the Preliminary Injunction." *Id.* Defendants offered to "investigate the specific incidents alleged" if Plaintiffs provided "additional information for any specific detainee who was alleging non-compliance," but did not provide any evidence of compliance or address the systemic nature of the reported violations. *Id*. On August 6, 2026, Plaintiffs' counsel followed up, (1) advising Defendants' counsel that Plaintiffs were "continuing to receive reports of apparent non-compliance regarding access to medication and the provision of the statement of rights, which we previously communicated on July 2, 2026," and (2) requesting that Defendants' counsel "please also include those concerns" when discussing the overcrowding concerns with their client. *See* Ex. C. As of the date of this filing, Defendants have not provided any substantive response to the

medication access and statement-of-rights violations first raised on July 2, 2026, and reiterated on August 6, 2026.

As of the date of this filing, Plaintiffs' counsel has not spoken with any detained individuals who received the required statement of rights in any language. Some individuals received paperwork in Spanish regarding their rights to appeal or to legal representation, but they received no notice about their rights during their detention in the Baltimore Hold Rooms. *See* Exhibit E, Declaration of Rodrigo Gonzalez-Vargas at ¶ 6 (stating he received no paperwork about his rights at the Baltimore Hold Rooms); Exhibit F, Declaration of Juan Bermudez at ¶ 7 (same); Exhibit G, Declaration of Estanislao Lorenzo Cruz at ¶ 9 (same). Other individuals received no paperwork in Spanish whatsoever. *See* Exhibit H, Declaration of Cresencio Gomez at ¶ 17 (stating he received no paperwork in Spanish); Exhibit I, Declaration of Luis Morocho at ¶ 6 (same); Exhibit J, Declaration of E.A.M. at ¶ 17 (same); Exhibit K, Declaration of Everardo Bardales Pineda at ¶¶ 5, 15 (stating he received no paperwork about his rights or any paperwork in Spanish).

Additionally, numerous detained individuals have been left without access to medication (both over-the-counter and prescription) in direct violation of the Order. For example, R.T.M.G. requested pain medication for a persisting headache, and received nothing. Exhibit L, Declaration of R.T.M.G. at ¶ 7. Other individuals report being deprived of prescriptions for chronic illnesses such as diabetes, high blood pressure, and high cholesterol for multiple days. *See e.g.* Ex. H, Decl. of Cresencio Gomez at ¶ 8 (stating he did not receive medication for diabetes, high blood pressure, and high cholesterol for two days and only received his prescription when his wife brought them on the third day). In at least one instance, this lack of medication resulted in an emergency trip to the hospital, and even after that trip, Defendants

failed to fill a prescription for multiple days. Ex. F, Decl. of Juan Bermudez at ¶¶ 8–9 (stating he had to be taken to the hospital because he was not given medicine for his diabetes and hypertension and did not receive the medication until three days after the hospital visit).

The wholesale failure to provide detained individuals with the required statement of rights and the repeated failure to provide medication constitute an ongoing and dangerous deviation from the constitutionally required minimal conditions ordered by this Court.

## LEGAL STANDARD

"There can be no question that courts have inherent power to enforce compliance with their lawful orders[.]" *Redner's Markets,* 608 F. App'x at 131 (quoting *Shillitani v. United States,* 384 U.S. 364, 370 (1966)). The moving party bears the burden of demonstrating non-compliance with a specific and definite order by clear and convincing evidence. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). An order is sufficiently definite to support enforcement where its terms clearly and specifically proscribe the conduct at issue, considering both the order's language and the objective circumstances surrounding its issuance. *Nunez v. New York City Dep't of Correction,* 758 F. Supp. 3d 190, 218 (S.D.N.Y. 2024); *see also OCÉ N. Am., Inc. v. MCS Servs., Inc.*, No. WMN-10-0984, 2011 WL 13217391, at *1 (D. Md. Sept. 7, 2011).[3]

[3] The fact that Defendants have filed an appeal of this Court's preliminary injunction is of no consequence to this Court's jurisdiction over this Motion. "Although a district court is generally without jurisdiction to alter a judgment of its own while an appeal therefrom is ongoing, the judgment itself remains operative unless stayed and the district court retains its powers to enforce its unstayed judgment throughout the pend[e]ncy of the appeal." *Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Rubio*, No. 18-cv-1388, 2026 WL 322996, at *4 (D.D.C. Feb. 6, 2026) (citation modified) (quoting *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1129 (D.C. Cir. 1978)). "Because the injunction has not been stayed, this court retains jurisdiction to resolve Plaintiffs' Motion to Enforce." *Id.*; *see also* Fed. R. Civ. P. 62(c)(1). Defendants have not sought a stay of the Order either with this Court or the Fourth Circuit.

## ARGUMENT

### I. Defendants Have Violated the Court's Order.

The Order is valid and binding. Defendants certified that they received it and adopted procedures to comply with it. They then proceeded to violate it systematically, continuously, and for multiple, consecutive months. The evidence of non-compliance is clear and convincing.

The Order expressly enjoined Defendants from detaining any person at the Baltimore Hold Rooms in any room with less than 31 square feet of personal space, exclusive of floor area within eight feet from any toilet. ECF No. 171 at 2. The Order further required Defendants to (1) provide prompt access to over-the-counter pain medication when requested, and (2) within 24 hours following intake, provide access to any prescription medications necessary to ensure continuity of treatment for Detained Individuals. *Id*. at 2–3. Finally, the Order required that "within one hour following arrival of a Detained Individual to Baltimore Hold Rooms, Defendants must provide Detained Individuals with written notice in English and Spanish informing them of their right to the provisions and services noted herein." *Id*. at 3. Each of these requirements is specific, time-bound, and unambiguous.

Defendants certified that they had received the Court's order and had adopted policies to comply with it. ECF Nos. 172, 184. Defendants thus had actual knowledge not only of the Order's crowding requirements, but equally of its medication access and statement-of-rights requirements, all of which were contained in the same Order, transmitted to the same personnel, and subject to the same compliance procedures. The knowledge element is satisfied where, as here, the defendant received actual notice of the order and had the capacity to understand its terms. *Ashcraft*, 218 F.3d at 301; *Enovative Techs., LLC v. Leor*, 86 F. Supp. 3d 445, 447 (D. Md. 2015); *Nunez,* 758 F. Supp. 3d at 218.

Defendants had actual knowledge of the Order and its requirements. As set forth below,

Defendants have nonetheless repeatedly and systematically violated the Order's provisions.

### A. Defendants Violated the Order's Provisions on Crowding.

Defendants' own cell data sheets constitute clear and convincing evidence of non-compliance with the Order's crowding limits. As detailed above, Professor Blair's analysis confirms that at least one cell exceeded its court-imposed maximum occupancy on 69 of 116 days (59%) between March 7 and June 30, 2026, with cells collectively in violation for a combined total of 1,311 hours. Ex. A at ¶¶ 10, 14. The violations were neither momentary nor minor—on 26 days cells exceeded their limits for 12 to 24 hours, and in more than 40 instances occupancy exceeded the court-ordered limit by 50% or more. *Id.* at ¶ 16. The overcrowding documented in the Report represents a sustained deprivation endured by individuals confined for days at a time in cells packed far beyond constitutionally required limits.

There can be no genuine dispute that Defendants had actual knowledge of these violations. The cell data sheets that document the overcrowding were generated by Defendants' own personnel as part of their daily monitoring of cell conditions at the Baltimore Hold Rooms. Defendants maintained daily, contemporaneous, cell-level population records—records that, on their face, reflect occupancy figures exceeding the court-imposed limits. Defendants cannot plausibly contend that they were unaware of conditions they themselves routinely recorded.[4] The knowledge element is plainly satisfied. *See, e.g., Ashcraft*, 218 F.3d at 301; *GlaxoSmithKline, LLC v. Brooks*, No. 8:22-cv-00364, 2022 WL 1443735, at *10 (D. Md. May 5, 2022); *Ledo Pizza Sys., Inc. v. Singh*, No. CIV. WDQ-13-2365, 2014 WL 1347113, at *3 (D. Md. Apr. 3, 2014).

[4] Of course, even if Defendants could somehow disclaim actual knowledge, the legal standard requires only constructive knowledge of the violations. *Ashcraft*, 218 F.3d at 301.

### B. Defendants Violated the Order's Provisions on Medication Access and the Statement of Rights.

The attached declarations establish that Defendants have repeatedly and systematically failed to comply with the Order's medication access and statement-of-rights requirements.

Detained Individuals report that they were not provided with written notice of their court-ordered rights within one hour of arrival—or at all—in direct contravention of the Order's unambiguous directive. *See e.g.*, Ex. F, Decl. of Juan Bermudez at ¶ 7; Ex. K, Decl. of Everardo Bardales Pineda at ¶¶ 5, 15. They further report that Defendants failed to provide prompt access to over-the-counter pain medication upon request and failed to ensure continuity of access to prescription medications within 24 hours of intake. *See e.g.,* Ex. H, Decl. of Cresencio Gomez at ¶ 8; Ex. L, Decl. of R.T.M.G. at ¶ 7. Instead, Defendants continued the very practice this Court found constitutionally deficient: requiring family members or third parties to bring medications to the Baltimore Hold Rooms, leaving Detained Individuals without necessary treatment for days. This constitutes clear and convincing evidence of non-compliance with the Order's medication access and statement-of-rights requirements.

Defendants, of course, had actual knowledge of these violations. Defendants certified to this Court that they had disseminated the Order, including its medication access and statement-of-rights requirements, to all responsible personnel, ECF 172 at 1, and that they had adopted procedures to comply with the Order. ECF 184 at 1. Indeed, Plaintiffs' counsel expressly notified Defendants' counsel of the reported medication access and statement-of-rights violations by email dated July 2, 2026, and Defendants' counsel acknowledged receipt that same day. *See* Ex. D. Defendants thus had actual knowledge, both through their own compliance certifications and through Plaintiffs' counsel's direct correspondence, of the specific obligations at issue and of the specific allegations of non-compliance.

Where, as here, Defendants are under a court order imposing specific, time-bound obligations regarding medication access and the provision of a statement of rights, the knowledge element is plainly satisfied. *See Ashcraft*, 218 F.3d at 301; *GlaxoSmithKline,* 2022 WL 1443735, at *10; *Ledo,* 2014 WL 1347113, at *3.

## II. The Class Has Suffered Harm as a Result of Defendants' Non-Compliance.

Harm to the class from Defendants' violations is not speculative. This Court has already found, with the benefit of an extensive evidentiary record, the concrete harms that flow from the conditions at the Baltimore Hold Rooms. ECF No. 170 at 63–64 (finding that conditions "pose obvious and serious risks of irreparable harm to class members' physical well-being."). With respect to crowding, detained individuals are commonly confined to unclean cells, filled beyond capacity with individuals unable to tend to their basic personal hygiene. With respect to medication access, the denial of timely access to prescribed and over-the-counter medications causes direct physical harm to Detained Individuals who are left without necessary treatment, at times for days, leading to hospitalizations and potential exacerbation of chronic medical conditions. With respect to the statement of rights, the failure to provide the court-ordered written notice deprives Detained Individuals of knowledge of the protections this Court has ordered on their behalf.

Because a deprivation of a constitutional right, for even minimal periods, unquestionably constitutes irreparable injury, the harm to the Class is plain. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). These are not hypothetical harms. They are real, recurring, and attributable directly to Defendants' refusal to comply with this Court's Order. The crowding violations span from March 7 through June 30, 2026, and the documented medication access and statement-of-rights violations have likewise persisted from the Order's entry through at least June. For individuals who were detained and released, the

harm cannot be undone retroactively. For individuals currently or prospectively detained, the harm is ongoing.

## III. The Requested Relief Is Necessary and Warranted to Ensure Compliance with the Court's Order.

The Court has broad equitable authority to enforce the terms of its Order and to issue supplementary remedial directives to secure compliance.[5] *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 617 (D. Md. 2017) (citing *In re Gen'l Motors Corp*., 61 F.3d 256, 259 (4th Cir. 1995)). The relief Plaintiffs request is narrowly tailored to enforce and ensure future compliance with the Court's March 6, 2026 Order.

Plaintiffs respectfully request that the Court:

1. Find that Defendants have violated the Court's March 6, 2026, Preliminary Injunction Order by exceeding the court-imposed crowding limits and by violating the medication access and statement-of-rights requirements.

2. Order Immediate Compliance Enforcement Measures, including:

a) An order requiring Defendants to immediately comply with all provisions of the PI Order, including: (i) the cell-capacity limits established by the PI Order, as reflected in the table set forth in Section B.2 of this brief; (ii) the requirement to provide prompt access to over-the-counter pain medication upon request and access to prescription medications within 24 hours following intake; and (iii) the requirement to provide written notice in English and Spanish of Detained Individuals' rights within one hour of arrival at the Baltimore Hold Rooms;

[5] Plaintiffs' motion seeks to enforce the terms of the Order and does not request a contempt finding at this time. Plaintiffs note, however, that the Court may *sua sponte* hold Defendants in contempt based on the record before it. Plaintiffs expressly reserve the right to seek that relief by subsequent motion.

b) An order requiring Defendants to submit a sworn declaration from the Field Office Director or his designee within 14 days certifying that written compliance procedures have been adopted and implemented and specifically identifying those compliance procedures with respect to (i) daily monitoring of cell-level occupancy, (ii) the provision of prompt access to over-the-counter and prescription medications in accordance with the PI Order's requirements, and (iii) the provision of written notice of rights to each Detained Individual within one hour of arrival, as required by the PI Order.

3. Order Prospective Monitoring and Reporting, including:

a) Weekly sworn declarations from the Field Office Director or his designee reporting: (i) the daily maximum population of each cell during the preceding week; (ii) the number of Detained Individuals who requested over-the-counter or prescription medication during the preceding week, the time of each request, and the time at which medication was provided; and (iii) the number of Detained Individuals who arrived at the Baltimore Hold Rooms during the preceding week and whether each was provided written notice of rights within one hour of arrival, certified to the Court under penalty of contempt;

b) Continued production of cell data sheets to Plaintiffs on a weekly basis, as produced through July 29, 2026, to enable independent verification of compliance.

4. Order Defendants to file a sworn declaration from the Field Office Director or his designee within 14 days certifying that Defendants are in full compliance with all other provisions of the Court's March 6 Order, including but not limited to: (a) cleaning each Hold Room thoroughly at least once each day; (b) furnishing each Detained Individual with adequate daily supplies of soap, towels, toilet paper, oral hygiene items, and feminine hygiene products; (c) conducting a basic medical screening on each Detained Individual within 12 hours of entry; and (d) providing prompt access to emergency or hospital medical care as needed.

## CONCLUSION

This Court has broad authority to enforce its orders and to issue remedial directives to compel compliance. Plaintiffs ask this Court to exercise that authority now to impose remedial measures sufficient to ensure that every person detained at the Baltimore Hold Rooms is afforded the constitutionally required personal space, timely access to medication, and written notice of rights that this Court has already determined they are entitled to. Five months of

documented violations, combined with Defendants' certification of compliance and their refusal to meaningfully respond to Plaintiffs' specific allegations, demonstrate that voluntary compliance is not forthcoming. This Court's intervention is necessary, and it is necessary now.

Dated: August 13, 2026 Respectfully submitted,

*<u>/s/ Jared A. Levine</u>*
Jared A. Levine (NY Bar No. 4897211)*
Daniella A. Schmidt (NY Bar No. 5186283)*
**CROWELL & MORING LLP**
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com
DSchmidt@crowell.com

Jerome A. Murphy (D. Md. Bar No. 27678)
Kenneth Dintzer (DC Bar No. 90031556)*
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2895
JMurphy@crowell.com

Ian Austin Rose (D. Md. Bar No. 22079)
Amelia Dagen (D. Md. Bar No. 32279)
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Ave. NW
Suite 701
Washington, DC 20036
(202) 788-2509
Austin.rose@amicacenter.org
Amelia@amicacenter.org

Sirine Shebaya (D. Md. Bar No. 07191)
Yulie Landan (CA Bar No. 348958)*
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Rd. NW
Suite 175 #896645
Washington, DC 20009
(202) 656-4788
sirine@nipnlg.org
yulie@nipnlg.org

*Pro bono counsel for Plaintiffs*

* Admitted *Pro Hac Vice*

**EXHIBIT LIST**

| | |
|---|---|
| Exhibit A | Data Expert Report of Graeme Blair, dated August 11, 2026 |
| Exhibit B | Plaintiffs' Letter re: Apparent Violations of the Court's March 6, 2026 Preliminary Injunction Order, dated July 30, 2026 |
| Exhibit C | Email Thread, Subject "Apparent Violations of the Court's March 6, 2026 Preliminary Injunction Order," dated July 30, 2026–August 10, 2026 |
| Exhibit D | Email Thread, Subject "Concerns of PI Non-Compliance," dated July 2–9, 2026 |
| Exhibit E | Declaration of Rodrigo Gonzalez-Vargas |
| Exhibit F | Declaration of Juan Bermudez |
| Exhibit G | Declaration of Estanislao Lorenzo Cruz |
| Exhibit H | Declaration of Cresencio Gomez |
| Exhibit I | Declaration of Luis Morocho |
| Exhibit J | Declaration of E.A.M. |
| Exhibit K | Declaration of Everardo Bardales Pineda |
| Exhibit L | Declaration of R.T.M.G. |