**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| D.N.N. and V.R.G., *on behalf themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Robert Guadian, *in his official capacity as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations, Washington Field Office,* et al.,<br><br>*Defendants*. | **DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO ENFORCE PRELIMINARY INJUNNCTION**<br><br>Civil Action No.: 1:25-cv-01613 |

# DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION TO ENFORCE PRELIMINARY INJUNCTION

BRETT A. SCHUMATE
Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

Andrew Abrams
Brendan Moore
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
202.880.0330
Attorneys for Defendants

Respondents, by and through undersigned counsel, Brendan Moore and Andrew Abrams, Trial Attorneys, hereby oppose the "Motion to Enforce Preliminary Injunction" (ECF No. 197) (the "Motion") filed by Plaintiffs D.N.N. and V.R.G ("Plaintiffs").

## I. INTRODUCTION

Plaintiffs ask this Court to find, by clear and convincing evidence, that Defendants have systematically and indifferently violated the Court's March 6, 2026 Preliminary Injunction. The record supports neither that characterization nor Plaintiffs' requested relief. Defendants promptly adopted a detailed Standard Operating Procedure implementing the Order's requirements, calculated per-cell occupancy limits using their own methodology, posted those limits at each cell, and instituted monitoring, escalation, and alternative-placement protocols to maintain compliance. Where Plaintiffs' Motion identifies apparent gaps, closer examination of the record — including Plaintiffs' own supporting exhibits — reveals that much of what Plaintiffs characterize as undisputed noncompliance rests instead on errant or unverified assumptions: an exclusion-zone methodology this Court's Order does not itself require; an occupancy dataset that does not measure what Plaintiffs' expert assumes it measures, and self-serving interpretations of the significance of incomplete logs. The medication-access and statement-of-rights claims fare no better: they rest on a small set of individual statements that are, on examination, inconsistent with Defendants' contemporaneous records, not properly subscribed under 28 U.S.C. § 1746 at all, or even in conflict with Plaintiffs' own allegations. Civil contempt is thus inappropriate here because Plaintiffs have not satisfied and cannot satisfy the requisite elements by clear and convincing evidence and, even if they could, Defendants substantially complied with the Court's March 6, 2026 Order. For the reasons set forth below, the Motion should be denied.

If a cell is temporarily decommissioned for safety, maintenance, or operational reasons, the facility's total allowable occupancy is reduced by that cell's individual capacity for the duration of the decommissioning — rather than continuing to operate under the standard 55-person aggregate limit. *Id.* ¶ 15.

Each cell has a posted notice identifying its maximum occupancy, and each cell door has an attached whiteboard on which officers and contractors record and update the current detainee count. *Id.* ¶ 12; *see also* Defendants' Exhibit B, Photographs, Population Tracking Signs. ICE employees and contractors conduct frequent headcounts throughout the day, comparing actual population against the posted maximum to confirm compliance and address capacity concerns as they arise. *Id.*

### C. <u>**Medical, Hygiene, and Nutritional Protocols**</u>

Every individual arriving at the BHR receives a medical screening from a detention officer trained by the ICE Health Service Corps. *Id*. ¶ 22. That screening covers immediate medical needs, visible signs of injury or distress, current medications, known communicable diseases, disability or accommodation needs, and dietary requirements. *Id.* ¶ 23. Individuals showing signs requiring urgent care are transported immediately to the nearest hospital, typically by contracted transport personnel, with relevant information relayed back to the Field Office to inform ongoing care. *Id.* ¶ 24.

Individuals arriving with prescription medication on their person are permitted to continue taking it as prescribed; family members, friends, or attorneys may drop off medication as well. *Id.* ¶ 25. If medication cannot be obtained within twenty-four hours, ICE transports the individual to the nearest hospital — either St. Agnes or Johns Hopkins. *Id.* ¶ 26. Prescription medication received is logged, administered as directed, and travels with the individual upon transfer; where

a prescription must be filled at a pharmacy, ICE retrieves it as soon as it becomes available. *Id.* ¶ 27. Individuals prescribed an inhaler are permitted to keep it on their person at all times. *Id.* ¶ 29.

Cells are cleaned by a third-party contractor, Chimes, with each cleaning logged and verified by an ICE employee or contractor; ICE personnel additionally inspect cells at least three times daily and contact the cleaning contractor promptly if a cell is found not to meet standards. *Id.* ¶¶ 30, 32. Detained individuals are not tasked with cleaning duties beyond disposing of their own meal and water waste. *Id.* ¶ 31. Every individual held overnight receives a sleeping mat and blanket, with at least sixty mats maintained in reserve; sweaters and sweatpants are available upon request. *Id.* ¶¶ 33–34. Soap, towels, toothbrushes, toothpaste, toilet paper, and hand-washing access are provided to every individual without any requirement to share; feminine hygiene products are available on request. *Id.* ¶¶ 35–36. All individuals receive at least three meals daily plus snacks, a choice among multiple MRE options with allergy-conscious substitutions, vegetarian and halal options on request, and unlimited water bottles throughout the day. *Id.* ¶¶ 37–40.

**D. <u>The Parties' Correspondence</u>**

On July 30, 2026, Plaintiffs' counsel sent Defendants' counsel a letter identifying preliminary, AI-assisted findings of apparent crowding violations based on Defendants' cell-population records, and requesting evidence of compliance by August 5, 2026. ECF No. 197-3. Plaintiffs' counsel represented that these findings were being independently verified by a retained expert. *Id.* at 1.

Defendants' counsel responded on August 10, 2026. ECF No. 197-4. That response disputed Plaintiffs' exclusion-zone methodology directly, stating that "Defendants did not employ a zone of exclusion of 50+ feet." *Id*. Defendants' counsel quantified one resulting impact, noting

the assumed exclusion zone "reduces the available floor space by nearly half" in the isolation cells, "resulting in a capacity of 2 people per room (and comprising nine instances of the alleged noncompliance)." *Id.* Defendants' counsel separately raised a specific objection to Plaintiffs' population methodology, explaining that treating a blank TIME OUT entry as continuous overnight presence "may be unlikely to account for individuals who were released for transfer during the course of the night or early morning," and that Plaintiffs' "use of the cell data spreadsheets and snapshot data points to calculate simultaneous population presence is predicated on unreliable or faulty assumptions." *Id.* Defendants' counsel requested that Plaintiffs share their expert's forthcoming methodology and conclusions—rather than just their AI generated results—and represented that Defendants were continuing to cross-check the cell data against other records. *Id.* Plaintiffs did not provide that information before filing the instant Motion three days later — two days after their expert's report was finalized. *See* ECF 197-4.

## III. ARGUMENT

### A. <u>Legal Standard</u>

The moving party on a motion to enforce bears the burden of demonstrating non-compliance with a specific and definite order by clear and convincing evidence. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000).

"To be clear and convincing, evidence must place in the ultimate factfinder an abiding conviction that the truth of the [moving] party's factual contentions are highly probable." *Boshea v. Compass Mktg., Inc.*, No. CV ELH-21-309, 2025 WL 3033933, at *27 (D. Md. Oct. 30, 2025), (quoting *United v. Ali*, 874 F.3d 825, 831 n.2 (4th Cir. 2017) (internal quotation marks omitted)). "Willfulness is not an element of civil contempt." *Wagner v. Bd. of Educ. of Montgomery Cnty.,*

*Maryland,* 340 F. Supp. 2d 603, 620 (D. Md. 2004) *Wagner*, 340 F. Supp. 2d at 620 (citing In re Gen. Motors Corp., 61 F.3d 256, 258 (4th Cir. 1995) .

To establish civil contempt, a movant must show each of the following elements, by "clear and convincing evidence:" (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result. *Boshea*, 2025 WL 3033933, at *27 ("Once the moving party meets its burden, the burden shifts to the contemnor to demonstrate that it 'made in good faith all reasonable efforts to comply with' the court's order.") (quoting *Ali*, 874 F.3d at 832); *see generally Consolidation Coal Co. v. Local 1702, United Mine Workers of America,* 683 F.2d 827, 832 (4th Cir.1982) (a good faith attempt to comply, as well as substantial compliance or the inability to comply, can be defenses to a civil contempt order). "Substantial compliance is found where 'all reasonable steps' have been taken to ensure compliance: inadvertent omissions are excused only if such steps were taken." *United States v. Darwin Const. Co*., 873 F.2d 750, 754 (4th Cir. 1989).

**B. Because Plaintiffs Have Not Established Clear and Convincing Evidence of Systematic Crowding Violations, Their Motion Should Be Denied.**

1. *Defendants' Written Procedures and Operational Practices Reflect Diligent, Good-Faith Compliance Efforts.*

Defendants' SOP implements the Order's personal-space requirement using the Order's own language, without adopting a quarter-circle geometry or any other specific model Plaintiffs now treat as compelled. The SOP requires a shift-change occupancy log and conspicuously posted maximum occupancy for each cell, SOP § 4.2, consistent with the posted signage and whiteboards described above. It requires immediate escalation to the Field Office Director or designee

whenever a cell approaches or reaches capacity, with an obligation to arrange alternative placement, SOP § 4.1(4)–(5) — consistent with the declared practice of notifying personnel that transfers into the BHR must be redirected once capacity is reached. It requires quarterly compliance review with written corrective action for any systemic deficiency identified. SOP § 11. And Defendants' declared practice of reducing the facility's aggregate capacity when an individual cell is decommissioned — rather than continuing to operate as though that cell's capacity remained available — reflects an occupancy-management system calibrated to meet threshold requirements of individualized space, even though Defendants may sometimes temporarily have an inability to comply. *See Consolidation Coal Co. v. Local 1702, United Mine Workers of America*, 683 F.2d 827, 832 (4th Cir.1982) (a good faith attempt to comply, as well as substantial compliance or the inability to comply, can be defenses to a civil contempt order).

These provisions and practices are not offered to excuse the occupancy figures reflected in Defendants' own cell data. They are offered because Plaintiffs' Motion asks the Court to infer, from the fact of noncompliance alone, that Defendants' certifications were hollow representations made with knowledge of contemporaneous violations. Mot. at 6–7. The record instead reflects a detailed, substantive compliance structure — addressing each requirement at issue in this Motion — that was disseminated, staffed, and operated, with mechanism for identifying and correcting the kind of noncompliance Plaintiffs allege. *See Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332-RJS, 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17, 2008) ("Reasonable diligence, at the very least, requires a party to develop reasonably effective methods of compliance."). Whether that structure prevented every instance of noncompliance on every date at issue is a separate question from whether it existed and was implemented in good faith, and the Motion does not distinguish between the two. *Aspira of N.Y. v. Bd. of Educ. of the City of N.Y.*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976)

("The relevant inquiry is whether a defendant has been "reasonably diligent and energetic in attempting to accomplish what was ordered.").

2. *The Order Does Not Specify an Exclusion-Zone Methodology, and Plaintiffs' Occupancy Table Rests on an Unadopted — and Incorrect — Assumption.*

The Order requires 31 square feet of personal space "exclusive of floor area within eight feet of any toilet." ECF No. 171 at 2. Candidly and regrettably, Defendants accounted for the 31 square feet of personal space but did not account for an additional measurement with specific respect to exclude floor area surrounding the toilet. Even still, the Court's directive does not specify how that eight-foot exclusion is to be geometrically modeled, or from what reference point it is to be measured. Plaintiffs supply that missing variable themselves, modeling the exclusion zone as a quarter-circle radiating from the corner where the walls meet. Mot. at 7. Defendants disputed this methodology in specific, quantified terms before the Motion was filed. ECF no. 197-4. An order leaving a material variable to interpretation does not "clearly and specifically proscribe" the conduct at a level of precision sufficient to support the numeric findings Plaintiffs ask this Court to adopt. *See Nunez*, 758 F. Supp. 3d at 218.

3. *Plaintiffs' Occupancy Data Conclusions are Unreliable*

Plaintiffs' expert report—the authority on which their claims with respect to alleged cell overcrowding are premised—is comprised of consequential misplaced assumptions. First, Plaintiffs' entire occupancy reconstruction depends on the assumption that the "TIME IN" field in Defendants' cell-log data reflects the moment an individual was physically placed into a specific cell. ECF NO. 197-2, Report of Grame Blair, "Ex. A" at 2 (treating a blank TIME OUT as meaning the individual "was still in custody and physically present"). But that assumption is fundamentally incorrect. Instead, the "TIME IN" entry reflects the time an individual was brought into the BHR for the initiation of processing. Decl. ¶¶ 17, 20. Processing involves multiple discrete steps, and

while an individual is typically placed into a hold room only upon completion of that sequence, during periods of high arrestee volume individuals may be placed in hold rooms temporarily before being removed again to complete outstanding processing steps. Id. ¶ 17. Plaintiffs' Motion and its supporting expert report proceed as though "TIME IN" and cell assignment are contemporaneous and fixed, but that assumption does not hold. *Id.* ¶ 20. Far from a peripheral data-quality concern, Plaintiffs' entire methodology is built upon this foundation when in fact it does not measure the thing the methodology assumes it measures.

Second, Plaintiffs' methodology relies on unverified extrapolation between two measurement points. To his credit, Plaintiffs' expert has moved away from a daily-presence methodology that measured overcrowding by the cumulative number of unique individuals passing through a cell each day — a measure of throughput rather than concurrent occupancy. ECF no. 127-6. His current methodology instead attempts to reconstruct population at two fixed points daily: midnight and noon. ECF NO. 197-2, Ex. A at 2–3. However, the refined methodology nonetheless assumes population stability across the interval between those two points, without any showing that such stability existed.

Third, as the White declaration establishes, detainees are moved between cells for purposes of cleaning, space management, and separation, *id*. ¶ 13, and may also be temporarily relocated in urgent circumstances such as a broken lock or inoperable toilet—with decompression procedures used to transfer individuals elsewhere where the issue cannot be promptly resolved, *id*. ¶ 14. The cell logs simply do not accurately reflect all such movement. Id. ¶ 17.

Fourth, where data is missing or incorrect due to the operational realities of a high-volume intake facility, *id*. ¶ 21, Plaintiffs' expert resolved that uncertainty in the direction that maximizes apparent occupancy — treating incomplete records as full-day stays rather than excluding or

conservatively estimating them. More specifically, with respect to the "Time In" and "Time-Out," columns, the data sets contain hundreds of instances where either no value is entered (blank field) or the value entered contains an entry of 00:00. Plaintiffs' methodology treats this treats missing data as full-day occupancy, if a blank field for the "Time-In" or "Time-Out' field appears in the middle of a detainee's stay, that may make sense, but where it corresponds to the onset or end of a detainee's stay, it does not and merely serves as a way of inflating occupancy. Relatedly, Plaintiffs' methodology treats the value of "00:00," where associated with the beginning of a detainee's stay, as a true and accurate representation of the time—meaning a detainee would be regarded as present in the cell for 24 hours on that calendar day even though logic dictates that each one of these detainees was not booked in at the stroke of midnight. A manual review of the data sets shows there are at least 59 detainees whose stay is noted as starting at 00:00 on a particular day. This too serves as a mechanism to distort both the total occupancy numbers as well as the duration of stay.

Taken together, Plaintiffs' expert report is rife with methodological deficiencies that systematically overestimate both occupancy levels and durations of over-capacity periods and completely undermine the conclusions they ask this Court to accept. Resultingly, while the net impact of this maximalist methodology on population totals at the BHR is unclear, it is clear that Plaintiffs lack a sufficient supporting basis for the conclusions they reach and ask this Court to adopt. Plaintiffs have not met their burden of establishing systemic violations of the Court's requirement that individual detainees be afforded not less than 31 sq. feet of individual space by clear and convincing evidence. *See Darwin Const. Co.,* 873 F.2d at 754 (4th Cir. 1989) (a good faith attempt to comply, as well as substantial compliance or the inability to comply, can be defenses to a civil contempt order). At an absolute minimum, the record instead reflects that even

though there were episodic instances non-compliance with population caps, the record undeniably reflects that Defendants put in place a detailed, substantive compliance structure inclusive of secondary safeguards (use of whiteboards for visible posting of real-time population totals, etc) and measures to relocate detainees when hold rooms become temporarily inoperable. Accordingly, Defendants request this Court to conclude that they have substantially complied with the Court's PI. *See Consolidation Coal Co. v. Local 1702, United Mine Workers of America*, 683 F.2d at 832.

**B. <u>Plaintiffs' Medication-Access and Statement-of-Rights Claims Rest on a Thin and Internally Inconsistent Evidentiary Record.</u>**

Plaintiffs' medication-access and statement-of-rights claims rest almost entirely on eight individual declarations describing isolated instances over a four-month period, out of approximately 2,000 individuals processed through the BHR during that time. Mot. at 11–15 (citing Exs. E–L). Even if facially plausible, a small, self-selected sample of this kind, unaccompanied by any documentary or statistical evidence of frequency or rate, cannot establish by clear and convincing evidence the systemic, continuous pattern of noncompliance Plaintiffs allege. But, as demonstrated below, Plaintiffs' declarations are discredited by numerous, glaring deficiencies that render the testimony substantially unreliable and without evidentiary value. [1]

Mr. Bermudez, for example, claims he was detained at the BHR for approximately five days, from the morning of Friday, June 12, 2026, until the morning of Wednesday, June 17, 2026. *See* ECF no. 197-7. However, the cell logs appear to reflect that his detention actually began on June 13, 2026 and ended the following day on June 14, 2026. Ex. E, BHR Cell Logs, June 2026. The records also contradict Mr. Bermudez' claims concerning cell population. While Mr.

[1] Additionally, substantial portions Plaintiffs' attached declarations contain assertions regarding subject matter outside the scope of this Motion — including warrant disclosure, consulate and clergy access, and attorney access during transport — and are not properly considered in resolving the claims actually before the Court. See ECF Nos. 197-5 through 12.

Bermudez states that his cell capacity was 11 but reached a high of 24 people and never contained fewer than 19 people, ECF no. 197-7, the cell-population records further reflect that he was detained in Room 1 both days (capacity 16), where the peak cell population reached only 13 and 16 individuals on each date respectively. *Id*. Moreover, Mr. Bermudez' declaration was executed nearly two months after the events described and asserts that his transport occurred in a private car "instead of the usual transport van" — a comparative characterization a first-time detainee at this facility has no apparent basis to make. *See* 197-7; Fed. R. Evid. 602.

Additional reliability problems can be seen in the declaration of Mr. Gonzalez-Vargas, whose signature block was executed by his counsel, who separately attests that Mr. Gonzalez-Vargas authorized him to sign on his behalf. ECF No. 197-6. Section 1746 requires subscription "as true under penalty of perjury" by the person making the statement — here, the individual with personal knowledge of the facts recounted. An authorization to sign does not satisfy that requirement where the declaration's substance is a first-person factual account only the declarant is positioned to attest to. *See e.g., Heritage Foundation v. U.S. Department of Justice*, 805 F. Supp. 3d 579 (D. Del. 2025); *Elliot v. Fed. Bureau of Prisons,* No. 04-1702, 2006 WL 5217760, at *6 (D.D.C. Oct. 17, 2006)

Other declarations simply wholly undermine the “systematic failure” narrative Plaintiffs seek to advance. Mr. Cruz's declaration, for example, states that he received medication during his detention. ECF No. 197-8. He further describes being transported directly to a hospital after reporting symptoms following his arrest, before BHR intake — consistent with, and corroborative of, Defendants' emergency-response protocols. 197-8, ¶ 24. Mr. Cruz also states that he was asked screening questions about current health and medical history; including mental health, whether he was taking any medication; and if he required any specific diet or food. Id.

In fact, Mr. Cruz is one of 6 declarants that concedes that he was asked screening questions about his current health, medical history, and whether he was taking any medication. *See* ECF Nos. 197-6 (Gonzalez-Vargas); 197-9 (Cresencio Gomez); 197-10 (Luis Morocho); 197-12 (Bardales Pineda); and Lorenzo Cruz was asked the screening questions at the hospital after he was taken immediately there following his arrest (197-8). Notably, one of the declarants who claims he was not asked screening questions, "E.A.M.," has provided only his initials rather than his full name, and his testimony—taken by his attorney nearly three months after his stay at the BHR—suffers from the same Section 1746 issues that the declaration of Gonzalez-Vargas has. ECF No. 197-11. Thus, Plaintiffs' attached declarations do not come near satisfying their burden to establish contempt by clear and convincing evidence.

### C. Defendants' Protocols and Record Evidence Showing their Diligent Implementation Further Support Substantive Compliance

Defendants' medical intake protocol requires screening of every individual by IHSC-trained personnel, covering immediate needs, visible injury or distress, current medications, communicable disease, disability needs, and dietary requirements. White Decl. ¶¶ 22–23. Individuals requiring urgent care are transported immediately, with information relayed back to inform ongoing care. *Id.* ¶ 24. Prescription medication is affirmatively pursued where an individual arrives without it — through family, friend, or attorney drop-off, and, failing that, through hospital transport within twenty-four hours — logged, administered as directed, and carried with the individual upon any transfer. Ample record evidence reflects that these adopted protocols to ensure safety and well-being of the temporary detainee population are being reliably executed as intended. *Id.* ¶¶ 25–27; *See* Group Ex. C, Records reflecting BHR staff facilitating medical care and pain relief; Group Ex D, Records Reflecting BHR staff facilitating prescription medication continuity.

[2] Plaintiffs' characterization of a "wholesale failure" to provide medication access and notice, Mot. at 15, cannot be reconciled with a record showing a detailed, substantively implemented protocol addressing each of the requirements at issue — including corroboration drawn from Plaintiffs' own declarants. *See Darwin Const. Co.,* 873 F.2d at 754 (4th Cir. 1989) (a good faith attempt to comply, as well as substantial compliance or the inability to comply, can be defenses to a civil contempt order).

## IV. Plaintiffs Have Not Established the Harm Necessary to Support the Relief Requested

Plaintiffs' harm argument relies principally on this Court's prior findings from the preliminary injunction proceedings regarding the general risks posed by the conditions at the Baltimore Hold Rooms, together with the assertion that "a deprivation of a constitutional right, for even minimal periods, unquestionably constitutes irreparable injury." Mot. at 19 (quoting Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022)). That principle does not relieve Plaintiffs of the threshold burden of establishing, by clear and convincing evidence, that the specific deprivation alleged actually occurred as alleged. Where, as set forth above, the underlying occupancy figures do not reliably establish sustained, simultaneous overcrowding — as opposed to point-in-time fluctuations captured by flawed methodologies applied to a data field— the premise for the asserted harm is itself unestablished. A claim of harm from a continuous deprivation of adequate personal space is not interchangeable with a claim of harm from a population figure recorded at an isolated moment during a period of active intake and processing activity. Supra Part II.C. Plaintiffs' Motion does not distinguish between the two, and the record now before the Court — including Plaintiffs' own declarant's cell data, supra Part II.C.3–4 — indicates that many of the alleged violations reflect the latter, not the former.

[2] These records are submitted as a relevant sample and not intended to be comprehensive.

The same limitation affects the medication-access and statement-of-rights harm allegations. Plaintiffs assert that "the denial of timely access to prescribed and over-the-counter medications causes direct physical harm," and that "the failure to provide the court-ordered written notice deprives Detained Individuals of knowledge of the protections this Court has ordered on their behalf." Mot. at 19. These are legitimate categories of harm in the abstract, but Plaintiffs' showing that they in fact occurred, systemically, rests on the same small set of individually recalled declarations addressed above — declarations that are, in material respects, inconsistent with Defendants' contemporaneous records and, in direct conflict with Plaintiffs' allegations, or not properly subscribed under 28 U.S.C. § 1746 at all. Supra Part III.B. Harm cannot be presumed at the systemic level Plaintiffs request from a proof of violation that has not itself been clearly and convincingly established. This Court unquestionably possesses broad equitable authority to enforce the terms of its orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). But that authority is properly exercised in proportion to a demonstrated violation, and the relief Plaintiffs request here — an order finding violations across all three categories alleged, weekly sworn declarations from the Field Office Director personally, ongoing production obligations, and reporting certified to the Court under penalty of contempt, Mot. at 20–21 — substantially exceeds a request to bring Defendants into compliance with the Order as written. It functions, in substance, as a request for a new and more onerous reporting regime layered on top of the existing injunction, without the showing that would ordinarily support modifying an injunction's terms.

This mismatch is underscored by the posture Plaintiffs themselves have chosen. Plaintiffs expressly disclaim seeking a contempt finding "at this time," while "expressly reserv[ing] the right to seek that relief by subsequent motion," Mot. at 20 n.5, yet ask the Court to make findings — under the clear-and-convincing evidentiary standard that governs contempt determinations,

Ashcraft, 218 F.3d at 301 — that would supply much of the factual predicate for exactly the contempt motion Plaintiffs reserve the right to bring later. Defendants respectfully submit that if Plaintiffs intend to seek contempt-level findings against Defendants, and personally against the Field Office Director through individually mandated weekly certifications, that request should be presented, and tested, as what it is — with the full procedural safeguards that accompany a contempt motion — rather than by an attempt to secure them in substance through a motion styled to avoid them.

## V. CONCLUSION

Plaintiffs' Motion asks this Court to find clear and convincing evidence of systematic noncompliance on a record that does not support that characterization. The crowding claim depends on unreliable methodologies Defendants disputed before this Motion was filed. The medication-access and statement-of-rights claims rest on a small set of individual accounts that are internally inconsistent, in tension with Defendants' contemporaneous records, and in at least one instance not properly subscribed under 28 U.S.C. § 1746. For these reasons, the Court should deny Plaintiffs' Motion.

Dated: September 2, 2026

Respectfully submitted,

BRETT A. SCHUMATE
Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

*s/ Brendan T. Moore*
BRENDAN T. MOORE
Trial Attorney
Office of Immigration Litigation
Civil Division, U.S. Department of Justice
202.880.0330

Attorneys for Defendants