**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

D.N.N. and V.R.G., *on behalf themselves and all others similarly situated*,

*Petitioners-Plaintiffs*,

v.

VERNON LIGGINS, *et al*.,

*Respondents-Defendants*.

Civil Action No.: 1:25-cv-01613

**DECLARATION OF MELANIE C. WHITE**

I, Melanie C. White, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Assistant Field Office Director ("AFOD") employed by the U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") division. I have been employed by ICE since June 2, 2002, having held various ERO roles involving detention, processing, and removal operations. I have been the AFOD at the Washington Field Office and Baltimore Resident Office since February 13, 2022. I am currently assigned to the Enforcement Fugitive Operations, Criminal Alien Program and am currently overseeing operations in the Baltimore Hold Room ("BHR"). I am familiar

with the operations of the Baltimore ERO office, as well as ICE's processing, detention and transfer policies, guidance and protocols.

2. As AFOD, I oversee operations at the BHR, including facility, staffing, security protocols, detainee movement, and processing workflows. My responsibilities also including supervising personnel and ensuring facility operations are conducted in accordance with ICE policies, operational requirements and applicable security standards.
3. This declaration is submitted in connection with the Court's Preliminary Injunction entered on March 6, 2026, as well as Defendants response to Plaintiffs' Motion to Enforce the Preliminary Injunction.
4. The statements in this declaration are based on information provided to me in the course of my official duties from personnel involvement in facility operations.

**ICE Policies Regarding the Baltimore Hold Room**

5. In response to the Court's Preliminary Injunction, ERO Baltimore created a Standard Operating Procedure ("SOP") detailing the various requirements of the Preliminary Injunction and to provide guidance to ICE employees
6. The SOP discusses the following topics:
   a. Physical Space Requirements;
   b. Sanitation and Hygiene Requirements;
   c. Medical Care Requirements;
   d. Services for Detained Individuals with Disabilities and
   e. Written Notice of Rights Requirements

7. ICE employees are required to adhere to this SOP for their work in the BHR. The SOP also applies to contractors who work in the BHR. The SOP was disseminated to all employees who work in the Field Office.

**Physical Space requirements**

8. The Preliminary Injunction ordered all individuals detained in the BHR to have 31 square feet of personal space, exclusive of floor area within eight feet from any toilet.

9. In light of these requirements, ERO determined the occupancy limits for each of the following cells:

| Cell Number | Square Feet | Maximum number of individuals |
|---|---|---|
| 1 | 494.93 | 16 |
| 2 | 420.15 | 13 |
| 3 | 559.53 | 18 |
| 4 | 128.78 | 4 |
| 5 | 128.78 | 4 |

10. After the Court issued the Preliminary Injunction, ERO determined the maximum occupancy limit for each cell by dividing the available square footage of each cell by 31.

11. The total maximum detainee occupancy for the hold room is 55. If a cell has reached capacity, other cells with available capacity will be used until that cell has reached capacity. If the BHR reaches maximum occupancy, ERO notifies any personnel coordinating a potential incoming transfer that detainees cannot be moved into the BHR and that alternative detention space must be identified. If the BHR is near or at maximum

capacity, ERO works diligently to identify and secure appropriate alternative detention space for individuals in custody.

12. Each cell has a posted notice outside the door identifying the maximum number of individuals permitted in that cell. In addition, each cell door has an attached whiteboard on which officers and contractors record and update the current number of detainees housed in the cell. These postings provide a clear, readily accessible reference for staff responsible for monitoring occupancy levels and help ensure that detainee counts are consistently tracked throughout the day. I have attached photographs of each cell door to this declaration, which show the posted maximum occupancy information and the whiteboards used to record the current detainee count. ICE employees and contractors conduct frequent head counts and compare the actual number of detainees in each cell against the posted maximum capacity. These checks are performed to confirm that each cell remains at or below its established occupancy limit and to allow staff to promptly address any capacity concerns if they arise.

13. Individuals detained in the BHR are sometimes moved between cells for operational, security, and facility-management reasons. This may occur when cells are being cleaned, sanitized, or otherwise serviced, requiring detainees to be temporarily placed in different cells. Additionally, when feasible, individuals may be reassigned to other cells to better manage available space and provide greater separation among detainees within the BHR.

14. Additionally, in urgent or unforeseen circumstances, individuals may need to be temporarily moved from one cell to another for security purposes on account of issues outside the immediate control of staff, such as a broken cell lock or an inoperable toilet. When this occurs, ICE takes immediate steps to address and remedy the issue as quickly

as practicable. If the issue cannot be resolved promptly, ICE works to arrange transportation for the affected detainees to another appropriate location, a process called decompression.

15. If a cell is temporarily decommissioned due to safety, maintenance, or operational concerns, ICE reduces the BHR's overall maximum occupancy accordingly. In such circumstances, ICE does not continue operations using the standard 55-detainee limit (inclusive of individual population limits). Instead, the total allowable occupancy is decreased by the maximum occupancy assigned to the decommissioned cell for the period during which that cell is unavailable for use.

16. The contractors employed to perform security services in the BHR also use a log to track detainee movements. The log is exclusively maintained by the contractors.

17. I have reviewed these logs. It appears the logs maintained by the contractors do not reliably reflect all instances of detainee movement that occur at the hold rooms. As stated, there are numerous reasons why individuals may be moved between cells. In addition to relocating individuals from assigned cells for purposes of cell cleaning and decompression, individuals are also commonly placed in different cells to allow for additional individual space. Relatedly, the time-in column signifies the time at which the processing of an individual begins rather than the time at which an individual is placed in a hold room cell. Processing involves numerous, separate steps, and while an individual most typically is placed in the hold rooms at the completion of this sequence of processing steps, there are some occasions—such as when an influx of new arrestees arrive at the facility in close proximity—where individuals will be placed in the hold rooms temporarily before being taken out again to complete one or more phases of

processing. Thus, detainee movement between cells and in and out of cells frequently occurs and the logs do not appear to reflect the extent to which this practice occurs.

18. I have been made aware that these logs have been produced in discovery in this matter. I understand that Plaintiffs have relied in part on these logs in support of their allegations that Defendants are violating the Preliminary Injunction.

19. Upon my review, it appears that the Plaintiffs interpret the "time-in" column of the logs to represent the moment individuals were placed into a cell. As noted above, such an interpretation is inaccurate. Instead, the "time-in" entry is meant to indicate the time at which an individual was brought into the BHR for initiation of processing.

20. There also appear to be some instances where associated information pertaining to a detainee entry is missing from the logs, such as detainee time-in and time-out or specific cell assignments. Due to the nature of operations, information is missing from the logs or incorrect information is added.

**Medical Screenings at the Baltimore Hold Room**

21. Once an individual arrives at the BHR, they are given a medical screening by a detention officer who has been trained by the ICE Health Service Corps ("IHSC") to conduct medical screenings.

22. ICE reviews the following in each medical intake:

    a. Immediate apparent medical needs or emergencies;

    b. Visible signs of injury, illness or distress;

    c. Inquire about current medications including both prescription and over-the-counter medications;

    d. Inquire about known communicable diseases or symptoms;

e. Inquire about any physical disabilities or accommodation needs;

f. Inquire about any food allergies or necessary dietary requirements;

g. Review any documents in detainee's file.

23. If there are any signs that the individual needs urgent medical care, they are immediately transported to the closest hospital. The transports are often conducted by the contractors. Once the hospital visit is complete, any pertinent information is relayed to the field office to ensure adequate care is provided to the individual while they are held at the BHR.

**Prescription and over-the-counter medications at the Baltimore Hold Room**

24. If an individual has any prescription medication on their person when they are brought to the BHR, they are able to take it as prescribed. If the individual is not in possession of his prescription medication at the time of processing, but has a family member, friend or attorney who can drop off their medication, they are also permitted to do so.

25. If no medication can be dropped off within 24 hours, ICE takes the individual to the closest hospital, which is either St. Agnes or Johns Hopkins Hospital.

26. If the detainee is given any prescription medication, ICE logs this information and allows the individual to take their prescribed medication as told by their doctor or nurse. Should the medication need to be picked up at a pharmacy, ICE picks up the medication as soon as it is available. All prescription medication also travels with the individual as they move to another location.

27. Should an individual request over-the-counter medication such as Tylenol and Advil due to any pain they are having, ICE also takes them to the hospital. ERO had originally planned to keep over-the-counter medications in the hold room but decided to instead take any individual who requests medications to the hospital. This is done for a couple of

important reasons. First, it ensures that if there is an underlying cause for the individual's pain, it is appropriately checked by a medical professional. Second, if an individual were to have an allergy to an over-the-counter medication not disclosed to ICE during their intake, the hospital would be able to remedy the situation as soon as possible.

28. Any individual prescribed an inhaler is allowed to always keep it on their person. If an individual's inhaler runs out of mediation, ICE takes them to the hospital to receive a prescription if no family member, friend or attorney can drop off an inhaler for them.

**Cleaning and Sanitary Care at the Baltimore Hold Room**

29. All cells are cleaned by a third-party contractor, Chimes. They are tasked with cleaning the hold room. Each time they clean each cell, it is logged and verified by an ICE employee or contractor.

30. Individuals detained in the Baltimore Hold room are not tasked with any cleaning besides throwing any garbage from their meals or empty water bottles after they finish eating or drinking. ICE keeps a garbage bin inside each cell for this purpose.

31. ICE employees and contractors view the cells at least three times a day to ensure it is clean. If ICE believes the cell is not clean, they will contact the cleaning contractor to clean the cell as soon as possible.

**Bedding and Hygiene at the Baltimore Hold Room**

32. Each individual is given a sleeping mat if they will be held overnight at the BHR. ICE keeps at least 60 sleeping mats in its possession to ensure that if one becomes unusable, there are additional mats to replace them.

33. All individuals are provided a blanket at night should they be held overnight at the BHR. ICE also provides sweaters and sweatpants to any individual upon request.

34. All individuals are given soap, towels, toothbrushes, toothpaste, toilet paper and access to hand-washing fixtures. Female detainees are given access to feminine hygiene products upon request.

35. No individual is required to share any personal hygiene items. ICE provides as many hygiene supplies as requested as well as ensures that each detainee possesses the required hygiene supplies.

**Food and Water at the Baltimore Hold Room**

36. All individuals in the BHR are given at least three meals per day. ICE also offers multiple snacks per day such as chips or cookies.

37. Currently, all individuals are given the choice of multiple kinds of MRE's. If an individual is allergic to any item in the MRE, they are given a different MRE.

38. ICE also provides vegetarian and halal options for individuals should they request it.

39. All individuals are given new plastic water bottles. Individuals can request new bottles at any time throughout the day, and ICE will provide as many as they request.

Date: September 1, 2026

MELANIE C WHITE

Digitally signed by MELANIE C WHITE
Date: 2026.09.01 17:26:13 -04'00'

Melanie C. White
Enforcement and Removal Operations
Immigration and Customs Enforcement
Department of Homeland Security