**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| D.N.N. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Vernon Liggins, *et al.,*<br><br>*Defendants*. | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION**<br><br>Civil Action No.: 1:25-cv-01613 |

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

ADDITIONAL BACKGROUND.................................................................................2

ARGUMENT .........................................................................................................3

I. Defendants' Admissions Confirm Their Overcrowding Violations. ...............................3

A. Professor Blair's Findings Are Unrebutted and Based on Conservative Assumptions that Understate the True Extent of Overcrowding. ............................................ 3

B. Defendants' Attack on Their Own Records Further Establishes Rather Than Excuses Noncompliance. ............................................................................ 6

C. Defendants' Admission on the Toilet Exclusion Zone is Dispositive. .......................... 7

D. Defendants Certified Compliance While Actively Violating the Order. ....................... 8

II. The White Declaration Reveals an Agency Unable to Monitor Its Own Compliance and Unable to Invoke Substantial Compliance as a Defense. ..........................................9

III. Defendants Have Violated the Order's Medication-Access Requirements, and Their Opposition Confirms It. ............................................................................10

IV. Defendants Have Conceded the Statement-of-Rights Violations Through Silence...........13

V. The Pattern Before This Court Warrants Escalated Relief, Including Consideration of an Independent Monitor. ......................................................................14

CONCLUSION.......................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kimbrough v. Mayor & City Council of Balt.*,
No. CV 25-2187, 2026 WL 2124003 (D. Md. July 23, 2026)....................14

*Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*,
608 F. App'x 130 (4th Cir. 2015)....................14

*Schwartz v. Rent-A-Wreck of Am.*,
261 F. Supp. 3d 607 (D. Md. 2017)....................14

*Shillitani v. United States*,
384 U.S. 364 (1966)....................14

*United States v. Darwin Constr. Co.*,
680 F. Supp. 738 (D. Md. 1988)....................9

*United States v. Darwin Constr. Co.*,
873 F.2d 750 (4th Cir. 1989)....................9

## INTRODUCTION

Plaintiffs have already provided clear and convincing evidence of systematic violations of this Court's March 6, 2026 Preliminary Injunction Order (ECF No. 171, the "Order"). To the extent any doubt remained, Defendants' opposition confirms these violations. Six months into the preliminary injunction period, the record before this Court reflects the following undisputed facts:

- Defendants' own records indicate that they violated the Order's crowding limits on at least 78 of 116 days (67% of the review period), with cells in violation for a combined 1,588 hours. Exhibit 1, September 9, 2026 Expert Report of Professor Graeme Blair ("Blair Reply Report") ¶¶ 8–9, Appendix A.

- Defendants admit they "did not account for an additional measurement with specific respect to exclude floor area surrounding the toilet"—the eight-foot toilet exclusion zone this Court's Order expressly mandates (ECF No. 210 at 8). As a result, Defendants posted limits for Cells 4 and 5 that were literally double the court-ordered maximum.

- Defendants' own Assistant Field Office Director ("AFOD") states that Defendants' cell logs "do not reliably reflect all instances of detainee movement that occur at the hold rooms" (ECF No. 210-1, ¶ 17), conceding that Defendants have no mechanism for monitoring compliance with the Order. Defendants also do not even suggest that they have been reviewing these records or making any effort to monitor compliance at all.

- Defendants claim they respond to over-the-counter medication requests by transporting individuals to a hospital—the very practice this Court already held constitutionally inadequate. ECF No. 210-1 ¶¶ 27–28. Yet they provide no evidence such transports actually occur, nor any explanation why the facility cannot stock basic products like Tylenol. *Id.*

- Defendants continue to rely on delivery from friends and family as the primary mechanism for prescription medication access. ECF No. 210-1 ¶ 24. Defendants claim that if no one brings medication within 24 hours, individuals will be transported to the hospital—but they possess no log tracking when medication was requested, when or whether it was provided, or whether the 24-hour deadline was met in any individual case. *Id.* ¶ 25. Their only evidence is a handful of email exchanges showing that a few individuals received medication over five months, with no detail on the circumstances. ECF No. 211-3, 211-4.

- Defendants do not even claim to have provided the written statement of rights the Order requires within one hour of arrival, and they have produced no copy of any such statement despite both a discovery obligation and the opportunity to do so in opposing this Motion.

Defendants' inability to provide basic information about daily conditions at the Baltimore Hold Rooms is the inevitable result of treating this Court's Order as aspirational rather than

binding. The agency knows what its Standard Operating Procedure ("SOP") says. It has no reliable idea whether that SOP is being followed. They possess no contemporaneous record, no reliable log, and no personnel with firsthand knowledge sufficient to reconstruct conditions inside their own facility on any given day. That evidentiary void is not a minor gap—it is the absence of any compliance mechanism whatsoever. Defendants cannot claim substantial compliance with obligations they never equipped themselves to monitor.

The question before this Court is not whether violations occurred—they did, and Defendants have admitted as much. The question is what this Court must do about a government agency that cannot account for what is happening inside a facility it controls, and one that has filed two compliance certifications that the record has exposed as hollow. This Court should intervene firmly and immediately by granting Plaintiffs' requested relief and, if Defendants remain unable or unwilling to comply, by appointing an independent monitor to safeguard the constitutional rights and wellbeing of those detained at the Baltimore Hold Rooms.

## ADDITIONAL BACKGROUND

After Plaintiffs filed their opening brief, Defendants provided a September 1, 2026 supplemental interrogatory response (Exhibit 2) advising that the cell dimensions they previously represented for Cells 1 and 3 were transposed. Professor Blair has rerun each analysis using the corrected dimensions, which yield an occupancy limit of 14 for Cell 1 (reduced from 16) and 16 for Cell 3 (increased from 14), with all other cells unchanged. Blair Reply Report, ¶ 7. The corrected analysis reveals that the overcrowding was even more pervasive than reflected in Professor Blair's original report. The number of days on which at least one cell exceeded its occupancy limit increased from 69 days (59% of the review period) to 78 days (67% of the review period). *Id.* ¶ 8. Cell 1 alone was in violation on 71 days—61% of the review period—an increase of 34 days over the original analysis (*id*):

| Cell | Original Report: Days Over Limit | Original Report: % of Days | Corrected Analysis: Days Over Limit | Corrected Analysis: % of Days | Change in Days |
|---|---|---|---|---|---|
| 1 | 37 | 32% | 71 | 61% | +34 days |
| 2 | 12 | 10% | 12 | 10% | No change |
| 3 | 44 | 38% | 29 | 25% | -15 days |
| 4 | 1 | 1% | 1 | 1% | No change |
| 5 | 11 | 9% | 11 | 9% | No change |
| Any Cell | 69 | 59% | 78 | 67% | +9 days |

The corrected analysis likewise reveals a substantial increase in the total duration of overcrowding. The number of hours during which cell populations exceeded the applicable occupancy limits increased from 1,311 hours to 1,588 hours—an increase of 277 hours (*id.* ¶ 9):

| Cell | Original Report: Total Hours Over Limit | Corrected Analysis: Total Hours Over Limit | Change in Hours |
|---|---|---|---|
| 1 | 365 | 879 | +514 hours |
| 2 | 191 | 191 | No change |
| 3 | 551 | 314 | -237 hours |
| 4 | 12 | 12 | No change |
| 5 | 191 | 191 | No change |
| All Cells | 1,311 | 1,588 | +277 hours |

## ARGUMENT

### I. Defendants' Admissions Confirm Their Overcrowding Violations.

#### A. Professor Blair's Findings Are Unrebutted and Based on Conservative Assumptions that Understate the True Extent of Overcrowding.

Defendants do not challenge Professor Blair's qualifications. They do not offer alternative occupancy figures. They do not contend that any specific violation he identified did not occur.

Their only response is to raise speculative objections to their own cell records. ECF No. 210 at 8. None of those objections withstand scrutiny.

First, Defendants argue that the "Book In" time recorded in the cell logs does not reflect the moment a detainee was physically placed in a cell, but rather the time of arrival at the Baltimore Field Office for the initiation of processing. Because processing involves "multiple discrete steps," Defendants contend there is a lag between when an individual enters the facility and when that individual is physically placed in a cell, such that Professor Blair's analysis overstates the duration of each individual's cell occupancy. ECF No. 210 at 8–9.

At the outset, Professor Blair's overnight findings are wholly unaffected by this objection. Professor Blair identified 70 distinct overnight violations—periods in which cell occupancy exceeded the court-imposed limit beginning at midnight—and noted that "virtually no individuals are booked in overnight from 12 a.m. to 6 a.m.," rendering Defendants' processing-time argument inapplicable to those violations. Blair Reply Report ¶ 15. These violations are measured at the moment when the logs unambiguously reflect the population present, making Defendants' book-in delay critique inapplicable by its own terms. These are also among the worst violations, as they involve periods when individuals are forced to sleep huddled together on the cell floor.

Professor Blair's analysis independently disproves any material impact from Defendants' booking-time objection. Professor Blair tested Defendants' processing-time theory by adding two hours to the recorded book-in time (except where doing so would have shortened the stay to under an hour). *Id.* ¶¶ 12–14. The results were negligible: violation days fell from 78 to 75, and violation hours from 1,588 to 1,434. *Id.* ¶ 14. That adjustment is far more generous than any processing delay Defendants have identified, and it leaves the core finding intact: cells exceeded court-imposed occupancy limits on approximately two out of every three days during the review period.

Second, Defendants mischaracterize Professor Blair's methodology as a "noon and midnight" snapshot approach that "relies on unverified extrapolation between two measurement points." ECF No. 210 at 9. As Professor Blair has confirmed, Defendants "appear to be referring not to [his] analysis, but rather to an AI-generated analysis that was provided in a letter from Plaintiffs' Counsel." Blair Reply Report ¶ 16. His methodology is entirely independent of that letter; he calculated cell populations at each moment a detainee was added to a cell throughout the relevant period, tracking every change in population as individuals entered and exited each cell. *Id.* Defendants' conflation of the two analyses should be disregarded.

Third, Defendants contend that Professor Blair inflated his occupancy figures by treating missing or ambiguous data—blank entries and "00:00" values in the "TIME IN" and "TIME OUT" fields—as evidence of full-day occupancy. ECF No. 210 at 9–10. That is wrong. Professor Blair identified the ambiguities, explained them, and then tested whether they mattered. First, he made reasonable assumptions about each missing or ambiguous entry based on patterns in the complete data and his understanding of ICE detention operations. Blair Reply Report ¶ 23. Second, he reran his entire analysis under alternative assumptions designed to minimize apparent occupancy, to confirm that his conclusions do not depend on how those entries are interpreted. *Id.*

In that conservative sensitivity analysis, Professor Blair reversed each assumption in Defendants' favor—treating blank book-in times as midnight at the end of the day, blank book-out times as midnight at the start, and single-day stays with blank or "00:00" book-out times as though the individual was never present at all. *Id.* ¶¶ 25–26. The results barely changed: violation days fell from 78 to 76, and violation hours from 1,588 to 1,400. *Id.* ¶¶ 28–29. Even crediting every data-quality objection Defendants raise and resolving every ambiguity entirely in their favor, cells still exceeded court-imposed occupancy limits on two out of every three days.

The results are stark. Over the 116-day review period, at least one cell exceeded its court-imposed maximum on 78 days (67%). Cell 1 alone was in violation on 71 days for 879 hours; Cell 3 on 29 days for 314 hours. Blair Reply Report ¶¶ 8–9. Defendants have not disputed a single specific violation, which alone suffices to support Plaintiffs' requested relief as to enforcement of the Order's overcrowding provisions.

### B. Defendants' Attack on Their Own Records Further Establishes Rather Than Excuses Noncompliance.

The White Declaration acknowledges that the contractor logs "do not reliably reflect all instances of detainee movement that occur at the hold rooms." ECF No. 210-1 ¶ 17. The AFOD further concedes that "information is missing from the logs or incorrect information is added." *Id.* ¶ 20. Defendants offer this as a defense. It is the opposite.

As this Court observed, "the data at issue is clearly within Defendants' control, and they have presumably maintained a monitoring procedure as part of their overall compliance procedures per the preliminary injunction order." ECF No. 203-1. Defendants have exposed that presumption as unfounded. Their own AFOD concedes that the logs—maintained exclusively by contractors—do not reliably capture detainee movement. ECF No. 210-1 ¶¶ 16, 17, 20. By submitting a declaration that invalidates their own monitoring records, Defendants have not demonstrated compliance—they have demonstrated the absence of any system capable of ensuring compliance.

Moreover, Defendants' critique cuts against them in a second way. The AFOD acknowledges that individuals are "sometimes moved between cells" for cleaning, space management, and decompression. *Id.* ¶¶ 13–14. When a cell goes offline, its occupants must be redistributed among the remaining cells, necessarily increasing population density beyond what any single cell log would show. Professor Blair analyzed this issue and found that, for Cells 1 and 3, it would not have been possible to transfer all occupants to any other single cell without causing

that cell to exceed its own occupancy limit for more than half the time those cells were occupied. Blair Reply Report ¶¶ 18–19. In other words, in the very scenarios Defendants describe—cleaning, broken locks, inoperable toilets—the receiving cell would have exceeded its limit more often than not. *Id*. ¶ 19. And this analysis does not account for gender-based cell restrictions, which would further reduce available receiving cells and make compliant transfers even less feasible. *Id*. ¶ 21. Defendants' own operational practices thus confirm that the overcrowding Professor Blair documented likely *understates* actual conditions. The logs-are-unreliable argument leaves Defendants without any record of compliance while simultaneously suggesting conditions were worse than the record reflects.

**C. Defendants' Admission on the Toilet Exclusion Zone is Dispositive.**

Defendants acknowledge that they calculated per-cell capacity limits without accounting for the toilet exclusion zone. ECF No. 210 at 8. The White Declaration confirms that ICE determined each cell's maximum occupancy by dividing total square footage by 31 without excluding any space within eight feet of any toilet. ECF No. 210-1 ¶ 10. Defendants' own counsel quantified the consequence: the exclusion zone "reduces the available floor space by nearly half" in the isolation cells, "resulting in a capacity of 2 people per room." ECF No. 197-4. Yet Defendants posted a limit of 4 for those cells—double the lawful maximum.

Across all five cells, Defendants' posted limits were 16 (Cell 1), 13 (Cell 2), 18 (Cell 3), and 4 each for Cells 4 and 5, for an aggregate of 55 (ECF No. 210-1 ¶ 9), compared to the correct court-mandated limits of 14 (Cell 1), 11 (Cell 2), 16 (Cell 3), and 2 each for Cells 4 and 5, for an aggregate of 45. ECF No. 210-1 ¶ 9; ECF No. 197-1 at 7–8; Blair Reply Report ¶ 7.

Defendants attempt to characterize the toilet exclusion zone as methodologically ambiguous, but their own written procedures foreclose that argument. Defendants' SOP—the very procedures they certified to this Court as ensuring compliance—requires that "[a] minimum

clearance of eight (8) feet shall be maintained between any designated personal space and any toilet fixture within the hold room." ECF No. 211-1 § 4.1(2). Having adopted that requirement in their own compliance framework, Defendants cannot now contend the Order was insufficiently clear. If they genuinely believed the exclusion requirement was ambiguous, they were obligated to seek clarification from this Court. They did not. They calculated cell capacities as though the exclusion zone did not exist, certified those capacities as compliant, and now ask this Court to treat that choice as a reasonable methodological dispute.

**D. Defendants Certified Compliance While Actively Violating the Order.**

Defendants twice certified compliance with the Order. On March 9, 2026, they filed a notice certifying transmittal of the Order to all responsible personnel. ECF No. 172. On May 5, 2026, they certified that "written procedures [for compliance] have been adopted." ECF No. 184. But the Order did not direct Defendants merely to draft a policy. It required them to "adopt written procedures to ensure compliance"—to put in place operational mechanisms that would actually achieve and sustain compliance with each substantive requirement. A policy that exists on paper but is not implemented through functioning compliance systems satisfies neither the letter nor the purpose of the Order.

Defendants' own cell records reveal that both certifications were filed while Defendants were actively violating the Order. The March 9 certification came just two days after the most severe overnight violation in the dataset: on March 7, 2026, Cell 1 held 35 individuals against a limit of 14, Cell 2 held 26 against a limit of 11, and Cell 3 held 30 against a limit of 16. Blair Reply Report, Appendix A. The May 5 certification was filed at the start of a month in which violations would occur on 23 of 31 days. *Id*. Whatever procedures Defendants certified, they did not prevent violations on the very days those certifications were filed. Moreover, Defendants had contemporaneous knowledge of the violations: the cell records were "generated by Defendants'

own personnel as part of their daily monitoring of cell conditions." ECF No. 197-1 at 17. Plaintiffs have not sought a finding of contempt on this motion. But there is no good faith or substantial compliance defense to easily identifiable and known violations of this magnitude.

## II. The White Declaration Reveals an Agency Unable to Monitor Its Own Compliance and Unable to Invoke Substantial Compliance as a Defense.

Defendants filed the White Declaration as their affirmative showing of good faith. It is the most damaging document in the record. Read carefully, it describes an agency that knows what its SOP says and cannot verify whether that SOP is being followed inside its own facility.

Defendants' compliance system consists of posted signs, whiteboards with erasable markers, contractor-maintained logs, and "frequent headcounts." ECF No. 210-1 ¶ 12. The AFOD herself has declared that the logs generated by that system, the only contemporaneous record of cell-level population, "do not reliably reflect all instances of detainee movement" and contain "missing" and "incorrect" information. *Id.* ¶¶ 17, 20. Defendants cannot reconstruct, after the fact, who was in which cell at what time on any given day.

That posture is fatal to the substantial compliance defense Defendants invoke. Defendants cite Fourth Circuit precedent for the proposition that, "[s]ubstantial compliance is found where 'all reasonable steps' have been taken to ensure compliance: inadvertent omissions are excused only if such steps were taken." *United States v. Darwin Constr. Co.*, 873 F.2d 750, 755 (4th Cir. 1989) (quoting *United States v. Darwin Constr. Co.*, 680 F. Supp. 738 (D. Md. 1988)). A monitoring system that the agency's own AFOD declares unreliable is not a "reasonable step" toward compliance. It is evidence of a failure to ensure compliance at all. Indeed, Defendants have not identified a single individual who purports to have reviewed the cell logs at any time to ensure compliance with the Order's occupancy limits, nor have they produced any evidence that anyone was in fact monitoring those logs for that purpose. And critically, Defendants cannot invoke

"inability to comply" as a defense when that inability is self-created. An agency that chose not to maintain a reliable monitoring system, and that cannot demonstrate anyone was even reviewing the records that system generated, cannot hide behind the very inadequacy it created. S*ee Darwin Constr. Co.,* 873 F.2d at 755. AFOD White knows what the written policy says. But AFOD White cannot tell this Court what is actually happening in the cells. That gap, between written policy and operational reality, is precisely what this Court's Order was designed to eliminate.

## III. Defendants Have Violated the Order's Medication-Access Requirements, and Their Opposition Confirms It.

At the preliminary injunction stage, this Court found that Defendants "have [no one] onsite who is licensed to provide any medical or mental health care services," and had "failed to facilitate the medical care or medications of individuals with broken bones, diabetes, high blood pressure, HIV, and Leukemia." ECF No. 170 at 33, 56. The Court found that medication was provided only if it was on the individual's person or "brought to the Baltimore Hold Rooms by a family member or other third party," and expressly held that this practice was "wholly inadequate." *Id.* at 19, 57–58. Nothing in the White Declaration demonstrates that any of this has changed.

On over-the-counter medication, the White Declaration states that when an individual requests Tylenol or Advil, ICE transports that individual to a hospital. ECF No. 210-1 ¶ 27. The AFOD explains that "ERO had originally planned to keep over-the-counter medications in the hold room but decided to instead take any individual who requests medications to the hospital"—the opposite of "prompt access upon request." *Id.*; ECF No. 171 at 2–3. That protocol is implausible on its face. Defendants' own SOP requires a minimum of two ICE officers to accompany any Detained Individual transported to an outside medical facility. ECF No. 211-1 § 6.7. Defendants cannot credibly claim they deploy two officers and arrange a hospital visit every time someone requests a Tylenol—particularly when they acknowledge they had "originally planned" to keep

such medication on-site. The far more logical inference is that the protocol is not being followed at all, and that requests for over-the-counter medication are simply going unmet. Defendants have offered no explanation for why they cannot maintain a supply of basic over-the-counter pain medication at the facility, and Defendants' alternative claimed practice plainly violates the Order.

On prescription medication, the White Declaration confirms that the primary mechanism for providing prescription medications remains reliance on the individual's personal supply or third-party delivery by family or friends, with hospital transport as the fallback if no delivery is arranged within 24 hours. ECF No. 210-1, ¶¶ 24–25. This system is identical to the framework that the Court already found constitutionally deficient. ECF No. 170 at 57–58.[1] Moreover, Defendants cannot provide any evidence that this practice is even being followed. They possess no log tracking when medication was requested, when or whether it was provided, or whether the 24-hour deadline was met in any individual case. Their only evidence is a handful of email exchanges showing that a few individuals received medication over five months, with no detail on the circumstances. ECF Nos. 211-3, 211-4.

At the preliminary injunction hearing, Dr. Goldenson reviewed comparable evidence of medication access and concluded that it demonstrated a lack of access, noting that approximately 50 percent of individuals entering a detention facility are typically taking medications and that the number of individuals reflected in Defendants' records as having received medication was "an absurdly low number" relative to the population detained. See Exhibit 4, Excerpts of Mar. 3, 2026 Hr'g Tr. Professor Blair's data reflects 1,834 individual stays at the Baltimore Hold Rooms during

---

[1]Dr. Goldenson, Plaintiffs' medical expert, has opined that the most straightforward mechanism for achieving prescription medication continuity in a short-term detention facility is a contract with a local pharmacy—a standard practice in correctional health settings that would impose minimal cost and administrative burden. *See* Exhibit. 4, Excerpts of Mar. 3, 2026 Hr'g Tr. Defendants have offered no explanation for why they have not adopted this or any comparable alternative, nor any evidence that they have explored one.

the review period alone (ECF No. 197-2, ¶¶ 5–6); Defendants' claimed hospital-transport protocol would have necessitated hundreds of two-officer hospital escorts—yet Defendants' evidence of compliance reflects only a handful of hospital visits.

Defendants' argument that Plaintiffs' declarations represent a thin, self-selected sample misses the point entirely. Six of Plaintiffs' eight declarants confirmed they were asked screening questions about their medications, but the issue is not whether Defendants asked the questions. It is whether, after those questions were asked, Defendants provided prompt access to over-the-counter medication upon request and prescription medication within 24 hours. On that question, Defendants produce records of the SOP they operate. They do not produce a single record showing that any of the declarants received compliant medication access. The practice confirmed in the White Declaration is not a disputed characterization of what happened to individual declarants. It is the insufficient policy that Defendants have chosen to write down on a piece of paper with no apparent compliance or reporting mechanisms in place.

The human consequences of Defendants' medication failures are documented in the declarations Plaintiffs submitted. R.T.M.G. requested pain medication for a persisting headache and received nothing. ECF No. 197-13 ¶ 7. Cresencio Gomez went without medication for diabetes, high blood pressure, and high cholesterol for two days, receiving his prescription only when his wife brought it on the third day. ECF No. 197-9 ¶ 8. Juan Bermudez had to be taken to the hospital because he was not given medication for diabetes and hypertension, and even after that hospitalization, Defendants failed to fill his prescription for multiple additional days. ECF No. 197-7 ¶¶ 8–9. These occurrences are not isolated anecdotes. They are the predictable consequences of a system this Court has already found constitutionally deficient, operating in the same manner it operated before the Order was issued.

Finally, Defendants' attempt to discredit Mr. Bermudez's declaration by reference to the cell logs backfires. Defendants assert that "the cell logs appear to reflect that his detention actually began on June 13, 2026 and ended the following day on June 14, 2026," contradicting Mr. Bermudez's account of a five-day detention from June 12 through June 17, 2026. ECF No. 210 at 11–12. But a complete review of the June 2026 cell logs tells a different story. Mr. Bermudez appears as a holdover on the June 15, June 16, and June 17 logs with a departure recorded on June 17 at 1010 hours to Chantilly. *See* Exhibit 3. Defendants appear to have ended their record review prematurely and overlooked four additional daily logs in which he appears.

Defendants cannot point to a single piece of evidence demonstrating compliance with the Order's medication-access requirements. Sometimes, the absence of evidence is in fact evidence of absence. That is plainly the case here. For the thousands of individuals detained at the Baltimore Hold Rooms each year, this is a matter of life and death. The Court should immediately grant Plaintiffs' requested relief to protect these individuals.

**IV. Defendants Have Conceded the Statement-of-Rights Violations Through Silence.**

As of the date of Plaintiffs' Motion, counsel had not spoken with a single detained individual who received the required statement of rights in any language. Seven declarants confirmed they received no written notice of their court-ordered rights during detention at the Baltimore Hold Rooms. *See* ECF No. 197-6, at ¶ 6; ECF No. 197-7 at ¶ 7; ECF No. 197-8 (Decl. of Lorenzo Cruz) at ¶ 9; ECF No. 197-9 (Decl. of Gomez) at ¶ 6; ECF No. 197-10 (Decl. of Morocho) at ¶ 6; ECF No. 197-11 (Decl. of E.A.M.) at ¶¶ 6, 16; ECF No. 197-12 (Decl. of Bardales Pineda) at ¶¶ 5, 15. The Order requires that "within one hour following arrival of a Detained Individual to Baltimore Hold Rooms, Defendants must provide written notice in English and Spanish informing them of their right to the provisions and services noted herein." ECF No. 171 at 3.

Defendants' opposition does not dispute, address, or even acknowledge these allegations. Defendants do not contend that written notice was provided to any declarant. They do not identify any records reflecting that the notice was distributed. They do not argue that their compliance procedures were implemented with respect to this requirement. Although the SOP contemplates a written notice, *see* ECF No. 211-1 § 8, Defendants have produced no copy of that notice in any language—either as an exhibit to their opposition or at any prior stage of this litigation. Plaintiffs specifically sought evidence of compliance with the statement-of-rights requirement through discovery, and Defendants failed to produce any responsive documents, including any copy of the written notice itself. The absence of that document from the record, despite both a discovery obligation and the opportunity to submit it in opposition to this Motion, is not a gap. It is a concession that no compliant notice has ever been prepared or distributed.

Where a party fails to respond to an argument raised in a motion, the court may treat that argument as conceded. *See Kimbrough v. Mayor & City Council of Balt.*, No. CV 25-2187, 2026 WL 2124003, at *4 (D. Md. July 23, 2026) (collecting cases). Defendants have conceded this violation.

## V. The Pattern Before This Court Warrants Escalated Relief, Including Consideration of an Independent Monitor.

Defendants cannot answer the Court's most basic questions about their own facility. They know what their SOP says. They cannot demonstrate that it is being followed. That is not substantial compliance. It is a documented failure of institutional will and operational capacity. This Court has broad equitable authority to enforce the terms of its orders and to issue supplementary remedial directives to secure compliance. *Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship,* 608 F. App'x 130, 131 (4th Cir. 2015); *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 617 (D. Md. 2017); *see also* ECF No. 197-1 at 20–21. The relief Plaintiffs have

requested – sworn compliance declarations, weekly reporting certified under penalty of contempt, and continued production of cell data – is the minimum necessary to give this Court meaningful visibility into what is actually happening at the Baltimore Hold Rooms. *See* ECF No. 197-1 at 20–21.

Given the record now before this Court, it may ultimately be necessary for the Court to appoint an independent monitor. Defendants have demonstrated, through five months of verified violations, false certifications, and the AFOD's own concession, that their monitoring records are unreliable and they lack either the willingness or the operational capacity to ensure compliance with this Court's Order on their own. An independent monitor with real-time access to the facility and the authority to report directly to this Court may be the only mechanism sufficient to protect the Class going forward. *Redner's Markets*, 608 F. App'x at 131 (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders[.]"). In the first instance, the Court should grant Plaintiffs' requested relief and enforce the terms of the Order, with a warning that further violation will subject the Defendants to contempt proceedings and the potential appointment of a monitor.

## CONCLUSION

Plaintiffs respectfully request that this Court: (1) find that Defendants have violated the Preliminary Injunction Order with respect to cell capacity limits, medication access, and the statement of rights; and (2) Order the immediate compliance enforcement and prospective monitoring measures requested in Plaintiffs' Motion, including weekly sworn declarations from the Field Office Director certified under penalty of contempt.

Dated: September 9, 2026

Respectfully submitted,

*/s/ Jared A. Levine*
Jared A. Levine (NY Bar No. 4897211)*
Daniella A. Schmidt (NY Bar No. 5186283)*
**CROWELL & MORING LLP**
375 9th Ave, 44th Floor
New York, NY 10001
(212) 223-4000
JLevine@crowell.com
DSchmidt@crowell.com

Jerome A. Murphy (D. Md. Bar No. 27678)
Kenneth Dintzer (DC Bar No. 90031556)*
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2895
JMurphy@crowell.com

Ian Austin Rose (D. Md. Bar No. 22079)
Amelia Dagen (D. Md. Bar No. 32279)
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Ave. NW
Suite 701
Washington, DC 20036
(202) 788-2509
Austin.rose@amicacenter.org
Amelia@amicacenter.org

Sirine Shebaya (D. Md. Bar No. 07191)
Yulie Landan (CA Bar No. 348958)*
**NATIONAL IMMIGRATION PROJECT**
1763 Columbia Rd. NW
Suite 175 #896645
Washington, DC 20009
(202) 656-4788
sirine@nipnlg.org
yulie@nipnlg.org

*Pro bono counsel for Plaintiffs*

* Admitted *Pro Hac Vice*

***EXHIBIT LIST***

| | |
|---|---|
| Exhibit 1 | Data Expert Report of Graeme Blair, Dated September 9, 2026 |
| Exhibit 2 | Defendants' September 1, 2026 Supplemental Interrogatory Response |
| Exhibit 3 | Cell Logs Produced by Defendants for June 15, June 16, and June 17, 2026 |
| Exhibit 4 | Excerpts of Mar. 3, 2026 Hr'g Tr. |