**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| D.N.N. and V.R.G., *on behalf themselves and all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>*Vernon Liggins*, *as Field Office Director of the Immigration and Customs Enforcement, Enforcement and Removal Operations Baltimore Field Office,* et al.,<br><br>*Defendants*. | **DEFENDANTS' SUR REPLY RE: PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNNCTION AND EXPERT REPORTS OF DR. GRAEME BLAIR**<br><br>Civil Action No.: 1:25-cv-01613 |

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO
EXPERT REPORT ANALYSIS AND CONCLUSIONS**

## I. INTRODUCTION

This Court granted Defendants leave to file this Sur-Reply on the discrete issue "of the Blair Report and/or the Blair Reply Report," attached to Plaintiffs' Opening Brief and Reply respectively. ECF Nos. 219, 197-2, 214-1. Professor Blair's expert opinions and the analysis contained in his reports and Plaintiffs' conclusions derived from them are deeply flawed and, upon examination, do not support Plaintiffs' claim for relief. Blair's report is not merely flawed analytically; it produces a systematically skewed portrayal of the Baltimore Hold Room's operations that do not comport with reality.

Defendants submit with this Sur-Reply the expert report of Dr. Pan (Defendants' Exhibit A, Expert Report of Dr. Pan). Dr. Pan's report demonstrates that Professor Blair's headline figures — 1,588 hours, "78 of 116 days," "67%" — never once ask whether the facility's total population, across all five cells combined, exceeded the Order's combined limit of 45 people at a given moment, and never ask whether occupants of an over-limit cell could have been redistributed to a cell with available space. Every version of Professor Blair's analysis, including the two "sensitivity" tests he offers as proof of robustness, leaves that question untested. Once it is tested, Dr. Pan's report shows that this facility exceeded the Order's combined capacity in no more than approximately 9% of the hours across the entire five-month review period — and in only 4 to 5% of those hours once occupants are properly treated as capable of moving to a cell with available space. These figures, moreover, retain the same elevated population counts and conservative interpretive assumptions Professor Blair applied wherever the data is ambiguous. A more favorable, equally defensible set of assumptions would yield a lower figure still.

This Sur-Reply addresses Plaintiffs' contentions in turn, beginning with the standard Plaintiffs must satisfy.

## II. ARGUMENT

### A. The Governing Standard, and the Distance Between Plaintiffs' Portrayal and the Record

To obtain the enforcement relief sought, Plaintiffs must establish, by clear and convincing evidence, a violation of this Court's Order inconsistent with substantial compliance. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). That standard requires evidence sufficient to leave this Court with a firm conviction that the alleged violation occurred and that it is incompatible with substantial compliance — not a formality, but the threshold governing whether this Court imposes the escalated, facility-wide relief Plaintiffs request.

Plaintiffs describe a facility in violation of the Order's crowding limits "on at least 78 of 116 days (67% of the review period)" — a formulation calculated to convey sustained, near-continuous breach. As

shown below, that formulation does not survive examination of what Professor Blair's underlying calculations actually measure. Properly corrected, the record establishes that this facility remained within the Order's combined capacity in roughly 91 to 96% of the hours in the review period. Exhibit A, ¶ 34. Accordingly, Plaintiffs' have failed to meet their burden of showing that Defendants failed to substantially comply with the preliminary injunction, and the Court should deny this motion."

**B. Professor Blair's Overnight, Buffer, and Day-Level Figures Share a Common Design: Each Avoids Ever Testing Whether Transfer Was Possible**

Plaintiffs offer three responses to arguments Defendants raised in their response— that the overnight violations are immune from the booking-delay critique, that a two-hour buffer test leaves the results "negligible," and that "78 of 116 days" reflects the true scope of noncompliance. Reply at 4-6. Each response addresses a narrow, secondary question while leaving entirely untested the question that actually determines whether this facility was overcrowded: whether the population in a cell exceeding its own limit could have been redistributed, at that same hour, to a cell that had room. That omission is not incidental across three unrelated arguments. It is the same omission, repeated because none of Professor Blair's figures is constructed in a way that could expose it.

Plaintiffs argue that Professor Blair's 70 overnight violations are unaffected by the booking-delay objection because "virtually no individuals are booked in overnight," making a booking-to-placement lag irrelevant to a midnight count. Reply at 4. Accepting that observation defeats one narrow objection; it does nothing to show that the facility's aggregate population, across all five cells, exceeded 45 at that hour, or that no transfer was available. An overnight snapshot showing a single cell above its own limit is silent on both questions. Nor is such a snapshot the unambiguous data point Plaintiffs suggest — its accuracy depends entirely on whether departures were reliably logged, a matter unrelated to whether new admissions occurred overnight, and Plaintiffs' own Reply concedes elsewhere that the logs "do not reliably reflect all instances of detainee movement."

Dr. Blair's two-hour booking-buffer test suffers from the identical gap. Professor Blair's addition of a two-hour buffer produced what Plaintiffs call a "negligible" change — violation days from 78 to 75, hours from 1,588 to 1,434. ECF No. 214, Blair Reply Report, ¶¶ 12–14.[1] Blair did not re-run the transfer assumption (whether a cell with an occupant could have transferred excess occupants to any other single cell) under the 2-hour buffer or the reversed ambiguity assumptions. [2] His test adjusts only how long an individual is counted present when a boundary time is uncertain. It was never designed to ask, and does not ask, whether the facility's combined population exceeded 45, or whether an available cell could have received a transfer. Exhibit A, ¶ 34. A test built exclusively around duration cannot speak to a question about transfer availability.

The "78 of 116 days" and "two out of every three days" figures complete the pattern by discarding duration and transfer alike in favor of a bare occurrence count: whether any cell exceeded its own limit for any length of time on a given day. A cell over its limit for ninety seconds and a cell over its limit for twenty-four hours register identically under this metric. A measure built this way cannot distinguish a fleeting, transferable imbalance from a sustained, facility-wide one — which is precisely why it says nothing about whether transfer was possible in any of the instances it counts.

Dr. Pan's report supplies the analysis Professor Blair's three figures collectively omit: a measure of the facility's aggregate population against its aggregate court-ordered capacity of 45, accounting for whether cells with available space existed at the relevant hour. That analysis shows the facility exceeded its combined capacity in no more than approximately 9% of the hours in the review period, and closer to

[1] Blair's Reply Report totals hours each individual cell was over its own limit, across all five cells, then adds them together (879 + 191 + 314 + 12 + 191 = 1,588). This means a single calendar date effectively has 120 hours.

[2] The 2-hour buffer is Blair's own estimate of processing delay, not something tied to actual booking-to-cell-placement data from Defendants' operations. If real processing routinely takes longer, this sensitivity test understates the true effect.

4 to 5% once transfer to any available cell — not merely one specific cell — is properly credited. Exhibit A, ¶¶ 34. None of Plaintiffs' three figures competes with this analysis on the merits, because none of them was built to answer the same question.

**D. Professor Blair's "Conservative" Reversal Test Is Not Actually Conservative**

Plaintiffs present Professor Blair's reversed-assumption test as resolving every ambiguity entirely in [Defendants'] favor. Reply at 5. This is not so. Blair applied the reversal in a way that's still asymmetric between single-day and multi-day stays. By Plaintiffs' own description, a blank or "00:00" departure time is treated as though the individual was never present at all — but only for single-day stays. For a multi-day stay with the identical missing-boundary problem — a blank or "00:00" book-out — the general rule applies instead (midnight at the start of that day), and the person still counts as present for every other day of their multi-day stay. They are not dropped from the analysis the way a single-day stay is. Thus, Dr. Blair makes the mistake of not treating the missing TIME IN on the first day of a multi-day stay and the missing TIME OUT on the last day of a multi-day stay differently from a middle day of a multi-day stay. So Blair concedes the most ground on the category that barely affects his total (single-day stays are a small slice of the data) Even in the test he's offering as proof that his numbers are conservative and robust, he built in a bigger giveaway exactly where it costs him/them the least.

**E. Plaintiffs Cannot Treat the Same Records as Both Too Unreliable to Show Compliance and Reliable Enough to Prove a Violation**

Plaintiffs characterize the Cell Logs, in one part of their Reply, as so unreliable that they "demonstrate the absence of any system capable of ensuring compliance," while asking this Court, elsewhere, to credit those same logs as precise enough to sustain a finding that Cell 1 was in violation for exactly 879 hours and Cell 3 for exactly 314. Plaintiffs cannot have it both ways.

The White Declaration explains what Plaintiffs' selective framing omits. *See* Declaration of Maleanie White, ECF No. 210-1. Its acknowledgment that the logs do not capture "all instances of detainee movement" reflects the operational reality of a high-turnover intake facility, where individuals may be

placed in a cell shortly after arrival pending completion of a multi-step intake process and returned to processing before that intake concludes. A monitoring instrument that does not register every such transitional movement with perfect fidelity is evidence of the friction inherent in tracking a dynamic population through a static log — not evidence of an agency indifferent to monitoring. The same declaration identifies a further compliance mechanism Plaintiffs' Reply never mentions: whiteboards posted at each cell, providing real-time visual capacity information directly to staff, alongside the logs and headcounts. An agency that leans on a more immediate tool for the purpose that matters most — preventing a cell from exceeding capacity in the moment — is not thereby shown to have abandoned reasonable compliance efforts.

Defendants created these logs as a tool to track cell populations and uses them to monitor compliance with the PI, but that they are not the only tool ICE uses. Due to the transitory nature of the facility, ICE also relies on additional monitoring methods, such as the whiteboards and headcounts, which are better able to capture real-time changes in cell populations. AFOD White described this in her declaration, White Decl. at 12, but Plaintiffs chose to disregard those additional methods and focus on the logs themselves, despite the evidence that the logs do not provide a complete picture.

**F. The Toilet-Exclusion-Zone Error Does Not Affect the Occupancy Analysis**

Defendants do not dispute that the posted limits for the cells omitted the required exclusion zone. But the corrected limits — 14, 11, 16, 2, and 2 — are the limits Professor Blair's Reply Report applies throughout, and the limits underlying Dr. Pan's analysis as well; the error adds no additional overcrowding to figures that were never calculated using the incorrect limits.[3] Plaintiffs characterize the admission as

[3] The capacities calculated by allocating 31 square feet per detainee are not whole numbers: 14.4, 11.9, 16.4, 2.5, and 2.5 for Cells 1 through 5, respectively. The low-capacity-limit scenario rounds each value down to a whole detainee. As a result, some allocable floor area remains when a cell reaches the rounded-down limit. For example, a residual of 0.4 detainee corresponds to 12.4 square feet, and the residual of 0.9 detainee in Cell 2 corresponds to 27.9 square feet. Exhibit A, 3. Dr. Pan also additionally computes compliance under reasonable higher capacity figures. Exhibit A, tables 5, 6, 8.

"dispositive" while declining to credit the same episode for what it also demonstrates: Defendants' own written procedures already stated the governing eight-foot standard without ambiguity, and the error Defendants identified and corrected was a computational one — a misapplication of a clear rule to a specific floor plan, not a legal uncertainty requiring this Court's clarification.

**G. Defendants' Certifications Attested to Two Narrow, Discrete Steps — Not Ongoing, Uninterrupted Compliance**

Plaintiffs' assertion that "Defendants certified compliance while actively violating the Court's Order," is meritless. Reply at 8. First, Plaintiffs' reliance on Blair's charts showing high populations on March 7, 2026 fails to account for the fact that the Court's Order was issued the afternoon of March 6 and Defendants could not simply release the existing population. As discussed in the White declaration, ECF 210-1, in such circumstances, Defendants had to conduct decompression—identifying new places of detention for the holdover detainees. Indeed, Blair's report attributes 18 violations in the hours following the issuance of the Order on March 7 and March 8. On March 9, 2026, there are no violations. Second, the Order itself defines what these certifications were required to say. It requires only that Defendants (1) disseminate the Order to responsible personnel and certify that the dissemination occurred, and (2) adopt written operational policies and procedures implementing the Order's requirements and certify that adoption occurred. ECF No. 171. The March 9 certification attested that the Order had been transmitted; a violation two days later, drawn from the same concentrated, since-corrected Cell 1 data discussed above, says nothing about whether that tramittal occurred. The May 5 certification attested that written procedures had been adopted; imperfect compliance with those procedures over the following month does not retroactively make that certification false, any more than an organization's certification that it has adopted a code of conduct is falsified by a subsequent violation of it.

Plaintiffs' assertion that Defendants had "contemporaneous knowledge" of violations because the logs were "generated by Defendants' own personnel as part of their daily monitoring" does not close this

gap. Reply at 9. A record generated by staff in the ordinary course of operations is not equivalent to the certifying official's contemporaneous, cell-by-cell review of that record against the Order's limits, particularly where the certifications made no representation about occupancy at all. Plaintiffs offer no evidence of what the certifying officials actually reviewed; the argument asks this Court to infer knowledge from the proximity of a log entry to a certification date, not from anything the certifications state.

**III. CONCLUSION**

Professor Blair's report does not show a facility in systemic breach of this Court's Order. It shows a methodology constructed, across every version and every purported sensitivity test, to avoid ever asking whether this facility's aggregate population exceeded its aggregate court-ordered capacity, or whether transfer could have relieved an over-limit cell — compounded by an uneven correction of its own assumptions, selective reliance on evidence credited only when convenient, and a set of dramatic examples that resolve, on inspection, to a single already-corrected cell. Corrected for each of these defects, using the same conservative, defense-unfavorable assumptions Professor Blair himself applied, the record shows this facility operated within the Order's combined capacity in approximately 91 to 96% of the hours in the review period. That is not clear and convincing evidence of a violation inconsistent with substantial compliance, and the relief Plaintiffs seek on this record should be denied.