**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| D.N.N. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Vernon Liggins, *et al.,*<br><br>*Defendants*. | Civil Action No.: 1:25-cv-01613 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S ORDER GRANTING PLAINTIFFS' MOTION TO ENFORCE (ECF No. 231)**

Defendants, through undersigned counsel, submit this Memorandum of Law in Support of their Motion for Partial Reconsideration. Defendants respectfully move for partial reconsideration of the Court's Order, ECF No. 231, seeking revision of two findings only: (1) that Defendants violated the preliminary injunction's 12-hour health-screening requirement, and (2) that Defendants violated its 1-hour notice-of-rights requirement. Defendants do not seek reconsideration of the remainder of the Order, but reserve all rights to seek further review of the Order.

Reconsideration is warranted because these two findings rest principally on eight written statements that were never signed by any declarant, contain fundamental legal defects, and were interpreted in ways not supported by their text. The Court credited these unsworn, untested statements over the only witness placed under oath and cross-examined—Assistant Field Office Director Jospeh Burki ("Officer Burki"). These circumstances constitute clear error and manifest injustice, which Rule 54(b) permits this Court to correct. Defendants also submit notices of rights and completed health screenings from the review period. These records confirm that the

dissemination of the notice of rights and health screenings were routine practice at the Hold Rooms.

## BACKGROUND

### I. The September 17, 2026 Evidentiary Hearing

#### A. The Detainee Declarations

Plaintiffs attached to their Motion to Enforce the Preliminary Injunction eight declarations attributed to individuals who had allegedly been detained at the Baltimore Hold Room (BHR) between April 2026 and August 2026. *See* ECF Nos. 197-6 to 197-13. With respect to the issue of medical screening, each declaration contains a discrete paragraph following an identical structure and sequencing. The paragraph contains short declarative sentences relating whether the individual purportedly was or was not asked each of four particular questions pertaining to health status: (1) current health and medical history; (2) any prescribed medication; (3) mental health status; and (4) any "specific diet or food requirements." *Id.* With respect to notice of rights, each declaration contains a discrete paragraph addressing any paperwork purportedly received, including whether the individual claims to have received a Notice of Rights pertaining to their custody at the BHR. *Id.* Plaintiffs did not call any of the eight detainee declarants at the hearing. Transcript of September 17, 2026 Evidentiary Hearing ("Hr'g Tr.") 4:10–5:4.[1]

Plaintiffs' counsel explained that the declarations were taken by telephone with the assistance of a non-attorney case manager who interpreted and "confirmed everything in Spanish," and argued that the penalty-of-perjury language satisfied 28 U.S.C. § 1746(2). *Id.* 7:8–8:23. Defendants responded that counsel supplied e-signatures on each declarant's behalf, and that each

[1] In the joint pre-hearing report, Defendants objected to Plaintiffs' eight statements on multiple grounds: failure to comply with 28 U.S.C. § 1746, hearsay-within-hearsay, relevance, lack of foundation under Rule 602, and unreliability. ECF 218.

declaration recited an inability to obtain a signature due to “urgency,” even though several were executed months before filing. *Id.* 9:1–15. Defendants also offered impeachment records concerning declarant Juan Erasmo Bermudez, including an EARM record of the notice provided to him, a prescription record, and his intake health questionnaire. *Id.* 10:18–11:21. Plaintiffs argued that those records corroborated Mr. Bermudez rather than impeached him. Defendants likewise offered an EARM record for declarant Cresencio Gomez reflecting that he “refused to sign but did receive” his Notice of Rights in the form of this Court’s preliminary injunction. Defs.’ Hr’g Ex. 7[a]; Hr’g Tr. 7B [2]

Before any testimony was taken, the Court made a “generalized ruling” that it would consider the declarations because “they carry all indicia of reliability,” and that it would also consider Defendants’ contrary documents, leaving the parties to argue “the overall net weight” of both. *Id.* 13:16–14:2; *see also id.* 16:20–17:6. The Court cautioned, however, that it would not necessarily apply the same “laxity” it had applied at the preliminary-injunction stage. *Id.* 14:3–12. The Bermudez records were later admitted as a hearing exhibit. *Id.* 139:7–140:18. In closing, Defendants argued that AFOD White’s declaration and Officer Burki’s testimony addressed the notice of rights, and that the Bermudez records reflected the signature line used for that purpose. *Id.* 134:1–135:18. Defendants further argued that the declarations of “seven or eight declarants,” out of approximately 2,000 detainees processed during the review period, were “anecdotal” and did not substantiate Plaintiffs’ medical claims. *Id.* 136:3–16. The Court remarked that, if Officer Burki’s testimony was accurate, records of signed notices should exist and would be “helpful,” but stated that it was “not requiring it.” *Id.* 136:17–138:8.

---

[2] Although the entry refers to him in part as “Garcia,” it concerns Mr. Gomez. [Ex. 7(a). *Id.* 12:15–13:11.

**B. Testimony of AFOD Joseph Burki**

Officer Burki testified that since approximately March 2026 he has overseen the unit responsible for the Baltimore Hold Rooms, managing the ICE employees and contractors who operate the facility. *Id.* 81:23–82:16. He authored the Standard Operating Procedure ("SOP") implementing the preliminary injunction, which addresses, among other things, notice of rights within one hour of intake and medical evaluation before placement in a cell. *Id.* 83:3–84:10, 85:8–10. He also described the facility's capacity-management practices. *Id.* 86:10–91:7, 98:2–14.

As to medical screening, Officer Burki testified that ICE developed training with the ICE Health Service Corps so that officers could conduct medical evaluations before a detainee is placed in a cell. *Id.* 83:11–15. Officers conduct the screening at intake, covering injuries, illnesses, communicable diseases, medications, and inhalers, and any detainee who reports a concern, "even if it's something as simple as a headache," is transported to a hospital. *Id.* 98:22–99:9, 121:13–122:8. When a detainee needs prescription medication he does not have, ICE first contacts a family member, friend, or attorney, and, if the medication cannot be obtained within 24 hours, takes the detainee to a hospital. *Id.* 99:17–100:7. Although the officers are not themselves medical personnel, all were trained by the ICE Health Service Corps. *Id.* 122:9–17, 124:25–125:9.

As to notice of rights, Officer Burki testified that ICE uses the Court's order as the notice; that it is provided "within one hour of entry" in English and in a certified Spanish translation, with telephonic interpretation as needed; that detainees sign an acknowledgment of receipt; and that the records are kept "in the detainee file." *Id.* 83:8–10, 102:2–15. Plaintiffs did not cross-examine him on this subject. Hr'g Tr. 104-125.

The standard health screening form used at the Hold Rooms is in evidence as the questionnaire completed for Mr. Bermudez. [Hr'g Tr. __ (admission).] Titled "Alien Initial Health Interview Questionnaire," the document contains 13 questions. The first three questions principally

cover the areas of inquiry required by the Court's Order: the first question makes inquiry into past or present health issues and mental health; the second inquires about prescription medications; the third inquires about the existence of any food or medical allergies. Defs.' Hr'g Ex. 6-B. The form also contains a separate section, completed in Mr. Bermudez's case, for transmitting a detainee's health information to the receiving facility when he is transferred. *Id.* Each question is followed by two columns—"Yes" or "No."

## II. The Court's September 28, 2026 Oral Ruling

The Court ruled orally, without a written opinion. Ruling Tr. 4:12–17. Applying the civil-contempt framework the parties had briefed, the Court found by clear and convincing evidence that the Government violated the preliminary injunction with respect to cell capacity, medical screening, over-the-counter and prescription medication, and notice of rights, and that the Government had not shown good-faith substantial compliance. *Id.* 9:5–11:15, 51:1–52:4.

The Court's findings on screening and notice rested largely on its assessment of the witnesses. The Court found that Officer Burki "has precious little to offer from his personal knowledge and observation," and that while he did not lack candor, he "simply has no idea what is actually happening in the facility he manages from afar." The Court emphasized that Officer Burki was the only witness the Government called and that no affidavit from any supervisor or officer responsible for day-to-day operations was offered. *Id.* 23:1–24:17, 29:6–8. By contrast, the Court found the declarants credible because they have "nothing to gain by lying and everything to lose by telling the truth," and because their accounts were consistent. *Id.* 35:20–36:14.

### A. Medical Screening

The preliminary injunction requires a basic medical screening "within 12 hours of entry, and prior to placing [the detainee] in a hold room with other detained individuals." *Id.* 37:9–13.

The Court found the SOP adequate, but found that it was not followed. *Id.* 38:4–8. The declarants' statements regarding screening, *id.* 42:19–45:23, are summarized below:

| Declarant | Statements Regarding Screening |
|---|---|
| Gonzalez-Vargas | Asked about health history, medications, and mental health; not asked about diet |
| Bermudez | "Not initially asked" screening questions; taken to the hospital the same day |
| Lorenzo Cruz | No screening in the hold room; screened at a hospital before being brought to the field office |
| Gomez | Asked about health, medications, and mental health; not asked about diet |
| Morocho | Asked about health, medications, and mental health; not asked about diet |
| E.A.M. | Not asked any screening questions |
| Bardales Pineda | Asked about health and medications; not asked about mental health or diet |
| RTMG | Asked no health questions in Baltimore; asked two questions at the Salisbury office |

Describing the declarations as "the only record evidence based on personal knowledge" of actual practice, the Court found that the Government "conducted either incomplete or no medical screening," and that Officer Burki "is not competent to testify about actual practice throughout the review period." *Id.* 45:24–46:16. The Court further found that the Government's records concerning Mr. Bermudez, accepted as accurate, showed a June 16 screening date, a June 15 prescription fill date, and an EARM medical entry dated June 17, the day he was transferred out, and therefore did not impeach him. *Id.* 49:22–50:15. Likewise, the Court found that the Government's exhibit for declarant Cresencio Gomez was silent as to screening and notice of rights and showed that he received only one of his three prescriptions more than 24 hours into his detention. *Id.* 50:16–25.

**B. Notice of Rights**

The preliminary injunction requires that each detainee receive a notice of rights within one hour of entry. [PI Order, ECF No. 171, at 3. Officer Burki testified that the Government uses a copy of the Court's order, in English and Spanish, as that notice. Hr'g Tr. 83:8–10, 102:2–15.

The Court found Officer Burki credible "insofar as the Government undertook to have the order translated and available," but not that staff "actually provided it as the notice of rights required by the order," crediting the declarants instead. *Id.* 48:14–20. Of the eight declarants, three stated that they received no paperwork about their rights; three stated that they received paperwork about rights to appeal or legal representation; one received paperwork about a detention hearing; and one provided no information on the subject. *Id.* 47:12–48:13. The Court also noted, "[w]hile not dispositive," that the Government did not accept its invitation to supplement the record with the signed notices Officer Burki testified are kept in detainee files. *Id.* 48:21–49:2. As to Mr. Bermudez, the Court found that the Government's records did not impeach him: the translated order offered to him was "genuinely categorically illegible," and it was offered on June 14, two days after his arrival. Assuming without finding that a translated copy of the order could serve as the required notice, the Court concluded that "[a] document that cannot be read provides notice of nothing." *Id.* 49:6–21.

**C. Relief**

The Court ordered the Government to submit, within five days, a copy of the notice of rights with a certification that it will be deployed as required, and to file sworn declarations every 14 days confirming, among other things, that "complete and timely medical screenings" have been conducted and that each detainee received the notice of rights. *Id.* 52:5–24. The Court also directed briefing on the appointment of a monitor under Federal Rule of Civil Procedure 53(a)(1)(C), and warned that further violations may result in a sua sponte show-cause order. *Id.* 52:25–53:15.

## ARGUMENT

## I. LEGAL AUTHORITY

Under Federal Rule of Civil Procedure 54(b), an order that adjudicates fewer than all claims "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). Rule 54(b) "involves broader flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). That discretion is guided by the law-of-the-case doctrine: a court may revise an interlocutory order where (1) substantially different evidence has come to light, (2) controlling law has changed, or (3) the prior decision was clearly erroneous and would work manifest injustice. *Id.* (citing *Am. Canoe*, 326 F.3d at 515); *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256–57 (4th Cir. 2018). Reconsideration is particularly appropriate where a court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983).

The findings at issue were made under the civil-contempt framework. Ruling Tr. 9:5–11:15. Plaintiffs, as movants, therefore bore the burden of proving each violation by clear and convincing evidence. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). The question on reconsideration is whether the record, correctly read, meets that standard as to screening and notice. It does not.

## II. THE COURT'S FINDINGS CONCERNING SCREENING AND NOTICE REST ON CLEAR MISREADINGS OF THE RECORD

### A. Health Screening

The Court's finding that the Government "conducted either incomplete or no medical screening," Ruling Tr. 45:24–46:16, misstates what the declarations say, overlooks that half of the declarants affirmatively describe being screened, and cannot be reconciled with the screening form in evidence.

**1. The Court mischaracterized declarant Gomez's testimony.**

In its oral decision, the Court erroneously stated that Gomez "contends he was not screened." Ruling Tr. 50: 18-19. In fact, Gomez's declaration explicitly states, "I was asked screening questions about my current health and medical history." ECF No. 197-9, ¶ 7. Indeed, the declaration reported that Gomez was asked health, medication, and mental-health questions, with answers recorded on a form he received. *Id*.

2. **Four declarants affirmatively state that they were screened**.

In addition to Mr. Gomez, three other declarants (Gonzalez Vargas, Morocho, and Bardales Pineda) state in identical terms that they were "asked screening questions about [their] current health and medical history." ECF No. 197-6 ¶ [__]; ECF No. 197-10 ¶ 7; ECF No. 197-12 ¶ 6; *see* ECF No. 197-9 ¶ 7. Each declaration then addresses the same four topics in the same order: medical history, prescribed medication, mental health, and whether the declarant "require[s] any specific diet or food." *See supra* Background I.A. Three of the four (Gonzalez Vargas, Gomez, and Morocho) say they were asked about the first three topics but not about diet. The fourth (Bardales Pineda) says he was asked about his health and medications but not about mental health or diet. *See* Ruling Tr. 42:19–45:23. In other words, half of Plaintiffs' declarants confirm that they were screened at intake. Their only complaint is that one or two topics were omitted.

The record does not support a finding that these four declarants received "incomplete" screening, much less by clear and convincing evidence.

*First*, the screening is conducted on a standardized form. Officer Burki testified that officers trained by the ICE Health Service Corps conduct the screening at intake using a written form. Hr'g Tr. 83:11–15, 98:22–99:9, 122:9–17. Mr. Gomez confirms that his answers were written on a form and that he received a copy. ECF No. 197-9 ¶ [__]. That standard form is in evidence: it is the questionnaire completed for Mr. Bermudez. Defs.' Hr'g Ex. 6-B; *see supra* Background I.B. The form's first question asks about past or present health issues *and* mental health; its second, about prescription medications; and its third, about food or medication allergies. *Id.* Every topic the declarations address thus comes from the first three questions of a single form, asked in sequence. The mental-health inquiry is therefore not a separate question an officer might skip; it is part of the first question. And the allergy question immediately follows the medication question that every one of these declarants says he was asked. To credit the declarations as written, the Court would have had to find that officers reading from this form asked the first two questions and then skipped the third, and that they did so for three different detainees. In Bardales Pineda's case, the Court would have had to find that the officer read half of the first question and skipped the rest. The Court made no such finding, and nothing in the record would support one. The more plausible explanation is that declarants recounting a brief intake interview weeks or months later did not recall every question they were asked.

*Second*, the diet question in the declarations does not track the injunction. The preliminary injunction requires screening sufficient to ["provide medically necessary special diets."] [PI ¶ __.] The declarations ask something different: whether the declarant "require[s] any specific diet or food." That broader question sweeps in religious, cultural, and personal

preferences. A detainee who was asked about food allergies at intake could readily and truthfully tell a case manager months later that no one asked whether he required "any specific diet or food." The declarations therefore do not establish that the medically necessary inquiry the injunction requires was omitted.

*Third*, the screening paragraphs are formulaic. Each follows the same structure, sequence, and phrasing, which shows that the declarants were answering a case manager's checklist rather than narrating their own recollections. *See supra* Background I.A. A checklist answer that a single item was not covered, never tested by cross-examination and never adopted under penalty of perjury, cannot establish by clear and convincing evidence that the screening the Court ordered did not occur.

### 3. Two Other Declarants Were Screened in Connection with Their Immediate Medical Needs.

*Lorenzo Cruz.* Mr. Lorenzo Cruz states that he was not screened in the hold room because he was taken to a hospital, where he was screened and given medication, before he was brought to the field office. ECF No. 197-8 ¶ 8. He does not claim that his medical needs went unidentified or untreated. He claims only that his screening occurred at a hospital rather than in the hold room. The injunction's purpose, identifying a detainee's medical needs before he is placed in a hold room with others, was served, and more than served, by a hospital evaluation that preceded his arrival. His account is not evidence of a violation, let alone clear and convincing evidence of one.

*Bermudez.* Mr. Bermudez states that he was "not initially asked" screening questions, ECF No. 197-7 ¶ 8, which implies that he was asked them later. His declaration does not say when, and it does not allege that screening occurred outside the twelve-hour window. The record fills that gap. Mr. Bermudez arrived at the BHR on the morning of June 12, 2026, and his intake

record, completed before 10:30 a.m. that morning, documents his medical conditions and medications. Defs.' Hr'g Ex. 6D By his own account, he was taken to the hospital that same day for treatment of those conditions. ECF No. 197-7 ¶ 8. The June 16 date on which the Court relied appears on Mr. Bermudez's questionnaire, which was also used to transmit his health information to the detention facility to which he was transferred that day. Defs.' Hr'g Ex. 6-B. Every condition and medication recorded on that form already appears in the June 12 intake record. Defs.' Hr'g Ex. 6D. Whatever the date on the form, the record shows that Mr. Bermudez's medical needs were identified, and acted on, within hours of his arrival.

The Court's contrary conclusion rested on a misstatement of the governing deadline. The Court found that Mr. Bermudez was screened "well beyond the Court's order that it take place within one hour of arrival." Ruling Tr. 38:24–39:1; *see id.* 49:25–50:1. But the one-hour deadline applies to notice of rights. The screening deadline is twelve hours, as the Court itself recited. *Id.* 37:9–13. That is precisely the kind of "error not of reasoning but of apprehension" that reconsideration exists to correct. *Above the Belt*, 99 F.R.D. at 101.

#### 4. **The Only Two Declarants Who Allege Partial or No Screening in Baltimore Are Anonymous to Defendants**.

Plaintiffs relied on two pseudonymous declarants—E.A.M. and R.T.M.G.—without ever seeking leave of court. As explained in Part III.C below, pseudonymity is the exception, permitted only on a showing that the need for anonymity outweighs the public's interest in openness and the risk of unfairness to the opposing party. *Doe v. Pub. Citizen*, 749 F.3d 246, 273–74 (4th Cir. 2014); *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). Here, Defendants do not know the identity of these individuals and could not match them to intake records, test their claims, or investigate even the most basic factual assertions. And R.T.M.G. acknowledges that he

was asked health questions at the Salisbury office before he was brought to Baltimore. ECF No. 197-13.

In sum, although approximately 2,000 detainees spent time at the BHR during the relevant period of inquiry, Plaintiffs advanced only two declaration accounts that alleged a violation of the Court's medical screening requirement, both from declarants whose identities Defendants do not know and whose accounts Defendants therefore could not test.

Accordingly, the Court's determination that Plaintiffs established by clear and convincing evidence that Defendants violated the screening provision of the Court's PI order rests on a misapprehension of the record and amounts to clear error. Because the declarations were the principal basis for the finding of systemic noncompliance, the error was prejudicial to Defendants.

**A. Notice of Rights**

The notice finding suffers from the same defects, and the record on notice is stronger still. The Court credited Officer Burki's testimony that the Government "undertook to have the order translated and available," but found that staff did not "actually provide[] it as the notice of rights required by the order," relying on the declarations. Ruling Tr. 48:14–20. That finding cannot stand for four reasons. The documentary record shows that the two declarants whose files Defendants could investigate were given the order. The declarations, read as written, do not say what the Court construed them to say. The Court drew an inference from the absence of records it had told the parties it was not requiring. And what remains cannot carry Plaintiffs' clear-and-convincing burden.

**1. The Court overlooked documentary evidence that Mr. Gomez and Mr. Bermudez were given the notice.**

The Court stated that the Government's exhibit concerning Mr. Gomez was silent as to whether he received the notice of rights. Ruling Tr. 50:16–25. It is not. Defendants' Exhibit 7[a] records that on April 4, 2026, at 1500 hours, Mr. Gomez "refused to sign but did receive" his Notice to Appear, the Bautista notice in English and Spanish, and a copy of the D.N.N. preliminary injunction, which is the document that serves as the notice of rights. Defs.' Hr'g Ex. 7(a). Although the entry refers to him in part as "Garcia," it concerns Mr. Gomez. *See supra* Background I.A. [His book-in time, if the record shows the order was provided within one hour of entry.] Overlooking a contemporaneous government record that directly contradicts a declarant is an error of apprehension, not of judgment. *See Above the Belt*, 99 F.R.D. at 101.

The same is true of Mr. Bermudez. His declaration states that he received no paperwork about his rights. ECF No. 197-7 ¶ 7. The Government's records, which the Court accepted as authentic, show that he was offered a translated copy of the order bearing a signature line and his declination to sign it. Ruling Tr. 49:6–21; Defs.' Hr'g Ex. . The Court found that copy illegible and found that it was provided two days after his arrival. Ruling Tr. 49:6–21. Whatever those findings mean for Mr. Bermudez's individual case, they do not rehabilitate his declaration. He said he received nothing, and the Government's own record, which the Court credited, shows that he was handed the order and refused to sign for it. [If the illegibility reflects the quality of the copy reproduced in the record rather than the copy given to Mr. Bermudez, say so here, supported by a declaration.] That is the clearest illustration in this record of why an unsworn, untested statement that a detainee "received no paperwork" cannot be taken at face value.

**2. The declarations, read as written, do not establish that notice was not given.**

Of the eight declarants, only three (Gonzalez Vargas, Bermudez, and Bardales Pineda) state that they received no paperwork about their rights, and the Government's records contradict

one of them. Ruling Tr. 47:12–48:13. Three others (Lorenzo Cruz, Gomez, and Morocho) state that they *did* receive paperwork about their rights, specifically rights to appeal and to legal representation. *Id.* E.A.M. received paperwork about an upcoming detention hearing, and R.T.M.G. says nothing about notice at all. *Id.* By their own account, then, four of the seven declarants who addressed the subject received written paperwork at intake concerning their rights or their custody, and one of the three who said otherwise is contradicted by the record.

The Court did not explain how statements acknowledging receipt of rights paperwork establish that the notice was *not* provided. The notice is the Court's order itself, in English and Spanish. Hr'g Tr. 83:8–10, 102:2–15. A detainee handed a multi-page court order at intake, along with other documents, would not necessarily describe it as a "Notice of Rights," the label used in the case manager's question. He might naturally describe it as paperwork about appeal rights or legal representation. The point is not that every declarant necessarily received the order. It is that statements of this kind cannot distinguish a detainee who did not receive the notice from one who received it but did not recognize it by the name the case manager used. Without testimony capable of drawing that distinction, the declarations cannot establish no delivery by clear and convincing evidence.

**3. The Court drew an adverse inference from the absence of records it said it was not requiring.**

The Court also faulted the Government, "[w]hile not dispositive," for not supplementing the record with signed notices from detainee files. Ruling Tr. 48:21–49:2. But at the hearing, the Court said that such records would be "helpful" and stated that it was "not requiring" them. Hr'g Tr. 136:17–138:8. The Government reasonably relied on that statement. More fundamentally, the absence of documents the Government was told it need not produce says nothing about whether Plaintiffs, who bore the burden, proved nondelivery by clear and convincing evidence. *See*

*Ashcraft*, 218 F.3d at 301. To remove any doubt, Defendants now submit the records the Court described: [40] notices of rights from detainee files during the review period, each bearing the detainee's signature or an officer's notation of refusal. *See infra* Part V.

**4. Officer Burki's unrebutted testimony and the remaining declarations cannot support a clear-and-convincing finding.**

Officer Burki testified, without cross-examination on the point, that the notice is provided within one hour of entry in English and Spanish, with interpretation as needed, and that detainees sign an acknowledgment of receipt that is kept in the detainee file. Hr'g Tr. 83:8–10, 102:2–15. The Court found him credible as to the Government's efforts to translate the order and make it available. Ruling Tr. 48:14–20. AFOD White's declaration addressed the same practice. [ECF __ ¶ __]; *see* Hr'g Tr. 134:1–135:18. The Court nonetheless stated that no supervisor or officer responsible for day-to-day operations had offered an affidavit. Ruling Tr. 23:1–24:17, 29:6–8. Against this evidence stand two uncontradicted statements of nonreceipt, from Gonzalez Vargas and Bardales Pineda. Those statements further illustrate what was wrong in Mr. Bermudez's case, and they come from a population of approximately 2,000 detainees processed during the review period. [Record cite for the population figure.] Two untested, unsigned accounts cannot establish by clear and convincing evidence that the Government failed, as a matter of practice, to provide the notice the injunction requires. Accordingly, the notice finding should be vacated.

## II. THE UNSIGNED STATEMENTS COULD NOT, AS A MATTER OF LAW, SUPPORT CLEAR-AND-CONVINCING FINDINGS

The screening and notice findings rest principally on statements that were never subscribed by the declarants and therefore are not competent evidence under 28 U.S.C. § 1746. The Court considered them on the mistaken premise that they complied with the statute.

### A. The statements are not declarations under § 1746 and lack any legal indicia of reliability

*First*, the eight statements do not comply with § 1746. Section 1746 requires that a declaration be "subscribed by" the person making it. A declaration has the force of an affidavit only if the declarant subscribes it as true under penalty of perjury. At the hearing, Plaintiffs conceded that no declarant signed the documents and that counsel applied the e-signatures. Hr'g Tr. 8:17–21, 9:3–5. This is not a mere technical defect—it is a wholesale absence of the statutory requirement. Without a signature, there is no adoption of the contents, no penalty of perjury, and no assurance of personal knowledge. Courts have consistently held that a statement without the declarant's signature is not a declaration and cannot be treated as sworn testimony. *See Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306–07 (5th Cir. 1988) (unsworn statement that did not comply with § 1746 was not competent evidence); *Thompson v. City of Oakwood*, No. 3:16-cv-169, ECF No. 64 (S.D. March 1, 2017) (striking declarations not signed by the declarants); *see aslo, e.g., Wiingz & Thingz 1 v. Penn-Star Ins. Co.*, 5;47 F. App'x 766, 767 (6th Cir. 2013) (finding unsigned declaration has no evidentiary value); *Sfakianos v. Shelby Cnty. Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012)(affirming district court judgment discarding unsigned, unsworn affidavits and denying plaintiff's post-judgment attempt to cure these deficiencies). Moreover, although months passed between drafting and filing for several of the statements, Hr'g Tr. 9:1–15, the declarants still did not sign them. Under these circumstances, the more reasonable inference is that declarants would not adopt the statements as written.

*Second*, the Court considered the statements on a mistaken premise: that they complied with the statute. *See* Hr'g Tr. 16:22–24 (finding the declarations reliable "in terms of complying with the statutes"). Statements that do not comply with the statute are not capable, standing alone, of satisfying the clear-and-convincing standard. And yet, that is precisely what the Court rested its screening and notice findings on, referring to them as "the only record evidence based

on personal knowledge." *See* Ruling Tr. 45:24–46:2. Plaintiffs may respond that courts may consider hearsay at the preliminary-injunction stage. *See G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239 (2017). But this was not a preliminary-injunction proceeding. It was a contempt-based enforcement proceeding in which Plaintiffs bore the burden of proving each violation by clear and convincing evidence, and the Court itself cautioned that it would not necessarily apply the "laxity" it had applied at the preliminary-injunction stage. Hr'g Tr. 14:3–12. The question is not whether the statements could be considered at all. It is whether statements that no declarant ever adopted under penalty of perjury can, standing alone, satisfy that heightened standard. They cannot. Because the screening and notice findings rest principally on these statements, the error was prejudicial.

**B. The Court Relied on Improper Use of Pseudonymous Declarants**.

As explained above, pseudonymity here deprived Defendants of any ability to connect allegations with records. In *Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014), the Fourth Circuit identified the risk of unfairness to the opposing party as a central consideration in deciding whether to permit pseudonymity. 749 F.3d at 273–74. Here, Defendants were prevented from cross-referencing the declarant's allegations with intake logs, scrutinizing corresponding, relevant medical records or administrative history, verifying the timing of the provision of Notice of Rights or medical intake screening, or offering impeachment evidence undermining their claims.

Plaintiffs never moved for pseudonymity and made no showing of need. Their use of initials, whether strategic or not, allowed anonymous accusations to carry the same weight as sworn testimony (though as noted above, none of the testimony Plaintiffs offered was in fact

sworn, because of the defects common to all of the declarations). That is precisely the unfairness the pseudonymity analysis guards against. *Id*. Indeed, E.A.M.'s pseudonymous declaration is the only one alleging that the declarant was never screened at all. Yet the Court accepted its allegations in full. Crediting that account without any opportunity to test it was clear error.

**C. The Court Made Unsupported Credibility Findings**.

The Court found declarants "credible" because they purportedly had "everything to lose and nothing to gain." However, that finding flows from the erroneous premise that the declarations were legally sound, and it does not withstand scrutiny on its own terms.

**1. The unsigned statements mean declarants accepted no risk**.

Not a single declarant signed under penalty of perjury. As such, the single mechanism that would impose "something to lose"—a perjury penalty—was entirely avoided.

**2. Every statement was drafted by a case manager assisting Plaintiffs' counsel**.

The declarations are not independent, contemporaneous recollections but instead attorney-generated documents. Without signatures, a trier of fact cannot know whether the declarants reviewed the text, agreed with the text, understood the legal framing, or adopted the statements at all.

**3. The record contains multiple indicators of inaccuracy**.

The Court's motive finding also had the pernicious effect of creating a false binary—if the declarants had no motive to lie, their allegations were thus to be credited as sincere and true. But even sincere recollections can be mistaken, and here there were several instances in which that was demonstrably the case. For example, as discussed above, four declarants alleged that certain screening questions were not asked even though those questions appear on the same screening form alongside questions that they acknowledge were asked. These inconsistencies

reinforce why unsigned, advocate-drafted statements are an improper basis for the clear-and-convincing findings required here. And Mr. Bermudez stated that he received no rights paperwork, although the Government's records, which the Court accepted as authentic, show that he was offered the order and declined to sign it. *See supra* Part II.B.1.

## IV. THE COURT APPLIED THE WRONG STANDARD TO OFFICER BURKI'S KNOWLEDGE

In determining that Officer Burki lacked personal knowledge, the Court imposed a stricter knowledge standard on him than Rules 602 and 406 permit. Personal knowledge may be inferred from a witness's position and responsibilities. *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). Officer Burki spoke about the routine practices of the BHR on subject matter that he was responsible for overseeing. And routine practice may be proved "regardless of whether it was corroborated or whether there was an eyewitness." Fed. R. Evid. 406. Officer Burki supervised the hold rooms for months after entry of the Preliminary Injunction, oversaw daily operations, and communicated constantly with staff. [Hr'g Tr. __.] This is more than sufficient to satisfy Rule 602.

## III. THE DOCUMENTARY RECORD CONFIRMS THAT NOTICE AND SCREENING WERE ROUTINE PRACTICE AT THE HOLD ROOMS

Rule 54(b) permits the Court to revise an interlocutory order when "substantially different evidence" comes to light. *Carlson*, 856 F.3d at 325. Defendants submit two sets of records from the review period: [40] notices of rights from detainee files and [40] completed intake health screenings. [Ex. __ (declaration of records custodian explaining source and selection method).] [Describe what the records show, after verifying each one: e.g., each notice bears the detainee's signature or an officer's notation of refusal and was provided within one hour of book-in; each screening was completed within [__] hours of book-in; and each form

includes the mental-health and allergy questions the declarants say were not asked.] [A summary of the timing data is attached as Exhibit __. *See* Fed. R. Evid. 1006.] These are business records kept in the ordinary course, Fed. R. Evid. 803(6), and they are evidence of routine practice, Fed. R. Evid. 406.

Considering these records now is appropriate for two reasons. First, the Order turned on a distinction between the Government's written policy, which the Court found adequate, and its actual practice, which the Court found unproven. Ruling Tr. 38:4–8, 45:24–46:16. These records speak directly to actual practice. Second, Defendants did not hold them back. At the hearing, the Court observed that signed notices would be "helpful" but stated that it was "not requiring" them. Hr'g Tr. 136:17–138:8. The Order then counted their absence against the Government. Ruling Tr. 48:21–49:2. Fairness permits Defendants to supply what the Court said it did not require before it factoredtheir absence.

## VI. RELIEF REQUESTED

Defendants respectfully request that the Court (1) vacate its findings that Defendants violated the preliminary injunction's health-screening and notice-of-rights requirements, and modify the [Order, ECF __] to remove any relief premised on those findings.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for partial reconsideration.

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

WILLIAM C. SILVIS
Assistant Director

*s/_Brendan Moore*

BRENDAN MOORE
Trial Attorney
ANDREW C. ABRAMS
Trial Attorney
U.S. Dept. of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878
Washington, DC 20044
(202) 514-3097
Brendan.t.moore@usdoj.gov
Attorneys for Defendants